No. 25-2163

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

COMITÉ DIALOGO AMBIENTAL, INC.; ALIANZA COMUNITARIA AMBIENTALISTA DEL SURESTE, INC.; CAMPAMENTO CONTRA LAS CENIZAS EN PENUELAS, INC.; CASA TALLABOENA DE FORMACION COMUNITARIA Y RESILIENCIA, INC.; CENTER FOR BIOLOGICAL DIVERSITY; COMITE CABORROJENO PRO SALUD Y AMBIENTE, INC.; COMITE YABUCOENO PRO-CALIDAD DE VIDA, INC; EL PUENTE DE WILLIAMSBURG, INC.; FRENTE UNIDO PRO-DEFENSA DEL VALLE DE LAJAS, INC.,
*Plaintiffs-Appellees*,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY; DEPARTMENT OF HOMELAND SECURITY; KAREN EVANS, Acting Administrator, Federal Emergency Management Agency; KRISTI NOEM, Secretary, Department of Homeland Security,
*Defendants-Appellants*.

Appeal from the United States District Court for the District of Puerto Rico
Civ. A. No. 3:24-1145 (Hon. Jay A. Garcia-Gregory)

**OPENING BRIEF FOR APPELLANTS**

(*For appearances, see inside cover*.)

*Of Counsel:*

LAUREN GILLESPIE
KRISTINA PETT
*Attorneys*
Federal Emergency Management
Agency

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

ROBERT LUNDMAN
JACOB ECKER
CHRISTOPHER C. HAIR
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-9583
christopher.hair@usdoj.gov

*Counsel for Defendants-Appellants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

GLOSSARY .................................................................................................................x

INTRODUCTION ........................................................................................................1

STATEMENT OF JURISDICTION............................................................................3

STATEMENT OF THE ISSUES.................................................................................3

PERTINENT STATUTES AND REGULATIONS....................................................3

STATEMENT OF THE CASE....................................................................................4

      A.     Statutory and regulatory background ....................................................4

            1.     The Stafford Act.........................................................................4

            2.     The National Environmental Policy Act....................................5

      B.     Factual background ...............................................................................6

            1.     FEMA's Programmatic Environmental
                   Assessments supporting Puerto Rico's recovery ......................6

      C.     Proceedings below.................................................................................8

SUMMARY OF ARGUMENT ..................................................................................10

STANDARD OF REVIEW ........................................................................................12

ARGUMENT ..............................................................................................................13

I.     Plaintiffs lack standing. ..................................................................................13

      A.     Plaintiffs' injuries related to climate change are neither
             imminent nor fairly traceable to FEMA's funding
             decisions. .............................................................................................15

B.     Plaintiffs' injuries from fossil fuels are not traceable to FEMA's funding decisions..................................................................17

C.     A favorable ruling for Plaintiffs would not result in rooftop solar development..........................................................21

D.     Plaintiffs cannot rely on procedural injuries alone to establish standing. ...............................................................23

II.     FEMA's NEPA analysis is adequate. .............................................25

A.     NEPA does not require FEMA to consider rooftop solar energy generation alternatives...........................................30

B.     FEMA appropriately considered required mitigation measures. ........................................................................37

C.     FEMA reasonably concluded that the effects of its funding decisions were not significant...............................40

III.     The District Court Erred in Requiring an EIS ................................45

CONCLUSION......................................................................................47

CERTIFICATE OF COMPLIANCE......................................................48

ADDENDUM ........................................................................................49

# TABLE OF AUTHORITIES*

## Cases

*Allen v. Wright*,
    468 U.S. 737 (1984)...........................................................................19

*Am. Electric Power Co. v. Connecticut*,
    564 U.S. 410 (2011)...........................................................................17

*Antilles Cement Corp. v. Fortuño*,
    o, 670 F.3d 310 (1st Cir. 2012)......................................................21

*Appalachian Voices v. Fed. Eenergy Reg. Comm'n*,
    139 F.4th 903 (D.C. Cir. 2025)........................................................5

*ASARCO, Inc. v. Kadish*,
    490 U.S. 605 (1989)....................................................................10, 19

*Badger Helicopters Inc. v. Federal Aviation Admin.*,
    154 F.4th 902 (8th Cir. 2025) .........................................................27

*Bennett v. Spear*,
    520 U.S. 154 (1997)..........................................................................18

*Beyond Nuclear v. Nuclear Reg. Comm'n*,
    704 F.3d 12 (1st Cir. 2013)..............................................................36

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) .........................................................39

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
    153 F.4th 869 (9th Cir. 2025).........................................................27

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ..................................................45, 46

---

* Authorities upon which we chiefly rely are marked with asterisks.

City of *Dania Beach v. Federal Aviation Admin.*,
485 F.3d 1181 (D.C. Cir. 2007)................................................................24

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013)................................................................18, 19

*Ctr. for Biological Diversity v. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009)................................................................10, 15

*Dantzler, Inc. v. Berríos Inventory and Operations, Inc.*,
958 F.3d 38 (1st Cir. 2020)................................................................19

*Dep't of Transp. v. Public Citizen*,
541 U.S. 752 (2004)................................................................12, 46

*Donahue v. City of Bos.*,
304 F.3d 110 (1st Cir. 2002)................................................................18

*Draper v. Healey*,
827 F.3d 1 (1st Cir. 2016)................................................................13

*Dubois v. Dep't of Agriculture*,
102 F.3d 1273 (1st Cir. 1996)................................................................32, 33

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)................................................................21

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996)................................................................16

*\*Florida Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)................................................................12, 46

*Food & Water Watch v. USDA*,
1 F.4th 1112 (D.C. Cir. 2021)................................................................25

*Friends of the Earth v. Laidlaw Env'tl Servs. (TOC)*,
528 U.S. 167 (2000)................................................................15, 17, 26

*Grazing Fields Farm v. Goldschmidt*,
626 F.2d 1068 (1st Cir. 1980)................................................................36

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
844 F.3d 1095 (9th Cir. 2016) ...................................................................40

*Katz v. Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012)...............................................................18, 21

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976).........................................................................28, 39

*Lovgren v. Locke*,
701 F.3d 5 (1st Cir. 2012).......................................................................27

*\*Lujan v. Defs. Of Wildlife*,
504 U.S. 555 (1992)............................................................10, 16, 18, 24

*Massachusetts v. EPA*,
549 U.S. 497 (2007).........................................................................17, 25

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean
Energy Mgmt.*,
675 F. Supp. 3d 28 (D. Mass. 2023).......................................................21

*Neighbors of the Mogollon Rim v. Forest Serv.*,
Civ. A. No. 22-15259, 2023 WL 3267846 (9th Cir. 2023) .........................47

*Quinonez-Lopez v. Coco Lagoon Dev. Corp.*,
733 F.2d 1 (1st Cir. 1984).................................................................13, 41

*Reddy v. Foster*,
845 F.3d 493 (1st Cir. 2017)...................................................................23

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)......................................................................5, 24, 39

*Roosevelt Campobello Int'l Park v. EPA*,
684 F.2d 1041 (1st Cir. 1982)..................................................................30

*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v.
Fed. Aviation Admin.*,
651 F.3d 202 (1st Cir. 2011)....................................................................39

*Seacoast Anti-Pollution League v. Nuclear Reg. Comm'n,*
598 F.2d 1221 (1st Cir. 1979)......................................................33

*\*Seafreeze Shoreside, Inc. v. Dep't of Interior,*
123 F.4th 1 (1st Cir. 2024) ...............................12, 30, 31, 36, 40

*Segrets, Inc. v. Gillman Knitwear Co.,*
207 F.3d 56 (1st Cir. 2000)........................................................12

*\*Seven County Infrastructure Coal. v. Eagle County,*
605 U.S. 168 (2025)................. 1, 2, 5, 6, 9, 11, 12, 13, 26, 29, 30, 42, 44, 46

*Shenandoah Valley Network v. Capka,*
669 F.3d 194 (4th Cir. 2012) ...............................................28, 44

*Shinseki v. Sanders,*
556 U.S. 396 (2009)..................................................................32

*Sierra Club v. Espy,*
38 F.3d 792 (5th Cir. 1994) .......................................................29

*Sierra Club v. Fed. Energy Regulatory Comm'n,*
867 F.3d 1357 (D.C. Cir. 2017)..................................................38

*Sierra Club v. Marsh,*
769 F.2d 868 (1st Cir. 1985)...................................12, 37, 38, 46

*Sierra Club v. Marsh,*
872 F.2d 497 (1st Cir. 1989)........................................................5

*Sierra Club v. United States Army Corps of Eng'rs,*
997 F.3d 395 (1st Cir. 2021).......................................................43

*Sierra Club v. Wagner,*
555 F.3d 21 (1st Cir. 2009)...........................................................5

*Simon v. E. Ky. Welfare Rights Org.,*
426 U.S. 26 (1976)........................................................11, 21, 23

*Society Hill Powers Owners' Ass'n v. Rendell,*
210 F.3d 168 (3rd Cir. 2000)......................................................42

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)........................................................13, 15, 24

*Town of Winthrop v. Federal Aviation Admin.*,
535 F.3d 1 (1st Cir. 2008)...............................................11, 24, 36

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..................................................................13

*Valley Citizens for a Safe Env't v. Aldridge*,
886 F.2d 458 (1st Cir. 1989).....................................................32

*W. Org. of Res. Councils v. Zinke*,
892 F.3d 1234 (D.C. Cir. 2018)................................................29

*Warth v. Seldin*,
422 U.S. 490 (1975)..................................................................18

*Wash. Env't Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) ..................................................16

*WildEarth Guardians v. U.S. Forest Serv.*,
70 F.4th 1212 (9th Cir. 2023) ...................................................24

*Wilkins v. Genzyme Corp.*,
93 F.4th 33 (1st Cir. 2024) ........................................................12

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
418 F.3d 36 (1st Cir. 2005).......................................................18

*Winter v. NRDC*,
555 U.S. 7 (2008).......................................................................45

**Statutes**

28 U.S.C. § 1291 ............................................................................3

28 U.S.C. § 1331 ............................................................................3

42 U.S.C. 4336(b)(2)......................................................................5

42 U.S.C. § 4332(2)(C) ...........................................................5

42 U.S.C. § 5121 ...............................................................4

42 U.S.C. § 5170c ..............................................................4

42 U.S.C. § 5170c(a) .........................................................34

42 U.S.C. § 5172(a)(1)(A) .........................................31, 33, 34

42 U.S.C. § 5172(e)(1)(A) ...............................................4, 34

42 U.S.C. § 5721 ...............................................................1

# Rules

Fed. R. App. P. 4(a)(1)(B) ..................................................3

# Regulations

40 C.F.R. § 1508.27 (2020) ...............................................42

40 C.F.R. § 1508.27(b)(3) (2020) .....................................44

40 C.F.R. § 1508.27(b)(5) (2020) .....................................44

40 C.F.R. § 1508.28 (2020) ...............................................28

44 C.F.R. § 206.201(i) .............................................4, 31, 1

44 C.F.R. § 206.226 .........................................................4

44 C.F.R. § 206.226(e) .....................................................4

44 C.F.R. § 206.203(d)(2) ...............................................35

# Other Authorities

82 Fed. Reg. 46, 820-02 (Oct. 6, 2017) ............................6

91 Fed. Reg. 618 (January 8, 2026) .................................41

Pub. L. No. 118-5, § 111, 137 Stat. 10, 45-46 (2023) ...............................................5

# GLOSSARY

FEMA   Federal Emergency Management Agency

NEPA   National Environmental Policy Act

PEA   Programmatic Environmental Assessment

EIS   Environmental Impact Statement

## INTRODUCTION

Hurricanes Irma and Maria struck Puerto Rico in September 2017, causing significant damage to Puerto Rico's aging infrastructure. As part of its emergency response, the Federal Emergency Management Agency (FEMA) prepared to provide speedy financial assistance to Puerto Rico to repair and rebuild disaster-damaged utilities and restore power. To facilitate rapid funding decisions, FEMA conducted an environmental review of its financial assistance via a Programmatic Environmental Assessment (PEA), which assessed anticipated project proposals for restoring utilities and, ultimately, determined that no significant environmental impacts would result from restoring the status quo.

Plaintiffs, several environmental groups, challenged FEMA's environmental assessment under the National Environmental Policy Act (NEPA). In the main, Plaintiffs allege that FEMA failed to consider renewable energy alternatives—specifically, rooftop solar and storage. But Plaintiffs lack standing to bring their claims because, among other things, FEMA does not decide which proposals to submit for funding and a favorable ruling will not bring forth applications for renewable energy generation, which are otherwise absent.

On the merits, just last year the Supreme Court held that "the central principle of judicial review in NEPA cases is deference." *Seven County Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 179 (2025). The Court

admonished at length that courts have improperly used NEPA to "hinder[] infrastructure development 'under the guise' of just a little more process," and that a "course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense." *Id.* at 184. Yet despite briefing on *Seven County*, the district court somehow neglected to even cite the case, much less comply with its instructions.

In direct contradiction of recent and controlling Supreme Court precedent, the district court's flyspecking of FEMA's time-sensitive determinations plainly failed to provide sufficient deference to the agency. Contrary to the district court's second-guessing, FEMA performed a sufficiently detailed NEPA analysis— including an analysis of alternatives based on reasonably anticipated project proposals, not hypothetical ones. Requiring FEMA to exhaustively identify, evaluate, and exclude all hypothetical alternatives—like rooftop solar—would impede the agency's core function of managing emergencies. Finally, even if FEMA's environmental analysis fell short (it didn't), the district court should have remanded to the agency for further explanation instead of requiring a full Environmental Impact Statement (EIS). The court's remedy improperly frustrates drastically needed infrastructure development "'under the guise' of just a little more process." *Id.*

This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. The district court entered a final judgment on October 2, 2025, (Addendum at 1), and FEMA filed a timely notice of appeal on December 1, 2025, (JA73); *see also* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether Plaintiffs have standing based on injuries caused by pollution and other impacts from Puerto Rico's pre-existing utilities infrastructure that will likely continue regardless of a favorable ruling here.

2.     Whether the district court erred in finding FEMA failed to satisfy NEPA where the agency (a) is entitled to significant deference in shaping its environmental review; (b) declined to consider hypothetical renewable energy alternatives after determining that such funding proposals were unlikely; and (c) considered mitigation measures for construction activities required by applicable permits.

3.     Whether the district court erred in requiring FEMA to prepare an Environmental Impact Statement.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

**STATEMENT OF THE CASE**

**A.      Statutory and regulatory background**

**1.              The Stafford Act**

The Stafford Act, 42 U.S.C. § 5121 *et seq.*, authorizes the President to

declare a major disaster or emergency upon request of the governor of the State in

which the disaster occurred.  After a disaster is declared, FEMA provides financial

assistance for emergency work (e.g., debris removal) and permanent work (e.g.,

restoring public utilities, buildings, roads, etc.).  For permanent work, the Stafford

Act authorizes FEMA to fund "[t]he cost of repairing, restoring, reconstructing, or

replacing a public facility on the basis of the design of such facility as it existed

immediately before the major disaster[.]"  42 U.S.C. § 5172(e)(1)(A); *see also* 44

C.F.R. § 206.201(i) (defining "permanent work" as "restoration of damaged

facilities through repair or replacement to pre-disaster design, in accordance with

eligible costs").  Accordingly, FEMA's Public Assistance program authorizes

funding to restore facilities "as they existed immediately prior to the disaster[.]"

44 C.F.R. § 206.226.  FEMA also may utilize its Hazard Mitigation program,

which permits the agency to consider proposals to implement hazard mitigation

measures that are not otherwise required by local codes and standards so long as

they are cost effective.  *See* 42 U.S.C. § 5170c; 44 C.F.R. § 206.226(e).

## 2. The National Environmental Policy Act

"NEPA is a *purely procedural statute.*" *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025) (emphasis in original); *see also Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989). The statute "'does not mandate particular results, but simply prescribes the necessary process' for an agency's environmental review of a project." *Seven Cnty.*, 605 U.S. at 177 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). NEPA requires an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may prepare an Environmental Assessment (EA) instead of an EIS for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown. *Sierra Club v. Wagner*, 555 F.3d 21, 24 (1st Cir. 2009). An EA is a "concise public document" that "set[s] forth the basis of [an] agency's finding of no significant impact or a determination that an environmental impact statement is necessary." 42 U.S.C. 4336(b)(2). Congress extensively amended NEPA in 2023, adding this definition of an EA and making other changes. Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 111, 137 Stat. 10, 45-46 (2023). These amendments modified existing judicial interpretations of NEPA. *See Appalachian Voices v. Fed. Energy Reg. Comm'n*, 139 F.4th 903, 927 (D.C. Cir. 2025)

(Henderson, J., concurring) (observing that NEPA's 2023 amendments superseded some NEPA precedent).

The Supreme Court has cautioned that federal courts "'play only a limited role'" in assessing agency compliance with NEPA's requirements. *Seven Cnty.*, 605 U.S. at 173, 179 n.2 (citation omitted). That role "is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project" and "reasonably explained" its decision. *Id.* at 180.

## B. Factual background

### 1. FEMA's Programmatic Environmental Assessments supporting Puerto Rico's recovery

The President's Stafford Act declarations for Hurricanes Irma and Maria authorized FEMA to deliver public assistance funding to Puerto Rico to repair disaster-damaged facilities. *Presidential Decl. Puerto Rico; Major Disaster & Related Determinations*, 82 Fed. Reg. 46,820-02 (Oct. 6, 2017). FEMA prepared two PEAs to streamline NEPA compliance for common types of disaster projects that the agency anticipated it would fund in Puerto Rico—one focusing on restoring Puerto Rico's public facilities and one on utilities. *See* JA206; JA864. To receive FEMA's financial assistance, applicants propose projects to FEMA, and the agency determines whether each project meets "the scope, impacts, and mitigation" considered by the PEAs, among other eligibility requirements. JA206; JA768. Puerto Rico's primary stakeholders in this effort are its Central Office of

Recovery, Reconstruction and Resiliency (COR3), which coordinates the Territory's efforts on this front, along with the entities that COR3 distributes funds to, including the Puerto Rico Electric Power Authority (PREPA). *Id.*

At issue in this appeal is FEMA's Utility Repair, Replacement, and Realignment PEA (the "Utilities PEA"). The purpose of the PEA is to "restore damaged utilities in Puerto Rico and increase their resiliency for future weather events." JA207. The Utilities PEA is necessary to fund projects to quickly "restore damaged utilities in Puerto Rico and increase their resiliency for future weather events." *Id.* FEMA was clear about the urgent need to "re-establish a safe and reliable network of utilities (through repair, replacement, or relocation) in order to reconnect the communities affected by the storm with safe and efficient delivery of energy[.]" *Id.*

FEMA considered four alternatives in the Utilities PEA, including a "no-action" alternative where FEMA would provide no funding. JA209. As a second alternative, FEMA considered projects that would repair, replace, and upgrade utilities by installing new equipment such as utility poles, flood barriers, and high-capacity pumps; burying utility lines in trenches that are 55 inches below land surface; and replacing stormwater, potable water, and wastewater systems. JA210-13. FEMA's third alternative involved realigning or relocating the utilities within 200 feet of an existing right-of-way. JA213. This alternative also considered

"supplemental power generation projects," most notably "rooftop solar" installation on "stable, durable structures that can support the array and withstand wind, rain, hail, and corrosion." JA214. Finally, as a fourth alternative, FEMA considered a combination of all alternatives (except for the "no action" one). JA215.

Because FEMA's aim was to quickly restore utilities to aid Puerto Rico's recovery, the agency acknowledged the possibility that a "more substantive" future proposal may well exceed the scope of the Utilities PEA. JA206. Accordingly, FEMA left open the possibility of preparing a tiered or supplemental NEPA review for a future proposal that would "exceed the capacity of the existing utility system, such that it requires a significant expansion of infrastructure" and would thus exceed the scope of the Utilities PEA. JA261.

### C. Proceedings below

Plaintiffs, consisting of several environmental and conservation advocacy groups, sued in 2024 to challenge both FEMA's Public Facilities PEA and Utilities PEA under NEPA. JA13. Specifically, Plaintiffs claimed that FEMA had conducted an inadequate NEPA analysis and was required to complete a full EIS to, among other things, consider renewable energy alternatives as part of its funding decisions supporting Puerto Rico's efforts to rebuild its energy grid. JA64-68. The parties cross-moved for summary judgment and, after summary

judgment briefing closed, submitted supplemental briefs addressing the Supreme Court's decision in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025).

The district court granted both parties' summary judgment motions in part and denied them in part. First, the district court concluded that Plaintiffs had standing. Mem. & Order at 3-6 (*see* Addendum at 2). Even though Puerto Rico provided no proposals to rebuild its energy grid with renewable energy sources, the court determined that Plaintiffs' harm (i.e., the lack of funding options for renewables) could be fairly traced to FEMA's funding decisions because of FEMA's influence over the types of proposals Puerto Rico submitted. *Id.* at 4. For redressability, the court found it was sufficient for Plaintiffs to show that more environmental analysis could influence FEMA's funding decisions. *Id.* at 6.

On the merits, the district court ruled that the Public Facilities PEA complied with NEPA's requirements but found the opposite for the Utilities PEA. The court held that FEMA's funding decisions contemplated by the Utilities PEA would significantly affect the environment because of the potential consequences involved with the operation (and/or failure) of the electrical power grid. *Id.* at 9-10. Therefore, in the district court's view, FEMA should have prepared an EIS. *Id.* at 10. The court also found that so-called "intensity factors" under NEPA's implementing regulations supported the preparation of an EIS. *Id.* at 11; *see also*

*infra* p. 41 n. 5 (noting that those regulations have since been rescinded).  Next, the court found that FEMA should have considered an alternative project to rebuild Puerto Rico's electrical grid with renewable energy.  *Id.* at 11-15.  Finally, the court found that FEMA had improperly relied on vague mitigation measures, especially in instances where the agency had concluded there could be environmental impacts.  *Id.* at 14-15.

As a remedy for the identified NEPA violations, the district court remanded the Utilities PEA to FEMA and directed FEMA to prepare an EIS, but the court did not vacate any of FEMA's funding decisions.

## SUMMARY OF ARGUMENT

1.      Plaintiffs lack standing.  For starters, Plaintiffs injuries related to climate change are insufficiently imminent or particularized to support an Article III injury here.  *See Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009).  Plaintiffs' remaining injuries based on Puerto Rico's pre-existing utilities infrastructure are not fairly traceable to FEMA because its role is limited to reviewing funding proposals made by "independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989)).  Moreover, Plaintiffs' alleged injuries are not redressable where Puerto Rico is

currently dependent on fossil fuels for energy generation and no proposals to FEMA for renewables are reasonably anticipated in the near term. Thus, Plaintiffs can only speculate that a favorable decision would redress their injuries by spurring a transition to rooftop solar. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976). Finally, absent any traceable and redressable injury, any procedural injury under NEPA is insufficient to establish standing here. *Town of Winthrop v. Federal Aviation Admin.*, 535 F.3d 1, 6 (1st Cir. 2008).

2.    On the merits, the district court erred in failing to afford FEMA's line-drawing choices "the substantial judicial deference required in NEPA cases," *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 174 (2025). Indeed, the district court did not even cite the Supreme Court's "course correct[ing]" decision in *Seven County. Id.* at 184. Moreover, the court erred in finding that NEPA required FEMA to consider the potential for hypothetical renewable energy proposals like one to construct rooftop solar generation. Consistent with the text of the Stafford Act, the Utilities PEA analyzed FEMA's funding of Puerto Rico's considered efforts to re-establish a safe and reliable network of utilities and restore power to local communities. FEMA reasonably concluded that large-scale energy generation projects—including renewables—were unlikely based on anticipated proposals by Puerto Rico's stakeholders. Thus, FEMA appropriately gave "substantial weight" to those anticipated proposals in deciding which alternatives

11

to evaluate.  *Seafreeze Shoreside, Inc. v. Dep't of Interior*, 123 F.4th 1, 22 (1st Cir. 2024).  FEMA also reasonably considered required mitigation measures and best management practices in evaluating the environmental impacts of the proposed projects.  *Sierra Club v. Marsh,* 769 F.2d 868, 877 (1st Cir. 1985).

3.    Finally, the district court improperly required FEMA to prepare an EIS instead of remanding for additional analysis.  Under *Seven County*, it is FEMA's prerogative to "'determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process.'"  *Seven County,* 605 U.S. at 181 (quoting *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004) (emphasis added).  FEMA's finding that the proposed projects would not result in any significant environmental impacts is well supported by the record and fully consistent with NEPA's implementing regulations in effect at the time.  Even if some aspect of FEMA's NEPA analysis was lacking, the district court should have remanded the Utilities PEA "for additional investigation or explanation" instead of requiring an EIS.  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985).

## STANDARD OF REVIEW

This Court decides subject matter jurisdiction, including standing, de novo. *Wilkins v. Genzyme Corp.*, 93 F.4th 33, 40 (1st Cir. 2024).  This Court reviews a district court's grant or denial of summary judgment de novo.  *Segrets, Inc. v.*

*Gillman Knitwear Co.*, 207 F.3d 56, 61 (1st Cir. 2000).  Compliance with NEPA is reviewed under the Administrative Procedure Act's deferential "arbitrary, capricious, [] abuse of discretion" standard.  *See Quinonez-Lopez v. Coco Lagoon Dev. Corp.*, 733 F.2d 1, 2 (1st Cir. 1984) (quoting 5 U.S.C. § 706(2)(A)).  "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven County,* 605 U.S. at 180 (citation omitted).

## ARGUMENT

### I.    Plaintiffs lack standing.

To demonstrate Article III standing, a plaintiff must establish (i) an "injury in fact that is concrete, particularized, and actual or imminent" (ii) "that the injury was likely caused by the defendant," and (iii) that the "injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  Organizations (like Plaintiffs here) can establish "associational standing" if, among other requirements, at least one of their members meets the requirements for standing.  *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016).

Plaintiffs rely on several declarations from their members in their attempt to establish standing.  Plaintiffs' members allege injuries that fall into one of four categories: (1) adverse health impacts from pollution and coal ash from fossil-fuel

power plants; (2) health and safety impacts from blackouts and reduced power reliability from those power plants; (3) ecological, aesthetic, and safety impacts from transmission lines; and (4) impacts to species Plaintiffs observe caused by climate change or local pollution.[2] Plaintiffs believe that solar installations on the rooftops of building "can help with many of these problems." *See, e.g.*, Gonzalez Garcia Decl. ¶ 14, JA103. Plaintiffs further assert that, if FEMA were to fund projects to build rooftop solar projects, that would "reduce the greenhouse gas emissions and other pollution that come from burning fossil fuels and help to make [Puerto Rico's] communities cleaner and safer" without the need for transmission lines. *Id.* ¶ 15, JA103; *see also* Alvarado Guzmán Decl. ¶ 10, JA107 ("It is [] critical that FEMA funding be used for rooftop solar projects rather than for large, utility-scale solar installations."). Plaintiffs' declarations fall short of establishing their standing to sue for several reasons.

---

[2] *See, e.g.,* Decl. of Timmy Boyle ¶¶ 4-12, JA86-88; Decl. of José Manuel Díaz Pérez ¶¶ 5-14, JA89-90; Decl. of Lydia Diaz Rodriguez ¶¶ 3-8, JA92-93; Decl. of Peter Galvin ¶ 6, JA97; Decl. of Frank Gonzalez Garcia ¶¶ 4-16, JA100-03; Decl. of Victor Alvarado Guzmán ¶¶ 4-10, JA105-07; Decl. of Sirena Montalvo Katz ¶¶ 7-12, JA109-10; Decl. of Federico Cintrón Moscoso ¶¶ 6-22, JA112-15; Decl. of Jose Vargas ¶¶ 4-10, JA116-18; Decl. of Carlos Alvredo Vivoni ¶¶ 8-9, JA120-21.

**A.    Plaintiffs' injuries related to climate change are neither imminent nor fairly traceable to FEMA's funding decisions.**

To begin, Plaintiffs' alleged climate-change injuries are insufficient to establish an "imminent" injury traceable to the challenged FEMA funding decisions.  For example, one of Plaintiffs' members, Carlos Alfredo Vivoni, testifies that "burning fossil fuels contributes to global warming," and causes more hurricanes and increased ocean temperatures and acidity.  Alfredo Vivoni Decl. ¶ 8, JA120.  This warming, Plaintiffs say, impacts fish and coral reef habitats and other specifics.  *Id.*; *see also* Gonzalez Garcia Decl. ¶ 5, JA100 ("Burning fossil fuels also causes climate change, which causes many harms to our island and its biodiversity."); *id.* ¶ 7, JA101 (alleging that "climate change and pollution from the fossil fuel power plants in Puerto Rico are harming [] rare birds")

These climate change injuries are not the sort of "imminently threatened" injuries required for standing.  *Summers,* 555 U.S. at 492.  It is well established that an injury must be "concrete and particularized," "actual or imminent," and neither "conjectural [n]or hypothetical."  *Friends of the Earth v. Laidlaw Env'tl Servs. (TOC)*, 528 U.S. 167, 180-81 (2000).  But here, Plaintiffs' injuries tied to impacts from climate change are too hypothetical to support standing.  *See Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (no standing where petitioners averred only that adverse effects of climate change "may" occur at some point in the future).  Plaintiffs fail to show with meaningful

15

specificity any connection between the harm they allege and any of the specific proposals considered by FEMA as part of the Utilities PEA.  Therefore, Plaintiffs cannot show that these general impacts affect them in a "personal and individual way."  *Lujan*, 504 U.S. at 560 n. 1; *see Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (explaining that standing in a NEPA matter "focuses on whether appellants have shown a particularized environmental interest of theirs that will suffer demonstrably increased risk").

Even if Plaintiffs could make out an imminent climate change injury, it would nevertheless fail to support standing because it is implausible to allege that the specific projects considered here by FEMA—which are limited to utilities projects on the island of Puerto Rico—would themselves cause global climate change or any of Plaintiffs' alleged harms.  Plaintiffs offer only "vague, conclusory statements" that FEMA's funding decisions to restore some fossil fuel-based utilities "contributes to greenhouse gas emissions, which in turn contribute to climate-related changes that result in their purported injuries."  *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013).  That is not enough.  *Id.* at 1143 ("[S]imply saying that [the government has] failed to curb emission of greenhouse gases, which contribute (in some undefined way and to some

undefined degree) to their injuries, relies on an attenuated chain of conjecture insufficient to support standing." (cleaned up)).[3]

"The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181. Besides, the global nature of climate change means that impacts are notoriously impossible to tie to any particular source. *See Am. Electric Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) (noting that "emissions in New Jersey may contribute no more to flooding in New York than emissions in China"). Thus, to the extent Plaintiffs' alleged injuries rely on climate change impacts, those injuries do not support their Article III standing.

### B. Plaintiffs' injuries from fossil fuels are not traceable to FEMA's funding decisions.

For Plaintiffs' remaining injuries (i.e., those tied to fossil fuel pollution, transmission lines, or power outages), Plaintiffs cannot show that they are traceable to FEMA's funding decisions and supporting NEPA analysis. The "traceability" or causation element "requires the plaintiff to show a sufficiently direct causal

---

[3] The Supreme Court's decision in *Massachusetts v. EPA* does not help Plaintiffs' standing in this csae. 549 U.S. 497, 526 (2007) (holding that Massachusetts had standing to challenge an EPA order declining to regulate greenhouse gas emissions from motor vehicles under the Clean Air Act). That is because "States are not normal litigants for the purposes of invoking federal jurisdiction," and that given "Massachusetts' stake in protecting its quasi-sovereign interests, [it] is entitled to special solicitude in [a] standing analysis." *Id.* at 518, 520.

connection between the challenged action and the identified harm." *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012). That connection "cannot be overly attenuated." *Id.* (quoting *Donahue v. City of Bos.*, 304 F.3d 110, 115 (1st Cir. 2002)). Moreover, as especially relevant here, "causation is absent if the injury stems from the independent action of a third party," *id.* at 71-72, so long as the injury is not the product of the challenged action's "coercive effect," *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 45 (1st Cir. 2005) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Here, Plaintiffs are not the object of FEMA's funding decisions. Rather, those decisions are based on the proposals put forth by Puerto Rico's stakeholders, including COR3 and PREPA. Accordingly, standing is "substantially more difficult" to establish. *Lujan*, 504 U.S. at 562. That is because a plaintiff whose alleged injury hinges on actions taken by a third party must "adduce facts showing that those [third party] choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 505 (1975)); *see also Clapper v. Amnesty Int'l*, 568 U.S. 398, 413-14 (2013) (emphasizing the Supreme Court's traditional "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

The district court concluded that FEMA's funding decisions can serve as a "substantial motivating factor" regarding the decisions of power generation entities. Mem. & Order at 4. Tellingly, the district court cited no evidence for this conclusory statement. Moreover, FEMA's role is limited to reviewing funding proposals made by "independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989)). As FEMA explained to Congress, those decisions are "made by the Commonwealth of Puerto Rico and PREPA in determining the type of power grid" it prefers and "FEMA does not play a role in determining what that decision is nor authorizes the use of funding for projects outside the eligible parameters adopted in FEMA policy." JA380. Plaintiffs have failed to provide any evidence that FEMA has any influence over Puerto Rico's decisions regarding which project proposals to submit for approval. The district court's contrary conclusion assumes—without evidence—that FEMA has a policymaking role regarding Puerto Rico's energy future. That is incorrect, which dooms Plaintiffs' attempt to establish standing here. *See Dantzler, Inc. v. Berríos Inventory and Operations, Inc.*, 958 F.3d 38, 48 (1st Cir. 2020) (citing *Allen v. Wright*, 468 U.S. 737, 757-59 (1984) (finding the "links in the chain of causation" between the challenged conduct and the alleged injury "far too weak for the chain as a whole to sustain . . . standing" where the

19

chain involved "numerous third parties" whose independent actions had an uncertain and speculative effect).

Finally, Plaintiffs have identified only two specific projects under the Utilities PEA that have allegedly harmed them. First, Plaintiffs allege that the Aguirre Power Plant threatens nearby marine life and produces disturbing noises, smells, and air pollution. *See* 2d Decl. of Alvarado Guzmán ¶¶ 4-5, JA157. Although FEMA has funded repairs to that facility, Plaintiffs assume without evidence that if FEMA were to invest in rooftop solar, the power plant "might be able to come out of service faster" than its soon-anticipated retirement. *Id.* ¶ 6. This assertion does no more than speculate about the economic decisions of third parties.

So too with Plaintiffs' alleged harm related to the Cataño Substation facility. *See* Aviles- Ríos Decl. ¶ 6, JA159. Plaintiffs assume that some "kind of explosion" may occur at the facility (*id.* ¶ 7), but adduce no allegations or evidence whatsoever that an explosion is likely. Plaintiffs fare no better in claiming that "[t]oo much" of the substation is paved with impermeable surfaces, for which Plaintiffs "*hope* the area could be restored" to permit proper drainage that "*might* help with residential flooding in the area." *Id.* ¶ 8 (emphasis added). Even if those concerns were not overly speculative, nowhere do Plaintiffs connect the dots between FEMA's limited funding decisions related to the Cataño Substation to

20

their alleged harms.  *See Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28, 51 (D. Mass. 2023) (no standing where plaintiffs failed to provide evidence that agency action would impair air quality), *aff'd*, 100 F.4th 1 (1st Cir. 2024).  "The causation requirement [] rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish [] standing."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

### C.   A favorable ruling for Plaintiffs would not result in rooftop solar development.

For similar reasons, Plaintiffs also flunk the redressability requirement of standing.  To satisfy this requirement, a plaintiff must show "that a favorable resolution of [its] claim would likely redress the professed injury."  *Katz*, 672 F.3d at 72.  This requirement is a "matter of degree," *id.*, and a plaintiff "need not definitively demonstrate that a victory would completely remedy the harm."  *Antilles Cement Corp. v. Fortuño,* 670 F.3d 310, 318 (1st Cir. 2012).  Nevertheless, it cannot be merely speculative that, if a court grants the requested relief, the injury will be redressed.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976).

Plaintiffs' declarations claim that their preferred energy source—rooftop solar—would ameliorate many of the problems they allege.  *See* González García Decl. ¶ 15, JA103 ("If FEMA helps to build rooftop solar [in Puerto Rico], it will

21

also reduce the greenhouse gas emissions and other pollution that come from burning fossil fuels and help to make our communities cleaner and safer."); Alvarado Guzmán Decl. ¶ 10, JA107 ("It is [] critical that FEMA funding be used for rooftop solar projects rather than for large, utility-scale solar installations."); Montalvo Katz Decl. ¶ 12, JA110 (similar); Cintrón Moscoso Decl. ¶ 21, JA114 (claiming that using FEMA's funding for rooftop solar would promote "security" and "health"); Jose Vargas Decl. ¶ 10, JA118 ("Speeding a transition to rooftop solar will also help reduce the pollution from fossil fuels[.]").

The problem for Plaintiffs is that Puerto Rico is primarily reliant on fossil fuels in the near term and investing in other energy sources would take time. *See* JA579 (noting that power in Puerto Rico "is derived from 98 percent fossil fuels (petroleum fuel, natural gas, and coal"). As discussed, FEMA has no decision-making role in deciding which projects are submitted and no rooftop solar proposals have been submitted for FEMA's approval to date. To be sure, Puerto Rico's stakeholders expressed an interest in renewable energy sources. *See, e.g.*, JA507; JA636. And Plaintiffs submitted comments urging FEMA's consideration of solar energy alternatives. JA395. But that does not change the fact that Puerto Rico is primarily dependent on fossil fuels. The record shows that investing in new infrastructure to support solar rooftop energy would need to "occur strategically over a five to ten-year period," JA456, and implementation is nowhere

close, JA454 (estimated "at three to four years out").  Moreover, subsequent to the Utilities PEA, FEMA coordinated with agencies like the U.S. Department of Energy (which is primarily responsible for evaluating ways for Puerto Rico to meet its renewable energy goals) to begin the process of preparing a separate PEA based on potential future energy projects to include renewables.  JA862-65.  FEMA dubbed this coordinated project the "Energy Generation" PEA, but ultimately paused it because of the absence of proposals.  JA855 (noting that FEMA had not received proposals for energy generation or renewable energy projects and that if "conditions change, [FEMA] will again move forward this NEPA document").

Given the lack of any concrete proposals and the absence of concrete renewables investment, it is too speculative that a favorable ruling would result in future investment in rooftop solar.  *See Simon*, 426 U.S. at 43 (plaintiffs lacked standing where it was "speculative" that private hospitals would stop their practice of continuing to deny service to plaintiffs); *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (where evidence that challenged action will ever come into fruition is lacking, alleged injury is "too speculative").

**D.      Plaintiffs cannot rely on procedural injuries alone to establish standing.**

Finally, Plaintiffs' alleged procedural injuries under NEPA are insufficient to resuscitate their standing.  *See, e.g.*, Cintrón Moscoso Decl. ¶ 20, JA114

(claiming that FEMA's purported failure to consider rooftop solar and storage alternatives violates NEPA).

As the district court noted, any "relaxation" of the causation or redressability requirements for standing based on procedural claims exist "only in the sense that a plaintiff need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps."  Mem. & Order at 3 (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1216 (9th Cir. 2023)); *see Lujan*, 504 U.S. at 572 n.7.  That makes sense because "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350.

Even so, a "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *Summers*, 555 U.S. at 496.  Plaintiffs must still "show that 'the government act performed without the procedure in question [here, sufficient NEPA review] will cause a distinct risk to a particularized interest of the plaintiff.'"  *Town of Winthrop*, 535 F.3d at 6 (quoting *City of Dania Beach v. Federal Aviation Admin.*, 485 F.3d 1181, 1185 (D.C. Cir. 2007)) (brackets in original).  And even for procedural claims, when an "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" to demonstrate causation and redressability.  *Lujan*,

504 U.S. at 562 (emphasis in original); *see Food & Water Watch v. U.S. Dep't of Agriculture*, 1 F.4th 1112, 1116 n.2 (D.C. Cir. 2021) ("The relaxation of redressability standards for procedural injuries . . . applies only to the Agency's actions, not to third parties not before the court.").

As discussed above, FEMA's funding actions are not the source of Plaintiffs' alleged harms from fossil fuel pollution because the agency plays no role in setting Puerto Rico's energy policy. What is more, FEMA does not control the proposals submitted to it and there is insufficient interest in renewable projects to generate viable funding applications. Plaintiffs adduce no evidence that, absent any funding from FEMA, Puerto Rico will discontinue its current reliance on fossil fuels for energy generation. Further, FEMA's emergency funding decisions do not foreclose the subsequent proposal development of renewable energy alternatives, which may require additional NEPA review. But additional NEPA review *now* would be premature and, importantly, would not change any of these circumstances. Accordingly, there is no "possibility that the requested relief [i.e., FEMA's preparation of an EIS] will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518.

## II. FEMA's NEPA analysis is adequate.

FEMA's Utilities PEA adequately considered the environmental impacts of its funding decisions to restore Puerto Rico's utilities and selected alternatives

based on reasonably anticipated funding proposals by Puerto Rican stakeholders. JA319.

In evaluating the Utilities PEA, the district court egregiously erred by flouting the Supreme Court's unequivocal holding in *Seven County*. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." 605 U.S. at 185. At length, *Seven County* describes the required deference. Courts must defer to the agency on the level of detail in an assessment, what alternatives are feasible, and the scope of the environmental effects that the NEPA document will address. *See id.* at 180-83. That is because "[w]hen assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting" NEPA documents. *Id.* at 182-83. "Courts should afford substantial deference and should not micromanage those agency choices." *Id.*

Yet in evaluating the Utilities PEA, the district court failed to cite *Seven County* and made no mention of deference to FEMA's judgments. Rather, the district court relied entirely on pre-*Seven County* precedent. There is no basis for this. *See, e.g., Badger Helicopters Inc. v. Federal Aviation Admin.*, 154 F.4th 902, 913 n.2 (8th Cir. 2025) (finding that "*Seven County*'s emphasis on deference has

even greater force" when dealing with an EA); *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025) (same).

The district court compounded its error by misinterpreting the scope and purpose of the Utilities PEA. To wit, FEMA issued the Utilities PEA for funding projects to quickly "restore damaged utilities in Puerto Rico and increase their resiliency for future weather events." JA207. The purpose and need statement in the Utilities PEA emphasized the urgent need to "re-establish a safe and reliable network of utilities (through repair, replacement, or relocation) in order to reconnect the communities affected by the storm with safe and efficient delivery" of utilities. *Id.* Given these purposes, FEMA reasonably declined to consider alternatives that were not readily available for development by a qualified applicant. *See Lovgren v. Locke*, 701 F.3d 5, 37 (1st Cir. 2012) (under former CEQ regulations, consideration of alternatives is bounded by "practical considerations and the 'purpose and need' for the proposed action").

Notwithstanding FEMA's clear statements regarding the narrow purpose and need for its proposed action, the district court viewed FEMA's funding role as a fundamentally different—and far broader—endeavor. *See* Mem. & Order at 12 (rejecting FEMA's argument regarding the scope of the Utilities PEA). Rather than credit the agency's purpose as limited to reconnecting storm-affected communities with utilities, the district court more broadly interpreted FEMA's

27

intent to "replace" utilities during its efforts to fund rebuilding projects as involving unfettered policy choices about what those replacements should be. *Id.* at 12. That broad interpretation improperly expanded FEMA's role into that of a policymaker for Puerto Rico's energy generation future, which far exceeds the limited purpose of the Utilities PEA. The district court thus improperly "substitute[d] its judgment for that of the agency as to the environmental consequences of its actions[.]" *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

The district court also failed to grapple with FEMA's *programmatic* approach here. Specifically, FEMA evaluated the environmental impacts from restoring power to Puerto Rico programmatically under NEPA. *See* 40 C.F.R. § 1508.28 (2020) (permitting programmatic "tiering" of NEPA reviews). A tiered—or multiphase—NEPA analysis can be useful for agencies like FEMA that are "contemplating large or complex projects" like assisting in the recovery from the largest and longest blackout in United States history. *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 196 (4th Cir. 2012). Through tiering, an agency can first assess "broad environmental consequences" in a programmatic NEPA review and later supplement that analysis with narrower reviews of specific actions

as needed.  *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1237-38 (D.C. Cir. 2018) (cleaned up); *see also Sierra Club v. Espy,* 38 F.3d 792, 796 (5th Cir. 1994).

Using this approach, FEMA efficiently but carefully considered the potential environmental impacts to a host of resources, including soil, wildlife, vegetation, air quality, and water quality.  *See* JA219-29; JA271-76.  For any actions not addressed in the Utilities PEA, FEMA made clear that it would evaluate those separately based on future project proposals: "[S]hould a subrecipient submit a project proposal that would require an environmental impact statement, FEMA will consider whether or not to fund it, and if so, then initiate an EIS as needed." JA340; *see also* JA332.  As noted, FEMA and other agencies like the Department of Energy began the process to evaluate potential transformative renewable energy projects under NEPA but suspended that effort when those projects failed to materialize.  JA855.  Thus, the Utilities PEA comprises the type of "fact-dependent, context-specific" choices by FEMA that fall within NEPA's "broad zone of reasonableness."  *Seven County*, 605 U.S. at 169.

For the foregoing reasons, the district court should have deferred to FEMA's "reasonable choices regarding the scope and contents" of the NEPA analysis.  *Id.* at 184.  We take each of the ways the district court incorrectly faulted FEMA's NEPA analysis in turn below.

**A. NEPA does not require FEMA to consider rooftop solar energy generation alternatives.**

The district court's most glaring error was concluding that FEMA was required to consider the possibility of distributed renewable energy generation—e.g., Plaintiffs' preferred energy source of rooftop solar with battery storage—for rebuilding Puerto Rico's utility infrastructure. Mem. & Order at 11-13. In fact, FEMA reasonably limited its NEPA review to demonstrably viable options that local stakeholders had shown a concrete interest in.

NEPA requires agencies to consider "feasible alternatives," but when reviewing an agency's assessment of which alternatives "are really 'feasible,'" a "court must be at its 'most deferential.'" *Seven County*, 605 U.S. at 181-82. And where, as here, "the agency is not itself the project's sponsor, it may give substantial weight to an applicant's preferences, at least insofar as it considers alternatives." *Seafreeze Shoreside, Inc. v. Dep't of Interior*, 123 F.4th 1, 22 (1st Cir. 2024); *see Roosevelt Campobello Int'l Park v. EPA*, 684 F.2d 1041, 1046-47 (1st Cir. 1982) (affirming alternatives that focused on "the primary objectives of the permit applicant").

Here, the starting point for FEMA's funding decisions related to the Utilities PEA is restoring pre-existing energy infrastructure. Indeed, the Stafford Act's funding authorization focuses on restoring pre-disaster conditions: it authorizes contributions "for the repair, restoration, reconstruction, or replacement of a public

30

facility damaged or destroyed by a major disaster," 42 U.S.C. § 5172(a)(1)(A), which FEMA estimates "on the basis of the design of the facility as the facility existed *immediately before* the major disaster," *id*. § 5172(e)(1)(A) (emphasis added). FEMA's implementing regulations point in the same direction. Funding decisions for permanent work—such as the proposals to rebuild Puerto Rico's utilities here—are based on the repair or replacement of facilities to their "*pre-disaster design*[.]" 44 C.F.R. § 206.201(i) (emphasis added).

Neither the Stafford Act nor FEMA's implementing regulations require FEMA to restore public facilities in a different form. FEMA is not authorized to make policy decisions subject to local control; rather, FEMA responds to the proposals put before it. *See* JA332 ("The recipient and subrecipients are responsible for selecting and designing projects for submittal to FEMA for grant funding."). Based on proposals put forth by Puerto Rico's stakeholders, which did not include energy generation or renewable energy proposals, FEMA reasonably limited its alternatives to projects that "support supplemental power . . . rather than new permanent power generation." JA333. The district court should have deferred to the "substantial weight" FEMA gave to reasonably anticipated projects in its alternatives analysis. *See Seafreeze Shoreside*, 123 F.4th at 22.

As the record reflects, the construction of renewable energy sources would represent a significant departure from the design of Puerto Rico's facilities that

31

existed prior to the hurricanes.  JA579 (advocating for 40-45% generation from renewables in Puerto Rico, increased from 1%).  Again, based on FEMA's discussions with Puerto Rico's project proponents, the agency believed that proposals for renewable energy were unlikely.  *See, e.g.*, JA840-45 (including no project proposals for renewables when FEMA issued the Utilities PEA).  In fact, it is undisputed that FEMA has yet to receive *any* funding proposals for renewables in Puerto Rico.  *See, e.g.*, JA346 (noting that Puerto Rico's "current FEMA funding request does not include a single dollar towards renewables or storage").  FEMA's feasibility determination on this front was therefore reasonable.  Even if not, FEMA's purported failure to consider renewable energy alternatives is harmless since those proposals remain strictly hypothetical.  *See Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (explaining that harmless error review requires the "case-specific application of judgment, based upon examination of the record"); *see also Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 460 (1st Cir. 1989) (noting that the court's review is made "in light of the information and comments before the agency at the time").

In concluding that FEMA was required to consider renewable energy alternatives, *see* Mem. & Order at 11, the district court relied on this Court's holding that, where public comments bring a specific alternative to the agency's attention, the agency "must *on its own initiative* study all alternatives that appear

reasonable and appropriate for study at the time[.]" *Dubois v. Dep't of Agriculture*, 102 F.3d 1273, 1291 (1st Cir. 1996) (emphasis in original) (quoting *Seacoast Anti-Pollution League v. Nuclear Reg. Comm'n,* 598 F.2d 1221, 1230 (1st Cir. 1979)). But the challenged agency actions in *Dubois* and *Seacoast* (i.e., a Forest Service permit for a ski resort and a license to construct a nuclear power plant, respectively) are far different from the more circumscribed funding decisions faced by FEMA here. The ski resort in *Dubois* was planned for federal land and therefore subject to direct federal control. 102 F.3d at 1278. And the nuclear power plant in *Seacoast* was subject to comprehensive federal health and safety regulation. 598 F.2d at 1232. FEMA's funding decisions are far narrower, and the Stafford Act provides for FEMA to make contributions to a local government working to repair damaged facilities. 42 U.S.C. § 5172(a)(1)(A). FEMA is not a health and safety regulator or land manager. FEMA conducts eligibility reviews for the specific proposal before it.

At the same time, the generalized nature of the programmatic NEPA review at issue here means that funding for future renewable energy projects is not foreclosed. *See* JA847 (noting that Utilities PEA "is not intended to preclude a more comprehensive environmental review by FEMA or its federal partners of energy measures that Puerto Rico contemplates undertaking in the future"). In

contrast, the projects in *Dubois* and *Seacoast* were singular, foreclosing any other alternative once selected.

Here, the district court ignored FEMA's actual analysis of renewables. FEMA considered the installation of new industrial equipment that meets the Department of Energy's renewable energy standards (JA223) and backup power generation to include rooftop solar (JA214). While Puerto Rico's 2019 Energy Public Policy Act sets forth the Commonwealth's energy policy and, among other things, establishes energy efficiency goals, *see* JA333, the Utilities PEA algins with the Act because it requires compliance with current codes and standards. *Id.* For any future proposals put forth by Puerto Rico to meet its energy needs, the Stafford Act includes flexibility for FEMA in approving funding so long as the proposal is consistent with updated codes, standards, and hazard-resistant designs, and is "resilient." 42 U.S.C. § 5172(e)(1)(A); *see also* FEMA's National Resilience Guidance: A Collaborative Approach to Building Resilience, August 2024 (defining "resilience" as "the ability to prepare for threats and hazards, adapt to changing conditions, and withstand and recover rapidly from adverse conditions and disruptions").[4]

---

[4] *Available at*, https://www.fema.gov/sites/default/files/documents/fema_national-resilience-guidance_august2024.pdf.

Moreover, FEMA may consider proposals for "hazard mitigation," which the Stafford Act permits so long as they are cost effective and "substantially reduce the risk of, or increase resilience to, future damage." *See* 42 U.S.C. § 5170c(a) (authorizing funding for "hazard mitigation measures which the President has determined are cost effective and which substantially reduce the risk of, or increase resilience to, future damage"); JA339. FEMA's regulations also provide for the agency's consideration of "alternate projects" where a recipient of funds "determines that the public welfare would not be best served by restoring a damaged public facility or the function of that facility[.]" 44 C.F.R. § 206.203(d)(2). Indeed, FEMA's purpose and need statement in the PEA expressly recognizes these funding options. JA207 (noting that "FEMA has authority to provide funding for cost-effective hazard and mitigation measures" and for other "cost-effective activities that have the purpose of reducing or eliminating risks to life and property"). All of this means that even though renewable energy generation projects were beyond the scope of the Utilities PEA, FEMA retains flexibility to consider future proposals along those lines if and when they are presented.

Finally, there is nothing improper about FEMA's commitment to perform a supplemental NEPA evaluation for any energy generation projects (including renewables) in the future. As noted, FEMA began this process but paused it due to

the lack of proposals before the agency. Also, the Utilities PEA expressly notes that, if a proposed project falls outside of the scope of FEMA's NEPA analysis, the agency will perform additional analysis as needed. JA206. That is permissible under NEPA. *Town of Winthrop v. Fed. Aviation Admin.*, 535 F.3d 1, 7 (1st Cir. 2008) (supplemental NEPA analysis required when "new information painted a dramatically different picture of impacts compared to the description of impacts" in the prior NEPA document (cleaned up)).

An agency need only consider alternatives that will "bring about the ends of the proposed action," *Beyond Nuclear v. Nuclear Reg. Comm'n*, 704 F.3d 12, 19 (1st Cir. 2013) (cleaned up), with due weight given to the project's sponsor, *see Seafreeze Shoreside*, 123 F.4th at 22. In this context, FEMA's alternatives were permissibly aimed at fulfilling the agency's purpose of funding proposals to "*restore* damaged utilities[,]" JA207 (emphasis added), instead of hypothetical new sources of renewable power generation. And courts "cannot force agencies to include . . . alternatives too fanciful or hypothetical" in their NEPA analyses. *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1074 (1st Cir. 1980). Because no concrete proposals for FEMA funding have materialized, Plaintiffs' preferred alternative of solar generation with storage is exactly the sort of hypothetical alternative that FEMA did not need to include.

### B. FEMA appropriately considered required mitigation measures.

The district court also incorrectly found that FEMA's NEPA analysis was deficient because it relied on mitigation measures to make its finding of no significant impact. *See* Mem. & Order at 14. The district court's fly-specking is improper under *Seven County* and should be rejected.

FEMA considered that, in most instances, environmental impacts would be minor because the construction of approved projects would primarily occur within already disturbed areas for existing utilities and facilities. *See, e.g.*, JA244. Moreover, that construction would be subject to statutorily required permits that will impose mitigation measures and best management practices. *See, e.g.*, JA206-07; JA224-28; JA241-45; JA274-76. This analysis was appropriate because, as this Court has held, "mitigation measures may be relied upon to make a finding of no significant impact [] if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal." *Sierra Club v. Marsh,* 769 F.2d 868, 877 (1st Cir. 1985).

FEMA considered required mitigation measures in assessing specific resource areas. For example, FEMA assessed potential water and air impacts based on a subrecipient's compliance with standards for water and air quality that would minimize impacts. JA219-30; JA276. As to air quality, FEMA discussed the Clean Air Act's scheme for achieving and maintaining ambient air standards

set by the Environmental Protection Agency or Puerto Rico. JA219-21. FEMA

then explained the short-term impacts like exhaust emissions from construction

equipment. JA222. FEMA concluded that these short-term impacts would be

minor because the equipment "will comply with Tier 4 USEPA standards for off

road diesel" meaning that they will operate using "low-sulfur diesel." *Id.*

FEMA also considered short-term increases in dust and vehicular emissions

from equipment and explained that mitigation measures (e.g., watering roadways

and chemical stabilization) would suppress these short-term impacts rendering

them "negligible." *Id.* Further, FEMA pointed out that anticipated projects, if

implemented, could have beneficial impacts on air quality through upgrades that

would reduce emissions. JA222-23. Accordingly, FEMA reasonably concluded

that none of the alternatives will result in an exceedance of the National Ambient

Air Quality Standards. JA223; *see Sierra Club v. Fed. Energy Reg. Comm'n*, 867

F.3d 1357, 1370 n.7 (D.C. Cir. 2017) ("FERC appropriately relied on EPA's

national ambient air quality standards (NAAQS) as a standard of comparison for

air-quality impacts.").

For water quality impacts, FEMA noted all relevant federal regulations, *see*

JA224-25, and noted that discharges of dredged and fill materials into waters of the

United States will require a permit from the U.S. Army Corps of Engineers, which

will in turn require its own NEPA analysis before a permit is issued. *See* JA224.

FEMA disclosed the potential adverse effects of reasonably expected discharges, but explained how mitigation and federal regulation will minimize these potential impacts. JA229.

As FEMA acknowledged, any future project proposals that would necessitate mitigation measures beyond those described in the PEA would require a separate NEPA analysis. JA272; *see Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) ("[D]etermination of the extent and effect of [impacts] . . . is a task assigned to the special competency of the appropriate agencies."); *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211, 1214 (9th Cir. 1998) (noting courts defer to agency's "fully informed and well considered" determination of "reasonably foreseeable future actions"). Because those future projects are not yet known, FEMA was not required to "speculate about the possible effects of future actions that may or may not ensue." *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. Fed. Aviation Admin.*, 651 F.3d 202, 218 (1st Cir. 2011). That is the nature of a programmatic NEPA review, and the district court was incorrect to fault the agency for refraining from a more granular—and necessarily speculative—analysis.

Based on the foregoing, the Utilities PEA adequately disclosed the contemplated mitigation measures meant to minimize potential impacts and did not preclude the agency or the public from "properly evaluat[ing] the severity of [the

Project's] adverse effects" on the environment. *Robertson*, 490 U.S. at 352; *see*

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1109-10 (9th

Cir. 2016) (finding discussion of mitigation measures adequate even though the

agency could have provided more detail). Because this mitigation was based on

regulatory and permitting requirements of other statutes, regulations, and separate

regulatory authorities, alongside limits on the scope of the proposal in the first

instance, the district court erred in concluding that FEMA relied on mitigation to

avoid an EIS. Mem. & Order at 14.

**C.     FEMA reasonably concluded that the effects of its funding decisions were not significant.**

The district court concluded that FEMA's funding decisions would

significantly impact the environment because "[m]ost Puerto Ricans depend on an

electrical power infrastructure that relies on fossil fuels" and that infrastructure

"has proven inadequate, unreliable, and extremely vulnerable to weather events[.]"

Mem. & Order at 9. In the court's view, these reasons alone are "sufficient to

require the preparation of an EIS." *Id.* at 10. Not so.

As discussed, FEMA's role regarding the Utilities PEA is limited to

evaluating funding proposals for projects aimed at re-establishing a "safe and

reliable network of utilities . . . and help reduce the potential for future damages by

upgrading damaged utilities in accordance with current engineering codes and

standards." JA207. Because repairs would need to meet current codes and

40

standards, which are generally more stringent than those applicable when older equipment was installed, FEMA concluded that utility networks would be more resilient than before. JA254-55; JA265 (noting that the applicant "would use current codes and standards for the development and installation of utilities that can handle the network's pre-disaster capacity and be more resilient to future storm events."). The district court ignored this context and instead focused on the reliability issues associated with the state of Puerto Rico's utilities *before* the hurricanes and not those repaired or replaced using FEMA's funding. The court gave no weight to any improvements to power reliability in light of modern repairs. The court further ignored the fact that, as noted above, Puerto Rico has not put forth proposals to pivot away from fossil fuels at all—much less in a way that would transform Puerto Rico's mix of energy generation into one exclusively favoring rooftop solar and storage. Thus, the court's analysis failed to consider FEMA's finding of no significant impact "in light of the factual circumstances" before the agency. *Quinonez-Lopez*, 733 F.2d at 2.

The district court's findings are also unsupported by the Council on Environmental Quality's (CEQ) NEPA regulations in effect at the time.[5] Mem. & Order at 10-11. According to those regulations, FEMA was required to consider

---

[5] On January 8, 2026, CEQ issued a final rule rescinding its NEPA regulations in their entirety. 91 Fed. Reg. 618.

the proposed project's "context" and "intensity" in deciding whether the proposed action would significantly impact the environment. 40 C.F.R. § 1508.27 (2020). "Context" refers to a range of considerations, from "society as a whole" to the "affected region, the affected interests, and the locality." *Id.* § 1508.27(a). "Intensity" refers to the "severity of the impact," and NEPA regulations applicable to this case identify ten factors to consider in evaluating the "intensity" of the environmental impact. *Id.* §§ 1508.27(b)(1)-(10). The presence of any one factor does not necessarily require an EIS. *See Society Hill Powers Owners' Ass'n v. Rendell*, 210 F.3d 168, 184 (3rd Cir. 2000); *see Seven County,* 605 U.S. at 181 (it is the agency's prerogative to "determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process" (cleaned up)).

The district court found that "several" factors in Section 1508.27 established that there was as significant impact here, but it did not specify which ones. Mem. & Order at 11. Nevertheless, the court found that FEMA's funding decisions affected "the vast majority of Puerto Rico" and "frequent power outages caused by the aging infrastructure" would impact public health and safety. *Id.* As discussed, any consequences that flow from Puerto Rico's pre-existing infrastructure cannot be attributed to FEMA. Rather, the funding proposals FEMA evaluated led it to reasonably conclude that rebuilding pre-storm infrastructure would make it more

42

resilient than before. *See* JA207. FEMA reasoned that in most instances environmental impacts would occur in already disturbed areas for existing utilities and facilities, *see e.g.*, JA244.

The court also found that transmission lines run through park lands, "ecologically critical areas," and impact protected species but did not identify any particular species, areas, or parks. Mem. & Order at 11. Responsibility for the placement of those transmission lines lies with agencies like PREPA, not FEMA, so the court's reliance on impacts from those is also irrelevant to the decision before the agency. *Cf. Sierra Club v. United States Army Corps of Eng'rs*, 997 F.3d 395, 404-05 (1st Cir. 2021) (upholding agency determination that it had insufficient authority over transmission line to require analyzing effects of entire line).

Next, the court found that FEMA's continued funding of fossil fuel-based infrastructure could "establish a precedent for future actions with significant effects" because Puerto Rico will likely not have "the resources to pursue renewable energy alternatives in the near future." Mem. & Order at 11. Again, funding proposals are put forth exclusively by Puerto Rican stakeholders. Those proposals are not precedential in any way. To be sure, both FEMA and Puerto Rico have limited resources to devote to any rebuilding efforts. But it is Puerto Rico's prerogative—not FEMA's—to select which proposals to put forth and when

to do so.  *See* JA380 (noting that "FEMA does not play a role in determining what that decision is nor authorizes the use of funding for projects outside the eligible parameters adopted in FEMA policy").  Puerto Rico's choices about how to use its resources provides no basis to fault FEMA's NEPA analysis.  Further, if Puerto Rico submits proposals for rooftop solar funding in the future, nothing in the Utilities PEA precludes FEMA from authorizing them (subject to an appropriate NEPA evaluation).

The district court also ignored FEMA's commitment to preparing a separate NEPA analysis for areas like the El Yunque National Forest and Wild and Scenic River corridors, which may qualify as "unique" areas affected by the proposed projects, *see* 40 C.F.R. § 1508.27(b)(3) (2020).  Again, there is nothing wrong with the tiered approach favored by FEMA with respect to the complex, multi-step funding projects at issue here in rapid response to a historic blackout.  *See Shenandoah Valley Network*, 669 F.3d at 196.  In any event, *Seven County* required the court to defer to FEMA's judgment in crafting its environmental review.  605 U.S. at 184-85.

Although the district court mentioned the potential for "uncertain or unknown risks" posed by pre-existing infrastructure, it identified no specific risks—much less any "unique or unknown risks" sufficient to justify a "highly uncertain" designation.  40 C.F.R. § 1508.27(b)(5) (2020).  This is not a case

where an EIS might be required due to "a new type of activity with completely unknown effects." *Winter v. NRDC*, 555 U.S. 7, 23 (2008). Rather, FEMA fully assessed the impacts of reasonably anticipated repair and restoration projects in the Utilities PEA. As FEMA explained in the Utilities PEA, "[u]ntil a subrecipient develops a project proposal, FEMA typically does not have detailed lists, scopes of work, or other details to review." JA329.

## III. The District Court Erred in Requiring an EIS

Finally, the district court erred in remanding the Utilities PEA to FEMA with the instruction to prepare an EIS. FEMA issued its finding of no significant impact (or FONSI) after fully considering the environmental impacts of its funding decisions in the Utilities PEA. FEMA's analysis of the effects of its funding action was reasonable and ordering an EIS is not the proper remedy for any flaws. *See* Mem. & Order at 11 (faulting FEMA's FONSI based on "conclusory statements").

When a court finds a NEPA violation based on inadequate information, the appropriate remedy is to remand to the agency to consider next steps under NEPA. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1226 (9th Cir. 2008) ("[I]f there is uncertainty over whether the proposed project may have a significant impact, including uncertainty caused by an incomplete administrative record or an inadequate EA, the court should ordinarily remand for the agency to either prepare a revised EA or reconsider whether an EIS

45

is required."); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744

(1985) ("if the agency has not considered all relevant factors … the proper course,

except in rare circumstances, is to remand to the agency for additional

investigation or explanation").  As the Supreme Court reiterated in *Seven County*,

the agency is "better equipped" to "'determine *whether* and to what extent to

prepare an EIS based on the usefulness of any new potential information to the

decisionmaking process.'"  *Seven County,* 605 U.S. at 181 (quoting *Public Citizen*,

541 U.S. at 767) (emphasis added).  The district court erred here in requiring an

EIS, rather than remanding to FEMA to determine how to proceed.

Relatedly, this is not a case where the district court identified record

information contradicting FEMA's analysis of the impacts from its funding

decisions.  *See Sierra Club v. Marsh*, 769 F.2d 868, 881-82 (1st Cir. 1985)

(requiring an EIS where the record "cannot support a FONSI"); *see also Ctr. for*

*Biological Diversity*, 538 F.3d at 1179 (appropriate to remand with instructions to

prepare an EIS if the "administrative record demonstrates that the project or

regulation may have a significant impact").  Instead, the district court primarily

found the PEA lacked adequate explanation for its conclusions.  *See* Mem. &

Order at 11 (finding that "the Utilities PEA and accompanying finding of no

significant impact ("FONSI") failed to offer adequate explanations").  On remand,

FEMA should maintain discretion to either revise the PEA or, if necessary, prepare

an EIS.  *See Neighbors of the Mogollon Rim v. Forest Serv.*, Civ. A. No. 22-15259,

2023 WL 3267846, at *3 (9th Cir. 2023) (noting that a court should "leave [the]

decision [whether to prepare an EIS] for the agency to consider in the first instance

on remand.").  To require otherwise was error.

## CONCLUSION

For the foregoing reasons, this case should be dismissed for lack of subject

matter jurisdiction on standing grounds, and the district court decisions should be

vacated.  If the Court reaches the merits, the district court's summary judgment

decision and order requiring FEMA to prepare an EIS on remand should be

reversed.

Respectfully submitted,

Adam R.F. Gustafson
*Principal Deputy Assistant Attorney General*

| | |
|---|---|
| Of Counsel: | /s/ *Christopher C. Hair* |
| | Robert Lundman |
| Lauren Gillespie | Jacob Ecker |
| Kristina Pett | Christopher C. Hair |
| *Attorneys* | *Attorneys* |
| Federal Emergency Management | Environment and Natural Resources Division |
| Agency | U.S. Department of Justice |
| | Post Office Box 7415 |
| | Washington, D.C. 20044 |
| | (202) 598-9583 |
| | christopher.hair@usdoj.gov |

March 23, 2026
DJ # 90-1-4-17073

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 10,470 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Christopher C. Hair*
CHRISTOPHER C. HAIR

*Counsel for Appellants*

# ADDENDUM

September 30, 2025, Memorandum and Order (Dkt. 72)............................................1

October 2, 2025, Judgment (Dkt. 73) ............................................................2

42 U.S.C. § 5172............................................................................19

44 C.F.R. §§ 206.201; 206.226................................................................20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

COMITÉ DIALOGO AMBIENTAL, INC., *et al.*,

    **Plaintiffs,**

        v.

FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,

    **Defendants.**

CIVIL NO. 24-1145(JAG)

### JUDGMENT

Pursuant to this Court's Memorandum and Order, Docket No. 72, Judgment is hereby entered remanding the case for FEMA to prepare an Environmental Impact Statement as to the Utilities PEA. The case is now closed for statistical purposes.

IT IS SO ORDERED.

In San Juan, Puerto Rico this Thursday, October 2, 2025.

s/ Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
U.S. DISTRICT JUDGE

**Addendum_001**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC., *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,<br><br>**Defendants.** | CIVIL NO. 24-1145 (JAG) |

## MEMORANDUM AND ORDER

GARCIA-GREGORY, D.J.

Pending before the Court are Plaintiffs' Motion for Summary Judgment, Docket No. 46; and Defendants' Cross-Motion for Summary Judgment, Docket No. 62. For the following reasons, Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and Defendants' Cross-Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

### I.    Standing

Article III of the U.S. Constitution limits the jurisdiction of federal courts to actual cases and controversies. *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 46 (1st Cir. 2020). "A case or controversy exists only when the party soliciting federal court jurisdiction (normally, the plaintiff) demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (cleaned up). Therefore, "plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*,

**Addendum_002**

CIVIL NO. 24-1145 (JAG)                                                          2

568 U.S. 398, 408 (2013) (cleaned up). "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019); *see Rumsfeld v. Forum for Acad. & Inst'l Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (citation omitted).

As applicable here,

> In order to ground a claim of associational standing (that is, standing to bring suit on behalf of its membership), [Plaintiffs] must show three things: (i) that individual members would have standing to sue in their own right; (ii) that the interests at stake are related to the organization's core purposes; and (iii) that both the asserted claim and the requested relief can be adjudicated without the participation of individual members as named plaintiffs.

*Maine People's All. And Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006). Specifically, "plaintiffs must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Katz*, 672 F.3d at 79 (cleaned up); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) ("To survive the [] summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by [the challenged] activities . . . but also that one or more of [Plaintiffs'] members would thereby be directly affected apart from their special interest in th[e] subject.") (cleaned up).

It is uncontested that the interests at stake in this litigation are related to Plaintiffs' core purposes, *see* Docket No. 1 at 8-17, and that the claim can be adjudicated without the participation of individual plaintiffs as named plaintiffs. Thus, the Court need only determine whether an individual member of Plaintiffs' organizations would have standing to sue in their own right.

**Addendum_003**

CIVIL NO. 24-1145 (JAG)                                                                3

### A.  Constitutional Requirements

The standing inquiry involves constitutional concerns and prudential concerns. First, "[t]he irreducible constitutional minimum of standing entails three elements." *Dantzler*, 958 F.3d at 47 (cleaned up). "[A] plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."[1] *Dep't of Com.*, 588 U.S. at 766 (cleaned up). Here, Defendants do not contest the injury-in-fact requirement, Docket No. 62-1 at 15, but in any case the Court finds that they have met this requirement so the Court will only address traceability and redressability.

### 1.  Traceability

As is the case here, "when a plaintiff alleges a 'procedural injury'—including the failure to comply with [the National Environmental Policy Act ("NEPA")]—the causation and redressability requirements are relaxed . . . [but] only in the sense that a plaintiff need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps." *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1216 (9th Cir. 2023) (cleaned up). Plaintiffs "need not show that the agency action would have been different but for the procedural violation." *Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 752 F. Supp. 3d 13, 18 (D.D.C. 2024) (cleaned up).

"The traceability or causation element requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm. That connection cannot

---

[1] "These standing requisites must be proved with the manner and degree of evidence required at the successive stages of the litigation." *Mallinckrodt, Inc.*, 471 F.3d at 283. At the summary judgment phase, Plaintiffs bear the burden of showing the existence of standing by a preponderance of the evidence.

**Addendum_004**

CIVIL NO. 24-1145 (JAG)                                                                    4

be overly attenuated." *Dantzler*, 958 F.3d at 47 (cleaned up). It is enough to show that the asserted injury is "fairly traceable" to the defendant's action; proximate causation is not needed. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019).

Defendants claim that Plaintiffs cannot meet the traceability requirement because the injuries asserted are the result of actions by third parties. Docket No. 62-1 at 14-17. The Court disagrees. While it is true that the causation "requirement forces plaintiffs to show that their injury fairly can be traced to the challenged action of the defendant, and not . . . some third party not before the court," Plaintiffs can still show causation by "showing that third parties will likely react in predictable ways to the defendant's conduct." *Mass. Coal. for Immigr. Reform*, 752 F. Supp. 3d at 29 (cleaned up). "The key inquiry is whether the defendant's actions were a substantial factor motivating the decisions of the third parties that were the direct source of the plaintiff's injuries. Article III demands far less than statistical certainty; it asks only for *de facto* causality." *Id*. at 29-30.

Here, Defendants' decision as to how to channel billions of dollars in federal disaster aid, without which Puerto Rico would not have had the necessary resources to reestablish power in the island, would be a substantial factor motivating the decisions of the third parties that were the direct source of the plaintiff's injuries, i.e. the entities that operate the different components of the electrical power system in Puerto Rico. *Sierra Club v. Glickman*, 156 F.3d 606, 614 (5th Cir. 1998) ("[T]he relevant inquiry in this case is whether [the defendant] has the ability through various programs to affect the [ ] decisions of those third part[ies] to such an extent that the plaintiff's injury could be relieved.") (cleaned up). FEMA's funding decisions "exert[] a determinative [] effect on the third-party conduct that directly causes the injury." *WildEarth Guardians*, 70 F.4th at 1217 (cleaned up); *see also id.* ("The injury was caused by development carried

**Addendum_005**

CIVIL NO. 24-1145 (JAG)                                                     5

out by third parties, but the [defendant] regulated whether that development could occur.")
(citation omitted). Plaintiffs' "theory of standing thus does not rest on mere speculation about the
decisions of third parties; it relies instead on the predictable effect of Government action on the
decisions of third parties." *Dep't of Com.*, 588 U.S. at 768 (citations omitted). Thus, Plaintiffs meet
the traceability requirement.

## 2. Redressability

Turning to the redressability of Plaintiffs' asserted injuries, this "element of standing
requires that the plaintiff [show] that a favorable resolution of [its] claim would likely redress the
professed injury. This means that it cannot be merely speculative that, if a court grants the
requested relief, the injury will be redressed." *Dantzler*, 958 F.3d at 47 (cleaned up). The First
Circuit has found that "[i]n cases of alleged procedural harm . . . plaintiffs receive special
treatment. The person who has been accorded a procedural right to protect his concrete interests
can assert that right without meeting all the normal standards for redressability and immediacy."
*Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27 (1st Cir. 2007) (cleaned up). As such,
Plaintiffs "need not demonstrate that [their] entire injury will be redressed by a favorable
judgment, [but they] must show that the court can fashion a remedy that will at least lessen its
injury." *Dantzler*, 958 F.3d at 47 (citations omitted); *see Katz*, 672 F.3d at 72 ("To satisfy [the
redressability] requirement, the plaintiff need not definitively demonstrate that a victory would
completely remedy the harm.") (cleaned up). In cases like the present action, where a plaintiff
asserts a procedural injury, redressability is an "undemanding burden." *Ocean Advocs. v. U.S. Army
Corps of Eng'rs*, 361 F.3d 1108, 1120 (9th Cir. 2004). In these cases, "[a]ll that is required . . . is some

**Addendum_006**

CIVIL NO. 24-1145 (JAG)                                                                                6

possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Impson*, 503 F.3d at 28 (cleaned up).

Because Plaintiffs' claims center around the "inadequacy of a government agency's environmental studies under NEPA[, they] need not show that further analysis by the [agency] would result in a different conclusion. It suffices that, as NEPA contemplates, the [agency's] decision could be influenced by the environmental considerations that NEPA requires an agency to study." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (citation omitted). Plaintiffs have shown that:

> In the aftermath of Hurricanes Irma and Maria, multiple studies analyzed the best ways to rebuild Puerto Rico's energy system. The universal conclusion was that widespread adoption of distributed solar and storage could create an energy future for Puerto Rico that was not only more resilient against future storms, but was also cleaner, more affordable, more equitable, and offered economic opportunities for Puerto Rican communities.

Docket No. 46-2 at 11-12. The Court finds this is sufficient to show that Defendants' decision could be influenced by environmental considerations that must be studied under NEPA.

Accordingly, the Court finds that Plaintiffs have standing to pursue this suit.

## II.    Merits

Having found that Plaintiffs have standing to pursue this case, the Court now turns to the merits of the Parties' motions. Plaintiffs contend that Defendants violated NEPA by (1) failing to consider distributed renewable energy alternatives, (2) failing to engage with public comments proposing renewable energy alternatives, (3) failing to adequately examine the environmental harms associated with rebuilding the fossil fuel grid, (4) relying on undefined mitigation measures or promises of future tiering as substitutes for taking a hard look at environmental impacts, (5) refusing to prepare an EIS for the proposed projects, and (6) failing to undertake additional NEPA

**Addendum_007**

CIVIL NO. 24-1145 (JAG)                                                                                   7

review in light of significant new information undermining the agency's decision. Docket No. 46-2.

NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir. 1996) (citations omitted). It "is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1143-44 (9th Cir. 2019) (citation omitted). "Congress, in enacting NEPA, meant to insure a fully informed and well-considered decision." *Dubois*, 102 F.3d at 1284 (cleaned up).

"The primary mechanism for implementing NEPA is the Environmental Impact Statement (EIS) . . . [which] is an action-forcing procedure, designed [t]o ensure that this commitment is infused into the ongoing programs and actions of the Federal Government." *Id.* at 1285 (cleaned up). As such, NEPA requires the preparation of an EIS "[w]hen a major federal agency action will have significant environmental effects." *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 9 (1st Cir. 2024) (citations omitted). "The EIS helps satisfy NEPA's 'twin aims': to ensure that the agency takes a 'hard look' at the environmental consequences of its proposed action, and to make information on the environmental consequences available to the public, which may then offer its insight to assist the agency's decision-making through the comment process." *Dubois*, 102 F.3d at 1285-86 (cleaned up). The preparation of an "EIS thus helps [e]nsure the integrity of the process of decision, providing a basis for comparing the environmental problems raised by the proposed project with the difficulties involved in the alternatives." *Id.* (cleaned up).

**Addendum_008**

CIVIL NO. 24-1145 (JAG)                                                                              8

"Judicial review of agency decisions under NEPA . . . is provided by the [Administrative Procedure Act], which maintains that an agency action may be overturned only when it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006) (cleaned up). "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions, *and* that its decision is not arbitrary or capricious." *Dubois*, 102 F.3d at 1284 (cleaned up).

In reviewing FEMA's decision not to prepare an EIS, the Court must consider "whether the agency has taken a hard look at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1269 (9th Cir. 2017) (cleaned up). "[O]ne challenging a decision *not* to prepare an EIS must show a substantial possibility that agency action could significantly affect the quality of the human environment. If the record reveals such a 'substantial possibility' with sufficient clarity, the agency's decision (not to produce an EIS) violates NEPA." *Sierra Club v. Marsh*, 769 F.2d 868, 870-71 (1st Cir. 1985) (cleaned up).

Here, Plaintiffs challenge FEMA's decision not to prepare an EIS in relation to two Programmatic Environmental Assessments ("PEA"): (1) Utility Repair, Replacement, and Realignment ("Utilities PEA"), and (2) Public Facilities Infrastructure Recovery and Resiliency ("Public Facilities PEA"). The Court shall address each challenge in turn.

**Addendum_009**

CIVIL NO. 24-1145 (JAG)                                                                       9

### A.  Utilities PEA

In the present case, it is uncontested that the projects encompassed by the Utilities PEA constitute a "major Federal action" under NEPA. Moreover, the record shows that "substantial questions are raised as to whether [the projects at issue] . . . *may* cause significant degradation of some human environmental factor." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) (cleaned up). We do not see how FEMA could argue that there is no substantial possibility that the projects contemplated by the Utilities PEA could significantly affect the quality of the human environment. Most Puerto Ricans depend on an electrical power infrastructure that relies primarily on fossil fuels. Docket Nos. 46-1, ¶ 2; 46-6 at 13. The record amply shows that the existing infrastructure has proven inadequate, unreliable, and extremely vulnerable to weather events, events whose effects will be more severe in the future due to climate change.[2] Thus, any funding decisions as to how to reestablish electricity in Puerto Rico would significantly affect that quality of the human environment, especially considering that, as FEMA itself recognizes, "[f]ailure of these [utility] systems can cause injury, loss of life, and

---

[2] *See* Docket Nos. 46-6 at 14 ("PREPA's transmission and distribution (T&D) systems, a majority of which are above ground[,] were particularly vulnerable to the high winds, torrential rains, and erosion-related landslides associated with the recent hurricanes . . . electric power generation facilities are tied to each other using high voltage overhead transmission lines that run over mountainous terrain. Due to the physical location of these electrical connections, they are subjected to hurricane force winds and are most likely to fail, as experienced during Hurricane Maria."), 15 ("Transmission lines in the center of the island were severely impacted, as high winds were tunneled through the changes in terrain and tore down large transmission lattice towers. Historical storm tracks . . . suggest similar impacts can be expected in the future."), 99 ("Puerto Rico's electrical grid was vulnerable before the hurricanes due to a fragile system, dependency on fossil fuels, lack of skilled workers, and outstanding debt."); 49-1 at 15 ("Experts predict that extreme weather will continue to jeopardize electric power systems. The need to transition to renewable power sources [] is immediate . . . Rather than repairing a grid that does not provide sustainable or reliable power, communities should evaluate and shift to new solutions.").

**Addendum_010**

CIVIL NO. 24-1145 (JAG)                                                                  10

environmental issues." Docket No. 46-6 at 116;[3] *see also* Docket No. 46-6 at 188 ("The mission of

[FEMA] is to reduce the loss of life and property and protect our institutions from all hazards by

leading and supporting the nation in a comprehensive, risk-based emergency management

program of mitigation, preparedness, response, and recovery."). This is sufficient to require the

preparation of an EIS, especially since the Court agrees that the Utilities PEA and accompanying

finding of no significant impact ("FONSI") failed to offer adequate explanations—merely offering

conclusory statements not supported by studies, analysis, or data—as to why FEMA disregarded

the comments submitted by Plaintiffs and made a finding of no significant impact. Docket No. 46-

2 at 19-22; *see Ohio v. Env't Prot. Agency*, 603 U.S. 279, 297 (2024) (finding that the agency's response

to the petitioners' comments was legally insufficient because it failed to meaningfully address the

issue raised).

Additionally, "[w]hether a project has significant environmental impacts, thus triggering

the need to produce an EIS, depends on its 'context' (region, locality) and 'intensity' ('severity of

impact')." *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (citation

---

[3] The Utilities PEA also states:

> For example, failing transmission lines may start fires or present an electrocution risk, or waste systems may discharge pollutants into waterways. Should utility systems fail, local governments may be unable to provide critical services including fire suppression, emergency communication, power generation, potable water, and wastewater treatment. Additionally, the lack of utilities such as electricity and water can be life-threatening for at-risk populations like the elderly, young, and the sick. In an effort to restore these services and/or mitigate these impacts, federal agencies led by FEMA may provide funds for utility system restoration, replacement, upgrade, expansion, redesign, or relocation.

Docket No. 46-6 at 116.

**Addendum_011**

CIVIL NO. 24-1145 (JAG)                                                           11

omitted). The Court agrees that several intensity factors support the preparation of an EIS. The agency's decision is significant since it will affect the vast majority of Puerto Rico. Continued reliance on the existing energy infrastructure will affect public health and safety considering the frequent power outages caused by the aging infrastructure. The projects will also likely affect park lands, ecologically critical areas, and protected species considering that transmission lines run through some of these areas/habitats. Additionally, continuing to rely on the current infrastructure may pose uncertain or unknown risks to the human environment. It could also establish a precedent for future actions with significant effects: if FEMA funding continues to be channeled to fossil fuel-based infrastructure, it is unlikely that Puerto Rico will have the resources to pursue renewable energy alternatives in the near future.

The Court is not persuaded by FEMA's argument that it was not obligated to analyze other alternatives that were not submitted by project applicants. Adopting this argument would effectively allow an agency to bypass NEPA's requirements merely because an applicant did not provide alternatives. *See also Dubois*, 102 F.3d at 1291[4] ("NEPA requires the agency to try *on its own* to develop alternatives that will mitigate the adverse environmental consequences of a proposed project. In respect to alternatives, an agency must *on its own initiative study all alternatives that appear reasonable and appropriate* for study at the time, and must also look into other significant alternatives that are called to its attention by other agencies, or by the public during the comment period afforded for that purpose.") (cleaned up) (emphasis added). And it would allow FEMA to flout

---

[4] While this case addresses the adequacy of an EIS, the EA also requires consideration of alternatives and it would feel incongruous to require the agency to develop and study reasonable alternatives on its own initiative at the EIS stage and not at the EA stage, since the EA is the document that will allow agencies to decide whether an EIS is required under NEPA.

**Addendum_012**

CIVIL NO. 24-1145 (JAG)                                                                    12

its obligations under NEPA to make decisions based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. The case law is clear that "[a]n EA must include brief discussions of the need for the proposal, *of alternatives*[,] and of the environmental impacts of the proposed action and alternatives." *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 46 (D.D.C. 2022) (cleaned up) (emphasis added); *see United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 38 (1st Cir. 2011); *McGuinness v. U.S. Forest Serv.*, 741 F. App'x 915, 927 (4th Cir. 2018); *Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010); *Sierra Club v. Espy*, 38 F.3d 792, 802 (5th Cir. 1994).

The Court also rejects Defendants' argument that the renewable energy alternatives did not meet the purposes and need of the Utilities PEA, or that these alternatives were not feasible. First, the Utilities PEA states:

> The purpose of this action is to provide grant funding to restore damaged utilities and increase their resiliency for future weather events . . . The need for the action is to *re-establish a safe and reliable network of utilities* (through repair, *replacement*, or relocation) in order to reconnect the communities affected by the storm with safe and efficient delivery of energy, water, sewer service, and communications, and help reduce the potential for future damages by upgrading damaged utilities in accordance with current engineering codes and standards. The grant funding is necessary to address these concerns and reduce the damage and disruption caused by future disasters throughout the Commonwealth.

Docket No. 46-6 at 116 (emphasis added). FEMA's FONSI also stated that "[t]he types of utilities projects covered under this PEA involve repair, restoration, *replacement*, and hazard mitigation of the Commonwealth's utility and communications systems." Docket No. 46-6 at 189 (emphasis added). The Court cannot find that these statements limited FEMA's analysis to rebuilding the electrical power infrastructure as it was before Hurricanes Irma and Maria. Moreover, this narrow

**Addendum_013**

CIVIL NO. 24-1145 (JAG)                                                                13

reading would contravene the purpose of NEPA's aim to protecting and promoting environmental quality. The record clearly shows that renewable energy alternatives were reasonable and feasible. *See* Docket Nos. 46-1 at 2-5; 46-6 at 5-67, 97-106. Thus, FEMA violated NEPA by failing to consider renewable energy alternatives, especially since this issue was presented to FEMA during the public comments period. *See* Docket Nos. 46-1 at 6; 46-2 at 20; *see Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973) ("[W]here comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response."). Thus, FEMA should have considered renewable energy alternatives.

The Court is also unpersuaded by Defendants' claim that it must accord substantial weight to the preferences of the applicant. Puerto Rico's own Central Office for Recovery, Reconstruction and Resiliency ("COR3") prepared a report titled *Build Resilient Communities, Modernize Infrastructure, and Restore the Natural Environment* that reflected the desire to transform the energy system by "[d]evelop[ing] an energy system that is customer-centric, affordable, reliable, and scalable; *incorporates more renewables, microgrids, and distributed energy resources*: and can drive new businesses and employment opportunities and support residents' well-being." Docket No. 46-6 at 99 (emphasis added). Similarly, the December 2017 Build Back Better Report submitted by *inter alia* the Puerto Rico Electric Power Authority and Puerto Rico Energy Commission states:

> The Government of Puerto Rico views the recovery effort as an opportunity to *transform* the Island by implementing solutions that are cost-effective and forward-looking, harness innovative thinking and best practices, and revitalize economic growth. The Governor is sharing this economic and disaster recovery plan consistent with his vision: 'To build the new Puerto Rico to meet the current and

> future needs of the people through *sustainable* economic development and social transformation; transparent and innovative approaches to governance; *resilient, modern, and state-of-the-art infrastructure*; and a safe, educated, healthy, and *sustainable* society.'

Docket No. 46-6 at 74 (emphasis added).

As to Defendants' reliance on mitigation measures to make a finding of no significant impact, "[a]s a general rule, the regulations contemplate that agencies . . . should not rely on the possibility of mitigation to avoid the EIS requirement." *Marsh*, 769 F.2d at 877. Mitigation measures can only support a finding of no significant impact if "imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal." *Id.* (citation omitted). As the First Circuit has stated that

> If a proposal appears to have adverse effects which would be significant, and certain mitigation measures are then developed during the scoping or EA stages, the existence of such possible mitigation does not obviate the need for an EIS[, which] is essential to ensure that the final decision is based on all the relevant factors and that the full NEPA process will result in enforceable mitigation measures through the Record of Decision.

*Id.* (citation omitted). On several instances, the Utilities PEA does not include mitigation measures although FEMA concluded that the alternative would have potential impacts; and in other instances, the proposed mitigation measures are conclusory or insufficiently specific.[5] Thus,

---

[5] *See, e.g.*, Docket No. 46-6 at 128 (as to the potential impacts to geology, FEMA found that Alternatives 2 and 3 could cause soil disturbances and changes to topography, but concluded the impact would be negligible to minor without providing support for this statement or proposing mitigation measures), 138 (finding that "[c]ompensatory mitigation may offset adverse impacts to wetlands" without specifying the measures contemplated), 140 (finding that "[c]ompensatory mitigation could offset adverse impacts to wetlands" without specifying the measures contemplated), 143 (notes that the alternative "would have short-term negligible impact on floodplains and floodways due to the actions covered by this PEA, mitigation measures, and compliance with local and federal permit requirements" but fails to specify the measures contemplated), 146 (notes that "[c]oordination with PRDNER and PRPB will occur prior to any work and limit impacts to the extent possible" but fails to specify the measures contemplated), 163 (fails to specify mitigation measures and, instead, shifts the burden to the applicant to "determin[e] the best

CIVIL NO. 24-1145 (JAG)                                                                          15

FEMA's reliance on such measures to support its finding of no significant impact is improper as it relates to the Utilities PEA.

Accordingly, the Court finds that the record establishes that the projects can significantly affect the human environment and Defendants' contrary conclusion lies outside the legally permissible bounds laid by NEPA. Thus, Defendants must prepare an EIS.[6]

### B. Public Facilities PEA

It is also uncontested that the projects included in Public Facilities PEA constitute a "major Federal action" under NEPA. The projects similarly raise substantial questions as to whether they may significantly affect the quality of the human environment. Thus, any funding decisions as to how to restore public facilities, which provide critical services to the people of Puerto Rico, could significantly affect the human environment. *See* Docket No. 46-6 at 221 ("More resilient and upgraded public facilities will allow services to remain open during future disaster events, which will enable quicker emergency response times, increase public safety, reduce injury and death, and increase survivability."), 224-225, 282 ("An interruption of public service or utilities can adversely impact public health.").

However, Plaintiffs challenge to FEMA's decision not to prepare an EIS for the Public Facilities PEA is premised on the argument that FEMA did not adequately consider reasonable renewable energy alternatives to rebuilding the energy infrastructure in the island. The Public

---

method of minimizing impacts to local populations."), 171 (fails to specify mitigation measures and, instead, shifts the burden to the applicant to "coordinat[e] with service providers and construction managers to minimize impacts to public services and the communities they support.").

[6] Because the Court finds that FEMA must prepare an EIS in relation to the Utilities PEA, it need not address whether FEMA should have undertaken additional NEPA review in light of significant new information undermining the agency's decision to proceed with rebuilding Puerto Rico's frail electricity grid.

**Addendum_016**

CIVIL NO. 24-1145 (JAG)                                                                                16

Facilities PEA does consider a renewable energy alternative: the use of microgrids. Docket No. 46-6 at 227, 230, 293, 309. But more importantly, the purpose of the Public Facilities PEA does not encompass restoring or replacing the energy infrastructure in the island,[7] and Plaintiffs do not identify language in the Public Facilities PEA that limits the reestablishment of power in governmental facilities to fossil fuel powered electricity. Moreover, upon review of the Public Facilities PEA, the Court finds that it adequately identifies potential environmental impacts and provides adequately specific information about mitigation measures to counteract such impacts.[8]

Accordingly, the Court finds Plaintiffs have not established by a preponderance of the evidence that FEMA violated NEPA by failing to prepare an EIS in relation to the Public Facilities PEA.[9]

---

[7] "The purpose of the programmatic actions considered herein is to restore Puerto Rican public facilities and their functions to meet the post-disaster needs of subrecipients and increase the resiliency of them in response to future disaster events." Docket No. 46-6 at 221. Public facilities covered by this PEA include emergency response facilities, non-profit houses of worship and churches, publicly owned and non-profit higher education facilities, state and municipal government offices, public housing communities, judiciary buildings, correction facilities, public recreation facilities, libraries, archives, museums, and certain PRIDCO facilities. Docket No. 46-4 at 221-22. It does not cover public utilities like the electrical infrastructure. While the PEA includes a section on public utilities, that section is about the impacts of the public facilities projects on utilities like electricity, not about how to restore, replace, or repair the energy infrastructure.

[8] In the section arguing that FEMA failed to take a hard look at the environmental consequences of the alternatives, Plaintiffs only reference a few pages from the Public Facilities PEA. The Court finds that FEMA's assessments in the Public Facilities PEA regarding impacts to air quality and endangered species are more robust than those in the Utilities PEA and include a more thorough discussion of specific mitigation measures to address these adverse impacts.

[9] Plaintiffs also argue that FEMA violated NEPA by failing to prepare a comprehensive EIS encompassing the projects in both the Utilities PEA and the Public Facilities PEA. However, because the Court found that the Public Facilities PEA was adequate and the preparation of an EIS was not mandated by NEPA, the Court need not address this argument. In any case, the Utilities PEA and the Public Facilities PEA do not constitute an overall project to reestablish power to the island since the Public Facilities PEA does not encompass restoring or replacing the energy infrastructure in the island. Similarly, Plaintiffs' claim that FEMA should have undertaken additional NEPA review in light of significant new information undermining the agency's decision to proceed with rebuilding Puerto Rico's frail electricity grid is also denied because the Public Facilities PEA does not encompass restoring or replacing the energy infrastructure in the island.

**Addendum_017**

CIVIL NO. 24-1145 (JAG)                                                                    17

## CONCLUSION

For the following reasons, Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The case is hereby remanded for FEMA to prepare an EIS in relation to the Utilities PEA. Judgment shall be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this Tuesday, September 30, 2025.

s/ Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
United States District Judge

**Addendum_018**

# 42 U.S.C. § 5172

\*　　\*　　\*

(a) Contributions

(1) In general

The President may make contributions--

(A) to a State or local government for the repair, restoration, reconstruction, or replacement of a public facility damaged or destroyed by a major disaster and for associated expenses incurred by the government[.]

\*　　\*　　\*

(e) Eligible cost

(1) Determination

(A) In general

For the purposes of this section, for disasters declared on or after August 1, 2017, or a disaster in which a cost estimate has not yet been finalized for a project, or for any project for which the finalized cost estimate is on appeal, the President shall estimate the eligible cost of repairing, restoring, reconstructing, or replacing a public facility or private nonprofit facility--

(i) on the basis of the design of the facility as the facility existed immediately before the major disaster[.]

\*　　\*　　\*

**44 C.F.R. § 206.201**

\*     \*     \*

(i) Permanent work means that restorative work that must be performed through repairs or replacement, to restore an eligible facility on the basis of its predisaster design and current applicable standards.

(j) Predisaster design means the size or capacity of a facility as originally designed and constructed or subsequently modified by changes or additions to the original design. It does not mean the capacity at which the facility was being used at the time the major disaster occurred if different from the most recent designed capacity.

\*     \*     \*

**44 C.F.R. § 206.226**

Work to restore eligible facilities on the basis of the design of such facilities as they existed immediately prior to the disaster and in conformity with the following is eligible[.]

\*     \*     \*