No. 25-2163

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

COMITÉ DIALOGO AMBIENTAL, INC.; ALIANZA COMUNITARIA AMBIENTALISTA DEL SURESTE, INC.; CAMPAMENTO CONTRA LAS CENIZAS EN PENUELAS, INC.; CASA TALLABOENA DE FORMACION COMUNITARIA Y RESILIENCIA, INC.; CENTER FOR BIOLOGICAL DIVERSITY; COMITE CABORROJENO PRO SALUD Y AMBIENTE, INC.; COMITE YABUCOENO PRO-CALIDAD DE VIDA, INC; EL PUENTE DE WILLIAMSBURG, INC.; FRENTE UNIDO PRO-DEFENSA DEL VALLE DE LAJAS, INC.,

*Plaintiffs-Appellees*,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY; DEPARTMENT OF HOMELAND SECURITY; KAREN EVANS, Acting Administrator, Federal Emergency Management Agency; KRISTI NOEM, Secretary, Department of Homeland Security,

*Defendants-Appellants*.

Appeal from the United States District Court for the District of Puerto Rico
Civ. A. No. 3:24-1145 (Hon. Jay A. Garcia-Gregory)

## JOINT APPENDIX VOLUME 1 (1-529)

(*For appearances, see inside cover*.)

*Of Counsel:*
LAUREN GILLESPIE
KRISTINA PETT
*Attorneys*
Federal Emergency Management
Agency

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT LUNDMAN
JACOB ECKER
CHRISTOPHER C. HAIR
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-9583
christopher.hair@usdoj.gov

*Counsel for Defendants-Appellants*

HOWARD M. CRYSTAL
ANCHUN JEAN SU
Center for Biological Diversity
1411 K Street, N.W.
Suite 1300
Washington, DC 20005
(202) 809-6926
hcrystal@biologicaldiversity.org
jsu@biologicaldiversity.org

*Counsel for Plaintiffs-Appellees*

Table of Contents for Joint Appendix of Record Excerpts
*Comité Dialogo Ambiental, Inc., et al. v. Federal Emergency*
*Management Agency, et al.,*
1st Cir. No. 25-2163

| Volume 1 (1-569) | | |
|---|---|---|
| **Documents from District Court Record** | **ECF No.** | **JA Page** |
| District Court Docket Report | | 1 |
| Complaint (Apr. 11, 2023) | 1 | 13 |
| Federal Defendants' Notice of Lodging the Administrative Record (July 31, 2024) | 45 | 71 |
| Federal Defendants' Notice of Appeal (Dec. 1, 2025) | 74 | 73 |
| Plaintiffs' Statement of Material Facts (Aug. 21, 2024) | 46-1 | 76 |
| Declaration of Timmy Boyle (Aug. 21, 2024) | 46-3 | 86 |
| Declaration of José Manuel Díaz Pérez (Aug. 21, 2024) | 46-4 | 89 |
| Declaration of Lydia M. Diaz Rodriguez (excerpts) (Aug. 21, 2024) | 46-5 | 92 |
| Second Declaration of Peter Galvin (excerpts) (Aug. 21, 2024) | 46-6 | 96 |
| Declaration of Frank S. Gonzalez Garcia (Aug. 21, 2024) | 46-7 | 99 |
| Declaration of Victor Alvarado Guzmán (Aug. 21, 2024) | 46-8 | 105 |
| Declaration of Sirena Montalvo Katz (Aug. 21, 2024) | 46-9 | 108 |
| Declaration of Federico Cintrón Moscoso (Aug. 21, 2024) | 46-10 | 111 |
| Declaration of Jose Vargas (Aug. 21, 2024) | 46-11 | 116 |
| Declaration of Carlos Alfredo Vivoni (Aug. 21, 2024) | 46-12 | 119 |
| Declaration of Ann Brown (Nov. 22, 2024) | 63-3 | 122 |
| Second Declaration of Victor Alvarado Guzmán (Nov. 22, 2024) | 63-4 | 156 |
| Declaration of Lissette Aviles-Ríos (Nov. 22, 2024) | 63-5 | 158 |

| Documents from Administrative Record | AR Page | JA Page |
|---|---|---|
| Puerto Rico Energy System Recovery and Resilience Advisory Group Initial Scenario Discussion, Virtual Meeting (Mar. 31, 2022) | AR_0000596-634 | 160 |
| Programmatic Environmental Assessment, Utility Repair, Replacement, and Realignment (Aug. 2020) | AR_0002886-3004 | 199 |
| Finding of No Significant Impact, Programmatic Environmental Assessment, Commonwealth of Puerto Rico - Utilities Repair, Replacement, and Realignment (June 2021) | AR_0003136-60 | 318 |
| Opposition to PREPA's Motion Seeking Puerto Rico Energy Bureau Approval of 10-Year Infrastructure Plan (Mar. 2, 2021) | AR_0003933-70 | 343 |
| Expert Testimony of Daniel Gutman – Puerto Rico Integrated Resource Plan (excerpts) (Oct. 23, 2019) | AR_0004322-35 | 381 |
| Center for Biological Diversity Letter re: Comments Objecting to the Approval of the Programmatic Environmental Assessment (Dec. 21, 2020) | AR_0004375-400 | 395 |
| Build Back Better: Reimagining and Strengthening the Power Grid of Puerto Rico (Dec. 2017) | AR_0008376-438 | 421 |
| COR3, Puerto Rico Energy System Modernization (ESM) Plan, FEMA Presentation (Feb. 5, 2019) | AR_0011455-93 | 484 |
| Government of Puerto Rico - Puerto Rico Planning Board, Resolution JP-2018-324 (Oct. 3, 2018) | AR_0011701-07 | 523 |

| Volume 2 (570-961) | | |
|---|---|---|
| Documents from Administrative Record | AR Page | JA Page |
| Transformation and Innovation in the Wake of Devastation - An Economic and Disaster Recovery Plan for Puerto Rico (excerpts) (Aug. 8, 2018) | AR_0017363-600 | 530 |
| Application – Puerto Rico Electric Power Authority (excerpts) (Sep. 20, 2017) | AR_0026528-87 | 768 |

| | | |
|---|---|---|
| PREPA-LUMA 90-Day Plan (Dec. 2021) | AR_0027198-209 | 828 |
| PREPA Supplemental 90-Day Plan (Dec. 2020) | AR_0027224-29 | 840 |
| FEMA Letter to Center for Biological Diversity (Jan. 25, 2023) | AR_0029141-42 | 846 |
| Center for Biological Diversity Letter re: Urgent Demand for Appropriate NEPA Review on FEMA's Funding Towards Puerto Rico Electricity Projects (Jan. 6, 2023) | AR_0029401-07 | 848 |
| Email re: Energy PEA Partner Meeting (Apr. 13, 2023) | AR_0029687-90 | 855 |
| Email re: Energy PEA Partner Meeting (Feb. 15, 2023) | AR_0029701-03 | 859 |
| Email re: FEMA PR Power Kickoff (July 19, 2022) | AR_0029741-42 | 862 |
| Memorandum for Record: NEPA Approach for Puerto Rico Energy Generation Projects in the Hurricanes Irma and Maria and Earthquake Disasters at the Puerto Rico Joint Recovery Office (June 21, 2022) | AR_0029751-54 | 864 |
| We Want Sun and We Want More 75% Distributed Renewable Generation in 15 Years in Puerto Rico is Achievable and Affordable (Mar. 2021) | AR_0029787-807 | 868 |
| Puerto Rico Distributed Energy Resource Integration Study (Feb. 2021) | AR_0029934-66 | 889 |

# United States District Court
## District of Puerto Rico (San Juan)
## CIVIL DOCKET FOR CASE #: 3:24−cv−01145−JAG

Comite Dialogo Ambiental, Inc. et al v. Federal Emergency Management Agency et al
Assigned to: Judge Jay A. Garcia−Gregory
Case in other court:  District of Columbia, 1:23−cv−00984
25−02163
Cause: 30:181 Environment: Review of Agency Action

Date Filed: 03/26/2024
Date Terminated: 10/02/2025
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **Comite Dialogo Ambiental, Inc.** | represented by | **Anchun Jean Su**<br>Center for Biological Diversity<br>1411 K Street, NW<br>Suite 1300<br>Washington, DC 20005<br>(202) 849−8399<br>Fax: (510) 844−7150<br>Email: jsu@biologicaldiversity.org<br>*LEAD ATTORNEY* |
| | | **Howard M. Crystal**<br>Center for Biological Diversity<br>1411 K Street N.W.<br>Suite 1300<br>Washington, DC 20005<br>202−809−6926<br>Email: hcrystal@biologicaldiversity.org<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **William Santiago−Sastre**<br>P.O. Box 1801<br>Sabana Seca, PR 00952−1801<br>787−448−7032<br>Fax: 787−946−1090<br>Email: wsantiagosastre@gmail.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Alianza Comunitaria Ambientalista Del Sureste, Inc.** | represented by | **Anchun Jean Su**<br>(See above for address)<br>*LEAD ATTORNEY* |
| | | **Howard M. Crystal**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **William Santiago−Sastre**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

represented by

**JA_1**

**Campamento Contra Las Cenizas en Penuelas, Inc.**

**Anchun Jean Su**
(See above for address)
*LEAD ATTORNEY*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Santiago–Sastre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Casa Tallaboena de Formacion Comunitaria y Resiliencia, Inc.**

represented by **Anchun Jean Su**
(See above for address)
*LEAD ATTORNEY*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Santiago–Sastre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Center For Biological Diversity**

represented by **Anchun Jean Su**
(See above for address)
*LEAD ATTORNEY*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Santiago–Sastre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Comite Caborrojeno Pro Salud y Ambiente, Inc.**

represented by **Anchun Jean Su**
(See above for address)
*LEAD ATTORNEY*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Santiago–Sastre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Comite Yabucoeno Pro–Calidad de Vida Inc.**

represented by **Anchun Jean Su**
(See above for address)
*LEAD ATTORNEY*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Santiago–Sastre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**El Puente de Williamsburg, Inc.**

represented by **Anchun Jean Su**
(See above for address)
*LEAD ATTORNEY*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Santiago–Sastre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Frente Unido Pro–Defensa del Valle de Lajas, Inc.**

represented by **Anchun Jean Su**
(See above for address)
*LEAD ATTORNEY*

**Howard M. Crystal**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Santiago–Sastre**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Federal Emergency Management Agency**

represented by **Krystal–Rose Perez**
Natural Resources Sect, Environment &
Natural Resources Div
150 M Street NE
Washington, DC 20002
202–305–0486
Email: krystal–rose.perez@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA_3**

Katharine L. Laubach
DOJ–Enrd
150 M Street NE
Washington, DC 20002
202–305–8568
Email: Katharine.laubach@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Homeland Security**        represented by  **Krystal–Rose Perez**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Katharine L. Laubach**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Deanne Criswell**                        represented by  **Krystal–Rose Perez**
*Administrator; Federal Emergency*                          (See above for address)
*Management Agency*                                         *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Katharine L. Laubach**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Alejandro N. Mayorkas**                  represented by  **Krystal–Rose Perez**
*Secretary; Department of Homeland*                         (See above for address)
*Security*                                                  *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Katharine L. Laubach**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**LatinoJustice PRLDEF**                   represented by  **Roberto Cruz–Hernandez**
*3217541935*                                                Southern Legal Counsel, Inc.
                                                            1229 NW 12 Avenue
                                                            Gainesville, FL 32601
                                                            352–271–8890
                                                            Fax: 352–271–8347
                                                            Email: roberto.cruz@southernlegal.org
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**American Civil Liberties Union**
*6468858332*

**Amicus**

**American Civil Liberties Union of**      represented by  **Fermin Luis Arraiza–Navas**
**Puerto Rico**                                             American Civil Liberties Union
*7877539493*                                                PO Box 40473
                                                            San Juan, PR 00940–0473
                                                            787–966–3133
                                                            Fax: 787–753–4268
                                                            Email: arraizanavasfermin@gmail.com

JA_4

| Date Filed | # | Docket Text |
|---|---|---|
| 04/11/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number ADCDC–9989203) filed by CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Attachment, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons)(Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/11/2023 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CENTER FOR BIOLOGICAL DIVERSITY (Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/11/2023 | 3 | NOTICE of Appearance by Howard M. Crystal on behalf of All Plaintiffs (Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/11/2023 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Augusta C.F. Wilson, Filing fee $ 100, receipt number ADCDC–9989514. Fee Status: Fee Paid. by ALIANZA COMUNITARIA AMBIENTALISTA DEL SURESTE, INC., CAMPAMENTO CONTRA LAS CENIZAS EN PENUELAS, INC., CASA TALLABOENA DE FORMACION COMUNITARIA Y RESILIENCIA, INC., CENTER FOR BIOLOGICAL DIVERSITY, COMITE CABORROJENO PRO SALUD Y AMBIENTE, INC., COMITE DIALOGO AMBIENTAL, INC., COMITE YABUCOENO PRO–CALIDAD DE VIDA, INC., EL PUENTE DE WILLIAMSBURG, INC., FRENTE UNIDO PRO–DEFENSA DEL VALLE DE LAJAS, INC.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/11/2023 | | Case Assigned to Judge Colleen Kollar–Kotelly. (zrtw) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/11/2023 | 5 | SUMMONS (4) Issued Electronically as to DEANNE CRISWELL, DEPARTMENT OF HOMELAND SECURITY, FEDERAL EMERGENCY MANAGEMENT AGENCY and ALEJANDRO MAYORKAS (Attachments: # 1 Notice and Consent)(zrtw) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/11/2023 | | NOTICE OF ERROR re 1 Complaint; emailed to hcrystal@biologicaldiversity.org, cc'd 3 associated attorneys –– The PDF file you docketed contained errors: 1. Missing summonses–government. When naming a government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zrtw, ) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/11/2023 | 6 | REQUEST FOR SUMMONS TO ISSUE *to U.S. Atty Gen. and U.S. Atty for D.C.* by CENTER FOR BIOLOGICAL DIVERSITY filed by CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Summons–US Attorney for DC)(Wilson, Augusta) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/11/2023 | | MINUTE ORDER: The Court is in receipt of Plaintiff's 3 Motion for Admission Pro Hac Vice as to Augusta C.F. Wilson. Counsel Wilson represents that they practice from an office located in the District of Columbia and that their application for admission to the Bar of the District of Columbia is pending. Counsel Wilson does not represent that they have applied for admission to the bar of this jurisdiction. Pursuant to LCvR 83.2(c)(2) and the comment thereto, the 3 Motion for Admission Pro Hac Vice as to August C.F. Wilson is **DENIED WITHOUT PREJUDICE**. The Court will grant admission *pro hac vice* only after counsel Wilson submits an Application for Admission to the Bar of the United States District and Bankruptcy Courts for the District of Columbia. Signed by Judge Colleen Kollar–Kotelly on April 11, 2023. (lcckk1) [Transferred from dcd on 3/26/2024.] (Entered: 04/11/2023) |
| 04/12/2023 | 7 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zjm) [Transferred from dcd on 3/26/2024.] |

| | | |
|---|---|---|
| | | (Entered: 04/12/2023) |
| 04/13/2023 | 8 | NOTICE of Appearance by Anchun Jean Su on behalf of All Plaintiffs (Su, Anchun) [Transferred from dcd on 3/26/2024.] (Entered: 04/13/2023) |
| 05/25/2023 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/12/2023. Answer due for ALL FEDERAL DEFENDANTS by 6/11/2023. (Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 05/25/2023) |
| 05/25/2023 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/24/23. (Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 05/25/2023) |
| 05/25/2023 | 11 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FEDERAL EMERGENCY MANAGEMENT AGENCY served on 4/24/2023 (Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 05/25/2023) |
| 05/25/2023 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DEPARTMENT OF HOMELAND SECURITY served on 4/24/2023 (Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 05/25/2023) |
| 05/25/2023 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DEANNE CRISWELL served on 4/24/2023 (Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 05/25/2023) |
| 05/25/2023 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ALEJANDRO MAYORKAS served on 4/24/2023 (Crystal, Howard) [Transferred from dcd on 3/26/2024.] (Entered: 05/25/2023) |
| 06/08/2023 | 15 | NOTICE of Appearance by Krystal−Rose Perez on behalf of All Defendants (Perez, Krystal−Rose) [Transferred from dcd on 3/26/2024.] (Entered: 06/08/2023) |
| 06/08/2023 | 16 | Joint MOTION for Briefing Schedule *re Defendants' Motion to Transfer Venue*, Unopposed MOTION for Extension of Time to File Answer *to Plaintiffs' Complaint* by DEANNE CRISWELL, DEPARTMENT OF HOMELAND SECURITY, FEDERAL EMERGENCY MANAGEMENT AGENCY, ALEJANDRO MAYORKAS. (Attachments: # 1 Proposed Order)(Perez, Krystal−Rose) [Transferred from dcd on 3/26/2024.] (Entered: 06/08/2023) |
| 06/14/2023 | | MINUTE ORDER: The Court is in receipt of the parties' 16 Joint Motion for Enlargement of Time to File Answer and Set Briefing Schedule. The parties jointly request a briefing schedule for a motion to transfer venue and for a continuance of Defendant's deadline to answer pending the resolution of such a motion. As the parties consent, and upon good cause shown, the parties' 16 Joint Motion for Enlargement of Time to File Answer and Set Briefing Schedule is **GRANTED**. Defendants shall file their motion to transfer venue on or before **June 16, 2023**, Plaintiffs shall file their response on or before **July 7, 2023**, and Defendants shall file their reply on or before **July 21, 2023**. Finally, Defendants shall file their answer no later than **twenty−one days after the Court's resolution of the motion**. Signed by Judge Colleen Kollar−Kotelly on June 14, 2023. (lcckk1) [Transferred from dcd on 3/26/2024.] (Entered: 06/14/2023) |
| 06/14/2023 | | Set/Reset Deadlines: Defendants' Motion to transfer venue due by 6/16/2023. PlaintiffsResponse due by 7/7/2023. Defendants' Reply due by 7/21/2023. (dot) [Transferred from dcd on 3/26/2024.] (Entered: 06/16/2023) |
| 06/16/2023 | 17 | MOTION to Transfer Case by DEANNE CRISWELL, DEPARTMENT OF HOMELAND SECURITY, FEDERAL EMERGENCY MANAGEMENT AGENCY, ALEJANDRO MAYORKAS. (Attachments: # 1 Declaration)(Perez, Krystal−Rose) [Transferred from dcd on 3/26/2024.] (Entered: 06/16/2023) |
| 07/07/2023 | 18 | Memorandum in opposition to re 17 Motion to Transfer Case filed by ALIANZA COMUNITARIA AMBIENTALISTA DEL SURESTE, INC., CAMPAMENTO CONTRA LAS CENIZAS EN PENUELAS, INC., CASA TALLABOENA DE FORMACION COMUNITARIA Y RESILIENCIA, INC., CENTER FOR BIOLOGICAL DIVERSITY, COMITE CABORROJENO PRO SALUD Y |

| | | |
|---|---|---|
| | | AMBIENTE, INC., COMITE DIALOGO AMBIENTAL, INC., COMITE YABUCOENO PRO–CALIDAD DE VIDA, INC., EL PUENTE DE WILLIAMSBURG, INC., FRENTE UNIDO PRO–DEFENSA DEL VALLE DE LAJAS, INC.. (Attachments: # 1 Declaration Declaration of Macro Carrion, # 2 Declaration Declaration of Peter Galvin, # 3 Text of Proposed Order)(Su, Anchun) [Transferred from dcd on 3/26/2024.] (Entered: 07/07/2023) |
| 07/21/2023 | 19 | REPLY to opposition to motion re 17 MOTION to Transfer Case filed by DEANNE CRISWELL, DEPARTMENT OF HOMELAND SECURITY, FEDERAL EMERGENCY MANAGEMENT AGENCY, ALEJANDRO MAYORKAS. (Perez, Krystal–Rose) [Transferred from dcd on 3/26/2024.] (Entered: 07/21/2023) |
| 08/21/2023 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Augusta C.F. Wilson, Receipt No ADCDC–10291057. Filing fee $100. by ALIANZA COMUNITARIA AMBIENTALISTA DEL SURESTE, INC., CAMPAMENTO CONTRA LAS CENIZAS EN PENUELAS, INC., CASA TALLABOENA DE FORMACION COMUNITARIA Y RESILIENCIA, INC., CENTER FOR BIOLOGICAL DIVERSITY, COMITE CABORROJENO PRO SALUD Y AMBIENTE, INC., COMITE DIALOGO AMBIENTAL, INC., COMITE YABUCOENO PRO–CALIDAD DE VIDA, INC., EL PUENTE DE WILLIAMSBURG, INC., and FRENTE UNIDO PRO–DEFENSA DEL VALLE DE LAJAS, INC. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(ztnr) [Transferred from dcd on 3/26/2024.] (Entered: 08/22/2023) |
| 08/22/2023 | | MINUTE ORDER granting 20 Motion for Leave to Appear Pro Hac Vice as to Augusta C.F. Wilson. **Counsel shall register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) forthwith** Click for instructions. Signed by Judge Colleen Kollar–Kotelly on August 22, 2023. (lcckk1) [Transferred from dcd on 3/26/2024.] (Entered: 08/22/2023) |
| 08/25/2023 | 21 | NOTICE of Appearance by Augusta Wilson on behalf of CENTER FOR BIOLOGICAL DIVERSITY (Wilson, Augusta) [Transferred from dcd on 3/26/2024.] (Entered: 08/25/2023) |
| 03/11/2024 | 22 | MOTION to Compel *Production of the Administrative Record* by CENTER FOR BIOLOGICAL DIVERSITY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Text of Proposed Order)(Wilson, Augusta) [Transferred from dcd on 3/26/2024.] (Entered: 03/11/2024) |
| 03/12/2024 | 23 | MEMORANDUM OPINION AND ORDER granting Defendants' 17 Motion to Transfer Venue to the District of Puerto Rico. Signed by Judge Colleen Kollar–Kotelly on 3/12/2024. (lcckk1) [Transferred from dcd on 3/26/2024.] (Entered: 03/12/2024) |
| 03/12/2024 | | Set/Reset Deadlines: Transfer due by 3/22/2024. (dot) [Transferred from dcd on 3/26/2024.] (Entered: 03/13/2024) |
| 03/26/2024 | 24 | Case transferred in from District of District of Columbia; Case Number 1:23–cv–00984. Original file certified copy of transfer order and docket sheet received. (Entered: 03/26/2024) |
| 03/26/2024 | 25 | NOTICE TO COUNSEL re: case transferred from the District of Columbia. (mg) (Entered: 04/01/2024) |
| 04/02/2024 | 26 | NOTICE of Appearance by William Santiago–Sastre on behalf of All Plaintiffs (Santiago–Sastre, William) (Entered: 04/02/2024) |
| 04/02/2024 | 27 | ***FILED IN ERROR – Incorrect Signing format as to Applicant and Local Counsel*** Motion to allow Howard Crystal to appear pro hac vice (Pro Hac fee $300 receipt number APRDC–8613754) filed by William Santiago–Sastre on behalf of All Plaintiffs Responses due by 4/16/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Santiago–Sastre, William) Modified on 4/3/2024 (mg). (Entered: 04/02/2024) |
| 04/02/2024 | 28 | ***FILED IN ERROR – Incorrect Signing format as to Applicant and Local Counsel*** Motion to allow Augusta Wilson to appear pro hac vice (Pro Hac fee $300 receipt number APRDC–8613779) filed by William Santiago–Sastre on behalf of All Plaintiffs Responses due by 4/16/2024. NOTE: Pursuant to FRCP 6(a) an additional |

| | | |
|---|---|---|
| | | three days does not apply to service done electronically. (Santiago–Sastre, William) Modified on 4/3/2024 (mg). (Entered: 04/02/2024) |
| 04/02/2024 | 29 | First MOTION for Extension of Time until April 23, 2024 to File Answer filed by Krystal–Rose Perez on behalf of All Defendants Responses due by 4/16/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Laubach, Katharine) (Entered: 04/02/2024) |
| 04/02/2024 | | NOTICE of Docket Text Modification by Deputy Clerk re: 27 Motion to allow Howard Crystal to appear pro hac vice (Pro Hac fee $300 receipt number APRDC–8613754), 28 Motion to allow Augusta Wilson to appear pro hac vice (Pro Hac fee $300 receipt number APRDC–8613779). ***FILED IN ERROR – Incorrect Signing format as to Applicant and Local Counsel*** Local Counsel to re–file using electronic signature and applicant using manual signature. (mg) (Entered: 04/03/2024) |
| 04/04/2024 | 30 | Second Motion to allow Howard Crystal to appear pro hac vice (Pro Hac fee $300 receipt number APRDC–8613754) filed by William Santiago–Sastre on behalf of All Plaintiffs Responses due by 4/18/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Santiago–Sastre, William) (Entered: 04/04/2024) |
| 04/08/2024 | 31 | ORDER granting 29 Motion for Extension of Time to Answer. Answer due by 4/23/2024. Signed by Judge Jay A. Garcia–Gregory on 4/8/2024. (ABG) (Entered: 04/08/2024) |
| 04/11/2024 | 32 | ORDER granting 30 Motion to Appear PHV. Signed by Judge Jay A. Garcia–Gregory on 4/11/2024. (ABG) (Entered: 04/11/2024) |
| 04/12/2024 | 33 | NOTICE TO PRO HAC VICE Howard M. Crystal re: 32 Order on Motion to Appear PHV : The Court has granted your pro hac vice application. In order to start receiving notifications, you must file a notice of appearance using your upgraded PACER account. For more information, visit the following link: **https://www.prd.uscourts.gov/nextgen–cmecf–what–it–means–you**. (mg) (Entered: 04/12/2024) |
| 04/12/2024 | 34 | NOTICE of Appearance by Howard M. Crystal on behalf of All Plaintiffs (Crystal, Howard) (Entered: 04/12/2024) |
| 04/19/2024 | 35 | Second Motion to allow Augusta Wilson to appear pro hac vice (Pro Hac fee $300 receipt number APRDC–8613779) filed by William Santiago–Sastre on behalf of All Plaintiffs Responses due by 5/3/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Santiago–Sastre, William) (Entered: 04/19/2024) |
| 04/23/2024 | 36 | ORDER granting 35 Motion to Appear PHV. Signed by Judge Jay A. Garcia–Gregory on 4/23/2024. (ABG) (Entered: 04/23/2024) |
| 04/23/2024 | 37 | NOTICE of Appearance by Krystal–Rose Perez on behalf of All Defendants (Perez, Krystal–Rose) (Entered: 04/23/2024) |
| 04/23/2024 | 38 | ***FILED IN ERROR: Lacking Local Counsel's electronic signature (S/), it's required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Counsel to re–file*** ANSWER to 1 Complaint, filed by Krystal–Rose Perez on behalf of Deanne Criswell, Department of Homeland Security, Federal Emergency Management Agency, Alejandro N. Mayorkas.(Perez, Krystal–Rose) Modified on 4/24/2024 (mg). (Entered: 04/23/2024) |
| 04/23/2024 | 39 | SCHEDULING ORDER/CASE MANAGEMENT ORDER: The Parties shall file a JOINT Initial Scheduling Memorandum by 5/24/2024. **JOINT Proposed Pretrial Order due by 4/30/2026. Pretrial/Settlement Conference set for 5/14/2026 01:30 PM before Judge Jay A. Garcia–Gregory. Bench Trial Hearing set for 6/1/2026 10:00 AM before Judge Jay A. Garcia–Gregory.** Signed by Judge Jay A. Garcia–Gregory on 4/23/2024.(ABG) (Entered: 04/23/2024) |
| 04/23/2024 | | NOTICE of Docket Text Modification by Deputy Clerk re: 38 Answer to Complaint,. ***FILED IN ERROR: Lacking Local Counsel's electronic signature (S/) it's required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Counsel to re–file*** (mg) (Entered: 04/24/2024) |

| | | |
|---|---|---|
| 04/24/2024 | 40 | NOTICE TO PRO HAC VICE Augusta C. F. Wilson re: 36 Order on Motion to Appear PHV : The Court has granted your pro hac vice application. In order to start receiving notifications, you must file a notice of appearance using your upgraded PACER account. For more information, visit the following link: **https://www.prd.uscourts.gov/nextgen–cmecf–what–it–means–you**. (mg) (Entered: 04/24/2024) |
| 04/26/2024 | 41 | NOTICE of Appearance by Augusta Wilson on behalf of All Plaintiffs (Wilson, Augusta) (Entered: 04/26/2024) |
| 04/29/2024 | 42 | *Corrected* ANSWER to Complaint filed by Krystal–Rose Perez on behalf of Deanne Criswell, Department of Homeland Security, Federal Emergency Management Agency, Alejandro N. Mayorkas.(Perez, Krystal–Rose) (Entered: 04/29/2024) |
| 05/24/2024 | 43 | Joint INITIAL SCHEDULING CONFERENCE MEMORANDUM by Center For Biological Diversity, Comite dialogo Ambiental, Inc., Alianza Comunitaria Ambientalista Del Surreste, Inc., Casa Tallaboena de Formacion Comunitaria y Resilencia, Inc., Campamento Contra las Cenizas en Penuelas, Inc., Comite Caborrojeno Pro Salud y Ambiente, Inc., El Puente Williamsburg, Inc., Frente Unido Pro–Defendsa del Valle de Lajas, Inc., Department of Homeland Security, Comite Yabucoeno Pro–Calidad de Vida Inc. Deanne Criswell and Federal Emergency Manaement Agency. (Wilson, Augusta) Modified to add filers on 5/29/2024 (rim). (Entered: 05/24/2024) |
| 06/06/2024 | 44 | SCHEDULING ORDER/CASE MANAGEMENT ORDER. The Court hereby sets the following deadlines: **Lodge the complete Administrative Record with the Court due by 7/31/2024. Motions to challenge the sufficiency of the Administrative Record due by 7/23/2024. Response to motion challenging the sufficiency of the Administrative Record due by 8/28/2024. Reply in support of motion challenging the sufficiency of the Administrative Record due by 9/11/2024.** In the event no motion challenging the sufficiency of the record is filed, the Court sets the following deadlines: **Plaintiffs' Motion for Summary Judgment due by 8/21/2024. FEMA's Combined Cross–Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment due by 10/2/2024. Plaintiffs' Combined Reply in Support of their Motion for Summary Judgment and Opposition to FEMA's Cross–Motion for Summary Judgment due by 10/30/2024. FEMA's Reply in Support of its Cross–Motion for Summary Judgment due by 12/4/2024.** The briefs shall be limited to 30 pages, oppositions shall be limited to 20 pages, and replies shall be limited to 10 pages. Signed by Judge Jay A. Garcia–Gregory on 6/6/2024.(ABG) (Entered: 06/06/2024) |
| 07/31/2024 | 45 | NOTICE *of Lodging the Administrative Record* by All Defendants (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Perez, Krystal–Rose) (Entered: 07/31/2024) |
| 08/21/2024 | 46 | MOTION for Summary Judgment filed by Augusta Wilson on behalf of All Plaintiffs. Suggestions in Opposition to Summary Judgment due by 9/4/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Statement of Material Facts, # 2 Memorandum in Support, # 3 Declaration, # 4 Declaration, # 5 Declaration, # 6 Declaration, # 7 Declaration, # 8 Declaration, # 9 Declaration, # 10 Declaration, # 11 Declaration, # 12 Declaration)(Wilson, Augusta) (Entered: 08/21/2024) |
| 08/27/2024 | 47 | NOTICE of Appearance by Roberto Cruz–Hernandez on behalf of LatinoJustice PRLDEF, American Civil Liberties Union, American Civil Liberties Union of Puerto Rico (Cruz–Hernandez, Roberto) (Entered: 08/27/2024) |
| 08/27/2024 | 48 | ***FILED IN ERROR – Incorrect signature format as to Applicant Counsel–PHV and Local Counesl***. Motion to allow Nickole Durbin–Felix to appear pro hac vice (Pro Hac fee $300 receipt number BPRDC–8801748) filed by Roberto Cruz–Hernandez on behalf of LatinoJustice PRLDEF. Responses due by 9/10/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Cruz–Hernandez, Roberto) Modified on 8/28/2024 to place file in error. (mg). (Entered: 08/27/2024) |
| 08/27/2024 | 49 | Third Party MOTION for Leave to File Document *Brief of Amici Curiae* filed by Roberto Cruz–Hernandez on behalf of LatinoJustice PRLDEF. Responses due by 9/10/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to |

| | | |
|---|---|---|
| | | service done electronically. (Attachments: # 1 Exhibit Proposed Amicus Brief)(Cruz−Hernandez, Roberto) (Entered: 08/27/2024) |
| 08/27/2024 | | NOTICE of Docket Text Modification by Deputy Clerk re: 48 Motion to allow Nickole Durbin−Felix to appear pro hac vice (Pro Hac fee $300 receipt number BPRDC−8801748). ***FILED IN ERROR − Incorrect signature format as to Applicant Counsel−PHV and Local Counsel. Pro Hac Vice shall use handwritten signature. Lacking Local Counsel's electronic signature (S/) as required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Local Counsel to re−file*** (mg) (Entered: 08/28/2024) |
| 08/28/2024 | 50 | NOTICE of Appearance by Fermin Luis Arraiza−Navas on behalf of American Civil Liberties Union of Puerto Rico (Arraiza−Navas, Fermin) Modified on 8/29/2024 to edit docket text as to event type. (mg). (Entered: 08/28/2024) |
| 08/28/2024 | 51 | ***FILED IN ERROR: Lacking Local Counsel's electronic signature (S/) is required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Counsel to re−file*** Motion to allow Alejandro Ortiz to appear pro hac vice (Pro Hac fee $300 receipt number APRDC−8802919) filed by Fermin Luis Arraiza−Navas on behalf of American Civil Liberties Union of Puerto Rico. Responses due by 9/11/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Arraiza−Navas, Fermin) Modified on 8/29/2024 (mg). (Entered: 08/28/2024) |
| 08/28/2024 | | NOTICE of Docket Text Modification by Deputy Clerk re: 51 Motion to allow Alejandro Ortiz to appear pro hac vice (Pro Hac fee $300 receipt number APRDC−8802919). ***FILED IN ERROR: Lacking Local Counsel's electronic signature (S/) is required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Counsel to re−file*** (mg) (Entered: 08/29/2024) |
| 08/30/2024 | 52 | ***FILED IN ERROR: Lacking Local Counsel's electronic signature (S/) is required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Counsel to re−file*** Motion to allow Nickole Durbin−Felix to appear pro hac vice (Pro Hac fee $300 receipt number APRDC−8805683) filed by Roberto Cruz−Hernandez on behalf of LatinoJustice PRLDEF. Responses due by 9/13/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Cruz−Hernandez, Roberto) Modified on 8/30/2024 (mg). (Entered: 08/30/2024) |
| 08/30/2024 | | NOTICE of Docket Text Modification by Deputy Clerk re: 52 Motion to allow Nickole Durbin−Felix to appear pro hac vice (Pro Hac fee $300 receipt number APRDC−8805683). ***FILED IN ERROR: Lacking Local Counsel's electronic signature (S/) is required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Counsel to re−file*** (mg) (Entered: 08/30/2024) |
| 08/30/2024 | 53 | Motion to allow Nickole Durbin−Felix to appear pro hac vice (Pro Hac fee $300 receipt number APRDC−8806129) filed by Roberto Cruz−Hernandez on behalf of LatinoJustice PRLDEF. Responses due by 9/13/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Cruz−Hernandez, Roberto) (Entered: 08/30/2024) |
| 08/30/2024 | 54 | ORDER granting 53 Motion to Appear PHV. Signed by Judge Jay A. Garcia−Gregory on 8/30/2024. (ABG) (Entered: 08/30/2024) |
| 08/30/2024 | 55 | ***FILED IN ERROR: Lacking Local Counsel's electronic signature (S/) is required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Counsel to re−file*** Motion to allow Alejandro Ortiz to appear pro hac vice (Pro Hac fee $300 receipt number APRDC−8802919) filed by Fermin Luis Arraiza−Navas on behalf of American Civil Liberties Union of Puerto Rico. Responses due by 9/13/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Arraiza−Navas, Fermin) Modified on 9/3/2024 (mg). (Entered: 08/30/2024) |
| 08/30/2024 | | NOTICE of Docket Text Modification by Deputy Clerk re: 55 Motion to allow Alejandro Ortiz to appear pro hac vice (Pro Hac fee $300 receipt number APRDC−8802919). ***FILED IN ERROR: Lacking Local Counsel's electronic signature (S/) is required pursuant to the 2014 CM/ECF Revised Manual, II.C.3.b. Counsel to re−file*** (mg) (Entered: 09/03/2024) |

**JA_10**

| | | |
|---|---|---|
| 09/03/2024 | <u>56</u> | Motion to allow Alejandro Ortiz to appear pro hac vice (Pro Hac fee $300 receipt number APRDC–8802919) filed by Fermin Luis Arraiza–Navas on behalf of American Civil Liberties Union of Puerto Rico. Responses due by 9/17/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Arraiza–Navas, Fermin) (Entered: 09/03/2024) |
| 09/03/2024 | 57 | NOTICE TO PRO HAC VICE Nickole Durbin–Felix re: 54 Order on Motion to Appear PHV : The Court has granted your pro hac vice application. In order to start receiving notifications, you must file a notice of appearance using your upgraded PACER account. For more information, visit the following link: **https://www.prd.uscourts.gov/nextgen–cmecf–what–it–means–you**. (mg) (Entered: 09/03/2024) |
| 09/06/2024 | 58 | ORDER granting <u>56</u> Motion to Appear PHV.  Signed by Judge Jay A. Garcia–Gregory on 9/6/2024. (ABG) (Entered: 09/06/2024) |
| 09/06/2024 | 59 | NOTICE TO PRO HAC VICE Alejandro A. Ortiz re: 58 Order on Motion to Appear PHV : The Court has granted your pro hac vice application. In order to start receiving notifications, you must file a notice of appearance using your upgraded PACER account. For more information, visit the following link: **https://www.prd.uscourts.gov/nextgen–cmecf–what–it–means–you**. (mg) (Entered: 09/09/2024) |
| 09/20/2024 | <u>60</u> | Consent MOTION for extension of time filed by Krystal–Rose Perez on behalf of All Defendants. Responses due by 10/4/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # <u>1</u> Proposed Order)(Perez, Krystal–Rose) (Entered: 09/20/2024) |
| 10/02/2024 | 61 | ORDER granting <u>60</u> Motion for Extension of Time.  <span style="color:red">FEMA's Combined Cross–Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment due by 10/16/2024. Plaintiffs' Opposition to FEMA's Cross–Motion for Summary Judgment due by 11/22/2024. FEMA's Reply in Support of its Cross–Motion for Summary Judgment due by 1/10/2025.</span> Signed by Judge Jay A. Garcia–Gregory on 10/2/2024. (ABG) (Entered: 10/02/2024) |
| 10/16/2024 | <u>62</u> | Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed by Krystal–Rose Perez on behalf of All Defendants. Suggestions in Opposition to Summary Judgment due by 10/30/2024. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # <u>1</u> Combined Brief in Support of Defs.' Cross–Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, # <u>2</u> Statement of Facts, # <u>3</u> Response to Plaintiffs' Statement of Facts)(Perez, Krystal–Rose) (Entered: 10/16/2024) |
| 11/22/2024 | <u>63</u> | MEMORANDUM in Opposition *and Reply* filed by All Plaintiffs Re: <u>62</u> Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed by Federal Emergency Management Agency, Deanne Criswell, Alejandro N. Mayorkas, Department of Homeland Security filed by All Plaintiffs. (Attachments: # <u>1</u> Response to Statement of Facts, # <u>2</u> Additional Statement of Material Facts, # <u>3</u> Declaration, # <u>4</u> Declaration, # <u>5</u> Declaration)(Wilson, Augusta) (Entered: 11/22/2024) |
| 01/10/2025 | <u>64</u> | REPLY to Motion filed by All Defendants Re: <u>62</u> Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed by Federal Emergency Management Agency, Deanne Criswell, Alejandro N. Mayorkas, Department of Homeland Security filed by All Defendants. (Attachments: # <u>1</u> Reply Statement of Facts)(Perez, Krystal–Rose) (Entered: 01/10/2025) |
| 01/13/2025 | <u>65</u> | MOTION to Withdraw Attorney as to Augusta Wilson filed by Augusta Wilson on behalf of All Plaintiffs. Responses due by 1/27/2025. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Wilson, Augusta) (Entered: 01/13/2025) |
| 01/14/2025 | 66 | ORDER granting <u>65</u> Motion to Withdraw as Attorney.  Signed by Judge Jay A. Garcia–Gregory on 1/14/2025. (ABG) (Entered: 01/14/2025) |
| 03/14/2025 | <u>67</u> | NOTICE of Appearance by Katharine L. Laubach on behalf of All Defendants (Laubach, Katharine) (Entered: 03/14/2025) |

| | | |
|---|---|---|
| 03/31/2025 | 68 | ORDER granting 49 Motion for Leave to File *Amicus* Brief. The Court notes that "[w]hether to permit amicus participation is a matter of judicial discretion." *United States v. Keheler*, 475 F. Supp. 3d 80, 83 (D.P.R. 2020). Accordingly, the Court will allow the *Amicus* Brief for the following reasons: (i) "the amicus has a special interest that justifies [it] having a say," *see Strasse v. Doorley*, 432 F.2d 567, 569 (1st. Cir. 1970); (ii) "the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide," *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997); and (iii) Defendants did not object, Docket No. 62–1 at 20 n.4. Nevertheless, the Court will consider the amicus briefs only insofar as they concern legal issues and positions raised by the parties. *New Jersey v. Trump*, 2025 U.S. App. LEXIS 5580, *4 n.1 (citing *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 33 n.10 (1st Cir. 2020)). Signed by Judge Jay A. Garcia–Gregory on 3/31/2025. (ABG) (Entered: 03/31/2025) |
| 07/29/2025 | 69 | ORDER. The Parties are hereby ORDERED to file simultaneous supplemental briefing on the impact of the Supreme Court's recent decision in *Seven Cnty. Infrastructure Coal v. Eagle Cnty.* on the present case. *See Seven Cnty. Infrastructure Coal v. Eagle Cnty.*, 145 S. Ct. 1497, 1513 (2025) (requiring courts to "afford substantial deference and [] not micromanage those agency choices so long as they fall within a broad zone of reasonableness."). **Supplemental briefs, no longer than ten (10) pages, due by 8/13/2025.** Signed by Judge Jay A. Garcia–Gregory on 7/29/2025.(ABG) (Entered: 07/29/2025) |
| 08/13/2025 | 70 | BRIEF *Plaintiffs' Supplemental Brief and Notice of Recent Authorities* by All Plaintiffs. (Crystal, Howard) (Entered: 08/13/2025) |
| 08/13/2025 | 71 | BRIEF *Defendants' Supplemental Brief* by All Defendants. (Laubach, Katharine) (Entered: 08/13/2025) |
| 09/30/2025 | 72 | MEMORANDUM AND ORDER granting in part and denying in part 46 MOTION for Summary Judgment; granting in part and denying in part 62 Cross MOTION for Summary Judgment. Signed by Judge Jay A. Garcia–Gregory on 9/30/2025. (MQ) (Entered: 10/02/2025) |
| 10/02/2025 | 73 | JUDGMENT. Signed by Judge Jay A. Garcia–Gregory on 10/2/2025. (MQ) (Entered: 10/02/2025) |
| 12/01/2025 | 74 | NOTICE OF APPEAL as to 73 Judgment, 72 Memorandum & Opinion, by Deanne Criswell, Department of Homeland Security, Federal Emergency Management Agency, Alejandro N. Mayorkas.<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Laubach, Katharine) (Entered: 12/01/2025) |
| 12/04/2025 | 75 | Certified and Transmitted Record on Appeal to US Court of Appeals re 74 Notice of Appeal [Docket Entries 72, 73 & 74] (idg) (Entered: 12/04/2025) |
| 12/11/2025 | 76 | USCA Case Number 25–2163 for 74 Notice of Appeal, filed by Federal Emergency Management Agency, Deanne Criswell, Alejandro N. Mayorkas, Department of Homeland Security. (idg) (Entered: 12/11/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC.<br>Urb. Evelymar 914 Calle Pino<br>Salinas, Puerto Rico, 00751, | **COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |
| ALIANZA COMUNITARIA<br>AMBIENTALISTA DEL SURESTE, INC.<br>Calle 2 V35, Villa Universitaria<br>Humacao, Puerto Rico, 00791, | Civil Action No.: _____ |
| CAMPAMENTO CONTRA LAS CENIZAS<br>EN PEÑUELAS, INC.<br>HC 3 Box 15516<br>Peñuelas, Puerto Rico, 00624, | |
| CASA TALLABOEÑA DE FORMACIÓN<br>COMUNITARIA Y RESILIENCIA, INC.<br>HC 3 Box 15516<br>Peñuelas, Puerto Rico, 00624, | |
| CENTER FOR BIOLOGICAL DIVERSITY,<br>1411 K St. NW, Suite 1300<br>Washington, D.C. 20005, | |
| COMITÉ CABORROJEÑO PRO SALUD Y<br>AMBIENTE, INC.<br>PO Box 1789<br>Cabo Rojo, Puerto Rico, 00623, | |
| COMITÉ YABUCOEÑO PRO-CALIDAD<br>DE VIDA, INC.<br>HC 4 Box 6901<br>Yabucoa, Puerto Rico, 00767, | |
| EL PUENTE DE WILLIAMSBURG, INC.<br>145 Ave. Hostos, Monte Sur Townhouses,<br>G409,<br>San Juan, Puerto Rico, 00918, | |
| and | |

1

**JA_13**

FRENTE UNIDO PRO-DEFENSA DEL
VALLE DE LAJAS, INC.
Apartado 3138,
Lajas, Puerto Rico, 00667,

        *Plaintiffs*,
   v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY,
500 C Street SW
Washington, DC 20472,

DEPARTMENT OF HOMELAND
SECURITY
2707 Martin Luther King Jr. Ave. SE
Washington, D.C., 20528,

DEANNE CRISWELL, Administrator,
Federal Emergency Management Agency
500 C Street, SW
Washington, D.C., 20472,

and

ALEJANDRO MAYORKAS, Secretary,
Department of Homeland Security
2707 Martin Luther King Jr. Ave. SE
Washington, D.C., 20528

        *Defendants*.

## I.      INTRODUCTION

1. This case challenges the failure of the Department of Homeland Security ("DHS") and

its component agency the Federal Emergency Management Agency ("FEMA") to comply with

the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in connection with

two projects related to restoring electric service throughout Puerto Rico—the Puerto Rico Fossil

Grid Entrenchment Project and the Puerto Rico Public Facilities Project. Although FEMA has

prepared two separate Programmatic Environmental Assessments ("PEAs") on these projects,

2

**JA_14**

they have fundamentally failed to address the environmental impacts of the projects, or to consider reasonable alternatives in the manner required by NEPA and the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* Most notably, the PEAs fail to meaningfully consider relying on distributed renewable energy systems like rooftop solar and storage to provide disaster-resilient and reliable electricity across Puerto Rico, an alternative supported by both federal technical studies and the Puerto Rican public.

2. In September 2022, Hurricane Fiona battered Puerto Rico, producing heavy flooding and landslides, and knocking out the archipelago's entire electricity grid. Fiona is the latest in a series of devastating storms that have ravaged Puerto Rico and its highly vulnerable, centralized, and fossil fuel-reliant electric system. Hurricane Maria, the second of two hurricanes that hit Puerto Rico in September 2017, also caused a complete blackout (the largest blackout in U.S. history) and killed thousands of people. Many died after the storm, when they were unable to run life-saving medical equipment or refrigerate life-saving medicine because they had no access to electricity.

3. It took nearly one year to fully restore power to all customers in Puerto Rico after Maria. The public health effects associated with the blackout were devastating. The lack of electricity meant that water pumping and treatment stations were knocked out, resulting in residents lacking access to clean and safe water. Hospital care also suffered. Most hospitals had only limited access to scarce fuel with which to run fossil fuel generators. Even months after the storm, almost half of all hospitals were still running on generators, resulting in only intermittent power and the need to delay surgeries and other critical medical treatments or conduct them by flashlight.

**JA_15**

4. Recent hurricanes in Puerto Rico have dropped tremendous amounts of rain, particularly in the mountainous central part of the main island, which received almost a quarter of its annual rainfall in just one day when Hurricane Maria hit. Scientists have concluded that Hurricane Maria's record-setting rains were directly connected to climate change.

5. Puerto Rico's centralized, fossil fuel-based electric grid is particularly susceptible to damage from the devastating storms that the climate crisis is bringing to the archipelago with increasing intensity. Most of Puerto Rico's electricity generation capacity is located on the southern part of the main island, while most of the electricity demand is in the north. High voltage transmission lines must traverse long distances through the mountainous and heavily vegetated terrain in between. These power lines are vulnerable to damage due to the high winds and floods that hurricanes bring, and damage at only a few points can knock out power to large areas and take a long time to repair.

6. Numerous technical studies have shown that distributed renewable energy resources— in other words, renewable generation sources like rooftop solar or solar microgrids that generate electricity at or near the place of use—can meet Puerto Rico's energy needs while reducing the overall need for this kind of large-scale, centralized power infrastructure that lacks resilience during disasters and other events. For example, in January, 2023, DOE released an interim report for its Puerto Rico Grid Resilience and Transition to 100% Renewable Energy Study ("PR100 Study")—a study FEMA is funding—finding that 1) Puerto Rico has more than enough renewable energy potential to fulfill all of the archipelago's electricity needs through 2050; and 2) all scenarios for meeting Puerto Rico's current renewable energy goals require significant investment in rooftop solar.

**JA_16**

7. Puerto Rico has set aggressive renewable energy targets, passing a landmark law in 2019 requiring that 100% of the territory's electricity come from renewable sources by 2050. In 2020, Puerto Rican experts and community organizations issued their own energy plan that centered distributed renewable energy systems to achieve the 2019 legislative target. The 2023 interim report for the PR100 Study also found that Puerto Ricans prefer distributed energy resources over centralized power because they are more disaster-resilient and reliable and preserve scarce agricultural land necessary for farming.

8. The existing system's dependence on fossil fuels only further increases its vulnerability because it contributes to the increasing severity and frequency of the very storms that threaten it. Distributed renewable energy like rooftop solar, by contrast, does not contribute to fossil fuel pollution, and has resilience benefits as well. Rooftop and community solar with storage have repeatedly demonstrated their ability to keep the lights on during storms.

9. This is the context in which DHS and FEMA (hereafter collectively referred to as simply FEMA) have been deciding how to channel billions of dollars in federal disaster aid for Puerto Rico, including aid to restore electricity. That restoration work has focused on repairing, reconstructing, and relocating Puerto Rico's outdated, inefficient, and centralized fossil fuel-based electricity infrastructure (hereafter the "Puerto Rico Fossil Grid Entrenchment Project" or "the Fossil Entrenchment Project"), and meeting the power needs specific to public government facilities (hereafter the "Puerto Rico Public Facilities Project" or "the Public Facilities Project").

10. In August 2020, FEMA issued a Draft Programmatic Environmental Assessment for the Puerto Rico Fossil Grid Entrenchment Project, which it finalized in June 2021 ("Fossil Entrenchment PEA"). The Fossil Entrenchment Project includes repair, replacement, and relocation of Puerto Rico's centralized power infrastructure, including transmission lines, towers,

**JA_17**

poles, substations, and distribution feeders (collectively "T&D") that transfer energy from power plant facilities to homes and businesses.

11. The Fossil Entrenchment PEA primarily considers mechanisms for repairing and relocating preexisting T&D infrastructure. It does not consider reasonable alternatives in which Puerto Rico's electricity needs might be met with distributed renewable energy such as rooftop solar and battery storage, which would be more resilient to damage from climate change-fueled storms.

12. In July 2022, FEMA issued another Draft PEA, this one for the Public Facilities Project, which it finalized in December 2022 ("Public Facilities PEA"). The Public Facilities Project addresses the electric power needs specific to various public facilities in Puerto Rico. With regard to electricity access, the Public Facilities Project focuses primarily on ensuring these facilities have continued access to the centralized fossil fuel power system.

13. Neither PEA addresses a central issue raised in comments: rebuilding Puerto Rico's electricity system to rely on distributed energy like solar and microgrids, which can provide communities in Puerto Rico with more resilient electricity than the unreliable, and polluting centralized fossil-fueled grid can. Likewise, neither PEA meaningfully assesses the public health, air, land, and water pollution impacts from the construction, relocation, and operation of the fossil fuel-supporting activities that they will fund. Further, neither PEA adequately considers— and the first PEA does not even mention—the climate crisis, the enhanced climate risk Puerto Rico faces, and thus the urgent need to build clean and resilient infrastructure now instead of adding to the problem.

14. The PEAs also fail to adequately consider the environmental justice impacts of FEMA's decision to invest billions of dollars in rebuilding, relocating, and perpetuating Puerto

6

**JA_18**

Rico's centralized, fossil fuel-based electricity grid, and likewise in perpetuating the dependence of public facilities in Puerto Rico on that grid. They do not consider how environmental justice communities in Puerto Rico will be disproportionately harmed by the continued vulnerability of this centralized system and the pollution from the construction, relocation, and operation of fossil fuel activities under the projects.

15. The PEAs also largely dismiss impacts that activities funded will have on threatened and endangered species and their habitats, despite FEMA's own acknowledgement that such impacts will or are likely to occur. Puerto Rico is an ecologically rich archipelago, with coasts, wetlands, waterways, dunes, and forests that support significant biodiversity, provide critical habitat for numerous threatened and endangered species, such as the iconic Puerto Rican Parrot, and provide both economic and recreational value. The projects described in both PEAs would cause tremendous damage to all these invaluable natural environments.

16. Public comments identified these flaws, urging FEMA to prepare an Environmental Impact Statement ("EIS") and, in the case of the Public Facilities PEA, specifically urging FEMA to prepare a single comprehensive EIS for its entire project to repair Puerto Rico's electricity grid and its public facilities' interconnections with that grid. Nonetheless, in the summer of 2021 FEMA finalized the Fossil Grid PEA and issued a Finding of No Significant Impact ("FONSI"), and in December 2022, FEMA likewise finalized the Public Facilities PEA and issued a FONSI.

17. On January 6, 2023, Plaintiffs sent FEMA a letter urging the agency to reopen the NEPA process in light of new information bearing on environmental concerns since the first FONSI was issued more than eighteen months ago. On January 25, 2023, FEMA denied Plaintiffs' call for further NEPA review.

**JA_19**

18. In this action, Plaintiffs seek an order vacating FEMA's Fossil Entrenchment PEA and FONSI and its Public Facilities PEA and FONSI, and ordering FEMA to prepare a single EIS on these projects.

## II.    JURISDICTION & VENUE

19. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as Defendant), and 5 U.S.C. § 702.

20. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 701-706, and 16 U.S.C. § 1540(g).

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## III.    PARTIES

22. Plaintiff Comité Dialogo Ambiental, Inc. ("CDA") is a community environmental group of residents of the Municipality of Salinas and the Guayama Region organized in 1997 as a nonprofit corporation under the Commonwealth of Puerto Rico law. CDA's purpose is to protect and restore the environment of the communities it serves and to promote conditions under which human beings and the environment can exist in harmony to fulfill economic, social, and other needs of present and future generations. CDA engages in education and community organizing around the adverse impacts of human activities on the ecologic balance of natural systems.

23. CDA is harmed by electric system infrastructure—including fossil-fired power plants, utility scale renewable energy projects, and centralized transmission and distribution systems— as well as by frequent power outages. The organization is concerned about adverse impacts on communities, agricultural land, water, and other natural resources.

**JA_20**

24. For example, one activist who is part of CDA, Hery Colon, lives near the Aguirre Power Complex in Salinas, Puerto Rico. One of his earliest memories is a large explosion there. He frequently suffers significant noise pollution from the complex, and has changed his habits of walking in his neighborhood, fishing, and enjoying the coast, because he is concerned about how toxic emissions from the Complex may harm his health. He also suffers from frequent power outages that impact his ability to work, and result in the spoiling of expensive groceries that he and his family cannot afford to lose.

25. CDA promotes alternatives to centralized, fossil-fired generation, distribution, and transmission, including rooftop solar installations, solar communities, and renewable energy microgrids, as well as energy storage, properly sited utility scale renewable generation, and solar installations at schools, water purification and treatment plants, parking lots and similar areas.

26. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm CDA and its interests in a more sustainable and healthier energy future.

27. Plaintiff Alianza Comunitaria Ambientalista del Sureste, Inc. ("ACASE") is a non-profit community and environmental organization working primarily in the Humacao, Yabucoa, Las Piedras, Caguas, and Patillas municipalities in Puerto Rico. ACASE was created in 2015 in response to the disposal of coal ash in the Humacao landfill. ACASE raises awareness in the communities of Humacao and neighboring towns of the health impacts from fossil fuel pollution, including coal combustion and coal ash.

28. ACASE also engages in policy advocacy to advance the transition in Puerto Rico away from burning fossil fuels to generate electricity. For example, in 2019 ACASE was part of

**JA_21**

a coalition of environmental and community groups that intervened in an Electric Power Authority proceeding relating to methane gas terminals in Mayagüez and Yabucoa, alleging that the Power Authority had failed to adequately consider the risks posed by flammable liquified natural gas. ACASE also does considerable community outreach and education efforts related to the dangers of fossil fuel-based energy and the possibilities for a clean renewable energy future for Puerto Rico.

29. Many of the communities ACASE works with and represents are near, and are impacted by, fossil fuel facilities and associated infrastructure, including the AES coal fired power plant. They are also harmed by frequent power outages. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm ACASE and its interests in a more sustainable and healthier energy future.

30. Plaintiff Campamento Contra las Cenizas en Peñuelas, Inc. ("Campamento") is a community and environmental non-profit organization formed in 2014 and dedicated to the fight against combustion residue from fossil fuel energy generation. Its mission is to raise community awareness about the dangers from toxic coal ash and the urgent need to end coal combustion in Puerto Rico.

31. The communities Campamento works with and represents are primarily in and around Peñuelas, Puerto Rico, and the group initially formed to oppose the deposit of toxic coal ash from the AES coal plant. There are multiple fossil fuel-fired power plants and petrochemical plants near Peñuelas, and the communities Campamento works with suffer the effects of pollution from these facilities. They are also harmed by frequent power outages. Through its

10

**JA_22**

advocacy, Campamento seeks to reduce harmful pollution from fossil fuel-based power facilities and to promote access to clean, renewable sources of electricity, especially for low-income residents.

32. Campamento is harmed by fossil fuel pollution and by unequal access to renewable sources of electricity. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm Campamento and its interests in a more sustainable and healthier energy future.

33. Plaintiff Casa Tallaboeña de Formación Comunitaria y Resiliencia ("Casa Tallaboeña") is a community-based organization operating since 2019 and dedicated to promoting social well-being by providing a first response to natural disasters and other crises in marginalized communities in and around Peñuelas, Puerto Rico.

34. Casa Tallaboeña first formed in the wake of Hurricane Maria, when communities near Peñuelas were profoundly affected by the blackouts that followed the storm and in need of an immediate emergency response. Many of these communities continue to be harmed by frequent power outages. Casa Tallaboeña promotes community empowerment by providing first response training and education that allows communities—particularly poor and rural communities in the Peñuelas region—to be more resilient in the face of storms and other natural disasters.

35. Casa Tallaboeña cares deeply about affordable and just access to rooftop solar and other forms of distributed renewable energy because the poor and remote communities Casa Tallaboeña works with are often the last to have electricity restored following a disaster and therefore suffer the most severe consequences. Casa Tallaboeña is harmed by unequal access to

11

**JA_23**

resilient and clean renewable sources of electricity. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm Casa Tallaboeña and its interests in a more sustainable and healthier energy future.

36. Plaintiff Center for Biological Diversity ("the Center") is a national, non-profit conservation organization with offices throughout the United States. The Center has more than 89,000 members, including members who live in Puerto Rico. The Center's members care about the country's urgent need to expedite the renewable energy transition, as well as about protecting human health, the natural environment, and threatened and endangered species from the ravages of the climate emergency and environmental degradation. The Center's Energy Justice Program focuses on advancing environmental and energy justice, and specifically fights to transition the electricity sector to renewable and resilient energy for a climate-safe and just future.

37. The Center has long worked on the vital and just transition of the Nation's energy sector away from fossil fuels and towards renewable and just energy systems. The Center advocates for the deployment of democratic and distributed clean power that protects low-wealth communities and communities of color, which disproportionately bear the brunt of the harm from fossil fuel pollution and centralized power monopolies. The Center also has a longstanding interest in the conservation of threatened and endangered species in Puerto Rico. For example, the Center petitioned to protect Puerto Rico's elkhorn and staghorn corals under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and it has also undertaken legal work to secure critical habitat protection and recovery plans for corals. The Center has also worked to protect habitat for other Caribbean wildlife and to reduce the risks to whales from vessel noise and ship strikes.

38. The Center brings this action on behalf of itself and its members. The Center has members who are impacted by pollution from fossil fuel-based electricity generation, transmission, or distribution infrastructure in Puerto Rico, and are also impacted by frequent and prolonged electricity outages in the archipelago. For example, one Center member, Frank Gonzalez Garcia, lives within a few miles of two major fossil fuel-fired power plants. He sometimes suffers from smelling noxious odors from these facilities in his home, and he worries about how the pollution they produce impacts his neighbors' health and downwind communities. He has also been impacted by frequent power outages and has family members who struggle with exorbitant power bills.

39. The activities FEMA will fund pursuant to the Fossil Entrenchment PEA and the Public Facilities PEA will result in further investment in the dirty and unreliable fossil fuel-based electricity system in Puerto Rico, and will therefore result in Center members continuing to experience the adverse effects of the resulting pollution and power outages.

40. The Center also has members who live near or regularly visit Puerto Rico's national parks, forests, rivers, wetlands, and coasts to hike, recreate, observe wildlife, boat, swim, beachcomb, sightsee, study, or take pictures. These Center members derive recreational and aesthetic enjoyment, as well as physical and mental health benefits, from their activities in these areas. Their enjoyment of these precious places depends on the health and condition of the ecosystems that exist in these areas, as well as on the health and condition of the wildlife that live and migrate through them.

41. The activities FEMA will fund pursuant to the Fossil Entrenchment PEA and the Public Facilities PEA will involve the construction and ongoing operation of numerous utility and related projects that will pollute the air, land, and water of many of the natural environments

13

**JA_25**

and ecosystems throughout Puerto Rico that the archipelago's electricity grid and public facility infrastructure traverse, and that Center members visit and plan to visit in the future. FEMA's Fossil Entrenchment Project and its Public Facilities Project will therefore adversely affect Center members and harm wildlife and habitats Center members enjoy visiting and observing.

42. Plaintiff Comité Caborrojeño Pro Salud y Ambiente, Inc. ("Caborrojeños") is a community-based organization operating since 1991, whose mission is to advance the preservation of the natural resources of the city of Cabo Rojo, Puerto Rico, and of the archipelago as a whole.

43. Caborrojeños primarily carries out its mission through community education. For example, the organization operates a Visitors' Center at the Cabo Rojo National Fish and Wildlife Refuge, where they offer school children and other visitors educational films about the Refuge's birds, information about the ecological and geological importance of the nearby salt flats, and walks through habitats in the refuge. Caborrojeños has also at times participated in public hearings to advocate against the granting of land use permits that harm the natural resources it seeks to protect.

44. Caborrojeños is deeply committed to shifting from a petroleum-based electricity production system in Puerto Rico to one based on clean, distributed renewable energy resources, and the organization works to educate the public about the need for this change. Caborrojeños is harmed by the pollution and environmental degradation from fossil fuel power plants, transmission lines, and other associated infrastructure. Caborrojeños is also harmed by frequent power outages, and such outages also impede Caborrojeños' ability to operate its Visitors' Center and carry out its mission. By further entrenching Puerto Rico's energy system's reliance

14

**JA_26**

on fossil fuels, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm Caborrojeños and its interests in a more resilient and just energy future.

45. Plaintiff Comité Yabucoeño Pro-Calidad de Vida, Inc. ("YUCAE") is a non-profit, community-based group established in 1988, whose mission includes promoting sustainable development, and protecting green infrastructure, parks, nature reserves, and agricultural land in Yabucoa, Puerto Rico. YUCAE first formed in order to address pollution problems from fossil fuels in Yabucoa and particular concerns about the health of students in schools.

46. An important part of YUCAE's work involves community organizing and education about the health effects of fossil fuel pollution. The organization also works to promote renewable energy, particularly rooftop solar since it avoids harms to agricultural lands and important nature reserves near Yabucoa as well as harms from frequent power outages. YUCAE is currently working on projects to help a number of individual households and a local school get rooftop solar installed.

47. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm YUCAE and its interests in a more sustainable and healthier energy future.

48. Plaintiff El Puente de Williamsburg, Inc. ("El Puente") is a nonprofit organization with offices in Puerto Rico and Brooklyn, New York. In New York, El Puente founded the Community Alliance for the Environment and co-founded the New York City Environmental Justice Alliance. Its Puerto Rico program, Latino Climate Action Network, is comprised of a group of Puerto Rican residents concerned about the impacts of air pollution and climate change in Puerto Rico.

**JA_27**

49. In 2013, El Puente led a campaign that fostered the Governor's signature on five Executive Orders in support of climate mitigation and adaptation that, taken collectively, lead all stateside governors' actions regarding climate change policy and paved the way for the approval of Act 33-2019, the Puerto Rico Climate Change, Mitigation, Adaptation, and Resiliency Act. El Puente seeks to build community sustainability through strategies to mitigate and plan for climate change. The organization works with communities affected by Hurricane Maria and other environmental crises by providing support and resources, including supplies and efforts to transform communities to sustainable solar energy. Through community organizing and policy advocacy, El Puente promotes environmental justice and climate change preparedness and prevention. El Puente has long made efforts to address planning for climate change, sea level rise, food security, water availability, and the impacts of power generation on climate change.

50. Some of the communities El Puente works with and represents are near, and are impacted by, fossil fuel facilities, including LNG terminal facilities in San Juan Bay. These facilities adversely impact physical and mental health in these communities, as well as their residents' enjoyment of their neighborhoods, coast, and bay. Many of these communities are also harmed by frequent power outages.

51. For example, one activist participating with El Puente, Federico Cintrón Moscoso, lives a few hundred feet from an electricity substation, and also lives and works near both the San Juan Power Plant and the New Fortress LNG Terminal. Observing all this fossil fuel infrastructure, and construction on it, significantly diminishes his enjoyment of his environment and the natural landscape around him. Further, because much of this infrastructure is unstable and vulnerable to the tropical weather conditions in Puerto Rico, he often feels unsafe walking around his neighborhood.

16

**JA_28**

52. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm El Puente and its interests in a more sustainable and healthier energy future.

53. Plaintiff Frente Unido Pro-Defensa del Valle de Lajas ("Frente Unido") is a community-based conservation organization that has been operating since 1995. Frente Unido works to protect farmland in the Lajas Valley and elsewhere in Puerto Rico, to advocate for rooftop solar as an energy solution in the Valley and throughout Puerto Rico, and to improve the quality of life for the Valley's residents. Frente Unido is concerned about the significant threat to agricultural lands in Puerto Rico posed by utility-scale renewable energy projects, and many of the communities the organization works with and represents are also harmed by frequent power outages. Frente Unido advocates for rooftop solar as an energy alternative in the archipelago, and has also engaged in litigation and intervened in regulatory proceedings regarding utility-scale renewable energy projects as part of various coalitions.

54. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm Frente Unido and its interests in a more sustainable and healthier energy future.

55. Defendant Federal Emergency Management Agency is an agency of the federal government within the U.S. Department of Homeland Security whose mission is "helping people before, during and after disasters."

56. Defendant Department of Homeland Security is an agency of the federal government that is the parent agency of FEMA, whose mission includes "relentless resilience, . . . responding

17

**JA_29**

decisively to man-made and natural disasters, and advancing American prosperity and economic security long into the future."

57. Defendant Deanne Criswell is the Administrator of the Federal Emergency Management Agency and is the official responsible for FEMA's compliance with federal environmental laws, including NEPA and the Administrative Procedure Act.

58. Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security, and is the official ultimately responsible for the supervision, management, and control of FEMA's activities and its compliance with applicable laws.

## IV.    STATUTORY BACKGROUND

### A.  The National Environmental Policy Act

59. NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA implementing procedures are intended to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* at §1500.1(b). The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA that are binding on all agencies. Executive Order No. 11991 (May 24, 1977), 40 C.F.R. § 1500.3.

60. In promulgating NEPA, Congress stressed that it is "[t]he continuing responsibility of the Federal government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may," among other things, "[f]ulfill the responsibilities of each generation as trustees of the environment for succeeding generations," attain the widest range of beneficial uses of the environment while avoiding environmental degradation and risks to health and safety, and enhance the quality of renewable resources. 42 U.S.C. § 4331(b).

18

**JA_30**

61. In order to achieve these goals, NEPA mandates that all federal agencies prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C §4332(2)(C).

62. NEPA's implementing regulations establish several criteria for determining whether an impact may be significant, thereby requiring an EIS. Among these are: "the degree to which the proposed action affects public health or safety; the unique characteristics of the geographic area such as proximity to ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the action may establish a precedent for future actions with significant effects; whether the action is related to other actions with  cumulatively significant impacts, and; the degree to which the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b). If an action may have a significant effect on the environment an EIS must be prepared. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. When an agency is uncertain whether an activity will have a significant impact on the environment and, thus, whether it must prepare an EIS, the agency may prepare an Environmental Assessment ("EA") to assist it in making this determination. 40 C.F.R. §§ 1501.3, 1501.4(b)-(c). An EA either supports a finding that an EIS must be prepared, or a FONSI.

63. Regardless of whether an agency is preparing an EA or an EIS, the agency must specify the underlying purpose and need to which its proposed action is responding. 40 C.F.R. §§ 1501.5, 1502.13. It must also take a "hard look" at the environmental impacts of the proposed action and alternatives. 40 C.F.R. §§ 1501.5, 1502.14. Although the agency may support a FONSI by including concrete and specific mitigation measures as part of a project design in

19

**JA_31**

order to achieve an environmentally preferable result, such measures must be effective and certain to occur in order to qualify. See 40 C.F.R. § 1501.6(c).

64. If an action will or may significantly affect the human environment, then the agency must prepare an EIS—a more comprehensive document than an EA. The "heart" of the EIS is the assessment of a range of alternatives to the proposed action. 40 C.F.R. §1502.14. An EIS must rigorously explore and objectively evaluate all reasonable alternatives, including alternatives not within the jurisdiction of the lead agency.

65. An EIS must discuss the environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. 40 C.F.R. § 1502.16. In discussing impacts, an EIS must address a proposed action's direct, indirect, and cumulative impacts and their significance. *Id.* §1508.25. The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems. *Id.* § 1508.8. Cumulative impacts are the result of any past, present, or future actions that are reasonably certain to occur. *Id.* § 1508.7. A cumulative impact is an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

20

**JA_32**

66. Federal agencies must also consider environmental justice—the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies— in their activities under NEPA. During the NEPA process, "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States . . . ." Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).

67. Once a NEPA review is completed, the CEQ regulations require that an agency supplement the analysis if the agency "makes substantial changes to the proposed action that are relevant to environmental concerns," or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d).

### B. The Stafford Act

68. The Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1974, 42 U.S.C. § 5121 *et seq.*, provides the primary statutory basis for most of FEMA's disaster response activities, and the provision of public assistance to affected communities.

69. The Stafford Act authorizes the President to issue a major disaster declaration, such as the ones that were issued for Puerto Rico following Hurricanes Maria and Fiona. In passing the Stafford Act, Congress was explicit that its purpose was to address the "loss of life, human suffering, loss of income, and property loss and damage" that disasters often cause, as well as the

**JA_33**

severe adverse effects they can have on governments, communities, individuals, and families. 42 U.S.C. § 5121(a).

70. The original Act also made clear that preparedness and mitigation should be an important focus of the federal response that an emergency or major disaster declaration triggers. Section 101 of the Act states: "It is the intent of Congress, by this Act, to provide an orderly and continuing means of assistance . . . to alleviate the suffering and damage which result from such disasters by . . . encouraging the development of comprehensive disaster preparedness . . . [and by] encouraging hazard mitigation measures to reduce losses from disasters . . . ." 42 U.S.C. § 5121 (b).

71. Congress expanded FEMA's mission in 2006, directing the agency to "reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation." 6 U.S.C. § 313(b). In 2017, Congress further expanded FEMA's mission to broaden federal investments into mitigation efforts that protect public infrastructure and strengthen both FEMA's public assistance and individual assistance programs. Disaster Recovery Reform Act, Pub. L. 115-254, 123 Stat. 3438.

72. FEMA itself has acknowledged that the climate crisis is increasing the likelihood of a range of threats, explaining that risks and hazards "including extreme heat, drought, flooding, and wildfires . . . are often exacerbated by climate change," and identifying FEMA's key role in helping communities "plan for, mitigate against, respond to, and recover from the adverse impacts of climate change."

22

**JA_34**

V.        FACTUAL BACKGROUND

A.        **The Hurricanes That Continue to Devastate Puerto Rico and the Opportunity to Rebuild a More Resilient Electricity Delivery System in the Wake of Disaster.**

73. In early September 2017, Hurricane Irma approached Puerto Rico's northern coast as a Category 5 storm, knocking out power to over 1 million residents, and causing hundreds of millions of dollars in damage. Roughly 2 weeks later, Hurricane Maria hit Puerto Rico as a Category 4 storm, killing thousands of people, causing an estimated $100 billion in damage, and completely knocking out power for the entire archipelago.

74. The Puerto Rico Electric Power Authority ("PREPA"), Puerto Rico's electric utility which at that time owned and operated electric generation, transmission, and distribution facilities serving the island, was still working on restoring power to customers who lost it as a result of Hurricane Irma when Hurricane Maria hit. Among many things, Maria significantly damaged PREPA's distribution network of electric power lines carrying fossil-fueled electricity. The result was a system-wide collapse that caused the largest blackout in U.S. history.

75. Only a few years later, in January of 2020, while Puerto Rico was still recovering from the 2017 hurricanes, a magnitude 6.4 earthquake struck, again wrecked electric transmission lines, and plunged almost the entire archipelago back into another blackout.

76. Some of the most extensive damage to the grid from these catastrophes has been to Puerto Rico's transmission lines. A significant portion of the electricity generation assets in the archipelago are located in the south part of the main island, while the most significant demand center is located on the main island's northern coast, across a mountainous inland region. As a result, many of the transmission lines pass through difficult to access and heavily vegetated mountain regions, resulting in increased damage to transmission infrastructure when storms hit, and long restoration times when damage results in power outages.

23

**JA_35**

77. The Federal Government issued a major disaster declaration after the hurricanes, authorizing FEMA to allocate funds for federal disaster assistance.

78. In September of 2020, FEMA approved nearly $10 billion to PREPA for the rebuilding of Puerto Rico's power grid. In June of 2022, that total rose to roughly $12.8 billion.

79. Nonetheless, on information and belief, to date only a small fraction of that money has been spent, and an even smaller proportion has been spent on permanent works. Years later, Puerto Rico's centralized power grid remains extremely vulnerable to disaster and unreliable.

80. Distributed renewable energy resources, including rooftop solar and solar microgrids, offer an alternative approach for addressing these problems. These resources do not depend on large-scale transmission lines, do not require electricity to be transported over long distances, and—particularly when paired with battery storage—can operate even when grid failures do occur, in the case of disasters. The viability and effectiveness of these technologies as a solution in Puerto Rico has been demonstrated repeatedly in technical studies. In the aftermath of the hurricanes, a 2018 Department of Energy report recommended exploring segmentation, microgrids, and a focus on renewable energy and energy efficiency in Puerto Rico. In 2020, a National Renewable Energy Laboratory study concluded that rooftop solar generation could generate vastly more electricity than all of Puerto Rico's consumption needs and could reduce the overall need for energy transmission and distribution on the islands. A 2021 analysis by Cambio PR and the Institute for Energy Economics and Financial Analysis found that:

- achieving 75% distributed renewable energy generation in Puerto Rico within 15 years is feasible with minimal upgrades to the distribution system;

- equipping 100% of homes with 2.7 kW PV and 12.6 kWh battery backup could provide 2700MW of power to the Puerto Rico grid;

24

**JA_36**

- achieving 75% distributed renewable energy by 2035 would cut imported fossil fuel costs to $430 million/year (relative to recent expenditures over $1.4 billion/year) and would reduce carbon dioxide emissions by more than 70%; and

- a 75% distributed renewable energy scenario is less expensive than the current grid.

81. Puerto Rico has also set aggressive renewable energy targets, passing landmark laws in 2019 requiring that 20% of the territory's electricity come from renewable sources by 2022, 40% by 2025, 60% by 2040, and 100% by 2050. In 2020, Puerto Rican experts and community organizations issued their own energy plan that centered distributed renewable energy systems to achieve the 2019 legislative target.

82. Despite these findings, and despite the allocation of over $10 billion in federal funds from FEMA to repair damage to the electric system, that funding has not been used for distributed renewable energy projects. Instead, FEMA's focus has remained on repairing, rebuilding, and relocating Puerto Rico's outdated, centralized electrical grid, and on perpetuating the dependence of Puerto Rico's critical public facilities on that grid. Contrary to Puerto Rico's target of 20% of electricity coming from renewables by 2022, the actual number for that year was roughly 3%.

**B.      The History of Problems with Puerto Rico's Centralized Electricity Grid**

83. PREPA, which, as referenced above, was, at the time Hurricane Maria hit, the publicly owned monopoly responsible for electricity generation, transmission, and distribution in Puerto Rico, was already suffering significant financial troubles before the storm. In July 2017, two months prior to Maria, PREPA effectively filed for bankruptcy.

84. After the blackout caused by the hurricane, mismanagement problems only compounded. PREPA approved a $300 million no-bid contract with a Montana-based company called Whitefish Energy to rebuild the grid, despite the fact that Whitefish Energy was a small company with limited disaster-relief experience.

**JA_37**

85. Problems persisted, and in June 2021, the government of Puerto Rico contracted with a private company, LUMA Energy ("LUMA"), to take over transmission and distribution of electricity in the archipelago. LUMA is a joint venture between ATCO, a Canadian company whose subsidiaries engage in natural gas extraction, and Houston-based Quanta Services. Since LUMA's takeover, blackouts have persisted and even intensified at some times and in some areas. Electricity customers in Puerto Rico have also reportedly suffered from skyrocketing bills for unreliable service.

### C.    FEMA's Puerto Rico Fossil Grid Entrenchment Project

86. In August of 2020, almost three years after Hurricane Maria, FEMA announced the Puerto Rico Fossil Grid Entrenchment Project and issued the Draft Fossil Grid Entrenchment PEA for public comment. The PEA covers work such as rebuilding or relocating transmission and distribution lines and repairing and "hardening"—in other words, strengthening so they may better survive the next storm—utility poles, towers, and substations.

87. In the PEA, FEMA defines the purpose of the Fossil Entrenchment Project as being "to provide grant funding to restore damaged utilities [in the Commonwealth of Puerto Rico], and increase their resiliency for future weather events." The Purpose and Need section of the PEA goes on to explain:

> "Geography, climate, and demographic trends have led to the development of a complex infrastructure of utility systems across Puerto Rico. Aging infrastructure, the need for increased capacity, and damage due to disaster events all have the potential to limit the ability of these utility systems to function as designed. Failure of these systems can cause injury, loss of life, and environmental issues."

88. The PEA then articulates the need for FEMA's Project as:

> "[T]o re-establish a safe and reliable network of utilities (through repair, replacement, or relocation) in order to reconnect the communities affected by the storm with safe and efficient delivery of energy, water, sewer service, and communications, and help reduce the potential for future damages by upgrading

26

**JA_38**

damaged utilities in accordance with current engineering codes and standards. The grant funding is necessary to address these concerns and reduce the damage and disruption caused by future disasters throughout the Commonwealth."

89. FEMA includes four alternatives in its PEA. The first is a "No Action" alternative, under which FEMA would not provide grant funding and the local governments of Puerto Rico would fund the Fossil Entrenchment Project from other sources. The second is a "Replacement" alternative, which involves the repair, replacement, and upgrading of the existing, centralized utility system. The third is a "Realignment or Relocation" alternative, which involves realigning or relocating utilities, as well as the installation of on-sight fossil-fueled backup generation. Finally, the fourth alternative is "some combination" of the first three. FEMA fails to identify deploying distributed renewable energy as a component of any of these alternatives.

90. Plaintiffs submitted extensive comments on the Draft PEA, raising a host of concerns about FEMA's failure to consider a distributed renewable energy alternative and the inadequacy of its environmental impacts analysis, and urging FEMA to prepare an EIS. In the summer of 2021, FEMA instead finalized the PEA and issued a FONSI, determining that the agency's preferred alternative—alternative four, "some combination" of replacement, realignment or relocation, and no action—best fulfilled the purpose of need of the PEA and would have no significant impact on the quality of human health and the environment, and that an EIS was not necessary. The final PEA did not adopt the distributed renewable energy alternatives that Plaintiffs suggested.

91. On information and belief, FEMA has authorized funding for the following projects, among others, pursuant to the PEA:

- Roughly $18 million for "immediate" repairs to gas turbines at the Mayaguez Hydro-Gas Power Plant that have been out of service since September 2020.

27

**JA_39**

- Almost $1 million for permanent repairs to the Cambalache Power Plant in Arecibo, including repairs to the plant's water pumping system and storm water pump system.

- $3 million for improvements to the wastewater treatment plant at the Aguirre Power Plant near Guayama.

- Almost $2.5 million for replacing circuit breakers at the Manati TC switchyard that are "beyond useful recommended service life, are obsolete, or unreliable."

**D.    FEMA's Puerto Rico Public Facilities Project**

92. In July 2022, almost 5 years after Hurricanes Irma and Maria, FEMA issued another PEA addressing public facilities in Puerto Rico damaged by the storms ("Public Facilities PEA"). The Public Facilities PEA identifies emergency response facilities like police and fire stations, hospitals and other healthcare facilities, and public housing communities as among the kinds of public facilities for which the project would fund repair, replacement, or relocation.

93. The Public Facilities PEA defines the purpose of the proposed program as to "restore Puerto Rican public facilities and their functions to meet the post-disaster needs of subrecipients and increase their resiliency in response to future disaster events." The PEA goes on to frame the need for the program as follows:

> "The need for this action is to repair public facilities to current codes and standards, equitably restore or increase resiliency measures, reopen facilities closed as a result of disaster events, support alignment to subrecipient needs of restoring facility services, align facilities with local laws, and provide hazard mitigation to increase resiliency in response to future disaster events."

94. The Public Facilities PEA acknowledges that a critical part of the damage to Puerto Rico's public facility infrastructure resulting from the hurricanes had to do with the archipelago's electricity grid. According to the PEA, three months after Hurricane Maria more than a third of the hospitals in Puerto Rico were still without electricity, and nearly a year after

28

**JA_40**

the storm more than 10% of the permanent healthcare facilities in the archipelago were still depending on backup generators.

95. Similar to the Fossil Entrenchment PEA, the Public Facilities PEA considers four alternatives: a no action alternative, a "Repair of Public Facilities with Added Resiliency Measures" alternative, a "Relocation of Public Facilities" alternative, and a fourth alternative which was a combination of alternatives 2 and 3. FEMA states that typical actions FEMA will fund under the Public Facilities PEA include replacing or hardening existing onsite utility networks, including electric power networks. The Public Facilities PEA considers distributed renewable energy resources, such as solar microgrids, only as sources of backup power for critical public facilities when the existing fossil fuel grid fails.

96. Plaintiffs submitted extensive comments on the draft Public Facilities PEA, again raising a series of concerns about FEMA's failure to consider a distributed renewable energy alternative and the inadequate analysis of environmental impacts, and urging FEMA to prepare one comprehensive EIS holistically assessing its overall plans for Puerto Rico's electricity grid. Instead, in December of 2022, FEMA finalized the Public Facilities PEA and issued a FONSI. The final PEA did not adopt the distributed renewable energy alternatives that Plaintiffs suggested.

### E.      The PEAs' Failure to Meet NEPA's Basic Requirements

### 1.      *The Fossil Grid Entrenchment PEA's Flawed Purpose and Need Discussion*

97. By defining the purpose of the Fossil Grid Entrenchment Project as being to "provide grant funding to restore damaged utilities and increase their resiliency for future weather events,"

**JA_41**

FEMA focuses exclusively on pre-existing utilities as they were in Puerto Rico prior to Hurricane Maria in 2017, and on the narrow purpose of restoring those utilities.

98. Because Puerto Rico's electric grid prior to Hurricane Maria was centralized and largely fossil fuel-based, defining the purpose of the Fossil Entrenchment Project in this unduly narrow way results in a myopic focus on rebuilding, relocating, and hardening the centralized, fossil fuel-enabling grid, rather than considering the possibility of meeting the objective of providing the archipelago's residents with safe and reliable electricity and increasing their resiliency to future weather events by funding projects aimed at installing distributed renewable energy such as rooftop solar, solar microgrids, battery storage, energy efficiency retrofits, weatherization, and other renewable energy and energy efficiency measures.

99. In the Fossil Entrenchment PEA, FEMA acknowledges that Puerto Rico's centralized grid and aging fossil energy infrastructure is highly susceptible to damage from disasters that not only results in environmental harms, but also can be life-threatening for vulnerable citizens and communities.

100. For example, loss of power can leave elderly, young, and sick residents without access to medical care, air conditioning or potable water during dangerous heat waves. As the Fossil Entrenchment PEA states, it can also leave local governments "unable to provide critical services including fire suppression, emergency communication, power generation, potable water, and wastewater treatment."

101. This is particularly true in Puerto Rico because, according to a University of Texas at Austin study, the archipelago is "among the world's most vulnerable regions to the effects of climate change." The kinds of disasters to which Puerto Rico's antiquated and highly centralized grid are so susceptible are only going to become more and more intense in the coming years.

30

**JA_42**

102. Nonetheless, FEMA has framed the purpose of its Project with a narrow focus on repairing, rebuilding, and relocating the pre-existing centralized electricity delivery system, excluding consideration of cleaner and more resilient alternatives to the fossil-fuel enabling system Puerto Rico has relied on to date.

### 2.    *Both PEAs' Flawed Alternatives Analyses*

103. The Fossil Entrenchment PEA fails to consider reasonable alternatives, including alternatives in which FEMA funds would be used for investing in distributed renewable energy as a primary source of power, and/or energy efficiency measures.

104. Instead, it only explores alternatives that assume continued reliance on the existing centralized grid—either by repairing, replacing, the grid in current locations, by moving elements, or some combination of the two.

105. As a result, the Fossil Entrenchment PEA fails to consider the relative environmental impacts that would be associated with fulfilling more of Puerto Rico's energy needs with distributed renewable energy and/or projects like energy efficiency that would reduce electricity demand.

106. FEMA's alternatives analysis in its Public Facilities PEA similarly fails to consider an alternative in which distributed renewable energy serves as the primary source of electricity for public facilities in the archipelago. To the extent the Public Facilities PEA considers distributed renewable alternatives at all, it is only as a potential source of backup power when the centralized grid is down.

107. As Plaintiffs detailed in their comments on both PEAs, these alternatives would reduce the need to continue repairing, rebuilding, and relocating infrastructure destroyed every time there is a new storm. They would simultaneously avoid short- and long-term pollution

associated with rebuilding, relocating, or otherwise repairing, and then continuing to rely on, centralized T&D and fossil fuel-powered electricity infrastructure.

108. Alternatives that prioritize distributed renewable energy, battery energy storage, and energy efficiency retrofits would also make Puerto Rico's electricity grid and its critical public facilities more resilient to future disasters—including those caused or worsened by the climate crisis—by making them less reliant on long distance transmission lines through mountainous and heavily vegetated regions. If an extreme weather event takes a large, centralized facility or transmission line out of service, decentralized energy sources may not be affected at all. In addition, distributed energy can be used to create "islandable" generation that operates even when outages occur. This would minimize and even avoid risks to human health and life that result from power outages. For example, a 2017 National Academies report recommended a more distributed energy generation architecture in Puerto Rico to limit or prevent widespread outages.

109. By displacing existing greenhouse gas polluting sources, alternatives that address Puerto Rico's electricity needs by prioritizing distributed renewable energy, battery energy storage and energy efficiency—and that ensure the archipelago's critical public facilities rely primarily on such resilient resources—would also help ameliorate future disasters exacerbated by the climate emergency, which is caused by greenhouse gas emissions.

110. Under Puerto Rico's 2019 Energy Public Policy Act, Act 17, PREPA is required to dramatically reduce the use of fossil fuels and minimize greenhouse gas emissions in the coming years. FEMA's failure to consider alternatives that prioritize distributed renewable energy as a primary source of power, battery energy storage and weatherization and other energy efficiency measures that reduce demand and thereby potentially reduce the need to repair, rebuild, or

32

**JA_44**

relocate existing infrastructure and facilities, also make the Fossil Entrenchment Project and the Public Facilities Project incompatible with the Puerto Rico's renewable energy goals.

### 3.     *Both PEAs' Flawed Environmental Analyses*

111. Both PEAs also fail to engage in meaningful analysis of the environmental effects of the alternatives they do consider.

*Air Pollution Impacts*

112. Puerto Rico currently has multiple non-attainment and maintenance areas for a number of criteria pollutants under the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*—in other words, geographic areas found to have a particular pollutant in amounts exceeding National Ambient Air Quality Standards under the CAA, or that were previously found to be in non-attainment but were redesignated subject to the requirement to develop a maintenance plan. Those pollutants include lead, sulfur dioxide, and particulate matter (PM10).

113. These are dangerous substances. Lead is a highly potent neurotoxin that can irreversibly damage the brain and nervous system, resulting in slowed growth and development, learning and behavior problems, and hearing and speech problems. Sulfur dioxide can have a range of harmful effects on the lungs and is particularly dangerous for people with asthma. It can also contribute to the formation of smog, which irritates airways and can increase the risk of serious heart and lung disease. Studies have linked exposure to particulate matter pollution with irregular heartbeats, aggravated asthma, decreased lung function, heart attacks, and even premature death.

114. The Fossil Entrenchment PEA acknowledges that repairing existing fossil fuel utility infrastructure may result in short-term increases in these emissions. However, FEMA makes a cursory assumption that the impacts from such emissions will be minor because the

equipment will be well-maintained and comply with applicable standards, and that mitigation measures such as dust suppression techniques will be followed and be completely effective in addressing any impacts that do occur.

115. The Fossil Entrenchment PEA also asserts that long-term air quality impacts will not occur. But FEMA's analysis does not consider any alternatives that do not involve continued reliance on Puerto Rico's preexisting centralized grid, as compared to alternatives in which fossil fuel consumption on the archipelago is reduced. For example, the fossil fuel-fired power plants in Puerto Rico emit a tremendous amount of sulfur dioxide and are significant contributors to violations of sulfur dioxide emission standards in the archipelago. The PEA fails to consider any long-term air quality impacts from continued reliance on those facilities, or the relative benefits from an air quality standpoint of alternatives that rely instead more heavily on distributed renewables.

116. The Public Facilities PEA similarly asserts negligible air quality impacts based on a conclusory assertion that all equipment will be well maintained and comply with applicable standards, and that mitigation measures such as dust suppression techniques will be followed and be completely effective.

117. Also like the Fossil Entrenchment PEA, the Public Facilities PEA does not consider any alternatives in which public facilities in the archipelago do not continue to rely on fossil fuel-based electricity, and does not consider the relative benefits to air quality of alternatives in which public facilities rely primarily on distributed renewables.

*Water Quality Impacts*

118. The Fossil Entrenchment PEA and the Public Facilities PEA both acknowledge that Puerto Rico already has hundreds of designated instances of pollutants impairing water quality

throughout the archipelago, including pollutants from industrial point sources like fossil-fuel-fired power plants.

119. Activities funded pursuant to the Fossil Entrenchment PEA will result in further harm to Puerto Rico's water resources in a number of ways. Construction activities to repair or relocate infrastructure frequently include discharges of fill material that impair water quality and damages wetlands, and also harms coral habitats when those discharges reach the ocean. Furthermore, fossil fuel-fired power plants release various pollutants, such as excess nitrogen, that get into water supplies and contribute to harmful blooms of algae and sargassum.

120. Relying on fossil fuel power plants also requires constant transportation of fuel to these plants. But transportation of fossil fuels by tanker or by pipeline can result in environmentally destructive spills. For example, in 1994 a tanker carrying fuel oil collided with a reef near San Juan, Puerto Rico, spilling tens of thousands of gallons of oil and severely impacting wildlife and sensitive habitats, as well as sensitive historical sites and tourism.

121. Although FEMA acknowledges that activities funded under the Fossil Entrenchment PEA may result in adverse impacts to water quality, it again makes a conclusory assumption that all such impacts will be minor or negligible, and that local and federal requirements will be completely effective in mitigating any impacts that do occur.

122. Activities funded pursuant to the Public Facilities PEA will have many of the same impacts on water quality. Construction on repair projects, and particularly relocation activities, for public facilities will lead to discharge of fill material and impair water quality, damage wetlands, and harm corals. Investing in making public facilities in the archipelago continually reliant on fossil fuels will also result in continued pollution and spills of the kinds referenced above.

35

**JA_47**

JA_48

*Climate Consequences*

123. Climate change is multiplying exactly the kinds of threats FEMA is charged with addressing, particularly in locations like Puerto Rico that are especially vulnerable to climate impacts.

124. The climate crisis is fueling more destructive hurricanes. For example, scientists estimate that global warming made Hurricane Harvey's record rainfall in August of 2017—just weeks before Hurricanes Irma and Maria—3.5 times more likely, and that the storm's total rainfall was 15-38% higher than it would have been without global warming. Rising sea levels resulting from fossil-fuel caused climate change are also causing higher storm surge—walls of water pushed onto the coast when storms occur.

125. Puerto Rico experienced these effects when Maria hit in 2017. Scientists found that a storm of Maria's magnitude is nearly five times more likely today than it was in the 1950s because of warmer air and ocean water caused by the climate crisis. Hurricane Fiona fit this same pattern of massive rainfall fueled by climate change, with some parts of the territory receiving even more rain than they did during Hurricane Maria.

126. Puerto Rico is experiencing other climate change impacts as well. It is already experiencing significantly more hot days, rising sea levels, and coastal erosion, with these problems expected to only worsen in coming years. Although the climate emergency will make heavy rainfalls more common in Puerto Rico, it is likely that total rainfall will decrease in the Caribbean as a result of climate change. Warmer temperatures also increase the rate at which water evaporates. These factors together mean that, paradoxically, Puerto Rico may also face an increased risk of drought. This, in turn, may result in increased risk of wildfire in the archipelago.

**JA_48**

127. The CEQ has identified climate change as a relevant factor that should be considered in NEPA reviews. Nonetheless, the Fossil Entrenchment PEA and the Public Facilities PEA both fail to consider the climate change impacts of the alternatives considered. The Fossil Entrenchment PEA does not mention the climate crisis at all, despite the relevance of climate risks both to Puerto Rico and to FEMA's mission.

128. In both PEAs, FEMA also fails to consider how climate change will affect its proposed action. Reconstructing existing powerlines—even if they are reinforced—will not address the fundamental problem that those lines must traverse long, mountainous, and heavily vegetated distances to bring power from the primary generation sources in the south to the primary electricity needs in the north. The power grid will continue to be highly vulnerable to winds from hurricanes that typically traverse the island from east to west. Nor will burying power lines fully address climate vulnerability. Buried power lines, which are multiple times more expensive, are also more susceptible to flooding and corrosion by salt water, problems which are also expected to increase as a result of the climate crisis.

129. Similarly, simply repairing public facilities' connection to the existing fossil fuel grid will not prevent harm resulting from power outages at those facilities when the grid inevitably goes down again in another climate change-fueled storm. The Public Facilities PEA fails to consider how ensuring these facilities rely on distributed renewable energy, like rooftop or community-based solar microgrids with battery storage, can make them more resilient to climate change.

130. Both projects, but particularly the Fossil Entrenchment Project, will also actively exacerbate the climate crisis. Most critically, by committing billions of federal dollars to rebuild and reinforce Puerto Rico's centralized fossil fuel-reliant electricity system, the Fossil

37

**JA_49**

Entrenchment Project will necessarily prolong the archipelago's dependence on fossil fuels and lock in years if not decades worth of unnecessary greenhouse gas emissions and co-pollutants that overburden nearby communities.

131. For example, as commenters explained, the Fossil Entrenchment Project will certainly result in increased and prolonged demand for liquified natural gas ("LNG") in Puerto Rico, resulting in additional greenhouse gas emissions and induced demand for more natural gas drilling and extraction, as well as a host of other environmental concerns. None of this is addressed in the Fossil Entrenchment PEA.

*Environmental Justice Impacts*

132. The Fossil Entrenchment PEA and the Public Facilities PEA both fail to adequately address the potential environmental justice impacts of the projects under consideration—a required part of an agency's NEPA review.

133. Both PEAs fail to adequately consider the impacts that the public health air, land, and water pollution from the construction, relocation, and continued operation of projects under the PEAs will have on already overburdened environmental justice communities. At every stage of their life cycle—extraction, processing, transport, and combustion—fossil fuels generate harmful pollutants, including known cancer-causing chemicals like benzene and formaldehyde, ozone-forming chemicals like nitrogen oxides, volatile organic compounds, heavy metals like lead, and particulate matter including black carbon and silica dust that cause lung and heart disease. Burning coal also produces large amounts of coal ash, which contains mercury, cadmium, and arsenic, and which makes its way into waterways and contaminates drinking water supplies. Puerto Rico has a number of coal ash waste sites.

134. In Puerto Rico, as elsewhere, these fossil fuel pollutants disproportionately impact communities of color, low-income, and low-wealth communities. For example, the AES coal-fired power plant in Guayama and the Aguirre Power Complex in Salinas, both in southeastern Puerto Rico, are two primary sources of fossil fuel pollution located near some of the archipelago's poorest communities.

135. The Public Facilities PEA acknowledges that "long-term beneficial cumulative impact on air quality would occur if inclusion of renewable energy microgrids occurs throughout Puerto Rico," but neither it nor the Fossil Entrenchment PEA meaningfully consider the pollution burden for environmental justice communities in the archipelago that will result from reinvesting in and perpetuating dependence on the existing fossil fuel-based electricity system that FEMA's preferred alternatives in both PEAs involve. Nor does either PEA adequately consider the relative benefits in terms of avoided pollution to environmental justice communities of an alternative in which FEMA invests in distributed renewable energy as a primary source of power across the archipelago, including for critical public facilities.

136. Likewise, neither PEA considers how the climate change impacts of the projects it authorizes will affect environmental justice communities in Puerto Rico. The harms from climate disasters are not felt equally, but instead are disproportionately felt by Black, Latino, Indigenous, and low-wealth communities. Black, Latino, and low-income households are more likely to live in high climate-risk areas like heat domes, flood zones, and hurricane-prone areas. These communities tend to be particularly vulnerable to climate change impacts like more frequent extreme heat and poor air quality, as well as to the health impacts those events cause, such as cardiovascular and respiratory complications, renal failure, and preterm birth.

39

**JA_51**

137. The Fossil Entrenchment PEA in particular also fails to consider how reconstructing Puerto Rico's outdated and inefficient fossil fuel-based electricity grid will cement the problems that have led to that grid being so unreliable—problems which disproportionately affect environmental justice communities. The continued necessity for transmission lines to traverse long distances from generation centers in the south to population centers in the north through mountainous and heavily vegetated terrain will leave environmental justice communities particularly vulnerable to all the human health and safety concerns associated with frequent and prolonged blackouts.

138. The Public Facilities PEA acknowledges that solar microgrids can improve resilience but, as previously stated, only considers microgrids as backup power. And, even within that framework, FEMA does not consider whether deployment of renewable-based microgrids could provide backup power to both a public facility and the surrounding community, allowing both to have their critical power needs met during grid failures and providing especially crucial resilience benefits for environmental justice communities.

139. Finally, neither PEA considers how perpetuating reliance on the fossil fuel-based grid may make electricity bills in Puerto Rico both higher and more unstable than they would be if FEMA invested in a distributed renewable energy alternative, or how this may affect the relative environmental justice impacts of FEMA's preferred alternatives.

*Cultural and Historic Resources Impacts*

140. In the Fossil Entrenchment PEA, FEMA does not specifically consider the extent to which the overarching Project and its associated work like access road projects would impact cultural and historic resources. While it catalogues the existence of historic, cultural, and archeological resources and regions across Puerto Rico generally, it does not do any analysis of

40

**JA_52**

Project impacts to cultural and historic resources, despite acknowledging that the Fossil Entrenchment Project has a "high potential for adversely affecting historic properties."

141. The Public Facilities PEA does assess potential impacts to historic buildings, including vibrations from construction equipment and relocation or abandonment of historic buildings. FEMA concluded that short and long-term major impacts to such properties will occur, but makes a cursory assumption that treatment measures will limit all impacts to moderate or minor, without providing any details.

*Threatened and Endangered Species Impacts*

142. Both the Fossil Entrenchment PEA and the Public Facilities PEA also fail to take the requisite hard look at the impacts both projects will have on threatened and endangered species.

143. The 2017 hurricanes and Hurricane Fiona caused tremendous damage and stress to critical habitats in Puerto Rico—including wetlands, dunes, beaches, coral reefs, seagrasses, and forests—and to the species that depend on them. This damage adversely impacted many of the federally listed threatened and endangered species that make Puerto Rico and its waters home. These consequences include direct loss of individuals, habitat loss or changes in habitat structure or function, and increased predation and competition from invasive species. Habitat for the critically endangered Puerto Rican parrot, hawksbill turtle, and sharp-shinned hawk, among many others, was decimated by the storms. The listed coral species *Acropora cervicornis* and *Orbicella annularis*, which are both major contributors to nearshore reefs that provide critical protection to coastlines from storm surge and waves, were also severely impacted by the hurricanes. Even before Hurricane Fiona, the loss or decline of native species that has resulted from Hurricanes Irma and Maria has created a void that invasive, non-native species are rapidly filling.

41

**JA_53**

144. Activities carried out under the Fossil Entrenchment Project and the Public Facilities Project will exacerbate these harms. Several threatened or endangered species of bird and coral in Puerto Rico are particularly likely to be affected. The elfin woods warbler (*Setophaga angelae*), listed as threatened in 2016, is found, among a few other places, in the Maricao Commonwealth Forest. Transmission lines appear to cut across the Maricao Commonwealth Forest, and any utility repair, replacement, upgrading, or relocation activities in the vicinity have the potential to adversely affect this species. Elfin woods warblers utilize dense vegetation, typically closed-canopy, high-elevation forests with a well-developed understory. Loss and fragmentation of this habitat to urbanization are central causes of the species' decline. In the listing decision for the elfin woods warbler, the Fish and Wildlife Service ("FWS") references "development of infrastructure for utilities and communications" and associated road construction as activities that negatively affected warbler habitat. Expansion of existing utility infrastructure also may degrade suitable habitat for the warbler. Given its already restricted distribution, habitat modification presents a significant threat to the species' persistence. The warbler's restricted distribution also leaves it increasingly vulnerable to storms and other threats associated with the climate crisis, which will be exacerbated by continued reliance on fossil fuel-based electricity, but the PEAs fail to address these concerns.

145. The endangered Puerto Rican parrot (*Amazona vittate*)—the only parrot native to the United States, and one of the world's most endangered bird species—has a current range that is restricted to the El Yunque National Forest and the Rio Abajo Forest. Transmission lines appear to cut across the Rio Abajo Forest area, and any utility repair, replacement, upgrading, or relocation activities in the vicinity have the potential to adversely affect the Puerto Rican parrot. Climate-fueled hurricanes also pose a threat to this highly endangered species. Indeed, "[g]iven

**JA_54**

JA_55

the small size of the wild population, a single strong hurricane could potentially wipe out the entire current wild population." Continued reliance on centralized T&D and fossil fuel-based energy as proposed in both PEAs increases the likelihood of these intense storm events and consequent necessary repair work on Puerto Rico's utility and public facility infrastructure, but the PEAs fail to address these issues.

146. The Puerto Rican nightjar (or whip-poor-will)(*Caprimulgus noctitherus*), listed as endangered in 1973, was restricted to dry, closed-canopy, semideciduous forests in the southern portion of the main island including Guánica Commonwealth Forest, Susua Forest, and Guayanilla Hills as of the mid-1980's when the recovery plan for the species was drafted. Portions of occupied nightjar habitat appear heavily impacted by utility infrastructure. Habitat modifications that flow from repair, replacement, or relocation activities in the vicinity have the potential to have "significant negative effects on the species." The FWS has stated that "[t]he sedentary nature of this species and its link to mature, closed-canopy forest provides little room for what proponents may visualize as minor habitat modifications." FEMA failed to describe how the activities covered by either PEA would affect the species and its habitat—specifically the coastal dry forests and lower cordillera forests of Susúa and Guánica that are crucial to the nightjar's recovery.

147. The yellow-shouldered blackbird (*Agelaius xanthomus*), listed as endangered in 1976, occurs from southwestern through eastern Puerto Rico, including Boquerón Commonwealth Forest, Salinas, Roosevelt Roads Naval Station. These areas are crisscrossed with utility infrastructure and any habitat modifications that flow from repair, replacement, expansion, or relocation activities in the vicinity have the potential to harm this species. Severe storms also pose a threat to yellow-shouldered blackbirds, contributing to nest failure and

mortality. Continued reliance on fossil fuel-based energy as proposed in both PEAs increases the likelihood of intense storm events including hurricanes that will adversely impact the yellow-shouldered blackbird, but the PEAs failed to consider these issues.

148. The Fossil Entrenchment PEA acknowledges that activities related to the Project—particularly those involving relocating utilities and therefore potentially doing construction work in previously undisturbed areas—may have adverse short- and long-term impacts on federally listed threatened or endangered species, proposed or candidate species, and their designated critical habitats. However, the PEA does not assess or evaluate the impacts of the Fossil Entrenchment Project on any of the bird species listed above—nor indeed on any of the species and habitats it identifies. Instead, the PEA makes a conclusory statement that the adverse impacts will be negligible to minor.

149. FEMA also declined to consider marine species in the Fossil Entrenchment PEA at all, asserting that the Project will not have any impacts in the oceans surrounding Puerto Rico, despite commenters explaining that the Project will inevitably have direct and indirect impacts on Puerto Rico's ocean environment and marine species.

150. Corals, in particular, stand to be significantly harmed. Seven species of corals that occur off Puerto Rico are listed under the ESA: elkhorn coral (*Acropora palmata*), staghorn coral (*A. cervicornis*), boulder star coral (*Orbicella franksi*), mountainous star coral (*O. faveolata*), lobed star coral (*O. annularis*), rough cactus coral (*Mycetophyllia ferox*), and pillar coral (*Dendrogyra cylindrus*). Sedimentation and runoff from land development degrade coral habitat and contribute to the species' endangerment; harms are particularly acute for sunlight-reliant species like elkhorn and staghorn corals. As the National Marine Fisheries Service explained in the elkhorn and staghorn coral recovery plan, "heavy sedimentation is associated with lower

44

**JA_56**

coral species richness and abundance, lower growth rates, decreased calcification, decreased net productivity, and lower rates of coral recruitment." Coral reefs off Puerto Rico are at increased risk of sediment accumulation due to the steep island topography, which leads to sediment-heavy runoff. Corals also are particularly sensitive to climate change effects including ocean warming, acidification, sea level rise, and increased storm events.

151. FEMA did not consider the extent to which pollution from construction and operation of projects under the Fossil Entrenchment Project will runoff into the marine environments around the islands and affect marine habitats and species, including the above-identified coral species. The Fossil Entrenchment PEA also did not consider the impacts of induced effects like additional dredging projects around the islands to allow more tanker traffic.

152. The Public Facilities PEA's analysis of impacts on threatened and endangered species and their habitats is similarly lacking. Much like the Fossil Entrenchment PEA, the Public Facilities PEA acknowledges that there will be adverse short and long-term impacts on listed species. However, it does not assess or evaluate any of the impacts on the species it identifies. Instead, it makes a conclusory assertion that the impacts will be negligible or minor, and that future consultations with FWS and conservation measures will minimize impacts. Also like the Fossil Entrenchment PEA, the Public Facilities PEA does not consider effects from pollution runoff, or induced effects like additional dredging.

*Cumulative Impacts*

153. In addition to examining direct and indirect impacts of an action, NEPA also requires that FEMA take a hard look at cumulative impacts. Cumulative impacts can "result from individually minor, but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.1(g)(3). Both PEAs assume that the activities they analyze will have minor

45

**JA_57**

environmental impacts based in significant part on FEMA's claim that any site-specific activities that may have significant impacts will undertake further NEPA review and impacts will be more carefully assessed at that stage. This approach allows projects with individually small but cumulatively major impacts on the environment and species to potentially proceed without any further environmental review at all.

154. The Fossil Entrenchment PEA allows a given project to disturb up to two acres of undeveloped land and up to five acres of previously disturbed land without further environmental review. It places no limitation on the number of projects that may disturb that amount of land simultaneously, in close proximity, or in total. It also authorizes "[u]pgrading or rebuilding up to 20 linear miles of pipeline, transmission or distribution line" on an island that is 35 miles long by 100 miles wide without requiring any additional analysis.

155. The PEA acknowledges that the Fossil Entrenchment Project may result in multiple utility projects being under construction in the same area at the same time, and that this may result in adverse cumulative impacts "to resources such as vegetation, water quality and soil," as well as in terms of "traffic delays and congestion, noise, and social services." The PEA summarily dismisses these concerns, simply stating that these cumulative impacts will be short-term and less than major.

156. The PEA also fails to consider potential significant cumulative air pollution impacts from the construction and operation of multiple concurrent projects in the same area. It similarly fails to consider cumulative impacts on federally listed threatened and endangered species and their critical habitats from the construction and operation of multiple projects under the Fossil Entrenchment Project's sweeping umbrella.

**JA_58**

157. The Public Facilities PEA suffers from the same defects. Much like the Fossil Entrenchment PEA, the Public Facilities PEA allows for up to two acres disturbance in rural areas and up to 5 acres disturbance in urban areas without any further environmental review, and without any limit on how many projects can result in such disturbances simultaneously or within the same area. FEMA acknowledges that "[r]ecently completed, ongoing, and planned temporary and permanent projects would add impacts to the same resources as those discussed in this PEA." In particular, the Public Facilities PEA acknowledges air emissions, decreased water quality, increased production of hazardous waste, and long-term adverse impacts to water, biological, air, and cultural resources, and to communities with environmental justice concerns, as potential long-term cumulative impacts.

158. Despite this, the Public Facilities PEA makes the conclusory assertion that the action alternatives it analyzes will not result in significant cumulative impacts. It fails to explain why the cumulative impacts of the Public Facilities Project will be minor, particularly since multiple projects may be carried out pursuant to the Public Facilities PEA in close physical proximity at the same time.

### 4.   *FEMA's Improper Refusal to Prepare a Single, Comprehensive EIS*

159. FEMA's Fossil Entrenchment Project will involve billions of dollars and the "repair, replacement, and realignment" of utility infrastructure across and throughout Puerto Rico. FEMA expressly acknowledges that this will include, among other things, repairing, rebuilding, or relocating miles of pipeline and may require new rights of way.

160. FEMA's Public Facilities Project will likewise involve a huge number of buildings and other facilities across the entire archipelago, including hospitals and clinics, police and fire stations and other emergency response facilities, education facilities, city halls, municipal service centers and other government offices, churches and other houses of worship, judiciary, buildings,

**JA_59**

correctional facilities, libraries, museums, and more. Further, the Public Facilities PEA explicitly allows for expanding facility function, capacity, and density by up to 20%, and for ground disturbance of up to 2 acres at rural sites and 5 acres at urban sites.

161. With respect to both PEAs, commentors urged FEMA to recognize that the potential impacts of the alternatives considered are significant and not conducive to mitigation to "less than major" impacts that could support a finding that an EIS is not necessary.

162. Rejecting these concerns, in both cases FEMA issued a short and conclusory FONSI finding that the agency has determined that the evaluated actions will have no significant impact. In both cases, the agency failed to explain why the presence of several NEPA significance factors do not require the preparation of an EIS, including the precedent of an EA on this kind of project, controversial and unknown impacts to the human environment; cumulatively significant impacts; the possible loss or destruction of significant scientific, cultural, or historical resources, and adverse impacts on threatened or endangered species or their critical habitat. 40 C.F.R. § 1508.27.

163. With respect to both PEAs, commentors pointed out that the environmental impacts of the projects discussed would be significant, cumulative, and warrant the preparation of an EIS. With respect to the Fossil Entrenchment PEA, FEMA inexplicably responded that an EIS was not necessary because it had not yet received any individual project proposal in Puerto Rico whose impacts "cannot be mitigated to lower levels" through permitting restrictions, consultation with other agencies, or imposition of project conditions. This fails to explain why the Fossil Entrenchment Project as a whole does not require an EIS. With respect to the Public Facilities PEA, FEMA did not provide a specific response to commentors as to why it concluded no EIS was warranted.

**JA_60**

164. With respect to the Public Facilities PEA in particular, commentors argued that, because the Public Facilities PEA contemplates projects involving repairing the connections of public facilities in Puerto Rico to the centralized fossil fuel-based electricity grid—overall repairs to which are a major subject of the Fossil Entrenchment PEA—the two actions are significantly connected and require the preparation of a single, comprehensive EIS. FEMA's response to this comment pointed to its expectation that it will take the agency years to fully fund the Public Facilities project, and referenced possible future EISs, but failed to explain why the current evident connected nature of these two projects do not require the preparation of a single, comprehensive EIS.

**F.     FEMA's Failure to Undertake Further NEPA Review in Light of Significant Developments Since the Issuance of the FONSIs.**

165. On information and belief, FEMA has yet to approve many specific projects or disperse most of the funds obligated under the umbrella of these two PEAs. In the meantime, several developments since the issuance of the Fossil Entrenchment PEA FONSI in 2021 raise serious concerns regarding the analysis included in that PEA, and necessitate that FEMA, at minimum, supplement its NEPA review. NEPA requires that an agency "shall" supplement the review where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d).

166. On January 6, 2023, Plaintiffs sent FEMA a letter detailing important new developments and urging FEMA to agree that it would undertake supplemental NEPA review at this time.

167. The letter first explained serious concerns related to LUMA Energy, which has now taken over management of the archipelago's electric transmission and distribution system. As

49

**JA_61**

JA_62

referenced above, LUMA has had numerous performance issues calling into question its ability to effectively repair utility infrastructure as FEMA assumes in the Fossil Entrenchment PEA. Under LUMA's management of the T&D system, residents have experienced frequent blackouts while electricity bills have soared.

168. These issues have been so significant that in September 2022, the New York Attorney General urged federal authorities to launch an investigation to address the company's performance. Among other concerns, LUMA's Monacillo substation suffered a fire that left 900,000 customers without power; a fire at the Costa Sur power plant caused a complete outage in April 2022; and additional widespread failures and outages have occurred.

169. The apparent inability of the company charged with rebuilding the centralized fossil fuel power system to operate safely or keep electricity bills stable seriously undermines the rationale in the 2021 FEMA PEA to spend billions of dollars to rebuild that system rather than pursue viable alternatives, and calls into question the continued validity of the Fossil Entrenchment PEA's assessment of the environmental and justice impacts of the chosen alternative.

170. Plaintiffs' January 6 letter also explained that additional research and data since the Fossil Entrenchment PEA was finalized further demonstrates how FEMA could rely on distributed solar and related technologies to serve electricity needs rather than pouring money into the vulnerable centralized power system.

171. For example, one recent analysis shows that Puerto Rico could achieve 75% distributed renewable energy generation within 15 years, with minimal upgrades to the distribution system, and that a 75% distributed renewable energy scenario is less expensive than the current grid. These new analyses seriously undermine FEMA's cursory rejection of these

50

alternatives in both PEAs, and call for supplemental NEPA review to consider these alternatives and compare their environmental impacts with FEMA's original chosen alternative.

172. Finally, Plaintiff's January 6 letter explained that Hurricane Fiona in September 2022, and its aftermath, also warrants further NEPA analysis. Although Hurricane Fiona hit as a relatively small Category 1 storm, it caused heavy flooding and landslides and knocked out the archipelago's entire electric grid yet again. Fiona is just the latest in a series of devastating storms that have repeatedly ravaged the archipelago and exposed the high vulnerability of its centralized grid.

173. As detailed in Plaintiffs' recent letter, any single one of these developments would be sufficient for FEMA to undertake supplemental NEPA review as significant new circumstances or information relevant to environmental concerns raised by the projects proceeding under both PEAs, pursuant to which FEMA is pouring billions into rebuilding the status quo centralized T&D and fossil fuel power system and into perpetuating Puerto Rico's public facilities' dependence on that system. Taken together, these developments demand that FEMA re-open the issues considered in the two PEAs and reconsider both the environmental impacts of its approach, and reasonable alternatives.

174. On January 25, 2023, FEMA sent a response to Plaintiffs' letter in which the agency refused to undertake supplemental NEPA review at this time. FEMA's reply acknowledged a number of the points Plaintiffs made in their January 6 letter but declined to commit to any specific further NEPA actions, including supplemental NEPA.

**JA_63**

**FIRST CLAIM FOR RELIEF**

**VIOLATIONS OF NEPA FOR ISSUING AN INADEQUATE ENVIRONMENTAL ASSESSMENT AND FINDING OF NO SIGNIFICANT IMPACT FOR THE PUERTO RICO FOSSIL GRID ENTRENCHMENT PROJECT**

175. Paragraphs 1-174 are incorporated from this Complaint.

176. FEMA's Puerto Rico Fossil Grid Entrenchment PEA and Finding of No Significant Impact violate NEPA because the agency defined the purpose of the Fossil Entrenchment Project unreasonably narrowly, framing it as being to restore and repair the centralized grid in Puerto Rico that existed prior to the 2017 hurricanes rather than as to meet the needs of the archipelago's residents for safe, resilient, and reliable electricity.

177. The PEA failed to take a "hard look" at the direct, indirect, and cumulative environmental impacts of the Fossil Entrenchment Project and reasonable alternatives.

178. The PEA lacked sufficient evidence and adequate analysis of the environmental impacts of the Fossil Entrenchment Project to support its ultimate Finding of No Significant Impact.

179. The PEA violates NEPA's requirement that FEMA consider a reasonable range of alternatives to the proposed action.

180. The PEA and FONSI are arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, see, inter alia, 42 U.S.C. § 4332(2)(C), (E); 40 C.F.R. §§ 1502.14, 1508.7, 1508.8, 1508.9, and violate the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2).

181. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

**JA_64**

**SECOND CLAIM FOR RELIEF**

**VIOLATIONS OF NEPA FOR FAILURE TO PREPARE AN EIS FOR THE PUERTO RICO FOSSIL GRID ENTRENCHMENT PROJECT**

182. Paragraphs 1-181 are incorporated from this Complaint.

183. FEMA's Puerto Rico Fossil Grid Entrenchment Project is a major federal action within the meaning of NEPA.

184. FEMA violated NEPA by failing to prepare an Environmental Impact Statement fully analyzing the environmental impacts of the Fossil Entrenchment Project, including air pollution impacts, climate change impacts, impacts to ESA-listed terrestrial and marine animals and their critical habitats, impacts to cultural and historic resources, environmental justice impacts, and cumulative impacts. The agency also failed to explain why several NEPA significance factors do not require the preparation of an EIS, including the precedential effect of FEMA's approach; controversial and unknown impacts to the human environment; cumulatively significant impacts; the possible loss or destruction of significant scientific, cultural, or historical resources; and adverse impacts on threatened or endangered species or their critical habitat. 40 C.F.R. § 1508.27.

185. FEMA's authorization of the Fossil Entrenchment Project without first preparing an EIS, or adequately explaining why an EIS is not necessary, is arbitrary, capricious, an abuse of discretion, done without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2).

186. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

**JA_65**

**THIRD CLAIM FOR RELIEF**

**VIOLATIONS OF NEPA FOR ISSUING AN INADEQUATE ENVIRONMENTAL ASSESSMENT AND FINDING OF NO SIGNIFICANT IMPACT FOR THE PUBLIC FACILITIES PROJECT**

187. Paragraphs 1-186 are incorporated from this Complaint.

188. FEMA's Public Facilities PEA and Finding of No Significant Impact violate NEPA because the PEA failed to take a "hard look" at the direct, indirect, and cumulative environmental impacts of the Public Facilities Project and reasonable alternatives.

189. FEMA's PEA lacked sufficient evidence and adequate analysis of the environmental impacts of the Public Facilities Project to support its ultimate Finding of No Significant Impact.

190. The Public Facilities PEA violates NEPA's requirement that FEMA consider a reasonable range of alternatives to the proposed action.

191. The PEA and FONSI are arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, inter alia, 42 U.S.C. § 4332(2)(C), (E); 40 C.F.R. §§ 1502.14, 1508.7, 1508.8, 1508.9, and violate APA. 5 U.S.C. § 706(2).

192. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

**FOURTH CLAIM FOR RELIEF**

**VIOLATIONS OF NEPA FOR FAILURE TO PREPARE AN EIS FOR THE PUBLIC FACILITIES PROJECT**

193. Paragraphs 1-192 are incorporated from this Complaint.

194. FEMA's Public Facilities Project is a major federal action within the meaning of NEPA.

**JA_66**

195. FEMA violated NEPA by failing to prepare an Environmental Impact Statement fully analyzing the environmental impacts of the Public Facilities Project, including air pollution impacts, climate change impacts, impacts to ESA-listed terrestrial and marine animals and their critical habitats, impacts to cultural and historic resources, environmental justice impacts, and cumulative impacts. The agency also failed to explain why several NEPA significance factors do not require the preparation of an EIS, including the precedential effect of FEMA's approach; controversial and unknown impacts to the human environment; cumulatively significant impacts; the possible loss or destruction of significant scientific, cultural, or historical resources, and adverse impacts on threatened or endangered species or their critical habitat. 40 C.F.R. § 1508.27.

196. FEMA's authorization of the Public Facilities Project without first preparing an EIS, or adequately explaining why an EIS is not necessary, is arbitrary, capricious, an abuse of discretion, done without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2).

197. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

**FIFTH CLAIM FOR RELIEF**

**VIOLATION OF NEPA FOR REFUSING TO CONDUCT SUPPLEMENTAL NEPA REVIEW**

198. Paragraphs 1-197 are incorporated from this Complaint.

199. NEPA requires an agency to conduct further environmental analysis whenever there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(d).

55

**JA_67**

200. FEMA is violating NEPA by refusing to conduct additional NEPA review in connection with the Puerto Rico Fossil Grid Entrenchment Project in light of developments since the Final PEA and FONSI were issued, which were detailed in Plaintiffs' January 6, 2023, letter. FEMA's refusal to conduct supplemental NEPA review is arbitrary and capricious and an abuse of discretion, done without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2).

201. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

1. Declare that FEMA's Puerto Rico Fossil Grid Entrenchment Programmatic Environmental Assessment and Finding of No Significant Impact violate NEPA, its implementing regulations, and the APA;

2. Vacate and set aside the Programmatic Environmental Assessment and Finding of No Significant Impact FEMA issued for the Puerto Rico Fossil Grid Entrenchment Project;

3. Declare that FEMA's failure to prepare an Environmental Impact Statement for the Puerto Rico Fossil Grid Entrenchment Project, or to adequately explain why an EIS is not necessary, violates NEPA, its implementing regulations, and the APA;

4. Order FEMA to prepare an Environmental Impact Statement for the Puerto Rico Fossil Grid Entrenchment Project in compliance with NEPA;

5. Declare that FEMA's Puerto Rico Public Facilities Environmental Assessment and Finding of No Significant Impact violate NEPA, its implementing regulations, and the APA;

**JA_68**

6. Vacate and set aside the Programmatic Environmental Assessment and Finding of No Significant Impact FEMA issued for the Puerto Rico Public Facilities Project;

7. Declare that FEMA's failure to prepare an Environmental Impact Statement for the Puerto Rico Public Facilities Project, or to adequately explain why an EIS is not necessary, violates NEPA, its implementing regulations, and the APA;

8. Order FEMA to prepare an Environmental Impact Statement for the Puerto Rico Public Facilities Project in compliance with NEPA;

9. Declare that FEMA's failure to conduct supplemental NEPA analysis for the Puerto Rico Fossil Grid Entrenchment Project violates NEPA, its implementing regulations, and the APA;

10. Order FEMA to conduct supplemental NEPA review for the Puerto Rico Fossil Grid Entrenchment Project;

11. Award Plaintiffs their costs for this action, including reasonable attorneys' fees; and

12. Grant such other relief as this Court deems just and proper.

**JA_69**

Dated: April 11, 2023                    Respectfully submitted,


                                          _/s/ Augusta C.F. Wilson_____
                                          Augusta C.F. Wilson
                                          (*Pro Hac Vice* Application Pending)
                                          awilson@biologicaldiversity.org


                                          _/s/ Howard M. Crystal_____
                                          Howard M. Crystal
                                          (D.C. Bar No. 446189)
                                          hcrystal@biologicaldiversity.org


                                          _/s/ Anchun Jean Su_____
                                          Anchun Jean Su
                                          (D.C. Bar No. CA285167)
                                          jsu@biologicaldiversity.org


                                          CENTER FOR BIOLOGICAL DIVERSITY
                                          1411 K Street NW, Suite 1300
                                          Washington, D.C. 20005
                                          Tel: (585) 503-8765

                                          *Attorneys for Plaintiff*

**JA_70**

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

KATHARINE LAUBACH (CO 42693)
KRYSTAL-ROSE PEREZ (TX 24105931)
Trial Attorneys
U.S. Department of Justice
Natural Resources Section
150 M Street NE
Washington, D.C. 20002
Phone: (202) 305-8568 (Laubach)
Phone: (202) 305-0486 (Perez)
Email: katharine.laubach@usdoj.gov
Email: krystal-rose.perez@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO**

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL EMERGENCY MANAGEMENT AGENCY, DEPARTMENT OF HOMELAND SECURITY, DEANNE CRISWELL, and ALEJANDRO MAYORKAS, <br><br> Defendants. | No. 3:24-cv-01145-JAG |

**<u>DEFENDANTS' NOTICE OF LODGING THE ADMINISTRATIVE RECORD</u>**

By and through undersigned counsel, Federal Defendants provide notice of their lodging

of the Administrative Record in the above-captioned case.  The Administrative Record lodged

with the Court consist of materials compiled by the Federal Emergency Management Agency

**JA_71**

related to the Programmatic Environmental Assessments and Findings of No Significant Impact at issue in this case.

Attached as Exhibit 1 to this Notice is the Declaration of John J. McKee certifying the Administrative Record.  The documents comprising the Administrative Record are on a thumb drive that also contains an index with hyperlinks to the documents.  The index is attached as Exhibit 2 to this Notice.

By no later than August 2, 2024, Federal Defendants will mail to the Clerk of Court's Office two thumb drives containing the Administrative Record.  Federal Defendants intend one of the thumb drives to be for the Clerk of Court's Office and the other one for the Chambers of the Honorable Jay A. Garcia-Gregory.

In addition, Federal Defendants are sending a thumb drive of the Administrative Record to Plaintiffs' counsel at the address provided to Federal Defendants.

Respectfully submitted this 31st day of July 2024.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Krystal-Rose Perez*
KATHARINE LAUBACH (CO 42693)
KRYSTAL-ROSE PEREZ (TX 24105931)
Trial Attorneys
U.S. Department of Justice
Natural Resources Section
150 M Street NE
Washington, D.C. 20002
Phone: (202) 305-8568 (Laubach)
Phone: (202) 305-0486 (Perez)
Email: katharine.laubach@usdoj.gov
Email: krystal-rose.perez@usdoj.gov

*Attorneys for Defendants*

**JA_72**

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

Katharine Laubach (CO 42693)
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street – North Terrace, Ste. 600
Denver, Colorado 80202
Phone: (202) 353-5765
E-mail: katharine.laubach@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC., et al., | |
| Plaintiffs, | No. 3:24-CV-1145-JAG |
| v. | **DEFENDANTS' NOTICE OF APPEAL** |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, et al., | |
| Defendants. | |

Notice is hereby given that Defendants appeal to the United States Court of Appeals for the First Circuit from this Court's order of September 30, 2025, ECF No. 72, and the judgment entered on October 2, 2025, ECF No. 73.

1

**JA_73**

JA_74

Respectfully submitted on December 1, 2025,

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

_____
Katharine Laubach
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street – North Terrace, Ste. 600
Denver, Colorado 80202
(202) 353-5765
katharine.laubach@usdoj.gov
*Counsel for Defendants*

**JA_74**

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing Defendants' Notice of Appeal with the Clerk of Court using the CM/ECF system which electronically mails notice to the attorneys of record.

_____
Katharine Laubach
*Counsel for Defendants*

3

**JA_75**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

|  |  |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC., *et al.,*<br><br>          Plaintiffs,<br><br>     v.<br><br>FEDERAL EMERGENCY MANAGEMENT<br>AGENC, *et al.*,<br><br>          Defendants. | Civil Action No. 3:24-CV-01145-JAG |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, and in support of their

Motion for Summary Judgment, Plaintiffs hereby submit the following Statement of Material

Facts as to which they contend there is no genuine issue of material fact to be tried, with

accompanying citations to the Administrative Record:

1.      When two hurricanes hit Puerto Rico in quick succession in 2017, they caused the

longest power outage in U.S. history, and communities across Puerto Rico experienced

devastating personal and economic losses because they had no access to an essential element of

modern life: electricity. *Build Back Better: Reimagining and Strengthening the Power Grid of

Puerto Rico*, P.R. Energy Res. Working Grp. (2017) (AR8376) at 11, AR8387 (2d Declaration of

Peter Galvin ("Galvin Dec."), Exhibit ("Ex.") 1 [hereinafter "*Build Back Better Report*"];

Declaration of Sirena Montalvo ¶¶ 5-6; Declaration of Timmy Boyle, ¶ 6.

2.      For decades, most of Puerto Rico's electricity has been generated by fossil fuel-

powered plants in the southern part of the big island and transported over fragile transmission

lines—often long distances and through hard-to-reach terrain—to population centers, primarily

**JA_76**

in the north, making them highly vulnerable to the storms that regularly hit the archipelago: downed transmission lines can cause widespread power outages that are difficult to repair. *Build Back Better Report* at 9-11, AR8385-87. Before Puerto Rico had a chance to recover from the severe damage to the electricity grid that Hurricane Maria caused in 2017, Hurricane Fiona struck in 2022 and caused another total blackout. Comite Dialogo Ambiental, *et al.*, Comments on Programmatic Environmental Assessment for Utility Repair, Replacement, and Realignment (Dec. 21, 2020) (AR4375) at 2, AR4376 [hereinafter "*Pl. Entrenchment PEA Comments*"]; Comite Dialogo Ambiental, *et al.*, Comments on Programmatic Environmental Assessment for Puerto Rico Public Facilities Infrastructure Recovery (Sept. 30, 2022) at 2, AR12058 [hereinafter "*Pl. Public Facilities PEA Comments*"].

3. People die during power outages, from lack of access to essential medical care, life-saving medicine, and vital medical equipment, among other things. *Pl. Entrenchment PEA Comments* at 2, AR4376; *Pl. Public Facilities PEA Comments* at 2, AR 12058*; Transformation and Innovation in the Wake of Devastation*, Ctrl. Office for Recovery, Recon. and Res. (2018) (AR17363) at 44-47, AR17425-28 (Galvin Dec., Ex. 2) [hereinafter "*Transformation Report*"]. The fossil fuel-powered grid also pollutes the environment, exacerbates climate change, and causes other harms*. Transformation Report* at 59, AR17440.

4. Distributed renewable energy—renewable energy like rooftop and community solar and storage placed near the communities they serve—offers a resilient alternative to withstand these storms, keep electricity on during climate-driven hurricanes, and avoid other environmental harms. *Build Back Better Report* at 1, AR8377; *Transformation Report* at 84, AR17465. Studies show that Puerto Rican communities could obtain all the electricity they need from distributed energy, rather than continuing to rely on the failing centralized, fossil-fuel-based

2

**JA_77**

grid. *Pl. Public Facilities PEA Comments* at 9, AR12065; Puerto Rico Recovery and Resilience Advisory Group Initial Scenario Discussion (March 31, 2022) (AR596) at 21, AR616 [hereinafter "*Advisory Group Discussion*"].

5.      In December 2017, an interagency working group issued *Build Back Better: Reimagining and Strengthening the Power Grid of Puerto Rico* (AR 8376) to support FEMA in "defining first level funding requirements and electric power system rebuild recommendations" for Puerto Rico's power system following the damage caused by Maria and Irma. *Build Back Better Report* at 1, AR8377. That analysis recommended "the use of increased renewable energy resources, such as wind and solar and incorporating new distributed energy resource technologies, such as energy storage and microgrids to enable energy to become abundant, affordable, and sustainable to improve the way of life for the citizens of Puerto Rico." *Id.* The Report explained how new distributed energy resource technologies would "improve storm resilience, reduce dependence of fossil fuels, and support a more sustainable energy future by reducing carbon producing generation." *Id.* at 12, AR8388.

6.      The Report highlighted the significant opportunity available to FEMA in rebuilding Puerto Rico's energy system following the 2017 hurricanes, finding that in 2017 almost 500,000 homes in Puerto Rico were in need of rebuilding or major repair, and had the potential to be rebuilt with rooftop solar and energy-efficient technologies with minimal integration costs. *Id.* at 32, AR8408. The analysis concluded that if 20% of rebuilt homes in Puerto Rico included a rooftop solar system of an average 1-kilowatt size, they would produce 136 gigawatt hours (GWh) of electricity per year and offset the equivalent amount of fossil-fuel energy generation supplying the centralized grid. *Id.* It further found that if only 15% of rebuilt or rehabbed homes complied with the 2012 International Energy Conservation Code building

3

**JA_78**

standards for energy efficiency, Puerto Rico would save an additional 60 GWh of energy. *Id.* at 33, AR8409. The Report estimated that these investments in rooftop solar and energy efficiency could represent $315 million and $133 million in macro cost savings, respectively. *Id.* at 35, AR8411. Many of the benefits of distributed energy resources come from using them as a primary power source, which saves money and reduces the need for the fragile, centralized grid. *Id.* at 32, AR8408. The Report also found that increased use of renewables could reduce Puerto Rico's reliance on imported fuel—in other words that it could reduce the need to burn climate-warming fossil fuels. *Id.* at 6, AR8382.

7.      In 2018 Puerto Rico government's Central Office for Recovery, Reconstruction, and Resiliency (COR3) issued a Report, *Transformation and Innovation in the Wake of Devastation* (AR17363), which recognized the benefits distributed renewable energy could offer Puerto Rico, advocating for incorporating microgrids and regional "electrical islands" that can continue delivering locally generated electricity if sections of the transmission grid fail, and finding that, in addition to improving resilience, making this transition could also reduce Puerto Rico's reliance on imported fuel. *Id.* at 88-89, AR17469-70. The Report explained how a new energy system that "incorporates more renewables, microgrids, and distributed energy resources" could "drive new businesses and employment opportunities and support residents' well-being." *Id.* at 84, AR17465. Puerto Rico could generate at least 20 gigawatts of electricity from rooftop solar alone, which exceeds the current generation in Puerto Rico. *Advisory Group Discussion* at 21, AR 616; *Advisory Group PR100 Six-Month Progress Update* (July 12, 2022) at 58, AR399; *PR100 One-Year Progress Report* (Jan. 2023) at 11, AR1192.

8.      In a presentation to FEMA in 2019, COR3 described decentralizing electricity generation in Puerto Rico and moving to clean sources of electricity as a key principle that

4

**JA_79**

should be implemented in the wake of the 2017 hurricanes. *Puerto Rico Energy System Modernization Plan*, Presentation to FEMA (Feb. 5, 2019) (AR11455), at 5, AR11459. COR3 actively sought FEMA's help in funding this transition. *Id.* at 10, AR11464.

9.      In 2020, FEMA issued a Draft Programmatic Environmental Assessment for Utility Repair, Replacement, and Realignment in Puerto Rico *Programmatic Envt'l Assessment, Utility Repair, Replacement, and Realignment* (Aug. 2020) (AR2866) (Galvin Dec., Ex. 3) [hereinafter "*Entrenchment PEA*"]. The goal of the projects evaluated in the Entrenchment PEA was to provide "safe and efficient delivery of energy" to communities in Puerto Rico. *Entrenchment PEA* at 9, AR 2894.

10.     The PEA acknowledged that the proposed project is massive—with, for example, almost 2,500 miles of transmission lines in Puerto Rico requiring repair at the time of the draft PEA's issuance, *Entrenchment PEA* at 62, AR 2947—and that it will likely result in multiple projects in the same watershed at the same time, *id.* at 75, AR 2960. The PEA concluded that these cumulative impacts would be "short-term and less than major." *Id.* at 74-75, AR2959-60.

11.     The only action alternatives FEMA considered in the Draft Entrenchment PEA was some combination of repairing, replacing, or moving pre-existing centralized utility infrastructure by doing things like replacing or strengthening utility poles, or burying power lines. *Id.* at 11-17, AR2896-2902. FEMA repeatedly acknowledged that the proposed project would have environmental impacts, including on air quality, AR2909, water quality, AR2916, and threatened and endangered species. AR 2931-32.

12.     With respect to air quality impacts, the Entrenchment PEA recognized that there would be increases in particulate air pollution from construction equipment and activities, *id.* at 24-25, AR2909-10, and even acknowledged that the preferred alternative could involve

5

**JA_80**

construction projects or utility operation significant enough to require additional air quality permitting. *Id.* at 25, AR2910. The PEA "assume[d] the impacts from modern well-maintained equipment would be minor," that "equipment emissions would be below de minimis levels," and that mitigation measures would "limit negative impacts." *Id.* at AR 2909.

13.     With regard to water quality impacts, the Entrenchment PEA acknowledged that repair, replacement, and upgrade work associated with its preferred alternative could affect the temperature, dissolved oxygen levels, and turbidity of surface waters, and could "permanently alter the physical environment" where fill materials are placed. AR2916. The PEA concluded that these impacts would be minor and short-term. *Id.* The PEA similarly noted the possibility of adverse impacts to groundwater and wetlands related to sediment, debris, oils, and hazardous substances, but asserted these impacts would be "negligible." *Id.*

14.     The Entrenchment PEA repeatedly claimed that mitigation measures or best management practices will keep impacts below significant levels—including for air quality impacts, AR2909, water quality impacts, AR2916, and cumulative impacts. AR2959-60. These mitigation measures were generally undefined and intended to take place under different regulatory schemes, such as future Clean Water Act permitting, AR1802-3, and future consultation with the Fish and Wildlife Service. AR2932. The Entrenchment PEA authorizes, without additional NEPA review, an unlimited number of projects up to 5 acres in already-disturbed areas and the destruction an unlimited number of separate pristine areas of up to two full acres. AR2897.

15.     Plaintiffs submitted comments on the draft Entrenchment PEA, raising concerns about FEMA's consideration of impacts and failure to consider alternatives. *Pl. Entrenchment PEA Comments* (AR4375). The comments explained how studies have shown that "new solar

6

**JA_81**

generation [in Puerto Rico] will cost about 6.7 cents/ kWh" in comparison to the most recently approved rate of 23.77 cents/kWh. AR 4378.

16.     In June of 2021, FEMA issued a Finding of No Significant Impact ("FONSI") for the Entrenchment PEA without making any changes and without addressing Plaintiffs' comments. Finding of No Significant Impact, Utilities Repair, Replacement, and Realignment (June 16, 2021) (AR3136) (Galvin Dec., Ex. 4) [hereinafter "*Entrenchment FONSI*"].

17.     In July 2022, FEMA issued another Draft PEA, this one focused on public facilities in Puerto Rico, such as hospitals, fire stations, and municipal buildings. Programmatic Environmental Assessment, Public Facilities Infrastructure Recovery and Resiliency (July 2022) (AR11864)(Galvin Dec., Ex. 5) [hereinafter "*Public Facilities PEA*"]. The goal of the Public Facilities PEA was to "restore Puerto Rican public facilities and their functions to meet the post-disaster needs of subrecipients and increase the resiliency of them in response to future disaster events." *Public Facilities PEA* at 8, AR11871.

18.      The only action alternative considered in the Public Facilities PEA was a combination of repairing and relocating existing facilities, including their connections to the fossil fuel-based electricity grid. AR11875-11881. With respect to air quality impacts, AR11890, water quality impacts, AR11892-93, threatened and endangered species, AR11908-909, and cumulative impacts, AR11942-944, the Public Facilities PEA acknowledged that impacts may occur, but determined that such impacts would be minor or negligible, or assumed that mitigation measures will effectively reduce impacts to less than major. The PEA also identified a series of impacts on water quality, including petroleum leaks, spilled wastewater and laboratory chemicals, exposed soils, and "contaminated groundwater." AR11892.

7

**JA_82**

19.     The Public Facilities PEA identified purported mitigation measures that were generally undefined and intended to take place under different regulatory schemes, such as future Clean Water Act permitting, AR11892, and future consultation with the Fish and Wildlife Service, AR 11908.  The Public Facilities PEA authorizes, without additional NEPA review, an unlimited number of projects up to five acres in disturbed areas, and an unlimited number of projects in separate pristine areas of up to two full acres. AR11875.

20.     Plaintiffs submitted comments on the Draft PEA, raising concerns about the analysis of impacts and failure to consider alternatives. *Pl. Public Facilities PEA Comments* (AR12057).

21.     In December 2022, FEMA issued a FONSI on the Public Facilities PEA without making any changes and without addressing Plaintiffs' comments. Finding of No Significant Impact, Public Facilities Infrastructure Recovery and Resiliency (Dec. 22, 2022) (AR12029) (Galvin Dec., Ex. 6) [hereinafter "*Public Facilities FONSI*"].

22.     In January, 2023 Plaintiffs wrote FEMA seeking a comprehensive EIS that both takes a hard look at the impacts of these connected projects and considers distributed renewable energy alternatives. Pl. Letter to FEMA Administrator Deanne Criswell (Jan. 6, 2023) (AR 29401) (Galvin Dec., Ex. 7) [hereinafter "*Pl. Jan. 6, 2023 Letter*"]. Plaintiffs urged that in light of significant new developments and information after the Entrenchment FONSI was issued, FEMA must at minimum supplement its NEPA analysis. *Id.* at AR 29404-05.

23.     Hurricane Fiona—a relatively small Category 1 storm that hit in September 2022, after the Entrenchment FONSI issued—knocked out Puerto Rico's entire electricity grid again. *Id.* at 6, AR29406. Puerto Rico has also suffered from ongoing electricity service disruptions and related concerns with the new private company hired to manage Puerto Rico's transmission and

8

**JA_83**

distribution system. *Id.* at 4, AR 29404; *see also e.g., Puerto Rico Grid Privatization Flaws Highlighted in First Two Months of Operation,* Inst. for Energy Econ. and Fin. Analysis (Aug. 2021) (AR30112).

24.     Several recent studies further highlight the substantial benefits to communities obtaining access to resilient, distributed renewable energy. *E.g.*, Nat'l Renewable Energy Lab'y, *Puerto Rico Low-To-Moderate Income Rooftop PV And Solar Savings Potential* (Dec. 2020) (AR29761); Telos Energy, *Puerto Rico Distributed Energy Resources Integration Study* (Dec. 2020) (AR29808); *see also* Pl. Jan. 6, 2023 Letter at 5, AR29405. A 2021 Study—which was submitted with Plaintiffs' letter—shows how, with minimal upgrades, 75% of Puerto Rico communities could be relying on resilient renewable energy generation within fifteen years, saving Puerto Rico billions in imported fuel costs, and saving money as compared to investing in the ever-failing grid. Ingrid M. Vila Biaggi, *We Want Sun and We Want More: 75% Distributed Renewable Generation in 15 Years in Puerto Rico Is Achievable and Affordable* (2021) (AR29787).

25.     In January, 2024 the FEMA Administrator wrote Plaintiffs a letter refusing to prepare an EIS or conduct supplemental NEPA and making it clear the agency would continue to proceed with all the projects being undertaken pursuant to the Entrenchment PEA. Letter from FEMA Administrator (Jan. 25, 2023) (AR 29141) (Galvin Dec., Ex. 8) . The letter suggested FEMA might do additional NEPA review in the future, AR29142, but to date no such additional review has been initiated. In the meantime, in August, 2024, Hurricane Ernesto caused a massive power failure across Puerto Rico. Patricia Mazzei, *Hurricane Ernesto Knocks Out Power to Hundreds of Thousands in Puerto Rico*, N.Y. TIMES, Aug. 14, 2024.

9

**JA_84**

26.     Plaintiffs' members are being adversely impacted by the myriad projects being conducted under the authorization of the two PEAs and FONSIs at issue in this case. *See* Declarations of Timmy Boyle; Jose Diaz; Lydia Diaz; Frank Garcia; Victor Guzman; Sirena Montalvo; Federico Moscoso; Jose Vargas; Carlos A. Vivoni.


Respectfully submitted this 21st day of August 2024.

*/s/ Augusta C.F. Wilson*
Augusta C.F. Wilson (*Pro Hac Vice*)
(D.C. Bar No. 90013118)
Email: awilson@biologicaldiversity.org
Tel: (585) 503-8765

*/s/ Howard M. Crystal*
Howard M. Crystal (*Pro Hac Vice*)
(D.C. Bar No. 446189)
Email: hcrystal@biologicaldiversity.org
Tel: (202) 809-6926

CENTER FOR BIOLOGICAL
DIVERSITY
1411 K Street NW, Suite 1300
Washington, D.C. 20005

*/s/ William Santiago-Sastre*
William Santiago-Sastre, Esq.
USDC PR 201106
P.O. Box 1801
Sabana Seca, Puerto Rico 00952-1801
Email: wsantiagosastre@gmail.com
Tel: (787)448-7032; 622-3939

*Attorneys for Plaintiffs*

**JA_85**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC. *et al.,*<br><br>          Plaintiffs,<br><br>     v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY *et al.*,<br><br>          Defendants. | Civil Action No. 3:24-CV-01145-JAG |

**DECLARATION OF TIMMY BOYLE**

I, Timmy Boyle, do hereby declare as follows:

1.  I have personal knowledge of the following and could competently testify thereto if called as a witness.

2.  I live in Humacao, Puerto Rico. I have been a part of Alianza Comunitaria Ambientalista del Sureste (ACASE) since its founding in 2015. ACASE was originally created to fight against the dumping of coal ash in Humacao. However, the organization's mission has expanded over the years to include opposing the privatization of Puerto Rico's electricity system and advocating for Puerto Rico to transition to generating electricity using renewable energy rather than fossil fuels.

3.  ACASE uses a number of different organizational tools to carry out this mission, including organizing community meetings, developing written educational materials for the public, holding press conferences and other media events, and participating in demonstrations. I am the speaker of the organization, and my role is to be the main contact point and facilitate connection between ACASE and the media, government institutions, partner organizations, and the community as a whole. Our membership is open to anyone from the community who wishes to attend the meetings we hold every other Wednesday, and decision-making for the organization is made by consensus at those meetings.

4.  My community in Humacao has suffered from the effects of pollution from the burning of coal and the dumping of coal ash for years. I personally know people who have become sick as a result of this fossil fuel pollution. Likewise, I know that an oil refinery located in the nearby town of Yabucoa has sickened the community there and people have died as a result of the pollution from that facility.

**JA_86**

5. These harms are a significant part of the reason ACASE has fought for Puerto Rico to transition to renewable energy. We do not understand why we would continue to rely on fossil fuels for electricity when they cause so much harm to health and to the environment, and also contribute to climate change.

6. Fossil fuel-based electricity has also been extremely unreliable in Puerto Rico. When Hurricane Maria happened my family and I were without power for approximately five months. Although we sometimes received help from a neighbor with a generator, there were plenty of times when we were completely in the dark and the psychological impacts of this were very real. Last year—only three days before Hurricane Fiona hit—we installed rooftop solar with battery storage. As a result, we were fortunate not to lose power during Hurricane Fiona and once again be in the dark.

7. The power outages are still a regular occurrence, and in fact they have become more frequent—albeit generally shorter in duration—since LUMA took over transmission and distribution of electricity in Puerto Rico. Even though my family is no longer as directly affected because we have rooftop solar, it still impacts our lives when we I see our neighbors struggling without power. I try as much as I can to offer them help when outages occur, especially by providing water, and in that way the outages continue to harm me as well as my community.

8. The frequent outages also directly affect ACASE's work. Since COVID, we have begun hosting our regular meetings online, and it is a common occurrence that members who want to attend cannot join our meetings because they do not have electricity. I have colleagues in the organization who have gone an entire year without electricity, and it has been a constant inconvenience for them.

9. Widespread adoption of rooftop solar in Puerto Rico would address these electricity reliability challenges. It would also help to address problems with the skyrocketing price of electricity in the archipelago under LUMA. Puerto Rico has the highest poverty rate in the U.S. and yet our electricity prices are some of the highest in the nation.

10. As ACASE has become more involved in advocating for solar energy in Puerto Rico, we have also come to understand that the renewable energy future for the archipelago must be specifically rooftop solar and not big utility-scale solar farms. This is because those large-scale solar installations are often proposed to be located on agricultural land. Puerto Rico is a small island, and we have a very limited amount of high-quality agricultural land available that we must use for farming. We cannot afford to lose it to solar farms. There are enough roofs available in Puerto Rico to supply our energy needs using rooftop solar, and we prefer this option.

**JA_87**

11. We as human beings have a right to health, environment and a good quality of life. I understand that one of the things that negatively affects my quality of life, that of my neighbors and community here in Humacao, and that of everyone in Puerto Rico, is the burning of coal, oil, and gas to generate electricity. The pollution this creates harms our environment and our health. We need energy to be produced with renewables. We have an incredible gift in that we have wonderful sun here in Puerto Rico—it gives us a healthier way to produce the energy we need.

12. Making this transition would reduce power outages, and it would also allow us to no longer depend on other countries for our basic needs. We can produce our own energy, and the money we now spend importing fossil fuels can instead be invested here in Puerto Rico in order to improve all our lives.

13. The federal government has allocated a huge amount of money to FEMA to reconstruct Puerto Rico's electricity grid. It would truly be sad if that money is used to rebuild something that is inevitably going to fail again. It makes no sense to invest in rebuilding an electricity pole that will only fall down again. Instead, we need FEMA to invest in rooftop solar here—this is the energy future we need in Puerto Rico.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this \_\_ day of \_\_\_, 2024.

_____
Timmy Boyle

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

COMITÉ DIALOGO AMBIENTAL, INC.

*et al.,*

        Plaintiffs,

  v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY

*et al.,*

        Defendants.

Civil Action No. 3:24-CV-01145-JAG

### DECLARATION OF JOSÉ MANUEL DÍAZ PÉREZ

I, José Manuel Díaz Pérez, do hereby declare as follows:

1. I have personal knowledge of the following and could competently testify thereto if called as a witness.

2. I live in an area called Cerro los Cabros, located near the Cuebas neighborhood in the town of Peñuelas, Puerto Rico. I have been working for more than a decade to protect my community from environmental threats, which include both the devastating harms from fossil fuel infrastructure located near us, and the ongoing harms we are experiencing from climate change.

3. I have been closely involved in the formation and work of both Campamento Contra las Cenizas En Peñuelas, Inc. (Campamento) and Casa Tallaboeña de Formación Comunitaria y Resiliencia (Casa Tallaboeña).

4. Campamento was created in 2014 as the result of decades of work by people before us to protect our communities from environmental threats, and initially worked to address coal ash pollution. Campamento works to reduce harmful pollution from fossil fuel-based power facilities and promote access to clean, renewable sources of electricity, especially for low-income residents.



5. Our economically disadvantaged community is surrounded by polluting energy infrastructure, including fossil fuel power plants, pipelines, and other facilities. For decades these projects have caused serious health and pollution problems, including the dumping of toxic coal ash.

6. Like me, everyone in our community is a member of Campamento. For example, between 2014 and 2017 we had many fights to protect the community from the coal ash, and had many decisions to make about our strategies. We held general assemblies where all members could help us to determine what actions we would take. I am an active participant in those decisions.

7. Campamento's purpose has always been to confront specific environmental threats and to take action. Over many years Campamento has organized frontline communities to bring legal actions, educate people, bring our demands to the streets through direct protest, and to in other ways advocate for better environmental conditions. We have had significant victories addressing coal ash and other pollution in Peñuelas. However, many threats remain because Puerto Rico continues to generate electricity principally from burning polluting fossil fuels. We also work to support other communities in this work, who face similar challenges.

**JA_89**

8.    Hurricane Maria presented new challenges to our community and to Campamento. Because the Hurricane was so devastating, we quickly realized that we needed to become first responders to get emergency help to people. After Maria, we had to confront a devastating earthquake, and then Hurricane Fiona.

9.    As a result of these challenges Casa Tallaboeña was born, so we could provide immediate assistance to people in need. Again, like me everyone in the community is a member of Casa Tallaboeña. Casa Tallaboeña promotes community empowerment by providing first response training and education that allows communities—particularly poor and rural communities in the Peñuelas region—to be more resilient in the face of storms and other natural disasters. We help provide first aid, shelter, water, food and other essentials. We also help teach students when schools are closed.

10.    In addition, we go door to door to see about people's needs, which can include the need to safely store medicine or to run medical equipment. To address those needs we also help provide electricity – while this can include solar lights, when the grid is down most people get their electricity through fossil fuel generators because solar systems are more expensive. Casa Tallaboeña seeks affordable and just access to rooftop solar and other forms of distributed renewable energy because the poor and remote communities Casa Tallaboeña works with are often the last to have electricity restored following a disaster and therefore suffer the most severe consequences.

11.    To respond to the needs from Hurricane Fiona alone, Casa Tallaboeña spent more than $100,000, and we will need to continue to spend money to address further storm, including to help people with their electricity needs. Casa Tallaboeña is also building a first response center — a resilient building where people will be able to go once the next storm inevitably hits us. As planned, the center will rely on a canopy with solar panels for power, and will not be connected to the grid. We would not have to spend so much time and money on these projects if the community already had access to things like solar panel projects. I work for Casa Tallaboeña as an administrator of projects, and the Board has authorized me to be responsible for the development of the new first response center.

12.    Today, we continue to face ongoing challenges.  Despite our victories, we still have gas plants, liquid natural gas storage facilities, pipelines, and other fossil fuel infrastructure. We are still surrounded by polluting facilities.



13.    We also have a fragile grid that fails, leaving people without power essential for their lives and livelihoods. Because we know climate change will bring more frequent and severe storms, we know that we cannot rely on a centralized power system to provide reliable electricity. I myself have experienced the many challenges of these frequent outages — my wife needs insulin for a medical condition which means I always need power for refrigeration. I have to have a gas generator which I need to fuel with expensive gasoline that can cost me more than $100 a week when the power is out.

14.    To address these challenges, we need to dedicate funds to providing distributed renewable energy through rooftop solar panels, community solar projects, microgrids and other resilient technologies that do not rely on the fragile grid system. That is why our groups decided to join this case, because rather than investing in those proven solutions FEMA is spending billions of dollars to rebuild the fossil fuel grid, which is only going to continue to fail while it also continues to pollute communities like ours. If FEMA would use its resources to help our community get access to resilient renewable energy technologies, our groups would save money and we would see significant improvements in our community.

15.    We are also concerned about plans to build large-scale renewable energy projects as a way to meet clean energy goals, rather than giving local resilience and control through rooftop solar and related technologies. Companies are using important agricultural land for these large-scale projects, caused flooding and other harms. They are proposing a large solar project in Salinas, which will cause more environmental damage.

16.    We would also like to see more local control of hydroelectric plants in Peñuelas, which need repair but could be used to provide local power. This is another example of ways FEMA

2

**JA_90**

could spent money to help the local community rather than funding big corporations to rebuild the central grid, which does not serve our communities well.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this _11_ day of _August_, 2024.

_____
José Manuel Díaz Pérez

**JA_91**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC. *et al.,*<br><br>        Plaintiffs,<br>    v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY *et al.*,<br><br>        Defendants. | Civil Action No. 3:24-CV-01145-JAG |

**DECLARATION OF LYDIA M. DIAZ RODRIGUEZ**

I, Lydia M. Diaz Rodriguez, do hereby declare as follows:

1. I have personal knowledge of the following and could competently testify thereto if called as a witness.

2. I live in Yabucoa, Puerto Rico. I have been working with El Comité Yabucoeño Pro-Calidad de Vida (YUCAE) since the organization's inception in 1988. YUCAE's mission is for the town of Yabucoa to enjoy sustainable development that integrates economic development, social equity, and the preservation of ecosystems. My work with the organization includes helping communities organize to protect and preserve their natural resources, promoting resilient communities, and supporting the installation of rooftop solar systems. For example, I helped facilitate the donation of a solar system to the Quebradillas community in Yabucoa to establish a food storage center in a rescued school there. YUCAE also does education work, helping students learn about local natural resources and develop leadership and agroecology skills. Decision-making for the organization is done by consensus or, if consensus is not reached, by a majority vote.

3. The Yabucoa people have suffered significant harm from fossil fuel pollution where we live. For instance, for decades up until 2012, there was an oil refinery, owned first by Shell and then by Sun Oil, operating in the Juan Martin neighborhood of Yabucoa, about 10 minutes away from where I live. Close to that refinery, there is also Oil Recovery Corp, a plant that recycles oil and other products. Even though the Sun Oil refinery is now closed, we still have the Buckeye tanks, which store the oil that is distributed in Puerto Rico. We are still suffering from health impacts resulting from the pollution from these fossil fuel facilities, including higher rates of cancer than other parts of Puerto Rico.

**JA_92**

4. To give a sense of how this experience affects my own life and work, the one-time President of YUCAE died of cancer and I am aware of another colleague on the Comité who is sick with cancer. Indeed, the Comité first came into being in 1988 because the community here realized that children were getting sick with respiratory problems and having to miss school as a result of the refinery.

5. We have also dealt with other environmental harms the refinery created. These include pollution of our aquifer and saline intrusion because of the large amount of water the refinery extracted for cooling. We have also recorded significant amounts of air pollution, which tends to linger because Yabucoa is situated in a valley surrounded by mountains. Both the EPA and the Environmental Quality Board granted waivers to the company to exceed the allowable limits of air, noise and water pollution. I have often felt like my community was a dumping site for the fossil fuel industry. These effects have caused the community to come together to oppose new fossil fuel development where we live: we successfully prevented a new proposed natural gas plant from being built here.

6. My family and I have also been significantly affected by the frequent power outages here in Puerto Rico. I have a grandson who is diabetic and needs electricity to refrigerate his insulin. When Hurricane Maria hit in 2017, we did not have electricity for 9 months, so this was a very distressing, hopeless, and scary situation for me and my family. People need electricity to survive, especially because without electricity our system of rural aqueducts and wells is affected. This system depends on electricity to work. When the power goes out, people are forced to rely on generators that run on diesel in order to access clean water.

7. For all these reasons, my family installed rooftop solar panels after Hurricane Maria—we decided we will not let another hurricane affect us this way. We have also, through YUCAE, supported communities in the installation of 10-12 other rooftop solar systems since Maria happened. Even so, the almost-daily power outages still affect me and my community on a regular basis. For example, I have sometimes had to miss appointments with healthcare providers because their offices have no power or running water. These interruptions of services have constant and ongoing ripple effects throughout my community. They also affect YUCAE's ability to carry out its work and mission, since power outages make it difficult to conduct planned meetings.

8. If FEMA invested its funding in rooftop solar in Puerto Rico and in batteries, homes and businesses here could have reliable electricity and be resilient to the storms that inevitably hit the archipelago. More than that, communities like mine would not need to suffer all the negative health effects and other harms caused by the pollution from the fossil fuel facilities.

**JA_93**

**JA_94**

9.  It is also critical that FEMA invest in rooftop solar rather than in large, industrial-scale solar farms. There is a proposal to build one such large-scale solar facility near the La Lucia Nature Reserve here in Yabucoa. The community is very concerned about this proposal because the proposed location for the project is in a tsunami area. Building a solar farm there would reduce the ability of the land to absorb water and microorganisms, damage marine life, food security and sovereignty, disrupt the landscape, cause deforestation of the area, and could aggravate flooding conditions for nearby residents when storms or tsunamis happen.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 12 day of august of 2024

**[Illegible signature]**

Lydia M. Diaz Rodriguez

3

**JA_94**

JA_95

## Certification of Accuracy

Re: Translation *of Declaration of Lydia Diaz.*

I, Tamara Maria Cabrera Castro, Ph.D., hereby attest that:

a) I hold a 5-year degree, an M.A., and a PhD from the School of Translation and Interpreting at the University of Granada, Spain.

b) I am a Sworn Translator and Interpreter certified by the Spanish Ministry of Foreign Affairs, European Union and Cooperation for translating and interpreting from *Spanish* into *English* and from *English* into *Spanish.*

c) I am also an interpreter, certified by the Administrative Office of the U.S. Courts.

d) I have Phase I (written legal translation) of the Federal Court Interpreters Certification Examination.

e) I am certified by the American Translator Association.

I further attest that I have translated the attached document and that, to the best of my knowledge, ability, and belief this translation is a true, accurate, and complete translation of the original document that was provided to me.

SEAL

SIGNATURE  **Tamara Maria Cabrera Castro**

DATE **8/19/2024**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

|  |  |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC. *et al.,*<br><br>            Plaintiffs,<br><br>     v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY *et al.,*<br><br>            Defendants. | Civil Action No. 3:24-CV-01145-JAG |

**SECOND DECLARATION OF PETER GALVIN**

I, Peter Galvin, do hereby declare as follows:

1.  I have personal knowledge of the following and could competently testify thereto if called as a witness. I live in Shelter Cove, California. I submitted an earlier declaration in this case, in connection with the government's effort to have the case transferred from the District of Columbia to this Court. I submit this second declaration in support of Plaintiffs' motion for summary judgment.

2.  I am a founder of the Center for Biological Diversity ("Center") and have worked with the organization since it was incorporated in 1989. I currently serve as our Director of Programs. In that capacity, I help to coordinate the Center's legal actions and campaigns and assist in the formulation of its organizational policy and strategy.

3.  The Center is a nonprofit organization with roughly 90,000 members and offices in various locations around the United States. According to our membership department, the Center has more than 1,000 members and supporters who reside in Puerto Rico.

4.  I helped craft the Center's organizational purpose and goals when co-founding the Center, and I help oversee and guide our programs today. I work with our staff, as well as other organizations, to advance the Center's goals of protecting endangered species, addressing the climate crisis, and advancing a just and clean energy future through administrative actions and reform, scientific research, and the judicial process. I am also a longtime member of the organization.

5.  The Center's members rely on the Center to represent our interests in addressing the climate crisis, advocating for a clean and just energy future, and defending and restoring imperiled species and habitats. All these interests are at stake in this litigation, which

**JA_96**

concerns both the impacts on species and the environment of projects designed to restore the *status quo* energy system, and also concerns whether communities in Puerto Rico will get access to resilient renewable energy systems that will allow them to thrive in a world with increasingly severe weather due to the climate crisis, while also reducing the fossil fuel emissions fueling that crisis.

6. The Center has longstanding interests in the wildlife, habitat, air quality, and water quality that are threatened by the projects at issue in this case. These interests began more than two decades ago, when our staff was researching threats to species and habitats in the Caribbean region. During this research, I connected with Puerto Rican residents and activists who invited me to travel to the island and explore its wildlife and wild nature. Thankfully, I was able to take them up on their offers and got a firsthand view of some of Puerto Rico's magnificent natural values. I hiked along stunning beaches and coastlines; swam and snorkeled around the island; and looked for and learned about all kinds of native animals, including corals, sea turtles, seabirds, and manatees. I was able to visit several times, and I visited Old San Juan and explored areas around San Juan Bay on two of these trips.

7. These experiences gave me a deeper understanding and appreciation of the rich Puerto Rican culture and natural environment. These experiences also led me to direct organizational resources to identify and carry out actions to protect Puerto Rico's public trust values. We have devoted a significant amount of funding and staff time for these efforts over the years, and fortunately, much of it has paid off from an ecological perspective.

8. Exhibit 1 to this declaration is a true and correct copy of the 2017 Report titled *Build Back Better: Reimagining and Strengthening the Power Grid of Puerto Rico*, which begins on page 8,376 of the Administrative Record.

9. Exhibit 2 to this declaration is a true and correct copy of an excerpt from the 2018 Report titled *Transformation and Innovation in the Wake of Devastation*, which begins on page 17,363 of the Administrative Record.

10. Exhibit 3 to this declaration is a true and correct copy of Section 1-6 of the *Programmatic Environmental Assessment, Utility Repair, Replacement, and Realignment, Commonwealth of Puerto Rico*, which begins on page 2,886 of the Administrative Record.

11. Exhibit 4 to this declaration is a true and correct copy of the *Finding of No Significant Impact* for the Programmatic Environmental Assessment, Utility Repair, Replacement, and Realignment, Commonwealth of Puerto Rico, which begins on page 3,136 of the Administrative Record.

2

**JA_97**

12. Exhibit 5 to this declaration is a true and correct copy of Sections 1-6 of *the Programmatic Environmental Assessment, Public Facilities Infrastructure Recovery and Resiliency, Puerto Rico*, which begins on page 11,864 of the Administrative Record.

13. Exhibit 6 to this declaration is a true and correct copy of the *Finding of No Significant Impact* for the Programmatic Environmental Assessment, Public Facilities Infrastructure Recovery and Resiliency, Puerto Rico, which begins on page 12,029 of the Administrative Record.

14. Exhibit 7 to this declaration is a true and correct copy of Plaintiffs' January 6, 2023 Letter to the FEMA Administrator titled *Urgent Demand For Appropriate NEPA Review On FEMA's Funding Towards Puerto Rico Electricity Projects*, which begins on page 29,401 of the Administrative Record.

15. Exhibit 8 to this declaration is a true and correct copy of the *FEMA Administrator's January 25, 2023 Letter to Plaintiffs*, which begins on page 29,141 of the Administrative Record.

16. Exhibit 9 to this declaration is a true and correct copy of *Plaintiffs' June 18, 2024 letter to Defendants* raising concerns regarding the Administrative Record.

17.  Exhibit 10 to this declaration is a true and correct copy of *Defendants' July 8, 2024 Letter to Plaintiffs* concerning the Administrative Record.

18. Exhibit 11 to this declaration is a true and correct copy of the Council on Environmental Quality's implementing regulations for the National Environmental Policy Act prior to the 2020 amendments, available at https://www.energy.gov/sites/default/files/NEPA-40CFR1500_1508.pdf.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 20th day of August, 2024.

_____

Peter Galvin

3

**JA_98**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC. *et al.,*<br><br>         Plaintiffs,<br><br>   v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY *et al.*,<br><br>         Defendants. | Civil Action No. 3:24-CV-01145-JAG |

**DECLARATION OF FRANK S. GONZALEZ GARCIA**

I, Frank Gonzalez Garcia, do hereby declare as follows:

1. I have personal knowledge of the following and could competently testify thereto if called as a witness.

2. I live in Guaynabo, Puerto Rico, and have lived here for over 20 years. I lived in Florida for about seven years to attend college, receiving a bachelor's and master's degree in electrical engineering. I moved back to Puerto Rico when I was 24 and have worked as a registered professional electrical engineer during the last 25 years. I also obtained a certificate in environmental regulations and permits at the Río Piedras Campus of the University of Puerto Rico.

3. I have been a member of the Center for Biological Diversity since 2016. I actively read emails from the Center that I receive as a member, and sometimes take part in the Center's action alerts. I became involved with the Center when I served as President of the Puerto Rico Ornithological Society, during our quest to protect a private forest that used to be part of the Guanica State Forest within the municipality of Guayanilla, Puerto Rico, from an ill-sited wind farm project that had already destroyed—without permits—thousands of trees, native pre-Columbian Indian historic sites, and extremely unique and valuable natural resources. As part of our field investigations and collaboration with biologists, scientists, and members of the nearby communities, we discovered and documented the forest and its biodiversity, including a new population and breeding site for the endangered Puerto Rican Crested Toad living in the location where the wind farm was proposed to be built, a species that at that time was only known to exist in the Guanica State Forest. The Center was willing to step in and help us try to protect the forest and the endangered toad when others were not. I worked with attorneys and others from the Center to argue that rooftop solar would be a better alternative to the proposed

**JA_99**

windfarm because it would not require killing the endangered Puerto Rican Crested Toad and other endangered and threatened species, destroying forests, and fragmenting habitats.

4. I am deeply concerned about the impacts of pollution from burning fossil fuels to generate electricity in Puerto Rico. I live about a mile from a large petroleum-powered generating plant, and there is another such plant about 5 miles away. Occasionally when the wind blows in a certain direction, I smell an unpleasant sulfurous odor coming from these plants. This makes me worry about my health and that of my neighbors. I know that people who live near these plants suffer high levels of toxic contamination in their bodies, suffer from respiratory diseases, and have other similar problems. Coal burning plants also produce large amounts of coal ash that historically has been disposed of incredibly irresponsibly in Puerto Rico. This coal ash has sicked and killed people. The coal power plant operating in Guayama, Puerto Rico, is an excellent example of a toxic facility that was opposed by local communities and environmental organizations but ultimately approved by the Puerto Rico's Supreme Court. Coal ash from that facility was used to build roads and other commercial and housing projects in the southeast of Puerto Rico. Recent studies have established that coal ash is even more dangerous than previously thought, as it has arsenic and radiation levels that pose cancer risks. Despite massive public opposition, the coal power facility in Guayama has somehow managed to continue operating.

5. Burning fossil fuels also causes climate change, which causes many harms to our island and its biodiversity. For example, in the summers I like to go to the Cibuco River mouth in Vega Baja, the San Juan Bay Estuary, and other nearby coastal areas on the north coast of Puerto Rico to look for and identify endangered bird species that come for their nesting season. One of my favorite birds is the Caribbean Roseate Tern, a beautiful migratory seabird that nests in Puerto Rico from late spring to summer. I started learning a lot about Roseate Terns in 2001, after I heard that Garzas cay, which is at the mouth of the Cibuco River about 18 miles west of San Juan Bay, used to turn white during times of the year because there were so many white birds. Roseate Terns had never been documented there, but I thought they must be the white birds. My guess proved right, and I identified Roseate Terns there that year. I began documenting their presence and the importance of this area as a breeding site by doing monthly bird counts there every year between May and early August from 2006 to 2010.

6. Roseate Terns are devoted parents and beautiful to watch—incredibly graceful in flight and experts at fishing, reliably carrying fish back to their nests to feed their young. Their breeding process starts soon after adults arrive in spring; they hatch and raise their chicks, and then depart on their long journey somewhere in the Atlantic Ocean with their young, returning the following spring for the next life cycle to begin. It is very special to witness,

**JA_100**

filling my soul with wonder and awe and providing invaluable educational, aesthetic, and spiritual benefits.

7. In recent summers I have seen fewer and fewer Roseate Terns at the Cibuco River area. This is very worrying to me. The decrease in the Roseate Tern population on the northern coast of Puerto Rico not only diminishes my birdwatching experience, but also upsets me because I know that climate change and pollution from the fossil fuel power plants in Puerto Rico are harming these rare birds. I have searched for Roseate terns at several places around the island, including the Piñones shoreline, which is about 10 miles east of San Juan Bay, and around San Juan Bay itself. Unfortunately, I have not found Roseate Terns at San Juan Bay since about 15 years ago. I have looked for them there many times during that period, including three times during the summer of 2023 at different locations around San Juan Bay. I plan to go birdwatching again next summer to enjoy seeing a variety of native birds, and I plan to look for Roseate Terns during the next nesting season and hope to find them again. I also plan to visit the Piñones shoreline to search for possible-but-never-documented Roseate Tern nesting sites. So much of their nesting habitat has been lost and degraded around San Juan Bay as a result of fossil fuel development and other industrial development, but it is possible they are continuing to nest in the area, and I believe they can grace the estuary in greater and greater numbers if their habitat is protected and restored.

8. The Antillean manatee, another endangered species that inhabits Puerto Rico, is currently suffering from a chronic genetic bottleneck due to its small population and isolation, as they do not travel away from Puerto Rico. According to recent data, less than 300 manatees are known to remain in the coastal areas of Puerto Rico. Climate change caused by burning fossil fuels is harming these manatees by increasing coastal water temperatures and changing the acidity of the ocean. Since 2023, I have been visiting coastal areas where the manatees have been observed. I finally managed to encounter a baby manatee at the Condado Lagoon, which is part of the San Juan Bay Estuary. The dire conditions of this species have inspired me to publish a website to promote manatee protection, which is available at this link: www.salvemosalmanati.org.

9. Puerto Rico's dependence on imported fossil fuels for electricity has harmed manatees in another way as well: extensive dredging activities are now being carried out in San Juan Bay Estuary to allow large oil and natural gas tankers to access the Bay. The increased use of this estuary for large-scale oil shipping activities pollutes the water, risks oil spills, and increases the chances of manatees being killed in boat collisions. It also endangers local communities as well as coral and other marine species that still live in this once majestic estuary.

10. I also worry about the harms that come with other aspects of the fossil fuel-based electricity grid, particularly transmission lines that run through the forests and mountains

3

**JA_101**

we have here in Puerto Rico. Both the building and the maintenance of those lines requires heavy machinery, and roads end up being cut through our forests with little or no regulatory oversight regarding the valuable natural resources being destroyed. It makes me very sad to see the thousands and thousands of trees that are cut down for these purposes. Fragmenting these forest habitats with roads also seriously harms the species who call them home and makes them more vulnerable to various invasive species that we are struggling with here. Several endemic bird, amphibian, and reptile species—already threatened or endangered—die or lose their nests and offspring during such forest clearing activities. The harm caused by these activities is made worse by the use of Glyphosate, a non-selective herbicide that will kill most plants and is known to cause cancer in humans and animal species, particularly amphibians and reptiles.

11. Like everyone in Puerto Rico, I have also been significantly affected by the unreliability of the fossil fuel electricity grid here. After Hurricane Maria, my house was without power for 3 months. One of my mother's cousins died about six months after Hurricane Maria because he lived alone in the countryside and could not survive without electricity. Outages are still occurring regularly. Even small storms or moderate rain events make us worried about likely outages and the hardships of surviving without electricity. Because Puerto Rico is dependent on imports of fossil fuels to power our electricity system, storms as well as world events far beyond our control can mean that we are without power because we cannot receive fuel. For example, in 2022 Hurricane Fiona damaged some of the terminals where ships come to bring the fossil fuels from other countries. As a result, the power company was unable to get steady supplies of gas and we suffered power outages. Similarly, Russia's war in Ukraine meant that gas supplies that would have come to Puerto Rico were diverted to Europe while Puerto Rico had to struggle to get enough gas to keep the energy system running. Because of these gas shortages, the local power company has repeatedly resorted to burning more toxic diesel fuel to generate electricity.

12. Frequent electric power disruptions are extremely damaging. To illustrate one way in which these ongoing outages are a challenge for the local population, basic grocery items like meat, milk, and eggs have become very expensive in Puerto Rico. When the power goes out, people who are already struggling to make ends meet cannot run their refrigerators and end up losing necessary food items that they cannot afford to lose. During outages, families that can afford power generators have to expend time and money buying fuel, and those that do not have generators have to survive the tropical heat and humidity. It is especially difficult for people to sleep in these conditions, particularly since the generators are loud and create noxious odors.

13. All this instability has also resulted in Puerto Ricans facing extremely high energy bills. In 2022 my electricity rate was increased more than twenty times. My sister as well as many of my friends have faced real struggles in managing extremely high power bills. All

4

**JA_102**

these factors together have caused significant mental health challenges for many people in my community and throughout Puerto Rico. Many people have decided to move away from the island because they are facing such unstable and difficult conditions here and cannot live just waiting for the next big hurricane to cause the next catastrophe. Many businesses and factories have closed due to high energy bills and high service instability issues. A record number of public and private schools continue to close due to the increase in operating costs and reduction in the number of students. The instability of the power system is not favorable for economic growth and degrades the perceived social well-being of the population.

14. Rooftop solar can help with many of these problems. We are very fortunate here that the sun shines almost every day. Even on the days when it does not, with current technologies it is possible to use battery storage to ensure that you will always have power. Putting solar on every available rooftop in Puerto Rico would also mean that we do not have to lose power every time a storm comes through. The interconnection of multiple residential battery storage systems has been demonstrated to mitigate power grid outages. It would also make us much less dependent on other countries for our energy supply and would offer considerable security and reliability from that perspective as well.

15. If FEMA helps to build rooftop solar here, it will also reduce the greenhouse gas emissions and other pollution that come from burning fossil fuels and help to make our communities cleaner and safer. Rooftop solar also does not require the long transmission lines that can be so harmful to our forests and the species that depend on them.

16.  If FEMA invested in rooftop solar and storage in Puerto Rico, it would be completely in tune with its objectives to work together to improve our capability to prepare for, respond to, recover from, and mitigate hazards from hurricanes that are becoming stronger and more frequent with increasing temperatures. Rooftop solar energy plays an important role in reducing greenhouse gas emissions and mitigating climate change, thus it contributes to FEMA's objectives by reducing the frequency and strength of hurricanes, which is critical for the protection of humans, wildlife, and ecosystems.

17. We need FEMA to invest in rooftop solar here in Puerto Rico. It does not make sense for FEMA to invest billions of dollars in new power lines and utility poles when this old system of providing electricity has been proven time and time again not to work well here. It also does not make sense for FEMA to spend money on large solar farms that are planned to be located on high-value agricultural land or in other sensitive ecosystems. We don't have much land here in Puerto Rico, but we do have many roofs. This is what we need FEMA to focus on.

**JA_103**

JA_104

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 16th day of August, 2024.

_____
Frank S. González García

N THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

COMITÉ DIALOGO AMBIENTAL, INC.

*et al.*,

Plaintiffs,

v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY

*et al.*,

Defendants.

Civil Action No. 3:24-CV-01145-JAG

## DECLARATION OF VICTOR ALVARADO GUZMÁN

I, Victor Alvarado Guzmán, do hereby declare as follows:

1.  I have personal knowledge of the following and could competently testify thereto if called as a witness.

2.  I live in Salinas, Puerto Rico with my wife and son. I have lived here for over fifty years. I have been a part of El Comité Diálogo Ambiental (CDA) since it was founded in 1996. CDA's mission is to build a self-managed and participatory organization that fosters the balance between our surroundings and the environment for current and future generations.

3.  Over the years, I have frequently participated in inter-organizational meetings, and represented the Comité in meetings with other organizations with which we coordinate, in the media, and at various public-facing events like demonstrations. Anyone who agrees with our mission and values, and who requests to participate, can be a member of CDA, and we consider those who do then participate in our meetings and collaborate with our various committees to be members of the organization. Decision-making is done by consensus among members who participate in meetings.

4.  We have had a fossil fuel-fired thermoelectric plant in Salinas for decades, and a coal plant has been releasing toxics in Guayama since 2002. The EPA has even published an inventory of all the toxic agents that the coal plant is releasing into our air – the wind carries the coal plant's air pollution from Guayama to Salinas. Aguirre is a community in Salinas that borders Guayama, and it suffers from higher levels of pollution from the coal plant. These companies are making millions of dollars at our expense.

**JA_105**

5. When my son was three years old, my wife was diagnosed with breast cancer. The doctor informed us that hers was an unusual case, particularly because she was young, had no family history of cancer, and had breastfed my son. I believe that environmental factors such as toxic pollution likely played a role in her illness. Luckily, she is a survivor, but cancer is far too common amongst our friends and family who live nearby. We fight against pollution to prevent these illnesses all while fundraising for our neighbors who are battling cancer.

6. Compared to other parts of Puerto Rico, people in the regions of Salinas and Guayama are more likely to suffer from cancer, respiratory issues, increased rates of miscarriage, and other health problems. In Las Mareas and Miramar, communities close to the coal plant, many residents suffer from respiratory problems and cancer. In fact, many health problems such as childhood respiratory illness are higher in Guayama than anywhere else in Puerto Rico. In Aguirre, another community in Salinas that is very close to the coal plant, community members experience air quality-related health problems. Throughout Salinas, including very close to a hospital, 690,000 tons of coal ash from the coal plant have been dumped in exposed deposits. The coal ash is then picked up by the wind, collects on our streets, and enters our bodies when we breathe.

7. We are concerned that exposed coal ash deposits are contaminating our drinking water because they are located above the aquifers. A couple of years ago, we worked with chemists to test our faucets and determined that our drinking water was indeed contaminated. Following our demands last year, the EPA also investigated water contamination in our wells and sewers. More recently, in April of this year, Puerto Rico's College of Chemists released a study showing alarming levels of toxic, carcinogenic heavy metals in drinking water in the same areas of Salinas and Guayama that are affected by coal ash.

8. Power outages and reliability issues, exacerbated by hurricanes, have impacted our lives and the Comité's work. On several occasions we were forced to suspend meetings and cancel activities because the event location lost power. For instance, after Hurricane Fiona last year, we lost power for 3 days and were forced to halt our activities at a critical time for our community. Power outages have also become more frequent since Luma has taken control of the electrical grid. Some friends and colleagues suffer power outages every day. Although my family is fortunate not to suffer such frequent outages, we still experience anxiety about losing power.

9. It is for all these reasons that we at the Comité fight to transform the electric system in Puerto Rico and create a new, fairer system by investing in rooftop solar. Fifty percent of people in Salinas are poor and do not have the means to install rooftop solar systems without government programs, and neither LUMA nor the Puerto Rican government are

taking action to address this. Instead, LUMA has announced that they plan to convert the coal plant into a natural gas plant, which contradicts our law requiring 100% renewable energy by 2050. This plan would direct millions of dollars of funds to large fossil fuel companies while harming poor communities and failing to provide the clean, reliable, and affordable electricity people in Salinas and elsewhere in Puerto Rico truly need. We've seen this happen before. Roughly 15 years ago we successfully fought a proposal for a new coal plant and gas lines in Salinas that would have harmed and displaced poor communities in their path. The company that proposed the project ran off with $65 million in government funds without ever actually building anything.

10. It is also critical that FEMA funding be used for rooftop solar projects rather than for large, utility-scale solar installations. This is because developers are targeting the extremely limited agricultural land we have available in Puerto Rico for building such industrial-scale projects, with devastating consequences. For example, in an area of Salinas called El Coquí, developers removed the rich topsoil from agricultural land and compacted the soil to build an industrial-scale solar project. As a result, that land became less effective in controlling floodwaters, allowing water to move closer to communities. After Hurricane Fiona last year, many neighboring communities experienced flooding for the first time. Now, there is another large solar development project, almost three times larger than the one in El Coquí, being proposed in nearby San Felipe. Hydrological studies indicate that there would be many significant impacts of large-scale development in San Felipe. Instead of funding industrial-scale projects, FEMA should use its funds to install rooftop solar to directly benefit the people.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 16 day of July, 2024.

_____

Victor Alvarado Guzmán

**JA_107**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

COMITÉ DIALOGO AMBIENTAL, INC.

*et al.,*

        Plaintiffs,

   v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY

*et al.,*

        Defendants.

Civil Action No. 3:24-CV-01145-JAG

## DECLARATION OF SIRENA MONTALVO KATZ

I, Sirena Montalvo, do hereby declare as follows:

1. I have personal knowledge of the following and could competently testify thereto if called as a witness.

2. I live in Cabo Rojo, Puerto Rico. I have been a part of Comité Caborrojeño Pro Salud y Ambiente (Caborrojeños) for 19 years. Caborrojeños is a community group that seeks to protect the natural resources of Cabo Rojo. Caborrojeños advances this goal mainly through community education and—until recently—through operating a Visitor's Center at the Cabo Rojo National Fish and Wildlife Refuge. I have been aware of Caborrojeños and its work since I was a child. I first worked directly with them back when I was in high school and became a volunteer interpretive guide with the organization, giving tours around the salt flats that form part of the wildlife refuge.

3. More recently, my work with Caborrojeños has involve acting as a liaison for people who reach out to the organization looking for information about our various committees or for opportunities to volunteer with us. I also currently serve as the organization's Vice President.

4. Anyone from the community can attend Caborrojeños's meetings, and all those who attend are, like me, considered members of the organization. Caborrojeños also has a board of directors that makes financial decisions for the organization with input from the members. Other non-financial decisions are made by consensus among the members.

**JA_108**

5. My family and I, along with my entire community, have been deeply affected by the fragility of the fossil fuel-based electricity grid we have here in Puerto Rico. When Hurricane Maria happened, I was pregnant. That made the prolonged loss of power we experienced at that time extremely stressful. Hospitals and doctors struggled to function and see patients, and I remember having to have prenatal appointments done by candlelight using a battery-powered sonogram. Lack of access to hospitals and doctors is what caused most of the deaths we suffered here in Puerto Rico after Hurricane Maria. With no power it is also not possible to operate fans, and this was also a significant stress for me during this time because fans help keep insects away and protect pregnant women from serious mosquito-borne illnesses that can harm a fetus, such as dengue and zika.

6. The loss of communication was also very difficult. Like many people in Puerto Rico, I have family in the continental United States. I was not able to communicate with them for two weeks after Hurricane Maria hit, which was highly distressing both for them and for me.

7. Many of these problems persist today, because the fossil fuel-based grid continues to be extremely unreliable and power outages are frequent. My mother has a lung condition and needs supplemental oxygen. Her portable oxygen concentrator that she uses when she leaves the house requires electricity and has repeatedly been damaged by the power surges that follow electricity outages when she has plugged it in during medical appointments, as she needs to. My cousin has had to spend hundreds of dollars on gas for her generator because her husband also uses electric oxygen equipment that he needs to survive.

8. Regular power outages harm my family and my community in other ways as well. For example, it is very common for my daughter to have one or two days each week when her school is without power. I and others in my community struggle to get necessary basic medical needs—such as dentist appointments—taken care of when the power goes out. Similarly, expensive groceries spoil in people's refrigerators—or even in the grocery stores themselves if they do not have working generators—when outages occur.

9. Power outages also harm Caborrojeños' ability to do its work. For example, the Visitor's Center at the salt flats, which we ran until late 2023, cannot operate when there is no power. The Visitor's Center does have solar panels. However, because those panels are connected to the electricity grid—and because they are not paired with batteries where the electricity they generate can be stored during an outage—when the electricity grid goes down, the Visitor's Center has no power. The organization has lost considerable opportunities to accept donations and otherwise generate revenue through sales at the Visitor's Center when power outages have left us able to conduct cash transactions only. If the Visitor's Center had solar power connected to a back-up battery system, it could

2

**JA_109**

continue to operate even during grid outages, and Caborrojeños might not have had to stop running it.

10. After 10 years of saving, my family was recently able to install rooftop solar on our house so that we would no longer have to struggle as directly with these problems. Nonetheless, I continue to be concerned about my neighbors, especially those who are elderly. I frequently offer them the use of our refrigerator when their power goes out.

11. It makes me very angry to see critical services in my community like schools, hospitals, police and fire departments, supermarkets, and community centers unable to function without power when they have rooftop surfaces available that could host solar panels. There is no reason why these essential public spaces and community services can't benefit from this technology and have power all the time, especially if they also have battery storage. This is especially important since most schools in Puerto Rico are also used as emergency shelters during hurricanes and earthquakes. People like my mother or my cousin's husband—who depend on medical equipment that requires electricity— may often choose not to evacuate when they should because they cannot risk going to shelter in a place that does not have electricity.

12. Prioritizing installing rooftop solar panels, especially for these buildings that provide essential lifesaving services to their communities, can help resolve so many of these issues and improve the quality of life for communities like ours throughout Puerto Rico. It is essential that FEMA focus on these kinds of projects here. The hurricanes are not going to stop coming, and we need FEMA to help ensure that our communities have resilient rooftop solar that can withstand them.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 17 day of Aug , 2024.

Sirena Montalvo Katz

3

**JA_110**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC. *et al.,* Plaintiffs, v. FEDERAL EMERGENCY MANAGEMENT AGENCY *et al.*, Defendants. | Civil Action No. 3:24-CV-01145-JAG |

**DECLARATION OF FEDERICO CINTRÓN MOSCOSO**

I, Federico Cintrón Moscoso, do hereby declare as follows:

1.   I have personal knowledge of the following and could competently testify thereto if called as a witness.

2.   I am a resident of San Juan, Puerto Rico, and I am employed by El Puente, Puerto Rico, where I have been a member for eight     years and the Program Director for the past four years. El Puente is an organization founded in New York by Puerto Ricans in the Diaspora. The members of El Puente, Puerto Rico live in frontline communities that are vulnerable to the impacts of climate change and the pollution caused by the fossil fuel industry.

3.   As Program Director, I run El Puente Puerto Rico's office ("El Puente, Puerto Rico). Currently we have eight     employees, and three different programs, all focusing on climate change. One of the programs is the *Oasis Energ ticos* (Energy Oasis), where we install rooftop solar systems and accompany the installation with a series of workshops in which we build community capacity to withstand disasters and emergencies. This initiative was developed in the aftermath of Hurricane María. As Program Director, I also oversee El Puente, Puerto Rico's education program and a radio show called *Cuidando la Creaci  n* that has been on air for the past eight     years. This show provides a platform for us to discuss topics such as just transition, energy transition, climate change, and the environmental impacts of climate change in Puerto Rico.

4.   Through our education program, we work with schools and youth to educate them and conduct research on the topic of climate change and how it is affecting Puerto Rico. For example, in one community called Utuado we are working with an organization called COSSAO that is trying to rescue abandoned farms. Utuado was a large coffee plantation area in Puerto Rico, but coffee production has declined, so COSSAO is attempting to establish cooperatives and new ways of utilizing that land. They have a center where they train young people in these issues, and El Puente, Puerto Rico collaborated with them on the installation of a solar array to run a hydroponic system that includes the growth of plants and fish for sustainability. This is an example of how we assist in education efforts that integrate the topics of climate change and renewables.

5.   Personally, and as Program Director for El Puente, Puerto Rico, I have a tremendous interest in expediting the transition to renewable energy in Puerto Rico. In Puerto Rico energy is a social justice and public health issue. The communities closest to fossil fuels plants are the communities most affected by the various kinds of pollution those plants produce, and the faster we close these plants down the faster we provide justice and wellbeing to these communities. A rapid transition to renewable energy will allow us to do that.

**JA_111**

6. There is an electricity substation a few hundred feet away from my home in an area called Hato Rey. There are also many transmission lines nearby because the population in Hato Rey is very dense and a lot of energy infrastructure is required. Additionally, there are many substations and transmission lines in Rio Piedras where my office is. My home and my office are close to each other, and both are located very close to the San Juan Power Plant and the New Fortress LNG Terminal. All this fossil fuel infrastructure, including the transmission and distribution system, impacts the landscape and this is a major concern for me. The saturation of power lines and other fossil fuel infrastructure negatively affect how we perceive our environment and how comfortable we feel walking around and generally being outside in Puerto Rico. All this infrastructure limits my enjoyment of natural space. My comfort—and that of my neighbors—is also impacted by the fact that much of that infrastructure is very fragile and vulnerable to the tropical island and climate conditions. We always have light posts and electricity cables either already broken or on the verge of falling, which makes me feel unsafe walking around my community. We've seen how these things fall as a result of heavy rains, strong winds, or neglected vegetation. On top of that, the instability of the energy grid has resulted in the malfunctioning of traffic lights and light posts increasing the risks of walking and driving, especially at night. I found myself having to navigate and avoid certain streets, even segments of avenues, because of lack of proper illumination and traffic signals.

7. I also work with communities that are directly impacted by the San Juan Energy Plant and the New Fortress Terminal. In the course of this work, I am required to visit these communities and expose myself to all that pollution. In Cataño we work with an organization called Caras con Causa that is right next to the New Fortress LNG terminal. Cataño is one of the communities I worry about the most because they are surrounded by fossil fuel infrastructure. On one side, next to Guaynabo, there are PREPA oil plants as well as the New Fortress LNG terminal. This area is also the main port for all the gasoline that comes to Puerto Rico, so PUMA Energy, Texaco, and others are exposing Cataño to significant pollution as their ships make use of this port. On the other side of Cataño there is Palo Seco, which is another PREPA plant. South of Cataño, in Guaynabo, there are fossil fuel storage facilities. There is also a pipeline that runs from the east side of Cataño all the way to the west side carrying fossil fuels. One of the most serious concerns is the potential for an accident or explosion of this pipeline caused by the close proximity of diesel, LNG, and other fossil fuels. This occurred        in 2009 with the CAPECO explosion, which was disastrous. The residents of Cataño told extraordinary stories about the explosion and its impact on their homes, as well as the pollution; the fuel burned for a few days before it was contained, affecting the air quality. Cataño has a high rate of asthma and respiratory diseases, and my co-workers and I can smell the sulfur and contaminants when we're there working. In fact, when I'm there for fifteen to twenty minutes, I often get nausea and headaches. Some of our members who live there are affected daily by the contamination and pollution.

8. El Puente, Puerto Rico also works with communities in Salinas and Guayama, which are likewise impacted by energy plants. Guayama has been seriously harmed by the AES coal plant because of the mismanagement of the coal ash the plant produces. For roughly fifteen years the coal plant has been using the ashes for construction, mixing the ashes with concrete and other building materials, which has resulted in the distribution of the contamination from those ashes in more than twelve  municipalities across the island. The ash also flies directly into houses in communities near where it is deposited, or sinks into the aquifer, contaminating the sole source of drinking water for the residents of Salinas and Guayama. In Salinas, we also work with a group called *Iniciativa de Eco Desarrollo de Bah a de Jobos* (IDEBAJO) to help communities that are being harmed by pollution from the oil-powered Aguirre Power Plant there. All the contamination from that power plant has historically affected and impacted Salinas.

9. In addition to being deeply concerned about all these harms from fossil fuel-based electricity production in Puerto Rico, I am also impacted by the regular power outages that happen because the fossil fuel-dependent energy infrastructure is outdated and reliant on a centralized transmission and distribution system that often fails. These outages affect me in my home and in my workspace, whether that be in the office or out in the communities El Puente, Puerto Rico works with. Specifically, these outages prevent me from cooking or working, and cause me to lose the food that I have in the fridge. Voltage fluctuations associated with the power outages have also ruined my refrigerator and damaged my television. On a few occasions I have been forced to close the office as well for lack of power. Not knowing when the electricity will go out next, increases the level of anxiety of my family, my staff and myself.

JA_112

10. These interruptions have increased since the electricity transmission and distribution system here was privatized, and they are a tremendous nuisance that affects and destroys our life in every sense. Not knowing when the power will return and therefore not being able to plan ahead for meetings and other work that we do is highly distressing. Schools are also often forced to close because there is no power or water. This is not only extremely detrimental for the children, but impacts El Puente, Puerto Rico's work directly because we often work with schools but cannot do so when they are closed as a result of outages. Many of our activities as an organization are geared towards students in elementary, middle, and high school, and power outages have a detrimental effect on their involvement in school activities. Consequently, power outages negatively affect our capacity to carry out our school programs.

11. The continuous voltage fluctuations and blackouts have harmed El Puente, Puerto Rico's members in numerous ways, including but not limited to being unable to store food and medicines, losing appliances, and being unable to work. These continuous power outages and voltage fluctuations also leave children unable to do their homework, and cause mental distress for all of our members. Additionally, many of our members are old and require constant electric power to carry out their daily lives. Many of them have tried to install rooftop solar systems with batteries but do not have the economic means and technical knowledge to do so. Rapid deployment of rooftop solar, especially in low-income communities in Puerto Rico, would help address all these problems. In past years, we have been forced to secure additional funding in preparation for the hurricane season, in anticipation of the severe power outages that occur because of the weak power grid. This includes establishing a climate refuge in our offices to better assist the community during the outages.

12. I have a personal and professional interest in the protection of endangered species in Puerto Rico, and I worry a great deal about how pollution from fossil fuel-based electricity generation affects the diverse and sensitive species and ecosystems we have here in our archipelago. Some of these ecosystems and species are unique in the world, and preserving them for us and future generations is crucial. As a bird watcher and photographer, I spend a great deal of time outside and traveling to different parts of the archipelago to enjoy different ecosystems, whether on the coast or mountains. One of the places that I frequently visit is the Condado lagoon because it is close to my house. I also frequent many places around the Estuary area, including the boardwalk in Cataño. Additionally, I birdwatch in Parque Monagas in Bayamón, and in some of the reserves like El Yunque, Las Cabezas de San Juan, the Salt flats in Cabo Rojo, Vieques and Culebra. It has been part of my life for many years.

13. As a photographer I also go on short trips during the weekends to stay around the island in Rincón, San Sebastian, San Lorenzo or Utuado, among others, just to take pictures and enjoy the sites. I am also part of the Technical and Scientific Council of the San Juan Bay Estuary Program, which includes the San Juan Bay, and there is already a management plan for the Estuary that has been developed with the participation of the communities around the Estuary to improve the quality of the water, air, and surrounding communities. This plan includes the dredging of the Caño Martín Peña and the cleaning of other waterways in the Estuary. Part of the reason that that management plan was developed was to protect highly sensitive ecosystems and species living in that area. Fossil fuels plants in San Juan, Cataño, Guaynabo and the proposed dredging to bring bigger LNG tankers in San Juan go against the Management Plan as well as the objective of bringing justice back to the communities.

14. The conservation of endangered species and their habitats in Puerto Rico is also very dear to my identity as a Puerto Rican because I like to enjoy the outdoors in a way that conserves and protects the natural resources for other people and generations. I have seen first-hand how the spreading of fossil fuel infrastructure has damaged these ecosystems and species that I visit and care deeply for. In the southern part of the main island, all the way from Peñuelas to Guayama, the development of the fossil infrastructure for oil and then gas and coal are contaminating the air and harming the coastal species, including turtles and fish. In fact, it has been documented that fisherpeople in the South are not able to fish in the same way they used to fish twenty to fifty years ago. Much of that is related to the impact of the construction and development of fossil fuel plants.

15. The same can be said in Mayagüez and the San Juan Bay area, which are both close to power infrastructure. In the San Juan Bay area I am specifically worried about three protected species whose habitat lies within the Bay: manatees, turtles, and the corals. And again, because

**JA_113**

of the construction and expansion of fossil fuel infrastructure we are sacrificing the species in those habitats, and to me that is completely unacceptable.

16. I also contributed to the creation of the Management Plan for El Yunque National Forest, the only tropical forest in the United States' National Forest Service system. I oversaw El Yunque's community participation component a few years ago. There, we discovered that not only do many Puerto Ricans regard El Yunque as a symbol of Puerto Rican identity and culture, but that El Yunque is also threatened by the expansion of urban areas, which is linked to transmission and distribution lines for the power grid. The need to move electricity from centralized plants across the archipelago requires the construction of transmission and distribution lines, which harms protected forest, agricultural land, aquifers, and other sensitive ecosystems. For instance, the irresponsible clearing of vegetation by the private company in charge of the system to accommodate the existing power grid is worrisome since it does not take into account the health of sensitive ecosystems and close by communities. If we moved to decentralized rooftop solar, this would change.

17. Furthermore, we know that meeting all of Puerto Rico's energy needs with renewable energy is possible. The University of Puerto Rico, Mayagüez Campus, was the first to assert that it is possible to produce all the energy that we use here using solar. Queremos Sol, a coalition that includes El Puente, Puerto Rico, conducted research that shows that it is feasible to use the close to $16 billion in federal funding that has been allocated to the energy system here in Puerto Rico to install enough solar to meet our energy needs. The Department of Energy's (DOE) preliminary findings in the PR 100 study also concluded that we have enough sun to generate all the energy that we require, and we should move in that direction. We have the funds, knowledge, and the capacity to transition rapidly to a cleaner and more resilient renewables-based electricity system.

18. This is why we believe FEMA should be more proactive in ensuring that the majority of the money they invest in Puerto Rico's energy system is directed toward renewables. FEMA cannot avoid this responsibility, especially since federal public policy currently promotes renewables. To us, it is a major contradiction that FEMA and local governments are not acting with the urgency that is required. They are not progressing with the transition to renewable energy, which is a matter of urgency for me.

19. In my opinion, FEMA has a significant role to play in guiding and moving local governments towards achieving Puerto Rico's renewable energy goals. And all the pieces are in place: we have legislation, funds, technical studies, and the desire, which is shared by the people of Puerto Rico—most people here are convinced that we need to transition to renewable energy. The only thing lacking is a serious government commitment to achieve this transition, and FEMA can be a key part of making that happen. Nonetheless, they have washed their hands up to this point by claiming that their only responsibility is to give the money to local agencies, who must then decide what to do with it. We are past that. I believe it is now the responsibility of federal agencies, including FEMA, to take the lead.

20. When we talk about how to use federal funding, we need to evaluate all possible alternatives, which FEMA is not doing here. Instead, they are dispersing funds without comparing the reconstruction of the entire power system to the construction of a new renewable system and determining which option is superior. We know from multiple studies that when these options are compared, the logical and reasonable conclusion is that a shift toward a decentralized grid composed of rooftop solar + storage is the better path, because it is a cleaner and more resilient source of energy. FEMA's failure to conduct such an evaluation, in my opinion, violates NEPA, which states that you must evaluate all reasonable alternatives and make an informed decision. FEMA's decision to move forward before it has fully evaluated a rooftop solar alternative is unacceptable.

21. I am completely in favor of FEMA funding rooftop solar projects. We have the money to do so, and we can start with the 500,000 families in Puerto Rico that need rooftop solar now but do not have the resources to install it. Using FEMA's funding this way would provide these families with security and health. It is crucial that this once-in-a-lifetime amount of money is used wisely; we cannot afford to miss this opportunity.

**JA_114**

22. Because of climate change, we know we're going to have more intense hurricanes, and decentralized renewable energy systems will be more resilient in the face of these storms and make us more prepared for this future we are facing. If we shift to producing our own energy with rooftop solar we will also reduce our reliance on importing fossil fuels from foreign countries. This will be cheaper, more accessible, and more equitable for everyone here in Puerto Rico.

23. Act 33-2019 states that Puerto Rico needs to reduce its contribution to the GHG by 50% by 2025. An independent study showed that if we continue the way we are going we would not achieve that goal. Moreover, it concludes that in order to reach that goal Puerto Rico needs to stop investing in fossil fuels, especially LNG. Similarly, the Union of Concerned Scientists concluded in a recent report on the impact of climate change in Puerto Rico, that it is imperative to phase out the use of fossil fuels in the island and move urgently to renewable energy. This contradicts significantly the current government effort to expand LNG imports and infrastructure in Puerto Rico. Many of these expansions are being supported by FEMA, which goes against the will of the people to move quickly to renewable energy.

24. This is a matter of life and death for all of us in Puerto Rico. Putting this funding to the best posible use to really help communities in need is urgent and I think that it is time for FEMA to take action promoting real solutions, and not funneling out those funds to the bondholders and companies that have privatized the electricity system here. Rebuilding the old fossil fuel-based electricity infrastructure will ultimately direct all this money out of Puerto Rico to the two foreign companies that have taken over Puerto Rico's grid, rather than keep it here—where it is intended to be invested—helping the families and communities that need it most.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 16 day of August, 2024.

Federico Cintrón Moscoso

5

**JA_115**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC. *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL EMERGENCY MANAGEMENT AGENCY *et al.*, <br><br> Defendants. | Civil Action No. 3:24-CV-01145-JAG |

**DECLARATION OF JOSE VARGAS**

I, Jose Vargas, do hereby declare as follows:

1.  I have personal knowledge of the following and could competently testify thereto if called as a witness.

2.  I live in Cabo Rojo, Puerto Rico. I have been a part of Comité Caborrojeño Pro Salud y Ambiente (Caborrojeños) for over 10 years. Caborrojeños is a community group whose main mission is to educate the public about the protection of the natural resources we have here in Cabo Rojo. We also visit the local community to give talks about restoration and conservation of our natural resources.

3.  I am a member of Caborrojeños' Board of Directors. I also serve as the organization's secretary and take minutes during meetings I attend. Our meetings are open to all members of our community who wish to attend. As a board member I participate in financial decision-making, although decisions about general matters like organizational priorities and activities are made by group consensus. I have a bachelor's degree in microbiology, and a master's degree in environmental management, so I also sometimes go to give talks in schools on behalf of Caborrojeños on a range of topics such as specific local ecosystems, sea mammals, or birds.

4.  Burning fossil fuels to produce electricity contributes to climate change. I work as a field biologist doing coral restoration, and I sometimes do dives in the ocean near Cabo Rojo. On these dives recently I see that the coral reefs are dying. This is happening because the

**JA_116**

water is getting warmer as a result of climate change. The warmer water temperatures cause the coral to bleach and die.

5.  In addition to the fact that it will help to address climate change, I support transitioning away from fossil fuels for the generation of electricity in Puerto Rico because the fossil fuel-based electricity system is extremely unreliable and in particular cannot withstand the hurricanes that regularly come to our archipelago. Every time a hurricane hits, the power lines come down and power outages occur. Although I live in Cabo Rojo now, I grew up in a more remote mountainous region of Puerto Rico. Such regions are often the last to have their electricity restored after a storm knocks out the power. I remember times when we went months without electricity because landslides and fallen trees blocked the only routes by which repair workers could reach us.

6.  Downed electricity poles and wires create a significant safety hazard. Seeing live wires on the ground after any storm is a regular occurrence in my community, and I sometimes hear reports of utility workers or even just regular citizens being electrocuted.

7.  The psychological impact of the prolonged power outage after Hurricane Maria in 2017 was truly significant. One of the most difficult things was that we lost communication in a way we had not with previous storms. I was unable to contact my parents who also live in Puerto Rico for a long time. None of us were able to communicate with my sister, who lives in Texas. She saw only devastating and terrifying reports on the news and was extremely distressed not knowing what had happened to her family in Puerto Rico. This in turn was highly distressing to me when I was eventually able to talk with her and learned how upset she had been.

8.  Another very real psychological burden in the wake of Maria was the reality that gradually settled in that it would take years to rebuild the preexisting electricity system, and that the power outages would not stop any time soon. As a result, my family has now installed a rooftop solar system on our home. This brings me tremendous peace of mind. I sometimes need to travel for work, and take great comfort in knowing that if the power goes out while I am gone my wife will not need to struggle to find gasoline to power a generator so that our fridge keeps running while also taking care of our baby and her aging parents.

9.  This is why I support using every possible roof in Puerto Rico for solar, and why I want to see FEMA working to make that transition happen rather than investing money in the fossil fuel system. I know that if we can do this it will help people and communities avoid all the harms that come from the power outages that are such a regular occurrence here. This is especially important for mountain communities like the one I grew up in, which are always the last to be reached after a storm knocks out power. If they had functioning rooftop solar arrays they would not need to face weeks or months without power.

2

**JA_117**

10. Speeding a transition to rooftop solar will also help reduce the pollution from fossil fuels that affects many communities in Puerto Rico, especially those like Salinas and Peñuelas where fossil fuel generating stations are concentrated. At the same time, it will help address climate change, which I already see in my daily life is harming Puerto Rico.

11. In addition, rooftop solar will help reduce the need for Puerto Ricans to depend on other countries to supply our energy. We do not produce coal or oil here, and under our current system we need to import those fuels to power our electricity grid. If Puerto Ricans can power their homes and businesses with rooftop solar instead then we can become more self-sufficient and achieve greater independence.

12. Crucially, what we need—and what we need FEMA to invest in—is rooftop solar, not big solar farms on agricultural land. There are a number of such projects proposed here, and this would be such a waste. We are an island, and we are hugely dependent on food imports. Using the little land we have available for farming to build solar farms is simply not intelligent. We need FEMA to prioritize rooftop solar here in Puerto Rico.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 17 day of August 2024.

José Vargas

3

**JA_118**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

COMITÉ DIALOGO AMBIENTAL, INC.

*et al.,*

          Plaintiffs,

   v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY

*et al.,*

          Defendants.

Civil Action No. 3:24-CV-01145-JAG

**DECLARATION OF CARLOS ALFREDO VIVONI**

I, Carlos Alfredo Vivoni, do hereby declare as follows:

1. I have personal knowledge of the following and could competently testify thereto if called as a witness.

2. I live in the Lajas Valley in southwestern Puerto Rico. I have been part of Frente Unido Pro-Defensa del Valle de Lajas ("Frente Unido"), a conservationist organization in the Lajas Valley, since the organization's inception in 1995. Frente Unido works to protect farmland and irrigation systems in the Valley and beyond, to promote sustainable agricultural development in the Lajas Valley and throughout Puerto Rico, and to combat any threat to the balance that must exist between humans and the environment.

3. The members of Frente Unido experience many negative impacts as a result of the power interruptions that inevitably happen when a storm comes to our archipelago and knocks power out. Many farmers here depend on irrigation systems that cannot function when the power goes out. The power outages also directly harm farming operations in that they damage farms' computers and servers. Frente Unido members also report that the outages necessitate the frequent recalibration of automated machines, such as machines for packing onions by weight. Several members of Frente Unido have also had their household appliances damaged as a result of voltage surges following power outages. Further, the constant power interruptions cause people who work in agricultural operations to leave Puerto Rico, resulting in a damaging labor shortage on farms here.

4. Many members of Frente Unido, including me, are also negatively affected by the extremely high prices of electricity in Puerto Rico. Within the past year I have opted to

upgrade the solar power system on my house, in no small part in order to reduce my electricity bill. I hear people in my community talking about how burdensome their high electricity bills are on a near-daily basis.

5. In addition, the frequent power outages directly affect Frente Unido's ability to carry out our operations and our mission. Whenever the power goes out, the organization cannot proceed with any meetings that were scheduled and cannot move forward with its agenda as planned.

6. These struggles are one crucial reason why we need a radical change in the way we produce and consume electricity in Puerto Rico. We should avoid increasing Puerto Rico's dependence on fossil fuels and must instead switch to renewable resources. Crucially, we cannot switch to just any renewable resources, but must prioritize rooftop solar. We cannot support government plans to develop industrial-scale solar projects on high-value farmland because doing so would destroy a significant amount of that land's farming potential. We need our farmland in order to grow crops, particularly in the face of impending climate disaster that will bring food scarcity. In the last 60 years we have lost 70% of our farmland here in Puerto Rico. We cannot afford to have what remains occupied by solar arrays, particularly when we have plenty of rooftop space available.

7. Because of these concerns, Frente Unido has decided to work to oppose industrial-scale renewable energy projects that are proposed to be located on protected agricultural land in Puerto Rico, and particularly in the Lajas Valley. Like all decision-making at Frente Unido, this decision was reached by consensus of the members of the organization's board of directors (comprised of all the organization's active members), reached via dialogue among those members.

8. More broadly, we need to transition to rooftop solar because we in Puerto Rico have an urgent need to address the climate crisis. We all understand that burning fossil fuels contributes to global warming. We know that global warming will mean more hurricanes impacting Puerto Rico. We also know that climate change has resulted in increased ocean temperatures and increased ocean acidity that have affected reefs and habitats where fish develop and grow. It has also resulted in species going extinct because they cannot sustain the changes the climate is undergoing. As islanders, we see, feel, and are affected by all these changes. For us, climate change is not a future dystopia, it is something we are living right now.

9. Meanwhile, we have an incredible energy resource available to us in Puerto Rico—the sun—that does not require burning polluting fossil fuels that harm the climate and the environment. Focusing on rooftop solar also provides resilient energy and a better quality of life for the people of Puerto Rico, while avoiding damaging industrial-scale solar

farms and unsightly power lines. We need FEMA to prioritize rooftop solar solutions in its work here in Puerto Rico.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 12th day of August, 2024.

_____
Carlos Alfredo Vivoni

3

**JA_121**

JA_122

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| COMITÉ DIALOGO AMBIENTAL, INC. *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 3:24-CV-01145-JAG |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*, | |
| Defendants. | |

**DECLARATION OF ANN BROWN**

I, Ann Brown, declare as follows:

1.      I submit this declaration in support of Plaintiffs  Opposition to Defendants

Motion for Summary Judgment.

2.      The facts set forth in this declaration are based on my personal knowledge. If

called as a witness in these proceedings, I could and would testify competently to these facts.

3.      I have been an employee of the Center for Biological Diversity ( Center ) since

February 2017. I currently serve as the Center s Open Government Coordinator.

4.      I earned a Bachelor of Arts in Women s Studies from Denison University. I

earned a J.D. from Suffolk University Law School.

5.      As Open Government Coordinator, I work with Center programs on government

transparency by creating, submitting, and facilitating the processing of records requests to

government agencies under the Freedom of Information Act ( FOIA ).

1

6.      On January 31, 2023, on behalf of the Center, I submitted a FOIA request to the Federal Emergency Management Agency for records documenting the specific projects being undertaken pursuant to the Programmatic Environmental Assessments and Findings of No Significant Impact being challenged in this case. *See* Attachment 1.

7.      Since that time, FEMA has made several productions of responsive records. FEMA s cover letter states:

> You sought records related to FEMA s final Programmatic Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) for the Puerto Rico Utilities Repair, Replacement and Realignment Project. Specifically, you requested records that document each of the specific projects and or activities that fall under the NEPA coverage of either of the two aforementioned EAs and FONSIs that FEMA has funded, approved, or otherwise authorized from July 1, 2021, and the date of the search.

8.      The most recent productions were provided on September 20, 2024 and October 31, 2024.

9.      One of FEMA s FOIA productions included the attached project document for the  Aguirre Power Plant 001 Infrastructure Projects.   *See* Attachment 2.  On page one, the document lists an  Activity Completion Date  of  9 20 2027,  and page 12 reflects a $2.7 million  Federal Share.

10.     One of FEMA s FOIA productions also included the attached project document for the  Catano Substation  Rebuild. *See* Attachment 3. On page one, the document lists an  Activity Completion Date  of  9 20 2027,  and page 8 reflects a $20.9 million  Federal Share.

Pursuant to 28 U.S.C.   1746, I declare under penalty of perjury that the foregoing is true and correct.                                Executed this 20 day of November, 2024.

Ann    . Brown

2

ATTACHMENT 1

JA_124

 CENTER *for* BIOLOGICAL DIVERSITY                    *Because life is good.*

January 31, 2023

*VIA ONLINE PORTAL*
U.S. Department of Homeland Security
Federal Emergency Management Agency
https://www.securerelease.us/create-request

Re:    Freedom of Information Act Request: Puerto Rico Programmatic Environmental
       Assessment Implementation

Dear FOIA Officer:

This is a request under the Freedom of Information Act[1] from the Center for Biological Diversity
("Center"), a non-profit organization that works to secure a future for all species hovering on the
brink of extinction through science, law, and creative media, and to fulfill the continuing
educational goals of its membership and the general public in the process.

REQUESTED RECORDS

As background, on June 6, 2021 and pursuant to the National Environmental Policy Act[2]
("NEPA"), FEMA issued a final Programmatic Environmental Assessment ("EA") and Finding
of No Significant Impact ("FONSI") for the Puerto Rico Utilities Repair, Replacement, and
Realignment Project.  On December 22, 2022, FEMA issued a separate final Programmatic EA
and FONSI for the Puerto Rico Public Facilities Infrastructure Recovery and Resiliency project.[3]

Specifically, the Center requests from FEMA, from July 1, 2021 to the date that FEMA conducts
this search, the records that document each of the specific projects and/or activities that fall
under the NEPA coverage of  either of the two aforementioned EAs and FONSIs that FEMA has
funded, approved, or otherwise authorized.  This includes but is not limited to:
   1.  The record(s) that include a list of the aforementioned projects, if available; and
   2.  The specific contracts and/or other awarding documentation providing funding or
       authorization for the aforementioned projects, where FEMA is relying on either of these
       EAs and FONSIs for the agency's NEPA compliance.

---

[1] 5 U.S.C. § 552, *as amended*.

[2] 42 U.S.C. §§ 4321-4370h.

[3] *See* FEMA, Finding of No Significant Impact, Programmatic Environmental Assessments, Commonwealth of
Puerto Rico – Utilities Repair, Replacement, and Realignment,
https://www.fema.gov/sites/default/files/documents/fema_oehp-fonsi-utilities-repair_06-17-21.pdf  (last visited Jan.
31, 2023); *see also* FEMA, Finding of No Significant Impact, Programmatic Environmental Assessments,
Commonwealth of Puerto Rico – Public Facilities Infrastructure Recovery and Resiliency,
https://www.fema.gov/sites/default/files/documents/fema-4336-4339-4473-public-facilities-signed-
fonsi_12272022.pdf  (last visited Jan. 31, 2023).

Arizona • California • Colorado • Florida • N. Carolina • New York • Oregon • Virginia • Washington, D.C. • La Paz, Mexico

BiologicalDiversity.org

**JA_125**

*Please note: The Center excludes emails or other related documents.*

This request is not meant to exclude any other records that, although not specially requested, are reasonably related to the subject matter of this request.  If you or your office have destroyed or determine to withhold any records that could be reasonably construed to be responsive to this request, I ask that you indicate this fact and the reasons therefore in your response.

Under the FOIA Improvement Act of 2016, agencies are prohibited from denying requests for information under FOIA unless the agency reasonably believes release of the information will harm an interest that is protected by the exemption.[4]

Should you decide to invoke a FOIA exemption, please include sufficient information for us to assess the basis for the exemption, including any interest(s) that would be harmed by release. Please include a detailed ledger which includes:

1.    Basic factual material about each withheld record, including the originator, date, length, general subject matter, and location of each item; and

2.    Complete explanations and justifications for the withholding, including the specific exemption(s) under which the record (or portion thereof) was withheld and a full explanation of how each exemption applies to the withheld material. Such statements will be helpful in deciding whether to appeal an adverse determination.  Your written justification may help to avoid litigation.

If you determine that portions of the records requested are exempt from disclosure, we request that you segregate the exempt portions and mail the non-exempt portions of such records to my attention at the address below within the statutory time limit.[5]

The Center is willing to receive records on a rolling basis.

<u>THE FREEDOM OF INFORMATION ACT</u>

The purpose of FOIA is to "open agency action to the light of public scrutiny."[6]  President Biden emphasized the "presumption of openness" with regard to FOIA.[7]  Attorney General Merrick Garland's memorandum guides agencies to 1) withhold records only if they reasonably foresee that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates or disclosure is prohibited by law, 2) make proactive disclosures, 3) remove barriers to access, and 4) ensure fair and effective FOIA administration.[8]  In another prior memorandum,

---

[4] FOIA Improvement Act of 2016 (Public Law No. 114-185), codified at 5 U.S.C. § 552(a)(8)(A).
[5] 5 U.S.C. § 552(b).
[6] *Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976).
[7] *See Presidential Memorandum for Heads of Executive Departments and Agencies Concerning the Freedom of Information Act Guidelines*, (Mar. 15, 2022).
[8] *See id.*; Former President Obama reinforced FOIA's strong presumption of disclosure with regard to all FOIA decisions. *See Presidential Memorandum for Heads of Executive Departments and Agencies Concerning the Freedom of Information Act*, 74 Fed. Reg. 4683 (Jan. 21, 2009) (directing agencies to administer FOIA under a presumption that guidelines reinforce a commitment to open government, encouraging federal agencies to both

**JA_126**

Former Attorney General Eric Holder set forth the "foreseeable harm" standard for defending agency decisions to withhold information under FOIA.[9]  Thus, the DOJ will defend an agency's denial of a FOIA request "only if (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the statutory exemptions, or (2) disclosure is prohibited by law."[10] These authorities remain in effect.

FOIA's "frequently requested record" provision was enacted as part of the 1996 Electronic Freedom of Information Act Amendments, and requires all federal agencies to give "reading room" treatment to any FOIA-processed records that, "because of the nature of their subject matter, the agency determines have become the subject of subsequent requests for substantially the same records."[11]  Also, enacted as part of the 2016 FOIA Improvement Act, FOIA's Rule of 3 requires all federal agencies to proactively "make available for public inspection in an electronic format" "copies of records, regardless of form or format … that have been released to any person … and … that have been requested 3 or more times."[12]  Therefore, we respectfully request that you make available online any records that the agency determines will become the subject of subsequent requests for substantially the same records, and records that have been requested three or more times.

Finally, agencies must preserve all the records requested herein while this FOIA is pending or under appeal.  The agency shall not destroy any records while they are the subject of a pending request, appeal, or lawsuit under the FOIA.[13]  If any of the requested records are destroyed, the agency and responsible officials are subject to attorney fee awards and sanctions, including fines and disciplinary action.  A court held an agency in contempt for "contumacious conduct" and ordered the agency to pay plaintiff's costs and fees for destroying "potentially responsive material contained on hard drives and email backup tapes."[14]  In another case, in addition to imposing a $10,000 fine and awarding attorneys' fees and costs, the court found that an Assistant United States Attorney prematurely "destroyed records responsive to [the] FOIA request while [the FOIA] litigation was pending" and referred him to the Department of Justice's Office of Professional Responsibility.[15]

---

"make discretionary releases of information" and to "make partial disclosures" when an agency determines full disclosure is not possible).  *See also Former Attorney General Eric Holder's Memorandum for Heads of Executive Departments and Agencies* (Mar. 19, 2009).

[9] *Id.*

[10] *See id.*

[11] *Id*. § 552(a)(2)(D)(ii)(I).

[12] *Id*. § 552(a)(2)(D)(ii)(II).

[13] *See Chambers v. U.S. Dept. of Interior*, 568 F.3d 998, 1004 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under FOIA or the Privacy Act").

[14] *Landmark Legal Found. v. EPA*, 272 F. Supp.2d 59, 62 (D.D.C. 2003); *see also Judicial Watch, Inc. v. Dept. of Commerce*, 384 F. Supp. 2d 163, 169 (D.D.C. 2005) (awarding attorneys' fees and costs because, among other factors, agency's "initial search was unlawful and egregiously mishandled and …likely responsive documents were destroyed and removed"), *aff'd in relevant part*, 470 F.3d 363, 375 (D.C. Cir. 2006) (remanding in part to recalculate attorney fees assessed).

[15] *Jefferson v. Reno*, 123 F. Supp. 2d 1, 6 (D.D.C. 2000).

**JA_127**

FORMAT OF REQUESTED RECORDS

Under FOIA, you are obligated to provide records in a readily accessible electronic format and in the format requested.[16]  "Readily accessible" means text-searchable and OCR-formatted.[17] Pursuant to this requirement, we hereby request that you produce all records in an electronic format and in their native file formats.  Additionally, please provide the records in a load-ready format with a CSV file index or Excel spreadsheet.  If you produce files in .PDF format, then please omit any "portfolios" or "embedded files."  Portfolios and embedded files within files are not readily accessible.  Please do not provide the records in a single, or "batched," .PDF file.  We appreciate the inclusion of an index.

If you should seek to withhold or redact any responsive records, we request that you: (1) identify each such record with specificity (including date, author, recipient, and parties copied); (2) explain in full the basis for withholding responsive material; and (3) provide all segregable portions of the records for which you claim a specific exemption.[18]  Please correlate any redactions with specific exemptions under FOIA.

RECORD DELIVERY

We appreciate your help in expeditiously obtaining a determination on the requested records.  As mandated in FOIA, we anticipate a reply within 20 working days.[19]  Failure to comply within the statutory timeframe may result in the Center taking additional steps to ensure timely receipt of the requested materials.  Please provide a complete reply as expeditiously as possible.  You may email or mail copies of the requested records to:

Ann K. Brown
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
foia@biologicaldiversity.org

If you find that this request is unclear, or if the responsive records are voluminous, please email me to discuss the scope of this request.

REQUEST FOR FEE WAIVER

FOIA was designed to provide citizens a broad right to access government records.  FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to."[20]  In order to provide

---

[16] 5 U.S.C. § 552(a)(3)(B) ("In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format.").

[17] *See id*.

[18] *Id*. § 552(b).

[19] *Id*. § 552(a)(6)(A)(i); 21 C.F.R. § 20.41(b).

[20] *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted).

**JA_128**

public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard.[21] FOIA's fee waiver requirement is "liberally construed."[22]

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as the Center access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*."[23] As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ."[24]

I.      The Center Qualifies for a Fee Waiver.

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester."[25] The U.S. Department of Homeland Security regulations, which governs FOIA requests to FEMA, establish the same standard.[26]

Thus, the FEMA must consider four factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, and (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities.[27] As shown below, the Center meets each of these factors.

    A. The Subject of This Request Concerns "The Operations and Activities of the Government."

The subject matter of this request concerns the operations and activities of the FEMA. This request asks for from July 1, 2021 to the date that FEMA conducts this search, the records that document each of the specific projects and/or activities that fall under the NEPA coverage of either of the two aforementioned EAs and FONSIs that FEMA has funded, approved, or otherwise authorized. This includes but is not limited to: (1) The record(s) that include a list of the aforementioned projects, if available; and (2) The specific contracts and/or other awarding documentation providing funding or authorization for the aforementioned projects, where FEMA

---

[21] 5 U.S.C. § 552(a)(4)(A)(iii).

[22] *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

[23] *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D. Mass. 1984) (emphasis added).

[24] 132 Cong. Rec. S. 14298 (statement of Senator Leahy).

[25] 5 U.S.C. § 552(a)(4)(A)(iii).

[26] *See* 6 C.F.R. § 5.11(k)(i) – (ii).

[27] *Id*. § 20.46(b)(1) – (4).

is relying on either of these EAs and FONSIs for the agency's NEPA compliance.  Please note: The Center excludes emails or other related documents.

This FOIA request will provide the Center and the public with crucial insight into the environmental impact of the proposed reconstruction in Puerto Rico, for which FEMA has prepared two Programmatic EAs.  It is clear that a federal agency's analysis of construction projects in Puerto Rico is a specific and identifiable activity of the government, and in this case it is the executive branch agency of FEMA.[28]  Thus, the Center meets this factor.

> B.  Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will provide more insight into the Puerto Rico reconstruction, for which FEMA has prepared two Programmatic EAs.  The FEMA's Programmatic EAs focus on rebuilding the existing centralized power system and relying on that system to power public facilities.  Responsive records will demonstrate how FEMA is using these Programmatic EAs to fund specific projects.  Once the information is made available, the Center will analyze it and present it to its 1.7 million members and online activists and the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of the FEMA's operations and activities.

> C.  Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of Puerto Rico PEA Implementation.

The requested records will contribute to public understanding of whether FEMA's actions are consistent with NEPA.  As explained above, the records will contribute to public understanding of this topic.

Activities of FEMA generally, and specifically its environmental assessments of reconstruction in Puerto Rico, are areas of interest to a reasonably broad segment of the public.  The Center will use the information it obtains from the disclosed records to educate the public at large about this topic.[29]

---

[28] *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted).

[29] *See W. Watersheds Proj. v. Brown*, 318 F. Supp.2d 1036, 1040 (D. Idaho 2004) (finding that "WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how … management strategies employed by the BLM may adversely affect the environment").

**JA_130**

Through the Center's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter.[30]

Indeed, the public does not currently have an ability to easily evaluate the requested records, which are not currently in the public domain.[31]  As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations… ."[32]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of what conservation efforts are needed to mitigate the effects of the reconstruction activities.  The public is always well served when it knows how the government conducts its activities, particularly matters touching on legal questions.  Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about this pressing issue.

> D. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.

The Center is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of how the proposed construction will impact communities and the local environment, as compared to the level of public understanding that exists prior to the disclosure.  Indeed, public understanding will be *significantly* increased as a result of disclosure because the requested records will help reveal more about this topic.

The records are also certain to shed light on the FEMA's compliance with NEPA.  Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA.  Thus, the Center meets this factor as well.

---

[30] *Ettlinger v. FBI*, 596 F. Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dept. of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dept. of Hous. & Urban Dev.*, 405 F. Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

[31] *See Cmty. Legal Servs.*, 405 F. Supp.2d at 560 (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public.").

[32] *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987).  In this connection, it is immaterial whether any portion of the Center's request may currently be in the public domain because the Center requests considerably more than any piece of information that may currently be available to other individuals.  *See Judicial Watch*, 326 F.3d at 1315.

II.     The Center has a Demonstrated Ability to Disseminate the Requested Information Broadly.

The Center is a non-profit organization that informs, educates, and counsels the public regarding environmental issues, policies, and laws relating to environmental issues.  The Center has been substantially involved in the activities of numerous government agencies for over 30 years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

In consistently granting the Center's fee waivers, agencies have recognized: (1) that the information requested by the Center contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that the Center possesses the expertise to explain the requested information to the public; (4) that the Center possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes the Center as an established expert in the field of imperiled species, biodiversity, and impacts on protected species.  The Center's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

The Center's work appears in over 5,000 news stories online and in print, radio, and TV per month, including regular reporting in such important outlets as *The New York Times*, *Washington Post*, *The Guardian*,  *Los Angeles Times*, and *USA Today*.  Many media outlets have reported on the energy justice issues utilizing information obtained by the Center from state and federal agencies.  In 2022, more than 4.1 million people visited the Center's extensive website, viewing pages more than 6 million times.  In 2022, nearly 2.4 million actions were completed by more than 1.7 million members and supporters.  Three times a year, the Center sends printed newsletters to more than 82,000 members.  More than 614,000 people follow the Center on Facebook, and there are regular postings regarding energy justice.  The Center also regularly tweets to more than 138,500 followers on Twitter, and has more than 47,000 followers on Instagram.  The Center intends to use any or all of these far-reaching media outlets to share with the public information obtained as a result of this request.  The Center intends to use any or all of these far-reaching media outlets to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of the FEMA's duties is absolutely necessary.  In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably-broad audience of persons interested in the subject.[33]  The Center need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity."[34]  It is sufficient for the Center to show how it distributes information to the public generally.[35]

---

[33] *Carney*, 19 F.3d 807.
[34] *Judicial Watch*, 326 F.3d at 1314.
[35] *Id.*

**JA_132**

III.    Obtaining the Requested Records is of No Commercial Interest to the Center.

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to the Center's role of educating the general public.  Founded in 1994, the Center is a 501(c)(3) nonprofit conservation organization (EIN: 27-3943866) with more than 1.7 million members and online activists dedicated to the protection of endangered and threatened species and wild places.  The Center has no commercial interest and will realize no commercial benefit from the release of the requested records.

IV.    Conclusion

For all of the foregoing reasons, the Center qualifies for a full fee waiver.  We hope that the FEMA will immediately grant this fee waiver request and begin to search and disclose the requested records without any unnecessary delays.

If you have any questions, please contact me at foia@biologicaldiversity.org.  All records and any related correspondence should be sent to my attention at the address below.

Sincerely,

Ann K. Brown
Open Government Coordinator
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211-0374
foia@biologicaldiversity.org

**JA_133**

ATTACHMENT 2



# Department of Homeland Security
# Federal Emergency Management Agency

## General Info

| | | | |
|---|---|---|---|
| **Project #** | 669498    **P/W #**  10571 | **Project Type** | Specialized |
| **Project Category** | F - Utilities | **Applicant** | PR Electric Power Authority (000-UA2QU-00) |
| **Project Title** | FAASt [Aguirre Power Plant 001 Infrastructure Projects] (Generation) | **Event** | 4339DR-PR (4339DR) |
| **Project Size** | Large | **Declaration Date** | 9/20/2017 |
| **Activity Completion Date** | 9/20/2027 | **Incident Start Date** | 9/17/2017 |
| | | **Incident End Date** | 11/15/2017 |
| **Process Step** | Obligated | | |

## Damage Description and Dimensions

**The Disaster # 4339DR, which occurred between *09/17/2017* and *11/15/2017*, caused:**

### Damage #1222657; FAASt [Rehabilitation of Liner Dams Fuel Reserve Tanks Aguirre Generatrix Complex]

> DDD for this facility codified in the 136271 - MEPA078 Puerto Rico Electrical Power Authority Island Wide FAASt Project.

⊛

**General Facility Information:**

- **Facility Type:** Power generation, transmission, and distribution facilities
- **Facility:** Rehabilitation of Liner Dams Fuel Reserve Tanks Aguirre Generatrix Complex
- **Facility Description:** The purpose of the project is to comply with the Spill Prevention, Control and Countermeasure (SPCC) plan under the Oil Pollution Act of 1990. This act amended the Clean Water Act to require facilities to have spill response plans. of oils, which can reach the navigable waters of the United States.
- **Approx. Year Built:** 1967
- **GPS Latitude/Longitude:** 17.95111, -66.23554

**General Damage Information:**

- **Date Damaged:** 9/20/2017
- **Cause of Damage:** High winds & wind driven rain, caused by Cat 4 Hurricane Maria.

### Damage #1222658; FAASt [Aguirre Steam Plant – Procurement and Delivery of Two Re-Build (Remanufactured) Discharge Condenser Water Pump Motor]

> DDD for this facility codified in the 136271 - MEPA078 Puerto Rico Electrical Power Authority Island Wide FAASt Project.

⊛

**General Facility Information:**

2023-FEFO-00323-000248

## JA_135

- **Facility Type:** Power generation, transmission, and distribution facilities
- **Facility:** Aguirre Steam Plant – Procurement and Delivery of Two Re-Build (Remanufactured) Discharge Condenser Water Pump Motor
- **Facility Description:** To improve the generation asset's reliability, increasing their availability, and provide continuous generation service to the People of Puerto Rico, it is crucial to keep these assets operational and in the best possible condition. Therefore, the prioritization of conservation, repairs, and retrofitting works projects is at the top priority list. The project is necessary to assure the flow of the sea water use for the cooling system of the condenser of both units 1 and 2. This will maintain a reliable operational condition of these generation units.
- **Approx. Year Built:** 1967
- **GPS Latitude/Longitude:** 17.94793, -66.23124

**General Damage Information:**

- **Date Damaged:** 9/20/2017
- **Cause of Damage:** High winds & wind driven rain, caused by Cat 4 Hurricane Maria.

## Damage #1222660; FAASt [Aguirre Steam Plant - Two New Condenser Discharge Water Pump Motors]

> DDD for this facility codified in the 136271 - MEPA078 Puerto Rico Electrical Power Authority Island Wide FAASt Project.

⊛

**General Facility Information:**

- **Facility Type:** Power generation, transmission, and distribution facilities
- **Facility:** Aguirre Steam Plant - Two New Condenser Discharge Water Pump Motors
- **Facility Description:** To improve the generation asset's reliability, increasing their availability, and provide continuous generation service to the People of Puerto Rico, it is crucial to keep these assets operational and in the best possible condition. Therefore, the prioritization of conservation, repairs, and retrofitting works projects is at the top priority list. Internal inspection process revealed major damage in the stator and rotor. While on service, motors 1-3 and 2-2 associated to the discharge water pump suffered a breakdown, therefore, it was recommended to obtain new units. New motors will provide a better control of the discharge level which represents an increase in capacity and better dispatch reliability.
- **Approx. Year Built:** 1967
- **GPS Latitude/Longitude:** 17.94793, -66.23124

**General Damage Information:**

- **Date Damaged:** 9/20/2017
- **Cause of Damage:** High winds & wind driven rain, caused by Cat 4 Hurricane Maria.

## Damage #1222661; FAASt [Aguirre Steam Plant Permanent Repairs]

> DDD for this facility codified in the 136271 - MEPA078 Puerto Rico Electrical Power Authority Island Wide FAASt Project.

⊛

**General Facility Information:**

- **Facility Type:** Power generation, transmission, and distribution facilities
- **Facility:** Aguirre Steam Plant Permanent Repairs
- **Facility Description:** To improve the generation asset's reliability, increasing their availability, and provide continuous generation service to the People of Puerto Rico, it is crucial to keep these assets operational and in the best possible condition. Therefore, the prioritization of conservation, repairs, and retrofitting works projects is at the top priority list. After an inspection of Central Aguirre unit 2 equipment, it was

2023-FEFO-00323-000249

**JA_136**

determined that the existent Allis Chalmers breakers should be replaced for 480v breakers. These breakers are used for the protection of auxiliary equipment in unit 2.

- **Approx. Year Built:** 1967
- **GPS Latitude/Longitude:** 17.95079, -66.22855

## General Damage Information:

- **Date Damaged:** 9/20/2017
- **Cause of Damage:** High winds & wind driven rain, caused by Cat 4 Hurricane Maria.

## Final Scope

1222657

## FAASt [Rehabilitation of Liner Dams Fuel Reserve Tanks Aguirre Generatrix Complex]

**Introduction**

The purpose of this document is to present and update a Project Scope of Work (SOW) with Cost Estimates to be submitted to COR3 and FEMA for projects under DR-4339-PR Public Assistance. The completed document will be reviewed by COR3 and FEMA to create and version a specific project worksheet and post fixed-cost estimates to repair, restore, or replace eligible facilities including Section 406 hazard mitigation for a specific project.

Puerto Rico Electric Power Authority (PREPA) is the agency that provides the electric service to the entire island of Puerto Rico. As such, the facilities, sites, and systems identified in this Scope of Work are eligible as critical services facilities as defined in the PAAP (Section 428) and BBA 2018 guidance documents.

**Facility**

Aguirre Fuel Tank Farm

The purpose of the project is to comply with the Spill Prevention, Control and Countermeasure (SPCC) plan under the Oil Pollution Act of 1990. This act amended the Clean Water Act to require facilities to have spill response plans. of oils, which can reach the navigable waters of the United States.

GPS Coordinates: 17.951110, -66.235541

**Project Scope of Works**

The scope of work for the rehabilitation of Rehabilitation of Liner Dams Fuel Reserve Tanks Aguirre Generatrix Complex will consist of the following:

2023-FEFO-00323-000250

**JA_137**

1. Removal and disposal of the HDPE-Liner type coating.

2. Surface preparation by filling with select soil material.

3. Installation of covering material type HDPE - Liner.

4. Application of intrusion welding.

5. Tests of the installed material.

Please refer to pages 14 to 149 of document labeled: *669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf* for specific details and location of scope of works.

**Project Estimate**

The Contractor shall furnish and provide all engineering, design, work, labor, materials, tools, municipal taxes, equipment, enclosures, inspection, supervision, all necessary services, job administration, and superintendence, required for the for the Geo-Membrane Liner Rehabilitation Works, Fuel Tank Farm at the Aguirre Power Complex.

Lump Sum: $1,291,00.00

**DI# 1222657 Work to Be Completed (WTBC):   $1,291,000.00**

**Total Project Cost (All DI's): $3,031,265.05**

**Project Notes:**

1. For Environmental & Historical Preservation (EHP) requirements, details, and supporting documentation please refer to pages 257 to 274 of the document labeled: *669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf*.

2. Please see below general information and a brief description of the SOW for each additional generation project in the same facility: Aguirre Power Plant, as required by EHP:

    **Project# [669233] FAASt Aguirre Power Plant 002 Units 1 & 2 Projects (Generation)**

    DI# 1222391 FAASt Aguirre Power Plant Condenser Circulating Water Pump Motor

    The scope of work consists of:

    - Purchase and deliver the motor to Aguirre's Power Plant.

    DI# 1222392 FAASt Aguirre Unit 2 Excitation System Breakers

    The scope of work consists of:

    - General Requirement - The removal of ABB Unitrol D and installation services of the ABB Unitrol 6000 X-Power for the Unit #2 Excitation System, all parts and components, attachments, Covers and appurtenances. Includes but is not limited to receiving and inspecting, grounding, and anchoring, re-terminating existing cables, removing switches, lights and components, miscellaneous conduits, and fittings, etc.). All in accordance with the technical specifications.

    DI# 1222396 FAASt Aguirre Steam Power Plant Unit 1 Turbine and Generator Inspection Rehabilitation and Installation

2023-FEFO-00323-000251

**JA_138**

The scope of work consists of:

- Installation of refurbished HP and IP turbine rotors; LP1 and LP2 blades replacements and rotors installation.

- Refurbished gland casings.

- Repairs, and installation of control valves, stop valves, interceptor valves including the actuators.

- Lube and oil control system.

- S90 Trip Unit replacement.

- Emergency auxiliary and main oil pump.

- Turning gear; alignment.

- Cold and hot turbine recommissioning.

- Generator stator standard DC tests and generator rotor standard tests.

DI# 1222398 FAASt Aguirre Power Station Inner Barrel Bundle

The scope of work consists of:

- Manufacture and delivery of one (1) Inner Barrel Assembly for the 9BB Motor Driven Boiler Feed Pump.

**Project# [669815] FAASt [Aguirre Power Plant 003 Combined Cycle] (Generation)**

DI# 1222950 FAASt [Stage 2 & 3 Gas Turbine Rotor Bucket Set, Aguirre Combined Cycle Plant]

The scope of work consists of:

-Supply one (1) MS7001 EA stage 2 gas turbine rotor bucket set (refurbished).

-Supply one (1) MS7001 EA stage 3 gas turbine rotor bucket set (refurbished).

DI# 1222952 FAASt [New Water Condensate Tank for the Aguirre Combined Cycle]

The general scope of this project will consist of the following:

-Removal of existing steel water condensate storage tank.

-Design and Build of a new 287,000 gallons steel water condensate storage tank, including interior and exterior coating application.

-Instrumentation system for reading water levels and improvements to the existing tank's concrete base.

DI# 1222953 FAASt [Aguirre Combined Cycle Major inspection and Repairs Unit 1-3]

The scope of work consists of:

-Repair Turbine Rotor & Buckets

-Supply New Turbine Casing Shrouds

-Repair Turbine Nozzles Stages 1, 2 & 3

-Repair Transition Pieces Set

-New Fuel Oil Pump (Replacement)

DI# 1222954 FAASt - [Aguirre Combined Cycle Hot Gas Path Inspection and repairs Work Units 2-4 and stand by transformer]

Work Completed:

-Gas Turbine Nozzle stage 1, unit to gas 1-4: inspection of frame 7EA 1st stage nozzle, heavy repair of frame? EA 1st stage nozzle, and supply & install 36 trailing edge coupons on frame 7EA.

-Combustion Liners and Crossfire tubes, units 1 to 3: inspect and repair 3 sets of 10 combustion liner, apply a thermal barrier coating to the body and cowl cap of each liner, replace liner spring seal, weld and machine fuel nozzle bore, and aft end section replacement.

-Gas Turbine Transition Piece Set, unit to gas 2-4: inspect and repair 10 transition pieces, supply transition piece installation hardware kit, install new aft end picture frame inner lip made of Nimonic 263, L605 sleeves on side and floating seals groove, and restore inner body corrosion damage.

-HGP Inspection, unit to gas 2-4: supply supervision and craft labor during twelve (12) weeks for the assembly job of unit

2023-FEFO-00323-000252

**JA_139**

to gas 2-4.

-Transformer Replacement, unit to gas 2-3: design, manufacture and deliver a new Power Transformer GT MCC 500kva, 13.8kv/480v for the Aguirre Combined Cycle distribution system.

DI# 1222957-FAASt [Hot Gas Path Inspection Work Units 1-1 and 1-2]

The scope of work consists of:

-Rehabilitation of Stage 1 Turbine Nozzle, Hot Water Inspection (HGP) Gas Unit 1-4, Combined Cycle Power Plant.

-Repair of combustion baskets, Combined Cycle Power Plant

- Modification of Transition Parts Set, Hot Gas Passage Inspection  (HGPI) Gas Unit, Aguirre Combined Cycle Power Plant.

**Project# [670036] FAASt [Design Fire Pump for Aguirre Power Complex] (Generation)**

DI#1222664 FAASt [Design Fire Pump for Aguirre Power Complex]

The scope of work for the Design Fire Pump for Aguirre Power Complex will consist of the following:

- Retrofit of the existing Aguirre Power Plant fire protection system main distribution loop and partial segments along its distribution. This solution involves the installation of the main distribution pie above ground. These pipes layout will be install parallel to the exiting underground pipe. Where possible, exiting concrete pipe supports along the route will be reuse for the new installation. The above ground pipe layout will have some segments below grade level, at street crossing and some specific areas of traffic. The pipes in these below grade level areas will be installed inside open trenches with appropriate covers for their specific traffic conditions.

-Current Scope of Work was submitted for the creation of the project in Grants Manager. The specifications of the repairs/replacements will be provided in the Detailed Scope of Work after the A&E processes.

**Other SOW: Unit 1 South Wall Boiler Tubing Replacement and Boilers Repairs-(Pending Approval from PREB)**

DI#: pending creation based on the PREB response.

The scope of work for the Rehabilitation of the South Waterwall Boiler Unit 1 Aguirre Power Plant consists of the following:

- Purchase and delivery of boiler tube waterfall panels: 30 tubes wide x 43' ½ long, set of 6 panels

- Rehabilitation of the Furnace Front Waterwall Tubes
    - Removal and installation of the outer casing
    - Removal and installation of insulation
    - Removal and installation of panels
    - Manufacture and installation of additional panel
    - Removal of trunks of 9EA observation ports, cutting and installation of sight tubes and filling of refractory. o Fix membranes and weld wall to backstays.
    - Wall cutout for boiler access

- Repair the air and gas duct pre-heaters:
    - Duct de GRF (Gas Recirculation Fan Discharge Duct): Demolition, duct fabrication and installation including damper area.  Insulation and refractory removal. Manufacture Duct according to existing plans and current field measurement.

- Repair of air heater Unit 1, Aguirre: Axial plate replacement / Axial plate installation include the  following parts: Axial plate adjusters, Static seals / axial plate, Axial plate calibration
    - Replacement consists of axial access plate removal of inner casing area axial plate;  static stamps and rack pin section

- Replacement section plate hot/cold to remove and install sector plate, removal of static seals for plate sector removal / installation, removal / installation of adjusters and calibration - includes the following parts: Adjusters and axial reinforcement plate, Axial plate static seals, Hot/cold plate sector calibration

- Replacement of Rotor Seal Support and T-bar. Removal and installation of these parts, also the calibration
    - End Plate, stay plate - sol area, front/rear diaphragm – sol area, inspection repair of torch / steam, washing/ device, support / pin rack, guide / support bearing / rotor drive o removal
    - Installation Hot/ Cold of  stamps, radials, bypass and axials

**Scope Notes:**

1. The Applicant's provided SOW has been modified in order to follow FEMA's SOW format.

2023-FEFO-00323-000253

**JA_140**

2. For more information, please refer to pages 2 to 149 of the document labeled: *669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf.*

**406 HMP Scope**

There is no feasible Hazard Mitigation opportunity identified for this Project. This Project is part of PREPA Immediate Works request.

1222658

## FAASt [Aguirre Steam Plant – Procurement and Delivery of Two Re-Build (Remanufactured) Discharge Con

### Introduction

The purpose of this document is to present and update a Project Scope of Work (SOW) with Cost Estimates to be submitted to COR3 and FEMA for projects under DR-4339-PR Public Assistance. The completed document will be reviewed by COR3 and FEMA to create and version a specific project worksheet and post fixed-cost estimates to repair, restore, or replace eligible facilities including Section 406 hazard mitigation for a specific project.

Puerto Rico Electric Power Authority (PREPA) is the agency that provides the electric service to the entire island of Puerto Rico. As such, the facilities, sites, and systems identified in this Scope of Work are eligible as critical services facilities as defined in the PAAP (Section 428) and BBA 2018 guidance documents. Additional details may be found in Sections 3 and 4, respectively.

### Facility

Aguirre Steam Plant / Water Pump Motors

The project is necessary to assure the flow of the sea water use for the cooling system of the condenser of both units 1 and 2. This will maintain a reliable operational condition of these generation units.

GPS Coordinates: 17.947925, -66.231242

### Project Scope of Work

The scope of work for Aguirre's Steam Plant for Procurement and Delivery of Two Re-Build (Remanufactured) Discharge Condenser Water Pump Motors will consist of the following:

1. Manufacture, test, and delivery of two 400 Hp-395 RPM, 4,0000 Volts-3 Phase, 60 Cycle Re-build Motors for the water discharge condenser pumps for the sea water canal discharge system to the Aguirre Steam Plant.

### Project Cost Estimate

The estimate includes materials, construction labor and equipment, engineering, permitting, management, and contingencies. Cost is based historical pricing.

2023-FEFO-00323-000254

**JA_141**

Lump Sum: $750,000.00

For cost estimate details, please refer to PREPAs Fund certifications for Technical Specifications on pages 159 to 175 of document labeled: 669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf

**DI# 1222658 Work to Be Completed (WTBC):   $750,000.00**

Scope Notes:

1. The Applicant's provided SOW has been modified in order to follow FEMA's SOW format.
2. For more information, please refer to pages 150 to 175 of the document labeled: *669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf.*

## 406 HMP Scope

There is no feasible Hazard Mitigation opportunity identified for this Project. This Project is part of PREPA Immediate Works request.

1222660

# FAASt [Aguirre Steam Plant - Two New Condenser Discharge Water Pump Motors]

**Introduction**

The purpose of this document is to present and update a Project Scope of Work (SOW) with Cost Estimates to be submitted to COR3 and FEMA for projects under DR-4339-PR Public Assistance. The completed document will be reviewed by COR3 and FEMA to create and version a specific project worksheet and post fixed-cost estimates to repair, restore, or replace eligible facilities including Section 406 hazard mitigation for a specific project.

Puerto Rico Electric Power Authority (PREPA) is the agency that provides the electric service to the entire island of Puerto Rico. As such, the facilities, sites, and systems identified in this Scope of Work are eligible as critical services facilities as defined in the PAAP (Section 428) and BBA 2018 guidance documents. Additional details may be found in Sections 3 and 4, respectively.

**Facility**

Aguirre Steam Plant / Condenser Discharge Water Pumps Motors

An Internal inspection process revealed major damage in the stator and rotor. While on service, motors 1-3 and 2-2 associated to the discharge water pump suffered a breakdown, therefore, it was recommended to obtain new units. New motors will provide a better control of the discharge level which represents an increase in capacity and better dispatch reliability.

GPS Coordinates: 17.947925, -66.231242

**Project Scope of Work**

2023-FEFO-00323-000255

**JA_142**

The scope of work for Aguirre's Steam Plant Emergency purchase of two new condenser discharge water pumps motors:

1. The contractor must provide labor, supervision, materials, equipment, security, design (if necessary) for the delivery of two motors associated to the discharge water pumps for Aguirre's Steam Plant including:

Dielectric testing of windings with AWAIV Advanced Winding Analysis System.

- Insulation resistance and polarization index with temperature correction.
- Phase resistance and resistance balance with temperature correction.
- Direct Current Step Voltage Testing.
- Surge Comparison Testing.

IEEE 112 Test Run.

- No Load Power Analysis.
- No Load FFT Analysis after temperature stabilization.
- Noise Level and Rate of Airflow (when applicable).
- Performance Testing Per IEEE 112 Method F1.
- Bearing Temperature Monitoring until point of stabilization (when applicable).

Thermographic analysis on magnetic cores for integrity verification.

Space heaters and winding temperature detectors (2) per phase.

Bearing temperature detectors.

Ant rotation lock device.

**Project Cost Estimate**

The estimate includes materials, construction labor and equipment, engineering, permitting, management, and contingencies. Cost is based historical pricing.

| | |
|---|---|
| Purchase and delivery | $625,000.00 |
| Labor | $15,150.00 |
| Total | $640,150.00 |

For cost estimate details, please refer to executed contracts MR 712745, Quotation, and Technical Specifications included in RFP and PREPAs Fund certifications pages 186 to 201 of document labeled: *669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf*.

**DI# 1222660 Work to Be Completed (WTBC):   $640,150.00**

<u>Scope Notes:</u>

1. The Applicant's provided SOW has been modified in order to follow FEMA's SOW format.
2. For more information, please refer to pages 175 to 201 of the document labeled: *669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf*.

2023-FEFO-00323-000256

JA_143

**406 HMP Scope**

There is no feasible Hazard Mitigation opportunity identified for this Project. This Project is part of PREPA Immediate Works request.

## 1222661  FAASt [Aguirre Steam Plant Permanent Repairs]

**Introduction**

The purpose of this document is to present and update a Project Scope of Work (SOW) with Cost Estimates to be submitted to COR3 and FEMA for projects under DR-4339-PR Public Assistance. The completed document will be reviewed by COR3 and FEMA to create and version a specific project worksheet and post fixed-cost estimates to repair, restore, or replace eligible facilities including Section 406 hazard mitigation for a specific project.

Puerto Rico Electric Power Authority (PREPA) is the agency that provides the electric service to the entire island of Puerto Rico. As such, the facilities, sites, and systems identified in this Scope of Work are eligible as critical services facilities as defined in the PAAP (Section 428) and BBA 2018 guidance documents. Additional details may be found in Sections 3 and 4, respectively.

**Facility**

Aguirre Steam Plant / Unit 2 Excitation System

After an inspection of Central Aguirre unit 2 equipment, it was determined that the existent Allis Chalmers breakers should be replaced for 480v breakers. These breakers are used for the protection of auxiliary equipment in unit 2.

GPS Coordinates: 17.950787, -66.228553

**Project Scope of Work**

The scope of work for the acquisition and installation of 480v breakers in unit 2 of Aguirre Steam Plant will consist of the following:

1. Supply the replacement breakers for the Allis Chalmers LA type breakers on 480v Normal Bus. Breakers models to supply:

    LA600-AR600NM (E/O) 520MC LSI (ARMS CAPABLE) --- 12 EA

    LA1600-AR160M (E/O) 520MC LSI (ARMS CAPABLE) -- 1 EA

    - Each breaker includes:

        - A new door and cassette
        - 520 LSI trip unit or the 520MC LSI (ARMS Capable)
        - Mechanically Operated(M/O)Supply the replacement breakers for the Allis Chalmers LA type breakers on 480v Normal Bus. Breakers models to supply:

2. Complete turnkey installation services or supervisory services.

**Project Cost Estimate**

The estimate includes materials, construction labor and equipment, engineering, permitting, management, and contingencies. Cost is based historical pricing.

2023-FEFO-00323-000257

**JA_144**

Purchase and Installation: $350,115.05

For cost estimate details, please refer to contract 84361, RFP 2032, and Scope of Work with Technical Specifications on pages 212 to 256 of document labeled: *669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf.*

**DI# 1222661 Work to Be Completed (WTBC):  $350,115.50**

<u>Scope Notes:</u>

1. The Applicant's provided SOW has been modified in order to follow FEMA's SOW format.
2. For more information, please refer to pages 203 to 256 of the document labeled: *669498-D4339PR-Revised- PREPA SOW Aguirre 001 Infrastructure Projects.pdf.*

## 406 HMP Scope

There is no feasible Hazard Mitigation opportunity identified for this Project. This Project is part of PREPA Immediate Works request.

2023-FEFO-00323-000258

**JA_145**

## Cost

| Code | Quantity | Unit | Total Cost | Section |
|---|---|---|---|---|
| 9201 (PAAP Fixed Estimate (No Value - Tracking Purposes Only)) | 1.00 | Lump Sum | $0.00 | Completed |
| 9001 (Contract (FAASt Project 136271)) | 1.00 | Lump Sum | $1,291,000.00 | Uncompleted |
| 9201 (PAAP Fixed Estimate (No Value - Tracking Purposes Only)) | 1.00 | Lump Sum | $0.00 | Completed |
| 9001 (Contract (FAASt Project 136271)) | 1.00 | Lump Sum | $750,000.00 | Uncompleted |
| 9201 (PAAP Fixed Estimate (No Value - Tracking Purposes Only)) | 1.00 | Lump Sum | $0.00 | Completed |
| 9001 (Contract (FAASt Project 136271)) | 1.00 | Lump Sum | $640,150.00 | Uncompleted |
| 9201 (PAAP Fixed Estimate (No Value - Tracking Purposes Only)) | 1.00 | Lump Sum | $0.00 | Completed |
| 9001 (Contract (FAASt Project 136271)) | 1.00 | Lump Sum | $350,115.05 | Uncompleted |

| | |
|---|---|
| CRC Gross Cost | $3,031,265.05 |
| Total 406 HMP Cost | $0.00 |
| Total Insurance Reductions | $0.00 |
| CRC Net Cost | $3,031,265.05 |
| Federal Share (90.00%) | $2,728,138.55 |
| Non-Federal Share (10.00%) | $303,126.50 |

2023-FEFO-00323-000259

**JA_146**

ATTACHMENT 3

**JA_147**



# Department of Homeland Security
## Federal Emergency Management Agency

## General Info

| | | | |
|---|---|---|---|
| **Project #** | 174422    **P/W #**  10496 | **Project Type** | Specialized |
| **Project Category** | F - Utilities | **Applicant** | PR Electric Power Authority (000-UA2QU-00) |
| **Project Title** | FAASt - Catano-Rebuild 1801(Substation) | | |
| **Project Size** | Large | **Event** | 4339DR-PR (4339DR) |
| **Activity Completion Date** | 9/20/2027 | **Declaration Date** | 9/20/2017 |
| | | **Incident Start Date** | 9/17/2017 |
| **Process Step** | Obligated | **Incident End Date** | 11/15/2017 |

## Damage Description and Dimensions

**The Disaster # 4339DR, which occurred between *09/17/2017* and *11/15/2017*, caused:**

DDD for this facility codified in the 136271 - MEPA078 Puerto Rico Electrical Power Authority Island Wide FAASt Project.

### Damage #442268; FAASt - Catano-Rebuilt 1801

> DDD for this facility codified in the 136271 - MEPA078 Puerto Rico Electrical Power Authority Island Wide FAASt Project.

**General Facility Information:**

- **Facility Type:** Power generation, transmission, and distribution facilities
- **Facility:** Catano-Rebuilt 1801
- **Facility Description:** Catano 1801 Substation is approximately 22,200 SQ. FT. The substation has four transmission lines 9500, 9700, 8200 and 6200 38/13.2 kV and five feeders. The capacity of the substation is 12/22.40 MVA.
- **Approx. Year Built:** 1980
- **GPS Latitude/Longitude:** 18.42351, -66.14030

**General Damage Information:**

- **Date Damaged:** 9/20/2017
- **Cause of Damage:** High winds & wind driven rain, caused by Cat 4 Hurricane Maria

## Final Scope

442268   **FAASt - Catano-Rebuilt 1801**

2023-FEFO-00323-000054

**JA_148**

| Project Name | 174422 Cataño Modernization and Hardening |
|---|---|
| Region | Bayamón |
| Damaged Inventory/Asset Category | Island Wide Substations |
| FEMA Project Number | 174422 |

## Work to be Completed

The Applicant provided with this Detailed SOW pursuant to the T&D O&M Agreement between Puerto Rico. Puerto Rico Electric Power Authority ("PREPA"), the Puerto Rico Public-Private Partnerships Authority ("P3A") and LUMA Energy, and in accordance with the Consent to Federal Funding Letter issued by PREPA and P3A and provided herein as Appendix K which collectively provides the necessary consent for LUMA Energy, as agent of PREPA, to undertake work in connection with any Federal Funding requests related to the T&D System submitted to FEMA.

## Facilities

The Cataño Substation experienced substantial damages due to Hurricane Maria in September 2017. The purpose of this project is to repair damages, mitigate flooding issues and harden the substation to improve the reliability and resiliency of the Puerto Rico electrical grid.

| Physical Address | Carr 5 KM 27.0 Bo. Cañas Cataño, PR |
|---|---|
| Coordinates | 18.423513N, -66.140299W |
| Date of Construction | 1966 |

## Project Scope of Work (Section 428)

Substation:

A. Replace 22.4 MVA, 38/13.2 kV transformer with a new 33.6 MVA, 38/13.2 kV transformer and build a new oil containment around transformer.

B. Relocate five 13.2 kV distribution feeders from the existing Power Distribution Substation to the new Gas Insulated Switchgear ("GIS") enclosure within the new Control Building.

C. Removal the existing 38 kV Air Insulated Equipment including the steel lattice structure (approx. 67'x29'x 50'), lightning arrestors, insulators, copper bus bar, hardware, auxiliary systems, and disconnects switches.

D. Removal and disposal of four 38 kV Oil Circuit Breakers and salvage two SF6 Circuit Breakers.

E. Remove existing service transformer and install a new 100 KVA on the new elevated platform.

F. Removal and disposal of the existing concrete control building including the relays and control panels, Remote Terminal Units, battery bank, battery charger, AC/DC distribution panels and control panels/cables and associated conduits and wiring.

G. Salvage the existing 13.2 kV Power Distribution Switchgear and removal of foundations.

H. Removal of the existing transformer foundation.

I. Install a new 50 kW emergency generator that will act as a backup feed to the control building and telecom equipment.

Transmission Lines: [General fixing: Poles/structure; location; ordering]

Date Downloaded: 2/23/23 9:17am AST                    2 of 15

2023-FEFO-00323-000055

**JA_149**

| A. | Line 9500 – Remove two 38 kV wood poles and install two new steel 38 kV poles in the same location with concrete foundations: one dead-end pole with an underground riser inside the substation perimeter and one pole located outside of the substation fenced area. Build and install underground feed from the dead-end pole to connect to the 38 kV switchgear. Install a temporary pole inside the substation perimeter and overhead conductor to the new pole location in the substation to facilitate the construction. |
| B. | Line 8200 – Remove one 38 kV wood dead-end pole located outside of the substation and install one new 38 kV steel pole inside the substation perimeter with concrete foundation and install a new slack span conductor over a secondary road to new power pole. Build and install underground feed to connect to the 38 kV Gas Insulated Switchgear (GIS). |
| C. | Line 9600 – Remove 38 kV wood dead-end pole located outside the substation and install new 38 kV Steel structure with concrete foundation inside the substation with new riser for underground feed to GIS. |
| D. | Line 6200 – Remove two 38 kV wood dead end poles located outside the substation and install two new steel 38kV poles in the same location with concrete foundations. Build and install underground feed to connect to the 38 kV GIS. |
| E. | Line 9700 – Remove two 38 kV wood dead end poles located outside the substation and install two new steel 38 kV poles in the same location with concrete foundations. Build and install underground feed to connect to the 38 kV GIS. |

IT/Telecom System & SCADA:

| A. | Install telecom system and SCADA system inside the new control building. |
| B. | Install an 100ft self-supported communication antenna with a safety grated waveguide. |
| C. | Install conduits and new underground fiber optic cables from existing manholes to the telecom equipment inside the new control building and to the telecom antenna. |
| D. | Install battery bank (48 VDC) inside the new control building. |

**Total Project Estimate: $17,571,074.08**

**Architectural & Engineering Services Deduction (Project 335168 - FAASt A&E PREPA): -$1,211,174.91**

**Work to be Completed Total: $16,359,899.17**

**Project Notes**

1. The Applicant has identified 406 Hazard Mitigation (HM) opportunities as described in document: *10000-CP-SOW-0001Rev2.pdf* and related Appendices. HM can review this document for consideration based on applicable policies and guidelines. The Applicant has also stated the following: "*A Benefit Cost Analysis will be performed and submitted to FEMA to demonstrates the future risk reduction benefits to reduce or eliminate the long-term risk to life and property from hazard events and compares those benefits to its costs. FEMA requires the Cataño Substation equipment to be elevated to the 500-year ABFE guidelines. LUMA will require confirmation from FEMA that all costs associated with the elevation of all Cataño Substation equipment will be covered under the 406 Hazard Mitigation Grant Program otherwise LUMA may be required to remove the elevation design from the project scope. Delays in the receipt of confirmation from FEMA may delay the project schedule.*"
2. The zip code for the subject facility is 00962, as provided by the PDMG on 21-Dec-2021.
3. WTBC costs were obtained from Applicant provided document: *Appendix M - Cataño Cost Estimate.pdf*, as applicable for the 428 SOW portion of the estimate (no 406 HM). Document was later revised into *Appendix M - Cataño Cost Estimate - Rev. 4.1.2022.xlsx*.
4. Any claim or disbursement related to Engineering or Architecture (A&E) services for this project must be claimed/disbursed from Project 335168, which was prepared to cover A&E expenses related to this Applicants FAASt Projects. The A/E funds for the amount of $1,211,174.91 have been calculated for this project, however, the actual A&E costs will be claimed in GM project #335168. This dollar

2023-FEFO-00323-000056

**JA_150**

amount will be included in this project with a negative dollar amount, to avoid duplicity of funds.

## 406 HMP Scope

Project number:  174422

Damage #442268; Catano Rebuilt 1801

Applicant: PR Electric Power Authority (000-UA2QU-00)

Location:  Carr 5, Km 27.0, Barrio Canas, Catano, Puerto Rico

GPS Latitude/Longitude: Start: 18.423513, -66.140299

Hazard Mitigation Narrative

During the incident period from September 17, 2017, to November 15, 2017, the Commonwealth of Puerto Rico experienced hurricane-force winds, heavy rain, flooding and power outage from Hurricane Maria. The incident caused damage to the electrical system, such as power generation plants, transmission and distribution lines, substations, communication systems, buildings, among other damages to the infrastructures owned, operated, and maintained by the Puerto Rico Electric Power Authority (PREPA).

The Cataño Substation1801 was built approximately in 1960 and is located in the Municipality of Cataño Puerto Rico. The facility is a 38KV/13.2KV substation with a 12MVA transformer feeding a modular enclosed metal clad switchgear suppling six 13.2KV distribution circuits. The 38KV switch structure has eleven air breaker switches, two gas insulated switches, four oil insulated switches, six PTs, fifteen arrestors and one support structure. This substation is supported by a control building, electro-mechanical protection relays, SCADA, battery bank, battery charger, communications, and a remote transformer. According to the information provided by the Applicant, due to the high velocity hurricane winds and prolonged heavy rain (flooding), were the main cause of the damages of the facility.

System Approach:

As per most updated ABFE Maps, the Cataño Substation 1801 is now located in a Special Flood Hazard Area (SFHA) Zone A (formerly located on a Zone X). The recommended guides stated essential facilities (Flood Design Class 4) must be elevated or protected to the base flood elevation (BFE) + 2ft or 500-year flood elevation, whichever is higher. During Hurricane Maria the control room of the substation experienced flooding damage. As a Hazard Mitigation measure the control room will be elevated 2 ft above BFE. Nevertheless, by Mitigating only this portion of the substation, the risk to the functionality of the substation facility will not be significantly reduced because critical components such as the transformers, breakers and the switchgear continue to be exposed to the flood hazard. In order to ensure continue future operation of the facility and to protect federal investments, is proposing to mitigate the risk by elevating the Control Room and the other critical components of the substations. Note: The components of the substation operate as a system and are interdependent. If one component fails, the function of the substation will be compromised resulting in the interruption of the substation causing lack of power to the customers (loss of function of the substation).

Floodplain Evaluation:

Before Hurricane Maria, according to the Flood Insurance Rate Map (FIRM), the Cataño Substation 1801 was located in a Zone X, which is a zone with a minimum or moderate flood risk. After Hurricane Maria, the Government of PR adopted the Advisory Base Flood Elevation Maps (ABFE) to determine if a facility is within a Special Flood Hazard Area (SFHA). The Policy states that the most restrictive map (FIRM or ABFE) is to be used to determine flood zone for any particular site, that in this case, is the ABFE map labeled it in Zone A. A request to determine the base flood elevation (BFE) was requested to FEMA Floodplain Management Specialist, which determined that the (BFE) + 2 ft or 500-year flood elevation for the Cataño Substation is 3.7 meters (6.8 meters - 3.1 meters) above the existing floor elevation (EFE). According to the PA Site Inspection Report, the only flood damaged was 6 inches of flooding in the control room. Although, since the other substation components were not damaged by flooding, the Applicant requested FEMA to evaluate the substation as a system.  As indicated before, a System Approach analysis was granted, which

2023-FEFO-00323-000057

**JA_151**

means that whole critical components (damaged and undamaged elements) will be elevated 2 feet above BFE to avoid any future damage and loss of function.

Improved Project:

The mitigation strategy for future damages at Cataño Substation 1801 is accomplished by replacing the previously flooded control building with an elevated control building structure, from 1 ft or 100-year above BFE flood elevation (PA MOR) to 2 ft or 500-year above BFE flood elevation. The existing 38KV air insulated equipment, 13.2KV power distribution switchgear and 38KV/13.2KV transformer do not meet the new ABFE guidelines and are also required to be elevated. The improved project Scope of Work (SOW) incorporates new 38KV switchgear equipment, new 13.2KV switchgear equipment, telecom equipment, batteries and protection equipment and all associated equipment as part of the integrated control building. The proposed mitigation approach elevates all critical interdependent equipment to the (BFE) + 2ft or 500-year flood elevation and includes the integration of a Substation Automation System, and enhanced SCADA technology.

<u>Hazard Mitigation Proposal (HMP) Scope of Work:</u>

In order to prevent or reduce future damages from similar events, the applicant proposed the following mitigation measures:

Mitigation Measures *(Supplement)*

1. To avoid damage in a future flood event, the Applicant is proposing as a mitigation measure, an improved project that includes the elevation of the substation above (BFE) + 2ft or 500-year flood (3.7m) and the consolidation of all substation equipment into an enclosed elevated integrated control building that is a more cost-effective solution than rebuilding and elevating the existing 38KV air insulated equipment and 13.2KV power distribution switchgear in their existing configuration. This fact will reduce the footprint of the substation and will reduce the cost in comparison to elevate the existing "in-kind" substation. On the elevated platform (elevated integrated control building), the Applicant will install the new 38KV switchgear equipment, new 13.2KV switchgear equipment, telecommunication equipment, batteries and protection equipment and all associated components.
2. On the damaged perimeter chain-link industrial fence (Ga. 6 mesh, schedule 40 post and 3-line barbed wires), change from 10 ft on center to 8 ft on center, bury posts 3 ft deep instead of 2 ft deep and change posts from 2-inch diameter to 3-inch diameter for a 10 ft fence.

   **Note:** After a rigorous analysis and consultation with PA and HM advisors, <u>the following items were not included as 406 Mitigation measures</u>:

   1. Power Generator - Not available in pre-disaster condition.

   2. Batteries - Not PA eligible damage.

   3. SCADA and Communication Equipment – Included in the PA Method of Repair (MOR).

Net Cost of 406 HMP per DI: <u>$3,145,301.54</u>

Cost of 406 HMP w/factors: <u>$6,895,149.77</u>

**Project BCR (Benefit Cost Ratio):**

BCR = (Total Hazard Mitigation Benefits / Total Hazard Mitigation Project Cost)

BCR = ($20.347,710.00 / $7,585,187.00) = 2.68

The FEMA BCA tool is utilized in determining the benefit, which is the present value of the sum of the expected annual avoided damages of all the mitigation actions or damage inventories over the project useful life, and the dollar amount is compared with the

2023-FEFO-00323-000058

JA_152

total mitigation cost to obtain the benefit cost ratio (BCR). A project is considered cost-effective when the BCR is equal to or greater than (1).

*See Mitigation Profile Documents Tab for complete version of this HMP and supporting documents.

*Due to GM system constraints in the Mitigation Profile Cost Tab, there may be a discrepancy in the total dollar amount of the mitigation proposal (or, the cost effectiveness statement) cited in the Cost Tab of the project(s). Whenever a difference between the Mitigation Cost Tab and the completed HMP cost occurs, the correct dollar amount of the grant proposal will default to the amount of 406 funding cited on the actual HMP document (and the Cost Summary Spreadsheet) uploaded into the Mitigation Profile Documents Tab.

2023-FEFO-00323-000059

**JA_153**

## Cost

| Code | Quantity | Unit | Total Cost | Section |
|---|---|---|---|---|
| 3510 (Engineering And Design Services (A&E Deduction from Project 335168 - FAASt A&E PREPA)) | 1.00 | Lump Sum | ($1,211,174.91) | Completed |
| 9201 (PAAP Fixed Estimate (No Value - Tracking Purposes Only)) | 1.00 | Lump Sum | $0.00 | Completed |
| 9001 (Estimated Budget for Construction & Procurement (FAASt Project 136271)) | 1.00 | Lump Sum | $17,571,074.08 | Uncompleted |

| | |
|---|---|
| CRC Gross Cost | $16,359,899.17 |
| Total 406 HMP Cost | $6,895,149.77 |
| Total Insurance Reductions | $0.00 |
| CRC Net Cost | $23,255,048.94 |
| Federal Share (90.00%) | $20,929,544.05 |
| Non-Federal Share (10.00%) | $2,325,504.89 |

2023-FEFO-00323-000060

**JA_154**

## Award Information

### Version Information

| Version # | Eligibility Status | Current Location | Bundle Number | Project Amount | Cost Share | Federal Share Obligated | Date Obligated |
|---|---|---|---|---|---|---|---|
| 0 | Eligible | Awarded | PA-02-PR-4339-PW-10496(11743) | $23,255,048.94 | 90 % | $20,929,544.05 | 5/17/2022 |

### Drawdown History

| EMMIE Drawdown Status As of Date | IFMIS Obligation # | Expenditure Number | Expended Date | Expended Amount |
|---|---|---|---|---|
| 11/18/2022 | 4339DRPRP00104961 | 20172XGZ-11172022 | 11/16/2022 | $5,232,386.01 |

### Obligation History

| Version # | Date Obligated | Obligated Cost | Cost Share | IFMIS Status | IFMIS Obligation # |
|---|---|---|---|---|---|

2023-FEFO-00323-000061

JA_155

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

COMITÉ DIALOGO AMBIENTAL, INC.
   *et al.,*

             Plaintiffs,

      v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY, *et al.*,

             Defendants.

Civil Action No. 3:24-CV-01145-JAG

**SECOND DECLARATION OF VICTOR ALVARADO GUZMÁN**

I, Victor Alvarado Guzmán, do hereby declare as follows:

1. I prepared an earlier declaration submitted with Plaintiffs' motion for summary judgment in this case. In Paragraph 4 of that declaration, I referred to my concerns with the thermoelectric plant in Aguirre and a separate coal plant in Guayama. This declaration provides further details on the harms to me and my community from the Aguirre Power Plant in particular. It is my understanding that this Aguirre Plant is being repaired with FEMA funding being provided under the National Environmental Policy Act coverage of one of the Programmatic Environmental Assessments at issue here.

2. The Aguirre Power Plant is an enormous facility located at the southern end of Salinas, on the coast and near the Bahia de Jobos (Bay of Wolves). It has huge tanks and a big chimney we can see from the outside. It burns oil to make electricity.

1

3.      The Power Plant is adjacent to the community, and makes a loud noise at all times which is always disturbing to those nearby. We can also often see smoke coming out of the chimneys. I am concerned about the local air pollution from the smoke the facility sends over our community, which I breath along with the rest of my family and the entire community.

4.      For a while during the pandemic there was also a terrible metallic smell that we thought might be coming from the Aguirre Power Plant.

5.      The Power Plant also uses enormous quantities of water from the Bay to keep cool. That water is then returned as heated water to the Bay, where it threatens marine life. After the Plant violated requirements for how hot the water could be when discharged back to the Bay, the authorities raised the permissible temperature. I am concerned about the impacts of this heated water on marine biology and ecosystems. I am also concerned about the health of the fish we catch from the Bay because of the heated water and the possibility of pollution from the Power Plant, which is very near to the water. This also harms the fishermen in our community, who rely on the bay for their livelihood.

6.      Public stories suggest the Power Plant is nearing the end of its life and is set for retirement in a few years. If FEMA were to invest in rooftop solar and storage, instead of in temporary repairs to the Power Plant, it might be able to come out of service faster and I and my community could stop suffering from the noise, air, and heat pollution it produces sooner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of November, 2024.

_____
Victor Alvarado Guzmán

2

**JA_157**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

COMITÉ DIALOGO AMBIENTAL, INC.

Plaintiffs,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY,        ,

Defendants.

Civil Action No. 3:24-CV-01145-JAG

**DECLARATION OF LISSETTE A  ILES R  OS**

I, Lissette-Aviles Ríos, do hereby declare as follows:

1.      I have personal knowledge of the following and could competently testify thereto if called as a witness

2.      I live on Ocean Drive in Cataño, Puerto Rico, and have lived here since 1999.

3.      I am a Dominican sister of Santa Cruz, and a member of El Puente. I am also a marine biologist with a degree from Puerto Rico University Humacao.

4.      Within the diocese I am responsible for ecological issues, and especially issues around climate change. I work with the Comit  de Fe de el Puente Puerto Rico, the El Puente Committee of Faith, on these matters. I am also the Archbishop s delegate in ecological pastoral matters.

5.      In all this work I address climate change from different dimensions. For example, I collaborate and support campaigns about climate change, provide orientations and work on

1

**JA_158**

projects at the Parish level on climate change and mitigation issues, and represent our Bishop in everything with ecological matters.

6.     I am submitting this declaration to discuss the Cataño Substation in Cataño. It is my understanding that this Substation is being repaired with FEMA funding provided under the National Environmental Policy Act coverage of one of the Programmatic Environmental Assessments at issue here.

7.     I am familiar with this substation, which is connected to transmission lines. The substation is located in one of the main entries to the town of Cataño. It is located in an area that frequently floods and is not far from a lagoon behind the industrial area. It is also near several roadways and two gas stations, and there is an emergency room nearby. If there were any kind of explosion there, even if small, it could disturb transit, impact these facilities, and also effect the nearby entrance to the Vegas sector.

8.     Much of Cataño is below sea level. With the increasing storms and hurricanes we are seeing due to climate change, we must do everything we can to increase the areas where soil can absorb excess water. Too much of the area near the Cataño substation is paved with cement and other impermeable surfaces. If this substation were taken offline, I would hope the area could be restored and become an area where water could drain. This might help with residential flooding in the area.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20 day of November, 2024.

Lissette Aviles Ríos

2

**JA_159**








# Puerto Rico Energy System Recovery and Resilience Advisory Group

# Initial Scenario Discussion

Virtual Meeting

March 31, 2022, 2:00-4:00 p.m. AST

This Presentation is for Advisory Group Use Only - Please Do Not Distribute

AR_0000596

**JA_160**

# Agenda

| | | |
|---|---|---|
| **1** | Welcome, Agenda, and Updates (10 mins) | |
| **2** | Scenario Generation Overview (20 mins) | |
| **3** | Breakout Groups, Part 1 (25 mins) | |
| **4** | Break (5 mins) | |
| **5** | Example Scenarios (15 mins) | |
| **6** | Breakout Groups, Part 2 (25 mins) | |
| **7** | Discussion and Q&A (15 mins) | |
| **8** | Next Steps and Adjourn (5 mins) | |

2

AR_0000597

# Welcome

## Housekeeping

- Please mute if you are not speaking
- Raise your hand if you'd like to speak up
- Use Chat to provide input or ask questions
- Consider editing your name in Zoom to add your organization name or acronym

## Objectives

- Provide overview scenario generation and modeling approach for PR100 Study and present example scenarios
- Discuss Advisory Group member priorities regarding scenario tradeoffs and themes



**To edit your name in Zoom (desktop):**

1. Select Participants in bottom toolbar.
2. In Participants panel, hover over your name and click More.
3. Click Rename.
4. Add your affiliation to your name and click Change.

3

AR_0000598

**JA_162**

# Advisory Group Updates

- Welcome new members!
- <u>Registration Form</u> responses – thank you and we hear you!
  - Proposed meeting schedule and platform based on preferences (even split between Teams and Zoom)
  - English/ Spanish translation and interpretation will be provided for future meetings
  - Remuneration approach in development
  - Mobilize is coming! Registration link to follow
- Meeting materials and other documents in this <u>Puerto Rico Energy Planning Advisory Group folder</u> on Box

4

AR_0000599

**JA_163**

# Advisory Group Members – by organization
## (75 confirmed members as of 3/30/22) (slide 1 of 2)

| Name | Organization |
|---|---|
| Advanced Energy Group (AEG) | HG Chissell |
| AES Puerto Rico | Obed Santos |
| Association of Consultants and Contractors of Renewable Energy of Puerto Rico (ACONER) | Gabriel Perez |
| | Lourdes Marcano |
| | Saul Gonzalez |
| CAMBIO | Cathy Kunkel |
| | Ingrid Vila Biaggi |
| Center for Puerto Rican Studies, Hunter College, City University of New York (CUNY) | Carlos Vargas-Ramos |
| | Jennifer Hinojosa |
| Central Office for Recovery, Reconstruction and Resiliency (COR3) | Jesus Cintron |
| | Manuel Carretero |
| | Yan Oquendo |
| Clinica de Derecho Ambiental, Universidad Interamericana | Veronica Gonzalez |
| College of Architects and Landscape Architects of Puerto Rico (CAAPPR) | Cristina Algaze |
| | Fernando Abruña |
| Community Lawyer | Ruth Santiago |
| Consultant | Angel David Rodriguez |
| Cooperativa Hidroeléctrica de la Montaña | C.P. Smith |

| Name | Organization |
|---|---|
| Crowley | Jose Maeso |
| EcoElectrica | Carlos Reyes |
| El Puente | Marissa Reyes Díaz |
| El Puente ELAC Puerto Rico / Comunidad Sabana | Rev. Dr. Sary N. Rosario-Ferreira |
| Electric Power Research Institute (EPRI) | Arindam Maitra |
| Energy Futures Group | Anna Sommer |
| Federal Emergency Management Agency (FEMA) | Andres Garcia Martino |
| | Antonio Busquets Lopez |
| | Israel Martinez Santiago |
| Georgia Institute of Technology | Santiago Grijalva |
| Hispanic Federation Puerto Rico | Jonathan Castillo Polanco |
| | Maritere Padilla |
| U.S. Department of Housing and Urban Development (HUD) | Crystal A. Bergemann |
| | Michael Freedberg |
| | Mike Blanford |
| Institute for Building Technology and Safety (IBTS) | Chris Fennell |
| Institute of Competitiveness and Economic Sustainability (ICSE-PR) | Ramon A Sanchez |
| Interstate Renewable Energy Council (IREC) | Carlos Alberto Velázquez |
| | Loraima Jaramillo-Nieves |

AR_0000600

# Advisory Group Members – by organization
## (75 confirmed members as of 3/30/22) (slide 2 of 2)

| Name | Organization |
|---|---|
| LND Technical Services | Alex Echeverria |
| LUMA | Alex Nassif |
| | Michael Mount |
| | Veronika Rabl |
| Municipal Revenue Collection Center (Centro de Recaudacion de Ingresos Municipales (CRIM)) | Julian Bayne, Esq |
| NASA | Edil Sepúlveda Carlo |
| Northeastern University | Jennie Stephens |
| | Laura Kuhl |
| Puerto Rico Builders Association | Alfredo Martínez-Álvarez |
| Puerto Rico Department of Economic Development and Commerce (DDEC) Public Energy Policy Program (PPE) | Carlos R Tejera |
| | Edwin Acevedo |
| Puerto Rico Department of Economic Development and Commerce (DDEC) Puerto Rico Industrial Company (PRIDCO) | Luis Negrón Bonilla |
| Puerto Rico Department of Housing (Vivienda) | Ivelisse M. Martinez-Sanchez |
| | Shirley Birriel Osorio |
| Puerto Rico Electric Power Authority (PREPA) | Jaime A. Umpierre Montalvo |
| | Lourdes Lugo Guzmán |
| | Suheil M. Acevedo Serrano |
| Puerto Rico Energy Bureau (PREB) | Ferdinand Ramos-Soeggard |
| | Lillian Mateo Santos |
| | Ricardo Carrión-Abril, PE |

| Name | Organization |
|---|---|
| Puerto Rico Energy Center (PREC) at Ana G. Mendez – Gurabo University (UAGM-Gurabo) | Amaury Malave |
| Puerto Rico Independent Office of Consumer Protection (OIPC) | Gerardo Cosme Núñez |
| | Pedro Vázquez Meléndez |
| Rocky Mountain Institute (RMI) | Roy Torbert |
| Sierra Club, Puerto Rican Chapter | Adriana González |
| Solar and Energy Storage Association of PR (SESA-PR) | Javier Rua |
| | PJ Wilson |
| Synapse | Bob Fagan |
| The Nature Conservancy | Alberto Mercado |
| U.S. Department of Energy, Loan Programs Office | Michael Grimm |
| University of Puerto Rico | David R Sotomayor Ramirez |
| University of Puerto Rico Mayaguez, Electrical and Computer Engineering Department | Agustín Alexi Irizarry-Rivera |
| | Marcel J. Castro Sitiriche |
| University of Puerto Rico Resiliency Law Center | Adi Martínez-Román |
| University of Texas Rio Grande Valley | Cecilio Ortiz Garcia |
| | Marla Perez-Lugo |
| ViequesLove | Mark P. Martin-Bras |
| Windmar | Victor Luis Gonzalez |

6

AR_0000601

**JA_165**

# Proposed Meeting Schedule

- Upcoming remote and hybrid meeting dates in 2022
  - Thurs, April 28 (remote)
  - Week of May 23 (date TBD, hybrid)
  - Thurs, June 23 (remote)
  - Tues, July 12 (hybrid)
  - Thurs, September 22 (remote)
  - Thurs, October 20 (remote)
  - Thurs, December 15 (hybrid)

- Will send calendar invites through end of year; schedule with tentative topics to follow

7

AR_0000602

# Background Materials

- PR100 Public Launch webinar recording and published slide deck
- PR100 Study webpage and PR100 Overview slide deck
- Project overview
  - DOE webpage: Puerto Rico Energy Recovery and Resilience
  - NREL webpage: Multilab Energy Planning Support for Puerto Rico
- Email updates from DOE
  - Sign up at DOE Office of Electricity Email Updates (under Subscription Topics choose "Puerto Rico Resilience Efforts")



AR_0000603

**JA_167**

# PR100 Study

PR100 is a comprehensive analysis of stakeholder-driven pathways for Puerto Rico to achieve its goal of 100% renewable energy by 2050.

## Key Activities

- Community Engagement
- Scenario Generation and Modeling
  - Demand Projections
  - Distributed and Central Generation
- Impact Analysis

## Key Considerations

- Energy Justice – Equitable Access to Planning Process and Benefits
- Affordability, Reliability, and Resilience
- Climate Risk Assessment
- Economic Impact and Jobs

AR_0000604

# Project Timeline



**6 Months** (by June 2022) **:**
- **Established stakeholder group** meets monthly to inform scenarios
- **Four initial scenarios** to achieve Puerto Rico's goals

**Year One** (by December 2022):
- **High-resolution data sets** for wind and solar resource for 10 years
- **Three feasible scenarios** with high-level pathways

**Year Two** (by December 2023):
- **Comprehensive report** and web-based visualizations
- **Outreach** and public engagement

Responsive Stakeholder Engagement and Energy Justice (Q1-Q8)

Data Gathering and Generation (Q1-Q4)

Scenario Generation and Capacity Evaluation (Q3-Q6)

Impact Modeling and Analysis (Q5-Q8)

Jan 22 · Feb 22 · Mar 22 · Apr 22 · May 22 · Jun 22 · Jul 22 · Aug 22 · Sept 22 · Oct 22 · Nov 22 · Dec 22 · Jan 23 · Feb 23 · Mar 23 · Apr 23 · May 23 · Jun 23 · Jul 23 · Aug 23 · Sept 23 · Oct 23 · Nov 23 · Dec 23

10

AR_0000605

**JA_169**

# Scenario Generation Overview

Nate Blair, NREL

Tom Harris, NREL

Matt Lave, Sandia

Marcelo Elizondo, PNNL

AR_0000606



## Scenario Modeling

- What is a scenario, and what does scenario modeling involve?

- How are we planning to incorporate multiple inputs to achieve 100% renewable energy?

12

AR_0000607

**JA_171**

# Scenario Modeling: What Is a Scenario?

**A scenario is a possible pathway toward a clean energy future driven by a set of inputs.**



**Variable Scenario Inputs (examples):**

**Energy Demand**
How will demand for electricity change over time?

- Economic inputs
- Expected energy efficiency and EV adoption
- Value of backup power

**Energy Supply**
How will demand be met with 100% renewable energy?

- Distributed solar and storage
- Large scale solar, wind, etc.
- Public Policy (like Act 17)
- Resiliency requirements
- Transmission cost

13

AR_0000608

**JA_172**

# Prior Scenarios Work – LA 100

Four key scenarios examining tradeoffs between:
- Compliance with CA law Senate Bill 100
- Transmission
- Electrification
- Biofuels

Each scenario was evaluated under different projections of customer electricity demand (moderate, high, or stress)



**SB100**

**Evaluated under** Moderate, High, and Stress **Load Electrification**

- 100% clean energy by **2045**
- Only scenario with a target based on retail sales, not generation
- Only scenario that allows up to 10% of the target to be natural gas offset by renewable electricity credits
- Allows existing nuclear and upgrades to transmission



**Early & No Biofuels**

**Evaluated under** Moderate **and** High **Load Electrification**

- 100% clean energy by **2035**, 10 years sooner than other scenarios
- No natural gas generation or biofuels
- Allows existing nuclear and upgrades to transmission



**Transmission Focus**

**Evaluated under** Moderate **and** High **Load Electrification**

- 100% clean energy by **2045**
- Only scenario that builds new transmission corridors
- No natural gas or nuclear generation



**Limited New Transmission**

**Evaluated under** Moderate **and** High **Load Electrification**

- 100% clean energy by **2045**
- Only scenario that does not allow upgrades to transmission beyond currently planned projects
- No natural gas or nuclear generation

## Three possible futures for customer electricity demand

| **Moderate** energy efficiency, electrification, and demand flexibility, e.g.: | **High** energy efficiency, electrification, and demand flexibility, e.g.: | **Stress** grid conditions—high electrification but low energy efficiency and demand flexibility: |
|---|---|---|
| • 30% of passenger cars on the road in 2045 are plug-in electric | • Appliances, heating within buildings switch from natural gas to electric | • All the electrification of High |
| • Residential building equipment and appliance sales are distributed across all efficiency levels | • Residential building equipment and appliance sales are at highest efficiency available | • But timing of demand is not aligned with renewable generation |
| • 80% of new & retrofit equipment is 5 years ahead of California's Title 24 commercial building energy-efficiency code-minimum | • 80% of passenger cars on the road in 2045 are plug-in electric | • Energy efficiency adoption is lower than Moderate (matches LADWP's 2017 Strategic Long-Term Resource Plan 10-year efficiency goals) |
| • 75% of residents have access to residential charging; 25% access to workplace charging | • 60% of residents have access to residential charging; 50% access to workplace charging to encourage more daytime charging | • 90% of residents have access to residential charging; 15% access to workplace charging to restrict daytime charging |
| | • Demand is more flexible in its timing | |

*Sources: LA100 Key Findings by Scenario, LA100: The Los Angeles 100% Renewable Energy Study Executive Summary*

14

AR_0000609

**JA_173**

# Prior Scenarios Work – Solar Futures Study

- The Solar Futures Study considers three future scenarios, two of which assume deep decarbonization of the electric grid and examines the role solar energy could play.

- Note this references the Electrification Futures Study which also has a scenario structure perhaps of interest.

**Table 1 - 1. *Solar Futures* Scenarios Definitions**

| Scenario Name | Renewable Energy and Storage Technologies | Demand Flexibility | Electricity Demand | Policies |
|---|---|---|---|---|
| Reference | Moderate cost reductions | None | U.S. Energy Information Administration Reference | Existing policies* as of June 2020 |
| Decarbonization (Decarb) | Advanced cost reductions | None | U.S. Energy Information Administration Reference | Existing policies* + 95% reduction in $CO_2$ emissions from 2005 levels by 2035, 100% by 2050 |
| Decarbonization with Electrification (Decarb+E) | Advanced cost reductions | Enhanced | High electrification based on NREL Electrification Futures Study | Existing policies* + 95% reduction in $CO_2$ emissions from 2005 levels by 2035, 100% by 2050 |

\* The existing policies assumed include state renewable and clean energy mandates, state and regional emissions limits, and federal tax incentives.

*Sources: DOE and NREL, Solar Futures Study; NREL, Electrification Futures Study*

15

AR_0000610

**JA_174**

# Prior Scenarios Work – NREL Standard Scenarios

- The Standard Scenarios are simulated using ReEDS and the dGen capacity expansion models and are updated each year.

- 50 scenarios are examined overall. The reference scenario (called the Mid-case) uses default or median assumptions.

- To examine decarbonized futures, the Mid-case is run with three levels of power sector decarbonization.
  - No new carbon policies
  - CO2 emissions decrease linearly to 95% below 2005 by 2050
  - CO2 emissions decline to 95% below 2005 levels by 2035 and are eliminated on a net basis by 2050.

- 16 sensitivity scenarios that incorporate factors such as fuel prices, demand growth, technology costs, and transmission and resource conditions.

*Source: NREL, Standard Scenarios*



AR_0000611

# Oahu (Hawaii): Offshore Wind vs PV Land Use

Oahu has:

- High energy consumption
- Limited land available and competing uses (agriculture, grazing, woodlands, farmsteads, real estate, residential...)
- Competing maritime uses and opposition to offshore wind

Visualization shows:

- Trade-off in land and maritime surface uses with 2045 100% electric sector sales from RE
- Left: no offshore wind, 2500MW PV
- Right: 1200MW offshore wind, 500MW solar

(land use by solar projected buildout from lowest to highest LCOE in non-excluded areas)



*Source: Scenarios developed using NREL's Engage model with visualizations based on NREL's Scenario Viewer and Data Downloader.*

17

AR_0000612

**JA_176**

# <u>Re</u>silience <u>N</u>ode <u>C</u>luster <u>A</u>nalysis <u>T</u>ool (ReNCAT)

ReNCAT uses a genetic algorithm to analyze the distribution system and determine optimal placement of microgrids to ensure critical services remain equitably available to the community during grid outages. A key feature of ReNCAT is <u>allowing difference scenarios mapping critical services to critical infrastructure.</u>



## Applications
ReNCAT Analysis has most notably been used for analyses in partnership with:

- Puerto Rico
- New Orleans, LA
- San Antonio, TX



Lead Researchers:
Amanda Wachtel, awachte@sandia.gov
Darryl Melander, djmelan@sandia.gov

Sandia National Laboratories is a multimission laboratory managed and operated by National Technology & Engineering Solutions of Sandia, LLC, a wholly owned subsidiary of Honeywell International Inc., for the U.S. Department of Energy's National Nuclear Security Administration under contract DE-NA0003525. SAND2021-8380M

AR_0000613

# Transmission Resilience Analysis





**EGRASS**



**DCAT**

National hurricane center data

Electrical Grid Resilience and Assessment System (EGRASS)
- Infrastructure probability of failure
- Monte Carlo generation of N-k sequences

Dynamic Contingency Analysis Tool (DCAT)
- Dynamic cascading failure analysis
- Vulnerability with multiple N-k sequences

- EGRASS-DCAT used for Puerto Rico
  - Resilience evaluation of new generation options
  - Resilience evaluation of underground versus overhead transmission
- DCAT also applied to Texas, Western, and Eastern Interconnections

19

AR_0000614

# Utility-Scale Solar PV Development Potential

NREL Analysis of Utility-Scale Solar PV Development Potential Found Greater Than 20 GW Total



*Sources: Grue at al. (2019), Solar Resource and Technical Potential Modeling (NREL Presentation); Grue et al. (2021), Quantifying the Solar Energy Resource for Puerto Rico (NREL Technical Report)*

20

AR_0000615

**JA_179**

# Residential Rooftop Solar Potential by County

Distributed PV resource exceeds 20 GW of capacity potential —which also exceeds the current generation in Puerto Rico.



*Sources: Visualization generated using NREL's Distributed Generation Market Demand (dGenTM) model; Residential rooftop solar PV potential for Puerto Rico from Mooney and Waechter (2020), Puerto Rico Low-to-Moderate Income Rooftop PV and Solar Savings Potential*

21

AR_0000616

**JA_180**

# Other Generation Options – consider changing to gen options we are pursuing



Land-based and offshore wind

Hydropower

Other potential options

AR_0000617

**JA_181**

# Demand Impacts

   

↔ The electric usage on the island from estimates in the 2019 IRP.

⬇ The electric usage will be <u>reduced</u> by energy efficiency improvements.

⬆ The electric usage will be <u>increased</u> by modeled electric vehicle adoption.

⬇ The electric usage will be <u>reduced</u> by adoption of distributed solar and storage.

↔ The remaining (net) electric usage <u>will be met</u> by large solar, wind and other RE sources.

23

AR_0000618

# Trade-offs to support decision-making

- System cost vs. Resilience
  - Expectation: Full resilience at the building level will be more expensive than larger plants with transmission

- System cost vs. Full RE goal
  - Expectation: It will be cheaper to get to 90% clean energy than 100%

- Local control vs. Lower cost (utility scale)

- Land use constraints vs. More large-scale renewables

- More jobs vs. Cheaper technology

24

AR_0000619

# Breakout Groups, Part 1

Identify Energy System Priorities and Themes

AR_0000620

**JA_184**

## Breakout Groups, Part 1

- Members will be randomly assigned to small groups
- Each group will have a facilitator and notetaker
- Discussion questions:
  - What are your priorities for Puerto Rico's energy future (resilience, preserving agricultural land, lower electricity cost, etc.)?
  - Can these priorities be grouped into common themes? What are the groupings or themes?

26

AR_0000621

# Ground Rules for Advisory Group Discussions

- When you speak, please start by sharing your name and affiliation. Consider changing your name in Zoom to add your full name and affiliation.

- Everyone is encouraged to participate. We may ask for comments from those we haven't heard from yet. You're welcome to pass!

- Step up, then step back. Please share your ideas, and then let others have an opportunity. We want to hear from you, but please take care not to dominate the conversation.

- Do your part to allow one person speak at a time. If many people want to speak, consider raising your hand so the facilitator can call on people in order.

- Engage in productive discussion. Listen carefully and show respect for other points of view. Ask questions to understand.

- Maintain confidentiality to help create a space where we can all share ideas freely and build trust with each other. Please do not share the content of these discussions outside of the Advisory Group, as well as documents, quotes, or recordings, unless the project team gives explicit permission to do so.

*Source: University of Minnesota Extension, Setting ground rules for productive discussions*

27

AR_0000622

**JA_186**



Example Scenarios

AR_0000623

JA_187

# Summary of Example Scenarios

- To initiate discussion and provide structure for input, the multi-lab team has generated several example scenarios

- One of the anticipated key trade-offs is distributed deployment vs. large scale deployment – resulting in three example scenarios

  - Electric System Least Cost Scenario
  - High Rooftop Generation Scenario
  - Resilient Community Services Scenario

29

AR_0000624

**JA_188**

# Characteristics of All Example Scenarios

- Resources (solar, wind, etc.) constrained to areas where construction is possible (not national parks, etc.)

- Scenarios will incorporate the Act 17 goal of 100% RE by 2050

- Scenarios will observe typical capacity reserves and other resilience requirements for energy and capacity for typical systems

- Scenarios will incorporate grid expansion (transmission and distribution) adequate to provide normal grid resilience levels.

- Technology costs will reflect current PR costs and decrease in the future aligned with anticipated technology trends (aligned with the NREL Annual Technology Baseline)

- At the transmission-scale, the modeling will install a mix of solar PV, land-based wind, hydro, other technologies based on the "lowest system cost" investment at that time

- All scenarios will incorporate load projections, energy efficiency, EV adoption and distributed PV+storage adoption (at potentially varying levels)

30

AR_0000625

# Electric System Least Cost Scenario

- "Least Cost" indicates the lowest total investment and operations cost through 2050 – will feed into customer rates

- Retire existing capacity as currently planned

- "Best guess" on load, EE, EV, distributed PV + storage

- Transmission-scale generation buildouts as determined by Engage

Note: Majority of renewable generation likely to be utility-scale based on investment cost.



AR_0000626

# High Rooftop Generation Scenario

- Impose high levels of distributed PV and storage on residential and commercial rooftops (similar to the Cambio study; see charts at right).

- Enforce a distributed generation growth trajectory (like a PV carve-out).

- This system configuration likely to have a higher electric system cost than the scenario with more utility-scale renewables (utility-scale generation typically much cheaper than distributed generation).

*Image Credit: CAMBIO and Institute for Energy Economics and Financial Analysis (IEEFA), We Want Sun and We Want More (March 2021)*



**Installed Capacity by Resource Type**



**Map of Simulated Solar Locations Across Puerto Rico**
(colored by region)

AR_0000627

# Resilient Community <u>Services</u> Scenario

- Focus on making commercial and industrial and gov. buildings resilient that provide services (police, medical, water treatment, water supply, community center, etc.) with adequate PV-storage.

- Modeling will deploy rooftop PV and mini-grids on those key buildings/resources as needed. Remainder of needed electric capacity will be utility-scale.

- Potential compromise scenario between central and more fully rooftop deployment.



Map of potential distributed microgrid locations

*Image Credit: Sandia, <u>Analysis of Microgrid Locations Benefitting Community Resilience for Puerto Rico</u>*

33

AR_0000628

**JA_192**

# Other Items Stakeholder Interaction Will Inform

- Geospatial exclusions
- Puerto Rico specific costs by technology
- Technology reaction
- Adoption rates of distributed generation
- Energy justice outputs and impacts
- Economic impacts
- Rate impacts

34

AR_0000629

**JA_193**

# Breakout Groups, Part 2

Discuss Prioritized Scenario Themes

AR_0000630

## Breakout Groups, Part 2

- Breakout groups will be organized by priority or theme. Choose a group based on your interest in the priority or theme (group name)
- Each group will have a facilitator and notetaker
- Discussion questions:
  - What are the components of this priority or theme? What needs to happen to achieve this energy future?
  - What trade-offs may be required to achieve this energy future?
  - What are the non-negotiables? What needs to be included (or not included) in all the possible energy futures?

36

AR_0000631

**JA_195**

## Further Discussion

What other comments or questions do you have for the project team?

- Unmute or write questions in the Chat

- We will answer in writing if we run out of time

37

AR_0000632

**JA_196**

# Next Steps and Adjourn

- Meeting follow-up
  - We'll send a follow-up form with additional questions and input on initial scenario generation – today was just a start to the conversation
  - Invitation to join Mobilize online community coming soon
  - Please complete Registration Form if you haven't already

- Next meeting date: Thursday, April 28, 2-4 pm AST. Tentative topics:
  - Example scenarios
  - Working groups
  - Data gathering
  - Energy justice

38

AR_0000633

**JA_197**

# Thank You!

www.nrel.gov







AR_0000634

AR_0002886

Programmatic Environmental Assessment

# Utility Repair, Replacement, and Realignment

## Commonwealth of Puerto Rico

DR-4339-PR

*August 2020*



**U.S. Department of Homeland Security**
**Federal Emergency Management Agency Region II**
Puerto Rico Joint Recovery Office
50 State Road 165
Guaynabo, PR 00968

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

APPENDICES ........................................................................................................... iv

LIST OF TABLES ...................................................................................................... iv

ACRONYMS AND ABBREVIATIONS ............................................................................. v

1.0 INTRODUCTION .................................................................................................. 8

2.0 PURPOSE AND NEED .......................................................................................... 9

3.0 PROJECT LOCATION AND BACKGROUND ............................................................. 10

4.0 ALTERNATIVES .................................................................................................. 11

    *4.1 Alternative 1: No Action Alternative* ............................................................... *11*
    *4.2 Alternative 2: Repair, Replacement, and Upgrade of Utilities* .............................. *12*
    *4.3 Alternative 3: Realignment or Relocation of Utilities* ......................................... *15*
    *4.4 Alternative 4: Combination of the Alternatives* ................................................. *17*

5.0 AFFECTED ENVIRONMENT AND POTENTIAL IMPACTS .......................................... 18

    5.1 GEOLOGY, TOPOGRAPHY, AND SOILS .............................................................. 19
        *5.1.1 Existing Conditions* ............................................................................. *19*
        *5.1.2 Potential Impacts and Proposed Mitigation* ............................................ *20*
    5.2 AIR QUALITY ................................................................................................ 21
        *5.2.1 Existing Conditions* ............................................................................. *23*
        *5.2.2 Potential Impacts and proposed Mitigation* ............................................ *24*
    5.3 WATER QUALITY/WATER RESOURCES .............................................................. 26
        *5.3.1 Existing Conditions* ............................................................................. *27*
        *5.3.2 Potential Impacts and Proposed Mitigation* ............................................ *30*
    5.4 WETLANDS .................................................................................................. 32
        *5.4.1 Existing Conditions* ............................................................................. *32*
        *5.4.2 Potential Impacts and Proposed Mitigation* ............................................ *33*
    5.5 FLOODPLAIN ................................................................................................ 34
        *5.5.1 Existing Conditions* ............................................................................. *35*
        *5.5.2 Potential Impacts and Proposed Mitigation* ............................................ *35*
    5.6 COASTAL RESOURCES ................................................................................... 36
        *5.6.1 Existing Conditions* ............................................................................. *37*
        *5.6.2 Potential Impacts and Proposed Mitigation* ............................................ *38*
    5.7 VEGETATION ............................................................................................... 39
        *5.7.1 Existing Conditions* ............................................................................. *39*
        *5.7.2 Potential Impacts and Proposed Mitigation* ............................................ *40*
    5.8 WILDLIFE AND FISH ...................................................................................... 41
        *5.8.1 Existing Conditions* ............................................................................. *41*

AR_0002887

**JA_200**

*5.8.2 Potential Impacts and Proposed Mitigation*......................................................................................*42*

5.9 THREATENED AND ENDANGERED SPECIES ................................................................................43

*5.9.1 Existing Conditions* .............................................................................................................*43*

*5.9.2 Potential Impacts and Proposed Mitigation*......................................................................*46*

5.10 CULTURAL RESOURCES...........................................................................................................47

*5.10.1 Historic (Standing) Structures* ...........................................................................................*48*

*5.10.2 Archaeological Resources*..................................................................................................*50*

5.11 ENVIRONMENTAL JUSTICE .....................................................................................................52

*5.11.1 Existing Conditions* .............................................................................................................*53*

*5.11.2 Potential Impacts and Proposed Mitigation*......................................................................*55*

5.12 LAND USE AND PLANNING......................................................................................................56

*5.12.1 Existing Conditions* .............................................................................................................*56*

*5.12.2 Potential Impacts and Proposed Mitigation*......................................................................*57*

5.13 NOISE ....................................................................................................................................58

*5.13.1 Existing Conditions* .............................................................................................................*59*

*5.13.2 Potential Impacts and Proposed Mitigation*......................................................................*60*

5.14 TRANSPORTATION .................................................................................................................60

*5.14.1 Existing Conditions* .............................................................................................................*61*

*5.14.2 Potential Impacts and Proposed Mitigation*......................................................................*61*

5.15 PUBLIC SERVICES AND UTILITIES............................................................................................62

*5.15.1 Existing Conditions* .............................................................................................................*62*

*5.15.2 Potential Impacts and Proposed Mitigation*......................................................................*63*

5.16 PUBLIC HEALTH AND SAFETY .................................................................................................65

*5.16.1 Existing Conditions* .............................................................................................................*65*

*5.16.2 Potential Impacts and Proposed Mitigation*......................................................................*66*

5.17 HAZARDOUS MATERIALS........................................................................................................68

*5.17.1 Existing Conditions* .............................................................................................................*70*

*5.17.2 Potential Impacts and Proposed Mitigation*......................................................................*71*

5.18 CUMULATIVE IMPACTS ..........................................................................................................73

*5.18.1 Summary of Cumulative Impacts* ........................................................................................*73*

6.0 PERMITS AND REQUIREMENTS ................................................................................. 76

7.0 AGENCY COORDINATION AND PUBLIC INVOLVEMENT ......................................... 79

8.0 LIST OF PREPARERS .................................................................................................... 80

9.0 REFERENCES ................................................................................................................ 81

APPENDIX A................................................................................................................................ 89

APPENDIX B ................................................................................................................................ 102

APPENDIX C ................................................................................................................................ 107

APPENDIX D................................................................................................................................ 114

AR_0002888

**JA_201**

## APPENDICES

APPENDIX A: Figures (Maps)

Figure 1: Puerto Rico Commonwealth Map                                                                90
Figure 2: Farmland Classification in Puerto Rico                                                      91
Figure 3: Clean Air Act Attainment and Non-Attainment Areas in Puerto Rico                            92
Figure 4: Water Resources Map of Puerto Rico                                                          93
Figure 5: Caribbean National Forest, Wild and Scenic Rivers Map                                       94
Figure 6: Flood Zone Map of Puerto Rico                                                               95
Figure 7: Undeveloped Coastal Barriers Map                                                            96
Figure 8: Critical Habitat Map of Puerto Rico                                                         97
Figure 9: Historic Properties included in the NRHP                                                    98
Figure 10: Rural Education Persons 25 Years and Older                                                 99
Figure 11: Urban Population and Education Attainment of Persons 25 and Older                         100
Figure 12: Land Cover of Puerto Rico                                                                 101

APPENDIX B: Summary of Potential Impacts

APPENDIX C: CZMA Consistency Resolution (JP-2018-324)

APPENDIX D: Habitat Characteristics of Endangered Species Act Terrestrial Species of Commonwealth of Puerto Rico

## LIST OF TABLES

Table 1: Impact Significance and Context Evaluation Criteria for Potential Impacts                    18
Table 2: Eliminated Resource Topics                                                                  19
Table 3: Current Nonattainment and Maintenance Areas                                                 23
Table 4: Terrestrial-based Federally ESA Listed Threatened & Endangered Species                      43
Table 5: Land Cover of Puerto Rico                                                                   57

AR_0002889

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| APE | Area of Potential Effects |
| BCE | Before the Common Era |
| BFE | Base Flood Elevation |
| BMP | Best Management Practice |
| CAA | Clean Air Act |
| CBRA | Coastal Barrier Resources Act |
| CBRS | Coastal Barrier Resources System |
| CE | Common Era |
| CEQ | Council of Environmental Quality |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| COC | Communities of Concern |
| COR3 | Central Office of Recovery, Reconstruction and Resiliency |
| CWA | Clean Water Act |
| CZMA | Coastal Zone Management Act |
| dB | Decibels |
| dBA | Decibels (weighted) |
| DCH | Designated Critical Habitat |
| DNL | Day Night Average Sound Level (aka Ldn) |
| EA | Environmental Assessment |
| EJ | Environmental Justice |
| EO | Executive Order |
| ESA | Endangered Species Act |
| FCC | Federal Communications Commission |
| FEMA | Federal Emergency Management Agency |
| FHWA | Federal Highway Administration |
| FIRM | Flood Insurance Rate Map |
| FONSI | Finding of No Significant Impact |
| FPPA | Farmland Protection Policy Act |
| Ft | Feet |
| HMGP | Hazard Mitigation Grant Program |
| HUD | US Department of Housing and Urban Development |
| IPaC | Information for Planning and Consultation |
| Km | Kilometers |
| Leq | Equivalent Noise Level |
| LNG | Liquified Natural Gas |
| M | Meters |
| MBTA | Migratory Bird Treaty Act |
| Mi | Miles |
| MTA | Maritime Transport Authority |

v

AR_0002890

| | |
|---|---|
| MOT | Maintenance of Traffic |
| MRLC | Multi Resolution Land Characteristic Consortium |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NFIP | National Flood Insurance Program |
| NHPA | National Historic Preservation Act |
| NLCD | National Land Cover Database |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic Atmospheric Association |
| NPDES | National Pollutant Discharge Elimination System |
| NPL | National Priorities List |
| NPS | National Park Service |
| NRCS | Natural Resource Conservation Service |
| NRHP | National Register of Historic Places |
| OPA | Otherwise Protected Areas |
| OSHA | Occupational Health and Safety Administration |
| PCB | Polychlorinated biphenyls |
| PEA | Programmatic Environmental Assessment |
| PPE | Personal Protective Equipment |
| PRASA | Puerto Rico Aqueduct and Sewer Authority |
| PRCZMP | Puerto Rico Coastal Zone Management Plan |
| PRDLHRBLS | Department of Labor and Human Resources, Bureau of Labor Statistics |
| PRDNER | Puerto Rico Department of Natural and Environment Resources |
| PRDTOP | Puerto Rico Department of Transportation and Public Works |
| PREPA | Puerto Rico Electric and Power Authority |
| PREQB | Puerto Rico Environmental Quality Board |
| PRHTA | Puerto Rico Highway and Transportation Authority |
| PRPB | Puerto Rico Planning Board |
| PRSN | Puerto Rico Seismic Survey |
| RCRA | Resource Conservation and Recovery Act |
| REC | Record of Environmental Consideration |
| RHA | Rivers and Harbors Act |
| ROW | Right of Way |
| SDWA | Safe Drinking Water Act |
| SEA | Supplemental Environmental Assessment |
| SHPO | State Historic Preservation Office |
| SIP | State Implementation Plan |
| SPCC | Spill Control and Countermeasure Plan |
| SPL | Sound Pressure Level |
| SSA | Sole Source Aquifer |
| SWPPP | Stormwater Pollution Prevention Plan |
| T&E | Threatened and Endangered |
| USACE | United States Army Corps of Engineers |

AR_0002891

| | |
|---|---|
| USC | United States Code |
| USCG | United States Coast Guard |
| USDA | United States Department of Agriculture |
| USDOE | United States Department of Energy |
| USDHS | United States Department of Homeland Security |
| USDOT | United States Department of Transportation |
| USEDA | United State Economic Development Agency |
| USEPA | United States Environmental Protection Agency |
| USGS | United States Geological Survey |
| USFWS | United States Fish and Wildlife Service |
| WOTUS | Waters of the U.S. |
| WWTP | Waste Water Treatment Plant |

AR_0002892

# 1.0 INTRODUCTION

The mission of the Federal Emergency Management Agency (FEMA) is to reduce the loss of life and property and protect our institutions from all hazards by leading and supporting the nation in a comprehensive, risk-based emergency management program of mitigation, preparedness, response, and recovery. Beginning September 17, 2017, Hurricane Maria caused significant damages to Puerto Rico ("Commonwealth"). President Donald J. Trump issued a disaster declaration for Hurricane Maria on September 20, 2017 encompassing the entire territory. The declaration authorized federal public assistance to affected communities and certain non-profit organizations per FEMA, and in accordance with the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1974 (42 USC 5172) as amended; the Sandy Recovery Improvement Act (SRIA) of 2013; and the Bipartisan Budget Act of 2018 (Public Law 115-123). The Central Office of Recovery, Reconstruction and Resiliency (COR3) is the Applicant for FEMA grants and multiple agencies may be Subapplicant for specific projects.

This Programmatic Environmental Assessment (PEA) is prepared in accordance with Section 102 of the National Environmental Policy Act (NEPA) of 1969, as amended; and the Regulations for implementation of the NEPA (40 Code of Federal Regulations [CFR] Parts 1500 to 1508). The purpose of this PEA is to consider the potential environmental impacts of potential project alternatives, including a no action alternative, and to determine whether to prepare a Finding of No Significant Impact (FONSI) or an Environmental Impact Statement (EIS). In accordance with above referenced regulations, FEMA Directive 108-1, and FEMA Instruction 108-1-1, FEMA, during the decision-making process, evaluates and considers the environmental consequences of major federal actions it funds or undertakes.

If a proposed project meets the scope, impacts, and mitigation covered in this PEA, then FEMA will only prepare a record of environmental consideration (REC) as required, in addition to all applicable federal, state, and local consultations and permits. FEMA will prepare a REC for projects that meet FEMA's statutory or categorical exclusions that otherwise do not necessitate higher levels of NEPA review. If the scope of an action triggers additional analysis, FEMA will engage in the appropriate analysis or consultation requirement, prepare a REC, a tiered Environmental Assessment (EA), or Supplemental EA (SEA) under this PEA with the additional information.

8

AR_0002893

## 2.0 PURPOSE AND NEED

Hurricane Maria's wind, rain, and floodwater damaged many of the Commonwealth's utilities. The purpose of this action is to provide grant funding to restore damaged utilities and increase their resiliency for future weather events. Under the Stafford Act, FEMA has authority to provide funding for cost-effective hazard mitigation and resiliency measures for facilities damaged by Hurricane Maria. Additionally, FEMA is authorized to provide funding to eligible grant Applicants for cost-effective activities that have the purpose of reducing or eliminating risks to life and property from hazards and their effects. In addition, the Public Assistance Alternate Procedures provided by the Bipartisan Budget Act of 2018 along with Stafford Act sections 404 and 406 hazard mitigation encourage flexibility in recovery. Geography, climate, and demographic trends have led to the development of a complex infrastructure of utility systems across Puerto Rico. Aging infrastructure, the need for increased capacity, and damage due to disaster events all have the potential to limit the ability of these utility systems to function as designed. Failure of these systems can cause injury, loss of life, and environmental issues. For example, failing transmission lines may start fires or present an electrocution risk, or waste systems may discharge pollutants into waterways. Should utility systems fail, local governments may be unable to provide critical services including fire suppression, emergency communication, power generation, potable water, and wastewater treatment. Additionally, the lack of utilities such as electricity and water can be life-threatening for at-risk populations like the elderly, young, and the sick. In an effort to restore these services and/or mitigate these impacts, federal agencies led by FEMA may provide funds for utility system restoration, replacement, upgrade, expansion, redesign, or relocation.

The need for the action is to re-establish a safe and reliable network of utilities (through repair, replacement, or relocation) in order to reconnect the communities affected by the storm with safe and efficient delivery of energy, water, sewer service, and communications, and help reduce the potential for future damages by upgrading damaged utilities in accordance with current engineering codes and standards. The grant funding is necessary to address these concerns and reduce the damage and disruption caused by future disasters throughout the Commonwealth.

AR_0002894

# 3.0 PROJECT LOCATION AND BACKGROUND

Puerto Rico is the smallest of the Greater Antilles of the West Indies and consists of the main island of Puerto Rico and various smaller islands, including Vieques, Culebra (**Figure 1** in **Appendix A**), Mona, Desecheo, and Caja de Muertos. Of the smaller islands, only Culebra and Vieques have year-round inhabitants. The length of the main island from east to west is 180 kilometers (km) (112 miles [mi]) and is 65 km (40 mi) from north to south. The Commonwealth of Puerto Rico is comprised of its territorial ocean waters and has a combined land area of approximately 13,800 square (sq) km (5,328 square [sq] mi) including:

- Puerto Rico - 8,713 sq km (5,328 sq mi) (land mass only),

- Vieques is 132 sq km (51 sq mi),

- Culebra is 30 sq km (12 sq mi),

- Mona is 54 sq km (21 sq mi), and

- Territorial Waters: 4,921 sq km (1,900 sq mi) (Gómez-Gómez 2014).

The Commonwealth of Puerto Rico is made up of the following 78 municipalities:

*Adjuntas, Aguada, Aguadilla, Aguas Buenas, Aibonito, Anasco, Arecibo, Arroyo, Barceloneta, Barranquitas, Bayamón, Cabo Rojo, Caguas, Camuy, Canovanas, Carolina, Catano, Cayey, Ceiba, Ciales, Cidra, Coamo, Comerio, Corozal, Culebra, Dorado, Fajardo, Florida, Guanica, Guayama, Guayanilla, Guaynabo, Gurabo, Hatillo, Hormigueros, Humacao, Isabela, Jayuya, Juana Diaz, Juncos, Lajas, Lares, Las Marias, Las Piedras, Loiza, Luquillo, Manati, Maricao, Maunabo, Mayaguez, Moca, Morovis, Naguabo, Naranjito, Orocovis, Patillas, Penuelas, Ponce, Quebradillas, Rincon, Rio Grande, Sabana Grande, Salinas, San German, San Juan, San Lorenzo, San Sebastian, Santa Isabel, Toa Alta, Toa Baja, Trujillo Alto, Utuado, Vega Alta, Vega Baja, Vieques, Villabla, Yabucoa, and Yauco.*

Puerto Rico is mountainous with extensive coastal areas in the north and south. The main mountain range is called "La Cordillera Central" (The Central Range). There are a total of 5,385 mi of rivers and streams on the main island (USDI-NPS, 2019). The Association of State Dam Safety Officials in 2018 lists 37 dams in the National Dam Inventory in Puerto Rico and the 36 Commonwealth regulated dams are "High Hazard" dams meaning a dam's failure would cause loss of human life and significant property damage. Rivers in the northern region of the island are typically longer and with higher flow rates than those of the south, since the south receives less rain than the central and northern regions.

AR_0002895

## 4.0 ALTERNATIVES

FEMA is evaluating the following alternatives in this PEA to address the purpose and need. These alternatives represent classes of actions described below and implemented individually or in combination with one another. Additionally, potential scopes of work that would be detailed characteristic of the actions for each alternative in this section as well. Depending upon the recovery or mitigation action, FEMA may determine that there is only one viable option which fulfills the purpose and need. This evaluation is based upon engineering constraints, environmental impacts, and available property.

The utilities covered under this PEA are defined as: water storage facilities, water pump stations, treatment plants for potable water/wastewater and their delivery systems; supplemental power generation, transmission, and distribution facilities, including, but not limited to, wind turbines, solar farms, generators, substations, and power lines; natural gas transmission and distribution facilities; stormwater, sewage, and wastewater collection systems and treatment plants; and communication systems. Communication systems include cell towers, transmission lines, and towers which may have associated fiber optic lines attached to them or underground conduits with fiber optic. Various federal agencies may participate in funding the rebuild, upgrade, or repair of utilities. In accordance with the procedures documented in **Section 1** for implementing this PEA, utility projects that constitute a more substantive action such as a new sewer treatment facility may require a supplement analysis and a SEA to fully comply with NEPA.

For all Action Alternatives, a tiered EA or separate NEPA process may be required if an action's impacts on any resource cannot be mitigated to less than major impacts according to the scale in Section 5. Construction areas, including cleared staging areas and access roads that are greater than five acres for previously disturbed areas that require minimal clearing and up to two acres for undeveloped land requiring clearing, grubbing, or ground disturbance, would be considered on a case-by-case basis to avoid any major impacts to sensitive resources. If a proposed project exceeds the geographical constraints considered for this PEA, it can be evaluated by a FEMA approved specialist for the purpose of determining if its impacts are in alignment with what has been determined herein or if additional NEPA documentation is required.

### 4.1 Alternative 1: No Action Alternative

The Council of Environmental Quality (CEQ) regulations require an environmental analysis of the No Action Alternative to serve as a benchmark against the Action Alternatives. The CEQ defines the No Action Alternative as the environmental baseline conditions that would result if none of the other alternatives occurred. Under the No Action Alternative, FEMA would not provide grant funding and the local governments of Puerto Rico would have to fund permanent projects from other sources.

Selection of the No Action Alternative would simply maintain the existing conditions which would impact the Applicant's ability to address its infrastructure needs and mitigate potential hazards. Utilities stabilized with temporary, emergency measures would remain in their current state, but FEMA would not fund permanent repairs or improvements. The No Action Alternative does not meet the project's purpose and need, or objectives.

AR_0002896

## 4.2 Alternative 2: Repair, Replacement, and Upgrade of Utilities

This alternative applies to the repair, replacement, and upgrading of an existing utility within a maintained Right of Way (ROW) at an existing location. Standard actions including mobilizing construction equipment and materials to project sites, establishment of a staging area, and post-construction site restoration. Construction activities may entail using large cranes, excavators, dump trucks, jackhammers, skid-steer loaders, bulldozers, cement trucks, pickup trucks, and flatbed trucks. Potential actions may involve minor excavations, permanent access roads, placement of concrete footers and pads or fill material, and construction of a new facility at an existing site with ground disturbance up to five acres in previously disturbed areas and two acres in previously undisturbed areas. Non-recyclable waste material disposal will be at onshore facilities licensed by the Puerto Rico Environmental Quality Board (PREQB) to receive such materials. Existing disturbed sites, such as empty lots or maintained cleared areas, receive preference for staging areas, when available. During construction, temporary staging areas and access roads can be up to five acres for previously disturbed areas that require minimal clearing and up to two acres for undeveloped land requiring clearing, grubbing, or ground disturbance.

**Repair, Replacement, and Upgrading of Utility Lines**: Principle activities will involve replacing or hardening existing direct-embedded poles with enhanced support such as perimeter injected concrete grout or other soil stabilization methodologies; upgrading damaged poles, structures, insulators and hardware to a higher wind loading standard; strengthening utility poles with guy wires; and installation of underground power lines in select areas prone to damage by high winds. All activities may require maintenance or reconstruction of access to the utility structures if the disturbance is within the thresholds stated above. This alternative includes equipment upgrades only, not substantial deviations of footprint. Upgrading or rebuilding up to 20 linear miles of pipeline, transmission or distribution line, which may involve minor linear variations to accommodate current codes and standards if done within the previously developed road, pipeline, or powerline ROW, aligning with United States Department of Energy (USDOE) standards. The following are typical activities associated with utility line projects:

- **Utility Pole Installation**: New monopoles will be either pre-stress spun concrete poles or steel poles as required by current codes and standards to provide strength, durability, and long service life. Fiber optic lines may replace overhead ground wires or otherwise installed on electrical infrastructure along with their corresponding splice boxes. The installation of utility poles may require minor excavation of soil as poles will most likely involve placement in holes augured by auger rigs. Large steel monopoles will require concrete pours to anchor the base below ground as well as a concrete pad surrounding the base at ground level. The typical depth of utility pole installation may vary between 5 and 14 feet below land surface (PREPA 2000).

- **Trench Installation**: The placement of utilities and other utility-related equipment in trenches may require the excavation of soil and pavement. Underground lines will undergo installation in trenches. Based on PREPA's typical design standards for buried utilities, trenches may extend to a depth of 55 inches below land surface with widths of approximately 12 inches (PREPA 2000). Upon completion of placement of utilities in the trenches, the trenches will be backfilled, unless otherwise directed by licensed engineers. Associated actions may involve the maintenance of vegetation.

12

AR_0002897

- **Directionally-Drilled Installations:** Directional drilling methods utilize steerable drilling systems to install both small and large diameter lines. Typical hole diameter is between 1 inch to 5 inches along the proposed design centerline. Boring depth is dependent on-site conditions.

The Puerto Rico Energy and Power Authority (PREPA) has standard design requirements for both overhead transmission and distribution lines and underground transmission lines. The applicable ROW standard for overhead utilities involving the primary and secondary distribution of power is 10 feet. For the overhead transmission of power, the ROW width depends on the voltage of power transmitted and if the project is in a rural or urban area. The applicable ROW standards for overhead transmission of power are as follows:

- For ROW widths involving the transmission of 38 kilovolts (kV), the applicable standard is 25 feet in urban areas and 50 feet in rural area;

- ROW widths involving the transmission of 115 kilovolts (kV), the standard ranges from 30 to 40 feet in urban areas and 100 feet in rural areas;

- For ROW widths involving the transmission of 230 kilovolts (kV), the standard ranges from 40 to 60 feet in urban areas and 100 feet in rural areas; and

- Finally, ROW width standards for 345 kV is 50 to 70 feet for urban areas and 100 to 200 feet in rural areas (PREPA 2007).

- For the underground transmission of power, the ROW's vary between 20 feet for the lower voltages and 50 feet for the highest voltages (PREPA 2007).

**Hazard Mitigation for Power Generation and Substations**: Critical components of power generating stations, such as turbines and boilers are often located outside structures and in areas susceptible to weather, salt mist, and flooding. Power substations usually are comprised of a fenced outdoor yard containing switches, transformers, circuit breakers, capacity banks, control buildings, and other appurtenances. Standard activities include mobilization, establishment of a staging area, waste disposal, and post construction site restoration. Project areas will be cleared of vegetation and rock; and will be graded, graveled and secured with fencing. The site clearing and grading would occur prior to building new infrastructure. The gravel source would be from a local gravel quarry within the Commonwealth of Puerto Rico. The following are typical activities associated with the hardening of facilities that contain power generation or transmission and distribution:

- **Installation of Flood Barriers**: Associated activities will include installation of perimeter flood walls which may be comprised of either wire mesh-lined flood barriers or concrete walls. Associated actions may include the design of flood barriers using federal and local flood modeling.

- **Installation of High Capacity Pumps**: Complete with installation of redundant power sources, including onsite stand-by generation, and elevation of structures that may house various components of the power generation system or substation.

13

AR_0002898

**JA_211**

- **Reconstruction of communication systems**: Reconstruction of existing communication towers, access, sites, and control buildings. installation of fiber optic cable either on overhead utility structures or underground.

**Replacement of Stormwater, Potable Water, and Wastewater Systems**: Upgrades to potable water and wastewater systems will involve open cut trenching and replacement of existing pipes with right sized piping that meets current codes and standards. Associated activities may involve establishment of staging areas; removal of piping and pumps; installation of piping and pumps; and the disposal of old piping, broken pavements, and old pumps. Stormwater systems would include conduits, canals, water overflow ponds, trenches, and gutters, manholes, grates, and appurtenances. Site work may include surface grading, conduit replacements, trenching, concrete applications, cutting and resurfacing of pavement or curb and gutter, and hardware placement.

Standard activities include mobilization, establishment of a staging area, waste disposal, and post construction site restoration. Associated activities include electrical work and plumbing. The following are projects classes typical of Stormwater, Potable and Wastewater Conveyances:

- **Sewer System:** The installation specifications for modern sewer systems rely upon pipelines referred to as force mains and operate by a series of pumps and lift stations. The diameter of pipes used in the construction of force mains are typically between 2 and 36 inches. Although force main pipes installation is just below the land surface, trench dimensions will be are dependent on pipe diameter and site conditions (EPA 2000).

- **Potable Water:** Potable water lines are determined by site conditions and standards and codes. Potable water lines can vary greatly with typical lines being between a ½ inch and 12 inches. The installation of potable water pipes requires the excavation of trenches 2 meters wider than the diameter of the pipe (PRASA 1975). For instance, if a pipe has a one meter diameter, the total width of the trench would be 3 meters. Typically trench depth will be dependent on pipe size and site conditions as well as the anticipated loads on the pipe and the material constituent of that pipe. In areas where trucks are likely to drive over the system, the trench may have to be deeper or the pipe constructed out of more durable material.

- **Stormwater**: Upon reaching the main storm drainage system, stormwater conveyance is along and through the ROW to its discharge point via storm drains connected by access holes or other access structures. Some situations require stormwater pump stations also be a part of the conveyance system and temporary holding ponds to receive excessive water during an event. The installation of stormwater pipes requires the excavation of trenches 2 meters wider than the diameter of the pipe (PRASA 1975). Stormwater pipes can vary between 4 and 60 inches in size. Trench depth would be dependent on pipe size, material, and site conditions. In areas where trucks are likely to drive over the system, the trench depth may be deeper, or the pipe constructed out of more durable material.

**Pump Stations and Wastewater Treatment Facilities:** Wastewater systems include collection sewers, pump stations and treatment facilities. This PEA considers ground disturbance for pump stations and treatment facilities up to five acres. There are two basic stages in the treatment of wastes, primary and secondary, outlined here. In the primary stage, solids are allowed to settle and removed from wastewater. The secondary stage uses biological processes to further purify

14

AR_0002899

**JA_212**

wastewater. The primary activity will be the upgrading of pumps and associated piping. The following are typical scopes of work for projects occurring at pump stations and wastewater treatment facilities:

- **Replacement of Pumps and Associated Piping:** This activity will include the removal and disposal of old pumps and piping, installation of pumps and piping that meet current codes and standards, installation of electrical and control systems, and backup power supplies.

- **Upgrade of Primary and Secondary Treatment:** This includes the addition of advanced treatment techniques that would allow purified effluent use in industrial, agricultural, and recreational purposes, and for drinking water.

- **Facility Hardening:** Associated activities will involve raising equipment to elevation above the base flood elevation (BFE), installing backup power supply, flood prevention barriers, and flood proofing existing buildings.

### 4.3 Alternative 3: Realignment or Relocation of Utilities

This alternative includes utility realignment or relocation according to the needs of Subapplicant and engineering recommendations. This may involve relocation of utilities up to 200 feet from an existing ROW; FEMA will evaluate to determine if greater distances are consistent with this PEA on a case-by-case basis. Relocated utilities may be either abandoned in place or removed and disposed in accordance with applicable laws. All relocated lines will connect to points along the existing system. The specific activities, disposal, staging, and acreage limits discussed in Alternative 2 apply to this alternative as well.

**Realigned or Relocated Linear Utilities**: Standard activities include mobilization, establishment of a staging area, waste disposal, and post-construction site restoration. Principle activities will involve installing new utility poles, conductors, or conduit routing. For utility lines servicing critical facilities or in high wind prone areas, power lines and fiber optic lines may have underground. installation. The PREPA standard designs discussed in Alternative 2 will also apply to this alternative. Permanent single site work (such as substations), temporary access, and staging areas may have ground disturbance up to five acres in previously disturbed areas and two acres in previously undisturbed areas. The typical activities associated with utility line projects would be the same as described for Alternative 2 except that it includes pipelines or electric powerlines approximately 10 miles in length or less.

**Realigned or Relocated Wastewater, Potable water, and Stormwater Systems**: Standard practices will involve the realignment and relocation of wastewater, potable, and stormwater systems. The principle activities will involve open cut trenching for the placement of utilities that meets current codes and standards. Standard construction practices will include project mobilization, establishment of a staging area, waste disposal, and post construction site restoration. Typical site work will involve surface grading, conduit placements, electrical work, plumbing, trenching, concrete and pavement applications, and hardware placement. The typical activities associated with wastewater, potable, and stormwater projects are the same as described in alternative 2.

15

AR_0002900

**Power Generation**: The primary activity will be the installation of on-site supplemental generation at critical facilities. On-site backup generation may involve combined heat and power systems, rooftop solar, fossil fuel powered standby generators, battery storage, and building energy management systems. Associated actions will involve the construction of on-site fuel storage, installation of transmission and distribution lines, and construction of substations or switch stations. Typical construction practices include minor excavations, placement of concrete footers and pads or fill material, grounding mats, and construction of new facilities at an existing site. This PEA does not include construction of new utility scale generation such as power plants or wind or solar farms that market and distribute power to the public. The following are typical activities associated with the types of supplemental power generation projects covered by this Alternative:

- **Solar Photovoltaic (PV)**: Projects that involve the development of solar photovoltaic (PV) systems will include the installation of solar panels, battery storage, feeder automation control systems, load control equipment, and similar technologies. Solar PV array installation will be on stable, durable structures that can support the array and withstand wind, rain, hail, and corrosion. Battery storage of solar PV energy will be in a facility located outside the flood zone.

- **Standby Generators**: Fossil fuel powered generators will be located within the boundaries of existing facilities. The addition of new standby generators will require new electrical systems and controls. The type of concrete foundation would depend on the facility, size and weight of the generator, as well as the bearing capacity of underlying soils and would include piles, pile caps and elevated slabs. Design and construction criteria will be based on recommendations for licensed professionals. New standby generators support may require existing utility repair, replacement, or rerouting.

- **Conversion of Fuel Source:** This PEA allows for small non-power marketing plants the conversion from diesel to natural gas is a common practice that requires the reconfiguration of the generator's mechanics. The intention of this PEA is not for conversion of large public market supply power plants from coal to natural gas or similar actions. Associated actions permissible under this PEA are installing structures that can contain the fuel source and piping that extends from the storage container to the generator. Altering the mechanics, of the system may require additional modifications to the system controls.

**Pump Stations and Wastewater Treatment Facilities:** The primary activity will be installation of new pumps, piping, electrical, control systems, and backup power sources for pump stations and wastewater treatment facilities. Potential actions include minor excavations, placement of concrete footers and pads or fill material, and the construction of new on-site facilities. The following are typical activities associated with pump station and wastewater treatment facilities:

- **Installation of Pumps and Associated Piping**: The primary activity will be installing new pumps and piping per codes and standards. Pump and pipe size will be based on recommendations from licensed engineers. Installation of electrical and control systems including a backup power source. Associated activities would include installing a primary and backup power source. Standby power may require the installation of an above ground storage tank to for the purpose of storing fuel.

16

AR_0002901

**JA_214**

**Construction of Enclosures**: New structures to accommodate the required system controls, pumps are likely to be in new separate, standalone buildings; however, some existing building layouts may offer enough space to accommodate the new systems. Building sizes would vary by individual developments but would likely be between 250 and 2000 square feet. It is possible that some facilities may have to exceed 2000 square feet. Newly constructed facilities will be outside of the flood zone or protected to similar standards.

- **Facility Hardening:** Associated activities will involve raising equipment to elevation above the floodplain, installing backup power supply, flood prevention barriers, and flood proofing existing buildings.

## 4.4 Alternative 4: Combination of the Alternatives

This Alternative includes some combination of the No Action, Replacement, and/or Relocation alternatives. Individual utility segments can remain in their existing location and condition if FEMA and the Applicant determine that No Action is the safest, most cost-effective alternative. Some projects, depending on scope of work, may require replacement or relocation of contiguous portions of the utility to mitigate risk and restore infrastructure. This alternative is for the purpose of providing the post-disaster recovery effort with flexibility in the planning and decision-making process to address such contingencies.

17

AR_0002902

# 5.0 AFFECTED ENVIRONMENT AND POTENTIAL IMPACTS

The following sections discuss the potential environmental impacts and proposed mitigation measures associated with the No Action Alternative and the Action Alternatives. When possible, FEMA considers quantitative information to establish potential impacts; the potential qualitative impacts evaluated are based on the criteria listed in in **Table 1**.

**Table 1: Impact Significance and Context Evaluation Criteria for Potential Impacts**

| Impact Scale | Criteria |
|---|---|
| No Effect | There would be no impact on the resource area. |
| Negligible | Changes would either be non-detectable or, if detected, would have effects that would be slight and local. Adverse impacts would be well below regulatory standards, as applicable. |
| Minor | Changes to the resource would be measurable, but the changes would be small and localized. Adverse impacts would be within or below regulatory standards, as applicable. Mitigation measures would reduce any potential adverse effects. |
| Moderate | Changes to the resource would be measurable and have either localized or regional scale impacts. Adverse impacts would be within or below regulatory standards, but alteration of historical conditions is on a short-term basis. Mitigation measures would be necessary, and the measures would reduce any potential adverse effects. |
| Major | Changes to the resource would be readily measurable and would have substantial impacts on regional levels. Adverse impacts would exceed regulatory standards. Required mitigation measures to offset the adverse effects will reduce impacts, though long-term changes to the resource may occur. |

**Appendix C** summarizes the determination of effects. For the purposes of this PEA, the following definitions used throughout are as follows:

- **Direct impacts**: Caused by the action and occur at the same time and place as the action.

- **Indirect impacts**: Reasonably foreseeable effects occurring later in time or in a different location from the action site than direct impacts.

- **Cumulative impacts**: Result from individually minor, but collectively major actions that take place over time; incremental impacts of the action added to the impacts of other past, present, and reasonably foreseeable future actions, regardless of the person or agency or takes them.

- **Short-term impacts**: Impacts lasting less than project completion and site stabilization in duration.

- **Long-term impacts**: Impacts lasting beyond construction and site stabilization and based on the recovery or change to a resource.

FEMA is omitting the following two environmental resource topics because they do not apply to the project as covered by this PEA. **Table 2** presents eliminated topics from this PEA.

AR_0002903

**Table 2: Eliminated Resource Topics**

| Topic* | Reason |
|---|---|
| Bald and Golden Eagles | There are no bald eagles or golden eagles in Puerto Rico and therefore this section is not evaluated further. |
| Essential Fish Habitat | National Marine Fisheries Service (NMFS) Essential Fish Habitat (EFH) managed habitat will not be evaluated. This PEA covers only land-based and non-marine or non-EFH water projects. If there are potential impacts to EFH from an individual project, it will require a tiered or separate NEPA analysis. |

* Sections regarding the eliminated resource remain for consistency with PEA formatting.

## 5.1 GEOLOGY, TOPOGRAPHY, AND SOILS

Geologic and topographic characteristics such as shallow bedrock, steep slopes or excessive erodibility could affect the engineering design, method of construction, potential environmental impacts of the project and type of impact minimization measures that would be effective. Soil characteristics within a given area depend on the surficial parent material located in that area and described by "soil series" based on their origins, chemical and physical properties and slope.

Farmland Protection Policy Act (FPPA) of 1981 (7 U.S.C. § 4201 et seq.) protects prime and unique farmlands and farmlands of state and local importance from conversion to non-agricultural uses. Prime farmland is land with the best physical and chemical characteristics for the production of food, feed, forage, fiber and oilseed crops. Prime farmland is either used for food or fiber crops or is available for those crops; it is not urban, built-up land, or water areas. The definition of unique farmland is land that is for the production of certain high-value crops, such as citrus, tree nuts, olives, and fruits. The NRCS Web Soil Survey can are useful to determine whether there are prime or unique soils or soils of statewide or local importance at a site. The FPPA applies to not just lands currently under agricultural production but also forestland, pastureland, or other land types that can be coverted to lands that can be used for agriculture purposes.

Executive Order (EO) 12699 – Seismic Safety of Federal and Federally Assisted or Regulated New Building Construction establishes responsibilities regarding the seismic-related safety of buildings owned, leased or funded by Federal agencies. Under this EO, each Federal agency responsible for the design and construction of a Federal or federally-funded building must ensure that the design and construction of the building is in accordance with appropriate seismic design and construction standards. The 2018 building codes for Puerto Rico maintain the most recent codes and standards regarding seismic safety for the Commonwealth.

### 5.1.1 Existing Conditions

The principal physiographic feature of Puerto Rico is the Cordillera Central and the Sierra de Cayey, which form a continuous mountain range extending in an east-west direction nearly the entire length of the island. The foothills, which separate the coastal plain from the mountains, begin at an altitude of about 300 meters (m) (or 984 feet [ft]). Throughout most of the mountainous areas, ridge tops reach altitudes of 700 m (or 2,297 ft) with a maximum altitude of 1,338 m (or 4,390 ft) found at Cerro de Punta north of Ponce. Within the mountainous areas, hillsides are steep with about 50 percent of the land having slopes greater than 45 percent. The predominant

AR_0002904

physiographic feature characterizing the western two-thirds of the northern coast is karst terrain, which extends inland as much as 20 km (or 12.4 mi) (Gómez-Gómez 2014).

There are 77,323 total hectares (161,069 acres) of designated Prime Farmland (9%) in the Commonwealth as well as 98,803 hectares (244,147 acres) of Farmland of Statewide Importance (11%). There is an additional 6 percent that are "conditional" soils that are of statewide importance or prime farmland if irrigated, reclaimed from excess salts, or drained. (Gould 2017; NRCS 2011). **Figure 2** in **Appendix A** shows classified areas as farmland throughout the Commonwealth.

There has been an overall gradual loss of prime farmlands in Puerto Rico. According to the Economic Research Service of the US Department of Agriculture (USDA) and the USDA 2012 Agricultural Census, there are 584,988 cuerdas or 568,096 acres (229,900 hectares) of farmland (a gradual loss of approximately 5 percent since 2007) and 13,159 farms in Puerto Rico (loss of approximately 16 percent since 2007). Prime farmland appears throughout the Commonwealth (USDA 2014). Approximately 53,300 acres (21,569 hectares) of prime farmland changed use to urban or rural development between 1982 and 1997 (USDA 2017).

The Puerto Rico Seismic Network (PRSN), as part of the Geology Department of University of Puerto Rico, Mayaguez campus, works to detect, process and investigate seismic activity (earthquakes and tsunamis) in the Caribbean. They report the results for public safety, education, engineering, and scientific study purposes for Puerto Rico (PRSN 2019).

During 2018, PRSN recorded 3,974 seismic events in the Puerto Rico and Virgin Island area. This is up from the 3,129 events in 2017, but approximately the same as in 2016 (3,947 events). Of the reported earthquakes, 29 were strong enough to be noticeable by people in the responsible area. The depths of the earthquakes varied from two km to 185 km. Their magnitudes ranged from 0.63 local magnitude ($M_L$) to 4.67 $M_L$. (PRSN 2019).

### 5.1.2 Potential Impacts and Proposed Mitigation

If a project were to have a potential to impact geology, it would be a substantially larger-scale project that may likely require a supplemental EA or an EIS.

**Alternative 1: No Action**

In the No Action alternative, permanent repairs or upgrades, and temporary, emergency measures would remain the status quo. Under the No Action alternative there is no federal action and restoration of utilities would rely on local funding to address the projects purpose and need. Alternative 1 has potential leave some communities experiencing a reduction in their level of service. Erosion and sedimentation may increase if utilities receive further damage from remaining unrepaired. The No Action Alternative would likely have negligible to minor impacts on soils and geology and no impacts to seismicity or prime or important farmland.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

Under this alternative, the existing utilities replacements would be substantially within the existing footprint. Existing utilities updated to current codes and standards and installed under the appropriate permits and will follow best management practices (BMPs). Section 6 of this PEA

20

AR_0002905

displays a complete list of the conditions associated with this PEA. Utilities could have their elevations raised, to comply with floodplain regulations and flood avoidance during the construction process. FEMA anticipates that for utility upgrades the utility footprint will remain largely within the previous ROW.

In some cases, the additional width of infrastructure elements or changes in the elevation of utilities may require small portions of new ROW. There may be soil disturbance and changes to topography; however, FEMA expects Alternative 2 could have short term minor impact on geology and soils. This alternative would likely have negligible to minor impacts on prime or important farmland or seismicity.

**Alternative 3: Realignment or Relocation of Utilities**

During construction, previously undisturbed soils excavated or compacted will occur as a result of Alternative 3 (e.g. trenching for new underground lines; digging for new poles, telecommunication towers, or wind turbines; or prepping land for placement of new facilities). Engineering designs should entail bioengineering whenever possible. Additionally, stabilization projects should use BMPs to increase the amount of vegetation and soil stabilization in the long term.

There will be soil disturbance and there could be long term minor changes to topography. If realignment in potential farmland is involved FEMA may consult with USDA NRCS to avoid, minimize, or mitigate the impacts. Alternative 3 would have a minor impact on geology and soils, negligible to minor impacts on prime or important farmland, and no impacts on seismicity.

**Alternative 4: Combination**

The potential impacts of Alternative 4 would be similar to the impacts identified in Alternatives 2 and 3.

**5.2 AIR QUALITY**

The Clean Air Act (CAA) of 1970 (42 USC 7401–7661 [2009]) is a comprehensive federal law that regulates air emissions from area, stationary, and mobile sources. The act authorized the US Environmental Protection Agency (USEPA) to establish National Ambient Air Quality Standards (NAAQS) to protect public health and the environment. The NAAQS include standards for six criteria air pollutants: lead, nitrogen dioxide, ozone, carbon monoxide, sulfur dioxide, and particulate matter (including both particulate matter less than 10 micrometers in diameter [$PM_{10}$], and fine particulate matter less than 2.5 micrometers in diameter [$PM_{2.5}$]). Areas where the monitored concentration of a criteria pollutant exceeds the applicable NAAQS designation as being in nonattainment of the standards. Maintenance areas are those geographic areas that had a history of nonattainment; however, the areas are now consistently meeting the NAAQS. Maintenance areas have been re-designated by USEPA from "nonattainment" to "attainment with a maintenance plan," or designated by the Environmental Quality Commission. The classification of attainment areas is when the monitored concentration of criteria pollutants is below the standard.

Federally funded actions in nonattainment and maintenance areas are subject to USEPA conformity regulations (40 CFR Parts 51 and 93), which ensure that emissions of air pollutants from planned federally funded activities would not affect the state's ability to meet the NAAQS.

21

AR_0002906

**JA_219**

Section 176(c) of the CAA requires that federally funded projects conform to the purpose of the State Implementation Plan (SIP), meaning that federally funded activities would not cause any violations of the NAAQS, increase the frequency or severity of NAAQS violations, or delay timely attainment of the NAAQS or any interim milestone.

The 1990 Amendments to the CAA require that Federal agency activities conform to the State Implementation Plan (SIP) with respect to achieving and maintaining attainment of National Ambient Air Quality Standards (NAAQS) and to addressing air quality impacts. The USEPA General Conformity Rule requires that a conformity analysis be performed, which demonstrates that a proposed action does not: 1) cause or contribute to any violation of any NAAQS in the area; 2) interfere with provisions in the SIP for maintenance or attainment of any NAAQS; 3) increase the frequency or severity of any existing violation of any NAAQS; or 4) delay timely attainment of any NAAQS, any interim emission reduction goals, or other milestones included in the SIP.

The conformity requirements of the CAA and its regulations limit the ability of federal agencies to assist, fund, permit, and approve projects that do not conform to the applicable SIP. When subject to this regulation, the federal agency is responsible for demonstrating conformity for its proposed action. Conformity determinations for federal actions other than those related to transportation plans, programs, and projects, funded, or approved under title 23 USC or the Federal Transit Act (49 USC 1601 et seq.) must be according to the federal general conformity regulations (40 CFR 93 Subpart B). Exemptions for certain actions and activities from general conformity review include:

- Stationary source emissions regulated under major or minor New Source Review (air permitting) programs,

- Alteration and additions of existing structures as specifically required by new or existing applicable environmental legislation,

- Actions where the emissions are not reasonably foreseeable,

- Actions defined by the federal agency or by the state as "presumed to conform", and

- Activities with total direct or indirect emissions (not including stationary source emissions regulated under New Source Review programs) below *de minimis* levels. Emissions from construction activities are subject to air conformity review, unless they fall below the applicable *de minimis* levels.

**Construction Equipment**

The use of nonroad engines in an extremely wide range of applications will involve great differences in operating characteristics, engine technology, and market dynamics. USEPA has adopted emission standards for all types of nonroad engines, equipment, and vehicles. These standards apply separately to aircraft, heavy equipment, locomotives, marine, recreational vehicles, portable generators, and small equipment and tools.

22

AR_0002907

The USEPA has adopted a comprehensive national program to reduce emissions from nonroad diesel engines by integrating engine and fuel controls as a system to gain the greatest emission reductions.

**Heavy Equipment**

CFR Title 40, Part 89 contains USEPA emission standards for nonroad diesel engines (heavy equipment). Heavy equipment includes excavators and other construction equipment, farm tractors and other agricultural equipment, forklifts, airport ground service equipment, and utility equipment such as generators, pumps, and compressors (USEPA 2004). USEPA has adopted multiple tiers (Tier 1, Tier 2, Tier 3, and Tier 4) of emission standards. The Tier 1, Tier 2, Tier 3, and Tier 4 standards require compliance with progressively more stringent emission standards. In 2004, the USEPA published the final rule (40 CFR Parts 9, 69, et al.) introducing Tier 4 emission standards, which were phased-in over the period of 2008-2015.

To meet the Tier 4 emission standards, engine manufacturers produce new engines with advanced emission control technologies. Sulfur can cause damage to the emission control devices; therefore, the USEPA also adopted requirements for in-use diesel fuel to decrease sulfur levels by more than 99 percent. The resulting Ultra Low Sulfur Diesel Fuel has a maximum sulfur concentration of 15 parts per million (USEPA 2004).

## 5.2.1 Existing Conditions

The CAA's criteria pollutants include Carbon Monoxide, Lead, Nitrogen Oxides, Ozone, Particulate Matter ($PM_{10}$ and $PM_{2.5}$) and Sulfur Dioxide. As of March 21, 2019, the USEPA's Green Book for nonattainment lists Puerto Rico for of two criteria pollutants in the areas listed below on the island and maintenance for another pollutant. **Figure 3** in **Appendix A** illustrates the conditions for Puerto Rico's air quality. **Table 3** and **Figure 3** in **Appendix A** depict Puerto Rico's current nonattainment and maintenance areas for certain municipalities and criteria pollutants (USEPA 2019a).

**Table 3: Current Nonattainment and Maintenance Areas**

| Municipality | Criteria Pollutants |
| --- | --- |
| Arecibo | Lead (2008) |
| Bayamon | Sulfur Dioxide (2010) |
| Cataño | Sulfur Dioxide (2010) |
| Guaynabo | Sulfur Dioxide (2010) |
| Guaynabo | $PM_{10}$ (1987) - Moderate Maintenance (since 2010) |
| Salinas | Sulfur Dioxide (2010) |
| San Juan | Sulfur Dioxide (2010) |
| Toa Baja | Sulfur Dioxide (2010) |

Source: USEPA 2019a

On November 12, 2008, the USEPA revised the Lead NAAQS, lowering the level from 1.5 micrograms per cubic meter ($\mu g/m^3$) to 0.15 $\mu g/m^3$ calculated over a three-month rolling average. The USEPA established the 2008 Lead NAAQS based on significant evidence and numerous health studies demonstrating that serious health effects are associated with exposures to lead emissions. If temporary and/or new power generation equipment is necessary, it will need to

23

AR_0002908

conform to the requirements of the CAA, any associated amendments, as well as requirements stipulated in the SIP.

On August 14, 2017, the USEPA approved Puerto Rico's revised SIP dated August 30, 2016. The purpose of the revision was to address attainment issues associated with the 2008 Lead NAAQS for the Arecibo Lead nonattainment area. The Arecibo nonattainment Area is comprised of a portion of Arecibo Municipality in Puerto Rico with a 4-kilometer radius surrounding. The Battery Recycling Company, Inc. Puerto Rico initially submitted the revised SIP for the Arecibo area on January 30, 2015. On February 29, 2016, the USEPA indicated the potential disapproval of the SIP dated January 30, 2015. The PREQB rescinded the January 30, 2015 submittal and replaced it with the August 30, 2016 Lead SIP submittal for the Arecibo area (USEPA 2017).

### 5.2.2 Potential Impacts and proposed Mitigation

**Alternative 1: No Action**

In the No Action alternative, FEMA will not fund permanent projects, potentially leaving communities with unreliable electricity, communications, water and sewer services, and vulnerable to future storm events. There is the potential for residents and commercial entities to rely on outdated generators that could impact the concentrations of localized criteria pollutants. The usage of any remaining temporary power generators from emergency response efforts following the hurricane may not be replaced which may cause. Possible increase in overall vehicle emissions may occur if detour routes around downed utilities are extensive or if response causes traffic delays. Those areas without access may experience a reduction in localized vehicle emissions; while other areas may experience increased air pollution, due to increased congestion, increased vehicle wait times, and construction efforts related to the relocation of disaster-affected communities. Therefore, this alternative should have negligible to minor impacts to the current air quality.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

Based on the size and duration of construction projects or utility operation, an air quality permit from the PREQB may necessary. During construction there may be short-term increases in mobile and construction equipment exhaust emissions; however, FEMA assumes the impacts from modern well-maintained equipment would be minor. Equipment will comply with Tier 4 USEPA standards for off road diesel. Engines and generators should run on low-sulfur diesel. The equipment emissions would be below de minimis levels.

During construction activities on utility infrastructure, there would likely be some short-term increase in fugitive dust and vehicular emissions ($PM_{10}$ and $PM_{2.5}$); however, mitigation measures such as dust suppression techniques and employee transportation plans can limit negative impacts. Impacts from fugitive dust and vehicular emissions will be short-term and negligible. Control techniques for fugitive dust sources generally involve watering, chemical stabilization, or reduction of surface wind speed with windbreaks or source enclosures.

As part of Alternative 2, long-term impacts to air quality would not occur. The replacement of back-up power generation equipment with more modern equipment may prove to be a beneficial impact on air quality as emissions from their operations decrease.

24

AR_0002909

As a result of the short-term construction activities associated with Alternative 2, an increase in negligible emissions would occur for any pollutant. Alternative 2 would not cause a NAAQS exceedance and would not trigger major source permitting. With regards to the areas currently listed as nonattainment or under maintenance, the effects evaluation concludes the following:

- Alternative 2 will have no impact on lead attainment for the Arecibo area because all fuels should be unleaded, and no measurable amount of lead emissions will occur.

- Alternative 2 will have a negligible impact on $PM_{10}$ attainment for the municipality of Guaynabo. This determination is based on the US's adoption of Tier 4 emission standards that reduce the amount of particulate matter emitted from exhaust and the implementation of fugitive dust control measures.

- Alternative 2 will have negligible impact on SOx for the municipalities of Bayamon, Catãno, Guaynabo, Salinas, San Juan, and Toa Baja due to the adoption of Tier 4 emission standards for nonroad diesel engines.

The activities that Alternative 2 includes may have a beneficial impact on air quality and energy efficiency by updating existing utilities to current codes and standards. The USDOE through the Building Energy Codes Program, requires the establishment of mandatory energy efficiency requirements for federal, commercial, and residential buildings. Federal law also requires the USDOE to publish new energy efficiency standards for the installation of new energy and heating, ventilation, and air conditioning (HVAC) systems in existing facilities. By operating at a greater efficiency, it is possible that updated utilities would produce fewer emissions (USDOE 2020a).

By meeting current codes and standards, Alternative 2 activities would be in alignment with the Commonwealth's 2019 Energy Public Policy Act. The 2019 Act updates and unifies policy initiatives stated from several Acts regarding Puerto Rico's energy policy. The 2019 Act establishes the Puerto Rican energy public policy and guiding principles for the electric grid based on efficiency, formulates energy policy, and establishes goals and objectives for becoming more energy efficient and independent (PREPA 2019).

**Alternative 3: Realignment or Relocation of Utilities**

When considering most of the utilities, the impacts to air quality from this Alternative would be similar to those described for Alternative 2. However, if utility retrofits to accommodate greater capacity will be necessary, construction time may increase which would increase short-term minor emissions, though these impacts are not to exceed NAAQS levels. Any exceedances of NAAQS standards may require a tiered EA or stand-alone EA. Therefore, air emissions from equipment and impacts from fugitive dust would be short-term and minor. If a project involves the permanent installation of a generator, the facility may require additional permitting from PREQB and would require additional studies, which may require a tiered EA or stand-alone EA if emissions may exceed NAAQS levels. FEMA anticipates impacts to air quality to be comparable to Alternative 2 with no adverse long-term effects to air quality.

Alternative 3 may have a beneficial impact on air quality and energy efficiency long-term by installing new industrial equipment that meets the USDOE's Office of Energy Efficiency and Renewable Energy standards. The Office of Energy Efficiency and Renewable Energy sets energy

25

AR_0002910

efficiency standards for new industrial products such as distribution transformers, pumps, boilers, and electric motors. By operating at a greater efficiency, it is possible that updated utilities would produce fewer emissions (USDOE 2020b).

By installing industrial equipment that meets current efficiency standards, Alternative 3 activities would be in alignment with the Commonwealth's 2019 Energy Public Policy Act. The 2019 Act updates and unifies policy initiatives stated from several Acts regarding Puerto Rico's energy policy. The 2019 Act establishes the Puerto Rican energy public policy and guiding principles for the electric grid based on efficiency, formulates energy policy, and establishes goals and objectives for becoming more energy efficient and independent (PREPA 2019).

**Alternative 4: Combination**

Generally, the impacts to air quality from this alternative would be similar to those described for Alternatives 2 and 3 with air quality impacts being minor and short-term for the replacement and relocation project sites.

## 5.3 WATER QUALITY/WATER RESOURCES

Congress enacted the Federal Water Pollution Control Act in 1948 and later reorganized and expanded in 1972 and became known as the Clean Water Act (CWA) in 1977. The CWA regulates discharge of pollutants into water with sections falling under the jurisdiction of the US Army Corps of Engineers (USACE) and the USEPA.

Section 404 of the CWA establishes the USACE permit requirements for discharging dredged or fill materials into Waters of the United States and traditional navigable waterways. USACE regulation of construction activities in or near any navigable water of the United States is authorized under Section 10 of the Rivers and Harbors Act (RHA) of 1899 (33 USC § 401 et seq.).

Section 401 of the CWA requires that an Applicant for a federal license or permit provide a certification that any discharges from the facility will comply with the act, including state-established water quality standard requirements. Under the NPDES, the USEPA regulates both point and non-point pollutant sources, including stormwater and stormwater runoff for projects with ground disturbance of more than one acre. The NPDES permit requires that a Stormwater Pollution Prevention Plan (SWPPP) be prepared. The NPDES Permit Program authorizes the issuance of individual or general permits to control municipal and industrial point source discharges, including those from wastewater and stormwater.

The Sole Source Aquifer (SSA) program is established under Section 1424(e) of the Safe Drinking Water Act (SDWA) of 1974 (Public Law 93–523). The SDWA authorizes USEPA to designate an aquifer for special protection under the SSA program if the aquifer is the sole or principal drinking water resource for an area and if its contamination would create a significant hazard to public health. The definition of a designated SSA is one supplying 50 percent or more of the drinking water for a particular area. No commitment for federal financial assistance may proceed for any project that USEPA determines may contaminate a sole source aquifer such that it creates a significant hazard to public health.

26

AR_0002911

The Wild and Scenic River designation preserves selected rivers or river sections in their natural, free-flowing condition. To be eligible for designation, rivers must possess outstandingly remarkable scenic recreational or other natural values. Wild and Scenic River designation also requires Congressional action that mandates river segments be managed to protect and enhance the values which makes them eligible for designation. The segments must be free of impoundments and are accessible only by trail. Regulations require that riparian zone maintenance is in an essentially primitive condition (free of structures and modifications of the waterway, such as rip-rapping and channelization) and maintain current water quality. Scenic segments also remain free of impoundments, have largely primitive riparian zones, and are accessible only at certain points by roads (NPS 2018). For waterbodies designated as wild and scenic rivers, the following prohibitions or management activities apply to the river and surrounding wilderness corridor for up to ¼ of a mile (or 0.4 km) from each of the rivers' banks:

- No road construction or other development

- No motorized or mechanized (e.g. bicycle) use

- No timber harvesting

- No water development

- No treatment vs. control (manipulative) research

- No mineral activity

- Recreation management for low use, primitive experiences

- Primitive standards for trail construction

### 5.3.1 Existing Conditions

There are numerous rivers and streams on Puerto Rico's main island. Puerto Rico has a total of 5,385 mi of rivers, streams, and creeks (USDI-NPS, 2019). None of the rivers are navigable by large vessels. Only twenty of these rivers have a permanent minimum water flow of at least 0.28 cubic meters per second (9.88 ft$^3$/sec) and are relatively important to the island's fishery. Major river systems are the Río Grande de Loíza (64 km [39.8 mi]), Bayamón (41 km [25.5 mi]), La Plata (73 km [45.4 mi]), Arecibo (64 km [39.7 mi]), Culebrinas (40 km [24.8 mi]), and Añasco (65 km [40.4 mi]).

Puerto Rico has considerable variability in water resources due to geology, hydrology, and topography (**Figure 4** in **Appendix A**). Of a total area of 8,927 sq. km, approximately 3,500 sq. km underlain by groundwater hydrogeologic units classified as intergranular or fissured. These hydrogeologic units form the principal aquifer systems throughout Puerto Rico and the outlying islands. The United States Geological Survey (USGS) subdivides the major watersheds of Puerto Rico into 24 subsets at the Hydraulic Unit Code level 10 for major watersheds. There is one unit for each for the islands of Culebra, Vieques, and Mona, respectively.

There are reservoirs but no freshwater inland lakes. Fifty-five rivers discharge directly into the sea. Puerto Rico maintains 36 reservoirs that are between 6 and 390 hectares (PRDNER 2017). In 2010,

AR_0002912

surface water accounts for 83% of the total public water withdrawals and groundwater provides the remaining 17% for a total use of 733.16 million gallons/day (Mgal/d) (USGS 2010; Molina-Rivera 2014). The reservoirs provide potable water, irrigation, electrical power, and flood control. Problems with freshwater ecosystems are a major environmental issue in Puerto Rico. Water pollution, siltation of reservoirs, and excessive withdrawals of fresh water from rivers are associated with the past human population growth of the Island. Unauthorized wetland filling is also a substantial and continuing problem.

Surface water accounts for about 90 percent of public supplies but only about 20 percent of industry. Agriculture uses about equal amounts of ground water and surface water. Of the average daily (d) 11,600 million gallons (Mgal) (or 43,911 mega liters [Ml]) of precipitation, losses by evapotranspiration are about 7,240 Mgal/d (27,406 Ml/d); about 3,620 Mgal/d (13,703 Ml/d) by streamflow to the sea; (McCoy 1978).

- The population served by public-supply water facilities operated by the Puerto Rico Aqueduct and Sewer Authority (PRASA) estimated to be 96 percent of the total resident population for Puerto Rico in 2010 (approximately 3,586,000 residents) (USGS 2014).

- During 2010, public-supply water withdrawals from surface-water and groundwater sources constituted the major freshwater use category and estimated at 677 million gallons per day (Mgal/d) (2,562.7 Ml/d).

- Non-PRASA public-supply water withdrawals estimated at 7.1 Mgal/d (26.9 Ml/d) to serve a population of approximately 102 thousand residents.

- Public-supply domestic water use in Puerto Rico estimated at 206 Mgal/d (780 Ml/d), with about 30 percent of the total PRASA deliveries from surface-water and groundwater sources.

- Water withdrawals by domestic self-supplied users estimated at 2.41 Mgal/d (9.12 Ml/d) by a population of about 38 thousand people.

- Groundwater withdrawals by industrial users estimated at 4.30 Mgal/d (16.3 Ml/d).

- Crop-irrigation withdrawals from surface-water and groundwater sources estimated at 38.2 Mgal/d (145 Ml/d), of which 15.7 Mgal/d (59.4 Ml/d) of surface water were in areas supplied by the public irrigation systems operated by the Puerto Rico Electric Power Authority.

- Groundwater withdrawals from Puerto Rico's major aquifers for irrigation purposes were about 22 Mgal/d (83.3 Ml/d).

- Micro-irrigation was the predominant irrigation method (32,500 acres) (13,152.3 hectares) to supply artificially the water requirements of 40,200 cultivated acres (16,268 hectares).

- Freshwater use at thermoelectric power plants consisted of 1.77 Mgal/d (6.7 Ml/d) delivered from the PRASA to the plants located in Cataño and San Juan and 1.15 Mgal/d (4.35 Ml/d) from local aquifers at the Guayanilla and Salinas power plants.

28

AR_0002913

- The nine active hydroelectric power plants located throughout Puerto Rico had an instream freshwater use of 556 Mgal/d (2105 Ml/d), and

- In 2010, Puerto Rico had four thermoelectric power plants that used large amounts of saline (seawater) for cooling. The instream saline withdrawals totaled 2,262 Mgal/d (8,562.6 Ml/d) (Molina-Rivera 2010).

According to the USEPA's Map of SSA Locations, there are no SSA within the Commonwealth (USEPA 2019b). However, if the potable water pipeline constructed in 1978 from the Puerto Rican mainland to the islands of Vieques and Culebra becomes compromised, Vieques would revert to withdrawing from one of their two wells on the island for drinking water supply. There could be a potential that one of these could become a sole source aquifer (USGS 2014).

Rainfall averages about 11,600 million gallons of water per day (McCoy 1978). The mountainous interior receives the most rainfall and the southwest coast the least. The south coast is the most stressed area in terms of water deficiency. Changes in water use and the importation of water are alternatives for increasing supplies to meet future demands. Generally, the chemical composition of nearly all surface waters in Puerto Rico is about the same. The waters are predominantly of the calcium bicarbonate type. However, characteristic differences occur locally, especially in dissolved solids concentrations and in concentrations of specific constituents.

The designation of Wild/Scenic Rivers in Puerto Rico was a significant milestone for the program as they remain the only tropical rivers in the National Wild and Scenic River System. The designated rivers are Rio Mameyes, Río de la Mina, and a section of the Río Icacos. (**Figure 5** in **Appendix A**). The area of the Rio Mameyes, from the Forest boundary mile west of the Road 988 bridge (Puente Roto) to its headwaters in the Ba de Oro Research National Area's total length is 4.5 miles with 2.1 miles classified as wild, 1.4 miles as scenic, and 1.0 mile as recreational (National Wild and Scenic Rivers System 2002a). The Río de la Mina is designated as scenic from its confluence with the Río Mameyes to its headwaters located east of PR-191, with a total length of 2.1 miles (3.37 km) (National Wild and Scenic Rivers System 2002b). The section of the Río Icacos designated as scenic extends from its confluence with the Río Cubuy, to its headwaters approximately ½ miles south of the PR Highway 191 gate, with total length 2.9 miles (4.66 km) (National Wild and Scenic Rivers System 2002c).

The detailed management requirements for Puerto Rico's designated Wild and Scenic Rivers is in the El Yunque National Forest Wild and Scenic Rivers Comprehensive Management Plan (USDA Forest Service 2010). Although the El Yunque National Forest contains designated wild and scenic rivers, there is no federally designated wilderness in the surrounding forest.

The Commonwealth controls water quality through the Puerto Rico Water Quality Standards Regulation, administered by the PREQB. Regulations and an anti-degradation policy are in place to protect coastal, surface, and ground waters.

Based on the November 2018 USEPA 303(d) list of impaired waters, there are 666 instances of pollutants causing designation of water impairment though the island including surface water, groundwater, and reservoirs (USEPA 2018). The impairments constitute 12,090 river miles of impairment (with overlapping contaminants) in rivers, streams, and creeks alone. In 2018 the primary sources of pollutants reported are sewage discharges (274), urban runoff/stormwater

29

AR_0002914

(153), confined animal feeding operations (121), sewer overflows/system failures (103), industrial point sources (80), agricultural (57), and landfills (47). Copper leaching has already impaired over 1,000 miles of streams and rivers; 6,111 acres of reservoirs, lagoons, and bays; and around 250 miles of coastal shoreline (USEPA 2018b). Water resources impacts continue throughout the Commonwealth at this time due to broken pipes, groundwater contamination, and erosion into stream systems associated with exposed and sloughing soil.

Puerto Rico maintains expansive marine resources including coral reefs and rock reef communities. Activities covered by this PEA will not occur on or around coral reefs and rock reefs within the waters of Puerto Rico. As stated in previous sections actions affecting marine ecosystems are beyond the scope of this PEA.

**Consent Decree**

The USEPA and the Commonwealth have entered into a number of consent decrees that involve violations of the CWA. A consent decree involving the USEPA is an agreement that seeks to enforce the rules and regulations that Congress has delegated to the Agency. A consent decree is a formal agreement made on the record that ends a dispute without any of the parties having to admit guilt or liability. A consent decree associated with water quality enforces policies under the CWA. If the defendant does not hold up their end of the bargain as agreed to do in the decree, then the USEPA can take them to court on the charge of contempt.

An example of such an agreement with the Commonwealth is the 1995 consent decree between the USEPA and PRASA. The 1995 consent decree includes the operation, management, repair, and maintenance of PRASA's aqueduct, sewer, and customer services system. In 1998, the USEPA and PRASA amended the consent decree to allow PRASA to delegate operations to private operators.

Within the 1995 consent decree, the USEPA alleged that PRASA discharged pollutants in violation Section 301(a) of the CWA, Section 33 U.S.C §1311(a) and violated certain terms and conditions of NPDES permits issued by the USEPA to PRASA for their waste water treatment plants (WWTP) pursuant to Section 402 of the CWA 33 USC § 1342. The terms of the 1995 consent decree apply to all pump stations appurtenant to PRASA's WWTPs (USEPA 2019d).

It is the policy of FEMA's Public Assistance program to limit funding to damages caused by the disaster. Public Assistance would determine the applicability of funding projects that an existing consent decree would otherwise cover on a case-by-case basis.

**5.3.2 Potential Impacts and Proposed Mitigation**

**Alternative 1: No Action**

In the No Action alternative, FEMA does not provide funding for utilities projects, potentially leaving communities with unreliable electricity, communications, water and sewer services, and vulnerable to future storm events. An example of increasing the vulnerability is when a water control structure is not cleaned properly, repaired, and upgraded, as water quality would suffer or when potable water lines are damaged and not repaired leaving communities without clean drinking water. Lack of funding may increase erosion and sedimentation if utilities are damaged

30

AR_0002915

further from disrepair. Damaged utility infrastructure may cause increased pollution into waters from problems such as sewage-runoff mixing or copper leaching from old and broken pipes. Damages may constitute a flow impediment, potentially causing significant impacts to stream and floodplain hydraulics and function. The damages could also impact and limit water flow in pipes needed for fire suppression, agriculture, and overall health and cleanliness. Therefore, the No Action alternative could have moderate adverse impacts on water resources.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

Activities associated with utility repair, replacement and upgrades, including installing temporary access routes that allow heavy equipment to reach utilities, could involve embankment work and slope stabilization. BMPs will prevent fill material and other landscape modifications from impacting existing waters near or within project boundaries. The discharge of fill material into surface water may temporarily alter surface water quality including, but not limited to, temperature, dissolved oxygen, or turbidity. This could result in adverse minor short-term impacts to water quality. Fill placement could permanently alter the physical environment where placed. Section 6 of this document require erosion and sedimentation control techniques projects to reduce the potential for impacts to water resources during and after construction.

The design of some utility features may require a hydrologic analysis to determine the magnitude and frequency of flows and to properly size drainage facilities. During construction, the Applicant will mitigate impacts by applying BMPs to prevent sediment and fill material from entering the water. Projects larger than one acre would require a General Construction Permit under the NPDES program. A condition of the General Construction Permit is the preparation of a SWPPP that includes the implementation of construction BMPs. Some projects may require a Section 404 or other permit from the USACE and a Section 401 Water Quality Certification permit from PREQB. Compensatory mitigation may offset adverse impacts to wetlands. The Applicant and their contractor are responsible for complying with any conditions outlined within these federal permits. Verification of compliance occurs through a construction monitoring program that covers each phase of the project. The permitting agencies confirm compliance as part of their permit closeout procedures under the CWA.

This alternative would have a negligible long-term impact on groundwater recharge and water quality through the transmission of sediment, debris, oils, and hazardous substances into surface waters due to the type and size of the projects covered by this PEA. Local and federal Agency requirements would mitigate potential impacts to water resources by requiring BMPs to reduce transport of sediment, debris, oils, concrete waste, and hazardous substances into water resources, including wetlands or waterways.

**Alternative 3: Realignment or Relocation of Utilities**

The process of relocating utilities within a new or expanded ROW would have similar impacts and mitigation measures as those described for Alternative 2; however, the process of expanding a ROW and the removal and disposal of out-of-service utilities would increase the footprint of construction activities. As a result, this alternative may have a negligible to minor direct or indirect on impact water resources, including wetlands and waterways; but would have mitigation through Section 401 and Section 404 permitting. Damages may constitute a flow impediment, potentially

31

AR_0002916

**JA_229**

causing moderate adverse impacts to stream and floodplain hydraulics and function. Therefore, the removal of out-of-service utilities would prevent the potential of their future degradation and water quality contamination. Any relocation of a utility in El Yunque National Forest or a Wild and Scenic River would require an additional analysis under NEPA beyond this PEA. Such an analysis would involve the USDA's Forest Service cooperation.

**Alternative 4: Combination**

This alternative would generate impacts similar to those described for Alternative 2 and 3.

## 5.4 WETLANDS

Wetlands are areas saturated or inundated by surface or ground water with a frequency enough to support, or that under normal hydrological conditions does or would support, a prevalence of vegetation or aquatic life typically adapted for these soil conditions. Examples of wetlands include swamps, marshes, estuaries, bogs, beaches, wet meadows, sloughs, mud flats, among others. Wetlands are important because they protect and improve water quality, provide fish and wildlife habitats, provide economic, and social benefits, store floodwaters, and maintain surface water and groundwater flow during dry periods. EO 11990 Wetlands Management requires Federal agencies to avoid funding activities that directly or indirectly support occupancy, modification, or development of wetlands, whenever there are practicable alternatives. FEMA uses the 8-Step Decision-Making Process (8-Step Process) to evaluate potential effects on, and mitigate impacts to, wetlands in compliance with EO 11990. The U.S. Fish and Wildlife Service (USFWS) and the Puerto Rico Department of Natural and Environmental Resources (PRDNER) administer and regulate wetlands in Puerto Rico.

The USACE, through its permit program, regulates the discharge of dredged or fill material into waters of the United States (WOTUS), including wetlands, pursuant to § 404 of the CWA. In addition, the USEPA has regulatory oversight of the USACE permit program, allowing the agency under Section 404C to veto USACE–issued permits where there are unacceptable environmental impacts. 33 C.F.R. Section 328.3 defines WOTUS and includes a broad scope of surface waters.

### 5.4.1 Existing Conditions

Puerto Rico's wetlands are diverse, consisting of coastal and inland forested and herbaceous communities. The Commonwealths currently maintains 16,556 acres or 6,700 hectares of mangroves and 741 acres or 300 hectares of bloodwood swamps also known as *Pterocarpus* forests (PRDNER 2017).

Wetlands in Puerto Rico occur on each of the Commonwealth's islands as well as in the mountainous regions and along the coasts. The presence of lacustrine and riverine classified wetlands is minimal in both abundance and acreage. These wetlands are confined to the shallow areas of deep-water reservoirs and along the banks of streams and rivers. The most common types of wetlands in the Commonwealth are palustrine or estuarine. Freshwater wetlands (palustrine) are located on the island's northern coast. The most common estuarine wetlands are the mangrove wetlands along Puerto Rico's coastline. Between 70 percent and 90 percent of marine life with commercial or recreational value uses mangroves for at least part of their respective life cycles. In addition to the mangrove swamps, salt flats (also estuarine wetlands) are common along Puerto

AR_0002917

Rico's south coastline. Estuarine wetlands are habitats not covered under this PEA. Puerto Rico has lost approximately half of its naturally occurring wetlands since settlement; historically due to agricultural development, and more recently due to population growth and tourism (Adams et al 1996).

Degradation or destruction of wetlands can occur by activities such as drainage, dredging, filling, sedimentation, and oil spills. Wetlands in Puerto Rico have been heavily degraded and destroyed from dredging, filling, draining, eutrophication, and the use of agricultural fertilizers and pesticides (Miller 2009). Other stressors to Puerto Rico's coastal wetlands include: sea level rise; hurricanes and storms; erosion and stream channelization; for road construction and development; effluent and runoff; mining of gravel, limestone, sand, and other materials (Miller 2009). The CWA requires avoiding impacts to wetlands through a sliding scale by avoidance, then minimization, or finally mitigation.

### 5.4.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

In the No Action alternative, there is no permanent repair of utilities with FEMA funds, this may potentially leave communities without electricity, communications, water and sewer services, and vulnerable to future storm events. In the No Action alternative, there is no impact to wetlands by projects funded by FEMA. However, erosion and sedimentation may increase if additional damage occurs from utilities left unrepaired. Damaged utility infrastructure may cause increased pollution into waters and wetlands from problems such as sewage-runoff mixing or copper leaching. Therefore, the No Action alternative could have moderate adverse impacts on water resources. Damages may constitute a flow impediment, potentially causing impacts to stream and floodplain hydraulics and function. Federal and local coordination and permitting will be required should local entities, such as the Commonwealth, utility companies, or municipalities, fund projects that impact jurisdictional wetlands.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

Activities associated with utility repair, replacement and upgrades, including installing temporary access routes that allow heavy equipment to reach utilities, could involve embankment work and slope stabilization. Erosion and sedimentation control techniques would reduce the potential for impacts to wetlands and water resources during and after construction.

The design of some utility features may require a hydrologic analysis to determine the magnitude and frequency of flows and to properly size drainage facilities. During construction, agencies would mitigate impacts by requiring projects to apply BMPs to prevent sediment and fill material from entering the water. Projects larger than one acre must obtain a Construction General Permit from the USEPA which requires the development and implementation of a SWPPP and construction BMPs. Projects may require a Section 404(d) or other permit from the USACE and a Section 401 Water Quality Certification permit from PREQB. Compensatory mitigation could offset adverse impacts to wetlands. The Applicant and Subapplicant are responsible for complying with any conditions outlined within these federal permits.

33

AR_0002918

FEMA anticipates short-term and long-term negligible to minor direct and indirect impacts on wetlands, streams, and other WOTUS through the runoff of sediment, debris, oils, and other hazardous materials. Projects that may impact WOTUS would require permitting under Section 404(d) and Section 401 of the CWA. Such permits would seek to minimize or avoids impacts to WOTUS through project revisions and compensatory mitigation. Additionally, FEMA would mitigate potential impacts to wetland resources by requiring BMPs to reduce transport of sediment, debris, oils, concrete waste, and hazardous substances into wetlands or waterways. As a result of staying within the existing ROW, the intent of this alternative is that activities would not impact wetlands; however, certain sites could result in some fill placed within the wetland boundaries during construction. Where individual projects may impact wetlands, streams, or WOTUS, FEMA would consider further tiered review.

**Alternative 3: Realignment or Relocation of Utilities**

The process of relocating utilities within a new or expanded ROW would have the same impacts and mitigation measures as those described for Alternative 2; however, the process of expanding a ROW and the removal and disposal of out-of-service utilities would increase the footprint of construction activities. This alternative includes embankment and in-water work that may impact wetlands. This alternative may have minor short-term direct or indirect impacts on wetlands; however, Section 401 and Section 404 would require permitting to offset impacts.

**Alternative 4: Combination**

This alternative would generate the same impacts as those described for Alternative 2 and 3.

**5.5 FLOODPLAIN**

Executive Order 11988, Floodplain Management was issued in 1977 to eliminate the long- and short-term adverse impacts associated with the occupancy and modification of floodplains, and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative for locating a project outside of the floodplain. EO 11988 applies to federally-funded projects and directs agencies to consider alternatives to siting projects within a floodplain. EO 11988 requires that a Federal agency avoid direct or indirect support of development within the floodplain whenever there is a practicable alternative. Where there are no practicable alternatives, FEMA is required to use minimization standards to reduce impacts to the floodplain and impacts from the floodplain to the facility. Such standards include elevating facilities or equipment above the BFE, or floodproofing, among others. FEMA uses Flood Insurance Rate Maps (FIRM) to identify the floodplains for the National Flood Insurance Program (NFIP). FEMA evaluates actions within the 100-year floodplain, also known as the BFE (or 500 for critical action facilities), using the 8-Step Process. FEMA's regulations on conducting the 8-Step Process are contained in 44 CFR Part 9.

EO 11988 prohibits FEMA from funding new construction in Coastal High Hazard Area "V-Zones" that is not functionally dependent on water or facilitates open space use. FEMA would consider new construction and expansion in the V-zone or in the base-flood elevation where there is a potential to increase flood levels on a case-by-case basis, in order to determine whether this PEA applies.

34

AR_0002919

### 5.5.1 Existing Conditions

Following Hurricanes Irma and Maria, floodplain FIRM maps for the Commonwealth were re-evaluated and re-mapped based on high-water-marks during the storms. FEMA compared the effective flood hazard data and the advisory 1 percent seamless flood hazard data to analyze the changes in flood hazard zones. The differences identified between the effective and advisory flood zone information resulted in about 30 zone change (e.g. AE to A, VE to AE, A to X, etc.) combinations. In addition to reclassification of some flood zones, there was also a total increase to the 1% floodplain areas (STARRII 2018).

Under requirements established in 44 CFR Section 60.3, participating communities will require permits for all development, including temporary and new development, in the Special Flood Hazard Area. Any new construction and substantial improvements in the V Zones require structure elevation on pilings, posts, piers, or columns so that the bottom of the lowest horizontal structural member of the lowest floor (including pilings or columns), to or above the BFE. This protects new, substantially improved or substantially damaged buildings from damage by the base flood. The Flood Zone Map for Puerto Rico is found as **Figure 6** of **Appendix A**. FEMA will evaluate structures on a project by project basis using the FIRM panels and the 8-Step Process, as applicable.

### 5.5.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

In the No Action alternative, FEMA does not provide grant funding for permanent utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. An example of increasing the vulnerability would be if a stormwater control structure is not cleaned out properly, repaired, and upgraded. Erosion and sedimentation may increase if unrepaired utilities suffer further damage. Damaged utility infrastructure may cause increased pollution into the floodplains from problems such as sewage-runoff mixing or copper leaching into the floodplain. Damages may constitute a flow impediment, potentially causing moderate adverse impacts to stream and floodplain hydraulics and function.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

Because some utilities are location-dependent and potentially located within a floodplain, the scope of work of this alternative may have impacts to floodplains. Construction of utilities may result in alteration of the course or magnitude of floodwater. Utility repair and changes within floodplains may also have minor impact. If proposed changes to utility infrastructure to impact the floodplain/floodway, FEMA will apply the 8-Step Process to assess potential impacts and practicable alternatives. Projects may require a hydrology and hydraulics report to evaluate changes to stream hydraulics in detail and compliance with local ordinance.

Construction activities associated with utility replacement, including installing temporary access routes that allow heavy equipment to reach utilities, could involve embankment work and slope stabilization.

35

AR_0002920

This alternative would have short-term negligible impact on floodplains and floodways due to the actions covered by this PEA, mitigation measures, and compliance with local and federal permit requirements. As a result of staying within the existing ROW, the intent of this alternative is that it will have no effects to negligible long-term impacts; however, certain sites could result in additional impervious surfaces that could have indirect long-term, but minor impacts on floodplains and floodways. FEMA will evaluate projects in the V-zone or that have the potential to increase flood elevations on a case-by-case basis to determine whether this PEA applies.

**Alternative 3: Realignment or Relocation of Utilities**

The process of relocating utilities within a new or expanded ROW would have similar impacts and mitigation measures as those described for Alternative 2; however, the process of expanding a ROW and the removal and disposal of out of service utilities would increase the footprint of construction activities. As a result, floodplains may have short-term and long-term minor impacts due to this alternative; if there is not another alternative that would lie outside of the floodplain for the placement of the utilities. Additionally, if the increase in footprint results in added impervious area or trenching for new placement of underground utilities, the nearby floodplains could also have long-term minor impacts. Further evaluation on a project by project basis using the FIRM panels and the 8-Step Process, as applicable. The design of some utility features may require a hydrologic analysis to determine the magnitude and frequency of flows and to properly size drainage facilities. As a condition of construction, federal regulatory agencies would mitigate impacts by requiring the Applicant and Subapplicant projects to apply BMPs to prevent sediment and fill material from entering waters, floodplains, and floodways. Some projects may require preparation of a SWPPP that include the deployment of BMPs. FEMA will evaluate projects in the V-zone or that have the potential to increase flood elevations on a case-by-case basis to determine whether this PEA applies.

**Alternative 4: Combination**

This alternative would generate impacts like those described for Alternative 2 and 3.

**5.6 COASTAL RESOURCES**

The National Oceanic and Atmospheric Administration (NOAA), an agency within United States Department of Commerce's Office of Ocean for Coastal Management, administers the Coastal Zone Management Act (CZMA). Recognizing the national interest in managing coastal zone resources, the CZMA encourages states and U.S. territories along the oceans, Gulf of Mexico, and Great Lakes to proactively manage natural resources, balancing resource protection with economic, recreational, and cultural needs. The CZMA established a voluntary program for states and territories to develop and implement their own unique coastal management programs that describe coastal zone boundaries, uses and resources that are subject to management, legal authorities, and enforceable policies. The CZMA encourages states and territories to self-assess costal resources by aligning management plans with Section 309 of the CZMA, to assess coastal hazards and resources management issues throughout the nation (NOAA 2014) in coastal areas of national importance.

36

AR_0002921

Coastal resources protected under the CZMA include barrier islands, intertidal shoreline, beaches, salt marshes, fresh and saltwater wetlands, aquatic habitat, and any culturally significant or historic resources occurring in those areas, such as shipwrecks and archeological sites. Pursuant to Federal Consistency Regulations at 15 C.F.R. § 930, FEMA and the Puerto Rico Planning Board (PRPB) signed a Federal Consistency Certificate for Category C through G work dated October 3, 2018 (Resolution JP-2018-324). The CZMA resolution is found in **Appendix D**.

The Coastal Barrier Resources Act (CBRA) of 1982 created designated areas under the jurisdiction of the USFWS that are ineligible for both direct and indirect federal expenditures. This act, amended by the CBRA of 1990, which added a new category of coastal barriers called Otherwise Protected Areas (OPA). The Act protects sensitive and vulnerable barrier islands found along the U.S. Atlantic, Gulf, and Great Lakes coastlines; to minimize loss of human life; and to minimize wasteful expenditure of Federal revenues on coastal barriers that are affected by natural disasters repeatedly. In a federally-declared disaster area with CBRS System Units, federal assistance is allowed for most emergency actions that are essential for saving lives, protecting property, and protecting public health and safety, if those actions are consistent with the purposes of CBRA. Actions that are permissible are in System Units limited to those necessary to alleviate the emergency, such as removal of debris from public property; emergency restoration of essential community services such as electricity, water or sewer; provision of emergency shelter; and relocating individuals out of danger. In OPAs, the only prohibition is on provision of federal flood insurance. In September 2018, USFWS released a new Coastal Barrier Resources System (CBRS) data set which contains the flood insurance prohibition date for each area within the CBRS and the System Unit establishment date for each area within a System Unit under the NFIP (USFWS 2019).

Projects receiving federal assistance must follow the procedures outlined in 15 CFR 930.90 – 930.101 for federal coastal zone consistency determinations. To guide development and resource management within the Commonwealth's coastal area, the Commonwealth identified and promulgated substantive policies. The PRDNER serves as the lead agency and is responsible for managing the maritime zone, coastal waters, and submerged lands. The PRPB serves as the primary agency for managing coastal development.

### 5.6.1 Existing Conditions

The Federal Consistency provision, contained in Section 307 of the CZMA, allows affected states to review Federal activities to ensure that they are consistent with the state's coastal zone management program. This provision also applies to non-Federal programs and activities that use Federal funding or that require Federal authorization. Approved in 1978, the Puerto Rico Coastal Zone Management Plan (PRCZMP) provides guidance in management of the coastal zone. The PRCZMP defines the coastal zone as the strip of land extending 1,000 meters landward from the coastline, as well as additional distances necessary to include key natural systems such as rivers streams, wetlands, or other areas influenced by the tide. The coastal zone also includes territorial waters and submerged oceanic or marine land up to nine nautical miles from shore (NOAA 2015 and NOAA 2012). Required by Section 307(c) of the CZMA, any federal activity that directly or indirectly affects any land or water use or natural resource of the coastal zone must be consistent with the PRCZMP to the maximum extent possible. FEMA must evaluate projects falling within designated coastal zones to ensure they are consistent with the CZMA Plan.

AR_0002922

The main island of Puerto Rico is approximately 100 miles long by 30 miles wide, with approximately 310 miles of coastline. If you combine the coastline of the main island with the coastlines of the Commonwealth's other islands and cays, Puerto Rico coastline is in excess of 600 miles long (PRDNER 2010). Using the definition within the CZMA, NOAA estimates the total Coastline of the Commonwealth to be closer to 700 miles long. Additionally, NOAA estimates the size of the Commonwealth's shallow coral reef ecosystem to be 5,000 square kilometers (NOAA 2018). In addition to the habitats listed and defined by the CZMA, other habitats that occur in the coastal zone and marine corridors of the Commonwealth include coastal forests and mangroves, karst ecosystems and sea-caves, bioluminescent lagoons, and seagrass beds. There are 8,431 hectares classified as coastal barriers, located primarily in the south and northeast portions of the Commonwealth. There are 70 CBRS units: 41 federally protected CBRS units and an additional 29 OPA (**Figure 7** in **Appendix A**).

Under the direction of Section 306(c) and Section 309 of the CZMA, the Commonwealth has a Coastal and Estuarine Land Conservation Plan that inventories existing conservation programs and lists areas of ecological significance and national importance. Areas of ecological significance include: undeveloped and undisturbed stretches of shoreline; coastal wetlands; coastal dry forests; old growth forests; lands that provide connectivity to existing protected areas; lands that provide a buffer to encroachment on core habitats; marine reserves; lands in which the preservation is important to the cultural heritage of the islands; and lands that support low-impact, non-consumptive recreational activities. Puerto Rico's Conservation Plans list several other partnership conservation programs consistent with federal priorities (PRDNER 2005 2010). Critical Wildlife Areas and Important Bird Areas as defined by PRDNER occur along the coast, along with additional six wildlife refuges defined by USFWS Coastal Program and NOAA Habitat Blueprint Focus Areas

### 5.6.2 Potential Impacts and Proposed Mitigation

Actions that conflict with the Federal Consistency Resolution Certificate signed by FEMA and Puerto Rico Planning Board, dated October 3, 2018 would be beyond the scope of this PEA. This PEA's geographic thresholds would ensure that there are no adverse direct impacts to resources covered under CBRA.

### Alternative 1: No Action

In the No Action alternative, FEMA does not provide grant funding for permanent utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. As such, there would be no direct impacts to coastal areas, however with no mitigation measures or permanent repairs, FEMA anticipates further deterioration under this alternative. Deteriorating infrastructure could contribute additional debris during storm events which could lead to minor negative impacts to coastal areas.

### Alternative 2: Repair, Replacement, and Upgrade of Utilities

Since the footprint should stay relatively the same under this Alternative, FEMA anticipates short-term and long-term negligible to minor adverse impacts to the CZMA. Such impacts would be associated with upgrading systems that require additional acreage beyond what these systems

AR_0002923

currently occupy. The installation of upgraded pumps and generators within the CZMA would minimally reduce the available area within the CZMA; however, the actions would be in alignment with the October 3, 2018 Federal Consistency Resolution Certificate.

Due to this PEA's geographical constraints, there will be no direct impacts from Alternative 2 activities to resources covered under CBRA. For projects that have the potential to indirectly impact OPAs and CBRS units, FEMA will review each project location on a case-by-case basis to determine eligibility. In accordance with USFWS guidelines, FEMA would consult with USFWS for activities that have the potential to affect CBRS units.

**Alternative 3: Realignment or Relocation of Utilities**

Under this alternative, some adverse minor short-term and long-term impacts would occur within the CZMA. Coordination with PRDNER and PRPB will occur prior to any work and limit impacts to the extent possible. Due to this PEA's geographical constraints, there will be no direct impacts from Alternative 3 activities to resources covered under CBRA. For projects that have the potential to indirectly impact OPAs and CBRS units, FEMA will review each project location on a case-by-case basis to determine eligibility. In accordance with USFWS guidelines, FEMA would consult with USFWS for activities that have the potential to affect CBRS units.

**Alternative 4: Combination of Alternatives**

The potential CZMA and CBRA impacts of Alternative 4 activities and consultation requirements would be similar to those identified for Alternatives 2 and 3.

### 5.7 VEGETATION

Biological resources include native or naturalized plants and animals and their habitats (e.g. wetlands, forests, and grasslands). This PEA does not cover adverse impacts to species or habitats of concern over relatively large areas, or if disturbances cause reductions in population size or distribution. FEMA used potential physical impacts such as habitat loss, noise, and impacts to water quality to assess the effects of the Action Alternatives on biological resources.

An invasive organism is a species that grows or spreads aggressively in its new environment and causes environmental and/or economic harm. EO 13112, Invasive Species, enacted February 3, 1999, was issued to prevent the introduction of invasive plant and animal species, providing resources for their control, and diminishing their main economic and ecological impact. Invasive species prefer disturbed habitats and generally possess high dispersal abilities, enabling them to out-compete native species.

### 5.7.1 Existing Conditions

Puerto Rico is comprised of two major eco-regions within the Savanna Division of the Humid Tropical Ecoregion Domain: M412 Forest Steppe Mountains and 411 Open Woodlands, Shrubs, and Savannas (Bailey & Cushwa 1981). Puerto Rico maintains six climatic life zones: subtropical dry forest, subtropical moist forest, subtropical wet forest, subtropical rain forest, lower montane wet forest, and lower montane rain forest.

39

AR_0002924

Within the Commonwealth, there are 3,500 vascular plant species. These species include flowering plants, gymnosperms, ferns, and allies. As of 2017, local reports indicate that over 1,000 non-native plants exist in Puerto Rico. Invasive and exotic plants represent about a third of total plant diversity on the islands. The non-native flora in Puerto Rico is diverse and includes a wide range of taxonomic groups (PRDNER 2017). Their presence has resulted in detrimental effects, including extinctions of native species

## 5.7.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

In the No Action alternative, FEMA would not provide grant funding for utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. The No Action Alternative would have no direct impact on the existing vegetation from construction disturbance. However, without continued human use or landscape maintenance, some locations may become overgrown and provide additional habitat for fauna in the area. Conversely, if areas remain unmaintained, the No Action alternative could potentially result in negligible to minor long-term adverse impacts in those areas. This would result in the introduction and colonization of invasive plant species, which out-compete native species in disturbed type habitats.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

This alternative would likely result in short-term negligible impacts to terrestrial vegetation during construction activities. However, the mitigation of impacts would occur through permit requirements and BMPs. During the construction phase, to control the spread of invasive species, all vehicles (i.e. heavy equipment, construction and personal vehicles) will be free of dirt and debris before entering and exiting the project areas. The re-vegetation of project sites will occur in accordance with the applicable permits, SWPPP, and federal and local guidance. Thorough project identification, impact assessment, and review will occur as appropriate. FEMA anticipates no long-term negative impacts; however, any impacts to vegetation would be beneficial in the long-term as native species become established upon implementation of an approved SWPPP.

**Alternative 3: Realignment or Relocation of Utilities**

FEMA anticipates this alternative to have effects similar to those discussed under Alternative 2. However, this alternative could consist of performing work by constructing new utilities due to relocation, which would result in short-term and long-term minor impacts to vegetation. Building new utilities will often have greater impacts than working on existing utilities, particularly involving new ground disturbance in previously undisturbed areas. There will be impacts to vegetation along utility corridors during construction; however, the area would either revegetate on its own or be re-vegetated in accordance with the applicable permits and SWPPP. Relocation of utilities and corresponding ROWs into previously undeveloped areas may cause impacts to additional acreage of vegetation. If FEMA determines that biological impacts are greater than what this PEA includes, FEMA will review those projects on a case-by-case basis to determine appropriate level of NEPA analysis.

AR_0002925

**Alternative 4: Combination**

This alternative consists of performing work on existing utilities and constructing new utilities. Building new utilities will often have greater impacts than working on existing utilities, because of the potential for increased ground disturbance in previously undisturbed areas. Alternative 4 will have effects similar to those discussed under Alternatives 2 and 3.

## 5.8 WILDLIFE AND FISH

Biological resources include native or naturalized plants and animals and their habitats (e.g. wetlands, forests, and grasslands). Adverse effects to biological resources, including fish and wildlife are significant if impacts to species or habitats of concern are over relatively large areas, or if disturbances cause reductions in population size or distribution. FEMA evaluates the proposed alternatives to assess potential impacts to biological resources resulting from potential physical impacts such as habitat loss, noise, and impacts to water quality. There are several federal acts that express the will of Congress to protect the quality of the aquatic environment as it affects the conservation, improvement and enjoyment of fish and wildlife resources.

The Migratory Bird Treaty Act (MBTA) of 1918 provides a program for the conservation of migratory birds that fly through lands of the United States. The lead Federal agency for implementing the MBTA is the USFWS. The law requires Federal agencies to ensure that actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of any migratory birds or result in the destruction or adverse modification of designated critical habitat of such species. The law makes it illegal for anyone to "take," possess, import, export, transport, sell, purchase, barter, or offer for sale, purchase, or barter, any migratory bird, or their parts, feathers, nests, or eggs. "Take" is defined as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or any attempt to carry out these activities."

In the Commonwealth there are laws which place both state and federally protected wildlife and plants into the jurisdiction of PRDNER. As discussed above, the New Wildlife Law of Puerto Rico declares all plants and wildlife as property of the commonwealth. Additionally, Regulation No. 6765 and Regulation No. 6766 of the Commonwealth provides the legal basis for the Department of Natural and Environmental Resources to manage biological resources, including hunting activities and invasive species.

### 5.8.1 Existing Conditions

Puerto Rico hosts about 5,847 native species of fish, mammals, birds, reptiles, insects, and amphibians (PRDNER 2017). Of the 5,847 wildlife species, there are seven native freshwater fish, 15 terrestrial and marine mammals, 190 birds, 51 reptiles, and 18 amphibians (PRDENR 2005). The Draft Comprehensive Wildlife Plan revisions of 2017 shows some slightly different data, stating there are 15 mammals, nine native freshwater fish, 190 birds, 54 reptiles, 19 amphibians, and 5,573 insects; however, the plan is not yet final (PRDENR 2017).

Puerto Rico hosts more than 45 exotic bird and more than 35 are either well-established or have small breeding populations. Although 27 native species are known from Puerto Rico, two are extinct: The White-necked Crow *Corvus leucognaphalus* and the Hispaniolan Parakeet *Aratinga chloroptera*. According to the Puerto Rico Ornithological Society there are 20 Important Bird

41

Areas on the islands (Mendez 2008). The primary concerns for avian species on the archipelago are the rapid development of habitat to urbanized areas. The conservation priorities are for the acquisition of protected areas that provide for those necessary habitats that are rapidly disappearing and are under represented on the islands (USFWS 2015).

### 5.8.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

Under the No Action alternative, FEMA would not provide grant funding for permanent utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. While it is unlikely the Commonwealth and its partners would be able to finance widespread utility projects, there is no way to be certain that for the projects they do fund that they would comply with all applicable local and federal laws and regulations. Under the No Action Alternative, FEMA anticipates that the effect locally and regionally on wildlife and fish would be adverse and negligible to minor for both the short-term and long-term. The most likely adverse and beneficial impacts would be associated with neglect. Unstable or deteriorating infrastructure would pose both short-term and long-term adverse impacts to wildlife and fish through direct impacts from the collapse of structures and electrocution or indirect impacts resulting from erosion, stormwater runoff, and pollution. Conversely, without continued human use or landscape maintenance, some locations may become overgrown. If an area becomes overgrown, there is the potential for it to provide a beneficial habitat feature for wildlife.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

This alternative consists of performing work on utilities in existing alignments; however, utility projects included under Alternative 2 may occur in, on, or over land, streams, and reservoirs. The work on embankments and in-water work could impact wildlife and fish. This alternative would likely result in adverse short-term negligible to minor impacts to the habitat during construction activities. The implementation of the BMPs included in Section 6 would limit indirect impacts to fish and wildlife habitat. The requirements and implementation of NPDES permitting and SWPPP maintenance will limit degradation of water quality from runoff and sedimentation.

**Alternative 3: Realignment or Relocation of Utilities**

This alternative includes constructing new utilities in areas both previously disturbed and undisturbed. Building new utilities often causes greater impacts than working on existing utilities, particularly in undisturbed areas. The realignment or relocation of utilities and corresponding ROWs on undisturbed lands could result in removal of wildlife habitat. FEMA will review projects on a case-by-case basis to identify impacts to wildlife and fish. If necessary, consultation with the USFWS as well as other regulatory would occur as needed.

This alternative would likely result in adverse short-term negligible to minor impacts to the habitat during construction activities. The implementation of the BMPs included in Section 6 would limit indirect impacts to fish and wildlife habitat. The NPDES permitting process and implementation of a SWPPP would limit the degradation of water quality from runoff and contain loose sediment to the vicinity of the construction area. As some actions would result in the permanent conversion

42

AR_0002927

of land, this alternative would likely result in adverse long-term negligible to minor impacts to wildlife and fish habitat following the construction of utility projects.

**Alternative 4: Combination**

Alternative 4 will have effects similar to those discussed under Alternatives 2 and 3.

## 5.9 THREATENED AND ENDANGERED SPECIES

The Endangered Species Act (ESA) of 1973 provides a program for the conservation of threatened and endangered (T&E) plants and animals and their habitats. The lead Federal agencies for implementing ESA are the USFWS and the NOAA NMFS. The law requires Federal agencies to ensure that actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of designated critical habitat of such species. The law also prohibits any action that causes a "taking" of any listed species of endangered fish or wildlife.

Protected and sensitive biological resources include federally listed endangered or threatened, proposed, and candidate species designated by the USFWS and NMFS. Sensitive habitats include those areas designated by the USFWS as critical habitat protected by the ESA and sensitive ecological areas as designated by Commonwealth or federal rulings. Designated Critical Habitat (DCH) is a term defined and used in the ESA that outlines specific geographic areas that contain features essential to the conservation of an endangered or threatened species and that may require special management and protection. Critical habitat may also include areas that are unoccupied by the species but are necessary for its recovery. Sensitive habitats also include wetlands, plant communities that are unusual or of limited distribution, and important seasonal-use areas for wildlife (e.g. migration routes, breeding areas, crucial summer and winter habitats).

Section 7(a)(2) of the ESA requires the lead federal agency to consult with either the FWS or the NMFS, depending which agency has jurisdiction over the federally-listed species in question, when a federally-funded project either may have the potential to adversely affect a listed species, or a federal action occurs within or may have the potential to impact DCH. Additionally, Section 7, requires that federal agencies ensure that any activities they authorize, funded, or carried out are not likely to destroy or adversely modify the DCH of a listed species.

### 5.9.1 Existing Conditions

**Table 4** presents the federally listed threatened and endangered terrestrial species managed by USFWS for the Commonwealth. Appendix E contains habitat characteristics for the species presented in **Table 4**.

**Table 4: Terrestrial-based Federally ESA Listed Threatened & Endangered Species**

| Common Name | *Scientific Name* | Federal Status* | Critical Habitat |
|---|---|---|---|
| **Birds** | | | |
| Elfin-woods warbler | *Setophaga angelae* | T | Proposed |
| Piping plover | *Charadrius melodus* | E, T** | No |
| Puerto Rican broad-winged hawk | *Buteo platypterus brunnescens* | E | No |
| Puerto Rican nightjar | *Caprimulgus noctitherus* | E | No |

43

AR_0002928

| Common Name | Scientific Name | Federal Status* | Critical Habitat |
|---|---|---|---|
| Puerto Rican parrot | *Amazona vittata* | E | No |
| Puerto Rican plain Pigeon | *Columba inornata wetmorei* | E | No |
| Puerto Rican sharp-shinned hawk | *Accipiter striatus venator* | E | No |
| Roseate Tern | *Sterna dougallii dougallii* | T | No |
| Rufa Red Knot | *Calidris canutus rufa* | T | No |
| Yellow-shouldered blackbird | *Agelaius xanthomus* | E | Yes |
| **Amphibians** | | | |
| Golden coqui | *Eleutherodactylus jasperi* | T | Yes |
| Guajon | *Eleutherodactylus cooki* | T | Yes |
| Llanero Coqui | Eleutherodactylus juanariveroi | E | Yes |
| Puerto Rican crested toad | Peltophryne lemur | T | No |
| **Reptile** | | | |
| Culebra Island giant anole | *Anolis roosevelti* | E | Yes |
| Mona boa | *Epicrates monensis monensis* | T | Yes |
| Mona ground Iguana | *Cyclura stejnegeri* | T | Yes |
| Monito gecko | *Sphaerodactylus micropithecus* | E | Yes |
| Puerto Rican boa | *Epicrates inornatus* | E | No |
| Virgin Islands tree boa | *Epicrates monensis granti* | E | No |
| **Plants** | | | |
| Arana | Schoepfia arenaria | T | No |
| Bariaco | Trichilia triacantha | E | No |
| Cana Gorda Girdlepod | Mitracarpus polycladus | E | No |
| Capa rosa | Callicarpa ampla | E | No |
| Cerro de Punta Jayuya | Elaphoglossum serpens | E | No |
| Chase's Threeawn | Aristida chaseae | E | No |
| Chupacallos | Pleodendron macranthum | E | No |
| Cobana negra | Stahlia monosperma | T | No |
| Cook's holly | Ilex cookii | E | No |
| Cordillera Maiden Fern | Thelypteris inabonensis | E | No |
| El Yunque Colorado | Ternstroemia subsessilis | E | No |
| Elfin tree fern | Cyathea dryopteroides | E | No |
| Erubia | Solanum drymophilum | E | No |
| Heller's Cieneguillo | Daphnopsis hellerana | E | No |
| Higo Chumbo-Prickly Pear | Harrisia portoricensis | T | No |
| Higuero de sierra | Crescentia portoricensis | E | No |
| Jamaican Broom | Chamaecrista glandulosa var. mirabilis | E | No |
| Luquillo Mtn babyboot | Lepanthes eltoroensis | E | No |
| Mata Buey-Beautiful goetzea | Goetzea elegans | E | No |
| Maxwell's Girdlepod | Mitracarpus maxwelliae | E | No |
| Monte Guilarte Hollyfern | Polystichum calderonense | E | No |
| No common name | Varronia rupicola | T | Yes |
| No common name | Cranichis ricartii | E | No |
| No common name | Gonocalyx concolor | E | Yes |
| No common name | Leptocereus grantianus | E | No |

44

AR_0002929

**JA_242**

| Common Name | Scientific Name | Federal Status* | Critical Habitat |
|---|---|---|---|
| No common name | Myrcia paganii | E | No |
| No common name | Thelypteris verecunda | E | No |
| No common name | Vernonia proctorii | E | No |
| Palma de manaca | Calyptronoma rivalis | T | No |
| Palo colorado | Ternstroemia luquillensis | E | No |
| Palo de jazmin | Styrax portoricensis | E | No |
| Palo de nigua | Cornutia obovata | E | No |
| Palo de ramon | Banara vanderbiltii | E | No |
| Palo de rosa | Ottoschulzia rhodoxylon | E | No |
| Pelos del diablo | Aristida portoricensis | E | No |
| Proctor's Staggerbush | Lyonia truncata var. proctorii | E | No |
| Puerto Rico Halberd Fern | Tectaria estremerana | E | No |
| Puerto Rico Maiden Fern | Thelypteris yaucoensis | E | No |
| Puerto Rico Maidenhair | Adiantum vivesii | E | No |
| Puerto Rico Manjack | Cordia bellonis | E | No |
| Sintenis' Holly | Ilex sintenisii | E | No |
| St. Thomas prickly-ash | Zanthoxylum thomasianum | E | No |
| Thomas' Lidflower | Calyptranthes thomasiana | E | No |
| Tropical Lilythorn | Catesbaea melanocarpa | E | Only VI |
| Turtlefat | Auerodendron pauciflorum | E | No |
| Uvillo-Luquillo Mtn Stopper | Eugenia haematocarpa | E | No |
| Vahl's boxwood | Buxus vahlii | E | No |
| West Indian Walnut-Nogal | Juglans jamaicensis | E | No |
| Wheeler's peperomia | Peperomia wheeleri | E | No |
| Woodbury's Stopper | Eugenia woodburyana | E | No |
| Yerba Maricao de Cueva | Gesneria pauciflora | T | No |

E = federally listed endangered species located in the Commonwealth of Puerto Rico

T = federally listed threatened species located in the Commonwealth of Puerto Rico

Source: United States Fish and Wildlife Service Sources: https://www.fws.gov/southeast/puerto-rico/ and https://ecos.fws.gov/ecp0/reports/species-listed-by-state-report?state=PR

**Piping plover is endangered in Cabo Rojo National Wildlife Refuge, and threatened in the rest of PR

Currently there is one candidate species located within the Commonwealth, the Puerto Rico harlequin butterfly (*Atlantea tulita*) (USFWS ECOS 2018b). Petitioned species include Mona skink (*Spondylurus monae*), Puerto Rican skink (*S. nitidus*), and Culebra skink (*S. culebrae*) (USFWS pers. comm. 2019a).

**Designated Critical Habitat**

According to the USFWS, eleven of the federally listed T&E species managed by the service have designated critical habitat in Puerto Rico. In addition to those above species designated critical habitats, *Gonocalyx concolor* and *Varronia rupicola* also have critical habitat and the Elfin-woods

45

AR_0002930

**JA_243**

Warbler has proposed critical habitat even though these species are unlisted in Puerto Rico (**Figure 8** in **Appendix A**). The following is a list of terrestrial species that have designated critical habitat:

*Culebra Island Giant Anole, Golden Coqui, Goncalyx concolor, Puerto Rican Rock Frog, Hawksbill Sea Turtle, Mona Boa, Llanero Coqui Mona Ground Iguana, Monito Gecko, Varronia rupicola, and Yellow-shouldered Black Bird (USFWS IPaC 2018).*

NMFS has designated additional DCH for species; however, due to the location of the critical habitat being located either in the Atlantic Ocean or Caribbean Sea, it will not be discussed further.

### 5.9.2 Potential Impacts and Proposed Mitigation

Existing programmatic consultations may cover projects accomplished by FEMA for this disaster, such as consultation on the Puerto Rican Boa Commonwealth-wide. FEMA will initiate consultation for any project not covered by an existing consultation and apply appropriate conservation measures resulting from consultation. The project REC must document all consultations and results prior to construction commencement. FEMA will evaluate any project that potentially adversely affects federally listed species or their DCH for tiered or SEA, on a case-by-case basis.

### Alternative 1: No Action

Under the No Action alternative, FEMA would not provide grant funding for permanent utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. While it is unlikely the Commonwealth and its partners would be able to finance widespread utility projects, there is no way to be certain that for the projects they do fund that they would comply with all applicable local and federal laws and regulations. Under the No Action Alternative, FEMA anticipates that the effect locally and regionally on federally listed T&E species would be adverse and negligible to minor for both the short-term and long-term.

The most likely adverse and beneficial impacts to T&E species from the No Action Alternative would be associated with neglect. Unstable or deteriorating infrastructure would pose both short-term and long-term adverse impacts to T&E species through direct impacts from the collapse of structures and electrocution or indirect impacts resulting from erosion, stormwater runoff, and pollution. Conversely, without continued human use or landscape maintenance, some locations may become overgrown. If an area becomes overgrown there is the potential for it to provide a beneficial habitat feature for T&E species.

### Alternative 2: Repair, Replacement, and Upgrade of Utilities

The actions under this alternative may affect sensitive biological resources. However, at the programmatic level; the expectation is that landscaped or managed vegetation would occur within the disturbed footprint of many project areas. The potential impacts to T&E species are likely to result from construction activities. Alternative 2's actions consist of performing work on utilities within existing alignments. Embankment work and temporary in-water work that affects land, streams, and reservoirs may occur. FEMA will review projects based on available information for the potential occurrence of T&E species and DCH in the area.

46

AR_0002931

FEMA will consult with USFWS on individual projects as necessary for compliance with ESA. The consultation process would identify any project conditions necessary to minimize impacts to T&E Species and DCH. The Applicant would be responsible for complying with all conditions issued by the USFWS as well as, the implementation of BMPs presented in Section 6. Additionally, the NPDES permitting program and implementation of a SWPPP would limit impacts to water quality from runoff and sedimentation.

Based on this PEA's project thresholds, federal consultations, conservation measures, and NPDES permitting requirements, Alternative 2 may have an adverse negligible to minor short-term and long-term impact on the federally-listed endangered, threatened, and proposed or candidate species. If through the consultation process, the USFWS determines that a project has the potential to have an adverse effect on T&E species, the project would be beyond the scope of this PEA and require FEMA to perform an additional NEPA analysis.

**Alternative 3: Realignment or Relocation of Utilities**

This alternative includes constructing new utilities in areas both previously disturbed and undisturbed. Building new utilities often causes greater impacts than working on existing utilities, particularly in undisturbed areas. The construction phase, permanent conversion of land, and operations of new systems would constitute short-term and long-term adverse impacts. The realignment or relocation of utilities and corresponding ROWs on undisturbed lands could result in removal of plant and animal habitat.

FEMA would review projects on a case-by-case basis to identify potential impacts to federally listed T&E Species and DCH. If necessary, consultation with the USFWS as well as other regulatory agencies would occur as needed. The Applicant would be responsible for complying with all conditions issued by the USFWS and the implementation of BMPs presented in Section 6. Additionally, the NPDES permitting program and implementation of a SWPPP would limit impacts to water quality from runoff and sedimentation.

Based on this PEA's project thresholds, federal consultations, conservation measures, and NPDES permitting requirements, Alternative 3 may have an adverse negligible to minor short-term and long-term impact on the federally-listed endangered, threatened, and proposed or candidate species and their DCH. If through the consultation process, the USFWS determines that a project has the potential to have an adverse effect on T&E species, the project would be beyond the scope of this PEA and require FEMA to perform an additional NEPA analysis.

**Alternative 4: Combination**

Alternative 4 will have effects similar to those discussed under Alternatives 2 and 3.

**5.10 CULTURAL RESOURCES**

Cultural resources (aka historic and archaeological resources) are subject to review under Federal and State laws and regulations. The National Historic Preservation Act (NHPA) passed in 1966, established State Historic Preservation Offices (SHPO) and the National Register of Historic Places (NRHP).

47

AR_0002932

The NRHP is the United States' official list of significant historic properties and is part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect historic and archeological resources. The Secretary of the Interior administers the NRHP through the National Park Service (NPS). Historic properties include districts, buildings, structures, objects, landscapes, archaeological sites, traditional cultural properties, and other resources that are significant in American history, architecture, archeology, engineering, and culture. To be eligible for listing, a property must meet eligibility criteria delineated by the Secretary of the Interior and retain enough integrity to convey its significance to American culture. The 36 CFR Part 60 contains eligibility criteria for listing a property on the NRHP.

Section 106 of the NHPA, as amended, and implemented by 36 CFR Part 800 requires Federal agencies to consider the effects of their actions on historic properties and provide the Advisory Council on Historic Preservation (ACHP) an opportunity to comment on federal projects that have an effect on historic properties. This action must take place prior to the expenditure of federal funds. Pursuant to 36 CFR 800.4(a)(1), the definition of the Area of Potential Effects (APE) is the geographic area(s) within which the undertaking may directly or indirectly affect cultural resources.

Once identified, resources are assessed against significance criteria and only historic properties determined to be eligible for listing on the NRHP are covered under the NHPA.

FEMA evaluates impacts to cultural resources prior to project actions for both Historic Standing Structures (above ground resources) and Archaeology (on and below ground resources) within the APE.

### 5.10.1 Historic (Standing) Structures

### 5.10.1.1 Existing Conditions – Historic Standing Structures

Throughout four centuries, Spanish colonists established many buildings and structures (i.e. Catholic Churches, civic and military structures) throughout the island. Many remain standing and listed on the NRHP. Across Puerto Rico there are over 350 properties listed on theNRHP, 18 historic districts, and 6 National Historic Landmarks (NHL), altogether over 200 resources are within the register (**Figure 9** in **Appendix A**) (NPS NRHP 2019). Also, there are twelve Historic Zones declared by the PRPB and overseen by the Institute of Puerto Rican Culture.

Urban development, coastline, and mountains dominate Puerto Rico's overall viewshed. The Cordillera Central (Central Mountain Range) spans the island from east to west and separates the more arid south from the more tropical north. At its highest point (Cerro De Punta), the mountains reach 4,390 ft above mean sea level. Ruta Panorámica is a 165 mile stretch of highway running roughly east-west through the Central Mountain Range, connecting ridgelines, towns, and natural reserves. Other visual resources include elements incorporated into other sections of this PEA, including vast cultural and historic resources dating from pre-colonial Taíno carvings, Spanish Colonial forts, and historic districts.

Hurricane Maria damaged the Commonwealth's infrastructure causing negative impacts to many of the territory's historic structures. Recovery efforts that will repair and harden many of these historic properties are ongoing.

48

AR_0002933

## 5.10.1.2 Potential Impacts and Proposed Mitigation to Historic (Standing) Structures

Analysis of potential impacts to historic resources considers both direct and indirect impacts. Descriptions of what constitute direct and indirect impacts are as follows:

- Direct impacts may occur by physically altering, damaging, or destroying all or part of a resource or introducing visual, audible, or atmospheric elements that are out of character with the property or alter its setting. Once identification of the proposed action locations occurs, assessment of the project specific impacts can begin.

- Indirect impacts may occur associated with altering the characteristics of the surrounding environment that contribute to resource significance. Neglect of the resource to the extent that it causes deterioration or destruction of the resource can be an indirect impact as well.

Following the establishment of potential impacts or effects, is the identification of specific cultural and historic resources affected and the nature of potential impacts. Indirect impacts primarily result from such effects as project-induced population increases in areas served by utilities and development of new housing and commercial areas, access roads, services, and other associated development. Construction, and other activities associated with utilities and the communities they serve, can adversely affect historic resources. If a proposed action may adversely affect historic resources, consultation with the SHPO and other consulting parties can help identify ways to avoid or minimize impacts. If adverse effects are unavoidable, then agencies must resolve the adverse effects through a Memorandum of Agreement, or the Abbreviated Consultation Process as outlined in the FEMA Section 106 Programmatic Agreement. Additionally, FEMA or another Federal Agency may develop a Project Specific Programmatic Agreement to outline a review process, including a process for evaluating historic properties, avoidance and proposed mitigation.

**Alternative 1: No Action**

In the No Action alternative, FEMA does not provide grant funding for utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. The No Action Alternative does not include construction, and thus no new impacts to historic resources would occur as a result of federal funding. Though, existing historic structures may experience degradation due to inability to access the site for repairs and maintenance and could have a long-term negligible to minor impacts.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

This alternative has the potential to affect historic resources. Extant infrastructure of cultural significance or archeological resources may be present within the project area. Physical alternations of the site may also affect cultural resources. FEMA Historic Preservation staff will determine if a project scope of work has the potential to affect the resource or meets Allowances outlined in the Second Amendment Programmatic Agreement with the Puerto Rico SHPO executed onNovember 13, 2019 (FEMA-Puerto Rico SHPO Programmatic Agreement for Section 106 Review, May 2016, Amended April 2018 and known collectively as the Programmatic Agreement. If the scope meets the Allowances, the FEMA will determine if the project is within compliance with Section 106 of NHPA and the review process will be complete. If the proposed scope of work does not fall within an allowance, the Agency will follow the standard Section106

49

AR_0002934

review process and initiate consultation with the SHPO and any appropriate consulting parties. This alternative could consist of construction of new viewshed elements in NRHP districts or properties, removal of historic utility structures(e.g. substations, water pumps or treatment plants), and would require consultation with SHPO prior to their removal. Through consultation and mitigation, this alternative will have a negligible to moderate impact on historic structures.

**Alternative 3: Realignment or Relocation of Utilities**

This alternative will have effects similar to those discussed under Alternative 2. However, this alternative could consist of the removal of historic utility structures for realignment or relocation and would require consultation with SHPO prior to their removal. Through consultation and mitigation, this alternative may have a negligible to moderate impact on historic structures. Additionally, realignment or relocation of overheard utilities, such as powerlines, poles, and communication towers may impact viewshed of a historic property or historic district and require coordination with SHPO before their placement.

**Alternative 4: Combination**

Impacts are similar to those listed under Alternatives 2 and 3.

**5.10.2 Archaeological Resources**

**5.10.2.1 Existing Conditions**

Puerto Rico has a rich cultural history. The indigenous Taino people first encountered Western explorers at the end of the 15th Century when Christopher Columbus' second voyage brought him to the island known to the locals as Boriken (Borinquen). The Taino trace their roots to the Arawak tribes in the Oronoco delta in Venezuela. Around 400 years Before the Common Era (BCE), they began migrating across the Antilles and established communities with the original inhabitants across the northern Caribbean. At the time of Western contact, the Taino were in conflict with the Carib Indians who had settled the Lesser Antilles as early as 1,300 BCE.

Spanish settlers found a well-developed, primarily agrarian society that had developed a sophisticated pharmacopeia from native flora, created pottery with fine detail, cotton weavings and wood, and shell and stone carvings. Intermarriage with Spanish settlers and African slaves brought to the island, and the diseases they brought, coupled with an early 16th century uprising reduced the native Taino population to near zero by the middle of the century.

*Prehistoric Archaeological Resources*

Puerto Rico has approximately 6,000 years of human history encompassing indigenous, colonial, and contemporary occupations covering a chronological range from 3500 BCE to 1500 Common Era (CE). There are approximately 2,500 archaeological sites reported for Puerto Rico in the SHPO and the Institute for Puerto Rican Culture, with similar settlement patterns characteristic of Caribbean geography and defined by the geographical areas where they are located. Typical areas of ancient human settlements are similar to the currently inhabited areas. These include: coastal areas, interior valleys in mountain regions, and flood river valleys.

50

AR_0002935

Distinct types of archaeological sites are located within these principal geographical areas. The most predominant are: shell middens, stone workshops, villages/stone delimited plazas, caves and rock petroglyphs near rivers.

Over the last four decades the implementation of NHPA and Section 106 compliance review has resulted in the identification, evaluation and documentation of numerous significant archaeological resources because of the construction of new utility systems throughout the island. Any repair, replacement or relocation of utilities should take into consideration the potential impact to archaeological resources.

### *Historic Archaeological Resources*

Puerto Rican history did not end with the arrival of the Spanish conquistadors. This stage was one of the rich developments with contributions from many ethnic groups including: European, indigenous, African, Arab, Chinese. Between the 16th and 19th centuries, Puerto Rican culture, through a slow process of development, acquired its current characteristics. These groups constructed some of the social, political, and economic institutions, and the buildings that served as their headquarters. Among these infrastructures are lighthouses, roads, bridges, and buildings (i.e. hospitals and schools). While some of the structures still stand, there is still the need for identification and recording of many of the associated archaeological deposits of these institutions.

In 1898 after the Spanish-American War and the arrival of the U.S. government, there were new developments in Puerto Rico's political and economic structures. Among the most notable are the sugar mills, such as the Guanica Central. Many infrastructure works constructed were irrigation canals, roads, bridges, and public buildings. Many of them are under current conservation measures and are part of Puerto Rican historical heritage.

Among the actions for permanent projects that could potentially increase impact rates for archaeological sites and other historical properties are the construction of staging areas, new access roads, and new ROWs. In general, depending on the type of site, they can have an extension area that varies from hundreds of meters to several kilometers. FEMA has a Programmatic Agreement with the Puerto Rico SHPO executedNovember 13, 2019. These documents and any subsequent future amendments will aid in fulfilling FEMA's responsibilities for Section 106 under NHPA. However, the current version only applies to work limited to the footprint and the ROW but not the staging areas or new access roads. The 2019 2nd Amendment Programmatic Agreement established a distance of 200 meters (650 ft) to be maintained as a buffer zone between any ground disturbance activity and registered historical properties.

### 5.10.2.2 Potential Impacts and Proposed Mitigation, Archaeological Resources

### Alternative 1: No Action

In the No Action alternative, FEMA does not provide grant funding for utility projects potentially leaving communities with unreliable services and vulnerable to future flood events. The No Action Alternative does not include ground disturbance and thus no new impacts to archeological resources would occur.

AR_0002936

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

This alternative has the potential to affect archeological resources. Archeological resources may be present within the project area. Destruction or alteration of any site, structure, or object of prehistoric or paleontological importance may occur during construction. Physical alternations of the site may also affect cultural resources. FEMA Historic Preservation staff will determine if a project scope of work meets outlined Programmatic Allowances from the applicable Programmatic Agreement with the Puerto Rico SHPO or requires standard 106 review and consultation. If the scope of work meets an applicable allowance under the Second Amendment Programmatic Agreement, FEMA will determine that the project is within compliance with Section 106 of NHPA and the review process will be complete. If the proposed scope of work does not fall within the allowances, a FEMA representative will make an effect determination and initiate consultation with the SHPO following the standard Section 106 review process. SHPO consultation may require additional archaeological surveys of ground disturbing activities. This alternative has the potential to affect archeological resources; however, they would be negligible to minor impacts with SHPO consultation.

**Alternative 3: Realignment or Relocation of Utilities**

Utility relocation could result in new ground disturbance. While new ground disturbance has the potential to affect archaeological resources, methods of avoidance, mitigation, or documentation are similar to those used for projects described listed under Alternative 2. This alternative has the potential to affect archeological resources; however, they would be negligible to minor impacts with SHPO consultation.

**Alternative 4: Combination**

Impacts are similar to those listed under Alternatives 2 and 3.

**5.11 ENVIRONMENTAL JUSTICE**

Executive Order 12898, Federal Actions to Address Environmental Justice (EJ) in Minority Populations and Low-Income Populations, requires federal agencies to identify and address disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law. Similarly, NEPA ensures that environmental decisions do not have a disproportionate burden on minority communities or low-income groups.

FEMA uses demographics data to analyze trends associated with this PEA's Action Alternatives to identify potentially disproportionate impacts on minority and low-income populations. On a project level, FEMA would evaluate scopes of work on a case-by-case basis to ensure compliance with EO 12898. Data collection comes from previously published documents issued by Federal and Commonwealth agencies and from state and national databases .

The CEQ guidance states that "minority populations should be identified" where either: a) the minority population of the affected area exceeds 50 percent; or b) the population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographical analysis" (CEQ 1997).

52

AR_0002937

**JA_250**

### 5.11.1 Existing Conditions

This section incorporates a review of the Commonwealth's population dynamics and communities of concern in evaluating areas that may be environmental justice communities. The data sets presented herein are the most current demographics published for Puerto Rico; however, they may not accurately depict the Commonwealth's post Hurricane Maria economic status and population trends. The following summary details an overview of past losses, potential losses, and some of the most vulnerable jurisdictions.

**Population Data**

To ensure compliance with EO 12898, a key question is if a proposed action has the potential to disproportionately affect a low income or minority community and if so, has that population had considerable input in the development of alternatives. Unlike its treatment of poverty, the Census Bureau does not provide an official definition of low income. The USEPA's June 2016 Technical Guidance for Assessing Environmental Justice in Regulatory Analysis suggests that if income levels don't accurately predict risk factors associated with low-income populations due to localized existing conditions, low-income can more broadly be characterized by criteria other than just those that fall below the poverty threshold (e.g. to include families whose income is above the poverty threshold but still below the average household income for the United States). Educational attainment, baseline health status, and health insurance coverage may also be useful to identify low income communities (USEPA 2016).

With regards to determining a disproportionate adverse impact, some communities such as Puerto Rico will have a higher percentage of minority and/or low-income members than populations on mainland USA. Provided these differences have a regular, or uniform, distribution, they generally would not indicate a potential for a disproportionate adverse impact (USEPA 2016).

The 2010 U.S. census data provides the most complete data set of Puerto Rico's population. In 2020, the U.S. Census Bureau will be performing a constitutionally mandated update. The 2020 Census will be the first post-Hurricane Maria accounting of the Commonwealth's population. The 2010 Census revealed a decrease in the population living in the Commonwealth of 2.2percent for the period between 2000 and 2010 (U.S. Census Bureau 2017). The five most populous municipalities within Puerto Rico and their populations are as follows:

- San Juan, 381,931;

- Bayamón, 185,996;

- Carolina, 157,832;

- Ponce, 132,502; and

- Caguas, 82,243

San Juan's population decreased by 9.5 percent from the 2000 Census. With regards to other major municipalities, Bayamón decreased by 8.6 percent, Carolina decreased by 6.1 percent, Ponce decreased by 14.5 percent, and Caguas decreased by 7.3 percent (U.S. Census Bureau 2011).

53

AR_0002938

According the U.S. Census Bureau's fact sheet for the Commonwealth, as of July 1, 2017 (prior to Hurricane Maria) the Commonwealth's population was 3,337,177. The Census Bureau attributed the loss of population in Puerto Rico to emigration. The population data published by the Census Bureau Estimates from last decade used both a residual method and the American Community Survey/Puerto Rico Community Survey to measure international migration for Puerto Rico. Population estimates from the Census Bureau had projected a decline of 0.34 percent from 2000 to 2010; however, as noted above the population of Puerto Rico decrease by approximately 2.2 percent. The Commonwealth's Department of Labor and Human Resources Bureau of Labor Statistics (PR-DLHRBLS) in 2017 stated that according to the U.S. Census Bureau, Population Division, the population of Puerto Rico continued its downward trend losing 6.6 percent of its population between 2010 and 2015. The decreased in the estimated population from 2010 to 2015 shows a reduction of 247,345 persons (PR-DLHRBLS 2017). A possible explanation for the decrease in population and increased emigration from the Commonwealth is the rise in unemployment. According to Census Bureau data the unemployment rate in Puerto Rico increased by 17.3 percent between 2007 and 2011.

The racial makeup of the Commonwealth based on the 2010 census is 98.9 percent Hispanic or Latino. Within the category of Hispanic or Latino, the population was 69.4 percent white, 9.1 percent was black, 7.5 percent were two or more races, 0.3 percent were American Indian or Alaska Native, and 0.3 percent were Asian (U.S. Census Bureau 2017).

**Education**

Based on the most recent Census Data developed by the USDA, the trend in Puerto Rico over the last 50 years is towards higher levels of education (**Figures 10** and **11**, both in **Appendix A**). However, the percentage of the overall population with a college degree by 2016 was 24.6 percent, while 26.1 percent do not have a high school diploma or equivalent (U.S. Census Bureau 2017). By 2017, just one year later, the education levels improved slightly with 24.9 percent completing college and 25.3 percent still without a high school diploma (USDA 2019).

**Income Levels**

According to Census Bureau data, the median household income for the Commonwealth of Puerto Rico between 2012 and 2016 was $19,606. Commonwealth wide, 43.5 percent households are below the poverty level (U.S. Census Bureau 2017). In 2017, the poverty rate for the Commonwealth was 44.4 percent (USDA 2019).

The Puerto Rico Department of Labor Research and Statistics pre-Hurricane Maria expectation was that the highest occupational increases in the Commonwealth between 2014 and 2024 would be in the health care sector and the largest decrease in employment would be in the construction sector. Prior to Hurricane Maria, the anticipated main job losses within the construction sector were paving, surfacing, and associated activities. The most recent data from the U.S. Bureau of Labor Statistics indicates that the 2018 average hourly wage for Puerto Rico was $14.16 (U.S. Bureau of Labor Statistics 2018).

54

AR_0002939

**Communities of Concern**

The terms "EJ [EJ] Area" or "EJ Community" describe a community that satisfies the intent of EO 12898. Another term that is used in describing an applicable EJ community for analysis purposes is "Community of Concern (COC). Potential COC's are any EJ community that may become overburdened by an action alternative. For Puerto Rico, a COC can be indistinguishable from the surrounding community using minority status as the key demographic in the EJ analysis since the island is predominately Hispanic (Region 2 EPA 2000). As such other variables may be appropriate to considered when analyzing environmental justice. For instance, air quality, commercial and industrial facilities, and land use may be appropriate when analyzing EJ for Puerto Rico (Region 2 EPA 2000).

The percentage of households below the poverty level do not vary between Municipalities or towns a great deal island wide. There are however, small variations in racial makeup, income levels, and poverty rates that differ slightly between regions and Municipalities within Puerto Rico. For example, the southeast Municipalities near Arroyo and Yabucoa generally have a higher percentage of black Hispanic population than many other Municipalities. Population densities and per capita income are much higher in the San Juan-Bayamon-Guaynabo-Carolina and Caguas regions than the rest of the island (USEPA NEPAssist 2019c).

### 5.11.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

Under the No Action alternative, FEMA does not provide grant funding for utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. Additionally, EO 12898 would not apply to locally-funded projects.

The No Action Alternative may cause adverse impacts to the socioeconomics of a community if the Applicant is unable to repair, upgrade, or make utilities more resilient to future storm events. For instance, the No Action Alternative could result in a reduction in public services such as power, water, or communications access for emergency, police, and fire services. The No Action Alternative could impact localized employment rates for industries that are dependent on utilities to provide reliable service. However, data does not exist to support a claim that the existing level of utility service is causing widespread losses of employment and reduced access to health services. The No Action Alternative would continue the same level of service and resiliency for EJ communities. This could have both an adverse short and long-term less than major impact for those communities affected.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

FEMA anticipates jobs related to the recovery are likely to be available for all education and skill levels. The increase in construction jobs would be short-term in nature and upon completion of the recovery projects, conditions would likely return to a pre-disaster state. As such, FEMA anticipates an increase in construction jobs from the post Hurricane Maria recovery would likely have a less than major beneficial impact on Puerto Rico's economy.

AR_0002940

By meeting current codes and standards, activities covered under Alternative 2 would result in utility networks that are more resilient. At the programmatic level, Alternative 2 actions could occur at any applicable location throughout the Commonwealth. As such, all demographics within Puerto Rico could benefit from the actions undertaken by this Alternative. The benefit of improving resiliency would be long-term and depending on existing conditions could have a range of beneficial impacts from minor to moderate.

Short-term negligible to minor adverse impacts to effected populations may occur during construction due to service interruption, road detours, and building construction. The Applicant will be responsible for managing the inconveniences and disruptions of service through the implementation of maintenance of traffic (MOT) and public notifications. At the programmatic level, short-term minor adverse impacts could occur at any applicable location within the Commonwealth. Due to the geographical extent of the disaster and potential for projects to occur anywhere within Puerto Rico, Alternative 2 would not disproportionally single out low income or minority populations for adverse impacts from the construction of proposed actions. The Applicant would be responsible for identifying applicable projects and determining the best method of minimizing impacts to local populations.

**Alternative 3: Realignment or Relocation of Alternatives**

Generally, the impacts to socioeconomics and environmental justice from this alternative would be similar to those described for Alternative 2. The Applicant would be responsible for identifying applicable projects and determining the best method of minimizing impacts to local populations. FEMA would review projects on a case by case basis to confirm that Applicant has included mitigative measures in their scopes of work.

The Applicant may abandon utilities in place if they pose no risk to the surrounding population or environment. The Applicant would be responsible for recording any abandoned utilities with the appropriate agencies and utility locators.

**Alternative 4: Combination**

Generally, the impacts to socioeconomics and environmental justice from this alternative would be similar to those described for Alternatives 2 and 3.

**5.12 LAND USE AND PLANNING**

Comprehensive land use plans determine land use within the vicinity of urban and rural areas. These plans specify the types of present and future land use. In most cases, the development of comprehensive plans through a public participation process as approved by publicly-elected officials will capture local values and attitudes of planning and future development. Zoning ordinances and land use regulations vary throughout Puerto Rico.

**5.12.1 Existing Conditions**

**Figure 12** in **Appendix A** illustrates Puerto Rico's current land cover estimates based on the Multi-Resolution Land Characteristics (MRLC) Consortium 2001 National Land Cover Database. The

56

AR_0002941

values were derived by the MRLC through remote sensing and the application of an algorithm (MRLC 2018). **Table 5** displays the land cover in Puerto Rico.

**Table 5: Land Cover of Puerto Rico**

| NLCD2001 Land Cover Class for Puerto Rico | Percentage |
|---|---|
| 11. Open Water | 21.56 |
| 12. Perennial Ice Snow | 0.00 |
| 21. Low Intensity Residential | 2.21 |
| 22. High Intensity Residential | 5.45 |
| 23. Developed, Medium Intensity | 3.38 |
| 24. Developed High Intensity | 0.52 |
| 31. Bare Rock/Sand/Clay | 0.49 |
| 41. Deciduous Forest | 0.00 |
| 42. Evergreen Forest | 35.86 |
| 43. Mixed Forest | 0.00 |
| 52. Shrub/Scrub | 2.14 |
| 71. Grasslands/Herbaceous | 22.37 |
| 81. Pasture/Hay | 2.09 |
| 82. Row Crops | 1.75 |
| 90. Woody Wetlands | 0.93 |
| 95. Emergent Herbaceous Wetlands | 1.25 |
| **Total** | **100.00%** |

A detailed description of all NLCD2001 land cover class proportions across Puerto Rico. Note: this table is for illustrative purposes only, NLCD2001 has the most recent data file with complete detailed land cover analysis.

## 5.12.2 Potential Impacts and Proposed Mitigation

### Alternative 1: No Action

Under the No Action alternative, FEMA does not provide grant funding for utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. Under the No Action alternative there is no federal action and restoration of utilities would rely on local funding. Due to the emergency actions funded by FEMA, widespread disruptions in service from Maria-damaged utilities does not currently exist. FEMA anticipates that the No Action Alternative would have either no impact or an adverse negligible short-term and long-term impact on land use within the Commonwealth as residents adjust to existing conditions.

### Alternative 2: Repair, Replacement, and Upgrade of Utilities

Under this alternative, the replacement of existing utilities would be in-kind although with minor upgrades being possible. The use of current codes and standards would make utilities inherently more resilient. The construction process may include raising the elevation of existing utilities or placing utilities underground. During construction, temporary staging areas and access roads would have a short-term minor impact on land use. The utility footprint itself will remain largely within the previous ROW therefore no substantial changes in land use would occur. Some projects however may require small portions of new ROW due to upgrades. This may lead to adverse negligible to minor long-term changes in land use. If the footprint extends outside of the existing ROW into public or private lands, it may require a new or revised easement. For all ROW acquisitions, the Applicant will comply fully with federal and Commonwealth requirements where applicable.

57

AR_0002942

**Alternative 3: Realignment or Relocation of Utilities**

Alternative 3 entails the realignment or relocation of utilities. If it is unsafe for the Applicant to rebuild a utility that services an area, Alternative 3 allows local governments to buy out some parcels of private property. The Applicant may have to obtain a new or revised easement if project footprints extend outside of an existing ROW. For all ROW acquisitions, the Applicant would comply fully with all federal and Commonwealth requirements.

FEMA anticipates Alternative 3 would have an adverse short-term minor impact on land use from the installation of new utilities. The construction of Alternative 3 actions may include impacts to land use from the excavation and compaction of soil resources. Alternative 3 actions may also include the clearing of vegetation from within an existing or new utility corridor. The Applicant would be responsible for implementing site stabilization and revegetation measures in accordance with their NPDES permits and SWPPP. Additionally, the Applicant would be responsible for deploying the mitigation measures presented in Section 6 to minimize impacts to existing land uses.

The utility operators will manage deed and ROW restrictions to limit impacts to the infrastructure from other actions that could result in disruptions in service. The occupation of new ROWs and project areas would cause an adverse long-term minor impact to land use as restrictions on future development would likely exist.

FEMA anticipates that the removal of utilities would cause an adverse negligible to minor long-term impact on the former locations of relocated utilities. For locations where the Applicant plans on abandoning utilities or management issues remain, the resulting parcel may require land use restrictions that prevent future development. In some cases, the action would essentially revert the land to previous uses or the Applicant may be able to be reuse the parcels for other industrial purposes. In both cases, the Commonwealth could derive a negligible long-term benefit from the actions.

**Alternative 4: Combination**

The potential impacts of Alternative 4 would be similar to the impacts identified in Alternatives 2 and 3.

**5.13 NOISE**

Noise is defined as unwanted or unwelcome sound and measured in decibels (dBA) on the A-weighted scale (i.e. the scale most similar to the range of sounds that the human ear can hear). Noise that occurs during the night (10 p.m. to 7 a.m.) is more disturbing than those that occur during normal waking hours (7 a.m. to 10 p.m.). The Noise Control Act of 1972 required the USEPA to create a set of noise criteria. In response, the USEPA published *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety* in 1974 which explains the impact of noise on humans. The USEPA report found that keeping the maximum 24-hour Ldn value below 70 dBA protects the majority of people from hearing loss. The Quiet Communities Act of 1978 enabled the development of state and local noise control programs, to provide an adequate Federal noise control research program. According to

58

AR_0002943

published lists of noise sources, sound levels, and their effects, sound causes pain starting at approximately 120 to 125 dBA (depending on the individual) and can cause immediate irreparable damage at 140 dBA. Occupational Health and Safety Administration (OSHA) has adopted a standard of 140 dBA for maximum impulse noise exposure.

The HUD noise standards (24 CFR Part 51, Subpart B) indicate that for proposed new construction in high noise areas, the project must incorporate noise mitigation features. The "Normally Unacceptable" noise zone includes community noise levels from greater than 65 dBA to 75 dBA.

The Day Night Average Sound Level (DNL or Ldn) is an average measure of sound. The DNL descriptor, accepted by federal agencies, is a standard for estimating sound impacts and establishing guidelines for compatible land uses. The federal government regulates sound by the Noise Control Act of 1972, which charges the USEPA with preparing guidelines for acceptable ambient noise levels. USEPA guidelines, and those of many other federal agencies, state that outdoor sound levels in excess of 55 dBA DNL are "normally unacceptable" for noise-sensitive land uses including residences, schools, or hospitals (USEPA 1974). The Noise Control Act, however, only charges implementation of noise standards to those federal agencies that operate noise-producing facilities or equipment.

Sound Pressure Level (SPL) measures sound in decibels (dB or dBA) with the threshold of human hearing equaling 0 dBA. The SPL increases logarithmically, so that when the intensity of a sound is increased by a factor of 10, its SPL rises by 10 dB, while a 100-fold increase in the intensity of a sound increases the SPL by 20 dB. Equivalent noise level (Leq) is the average of sound energy over time, so that one sound occurring for 2 minutes would have the same Leq of a sound twice as loud occurring for 1 minute. Ldn, based on Leq, measures average sound impacts for the purpose of guidance for compatible land use. This method weighs the impact of sound perceived at night against the impact of the same sound heard during the day by adding 10 dBA to all noise levels measured between 10:00 pm and 7:00 am. For instance, the sound of a car on a rural highway may have an SPL of 50 dBA when *measured* from the front porch of a house. If measured at night, the 24-hour Ldn would include a value of 60 dBA.

Leq and Ldn are useful measures when used to determine levels of constant or regular sounds (such as road traffic or noise from a ventilation system). However, neither represents the sound level as perceived during discrete events, such as fire sirens and other impulse noises. They are averages that express the equivalent SPL over a given time. Because the decibel scale is logarithmic, louder sounds (higher SPL) would carry more weight; however, loud infrequent noises (such as fire sirens) with short durations would not significantly increase Leq or Ldn over the course of a day.

### 5.13.1 Existing Conditions

The PREQB regulates noise pollution in Puerto Rico in accordance with the Noise Pollution Control Regulation of 2011. The regulation has established the threshold for industrial levels at 75 dB.

Existing noise levels would vary by each site location and depend on the sound level and the observer's distance from the source. Noise events in the project vicinity may be associated with

AR_0002944

climatic conditions; transportation noise; local environment; and "life sounds" (e.g. communication, children playing). For those sites located along roadways, there would be existing traffic noise from roadway vehicles. Other potential sources of noise near the site locations prior to construction and repair activities may include transportation sources such as aircraft, machinery and industrial plant equipment, water channels, humans, and animals.

### 5.13.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

In the No Action alternative, FEMA does not provide grant funding for utility projects potentially leaving communities with unreliable services and more vulnerable to future storm events. Temporary emergency repairs and protective measures would remain in place and would only be sufficient until the next storm event. Noise levels would remain similar to those prior to the event. Although, some traffic reroutes from other hurricane-affected areas, like closed roads and bridges, may impact localized noise levels; however, these would be short-term negligible to minor effects.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

The restoration of utilities would carry similar noise levels to pre-disaster levels. FEMA anticipates that noise from construction activities will have short-term minor effects. The Applicant will manage noise impacts by complying with local noise ordinances, using well maintain equipment, and limiting work to daytime hours. During construction periods, transportation noise on temporary detour routes may increase under this alternative due to increasing traffic on alternate roadways as traffic is re-routed into low traffic areas. FEMA anticipates no long-term noise effects.

**Alternative 3: Realignment or Relocation of Utilities**

FEMA anticipates short-term minor impacts associated with utility abandonment or removal. Noise from new construction activities, such as pile/post driving, directional drilling, and construction vehicles (e.g. cement mixing trucks), may have short term minor adverse effects on the workers and persons who live nearby. Noise from construction will comply with PREQB standards. Appropriate BMPs will be similar to those in Alternative 2 to aid in minimizing noise from construction activities. FEMA anticipates no long-term noise effects.

**Alternative 4: Combination**

The noise impacts from this alternative would be like those described for Alternatives 2 and 3 with impacts from noise being minor and short-term impacts during construction activities, affecting both the replacement and relocation project sites. FEMA anticipates no long-term noise effects.

### 5.14 TRANSPORTATION

The Commonwealth's Department of Transportation and Public Works (PRDTOP) governs transportation facilities. The PRDTOP is comprised of the Puerto Rico Highway and Transportation Authority (PRHTA), the Puerto Rico Port Authority, the Maritime Transport Authority (MTA), and the Metropolitan Bus Authority (MBA). PRHTA is the government-owned corporation of Puerto Rico charged with constructing, operating, and maintaining roads, bridges,

AR_0002945

avenues, highways, tunnels, public parking, tolls, and other transit facilities in Puerto Rico. Additionally, the Authority provides an integrated transportation system to Puerto Rico and its people and has jurisdictional and maintenance responsibilities for highways and bridges within the Commonwealth.

## 5.14.1 Existing Conditions

Many linear utilities follow existing roadways; therefore, during construction there could be temporary road closures, traffic pattern changes, and re-routing of public transportation. Puerto Rico has over 2 million automobiles, trucks, and buses constituting one of the highest vehicle densities per capita in the world (Miller 2009). Based on 2007 data published by the FHWA, there are 2,531,199 registered motor vehicles and 115,865 registered motor cycles in the Commonwealth (FHWA 2011). Puerto Ricans are heavily dependent on their transportation system with the average worker commute time of 29.2 minutes, and 90.5% of the workforce travels to work via car, truck or van. Mobility in regional areas is critical for social, recreational and economic activities. Commuting is a part of daily life and truck transportation plays a vital role in Puerto Rico's economy. Although the presence of railway is minimal on the island and used primarily for the transportation of sugar cane. Per USDOT statistics, the Puerto Rico road system is a total of 18,359 miles (FHWA 2017). Puerto Rico has 35,048 total lane miles (or 56,404 km) of roadway of which 6,322 lane miles (or 10,174 km) are in rural areas. The roadways in rural areas include unimproved roads. FHWA assumed that unimproved roadways constitute two lanes in their calculations (FHWA 2013). FHWA lists 2,325 bridges of which 444 are in good condition, 1,608 are in fair condition, and 273 are in poor condition (FHWA 2018). Maintenance and reconstruction of roads and highways must be to the most current standards required by PRDTOP, or as a minimum the "General Design Criteria" for roads and highways (PRDTOP 1979), or the "Minimum Standards for Rural Municipal Roads" (PR FEMA 1992).

## 5.14.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

In the No Action alternative, FEMA does not provide grant funding for utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. Without permanent repairs, FEMA anticipates that further deterioration of utilities, including pipes under roadways, will lead to minor long-term impacts as additional temporary repairs occur.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

FEMA anticipates short-term minor impacts to transportation facilities during the implementation of Alternative 2 actions. Specifically, this would occur in areas where utilities are within or intersect transportation ROWs. Impacts may include temporary road closures, detours, and lane restrictions. The Applicant would minimize impacts by using MOT activities. The DTOP Design Manual (aka the Work Zone Safety and Mobility Policy) requires contractors working in Puerto Rico to implement MOT plans and conduct public notifications. Following repair, replacement, and/or upgrades to utilities, FEMA anticipates that there would be no long-term adverse impacts to transportation infrastructure. A beneficial impact would result from utilities being more resilient and less likely to cause disruptions to the Commonwealth's transportation network.

AR_0002946

**Alternative 3: Realignment or Relocation of Utilities**

FEMA expects negligible to minor long-term adverse impacts to transportation facilities following the relocation or realignment of utilities. The impacts would be associated with future repairs in areas where utilities previously didn't intersect the Commonwealth's transportation network. Adverse short-term minor impacts may occur during construction. The use of MOT by the Applicant, coordination between the Applicant and managers of the Commonwealth's transportation network, and public notifications would minimize adverse impacts to a level of less than major. A beneficial impact would result from utilities being more resilient and less likely to cause disruptions to the Commonwealth's transportation network.

**Alternative 4: Combination**

Generally, the impacts to transportation facilities from this alternative would be similar to those described for Alternatives 2 and 3.

## 5.15 PUBLIC SERVICES AND UTILITIES

This section evaluates the potential impacts of the Action Alternatives on public utilities. A public utility is an organization that maintains the infrastructure for a public service. The interruption of public utilities can cause public health concerns. A reduction in the reliability of public utility services affects all areas of daily life.

The classification of utilities for this PEA includes: water storage facilities, treatment plants, and delivery systems, supplemental power generation, transmission, and distribution facilities, including, but not limited to, wind turbines, generators, substations and power lines, natural gas transmission and distribution facilities, sewage collection systems and treatment plants, landfills, and communication systems.

### 5.15.1 Existing Conditions

The power grid alone includes six fossil fuel and seven hydroelectric generation sites, owned and operated by the PREPA, as well as privately owned generation facilities consisting of two cogeneration plants, two windfarms, and five solar farms. The electric grid includes 2,478 miles of transmission lines, 31,485 miles of overhead and underground distribution lines across the service territory, and 334 substations and transmission centers. Approximately 6% of the distribution lines are underground (Build Back Better 2017).

Approximately 69% of PREPA's 5,839 megawatt (MW) generating capacity is from petroleum. Four central locations generate the majority of electricity: Costa Sur Power Plant, Complejo Aguirre, San Juan, and Palo Seco.

Puerto Rico receives natural gas imported primarily from Trinidad and Tobago, as liquified natural gas (LNG) through the Penuelas terminal and regasification facility at Guayanilla Bay on the southwestern coast. This facility supplies the adjacent 507-megawatt EcoElectrica electricity generating plant. The facility also receives LNG at the terminal as standardized cryogenic containers to supply fuel to some industrial customers.

AR_0002947

PRASA owns and operates the island-wide public water and wastewater systems and has five operational regions: Metro, North, South, East, and West. PRASA has more than 20,000 miles of water and wastewater pipelines and operates 51 wastewater treatment plants that treat 206 million gallons per day of sewage and reported 126 water treatment facilities that treat approximately 500 million gallons per day (PRASA 2019 and PRASA 2013).

USEPA in its 2015 settlement with PRASA requires numerous upgrades in the system to bring the system into compliance with the CWA. PRASA estimated at that time the costs would be up to $1.5 billion (USEPA, 2015). These are long-standing infrastructure issues that USEPA and PRASA have been coordinating on as they relate to water quality and potential human health. Communications within the Commonwealth entails multiple resources, such as, cellular towers and provider networks, fiber optic lines, radio and associated broadcast towers, microwave antennas standard radio towers, land mobile radio (LMR) radio systems, 2-way radio radios, pagers, and Satellite phones (Cornell 2019).

Wireless priority service (WPS) cellular phone providers include: AT&T, Mobility, Sprint/Nextel (CDMA), Sprint/Nextel (iDEN), T-Mobile, and Verizon Wireless, and Claro. Cellular antennas are commercial wireless structures that send and receive signals connecting mobile devices within the carrier's designated coverage area to the public switched network. A Federal Communication Commission (FCC) database of cellular towers of greater than 200 ft in height indicates there are 88 total identified cell tower locations (51 towers are AT&T and 37 towers are other carriers) (Cornell 2019).

There are approximately 238 broadcasts antennas in the Commonwealth-wide. Broadcast antennas comprise of AM, FM, TV Digital, and TV NTSC. Additionally, there are approximately 6,141 microwave towers (Cornell 2019). Microwave towers transmit video, audio, or data between two locations.

### 5.15.2 Potential Impacts and Proposed Mitigation

Public services and utility infrastructure likely exist across all developed portions of the Commonwealth and would be in the vicinity of some, if not all, project sites. The locations of public services and utilities would be determined at each project site in order to assess individual and cumulative impacts. FEMA would document the absence or presence of public services and utilities, as well as, potential impacts within the project REC.

This PEA assesses the potential adverse and beneficial impacts of the Action Alternatives on utilities and infrastructure. This PEA does not include actions that have the potential to cause long-term effects that adversely affect human health and the environment. This PEA does not include actions that would cause long term disruptions to infrastructure networks that residents of the Commonwealth depend on for their existence. If projects exceed the capacity of the existing utility system, such that it requires a significant expansion of infrastructure, they would be beyond the scope of this PEA and require FEMA to perform an additional NEPA analysis.

Although FEMA funded activities under the Action Alternatives would substantially help the utilities within the Commonwealth bring their infrastructure up to current codes and standards, issues of concern do exist. For projects covered under this PEA, the main issues of concern would

be associated with the disruption of service during the construction phase, increased demand for utility capacity, and comparable increases in capacity from implementing the proposed Alternatives.

**Alternative 1: No Action**

Under the No Action alternative, FEMA does not provide grant funding for utility projects, therefore potentially leaving communities with unreliable services and vulnerable to future storm events. FEMA anticipates that the emergency repairs made following Hurricane Maria will not serve as long-term solutions to the Commonwealth's aging infrastructure. The lack of reliability could prove to be a long-term adverse impact on those communities and populations that rely on public services and utilities for their existence.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

During the construction phase of Alternative 2 actions, projects could cause adverse negligible to minor short-term impacts to Puerto Rico's social infrastructure. Social infrastructure includes facilities and institutions such as emergency services, schools, and hospitals. The Applicant would be responsible for coordinating with local communities and institutions regarding any possible delays or interruptions in utility service. Furthermore, the Applicant would be responsible for coordinating with service providers and construction managers to minimize impacts to public services and the communities they support. An adverse short-term minor impact to public services located within the project area could occur as a result of temporary road closures. The deployment of MOT by the Applicant's engineers and contractors would reduce or eliminate potential impacts due to road closures.

FEMA anticipates that Alternative 2 would have no adverse long-term impacts to public services and utilities as well as, the communities they support. This alternative would have long-term beneficial impacts, such as making the utilities more reliable and hardened against future disasters. By bringing utilities up to current codes and standards, energy demands on the existing system would not increase. For most utilities, United States Congress has legislated mandatory increases in energy efficiency for the development of current codes and standards (USDOE 2020). As such, FEMA anticipates that the Commonwealth would experience a long-term negligible beneficial impact by improving the energy efficiency of their utility networks.

**Alternative 3: Realignment or Relocation of Utilities**

The impacts from this alternative would be similar to those described for Alternative 2. However, projects that involve the realignment and relocation of utilities are more likely to intersect existing utility and transportation networks. During the construction phase, short-term impacts to social infrastructure, utility service providers, and the communities they support could occur. The Applicant would be responsible for coordinating with local communities and institutions regarding any possible delays or interruptions in service. Furthermore, the Applicant would be responsible for coordinating with service providers and construction managers to minimize impacts to public services and their communities. FEMA anticipates that the existing utilities will remain in operation until the realigned or relocated utility is ready for service. This would mitigate

64

AR_0002949

**JA_262**

disruptions in public services and utilities. Due to limiting capacity to pre-Hurricane Maria levels, there would be no additional long-term energy demands on the Commonwealth's utility networks.

FEMA expects that the Commonwealth would derive long-term beneficial impacts from Alternative 3. The United States Congress has legislated mandatory increases in energy efficiency for the development of current codes and standards (USDOE 2020). As such, the Applicant would be able to conserve energy as they provide the same level of service to their communities. The realignment and relocation of utilities to less disaster-prone areas would inherently make the Commonwealth's utility networks more resilient. A more resilient network of public services and utilities would in turn benefit the health and safety of the communities they support.

**Alternative 4: Combination**

The impacts to utilities from this alternative would be similar to those described for Alternatives 2 and 3.

## 5.16 PUBLIC HEALTH AND SAFETY

A considerable number of health and safety laws and regulations exist for a wide variety of activities. An exhaustive review of these various rules is beyond the scope of this PEA. With regards to worker safety, the U.S. Congress enacted the Occupational Safety and Health Act of 1970, 29 USC § 651 et seq. (OSHA) to assure safe and healthful working conditions for working men and women.

### 5.16.1 Existing Conditions

Safety considerations can arise in many stages of the NEPA process. Public health and safety can include everything from the safety and security of food supplies to the safe use of drug and medical devices. Utility projects in particular have the potential to affect our safety and security as our protective and health services rely on a vast network of utilities to function in a fast and efficient method.

Within the Commonwealth, the primary protective and health services include fire protection, law enforcement, and medical emergency services. The follow describes the primary authorities tasked with ensuring public health and safety within the Commonwealth:

- The Puerto Rico Firefighters Corps (*Cuerpo de Bomberos de Puerto Rico*) is a Commonwealth-wide fire department with over 91 fire stations. There are six (6) operational zones located in Aguadilla, Arecibo, Carolina, Caguas, Ponce and San Juan. There are eleven (11) districts located in: San Juan, Bayamón, Carolina, Rio Piedras, Caguas, Humacao, Ponce, Guayama, Aguadilla and Arecibo. The Puerto Rico Firefighters Corps' Special Operations Division is a separate division that performs functions such as search and rescue operations in conjunction with the emergency medical services (Cuerpo de Bomberos de Puerto Rico 2020).

- Within the Commonwealth, the municipal police forces, the Special Investigation Bureau, and the Department of Justice make up the local law enforcement apparatus. In all, approximately 17,000 officers service 78 municipalities. Local police departments provide

65

AR_0002950

**JA_263**

law enforcement and emergency services for each community and the surrounding areas. Hurricane Maria has had an adverse effect on many of Commonwealth's police officers, some of which have chosen to quit Puerto Rico's law enforcement establishment.

- The United States Coast Guard (USCG) is the Federal agency operating in Puerto Rico responsible for maritime safety and security, protection of natural resources, homeland security, and national defense. Sector San Juan of the USCG serves all of Puerto Rico

- The Puerto Rico Medical Emergency Corps is the agency of the executive branch of the government of Puerto Rico that responds to all medical emergencies within the jurisdiction of Puerto Rico. The Puerto Rico Department of Health manages the Puerto Rico Medical Emergency Corps. Additionally, the Puerto Rico Medical Emergency Corps is a component of the Puerto Rico's Emergency Operations Center (Departamento de Salud Gobierno de Puerto Rico 2020).

- Throughout the mainland of Puerto Rico, there are 68 hospitals (Puerto Rico Hospital Association 2019) and 30 clinics, all of which have re-opened since Hurricane Maria (Kaiser Family Foundation 2018). Prior to Hurricane Maria, the island of Vieques was served by one hospital and one clinic. Roughly 500-700 physicians and surgeons have left the island since Hurricane Maria (Lluveras 2018). There is no available data on how many medical professionals have since returned to the Commonwealth.

### 5.16.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

Under the No Action alternative, FEMA does not fund utility projects potentially leaving communities with unreliable utility services and be more vulnerable to future storm events. FEMA anticipates that the existing level of utility service is sufficient to maintain the Commonwealth's public health and safety. However, emergency measures funded by FEMA following Hurricane Maria may not be sufficient to prevent localized future power outages, water shortages, unsanitary conditions, or disruptions in communications. Each of which could adversely affect the administration of emergency medical personnel, police, and fire protective services. FEMA anticipates that the No Action Alternative has the potential to cause short-term and long-term less than major adverse impacts to public health and safety.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

Pre-construction meetings and equipment trainings for workers would minimize the risk of employment related injuries from construction phase activities. The potential adverse impact to worker safety would be short-term and minor. The use of qualified personnel trained in the operation of their equipment as well as, the implementation of OSHA safety measures would minimize risk to human health and safety. The Applicant would be responsible for posting the appropriate signage and placement of construction barriers to alert the public of potential hazards and prevent unauthorized access to project sites.

Under Alternative 2, the Applicant would use current codes and standards for permanent utility projects. During the construction phase, utility interruption and delays in fire, emergency, and law

AR_0002951

enforcement services could occur; however, the disruptions in service from upgrading utilities would cause only short-term negligible to minor adverse impacts. This Alternative includes activities that may require the re-routing of traffic. Road detours could adversely impact emergency services depending on how far traffic is to be re-routed. The Applicant can minimize disruptions through MOT, coordinating with service providers, and public notifications.

FEMA anticipates that results of Alternative 2 actions would cause no adverse long-term impacts to the administration of public health and safety services. The Commonwealth's residents may experience a long-term benefit to their health and safety from the application of more resilient utilities. Police and fire protective services would be able to consistently respond to emergencies in a timely manner. Patients would arrive at medical facilities in time for life saving measures. Additionally, medical personnel and medical devices would be able to function without concern of possible disruptions in utility service. By repairing and upgrading unstable utilities, Alternative 2 actions would reduce or eliminate the risk of electrocutions or the occurrence of similar types of catastrophic events. Based on the current status of Puerto Rico's utility networks, this would result in a long-term benefit to the health and safety of Puerto Rico's communities.

**Alternative 3: Realignment or Relocation of Utilities**

Pre-construction meetings and equipment trainings for workers would minimize the risk of employment related injuries from construction phase activities. The potential adverse impact to worker safety would be short-term and minor. The use of qualified personnel trained in the operation of their equipment as well as, the implementation of OSHA safety measures would minimize risk to human health and safety. The Applicant would be responsible for posting the appropriate signage and placement of construction barriers to alert the public of potential hazards and prevent unauthorized access to project sites.

Alternative 3 would have no long-term adverse impacts to public health or safety. The Applicant would use current codes and standards for the development and installation of utilities that can handle the network's pre-disaster capacity and be more resilient to future storm events. Similar to Alternative 2, fire, emergency, and law enforcement services could experience interruptions in service. Utility interruptions during the relocation process could cause short-term negligible to minor adverse impacts as road closures occur and the Applicant's contractor relocates various power and communications networks. The Applicant would be responsible for minimizing disruptions of service through the implementation of MOT, coordinating with utility service providers, and public notifications. The delays may be a bit longer than Alternative 2, as relocations may take longer than replacement in some cases.

The affected populations are likely to experience a long-term beneficial impact to their public health and safety from the application of more resilient utilities. Police and fire protective services would be able to consistently respond to emergencies in a timely manner. Patients would arrive at medical facilities in time for life saving measures. Additionally, medical personnel and medical devices would be able to work without concern of possible disruptions in services. An additional long-term benefit to public health and safety would occur from realigning or relocating utilities to less disaster-prone areas. By removing utilities from areas where accidents have the potential to occur, the public would inherently be safer.

67

AR_0002952

**Alternative 4: Combination**

Generally, the impacts to public health and safety from this alternative would be like those described for Alternatives 2 and 3.

## 5.17 HAZARDOUS MATERIALS

Hazardous materials and/or wastes constitutes any solid, liquid, contained gaseous or semisolid waste, or any combination of materials and/or wastes that pose a substantial present or potential hazard to human health and the environment. Hazardous materials constitute a type of substance demonstrating either flammable, corrosive, reactive, or toxic characteristics that may pose a substantial existing or potential hazard to human health and the environment. Federal and State environmental, safety occupational, and transportation laws and regulations extensively regulate the handling and use of hazardous materials. Examples of common hazardous materials include asbestos, lead, petroleum products (e.g. gasoline, heating oil, etc), paints, toxic (e.g. pesticides, herbicides, Polychlorinatated biphenyls , etc.) or highly reactive chemicals (e.g. explosives, etc.). Improper management or disposal of hazardous materials and/or wastes can lead to pollution or contamination of groundwater, surface water, soil, and/or the air.

Regulatory agencies enforce laws governing hazardous materials and wastes to ensure the protection of the environment and human health through the establishment of management systems. The systems track information regarding the makeup of the hazardous material or the identification, use, storage, treatment, transportation, and disposal of the hazardous waste. The regulations manage hazardous materials and wastes from cradle to grave. The laws and regulations governing hazardous materials and wastes provide a framework for adequate investigation and cleanup of sites already contaminated by the release of hazardous materials and wastes.

**Safety and Occupational Health**

Safety and occupational health issues include exposure to natural hazards; one-time and long-term exposure to asbestos, lead, radiation, chemicals, and other hazardous materials; and injuries or deaths resulting from a one-time accident. Existing utilities could cause safety and occupational health concerns for workers as well as, residents and pedestrians during or as a result of project implementation.

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980 (42 USC § 9601 *et seq.*) Resource Conservation and Recovery Act (RCRA), Subtitle D are the primary Federal laws for the management and disposal of hazardous substances. The USEPA regulates the management of non-hazardous solid waste according to the RCRA. Under RCRA, the USEPA is also in charge of regulating the handling and disposal of hazardous wastes.

Previous land use at the project sites and/or their location relative to known hazardous waste sites can be an indicator of whether hazardous materials are likely to be present. Project specialists from FEMA would review online databases that provide information about specific known contaminated locations to determine if a project area is located within proximity to a known source of contamination. Additionally, facilities constructed prior to the ban on lead-based paint and asbestos in 1978 or with materials manufactured prior to 1978 have the potential to contain lead-

AR_0002953

based paint or asbestos. Some countries after 1978 continued to manufacture materials that contained lead-based paint or asbestos. Exposure to these materials could impact the health of persons working on the project site and in the surrounding area.

Lead exposure can result from contact with lead-based paint chips, contact with or inhalation of paint dust, or inhalation of lead vapors from torch-cutting operations. Lead exposure can adversely affect the human nervous system. Exposure to lead based paint is especially dangerous to small children. OSHA considers all painted surfaces in which lead is detectable as a potential occupational health hazard. Asbestos exposure can result from the inhalation of dust from a multitude of construction materials or household products.

The power generation and transmission industries have widely deployed polychlorinated biphenyls (PCBs) as dielectric and coolant fluids and in heat transfer fluids. Because of their longevity, PCBs are still widely in use, even though their manufacture has declined drastically since the 1960s. The United States banned PCB production in 1978 because of their environmental toxicity and classification as persistent organic pollutants.

These industries also use diesel fuel for powering equipment. The potential for diesel power containment vessels to release increases during a disaster. Proper secondary containment is necessary to prevent releases to the environment.

Water and wastewater industries typically use various chemicals for treatment. Some of these chemicals may be hazardous materials and if released during a disaster would have the potential to adversely affect human health and the environment. Releases into the environment may also occur from pipe breaks of sewage water which may contaminate and impact local waterways with harmful bacteria. These bacteria can get into waterways and affect species in aqueous environments as well as have the potential to affect human health of those utilizing that resource.

Releases of contaminants from utility facilities may occur during a disaster from both flooding and wind-driven activities. Flooding of facilities can overcome secondary containment barriers releasing those stored chemicals. Wind-driven elements of a disaster have the potential to impact facilities by compromising the integrity of chemical storage areas by impacting the storage area directly.

USEPA RCRA Info online database is a national program management and inventory system of hazardous waste handlers. The activities of hazardous waste generators, transporters, treaters, storages and disposers must provide documentation to state environmental agencies. In turn, these agencies, pass on the information to regional and national USEPA offices. The RCRA Info database identifies location data for specific hazardous waste handlers and information on treatment, storage, and disposal facilities regarding permitting and closure status, compliance with federal and state regulations, and cleanup activities. In addition to a Non-Generator, there are three types of hazardous waste generators:

- Conditionally exempt small quantity generators (CESQGs) generate less than 100 kilograms (kg) of hazardous waste per month or less than 1 kg of acutely hazardous waste per month.

69

AR_0002954

- Small quantity generators (SQGs) generate between 100 kg and 1,000 kg of hazardous waste per month.

- Large quantity generators (LQGs) generate more than 1,000 kg of hazardous waste per month or more than 1 kg of acutely hazardous waste per month.

The USEPA National Priority List (NPL) is the list of sites of national priority among the known releases or threatened releases of hazardous substances, pollutants, or contaminants.

### 5.17.1 Existing Conditions

The PREQB has licensed several distinct types of landfills and disposal facilities. The classes of waste permitted for handling and disposal include municipal solid waste, some special waste, land clearing debris, construction and demolition debris, industrial waste, and commercial waste. The types of facilities include municipal landfills as well as, gas recovery facilities. Federal and State regulations require proper handling and disposal of the debris produced by the Proposed Action.

The RCRA online database lists 1,552 active generator sites throughout the Commonwealth (USEPA 2019e).

Currently, there are 19 actively managed sites under the Superfund Alternative (SA) approach. In addition to the 19 active sites, the USEPA has obtained closure on at least six former NPL sites. The 19 active NPL sites in Puerto Rico include the following:

> *Vieques: Atlantic Fleet Weapons Training Area;* **Cabo Rojo***: Cabo Rojo Ground Water Contamination;* **Cabo Rojo***: Cidra Ground Water Contamination;* **Corozal***: Corozal Well;* **Dorado***: Dorado Ground Water Contamination;* **Jobos***: Fibers Public Supply Wells;* **Caguas***: Hormigas Ground Water Plume;* **Juncos***: Juncos Landfill;* **Maunabo***: Maunabo Area Ground Water Contamination;* **Utuado***: Papelera Puertorriquena, Inc.;* **Arecibo***: Pesticide Warehouse I;* **Manati***: Pesticide Warehouse III;* **Penuelas***: PROTECO;* **San German***: San German Ground Water Contamination;* **Candeleria Ward***: Scorpio Recycling, Inc.;* **Bo. Cambalache***: The Battery Recycling Company;* **Barceloneta***: Upjohn Facility;* **Vega Alta***: Vega Alta Public Supply Wells;* **Rio Abajo Ward***: Vega Baja Solid Waste Disposal* (USEPA 2019f).

In 1988, the USEPA issued regulations requiring certain companies to report the asbestos used in their products. Products containing asbestos (e.g. insulation for pipes, walls, ceiling tiles, and floor tiles) can may be present anywhere in the Commonwealth. The naked eye cannot see asbestos fibers and, when inhaled, can cause asbestosis which can progress to cancer, disability, and death. Damaged or isolated utilities create public safety issues during and following disaster events. Utility structures constructed prior to 1978 or with materials manufactured prior to 1978 have the potential to contain lead-based paint or asbestos.

Since the 1990s, PREPA and PRASA have been in the process of removing PCB-laden transformers; however, some transformers may remain. It is anticipated that there may be transformers containing PCB-laden oil at non-PREPA and non-PRASA facilities. Exposure can result from fallen or damaged transformers that leak. Ballasts from fluorescent lights manufactured

70

AR_0002955

prior to 1978 may contain PCBs as well. Exposure can result from leaking or damaged ballasts by direct contact or through drinking/eating water containing PCBs.

### 5.17.2 Potential Impacts and Proposed Mitigation

**Alternative 1: No Action**

Under the No Action alternative, FEMA would not provide grant funding for permanent utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. Without permanent repairs, infrastructure may further deteriorate and result in the unregulated releases of contaminates into the environment. The No Action Alternative has the potential to adversely impact Puerto Rico. Although the CWA requires most licensed handlers of hazardous waste material to maintain a spill prevention and countermeasures plan (SPCC), uncontrolled discharges continue to occur. As such, FEMA anticipates adverse impacts in both the short and long-term to a level of less than major under the No Action Alternative.

The potential for utilities to deteriorate and release unregulated discharges exists for most utility service providers. Power generation, power transmission and distribution, cell towers, and WWTPs typical store or transport hazardous materials or wastes that could be detrimental to the environment and public health. For instance, the release of untreated waste from broken pipes can affect human health by temporarily contaminating local drink water supplies and recreational waters. The potential for aboveground and underground storage tanks to release has been well documented. Prior to recent regulations requiring secondary containment, on-site storage tanks were typically of single wall construction which lacks the ability to withstand corrosive forces and are susceptible to accidents. A similar situation exists with PCB use. While PCBs are capable of withstanding degradation, the equipment that relied on them are prone to deterioration and again susceptible to accidents.

**Alternative 2: Repair, Replacement, and Upgrade of Utilities**

Under Alternative 2, construction activities may temporarily use, encounter, or generate hazardous materials and wastes. Alternative 2 would use current codes and standards to implement proposed actions. Current codes and standards rely on materials that are more durable and safer for the environment than their predecessors. If contractors encounter contaminated soil or groundwater during construction, the Applicant must stop work. The contractor must contact PREQB and other regulators in accordance with applicable permits. The Applicant will be responsible for adhering to PREQB guidance before resuming work. For circumstances where the CWA requires the implementation of an SPCC, the plan would limit impacts of hazardous materials to the immediate area of the release.

The Applicant will ensure that on-site personnel follow applicable OSHA regulations for the abatement of asbestos and handling of lead-based paint. The Applicant will be responsible for ensuring their contractors use the appropriate level of personal protective equipment (PPE). The Applicant will ensure that on-site personnel will receive appropriate job specific safety training in accordance with OSHA regulations. The Applicant is responsible for the proper removal and disposal of all solid or hazardous wastes generated from project activities. The applicant will install construction barriers around active sites to prevent unauthorized personnel from gaining access.

71

AR_0002956

FEMA anticipates that the use of new materials that are up to current codes and standards, properly trained and equipped personnel, PREQB licensed disposal facilities, and development of an SPCC would minimize both adverse short-term and long-term impacts to human health and the environment to a level of less than major. A short and long-term beneficial impact to the environment and human health would come from the removal of old equipment that could potentially release hazardous materials. If the Applicant encounters soil and water contaminated medium, an additional beneficial impact would come from the treatment and removal of the contaminated material from the environment.

**Alternative 3: Realignment or Relocation of Utilities**

During the construction and operational phases of Alternative 3 actions, the Applicant may require the use of hazardous materials or generate hazardous wastes. Alternative 3 actions will involve use of materials that meet current codes and standards. Materials that meet current codes and standards are typically more durable and less harmful to the environment than their predecessors.

The abandonment or removal of existing utilities can result in the generation of hazardous wastes. The Applicant will be responsible for disposing of all hazardous waste at PREQB licensed facilities. Per PREQB guidance, the Applicant will only be able to dispose of hazardous materials at facilities licensed to receive such classes of waste. The handling of materials with painted surfaces containing lead, materials containing asbestos, or other hazardous substances, must follow USEPA and PREQB regulations. These regulations provide appropriate asbestos abatement procedures and would minimize the potential for an unregulated release of asbestos. The Applicant will be responsible for ensuring that construction workers are wearing the appropriate level of PPE and receive proper training.

Similar to Alternative 2, if contractors encounter contaminated soil or groundwater during construction, the Applicant must stop work. The contractor must contact PREQB and other regulators in accordance with applicable permits. The Applicant will be responsible for following PREQB guidance before resuming work. The Applicant is responsible for the removal and disposal of all solid or hazardous wastes generated by project activities. The Applicant will install construction barriers around active sites to prevent unauthorized personnel from gaining access.

FEMA anticipates that the use of new materials that are up to current codes and standards, properly trained and equipped personnel, PREQB licensed disposal facilities, and development of an SPCC Plan would minimize both adverse short-term and long-term impacts to human health and the environment to a level of less than major. A short and long-term beneficial impact to the environment and human health would come from the removal of old equipment that could potentially release hazardous materials. If the Applicant encounters soil and water contamination, an additional beneficial impact would come from the treatment and removal of contaminated materials from the environment.

**Alternative 4: Combination**

Generally, the impacts to from hazardous materials and waste from this alternative would be like those described for Alternatives 2 and 3.

72

AR_0002957

**JA_270**

## 5.18 CUMULATIVE IMPACTS

In accordance with NEPA, this PEA considers the overall cumulative impact of the Action Alternatives. The evaluation of cumulative impacts requires an assessment of the effects of the Action Alternatives and similar actions on the Commonwealth's vulnerable natural and socioeconomic resources. The statutory basis for considering cumulative impacts for federal actions under NEPA is in Title 42 USC 4321 et seq. In addition to NEPA, the CWA, CAA, Section 106 of the NHPA, and Section 7 of the ESA individually require an evaluation of cumulative effects for resources covered under their authorities.

According to CEQ regulations, cumulative impacts represent the "impact on the environment which results from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what federal agency or person undertakes such actions. Cumulative impacts can result from individually minor but collectively consequential actions taking place over a period" (40 CFR 1508.7). When combined with other actions affecting utilities and similar resources, the activities covered by this PEA could lead to cumulative impacts. The scale of those impacts would depend on the number of projects implemented, the size of the projects, and locality and proximity of the projects.

### 5.18.1 Summary of Cumulative Impacts

FEMA identified few permanent utility-related projects in progress or substantially planned by Federal agencies as of the time of writing this PEA. During and shortly after the storm event there were many disaster emergency response projects covering the entire Commonwealth. The federal response to Hurricane Maria included large scale debris removal, transportation structure stabilization or replacement, and all types of utility infrastructure emergency repair or replacement. The federal agency response was unprecedented in scope with over 19,000 federal employees from 80 federal agencies deploying to the Commonwealth and U.S. Virgin Islands.

All the 2,478 miles of transmission lines and remaining electrical grid infrastructure required survey and repair and 25 percent of all the structures were damaged and temporarily rebuilt. Forty out of 114 water treatment plants were out of service as were 22 of the 51 wastewater treatment plants. Eighty percent of the above ground fiber optic lines were damaged and 95 percent of the cellular communication towers were out of service (COR3 2018). Federal agencies have funded emergency repairs and stabilization for all of these facilities over the last two years

FEMA has accomplished much of their post-disaster work through mission assignments and funding of various federal agencies such as the USACE. The USACE was responsible for the issuance of an unprecedented number of contracts for emergency response construction. The USACE's emergency projects affected all aspects of commerce and life within the Commonwealth. For example, the USACE installed over 2,300 electric emergency generators in Puerto Rico as part of their recovery efforts (GAO 2018).

The Puerto Rico Recovery Plan (COR3 2018) states the rebuilding of utilities would cost approximately $2 billion for communications, $17.5 billion for potable water, wastewater and stormwater systems, and $18 billion for the electrical grid. The plan states that there are 17 federal agencies it expects to receive funding from for its energy and communications systems. The

AR_0002958

sources of funding referenced in the plan include FEMA, Community Development Block Grant-Disaster Recovery through HUD, United States Department of Health and Human Services, United States Department of Homeland Security, U.S. Department of Commerce, USDOE, United States Department of Labor, United States Department of Education, USEPA, United States Department of Defense, USDOT, FCC, NOAA, National Science Foundation, USDA, and the United States Department of Veterans Affairs. The Sub-Applicants receiving federal funding to complete a majority of the utility projects would likely be PREPA for actions involving energy generation, transmission and distribution and PRASA for all things water. It remains unclear what entities will be associated with the implementation of projects involving the Commonwealth's communications networks.

After the initial emergency response, FEMA began reviewing grant applications for the completion of permeant work projects. For grant applications that FEMA approves, the federal government transfer funds to COR3 who is responsible for overseeing the administration of the projects on behalf of the Commonwealth of Puerto Rico. In addition to funding provided by FEMA in response to the disaster, various federal agencies continue to finance projects that fall under their Congressionally approved authorities. For instance, FHWA continues to support the Commonwealth's transportation sector by funding bridge or road repairs while, the USEPA is actively restructuring loans and issuing grants to improve drinking water and wastewater systems. As part of the USEPA's program, the USEPA announced in August 2019 that it was restructuring more than 200 delinquent loans it had issued to PRASA. The delinquent loans totaled approximately $571 million. The loans have been in delinquency since 2016. The USEPA's decision to restructure the delinquent loans clears the way for PRASA to begin receiving new federal funding. It is PRASA's intent to use federal grant funding to begin financing drinking water permanent repair infrastructure projects throughout the Commonwealth (USEPA 2019g).

For larger permeant work projects that involve multiple agencies, FEMA anticipates that it will serve as the lead funding source and that other agencies will be responsible for administering the projects. The Guajataca Dam site is potential a prime example of how this arrangement would work. While FEMA is the likely source of funding for large permeant work projects involving the Guajataca Dam, the USACE would be responsible for scoping and contracting engineering and construction services. As joint projects become more clearly defined, FEMA as the likely lead agency would be responsible for evaluating cumulative impacts on a case-by-case basis. Under this scenario, FEMA would evaluate cumulative impacts in the preparation of a separate NEPA document. Project-specific cumulative impact analyses can be more meaningful than a single programmatic analysis due to range of actions evaluated programmatically. If the magnitude of impacts is greater than those described in this PEA or require additional mitigation measures beyond those listed in Section 6, a tiered NEPA document or supplemental NEPA document would be prepared.

FEMA expects the Action Alternatives in this PEA would not result in major cumulative impacts since FEMA is funding actions that involve the repair, replacement, or rehabilitation of projects that are similar in function, size, and locality to the existing systems. Therefore, most cumulative impacts from the initial installation and temporary restoration of the projects on the human environment have already occurred prior to and after Hurricane Maria. FEMA anticipates that the extended grant approval process for projects covered under this PEA or tiered from the PEA would further minimize cumulative impacts to Commonwealth's environmental and social resources. The

74

AR_0002959

JA_272

process of implementing projects over an extended time period would likely ensure that no one resource is overburdening at any given time by the implementation of federally financed utility projects.

- For circumstances where multiple utility projects are under construction within the same watershed and at the same time, a cumulative impact to resources such as vegetation, water quality, and soil could occur. Although adverse, FEMA anticipates that cumulative impacts from the utility projects covered under this PEA would be short-term and less than major. The conservation measures and BMPs presented in Section 6 will help minimize cumulative impacts to environmental and socioeconomic resources by maintaining compliance with applicable permit conditions.

- The combined effects of concurrent construction projects could have a short-term less than major cumulative effect on traffic delays and congestion, noise, and social services. The Commonwealth and Subapplicant will be responsible for coordinating project coordination and project schedule with their public utility departments and environmental permitting agencies.

75

AR_0002960

## 6.0 PERMITS AND REQUIREMENTS

The Applicant or Subapplicant is responsible for obtaining all applicable Federal, State, and local permits and other authorizations for project implementation prior to construction and adherence to all permit conditions. Any substantive change to the approved scope of work will require re-evaluations by FEMA for compliance with NEPA, and other laws and EOs. The Applicant or Subapplicant must also adhere to the following conditions during project implementations and consider the below conservation recommendations. Failure to comply with grant conditions may jeopardize Federal funds:

1. **The Applicant or Subapplicant**: Must comply with all applicable environmental and historic preservation laws. Federal funding is contingent upon acquiring all necessary Federal, State and Local permits. Noncompliance with this requirement may jeopardize the receipt of federal funds.

2. **Stormwater and Soils**: Under the USEPA NPDES, any project disturbing more than one acre requires a USEPA Construction General Permit, an NPDES Permit, and a SWPPP. The permits and plan require BMPs which serve to protect soils, in addition to stormwater. Applicant and Subapplicant are required to: manage any piles of soil or debris, minimize steep slope disturbance, preserve native topsoil unless infeasible; and minimize soil compaction and erosion (USEPA 2018).

3. **Erosion and Sediment Control**: Each project will implement the BMPs and guidelines recommended in the Puerto Rico Erosion and Sediment Control Handbook for Developing Areas (PREQB-PR & USDA-NRCS). All necessary permits such as NPDES must be obtained and required plans (i.e. SWPPP) implemented.

4. **Endangered Species Act**: All projects will comply with and implement the ESA conditions found in any FEMA programmatic consultation that applies, or those conditions from a project-specific consultation. Any actions that may adversely federally listed species or designated critical habitat. Impacts not resolved through consultation, will require individual NEPA compliance.

5. **Work Affecting Water**: Any work that may affect waters of the United States will be consulted on with the USACE. The Applicant is responsible for obtaining appropriate permits prior to the beginning of work, and implementing all requirements of the permits, including pre-construction notification.

6. **Floodplain**: For FEMA funded projects that are within or may affect a floodplain, FEMA will apply the 8-Step Decision-Making Process. FEMA will assess short- and long-term effects to floodplains and apply applicable avoidance, minimization, and mitigation measures to limit impacts to less than major. FEMA will consider projects in the V-Zone, those with potential major or greater impacts, or those with the potential to increase flood elevations on a case-by-case basis for whether this PEA applies, or to prepare a tiered EA or SEA. Projects must also comply with Commonwealth floodplain and flood risk regulations.

AR_0002961

7. **Wetlands**: For FEMA funded projects that are within or may affect a wetland, FEMA will apply the 8-Step Decision-Making Process. FEMA will assess short- and long-term effects to wetlands and apply applicable avoidance, minimization, and mitigation measures to limit impacts to less than major.

8. **Historic Preservation/Archaeological Resources**: For FEMA-funded projects, FEMA will review for any historic/archaeological resources on or eligible for the National Register of Historic Places. If there is potential to affect historic/archaeological resources, the stipulations from the FEMA/SHPO Puerto Rico 2nd Amendment Programmatic Agreement of November 13, 2019 and any subsequent future amendments between the SHPO and FEMA will be applied. If applicable stipulations cannot be applied, then consultation with SHPO must occur and any recommendations implemented.

   a. The Applicant is responsible for any applicable coordination with the Puerto Rico Institute of Culture (ICP) for compliance with Commonwealth historic preservation and archaeological requirements.

9. **Discovery of Cultural Resources**: If any cultural materials or human remains are discovered during construction, the contractor must halt work immediately and contact FEMA. FEMA staff meeting the Secretary of the Interior's Professional Qualification Standards (48 FR 22716, Sept. 1983) will evaluate the discovery in coordination with SHPO.

10. **Construction Material and Debris**: Any materials deposited in eroded embankments must be removed before start of work. The Applicant is responsible for ensuring that final disposal of bituminous and any non-recyclable debris materials resulting from the restoration and demolition activities must take place at a properly PREQB permitted landfill. If necessary, waste characterization may be required for certain waste types (i.e. oil, asbestos, lead-based paint, etc.) and properly disposed. The Applicant is responsible for obtaining any permits associated with transportation and handling of construction debris.

11. **Solid and Hazardous Waste**: The Applicant will handle, manage, and dispose of all solid and hazardous waste in accordance with requirements of local, state, and federal laws, regulations, and ordinances. In addition, the Applicant will ensure that all debris is separated and disposed of in a manner consistent with the PREQB guidelines at a permitted site or landfill.

12. **Clean Air Act**: The Applicant is responsible for complying with applicable EPA and PREQB requirements for low sulfur fuels and fugitive dust suppression.

13. **Asbestos and Lead**: The Applicant is responsible for determining the presence of asbestos or lead containing materials and obtaining applicable permits before beginning work. Applicant will identify, handle, transport, and dispose of hazardous materials and/or toxic waste in accordance with PREQB requirements including.

77

AR_0002962

**JA_275**

14. **Electric Generators**: The Applicant is responsible for complying with applicable EPA and DRNE/PREQB of Puerto Rico requirements and permits for installation and operation of electric generators.

15. **Tree Cutting:** The Applicant is responsible for complying with applicable DRNE/PREQB of Puerto Rico requirements for planting, pruning, and trimming.

16. **Commonwealth Permitting**: The Applicant is responsible for contacting the Puerto Rico Permit Management Office (OGPe) for any required permits prior to starting work.

17. **Invasive Species**: The Applicant is responsible for restoring disturbed soils with planting native, non-invasive species. Construction equipment should be power-washed prior to initial transport to the construction site and prior to changing locations to prevent spread of noxious weeds.

78

AR_0002963

# 7.0 AGENCY COORDINATION AND PUBLIC INVOLVEMENT

This Utilities PEA is available for agency and public review and comment for a period of 15 days. The public information process will include a public notice with information about the proposed action in these three newspapers: *El Vocero, Primer Hora, and El Nuevo Dia*, with targeted outreach to environmental justice populations through notices to community organizations. A Spanish translation of the PEA Executive Summary and Public Notice will also be posted. The PEA is available for download at *https://www.fema.gov/media-library*. The website link for the PEA will also be posted on the FEMA Puerto Rico Facebook, Inc. page https://www.facebook.com/FEMAPuertoRico/

A hard copy of the PEA will be available for review at the following locations:

*<name and address of where EA will be posted>*

Interested parties may request an electronic copy of the PEA by emailing FEMA at FEMA-EHP-DR4339@FEMA.DHS.GOV. This PEA reflects the evaluation and assessment of the federal government, the decision maker for the federal action; however, FEMA will take into consideration any substantive comments received during the public review period to inform the final decision regarding grant approval and project implementation. The public is invited to submit written comments by emailing FEMA-EHP-DR4339@FEMA.DHS.GOV or via mail to:

Federal Emergency Management Agency Region II – DR-4339-PR
Puerto Rico Joint Recovery Office
50 State Road 165
Guaynabo, PR 00968
Attn: Puerto Rico Utilities PEA Public Comments

If FEMA receives no substantive comments from the public and/or agency reviewers, FEMA will adopt the PEA as final and will issue a FONSI. If FEMA receives substantive comments, it will evaluate and address comments as part of the FONSI documentation or in a Final PEA.

79

AR_0002964

**JA_277**

## 8.0 LIST OF PREPARERS

FEMA Region II, 26 Federal Plaza, New York, NY 10278

Puerto Rico Recovery Office Environmental and Historic Preservation Assessment Writing Team

Puerto Rico Recovery Office, NEPA and Environmental and Historic Preservation Specialty Staff Contributors

80

AR_0002965

# 9.0 REFERENCES

Adams, Briane; United States Geologic Survey; Hafner, J.M; and United States Fish and Wildlife Service. 1996. National Water Summary on Wetland Resources: Puerto Rico Wetland Resources. pp 333. U.S. Geologic Survey Water Supply Paper 2424. Internet websites: https://pubs.er.usgs.gov/publication/wsp2425 (https://pubs.usgs.gov/wsp/2425-spanish/report.pdf). Website accessed June 26, 2018.

Autoridad de Energía Eléctrica (AEE) (aka PREPA). 2019. Internet websites: https://aeepr.com and https://aeepr.com/en-us/quiénes-somos/sistema-electrico. Website accessed April 29, 2019.

Bailey, Robert G. and Cushwa, Charles T. Ecoregions of North America. 1981. United States Fish and Wildlife Service. Washington, D.C. Map. Internet website: https://www.fs.fed.us/rm/ecoregions/products/map-ecoregions-north-america/. Website accessed June 27, 2019 and April 16, 2019.

Build Back Better. 2017. Reimaging and Strengthening the Power Grid of Puerto Rico. Internet website: https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/PRERWG_Report_PR_Grid_Resiliency_Report.pdf. Website accessed September 12, 2018.

Central Office of Recovery, Reconstruction, and Resilience (COR3). 2018. Puerto Rico Recovery Plan (PRRP). DRAFT. Transformation and Innovation in the Wake of Devastation: An Economic and Disaster Recovery Plan for Puerto Rico. Preliminary Draft, July 9, 2018. Puerto Rico Public-Private Partnerships Authority (P3A). Internet website: http://www.p3.pr.gov/assets/pr-draft-recovery-plan-for-comment-july-9-2018.pdf.

Commonwealth of Puerto Rico (PR) and Federal Emergency Management Agency (FEMA). 1992. Minimum Standards for Rural Municipal Roads. February 1992.

Council of Environmental Quality (CEQ).1997. Executive Office of the President. Environmental Justice: Guidance Under the National Environmental Policy Act. Internet website: https://www.whitehouse.gov/ceq/. Updated December 10, 1997. Website accessed May 1, 2019.

Cuerpo de Bomberos de Puerto Rico. 2020. Misión and Visión. Internet website: http://www.agencias.pr.gov/agencias/bomberos/SobreNosotros/Pages/Misi%c3%b3n-y-Visi%c3%b3n.aspx. Accessed January 30, 2020.

Departamento de Salud Gobierno de Puerto Rico, Undated-1. (No. 4-2011) (Approved February 9, 2011) AN ACT. Internet website: http://www.oslpr.org/DOWNLOAD/EN/2011/A-0004-2011.pdf. Accessed July 17, 2019.

Federal Emergency Management Agency (FEMA). 2018. Public Assistance Program and Assistance Policy Guide FP 104-009-2, V3.1 2018. April 2018.

AR_0002966

Federal Highway Administration (FWHA). 2011. Highway Statistics. 2007. Internet website: https://www.fhwa.dot.gov/policyinformation/statistics/2010/mv1.cfm. Website accessed June 27, 2019.

2013. Functional System Lane-Length. Internet Website: https://www.fhwa.dot.gov/policyinformation/statistics/2013/pdf/hm60.pdf. Website accessed July 5, 2019.

2017. Public Road Length, Miles by Functional System: 2013. Internet website: https://cms.bts.dot.gov/archive/publications/state_transportation_statistics/state_transportation_statistics_2015/chapter-1/table1_1. Website accessed June 27, 2019.

2018. Bridge Condition by Highway System 2018. Internet website: https://www.fhwa.dot.gov/bridge/nbi/no10/condition18.cfm. Updated December 31, 2018. Website accessed June 27, 2019.

Gann GD, Trejo-Torres JC, Stocking CG. 2015-2018. Plantas de la Isla de Puerto Rico / Plants of the Island of Puerto Rico. The Institute for Regional Conservation. Delray Beach, Florida, USA.

Gómez-Gómez, Fernando, Rodríguez-Martínez, Jesús, and Santiago, Marilyn. 2014. Hydrogeology of Puerto Rico and the outlying islands of Vieques, Culebra, and Mona: U.S. Geological Survey Scientific Investigations Map 3296, 40 p. plus 2 pls. Internet website: http://dx.doi.org/10.3133/sim3296. Website accessed March 29, 2019.

Gould, W. A.; F Wadsworth; M. Quiñones; S. Fain. 2017. Land Use, Conservation, Forestry, and Agriculture in Puerto Rico. Forests 2017, v8 p242. Internet website: https://data.fs.usda.gov/research/pubs/iitf/ja_iitf_2017_Gould001.pdf. Website accessed March 29, 2019.

Government Accountability Office (GAO). 2019. Report to Congressional Requestors. 2017 Hurricane Season. Federal support for Electricity Grid Restoration in the U.S. Virgin Islands and Puerto Rico. Government Accountability Office. April 2019. FAO-19-296.

Kaiser Family Foundation. 2018. "Health Centers in Puerto Rico: Operational Status after Hurricane Maria". Internet website: https://www.kff.org/medicaid/fact-sheet/health-centers-in-puerto-rico-operational-status-after-hurricane-maria/. Dated March 15, 2018. Website accessed February 1, 2019.

Lluveras, Lauren. 2018. "Puerto Rico has not recovered from Hurricane Maria". Science X™ network. Internet website: https://phys.org/news/2018-09-puerto-rico-recovered-hurricane-maria.html. Updated September 19, 2018. Website accessed February 1, 2019.

Miller, Gary L.; Lugo, Ariel E. 2009. Guide to the Ecological Systems of Puerto Rico. Gen. Tech. Rep. IITF-GTR-35. San Juan, PR: U.S. Department of Agriculture, Forest Service, International Institute of Tropical Forestry. June 2009. Internet website: https://www.fs.fed.us/global/iitf/pubs/IITF_gtr35.pdf. Website accessed June 3, 2019.

AR_0002967

**JA_280**

McCoy, H.J. 1978. Summary of the Water Resources of Puerto Rico, 1978: U.S. Geological Survey Open-File Report 78-971. Internet website: https://pubs.er.usgs.gov/publication/ofr78971. Website accessed July 5, 2018.

Molina-Rivera, W.L. 2014. Estimated Water Use in Puerto Rico, 2010: U.S. Geological Survey Open-File Report 2014–1117, 35 p. Internet website: https://dx.doi.org/10.3133/ofr20141117. Website accessed June 26, 2018 and June 24, 2019.

Multi-Resolution Land Characteristics Consortium. 2018. National Land Cover Database 2001 (NLCD2001) Product Data Downloads. Internet website: https://www.mrlc.gov/data/statistics/national-land-cover-database-2001-nlcd2001-statistics. Website accessed March 20, 2019.

National Oceanic and Atmospheric Administration. 2013. National Coastal Population Report: Population Trends from 1970 to 2020. NOAA State of the Coast Report Series, developed in partnership with the U.S. Census Bureau, March 2013. Internet website: https://aamboceanservice.blob.core.windows.net/oceanservice-prod/facts/coastal-population-report.pdf. Website accessed March 27, 2019.

2014. Coastal Zone Management Act Section 309 Program Guidance: 2016-2020 Enhancement Cycle. NOAA National Ocean Service Office of Ocean and Coastal Resource Management, June 2014. Internet website: https://coast.noaa.gov/data/czm/media/Sect-309_Guidance_2016-2020.pdf. Website accessed January 18, 2019.

2015. States and Territories Coastal Zone Management Programs. Internet website: https://coast.noaa.gov/czm/mystate/#puertorico. State Coastal Zone Boundaries: Internet website: February 9, 2012. Internet website: https://coast.noaa.gov/czm/media/StateCZBoundaries.pdf. Website accessed February 4, 2019.

2018. Puerto Rico Fast Facts. NOAA Office for Coastal Management. Internet website: https://www.coast.noaa.gov/states/puerto-rico.html. Updated March 4, 2019. Website accessed February 4, 2019.

Natural Resources Conservation Service (NRCS). 2011. Identification of Important Farmland. Adapted by Gould et al. (USDA) 2015. Internet website: https://prod.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs142p2_010970.pdf. Website accessed March 28, 2019.

National Wild and Scenic Rivers System. 2002a. Rio Mameyes. Internet website: https://www.rivers.gov/rivers/rio-mameyes.php. Website accessed June 25, 2018 and April 20, 2019.

National Wild and Scenic Rivers System. 2002b. Rio De La Mina. Internet website: https://www.rivers.gov/rivers/rio-de-la-mina.php. Website accessed June 25, 2018 and April 20, 2019.

83

National Wild and Scenic Rivers System. 2002c. Rio Icacos. Internet website: https://www.rivers.gov/rivers/rio-icacos.php. Website accessed June 26, 2018 and April 20, 2019.

National Park Service (NPS). 2018. Fact Sheet: Outstandingly Remarkable Values. Internet website: https://www.nps.gov/orgs/1912/upload/ORV_9_2011.pdf. Website accessed March 28, 2019.

National Register of Historic Places (NRHP). 2019. Internet website: https://www.nps.gov/subjects/nationalregister/index.htm. Website accessed July 5, 2019.

Puerto Rico Aqueducts and Sewers Authority (PRASA). 1975. Estado Libra Asociado de Puerto Rico, Oficina del Gobernador Junta de Planificacion. Normas De Diseńo Para Sistemas De Alcantarillado Pluvial.

2019. Internet website: http://www.acueductospr.com/INFORMESESTADISTICOS/index.html. Website accessed June 21, 2019.

Puerto Rico Department of Natural and Environmental Resources. 2005. Puerto Rico Comprehensive Wildlife Conservation Strategy. San Juan, Puerto Rico. Internet website: http://drna.pr.gov/documentos/puerto-ricos-comprehensive-wildlife-conservation-strategy-1/. Website accessed March 28, 2019.

2010. Draft Puerto Rico Coastal and Estuarine Land Conservation Plan. Internet website: https://coast.noaa.gov/czm/landconservation/media/celcpplanprdraft.pdf. Website accessed March 28, 2019.

2014. Puerto Rico Coastal Zone Management Program Proposal: NOAA Coastal Services Center Coastal Management Fellowship 2013.

2017. Puerto Rico State Wildlife Action Plan: Ten-Year Review (DRAFT). Internet website: http://drna.pr.gov/wp-content/uploads/2018/01/PRSWAP2017.pdf. Website accessed June 26, 2018.

Puerto Rico Department of Labor and Human Resources Bureau of Labor Statistics. 2017. Puerto Rico Economic Analysis Report 2015-2016. Internet website: https://www.doleta.gov/performance/results/AnnualReports/docs/2017_State_Plans/Economic_Reports/Puerto%20Rico/PR%20Economic%20Analysis.pdf. Website accessed June 25, 2018.

Puerto Rico Department of Transportation and Public Works Highway Authority (PRDTOP). 1979. Highway Design Manual.

Puerto Rico Hospital Association. 2019. Internet website: http://hospitalespr.org/. Updated 2019. Website accessed February 13, 2019.

AR_0002969

Puerto Rico Electric Power Authority. 2000. Sistema de Distribucion: Patrones de Distribución Soterrada.

2007. Reglamento De Servidumbers Para La Autoridad de Energia Eléctrica. Number 7282.

2019. Puerto Rico Energy Public Policy Act. S. B. 1121. No. 17-2019. Approved April 11, 2019. Internet website: https://aeepr.com/es-pr/QuienesSomos/Ley17/A-17-2019%20PS%201121%20Politica%20Publica%20Energetica.pdf. Accessed January 27, 2020.

Puerto Rico Seismic Network (PRSN). 2019. Internet website: http://redsismica.uprm.edu/English/. Website accessed April 20, 2019.

Region II Environmental Protection Agency. 2000. Interim Environmental Justice Policy. https://www.epa.gov/sites/production/files/2016-03/documents/ejpolicy.pdf. Website accessed October 31, 2019.

Strategic Alliance for Risk Reduction (STARRII). 2018. Puerto Rico Advisory Data and Products Post-Hurricanes Irma and Maria. March 1, 2018. Internet website: http://cedd.pr.gov/fema/wp-content/uploads/2018/06/Puerto_Rico_Advisory_Report_2018.05.23_Final_English.pdf. Website accessed April 25, 2019.

United States Army Corps of Engineers. 2013. Coastal Risk Reduction and Resilience: Using the Full Array of Measures. CWTS 2013-3. Washington, D.C: U.S. Army Corps of Engineers, Directorate of Civil Work. September 2013.

United States Bureau of Labor Statistics. 2018. May 2018 State Occupational Employment and Wage Estimates Puerto Rico. https://www.bls.gov/oes/current/oes_pr.htm#00-0000. Website accessed January 29, 2020.

United States Census Bureau. 2011. U.S. Census Bureau Delivers Puerto Rico's 2010 Census Population Totals, Including First Look at Race and Hispanic Origin Data for Legislative Redistricting. Internet website: https://www.census.gov/newsroom/releases/archives/2010_census/cb11-cn120.html. Website accessed June 25, 2018.

2017. Quick Facts: Puerto Rico. Population Estimate as of July 2017. Internet website: https://www.census.gov/quickfacts/fact/table/pr/PST045217. Website accessed June 26, 2018.

United States Department of Agriculture (USDA). 2012. Census of Agriculture, Puerto Rico Island and Municipio Data Volume 1, Geographic Area Series. Part 52 AC-12-A-52 Issued June 2014. Internet website: https://www.agcensus.usda.gov/Publications/2012/Full_Report/Outlying_Areas/prv1.pdf. Website April 26, 2018.

2014. USDA Releases 2012 Puerto Rico Census of Agriculture. Internet website: https://www.agcensus.usda.gov/Newsroom/2014/06_27_2014.php. Website accessed April 26, 2019.

2017. United States Department of Agriculture: National Agricultural Statistics Service. Census of Agriculture: Census by State – Puerto Rico. Internet website: https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Census_by_State/Puerto_Rico/index.php. Website accessed April 26, 2019.

2019. Source Economic Research Service Fact Sheet State Data: Puerto Rico. Internet website: https://data.ers.usda.gov/reports.aspx?StateFIPS=72&StateName=Puerto%20Rico&ID=17854. Website accessed June 26, 2019.

United States Energy Information Administration. 2019. Puerto Rico Energy Profile. Internet website: https://www.eia.gov/state/analysis.php?sid=RQ. Accessed August 5, 2019.

USDA Forest Service. 2010. Caribbean National Forest Wild and Scenic Rivers Comprehensive River Management Plan. Internet website: https://www.rivers.gov/documents/plans/el-yunque-plan.pdf. Website accessed July 5, 2018.

USDA Natural Resource Conservation Service (NRCS). 2017. Web Soil Survey. Internet website: https://websoilsurvey.nrcs.usda.gov/app/. Website accessed June 26, 2018.

2018. Map: Soil Orders of Puerto Rico. Internet website: https://www.nrcs.usda.gov/wps/portal/nrcs/main/pr/soils/. Website accessed March 20, 2019.

United States Department of Energy. 2020a. U.S. Department of Energy. Energy Efficiency and Renewable Energy, Building Energy Codes Program. ASHRAE 90.1-2019. Internet website: https://www.energycodes.gov/ Accessed January 27, 2020.

2020b. Office of Energy Efficiency and Renewable Energy. Standards and Test Procedures. https://www.energy.gov/eere/buildings/standards-and-test-procedures. Accessed January 27, 2020.

United States Department of Housing and Urban Development (HUD). 2018. Internet website: https://www.hud.gov/states/shared/working/r4/environment/guidancepr. Website accessed January 18, 2019.

United States Environmental Protection Agency (USEPA). 1995. AP-42, Chapter 13.2, Final Fugitive Dust Sources. January 1995. Internet website: https://www3.epa.gov/ttn/chief/ap42/ch13/final/c13s02.pdf. Accessed July 10, 2019.

2004. Final Rule for Control of Emissions of Air Pollution from Nonroad Diesel Engines and Fuel. Internet website: https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-control-emissions-air-pollution-nonroad-diesel. Site updated May 18, 2018. Accessed July 12, 2019.

AR_0002971

2012. Heavy-Duty Highway Program: Revisions for Emergency Vehicles and SCR Maintenance; Final Rule and Proposed Rule. 40 CFR Parts 85, 86, and 1039. Vol. 77, No. 111. Dated June 8, 2012. Internet website: https://www.govinfo.gov/content/pkg/FR-2012-06-08/pdf/2012-13088.pdf. Accessed June 28, 2019.

2015. Puerto Rico Aqueduct and Sewer Authority, et al. Clean Water Act Settlement. EPA website, accessed 2019. https://www.epa.gov/enforcement/puerto-rico-aqueduct-and-sewer-authority-et-al-clean-water-act-settlement.

2016. Technical Guidance for Assessing Environmental Justice in Regulatory Analysis. Internet website: https://www.epa.gov/sites/production/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf. Website accessed August 8, 2018.

2017. State Implementation Plan (Lead) for Puerto Rico. Internet website: https://www.federalregister.gov/documents/2017/07/14/2017-14730/approval-of-air-quality-implementation-plans-puerto-rico-attainment-demonstration-for-the-arecibo. Website accessed June 26, 2018.

2018. Fact Sheet on Puerto Rico's 2018 Impaired Waters List. November 2018. Internet website: https://www.epa.gov/sites/production/files/2019-01/documents/2018_puerto_rico_ir_fact_sheet.pdf. Website accessed December 16, 2019.

2018b. Puerto Rico 2018 305(b) and 303(d) Integrated Report. Appendix I – 2018 Cycle 303(d) List. Internet website: https://www.epa.gov/sites/production/files/2019-01/documents/2018_final_303d_list.pdf. Accessed December 16, 2019.

2019a. Green Book: Current Nonattainment Counties for All Criteria Pollutants Data is current as of May 31, 2018. Internet website: https://www3.epa.gov/airquality/greenbook/ancl.html. Website accessed December 16, 2018.

2019b. Map of Sole Source Aquifer Locations. https://epa.maps.arcgis.com/apps/webappviewer/index.html?id=9ebb047ba3ec41ada1877155fe31356b. Accessed January 24, 2020.

2019c. U.S. Environmental Protection Agency NEPAssist online public database. Internet website: https://nepassisttool.epa.gov/nepassist/nepamap.aspx.

2019d. Consent Decree: Puerto Rico Aqueduct and Sewer Authority (PRASA) Pollutant Discharge Settlement https://www.epa.gov/enforcement/consent-decree-puerto-rico-aqueduct-and-sewer-authority-prasa-pollutant-discharge. Accessed January 27, 2020

2019e. Envirofacts RCRA Info search. Internet website: https://www.epa.gov/enviro/topic-searches#waste. Website accessed December 16, 2019.

2018f. Superfund Sites. Internet website: https://www.epa.gov/superfund/national-priorities-list-npl-sites-state. Website accessed September 12, 2018. Accessed December 16, 2019.

2019g. EPA Clears the Way for Much Needed Funds for Water and Sewer Repairs in Puerto Rico. News Release, August 12, 2019. https://www.epa.gov/newsreleases/epa-clears-way-much-needed-funds-water-and-sewer-repairs-puerto-rico.

United States Fish and Wildlife Service (USFWS). 2018a. ECOS Environmental Conservation Online System. Puerto Rico T&E Species. Internet website: https://ecos.fws.gov/ecp0/reports/species-listed-by-state-report?state=PR. Website accessed June 25, 2018.

2018b. ECOS Environmental Conservation Online System. Candidate Species. Candidate Species Southeast Region. Internet website: https://ecos.fws.gov/ecp0/reports/ad-hoc-species-report?status=C&lead=4&header=Southeast+(Region+4)+Candidates&fleadreg=on&fstatus=on&finvpop=on. Website accessed June 25, 2018.

IPaC. 2018. Information for Planning and Consultation. Internet website: https://ecos.fws.gov/ipac/location/index. Website accessed June 27, 2018.

2019. Coastal Barrier Resource System: An Overview. USFWS Ecological Services. Internet website: https://www.fws.gov/cbra/. Website accessed March 27, 2019.

United States Fish and Wildlife Service and National Marine Fisheries Service. 1998. Consultation Handbook. Internet website: https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf. Website accessed July 16, 2019.

2019a. Personal Communications emails between Erica Santana, (FEMA) and Jose Cruz Burgos (USFWS) verifying ESA listed and candidate species on Puerto Rico. June 17, 2019.

United States Geological Society. 2010. Source, Use, and Disposition of Freshwater in Puerto Rico. 2010.

AR_0002973

**APPENDIX A**

FIGURES (MAPS)

89

AR_0002974



**Figure 1: Puerto Rico Commonwealth Map**

AR_0002975

**JA_288**



**Figure 2: Farmland Classification in Puerto Rico**

AR_0002976



**Figure 3: Clean Air Act Attainment and Non-Attainment Areas in Puerto Rico**

AR_0002977



**Figure 4: Water Resources Map of Puerto Rico**

AR_0002978

**JA_291**



**Figure 5: Caribbean National Forest, Wild and Scenic Rivers Map**

94

AR_0002979

**JA_292**



**Figure 6: Flood Zone Map of Puerto Rico**

AR_0002980

**JA_293**



**Figure 7: Undeveloped Coastal Barriers Map**

96

AR_0002981

**JA_294**



**Figure 8: Critical Habitat Map of Puerto Rico**

AR_0002982

**JA_295**



**Figure 9: Historic Properties included in the NRHP**

AR_0002983

**JA_296**



**Figure 10: Rural Education Persons 25 Years and Older**

AR_0002984



**Figure 11: Urban Population and Education Attainment of Persons 25 and Older**
Source: USDA Economic Research Service: https://data.ers.usda.gov/reports.aspx?StateFIPS=72&StateName=Puerto%20Rico&ID=17854

AR_0002985

**JA_298**



**Figure 12: Land Cover of Puerto Rico**

AR_0002986

## APPENDIX B

SUMMARY OF POTENTIAL IMPACTS

| Resource Area of Evaluation | Alternative 1: No Action | Alternative 2: Repair, Replacement, and Upgrade | Alternative 3: Realignment or Relocation | Alternative 4: Combination |
|---|---|---|---|---|
| Geology, Topography, and Soils | Alternative 1 has potential to permanently leave utility service absent in certain areas or leave some communities experiencing a reduction in their level of service. It could also lead to vegetation reclaiming ROW and degradation of public and private properties. Additionally, erosion and sedimentation may increase if utilities damage remains unrepaired. The No Action Alternative would likely have negligible to minor impacts on soils and geology and no impacts to seismicity or prime or important farmland. | During construction, Alternative 2 will have short-term minor impacts to soils. Alternative 2 has the potential to impact small portions of new ROW, so there may be minor impacts to soils and geology. No impacts to seismicity, and negligible to minor impacts for prime or important farmland. | During construction, Alternative 3 soils will result in soil excavation and compaction when placing new linear utilities (trenching) and utility structures (digging). Area clearing for vegetation and underlying soil removal will and will eventually stabilize; however, this process will alter soils in the immediate construction zone. FEMA anticipates minor changes to topography, minor impacts on geology and soils, negligible to minor impacts impact on prime farmland or important farmland, and no impact on seismicity. | Similar to Alternatives 2 and 3, as it is a combination |
| Air Quality | Under Alternative 1, there is the potential for residents and commercial entities to rely on outdated generators that could impact the concentrations of criteria pollutants. Possible increase in overall vehicle emissions may occur if detour routes (around downed utilities) are longer than the reroutes they replaced. Those areas without access may experience a reduction in localized vehicle emissions; while other areas may experience increased air pollution, due to increased congestion, increased vehicle wait times, and construction efforts related to the relocation of disaster-affected communities. Therefore, this alternative may have negligible to minor impacts to air quality. | During construction there may be adverse short-term minor impacts from exhaust emissions originating from mobile and construction equipment. Impacts from fugitive dust and vehicular emissions will be short-term and negligible. The implementation of construction BMPs will limit impacts to air quality. As part of Alternative 2, long-term adverse impacts to air quality may be negligible to minor. With regards to the areas currently listed as nonattainment or under maintenance, negligible to minor long-term impacts may occur. Alternative 2 activities may include beneficial impacts on air quality and energy efficiency by updating existing utilities to current codes and standards. Although new emergency generators would serve as a long-term source of emissions, new replacement emergency generators produce fewer emissions than their predecessors. | Similar to Alternative 2. | Similar to Alternatives 2 and 3, as it is a combination |
| Water Quality/Water Resources | No work would occur in water, thus there would be no direct impact to water due to project work. Erosion and sedimentation into downstream waters may increase if utilities damage remains unrepaired. Damaged utility infrastructure may cause increased pollution into waters from problems such as sewage-runoff mixing or copper leaching from old and broken pipes and may cause a flow impediment, potentially causing major impacts to streams and other waters. The damages could also impact and limit water flow in pipes needed for fire suppression, agriculture, and overall health and cleanliness. Therefore, the No Action alternative could have moderate adverse impacts on water resources. | The discharge of fill material into surface waters may temporarily alter surface water quality including, but not limited to, temperature, dissolved oxygen, or turbidity. This could result in adverse negligible to minor short-term impacts to water quality. This alternative would have a negligible long-term impact on groundwater recharge and water quality through the transmission of sediment, debris, oils, and hazardous substances into surface waters due to the type and size of the projects covered by this PEA. Local and federal Agency requirements would mitigate potential impacts to water resources by requiring BMPs to reduce transport of sediment, debris, oils, concrete waste, and hazardous substances into water resources, including wetlands or waterways. | The process of relocating utilities within a new or expanded ROW would have similar impacts and mitigation measures as those described for Alternative 2; however, the process of expanding a ROW and the removal and disposal of out-of-service utilities would increase the footprint of construction activities. As a result, this alternative may have a negligible to minor direct or indirect on impact water resources, including wetlands and waterways; but would have mitigation through Section 401 and Section 404 permitting. | Similar to Alternatives 2 and 3, as it is a combination |
| Wetlands | No work would occur in wetlands, thus there would be no direct impact to wetlands due to project work; however, there may be indirect impacts. Erosion and sedimentation into waters and wetlands may increase if utilities damage remains unrepaired. Damaged utility infrastructure may cause increased pollution into wetlands from problems such as sewage-runoff mixing or copper leaching from old and broken pipes and may cause a flow impediment, potentially causing major impacts to streams and other wetlands. Therefore, the No Action alternative could have moderate adverse impacts on water resources. | During construction, agencies would mitigate impacts by requiring projects to apply BMPs to prevent sediment and fill material from entering the water. Compensatory mitigation would offset adverse impacts to wetlands. FEMA anticipates short-term and long-term negligible to minor direct and indirect impacts on wetlands, streams, and other WOTUS. The impacts would originate from the runoff of sediment, debris, oils, and other hazardous materials from construction sites. FEMA would mitigate potential impacts to wetland resources by requiring construction BMPs. | Similar to Alternative 2, impacts from additional ROWs would be long-term, based on expanded footprint from ROW expansion or realignment. Removal of out-of-services utilities would decrease overall impacts. Additionally, for utilities along the edge of waterways, embankment and in-water work may occur during construction. This alternative may have minor short-term direct or indirect impacts on wetlands. | Similar to Alternatives 2 and 3, as it is a combination |
| Floodplain | Damaged utility infrastructure may cause increased pollution and may constitute a flow impediment, potentially causing moderate adverse impacts to floodplain hydraulics and function. | This alternative would have short-term negligible impacts on floodplains and floodways, especially for those utilities that are located within floodplains and are location-dependent. As a result of staying within the existing ROW, the intent of this alternative is that it will have negligible | This alternative would generate impacts similar to those described for Alternative 2 and additional areas of floodplain outside original ROW's through the construction of a realigned or relocated utility and could have short-term and long-term minor impacts on nearby floodplains. | Similar to Alternatives 2 and |

AR_0002987

| | | | | |
|---|---|---|---|---|
| | | long-term impacts; however, certain project areas could result in additional impervious surfaces that could have indirect long-term but minor impacts on floodplains and floodways. | | 3, as it is a combination |
| Coastal Resources | In the No Action alternative, there would be no impacts to CZMA and CBRA areas. | Since the footprint should stay relatively the same under this Alternative, FEMA anticipates short-term and long-term negligible to minor adverse impacts to the CZMA. Such impacts would be associated with upgrading systems that require additional acreage beyond what these systems currently occupy. The installation of upgraded pumps and generators within the CZMA would minimally reduce the available area within the CZMA; however, the actions would be in alignment with the October 3, 2018 Federal Consistency Resolution Certificate. Due to this PEA's geographical constraints, there will be no direct impacts from Alternative 2 activities to resources covered under CBRA. For projects that have the potential to indirectly impact OPAs and CBRS units, FEMA will review each project location on a case-by-case basis to determine eligibility. In accordance with USFWS guidelines, FEMA would consult with USFWS for activities that have the potential to affect CBRS units. | Under this alternative, some adverse minor short-term and long-term impacts would occur within the CZMA. Coordination with PRDNER and PRPB will occur prior to any work and limit impacts to the extent possible. Due to this PEA's geographical constraints, there will be no direct impacts from Alternative 3 activities to resources covered under CBRA. For projects that have the potential to indirectly impact OPAs and CBRS units, FEMA will review each project location on a case-by-case basis to determine eligibility. In accordance with USFWS guidelines, FEMA would consult with USFWS for activities that have the potential to affect CBRS units. | Similar to Alternatives 2 and 3, as it is a combination |
| Vegetation | The No Action Alternative would have no direct impacts on the existing vegetation from construction disturbance. Without continued human use or landscape maintenance, some locations may become overgrown and provide additional habitat for fauna in the area. Conversely, the No Action alternative could potentially result in long-term negative impacts in the area resulting from the introduction and colonization of invasive plant species, which compete with native species in disturbed type habitats, if the areas are unmaintained. | This alternative would likely result in short-term negligible impacts to terrestrial vegetation during construction activities. However, the mitigation of impacts would occur through permit requirements and BMPs. During the construction phase, to control the spread of invasive species, all vehicles (i.e. heavy equipment, construction and personal vehicles) will be free of dirt and debris before entering and exiting the project areas. The re-vegetation of project sites will occur in accordance with the applicable permits, SWPPP, and federal and local guidance. Thorough project identification, impact assessment, and review will occur as appropriate. FEMA anticipates no long-term negative impacts; however, any impacts to vegetation would be beneficial in the long-term as native species become established upon implementation of an approved SWPPP. | FEMA anticipates this alternative to have effects similar to those discussed under Alternative 2. However, the additional new area needed for the realignment or relocation of utilities may result in short-term and long-term minor impacts to vegetation. | Similar to Alternatives 2 and 3, as it is a combination |
| Wildlife and Fish | Under the No Action alternative, FEMA would not provide grant funding for permanent utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. Under the No Action Alternative, FEMA anticipates that the effect locally and regionally on wildlife and fish would be adverse and negligible to minor for both the short-term and long-term. The most likely adverse and beneficial impacts would be associated with neglect. Unstable or deteriorating infrastructure would pose both short-term and long-term adverse impacts to wildlife and fish through direct impacts from the collapse of structures and electrocution or indirect impacts resulting from erosion, stormwater runoff, and pollution. Conversely, without continued human use or landscape maintenance, some locations may become overgrown. If an area becomes overgrown there is the potential for it to provide a beneficial habitat feature for wildlife. | This alternative would likely result in adverse short-term negligible to minor impacts to wildlife habitat during construction activities. The implementation of the BMPs included in Section 6 would limit indirect impacts to fish and wildlife habitat. The degradation of water quality from runoff and sedimentation would be limited to the vicinity of construction activities and controlled through NPDES permitting and SWPPP maintenance. | This alternative includes constructing new utilities in areas both previously disturbed and undisturbed. Building new utilities often causes greater impacts than working on existing utilities, particularly in undisturbed areas. The realignment or relocation of utilities and corresponding ROWs on undisturbed lands could result in removal of wildlife habitat. This alternative would likely result in adverse short-term negligible to minor impacts to the habitat during construction activities. As some actions would result in the permanent conversion of land, this alternative would likely result in adverse long-term negligible to minor impacts to wildlife and fish habitat following the construction of utility projects. | Similar to Alternatives 2 and 3, as it is a combination |
| Threatened and Endangered Species | Under the No Action alternative, FEMA would not provide grant funding for permanent utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. Under the No Action Alternative, FEMA anticipates that the effect locally and regionally on federally listed threatened and endangered species would be adverse and negligible to minor for both the short-term and long-term. The most likely adverse and beneficial impacts to threatened and endangered species from the No Action Alternative would be associated with neglect. Unstable or deteriorating infrastructure would pose both short-term and long-term adverse impacts to T&E species through direct impacts from the collapse of structures and electrocution or indirect impacts resulting from erosion, stormwater runoff, and pollution. Conversely, without continued human use or landscape maintenance, some locations | Potential impacts to T&E species are likely to result from construction activities. Alternative 2's actions consist of performing work on utilities within existing alignments. Embankment work and temporary in-water work that affects land, streams, and reservoirs may occur. FEMA will review projects based on available information for the potential occurrence of T&E species and DCH in the area. FEMA will consult with USFWS on individual projects as necessary for compliance with ESA. The consultation process would identify any project conditions necessary to minimize impacts to T&E Species and DCH. Based on this PEA's project thresholds, federal consultations, conservation measures, and NPDES permitting requirements, Alternative 2 may have an adverse negligible to minor short-term and long-term impact on the federally-listed endangered, threatened, and proposed or candidate species. | Based on this PEA's project thresholds, federal consultations, conservation measures, and NPDES permitting requirements, Alternative 3 may have an adverse negligible to minor short-term and long-term impact on the federally-listed endangered, threatened, and proposed or candidate species and their DCH. If through the consultation process, the USFWS determines that a project has the potential to have an adverse effect on T&E species, the project would be beyond the scope of this PEA and require FEMA to perform an additional NEPA analysis. | Similar to Alternatives 2 and 3, as it is a combination |

AR_0002988

| | | | | |
|---|---|---|---|---|
| | may become overgrown. If an area becomes overgrown there is the potential for it to provide a beneficial habitat feature for T&E species. | | | |
| Cultural Resources: Historic (Standing) Structures | The No Action Alternative does not include construction, and thus no new impacts to historic resources would occur as a result of federal funding. Though, existing historic structures may experience degradation due to inability to access the site for repairs and maintenance and could have a long-term negligible to minor impact. | This alternative has the potential to affect historic or cultural resources. This alternative could consist of alteration or removal (for replacement) of historic utility structures and would require SHPO consultation (through the 2018 Programmatic Agreement) prior to their alteration or removal. Even through consultation and mitigation, this alternative may have a negligible to moderate impact on historic structures. | This alternative could consist of the removal or movement of historic utility structures for realignment or relocation; however, similar to Alternative 2, this alternative FEMA expects projects to have similar effects and through SHPO consultation and mitigation, this alternative may have a negligible to moderate impact on historic structures. Additionally, realignment or relocation of overheard utilities may impact viewshed and require coordination with SHPO before their removal or placement. Even through consultation and mitigation, this alternative may have a negligible to moderate impact on the viewshed | Similar to alternative 2 and 3, as it is a combination |
| Cultural Resources: Archeological Resources | The No Action Alternative does not include ground disturbance, and thus no new impacts to archeological resources would occur. | This alternative has the potential to affect archeological resources; however, they would be negligible to minor impacts with SHPO consultation. If SHPO agreement allowances apply, FEMA will determine if a project is compliant with Section 106 of NHPA and the review process will be complete. If the proposed scope of work does not fall within an allowance, FEMA will determine the effect and initiate consultation with the SHPO. Consultation requirements may include Archaeological surveys of ground disturbing activities. | Utility relocation may result in new ground disturbance. While new ground disturbance has the potential to affect archaeological resources, ways to manage impacts are similar to those used for projects described listed under Alternative 2. This alternative has the potential to affect archeological resources; however, they would be negligible to minor impacts with SHPO consultation. | Similar to Alternatives 2 and 3, as it is a combination |
| Environmental Justice | The No Action Alternative has the potential to cause adverse impacts to socioeconomics of a community if utilities are not repaired, upgraded, or made more resilient to future storm events. For instance, the No Action Alternative could result in a reduction in public services such as power, water, or communications access for emergency, police, and fire services. The No Action Alternative could impact localized employment rates for industries that are dependent on utilities to provide reliable service. However, at the data does not exist to support a claim that the existing level of utility service is causing widespread losses of employment and reduced access to health services. The No Action Alternative would continue the same level of service and resiliency for EJ communities. This could have both an adverse short and long-term less than major impact for those communities affected. | Jobs related to the recovery are likely to be available for all education and skill levels. The increase in construction jobs would be short-term in nature and upon completion of the recovery projects, conditions would likely return to a pre-disaster state. As such, FEMA anticipates an increase in construction jobs from the post Hurricane Maria recovery would likely have a less than major beneficial impact on Puerto Rico's economy. By meeting current codes and standards, activities covered under Alternative 2 would result in utility networks that are more resilient. At the programmatic level, Alternative 2 actions could occur at any applicable location throughout the Commonwealth. As such, all demographics within Puerto Rico could benefit from the actions undertaken by this Alternative. The benefit of improving resiliency would be long-term and depending on existing conditions could have a range of beneficial impacts from minor to moderate. Short-term negligible to minor adverse impacts to effected populations may occur during construction due to service interruption, road detours, and building construction. At the programmatic level, short-term minor adverse impacts could occur at any applicable location within the Commonwealth. | Generally, the impacts to socioeconomics and environmental justice from this alternative would be similar to those described for Alternative 2. | Similar to Alternatives 2 and 3, as it is a combination |
| Land Use and Planning | FEMA anticipates that the No Action Alternative would have either no impact or an adverse negligible short-term and long-term impact on land use within the Commonwealth as residents adjust to existing conditions. | During construction, temporary staging areas and access roads would have a short-term minor adverse impact on land use. The utility footprint itself will remain largely within the previous ROW therefore no substantial changes in land use would occur. Some projects however may require small portions of new ROW due to upgrades. This may lead to adverse negligible to minor long-term changes in land use. | FEMA anticipates Alternative 3 would have an adverse short-term minor impact on land use from the installation of new utilities. Alternative 3 actions may include the clearing of vegetation from within an existing or new utility corridor. The operational phase of new utilities would prevent or limit future actions from occurring within new ROWs or project footprints. The occupation of new ROWs and project areas would cause an adverse long-term minor impact to land use as restrictions on future development would likely exist. FEMA anticipates that the removal of utilities would cause an adverse negligible to minor long-term impact on the former locations of relocated utilities. For locations where the Applicant plans on abandoning utilities or management issues remain, the resulting parcel may require land use restrictions that prevent future development. In some cases, the action would essentially revert the land to previous uses or the Applicant may be able to be reuse the parcels for other industrial purposes. In both cases, the Commonwealth could derive a negligible long-term benefit from the actions. | Similar to Alternatives 2 and 3, as it is a combination |
| Noise | Under this alternative, utilities would remain in damaged condition potentially leaving communities with unreliable services and more | Following utility restoration, noise levels will return to that of pre-disaster levels. Noise during construction activities may have short-term minor | Noise impacts from construction activities at the original location would be minor and short-term if utility abandonment or removal occurs. Noise from | Similar to Alternatives 2 and |

104

AR_0002989

**JA_302**

| | | effects on workers and persons living near the construction areas. The Applicant will manage noise impacts by complying with local noise ordinances, using well maintain equipment, and limiting work to daytime hours. Transportation noise along other roadway segments within the area may increase under this alternative due to increasing traffic on alternate roadways as traffic is re-routed into historically low traffic areas. Traffic during construction and the impacts would also be short-term and minor. FEMA anticipates no long-term noise effects. | construction activities at the new location, such as pile/post driving, directional drilling, and construction vehicles (i.e. cement mixing trucks), may have short-term, minor adverse impacts on the workers and persons who live nearby. Similar to Alternative 2, transportation noise along other roadway segments within the area may increase due to re-routed traffic patterns. FEMA anticipates no long-term noise effects. | 3, as it is a combination |
|---|---|---|---|---|
| Transportation | Utility projects remain unfunded by FEMA and some projects that also affect transportation facilities, such as pipelines under roadways, may go unfunded or implemented. | FEMA anticipates short-term minor impacts to transportation facilities during the implementation of Alternative 2 actions. Specifically, this would occur in areas where utilities are within or intersect transportation ROWs. Impacts may include temporary road closures, detours, and lane restrictions. The Applicant would minimize impacts by using MOT activities. The DTOP Design Manual (aka the Work Zone Safety and Mobility Policy) requires contractors working in Puerto Rico to implement MOT plans and conduct public notifications. Following repair, replacement, and/or upgrades to utilities, FEMA anticipates that there would be no long-term adverse impacts to transportation infrastructure. A beneficial impact would result from utilities being more resilient and less likely to cause disruptions to the Commonwealth's transportation network. | FEMA expects negligible to minor long-term adverse impacts to transportation facilities following the relocation or realignment of utilities. Adverse short-term minor impacts may occur during construction. The use of MOT by the Applicant, coordination between the Applicant and managers of the Commonwealth's transportation network, and public notifications would minimize adverse impacts to a level of less than major. A beneficial impact would result from utilities being more resilient and less likely to cause disruptions to the Commonwealth's transportation network. | Similar to Alternatives 2 and 3, as it is a combination |
| Public Services and Utilities | Under the No Action alternative, FEMA does not provide grant funding for utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. FEMA anticipates that the emergency repairs made following Hurricane Maria will not serve as long-term solutions to the Commonwealth's aging infrastructure. The lack of reliability could prove to be a long-term adverse impact on those communities and populations that rely on public services and utilities for their existence. | During the construction phase of Alternative 2 actions, projects could cause adverse negligible to minor short-term impacts to Puerto Rico's social infrastructure. The Applicant would be responsible for coordinating with service providers and construction managers to minimize impacts to public services and the communities they support.<br>An adverse short-term minor impact to public services located within the project area could occur as a result of temporary road closures. The deployment of MOT by the Applicant's engineers and contractors would reduce or eliminate potential impacts due to road closures.<br>FEMA anticipates that Alternative 2 would have no adverse long-term impacts to public services and utilities as well as, the communities they support.<br>This alternative would have long-term beneficial impacts and make the utilities more reliable and hardened against future disasters. By bringing utilities up to current codes and standards, energy demands on the existing system would not increase.<br>FEMA anticipates that the Commonwealth would experience a long-term negligible beneficial impact by improving the energy efficiency of their utility networks. | During the construction phase, short-term impacts to social infrastructure, utility service providers, and the communities they support could occur. The Applicant would be responsible for coordinating with local communities and institutions regarding any possible delays or interruptions in service. FEMA anticipates that the existing utilities will remain in operation until the realigned or relocated utility is ready for service.<br>Due to limiting capacity to pre-Hurricane Maria levels, there would be no additional long-term energy demands on the Commonwealth's utility networks.<br>FEMA expects that the Commonwealth would derive long-term beneficial impacts from Alternative 3. The Applicant would be able to conserve energy as they provide the same level of service to their communities. The realignment and relocation of utilities to less disaster-prone areas would inherently make the Commonwealth's utility networks more resilient. A more resilient network of public services and utilities would in turn benefit the health and safety of the communities they support. | Similar to Alternatives 2 and 3, as it is a combination |
| Public Health and Safety | Under the No Action alternative, FEMA would not fund utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. FEMA anticipates that the existing level of utility service is sufficient to maintain the Commonwealth's public health and safety. However, emergency measures funded by FEMA following Hurricane Maria may not be sufficient to prevent localized future power outages, water shortages, unsanitary conditions, or disruptions in communications. Each of which could adversely affect the administration of emergency medical personnel, police, and fire protective services. FEMA anticipates that the No Action Alternative has the potential to cause short-term and long-term less than major adverse impacts to public health and safety. | Pre-construction meetings and equipment trainings for workers would minimize the risk of employment related injuries from construction phase activities. The potential adverse impact to worker safety would be short-term and minor.<br>During the construction phase, utility interruption and delays in fire, emergency, and law enforcement services could occur; however, the disruptions in service from upgrading utilities would cause only short-term negligible to minor adverse impacts. Road detours could adversely impact emergency services depending on how far traffic has to be re-routed. FEMA anticipates that results of Alternative 2 actions would cause no adverse long-term impacts to the administration of public health and safety services. The Commonwealth's residents may experience a long-term benefit to their health and safety from the application of more resilient utilities. | The potential adverse impact to worker safety would be short-term and minor. The Applicant would be responsible for posting the appropriate signage and placement of construction barriers to alert the public of potential hazards and prevent unauthorized access to project sites. Alternative 3 would have no long-term adverse impacts to public health or safety. The Applicant would use current codes and standard to develop new utilities that can handle the network's pre-disaster capacity as well as, being more resilient to future storm events. Similar to Alternative 2, fire, emergency, and law enforcement services could experience interruptions in service. Utility interruptions during the relocation process could cause short-term negligible to minor adverse impacts as road closures occur and the Applicant's contractor relocates various power and communications networks.<br>The affected populations are likely to experience a long-term beneficial impact to their public health and safety from the application of more resilient utilities. | Similar to Alternatives 2 and 3, as it is a combination |

AR_0002990

| Hazardous Materials | Under the No Action alternative, FEMA would not provide grant funding for permanent utility projects potentially leaving communities with unreliable services and vulnerable to future storm events. Without permanent repairs, infrastructure may further deteriorate and increase the potential for the unregulated releases of contaminates into the environment. Although the level would be less than major, the No Action Alternative has the potential to adversely impact human health and the environment of Puerto Rico. | The use of new materials that are up to current codes and standards, properly trained and equipped personnel, PREQB licensed disposal facilities, and development of an SPCC would minimize both adverse short-term and long-term impacts to human health and the environment to a level of less than major. A short and long-term beneficial impact to the environment and human health would come from the removal of old equipment that could potentially release hazardous materials. If the Applicant encounters soil and water contamination, an additional beneficial impact would come from the treatment and removal of contaminated substrates from the environment. | The abandonment or removal of existing utilities can result in the generation of hazardous wastes. The Applicant will be responsible for disposing of all hazardous waste at PREQB licensed facilities. The use of new materials that are up to current codes and standards, properly trained and equipped personnel, PREQB licensed disposal facilities, and development of an SPCC plan would minimize both adverse short-term and long-term impacts to human health and the environment to a level of less than major. A short and long-term beneficial impact to the environment and human health would come from the removal of old equipment that could potentially release hazardous materials. If the Applicant encounters soil and water contamination, an additional beneficial impact would come from the treatment and removal of contaminated materials from the environment. | Similar to Alternatives 2 and 3, as it is a combination |
|---|---|---|---|---|

106

AR_0002991

# APPENDIX C

## CZMA RESOLUTION (JP-2018-324)

## Federal Consistency Certificate October 3, 2018

**GOVERNMENT OF PUERTO RICO**
**PUERTO RICO PLANNING BOARD**

October 3, 2018

**RESOLUTION JP-2018-324**

Federal Consistency Certification with the Puerto Rico Coastal Zone Management Program
FEMA Puerto Rico DR-4336-PR and DR-4339-PR Permanent Work:
Federal Assistance for Permanent Work through the Public Assistance (PA) Program and
Hazard Mitigation Grant Program (HMGP)

The damage caused by high winds, storm surge and flooding attributed to Hurricanes Irma and Maria had devastating effects on Puerto Rico's coastal areas that need to be addressed in an expeditious manner. While many of the most dire emergency needs have been met, the post-Irma and Maria recovery needs of the Commonwealth are on-going and will continue into the near future.

In its role conducting reviews pursuant to the authority of the Commonwealth under the Coastal Zone Management Act, the Puerto Rico Planning Board recognizes that these circumstances require expedited reviews. In order to achieve this, the Federal Emergency Management Agency (FEMA) in coordination with the Puerto Rico Planning Board agreed the following:

1. The financial assistance awards made by FEMA for responding to the Hurricanes Irma and Maria (Puerto Rico DR-4336-PR and DR-4339-PR) are consistent with the enforceable policies of the Puerto Rico Coastal Zone Management Program (PRZCMP), when the use of such funds is to finance:

    a. Activities described under categories C through G according to the FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018). A summary table with these activities is provided in Appendix A.

    b. Hazard mitigation projects and activities to be covered through the "Hazard Mitigation Grant Program" (HMGP) according to the "Hazard Mitigation Assistance Guidance of February 27, 2015". Hazard mitigation activities to be covered by this program are detailed in appendix A.

    c. "Planning-Related Activities", "Technical Assistance" and "Management Cost" covered under the Hazard Mitigation Grant Program.

2. Financing the above mentioned projects and activities will not require further review pursuant to Subpart F of the Federal Consistency Regulations at 15 CFR Part 930, yet:

    a. The granting of financial assistance under the programs at reference does not exclude or supersede the financed projects to comply with applicable federal and state permits or requirements.

    b. Recipients and Subrecipients that receive FEMA assistance through these programs are not exempt to comply with Federal Consistency requirements (according to Subpart C of the 15 CFR Part 930) for certain projects and activities that may affect the Puerto Rico coastal resources.

    c. This Certification does not exempt or supersede any of the activities mentioned in paragraph number one (1) from compliance with Federal Consistency requirements for "Federal Licenses or Permits" (according to Subpart D of the 15 CFR Part 930) that may be required for certain projects and activities under this agreement.



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

107

AR_0002992

**JA_305**

d. Where "In-kind" repair or replacement is specified for a project, "In-kind" shall mean that it is either the same or a similar material, and the result shall match all physical and visual aspects. The in-kind repairs and replacements should be limited to pre-existing architectural features and physical components of buildings and structures that were in existence prior to the event but are not extant after the event.

After the evaluation of the type of activities to be granted, according to the above mentioned FEMA guides, the Puerto Rico Planning Board, in its meeting of October 3, 2018, determined the following:

"The Financial Assistance at reference is consistent with the Puerto Rico Coastal Zone Management Program; as long as each financed project complies with conditions under paragraph number two (2) of this resolution."

This Certification only applies to disasters DR-4336-PR and DR-4339-PR and will be in effect for a term of five years from the notification date of this resolution. The Certification at reference will be renewed or amended if necessary to extend its validity or address other matters. The Puerto Rico Planning Board agree to have an open line of communication with FEMA to resolve questions that may arise in executing the Federal Assistance grants under the programs at reference.

María del C. Gordillo Pérez
President

*Excused*
Eileen Poueymirou Yunqué
Associate Member

Rebecca Rivera Torres
Associate Member

Suheidy Barreto Soto
Designated Associate Member

**Certify:** That this Resolution is copy of the agreement adopted by Puerto Rico Planning Board (PRPB) in its meeting of **October 3, 2018**. I expedite and notify this copy to the parties under my sign and official stamp of the Puerto Rico Planning Board stamp, for general use and knowledge.

In San Juan, Puerto Rico, today    05 OCT 2018

Loida E. Soto Nogueras
Secretary



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

108

AR_0002993

**JA_306**

SUMMARY OF PUBLIC ASSISTANCE AND HAZARD MITIGATION ASSISTANCE COVERDED UNDER THE GENERAL FEDERAL
CONSISTENCY CERTIFICATION WITH THE PUERTO RICO COASTAL ZONE MANAGEMENT PROGRAM
RESOLUTION JP-2018-324
APPENDIX A

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| **CATEGORY** | **TYPE OF PROJECT** | **ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO:** | |
| **C- ROADS AND BRIDGES** | 1- Roads may be paved, gravel or dirt. Road components include but may not be limited to: <br>• Surfaces <br>• Bases <br>• Shoulders <br>• Ditches <br>• Drainage Structures, such as culverts <br>• Low Water Crossings <br>• Associated facilities, such as lighting, sidewalks, guardrails and signs. <br>2- Bridge components include, but may not be limited to: <br>• Decking <br>• Guardrails <br>• Girders <br>• Pavement <br>• Abutments <br>• Piers <br>• Slope Protection <br>• Approaches <br>• Associated facilities, such as lighting, sidewalks and signs. <br>3- Maintenance: the incident may cause minor damage to roads that result in damage similar to that which may occur over time from other causes. Normal maintenance is not eligible. | **Restoration:** Permanent repair or replacement | Localized Flood Risk Reduction Projects |
| | | | Non-localized Flood Risk Reduction Projects |
| | | | Infrastructure Retrofit |
| | | | Soil Stabilization |
| | | | Post-Disaster Code Enforcement |
| | | | Advance Assistance |
| | | | 5% Percent Initiative Projects: |
| | | | Miscelaneous/Other |

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

Page | 1

AR_0002994

**JA_307**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| CATEGORY | TYPE OF PROJECT | ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO: | |
| D- WATER CONTROL FACILITIES | Water Control facilities are does built for Channel alignment, recreation, navigation, land reclamation, irrigation, maintenance of fish and wildlife habitat, interior drainage, erosion prevention, flood control and storm water management. They include:<br>• Dams and reservoirs<br>• Levees and floodwalls<br>• Lined and unlined engineered drainage channels<br>• Canals<br>• Aqueducts<br>• Sediment and debris basins<br>• Storm water retention and detention basins<br>• Coastal shoreline protective devices<br>• Irrigation facilities<br>• Pumping facilities<br>• Navigational waterways and shipping channels | 1- **Debris and silt removal required to restore capacity (engineered and maintained facilities only)**<br><br>• Eligible only if the Applicant provides documentation to establish the pre-disaster capacity of the facility and that the facility was actively used and maintained with a regular clearance schedule.<br><br>2- **Restoration: Permanent Repair or Replacement**<br>• PNP irrigation facilities are only eligible if they provide water for essential services of a governmental nature to the general public for fire suppression, generating and supplying electricity, and drinking water supply. | Localized Flood Risk Reduction Projects |
| | | | Non-localized Flood Risk Reduction Projects |
| | | | Soil Stabilization |
| | | | Post-Disaster Code Enforcement |
| | | | 5% Percent Initiative Projects |
| | | | Miscelaneous/Other |

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)

GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

AR_0002995

110

**JA_308**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| **CATEGORY** | **TYPE OF PROJECT** | **ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO:** | |
| **E- BUILDINGS AND EQUIPMENT** | Buildings including:<br>• All structural and non-structural components, including mechanical, electrical, and plumbing systems.<br>• Contents and equipment within the building<br>• Furnishings<br><br>Equipment includes:<br>• Vehicles<br>• Construction equipment | 1- **Restoration – Permanent repair or replacement**<br>• Repair or replacement of buildings<br>• Repair or replacement of building components, vehicles or equipment with items similar in age, condition, and capacity.<br>• Replacement of destroyed contents with items similar in age, condition, and capacity.<br>• Recovering and stabilizing records.<br>• Stabilization of irreplaceable collections and individual objects is eligible.<br>• Re-shelving, cataloging, and other work incidental to the replacement of library books and publications.<br><br>2- **Demolition when replacing a facility including removal and disposal of associated debris.**<br><br>3- **Extracting water and removing mud, silt, or debris from interior in conjunction with repairs.**<br><br>4- **Mold remediation when conducted in conjunction with restoration of the facility**<br>• Post remediation sampling to confirm remediation is complete.<br><br>5- **Post-earthquake inspection and evaluation of welded steel moment frames in buildings to determine the level of disaster-related damage requiring repair.** | Property Acquisition and Structure Demolition<br><br>Property Acquisition and Structure Relocation<br><br>Structure Elevation<br><br>Wind Retrofit Projects<br><br>Soil Stabilization<br><br>Mitigation Reconstruction<br><br>Wildfire Mitigation<br><br>Advance Assistance<br><br>5% Percent Initiative Projects<br><br>Miscelaneous/Other |

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)

GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

AR_0002996

**JA_309**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| CATEGORY | TYPE OF PROJECT | ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO: | |
| F- UTILITIES | • Water storage facilities, treatment plants, and delivery systems<br><br>• Power generation, transmission, and distribution facilities, including, but not limited to, wind turbines, generators, substations, and power lines<br><br>• Natural gas transmission and distribution facilities<br><br>• Sewage collection systems and treatment plants<br><br>• Communication systems | **Eligible restoration activities:**<br><br>• Permanent repair or replacement of any component of system, including buildings, structures, or systems, even if not contiguous.<br><br>• Electrical conductor replacement subject to specific criteria.<br><br>• Inspection or assessment of damaged components of a system.<br><br>• Inspection or assessment of an inaccessible structure or component of a system may be eligible, but only when there is evidence of damage, such as when sunken ground appears above a water pipeline. | Generators |
| | | | Infrastructure Retrofit |
| | | | Soil Stabilization |
| | | | Post-Disaster Code Enforcement |
| | | | Advance Assistance |
| | | | 5% Percent Initiative Projects |
| | | | Miscelaneous/Other |



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)

AR_0002997

112

**JA_310**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| **CATEGORY** | **TYPE OF PROJECT** | **ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO:** | |
| **G- PARKS, RECREATIONAL, OTHER** | Eligible publicly owned facilities in this category include:<br>• Mass transit facilities such as railways<br>• Beaches<br>• Parks<br>• Playground equipment<br>• Swimming pools<br>• Bath houses<br>• Tennis courts<br>• Boat docks<br>• Piers<br>• Picnic tables<br>• Golf courses<br>• Ball fields<br>• Fish hatcheries<br>• Ports and harbors<br><br>Other facilities that do not fit in Categories C–F | Restoration – Permanent repair or replacement.<br><br>Restoration of engineered beaches is subject to specific eligibility criteria. | Infrastructure Retrofit<br><br>Soil Stabilization<br><br>Post-Disaster Code Enforcement<br><br>Advance Assistance<br><br>5% Percent Initiative Projects<br><br>Miscelaneous/Other |



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)

AR_0002998

113

**JA_311**

## APPENDIX D

**HABITAT CHARACTERISTICS OF ENDANGERED SPECIES ACT TERRESTRIAL SPECIES OF THE COMMONWEALTH OF PUERTO RICO**

Federally-Listed Terrestrial-Based Threated and Endangered Species: Habitat Characteristics.

| Common Name / Scientific Name | Habitat Characteristics |
|---|---|
| **Birds** | |
| Elfin-woods warbler (*Setophaga angelae*) | *Elfin-woods warblers live in forests with high rainfall, high humidity, low insolation, low temperatures, and constant winds. As its name suggests, this warbler inhabits elfin or montane dwarf forest with dense stands of short, small diameter, twisted trees and shrubs, but it is not exclusive to those areas. This warbler can also live in montane wet forest, and ranges to lower-elevation wet forest. Source: https://www.fws.gov/southeast/wildlife/birds/elfin-woods-warbler/* |
| Piping plover (*Charadrius melodus*) | *Piping plovers use wide, flat, open, sandy beaches with very little grass or other vegetation. Nesting territories often include small creeks or wetlands. Source: https://www.fws.gov/midwest/Endangered/pipingplover/pipingpl.html* |
| Puerto Rican broad-winged hawk (*Buteo platypterus brunnescens*) | *This species occurs in elfin woodland, sierra palm, caimitillo-granadillo, and tabonuco forest types of the Carite Commonwealth Forest, Toro Negro Forest, Los Tres Picachos Forest and El Yunque National Forest, as well as within mature hardwood plantations, shade coffee plantations, and mature secondary forest of the north-central karst region of Puerto Rico within and adjacent to the Río Abajo Commonwealth Forest, and in the Río Encantado area (Florida - Ciales). https://www.fws.gov/southeast/pdf/fact-sheet/puerto-rican-broad-winged-hawk-english.pdf* |
| Puerto Rican nightjar (*Caprimulgus noctitherus*) | *The tree species usually found in the Puerto Rican nightjar's habitat include the oxhorn tree (Bucida buceras), gumbo limbo (Bursera simaruba), birdcatcher trees (Pisonia albida), Caribbean princewood (Exostema caribaeum), and big-leaf mahogany (Swietenia mahogoni). Some of these trees shed their leaves during certain seasons, and the nightjar uses this leaf litter for nesting. Source: https://www.fws.gov/southeast/pdf/fact-sheet/puerto-rican-nightjar-english.pdf* |
| Puerto Rican parrot (*Amazona vittata*) | *The bird is found only in the Caribbean National Forest (known as "El Yunque") located in the northeastern part of the island. Source: https://nctc.fws.gov/Pubs4/PR_parrot.pdf* |
| Puerto Rican plain Pigeon (*Columba inornata wetmorei*) | *It can thrive in different habitats, but usually behaves as a border species, nesting, foraging and sleeping in trees along the sides of roads, rivers and creeks. https://www.fws.gov/southeast/pdf/fact-sheet/plain-pigeon-english.pdf* |
| Puerto Rican sharp-shinned hawk (*Accipiter striatus venator*) | *The Puerto Rican sharp-shinned hawk is an endemic species in Puerto Rico, and it is usually found in forested areas associated with the life zones known as subtropical montane rain forests and moist subtropical forests (e.g. cloud forests, Sierran palm, caimitillo-granadillo and tabonuco [candlewood]). Source: https://www.fws.gov/southeast/pdf/fact-sheet/puerto-rican-sharp-shinned-hawk-english.pdf* |
| Roseate Tern (*Sterna dougallii dougallii*) | *In the Caribbean area, this bird selects sparsely vegetated, rocky offshore islands for nesting. Source: https://www.facebook.com/pg/USFWSCaribbean/notes/* |
| Rufa Red Knot (*Calidris canutus rufa*) | *Habitats used by red knots in migration and wintering areas are generally coastal marine and estuarine habitats with large areas of exposed intertidal sediments. Source:https://www.fws.gov/verobeach/StatusoftheSpecies/20151104_SOS_RedKnot.pdf* |

114

AR_0002999

**JA_312**

| Common Name / Scientific Name | Habitat Characteristics |
|---|---|
| Yellow-shouldered blackbird (*Agelaius xanthomus*) | *The YSBL primarily nests in black mangroves (Avicennia germinans) and coconut palms (Cocos nucifera). It also nests in: West Indian locust (Hymenaea courbaril), red mangroves (Rhizophora mangle), Puerto Rico royal palm (Roystonea borinquena), and oxhorn bucida (Bucida buceras), among others. Source: [https://www.fws.gov/southeast/pdf/fact-sheet/yellow-shouldered-blackbird-english.pdf](https://www.fws.gov/southeast/pdf/fact-sheet/yellow-shouldered-blackbird-english.pdf)* |
| **Amphibians** | |
| Golden coqui (*Eleutherodactylus jasper*) | *All that is known about the golden coqui's habitat is that it lives in the bromeliads growing on trees, on the ground, and/or on vertical surfaces like cliff sides. Source: [https://www.fws.gov/southeast/pdf/fact-sheet/coqui-dorado-english.pdf](https://www.fws.gov/southeast/pdf/fact-sheet/coqui-dorado-english.pdf)* |
| Guajon (*Eleutherodactylus cooki*) | *The guajón is endemic to Puerto Rico and is restricted to the southeastern part of the island. presence of "guajonales" which are caves and grottoes made of plutonic, granitic or sedimentary rocks. Additionally, the species also lives in rocky stream banks covered with moss, ferns and other vegetation. Source: [https://www.fws.gov/caribbean/PDF/GuajonFacts.pdf](https://www.fws.gov/caribbean/PDF/GuajonFacts.pdf)* |
| Llanero Coqui (*Eleutherodactylus juanariveroi*) | *The coquí llanero is only found in one freshwater wetland in Puerto Rico, and it reproduces on only one plant, the bulltongue arrowhead. Source: [https://www.fws.gov/southeast/pdf/fact-sheet/coqui-llanero-spanish.pdf](https://www.fws.gov/southeast/pdf/fact-sheet/coqui-llanero-spanish.pdf)* |
| Puerto Rican crested toad (*Peltophryne lemur*) | *The habitat in which the Puerto Rican crested toad is found is usually described as a coastal dry forest, although they can also be found in subtropical, humid forest habitats, mainly along the karst fringes along the north and south coasts of Puerto Rico. Source: [https://www.fws.gov/southeast/pdf/fact-sheet/puerto-rican-crested-toad-english.pdf](https://www.fws.gov/southeast/pdf/fact-sheet/puerto-rican-crested-toad-english.pdf)* |
| **Reptile** | |
| Culebra Island giant anole (*Anolis roosevelti*) | *Not much is known about this anole's habits. The specimen collected in 1931 was found in a forested area comprised of ficus and gumbo-limbo trees (Bursera simaruba). Source: [https://www.fws.gov/uploadedFiles/CulebraGiantAnole ENG fact sheet.pdf](https://www.fws.gov/uploadedFiles/CulebraGiantAnole ENG fact sheet.pdf)* |
| Mona boa (*Epicrates monensis monensis*) | *This species is unique to the Mona Island Nature Reserve of Puerto Rico; that is to say, it is a species endemic to Mona. The subtropical dry forest, coastal plains, and coastal shrubbery are the species' preferred habitat. Source: [https://www.fws.gov/southeast/pdf/fact-sheet/mona-boa-english.pdf](https://www.fws.gov/southeast/pdf/fact-sheet/mona-boa-english.pdf)* |
| Mona ground Iguana (*Cyclura stejnegeri*) | *The Mona ground iguana is an endemic species of the Mona Island Nature Reserve of Puerto Rico. This species' habitat is rocky and dry, where the predominant flora is subtropical. The iguana seeks shelter in caves and rocky crevices during the nighttime and the cooler hours of the day. Source: [https://www.fws.gov/southeast/pdf/fact-sheet/mona-ground-iguana-english.pdf](https://www.fws.gov/southeast/pdf/fact-sheet/mona-ground-iguana-english.pdf)* |
| Monito gecko (*Sphaerodactylus micropithecus*) | *This gecko is only found in Monito Island. The gecko can be found in leaf litter on the ground, and it hides in small crevasses and holes in Monito Island. Source: [https://www.fws.gov/southeast/pdf/fact-sheet/monito-gecko.pdf](https://www.fws.gov/southeast/pdf/fact-sheet/monito-gecko.pdf)* |
| Puerto Rican boa (*Epicrates inornatus*) | *Observed in every ecosystem in Puerto Rico, it is most commonly sighted in the karst areas in northern Puerto Rico. Source: [https://www.fws.gov/uploadedFiles/PuertoRicanBoa ENG fact sheet.pdf](https://www.fws.gov/uploadedFiles/PuertoRicanBoa ENG fact sheet.pdf)* |
| Virgin Islands tree boa (*Epicrates monensis granti*) | *Virgin Island boas usually live in forest or xerophytic (dry) scrubland, characterized by sharp inclines and rocky, poorly fertile soil. Source: [https://www.fws.gov/uploadedFiles/VirginIslandsBoa ENG fact sheet.pdf](https://www.fws.gov/uploadedFiles/VirginIslandsBoa ENG fact sheet.pdf)* |
| **Plants** | |
| Arana (*Schoepfia arenaria*) | *This species is an evergreen shrub or small tree, occurs in low elevation evergreen and semi-evergreen forests of the limestone hills of northern Puerto Rico. Source: [https://ecos.fws.gov/docs/recovery_plan/920110.pdf](https://ecos.fws.gov/docs/recovery_plan/920110.pdf)* |

115

AR_0003000

**JA_313**

| Common Name / Scientific Name | Habitat Characteristics |
|---|---|
| Bariaco (*Trichilia triacantha*) | *Native dry forest located in the Montes de Barinas, Sabana Grande, Guayanilla and Ponce-Peñuelas.* Source: https://ecos.fws.gov/docs/recovery_plan/Trichilia%20triacantha_Final%20Draft%20Amendment.pdf. |
| Cana Gorda Girdlepod (*Mitracarpus polycladus*) | *Cana Gorda Girdlepod are found within the subtropical dry forest life zone, the driest life zone in Puerto Rico. The vegetation in this zone forms a complete ground cover and is deciduous on most soils. Leaves are succulent or coriaceous, and species with spines and thorns are common.* Source: https://ecos.fws.gov/docs/recovery_plan/981006a.pdf |
| Capa rosa (*Callicarpa ampla*) | *Capa rosa is known from five localities in the palo Colorado forest type.* Source: https://ecos.fws.gov/docs/recovery_plan/950731a.pdf |
| Cerro de Punta Jayuya (*Elaphoglossum serpens*) | *Elaphoglossum serpens is found at a single site in the montane dwarf forest of the summit of Cerro Punta in the central mountains, municipality of Jayuya.* Source: https://ecos.fws.gov/docs/recovery_plan/950117.pdf |
| Chase's Threeawn (*Aristida chaseae*) | *Aristida chaseae is known from the Cabo Rojo National Wildlife Refuge (CRNWR) and La Tinaja Farm which is part of the Cartagena Lagoon National Wildlife Refuge (CLNWR) and Cerro Mariquita area adjacent to the LTF in the Sierra Bermeja mountain range.* Source: https://ecos.fws.gov/docs/five_year_review/doc6034.pdf |
| Chupacallos (*Pleodendron macranthum*) | *Pleodendron macranth urn is known to exist in the subtropical wet (tabonuco forest type) and the subtropical lower montane wet (palo colorado forest type) forest life zones.* Source: https://ecos.fws.gov/docs/recovery_plan/980911a.pdf |
| Cobana negra (*Stahlia monosperma*) | *Grows in brackish, seasonally flooded wetlands in association with mangrove communities, although cultivated plants have been reported from inland areas such as the nursery at Cambalache State Forest in Puerto Rico.* Source: https://ecos.fws.gov/docs/recovery_plan/961101a.pdf |
| Cook's holly (*Ilex cookii*) | *Restricted to the dwarf or elfin forests of the highest elevations in the central mountains of Puerto Rico. Elevations at all known sites ranges from 3,900 to 4,260 feet (1,200 to 1,300 meters).* Source: https://ecos.fws.gov/docs/recovery_plan/910131a.pdf |
| Cordillera Maiden Fern (*Thelypteris inabonensis*) | *Thelypteris inabonensis is only known from high elevation wet montane forest in two localities, the headwaters of the Rio Inab6n in Ponce and Cerro Rosa in the municipality of Ciales. Both areas are located within the Toro Negro Commonwealth Forest.* https://ecos.fws.gov/docs/recovery_plan/950117.pdf |
| El Yunque Colorado (*Ternstroemia subsessilis*) | *The four known localities of Ternstroemia subsessilis are in the palo colorado forest. These species are extremely restricted in distribution and vulnerable to habitat destruction or modification by forest management practices and hurricanes.* Source: https://ecos.fws.gov/docs/recovery_plan/950731a.pdf |
| Elfin tree fern (*Cyathea dryopteroides*) | *Restricted to dwarf or elfin forests found at elevations greater than 830 meters.* Source: https://ecos.fws.gov/docs/recovery_plan/910131a.pdf |
| Erubia (*Solanum drymophilum*) | *Found in evergreen forests of the subtropical wet forest life zone. It occurs on volcanic soils at elevations ranging from 300 to 900 meters.* Source: https://ecos.fws.gov/docs/recovery_plan/Solanum%20drymophilum%20RP.pdf |
| Heller's Cieneguillo (*Daphnopsis hellerana*) | *All populations of Daphnopsis hellerana occur in the semi-evergreen and evergreen seasonal forests of the limestone hills of northern Puerto Rico at elevations which range from 100 to 350 meters.* Source: https://ecos.fws.gov/docs/recovery_plan/920807b.pdf. |
| Higo Chumbo-Prickly Pear (*Harrisia portoricensis*) | *Higo chumbo is known from the several vegetation types on the island of Mona but is most frequently observed in the cactus forest.* Source: https://ecos.fws.gov/docs/recovery_plan/961112c.pdf |

116

AR_0003001

**JA_314**

| Common Name / Scientific Name | Habitat Characteristics |
|---|---|
| Higuero de sierra (*Crescentia portoricensis*) | *Is known to occur only on serpentine soils in the western mountains of Puerto Rico. Elevations range from 200 meters in the Susua Forest to about 800 meters in Maricao. Source: https://ecos.fws.gov/docs/recovery_plan/910923.pdf* |
| Jamaican Broom (*Chamaecrista glandulosa var. mirabilis*) | *It is a small shrub endemic to the white silica sands of the northern coast of Puerto Rico at elevations near sea level. It is scattered along the southern shore of the Tortuguero Lagoon and is also found at one location in Dorado and one in Vega Alta. Source: https://ecos.fws.gov/docs/recovery_plan/940512.pdf* |
| Luquillo Mtn babyboot (*Lepanthes eltoroensis*) | *It is currently known from six discrete sites in the sierra palm, palo colorado, and dwarf forests of the Caribbean National Forest. https://ecos.fws.gov/docs/recovery_plan/960715.pdf* |
| *Beautiful goetzea (Goetzea elegans)* | *It is endemic to the island of Puerto Rico that has historically been known to occur at several locations within the karst and foothills regions on the northern side of the islands. At present, the species appears to be confined to a single area in the northwest. Source: https://ecos.fws.gov/docs/recovery_plan/beautiful%20goetzea%20rp.pdf* |
| Maxwell's Girdlepod (*Mitracarpus maxwelliae*) | *All areas where these three species are located are found within the subtropical dry forest life zone, the driest life zone in Puerto Rico. The vegetation in this zone forms a complete ground cover and is deciduous on most soils. Source: https://ecos.fws.gov/docs/recovery_plan/981006a.pdf* |
| Monte Guilarte Hollyfern (*Polystichum calderonense*) | *It is found in two locations: Monte Guilarte Commonwealth Forest in Adjuntas and Cerrote Penuelas in the municipality of Penuelas. Source: https://ecos.fws.gov/docs/recovery_plan/950117.pdf* |
| No common name (*Varronia rupicola*) | *Solitary scattered; in areas with low shrubs. Source: https://collections.si.edu/search/record/edanmdm:nmnhbotany_13353942* |
| No common name (*Cranichis ricartii*) | *Cranichis ricartii has been found at only three locations in the Maricao Commonwealth Forest. Source: https://ecos.fws.gov/docs/recovery_plan/960715.pdf* |
| No common name (*Gonocalyx concolor*) | *The only known populations of Gonocalyx concolor are located within the Carite Commonwealth Forest, managed by the Puerto Rico Department of Natural and Environmental Resources. Source: https://www.fws.gov/southeast/news/2014/05/service-seeks-comments-on-draft-economic-analysis-re-opens-comment-period-on-proposal-to-designate-critical-habitat-for-three-caribbean-plants/* |
| No common name (*Leptocereus grantianus*) | *The one known population occurs in dry thickets along a rocky shoreline on the southwestern part of Culebra. The population is located only 8 to 10 meters from high tide. Source: https://ecos.fws.gov/docs/recovery_plan/950726.pdf* |
| No common name (*Myrcia paganii*) | *Only eight individuals of M. Paganii are currently known from three localities in the Biafara-Arrozal area to the south of Arecibo and in Quebradillas. Only 19 individuals of A. pauc~florum are known from four groups in the Coto Ward area of Isabela. Both species are found in the semi-evergreen and evergreen seasonal forests of the subtropical moist forest life zones. Source: https://ecos.fws.gov/docs/recovery_plan/970929b.pdf* |
| No common name (*Thelypteris verecunda*) | *The fern is found at Charcas Ward in Quebradillas, Bayaney Ward in Hatillo, and Cidral Ward in the municipality of San Sebastian. Source: https://ecos.fws.gov/docs/recovery_plan/950117.pdf* |

117

AR_0003002

**JA_315**

| Common Name / Scientific Name | Habitat Characteristics |
|---|---|
| No common name (*Vernonia proctorii*) | *Located with dry forest habitat within the range of Sierra Bermeja (V. proctorii are known only from the summit of Cerro Mariquita in the Sierra Bermeja., this species occurs in a limited geographic area in southwestern Puerto Rico. https://ecos.fws.gov/docs/recovery_plan/A.chaseae_L.Truncata_V.proctorii_Recovery_Plan_Amendment_2.pdf and https://ecos.fws.gov/docs/recovery_plan/950731b.pdf* |
| Palma de manaca (*Calyptronoma rivalis*) | *An arborescent palm grows along streambanks in the semi-evergreen forests of the karst region of northwestern Puerto Rico. The three populations are known from San Sebastian, Caumy and Guajataca. Source: https://ecos.fws.gov/docs/recovery_plan/Recovery%20plan%20for%20Calyptronoma%20rivalis.pdf* |
| Palo colorado (*Ternstroemia luquillensis*) | *Ternstroemia luquillensis exist only in the Luquillo Mountains where it grows in three localities in the palo colorado forest and one locality in the dwarf forest. https://ecos.fws.gov/docs/recovery_plan/950731a.pdf* |
| Palo de jazmin (*Styrax portoricensis*) | *This species is endemic to Puerto Rico, where they exist only in the Luquillo Mountains. Its located in the palo colorado forest type. https://ecos.fws.gov/docs/recovery_plan/950731a.pdf* |
| Palo de nigua (*Cornutia obovate*) | *The plant is known to occur in the central mountains of Puerto Rico and in the limestone hill region. Source: https://ecos.fws.gov/docs/recovery_plan/920807b.pdf* |
| Palo de ramon (*Banara vanderbiltii*) | *Banara vanderbiltii, a small evergreen tree, is found in the semi-evergreen forests of the subtropical moist forest life zone. Populations are found on limestone hills or mogotes (elevations 100 to 150 meters) and in the central mountains of volcanic origin (elevations greater than 800 meters). Source: https://ecos.fws.gov/docs/recovery_plan/910315.pdf* |
| Palo de rosa (*Ottoschulzia rhodoxylon*) | *Palo de rosa is known from serpentine and limestone-derived soils in western Puerto Rico. In these areas, narrow moisture tolerance range has been identified. In Guánica, it is found in the more humid canyon bottoms, and in Quebradillas/Isabela it occurs on the drier upper slopes and summits. Source: https://ecos.fws.gov/docs/recovery_plan/940920.pdf.* |
| Pelos del diablo (*Aristida portoricensis*) | *Pelos de diablo is known only from serpentine slopes and red clay soils in southwestern Puerto Rico. Two populations are known: Cerro Las Mesas near Mayaguez and the Sierra Bermeja in the Cabo Rojo and Laja. Source: https://ecos.fws.gov/docs/recovery_plan/Recovery%20plan%20for%20Aristida%20portoricensis.pdf* |
| Proctor's Staggerbush (*Lyonia truncata var. proctorii*) | *Proctor's Staggerbush is known only from the summit of Cerro Mariquita in the Sierra Bermeja. Source: https://ecos.fws.gov/docs/recovery_plan/950731b.pdf* |
| Puerto Rico Halberd Fern (*Tectaria estremerana*) | *The Puerto Rico Halberd Fern has been reported to occur at only one location in the limestone hills of northern Puerto Rico near Arecibo. Source: https://ecos.fws.gov/docs/recovery_plan/950117.pdf* |
| Puerto Rico Maiden Fern (*Thelypteris yaucoensis*) | *Puerto Rico Maiden Fern is known from two localities in Yauco and one locality in Ciales and grows in humus on steep. shaded rocky banks, and ledges at high elevations. Source: https://ecos.fws.gov/docs/recovery_plan/950117.pdf* |
| Puerto Rico Maidenhair (*Adiantum vivesii*) | *Puerto Rico Maidenhair has been reported to occur at only one location in the limestone hills of northern Puerto Rico near Quebradillas. Source: https://ecos.fws.gov/docs/recovery_plan/950117.pdf* |
| Puerto Rico Manjack | *Cordia bellonis has been found at Maricao and Susua in serpentine soils, at road edges, river margins, and on steep slopes at an elevation between 230 to250 meters (754 to 820 feet) (Susua)* |

118

AR_0003003

**JA_316**

| Common Name / Scientific Name | Habitat Characteristics |
|---|---|
| (*Cordia bellonis*) | *and 441 to 820 meters (1,447 to 2,690 feet) (Maricao). In the Rio Abajo Forest, the species was found either on sunny banks along dirt roads, growing in thickets of vegetation, or in open saddles between limestone hills. Source: https://ecos.fws.gov/docs/recovery_plan/991001.pdf* |
| Sintenis' Holly (*Ilex sintenisii*) | *Occur within the federally owned Caribbean National Forest, within the municipalities of Ceiba, Loiza, Naguabo, and Rio Grande. Sintenis' Holly are located within the dwarf forest type. Source: https://ecos.fws.gov/docs/recovery_plan/950731a.pdf* |
| St. Thomas prickly-ash (*Zanthoxylum thomasianum*) | *The species is known to occur in the southern foothills and south coastal uplands as well as, the limestone karst region of northwest Puerto Rico. Source: https://ecos.fws.gov/docs/recovery_plan/st%20thomas%20prickly%20ash%20rp.pdf* |
| Thomas' Lidflower (*Calyptranthes thomasiana*) | *On Vieques, the Puerto Rican population is found on US Navy property in moist deciduous forest at an elevation of 301 meters. Source: https://ecos.fws.gov/docs/recovery_plan/970930a.pdf* |
| No common name (*Catesbaea melanocarpa*) | *Catesbaea melanocarpa occurs in the subtropical dry forest life zone, the driest life zone in Puerto Rico. The vegetation in this zone typically forms a nearly continuous single-layered canopy, with little ground cover, and it is deciduous on most soils. Source: https://ecos.fws.gov/docs/recovery_plan/050818.pdf* |
| Turtlefat (*Auerodendron pauciflorum*) | *Only 19 individuals of A. pauciflorum are known from four groups in the Coto Ward area of Isabela. Both species are found in the semi-evergreen and evergreen seasonal forests of the subtropical moist forest life zones. Source: https://ecos.fws.gov/docs/recovery_plan/970929b.pdf* |
| Uvillo-Luquillo Mtn Stopper (*Eugenia haematocarpa*) | *All known localities of these endemic tree species occur within Federal and Commonwealth lands, except a small population located on private property adjacent to the Carite Commonwealth Forest. Eugenia hoematocarpa is known to only exist in the subtropical lower montane wet (palo colorado forest type) forest life zone. Source: https://ecos.fws.gov/docs/recovery_plan/980911a.pdf* |
| Vahl's boxwood (*Buxus vahlii*) | *Vahl's boxwood is an evergreen shrub or small tree endemic to the island of Puerto Rico, where it is known from only two locations within the karst region on the northern side of the island. Source: https://ecos.fws.gov/docs/recovery_plan/vahls%20boxwood%20rp_1.pdf* |
| West Indian Walnut-Nogal (*Juglans jamaicensis*) | *In Puerto Rico, this species is known from only 14 individuals at one locality in the municipality of Adjuntas. The known locality is near the Monte Guilarte Commonwealth Forest. Source: https://ecos.fws.gov/docs/recovery_plan/991209A.pdf* |
| Wheeler's peperomia (*Peperomia wheeleri*) | *Wheeler's peperomia is an herbaceous plant, occurs on large granodiorite boulders beneath the semi-evergreen seasonal forest of the Monte Resaca area of Culebra Island. Source: https://ecos.fws.gov/docs/recovery_plan/901126.pdf* |
| Woodbury's Stopper (*Eugenia woodburyana*) | *Eugenia woodburyana is endemic subtropical dry forest in the southwestern Puerto Rico. Currently, the population total consists of approximately about 150 individuals in various locations in Sierra Bermeja in the municipalities Cape Red and Lajas. Source: https://www.fws.gov/caribbean/PDF/Eugenia_woodburyana.pdf* |
| Yerba Maricao de Cueva (*Gesneria pauciflora*) | *Gesneria pauciflora is known to occur only on serpentine derived substrates. At all known localities, the plants are associated with wet habitats, which are on steep rock faces with little or no soil formation. They are within the spray zone of waterfalls or near deep pools. Most are in shady situations where direct sun is not received. Most individuals are found within 1 meter of water and may actually be submerged for brief periods of time. Source: https://ecos.fws.gov/docs/recovery_plan/981006b.pdf* |

119

AR_0003004

**JA_317**

Federal Emergency Management Agency
FINDING OF NO SIGNIFICANT IMPACT
Programmatic Environmental Assessment
Commonwealth of Puerto Rico – Utilities Repair, Replacement, and Realignment

## BACKGROUND

The mission of the Federal Emergency Management Agency (FEMA) is to reduce the loss of life and property and protect our institutions from all hazards by leading and supporting the nation in a comprehensive, risk-based emergency management program of mitigation, preparedness, response, and recovery. Beginning September 17, 2017, Hurricane Maria caused significant damages to the Commonwealth of Puerto Rico (Commonwealth). In response, President Donald J. Trump issued a disaster declaration on September 20, 2017 encompassing the entire territory. The declaration authorized federal public assistance to affected communities and certain non-profit organizations through FEMA in accordance with the Robert T. Stafford Disaster Relief and Emergency Assistance (Stafford) Act of 1974 (42 United States Code §§ 5121-5207), *as amended*; the Sandy Recovery Improvement Act of 2013; and the Bipartisan Budget Act of 2018 (Pub. L. 115-123). The Puerto Rico Central Office of Recovery, Reconstruction and Resiliency (COR3) is the grant recipient, and multiple Commonwealth and Municipal agencies may be the subrecipient for specific projects.

This Programmatic Environmental Assessment (PEA) is prepared in accordance with Section 102 of the 1969 National Environmental Policy Act (NEPA), *as amended*, and the Regulations for NEPA Implementation (Title 40 Code of Federal Regulations [CFR] §§ 1500–1508) under the Council on Environmental Quality. This PEA considers potential environmental impacts of potential project alternatives, including a no action alternative, to determine whether to prepare a Finding of No Significant Impact (FONSI) or prepare an Environmental Impact Statement (EIS). In accordance with the above referenced regulations; Department of Homeland Security (DHS) Instruction Manual 023-01-001-01, Revision 01; FEMA Directive 108-1; and FEMA Instruction 108-1-1; FEMA is required, during the decision-making process, to evaluate and consider the environmental consequences of federal actions it funds or undertakes.

Recent changes to the President's Council on Environmental Quality regulations implementing NEPA (40 CFR §§ 1500–1508) became effective on September 14, 2020 (85 Fed. R. 43304-76 (July 16, 2020)). As stated in 40 CFR § 1506.13, the new regulations apply to any NEPA process begun after September 14, 2020. This PEA substantively commenced prior to that date; therefore, this PEA conforms to the CEQ NEPA implementing regulations that were in place prior to September 14, 2020, and procedures adopted pursuant to Department of Homeland Security Directive 023-01, Rev. 01, and FEMA Directive 108-1.

FEMA will review projects that fit within the parameters and thresholds considered in this PEA with any necessary project-specific consultation and permitting. Projects exceeding the thresholds or having impacts greater than those considered in this PEA may result in a project-specific tiered environmental assessment from this PEA, or a stand-alone project-specific environmental assessment. Projects that FEMA determines cannot meet a FONSI will require an EIS or FEMA may choose to not fund such a project. FEMA will engage the public for comment and input associated with project-specific assessments.

AR_0003136

## ALTERNATIVES

Under the Stafford Act, FEMA has authority to provide funding for cost-effective hazard mitigation and resiliency measures for facilities damaged by the recent disasters. The purpose of this PEA is to provide grant funding to restore damaged utilities and increase their resiliency in response to future disaster events. The need for the PEA is to re-establish a safe and reliable network of utilities (through repair, replacement, or realignment) in order to reconnect the communities affected by the storm with safe and efficient delivery of energy, water, sewer service, and communications, and help reduce the potential for future damages by upgrading damaged utilities in accordance with current engineering codes and standards. The grant funding is necessary to address these concerns and reduce the damage and disruption caused by future disasters throughout the Commonwealth.

The types of utilities projects covered under this PEA involve repair, restoration, replacement, and hazard mitigation of the Commonwealth's utility and communications systems. Common actions may include the removal and replacement of current infrastructure, upgrading systems to current codes and standards, utility trench installation, and directionally drilled installation of utilities. Hazard mitigation activities may include utility pole replacement and hardening, flood barrier installation, high capacity pump installation, realignment, or relocation of infrastructure to less potentially hazardous locations, and facility hardening. This PEA allows for up to 20 miles of upgrades to existing linear utility projects including pipelines, transmission lines, or distribution lines. Additionally, the Utility PEA establishes Right-of-Way (ROW) limits based on developed and undeveloped sites and urban and rural locations. For both overhead transmission and distribution lines and underground transmission lines, the applicable ROW standard for overhead utilities involving the primary and secondary distribution of power is 10 feet.

The classes of utilities covered under this PEA include: water storage facilities, water pump stations, treatment plants for potable water/wastewater and their associated delivery systems; supplemental power generation, transmission, and distribution facilities, including, but not limited to, wind turbines, solar farms, generators, substations, and power lines; natural gas storage, transmission, and distribution facilities; stormwater, sewage, and wastewater collection systems and treatment plants; and communication systems. Communication systems include cell towers, transmission lines, and towers which may have associated fiber optic lines attached to them or underground conduits with fiber optic lines. Construction areas, including cleared staging areas and access roads that are greater than five acres for previously disturbed areas that require minimal clearing and up to two acres for undeveloped land requiring clearing, grubbing, or ground disturbance, would be considered on a case-by-case basis to avoid any major impacts to sensitive resources.

FEMA developed and considered multiple alternatives to fulfill the purpose and need to address the overall programmatic impacts and effects for an expected large number of utility projects that FEMA anticipates receiving from the recipient and subrecipients for grant funding. The no action alternative ("Future without Federal Project Condition") will result in no FEMA funding supporting protective measures for the Commonwealth of Puerto Rico. The programmatic action

AR_0003137

alternatives for this PEA include Utility Repair, Replacement, and Upgrade; Utility Realignment or Relocation of Utilities; and a combination of the alternatives (Preferred Alternative) and represent classes of actions implemented both individually, or in combination with one another.

**SUMMARY OF POTENTIAL IMPACTS AND MITIGATION**

FEMA anticipates that project thresholds and the Conditions and Permits in Section 6.0 of this PEA will minimize impacts from the Action Alternatives to below the level of major. Project proposals with actions that exceed the thresholds and constraints evaluated in this PEA, including actions that will normally require an EA or EIS, will require additional analysis of impacts.

FEMA anticipates construction impacts will be below the level of major by requiring subrecipients to use best management practices (BMPs), adhere to local and federal ordinances and regulations, and use of ultra-low sulfur diesel fuel. Additionally, FEMA requires subrecipients to perform a general conformity applicability analysis in air quality nonattainment and maintenance areas.

If a project site is located within the floodway or 100-year floodplain, or within or near wetlands, FEMA will conduct the 8-Step Decision-Making Process in accordance with Executive Orders 11988 and 11990, as well as 44 CFR Part 9. Many of the actions undertaken as part of this PEA will result in a positive effect on floodplains by improving the hydraulic flow and protect developed areas from flooding. Hazard mitigation may include raising structures above flood levels, relocating, floodproofing, or otherwise minimizing their impacts on floodplains or wetlands. Avoidance and mitigation measures would minimize any adverse impacts to floodplains and wetlands.

If a proposed project is likely to impact waters of the United States, the subrecipients will be responsible for obtaining all applicable federal, Commonwealth, and local permit approvals and requirements. The implementation of required mitigation measures and erosion controls will minimize water quality impacts by limiting sediment leaving the site and retaining turbid waters within project areas.

Proposed actions located within the Commonwealth-defined coastal zone are subject to review in accordance with the Coastal Zone Management Act and Puerto Rico Coastal Zone Management Program and Policies. Pursuant to Federal Consistency Regulations at 15 CFR Part 930, FEMA and the Puerto Rico Planning Board (PRPB) signed a Federal Consistency Certificate for Category C through G work dated October 3, 2018 (Resolution JP-2018-324). FEMA will submit Federal Coastal Zone Consistency Determinations for scopes of work not included in the resolution to the PRPB for concurrence.

FEMA will determine if a project scope of work (SOW) meets outlined programmatic allowances from the most recent or applicable Programmatic Agreement with the Puerto Rico State Historic Preservation Office (SHPO) or requires standard Section 106 review and consultation. The Programmatic Agreement establishes a compliance review process for the undertaking, including avoidance measures which will aid to minimize and mitigate adverse impacts to historic resources.

AR_0003138

If the SOW is within the applicable allowances, FEMA will determine the project compliant with Section 106 of the National Historic Preservation Act and the review process will be complete. If the proposed SOW does not fall within the allowances, the standard Section 106 review process will be followed, FEMA will determine the effect and initiate consultation with the SHPO. Additional archaeological surveys of ground disturbing activities may be required depending on SHPO consultation.

FEMA anticipates the actions covered by this PEA will not adversely affect federally listed or proposed threatened and endangered species or their designated critical habitat (DCH). This PEA does not include actions that would create a level of impact beyond a *"not likely to adversely affect"* determination for federally listed species or have an *adverse modification* to DCH. Any such action that would cause an impact beyond not likely to adversely affect will require FEMA to perform additional NEPA compliance. The actions satisfied by this PEA may temporarily displace local wildlife during construction; however, landscape restoration would restore wildlife habitat following completion of utility projects.

## PUBLIC INVOLVEMENT

This Utilities PEA was available for agency and public review and comment for a period of 60 days from October 24 concluding on December 22, 2020. The public information process included a public notice in both Spanish and English with information about the proposed action in the *Primera Hora* newspaper. The public notice included addresses to locations where the documents were available for review. The public notice provided the location of two websites where the document was and is available to download and review: https://www.fema.gov/media-library and https://recovery.pr/es/document-library.

FEMA emailed a copy of the public notice to the recipient for distribution to the 78 municipalities in the Commonwealth with a request to post the public notice to their public facing website. As part of the public involvement campaign, FEMA targeted outreach to environmental justice populations through notices to ten community support organizations within the Commonwealth. The publicly available materials included a Spanish translation of the PEA and Executive Summary. As required by EHP protocol, FEMA has considered comments during the public notice comment period. **Attachment A** includes both agency and public comments as well as FEMA's responses.

## PERMITS AND PROJECT CONDITIONS

The subrecipients are responsible for obtaining all applicable Federal, State, and local permits and other authorizations for project implementation prior to construction. The subrecipient will be responsible for adhering to all permit conditions for site-specific project review. Failure to comply with these conditions may jeopardize Federal funds.

AR_0003139

**JA_321**

**FINDINGS**

FEMA received comments from agencies as well as the public during the 60-day extended public comment period. FEMA determined that the comments do not substantively change the analysis or outcomes; comments received are addressed in **Attachment A** to this FONSI. FEMA has made the determination that Alternative 4, Preferred Alternative, best fulfills the purpose and need of this PEA. In accordance with NEPA and the FEMA Directive and Instruction, FEMA has determined that the evaluated actions will have no significant adverse impact on the quality of human health and the environment within the constraints evaluated. As a result of this FONSI, an Environmental Impact Statement will not be prepared, and the actions as described in this PEA may proceed with the constraints described. This FONSI serves as the final public notice for the proposed action. Construction activities shall not start until fifteen days after the date of this FONSI.

**APPROVED BY:**

JOHN J MCKEE  Digitally signed by JOHN J MCKEE
Date: 2021.06.16 07:24:01 -04'00'

John McKee                                                                                         Date
Regional Environmental Officer, FEMA Region II

**PROGRAM ENDORSEMENT:**

DANNA E PLANAS OCASIO  Digitally signed by DANNA E PLANAS OCASIO
Date: 2021.06.16 12:47:59 -04'00'

Danna E. Planas Ocasio                                                                    Date
Infrastructure Division Director, Joint Recovery Office

ANTONIO R BUSQUETS  Digitally signed by ANTONIO R
LOPEZ                          BUSQUETS LOPEZ
                                     Date: 2021.06.16 14:12:41 -04'00'

Antonio Busquets Lopez                                                              Date
Hazard Mitigation Division Director, Joint Recovery Office

AR_0003140

**JA_322**

**Attachment A**: FEMA Responses to Agency and Public Comments

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 1 | USEPA, dated September 1, 2020 | In the PEA, there are no details of the types of construction equipment and the levels of service that will be expected for the actions in Alternatives 2 and 3, as the projects will be varied in construction equipment use and time. However, under 40 CFR Part 193, each agency must prepare an applicability analysis for an action in a non-attainment area, using estimated equipment emissions data, to determine whether the action meets de-minimus levels, and will not require a full general conformity determination. | Section 4.2 indicates construction activities may use large cranes, excavators, dump trucks, jackhammers, skid-steer loaders, bulldozers, cement trucks, pickup trucks, and flatbed trucks. Section 5.2 notes that FEMA's subrecipients are responsible for preparing a general conformity applicability analysis for projects. As noted in Section 6.0 of the Utilities PEA, subrecipients are required to obtain all applicable local, state, and federal permits, including any air quality permits required. |
| 2 | USEPA, dated September 1, 2020 | Please edit sentence on page 24 to indicate ultra-low sulfur diesel: "Engines and generators should run on ultra-low sulfur diesel." | Subrecipients will run engines and generators on ultra-low sulfur diesel. |
| 3 | USEPA, dated September 1, 2020 | Page 16 – Conversion of a Fuel Source. This paragraph should include an example of a "small power marketing plant" and discussion of the likely electrical or power output from such a plant. | Section 4.3 reference is used within branches of the Department of Energy (DOE) to refer to the sale of power from large hydrologic dams was improperly applied to Alternative 3. The appropriate reference is "Utility Scale" energy production. |
| 4 | EarthJustice, dated November 18, 2020 | EarthJustice requested an extension of the public comment period noting that organizations represented did not receive direct notice of the PEA. | The public notice for the Utilities PEA was initially published on October 22, 2020 ending on Saturday November 21, 2020. FEMA republished the public notice, sent copies to the organizations identified as represented by EarthJustice, and extended the comment period for an additional 30 days beginning November 22, 2020, and ending on December 22, 2020. |

AR_0003141

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 5 | Rincón chapter of Surfrider Foundation, dated November 18, 2020 | First, we have received many comments from individuals and groups who are also reviewing this document that the allotted 15 day period for submitting comments is inadequate for a valid assessment. Thus we respectfully request an extension to this comment period, to allow members of the general public sufficient time to formulate informed comments. | The public notice was initially published on October 22, 2020 ending November 21, 2020 for 30 days and subsequently extended an additional 30 days beginning November 22, 2020 and ending on December 22, 2020. |
| 6 | Rincón chapter of Surfrider Foundation, dated November 23, 2020 | Climate Change Impacts (CCI): nowhere in the document to find a mention of climate change as a criterion for determining potential environmental impacts to the work that needs to be done. | While the PEA does not use the term 'climate change,' FEMA funds projects that incorporate resiliency measures to withstand the impacts of extreme weather and other threats. The PEA considers impacts to water resources (Sections 5.3-5.6) and air quality impacts, including pollutants that exacerbate the effects of climate change (Section 5.2). FEMA requires projects to comply with local, state, and federal permitting under the authority of various regulatory agencies. This includes complying with Commonwealth laws such as Puerto Rico Climate Change Mitigation Adaptation and Resilience Act. Subrecipients submit projects designed to meet their needs and the risks they anticipate, meeting current codes and standards as established under the 2018 Puerto Rico Building Codes, that FEMA evaluates under its authorities. |

AR_0003142

**JA_324**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 7 | Rincón chapter of Surfrider Foundation, dated November 23, 2020 | In general for Puerto Rico CCI would include ongoing Mean Sea Level Rise, predictive modelling that indicates future tropical cyclones will most likely become stronger (average wind speed) and slower (longer duration of hurricane force winds) - and coupled with that, predictive modelling that shows significant changes rainfall patterns (where average annual rainfall totals may remain approximately the same for the island in general, but rainfall events becoming fewer but more intense, with significant regional variation). | See Response to Comment 6 |
| 8 | Rincón chapter of Surfrider Foundation, dated November 23, 2020 | Obviously allowing for CCI will affect the design and (re)construction of specific projects that may, in fact, involve significant environment impacts, ranging from the hardening / seawalls / 'storm proofing' of electric generation facilities and their associated fuel offloading infrastructure to the hardening / 'storm proofing' or relocation of T&D substations. | See Response to Comment 6 |
| 9 | Rincón chapter of Surfrider Foundation, dated November 23, 2020 | Since historically PREPA has been reluctant to factor CCI into their planning, we feel it is incumbent on FEMA to be the agency responsible to acknowledge these impacts, and include CCI mitigation as a specific criterion when determining potential environmental impacts of specific projects, and thus be included in the PEA. | See Response to Comment 6 |

AR_0003143

**JA_325**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 10 | Rincón chapter of Surfrider Foundation, dated November 23, 2020 | Agricultural Lands not included in Section 5 Affected Environments: a significant percentage of the high voltage transmission lines in the T&D system are located on agricultural land, so we feel that inclusion of this category is required for environmental assessment. More importantly, installations like the 'solar farm' located on agricultural land in Humacao that operated under the aegis of PREPA (which was destroyed by the hurricane) and other similar PREPA proposals that may in fact be approved by the time this document is finalized might be included in this funding - and thus merit a categorical environmental assessment. | Section 5.1 addresses the Prime Farmland under the Farmland Protection Policy Act; projects that affect soils qualifying as prime, unique, or of statewide importance may result in consultation between FEMA and the Natural Resource Conservation Service. Project SOW that exceed the thresholds set in Section 4 of the PEA will be evaluated when FEMA receives them in a Tiered Environmental Assessment or in a project-specific environmental assessment. |
| 11 | EarthJustice, dated December 21, 2020 | In the major federal action contemplated in the granting of a historic amount of funds, FEMA should be guided by its administrative procedure known as, "A Whole Community Approach to Emergency Management: Principles, Themes, and Pathways for Action". | FEMA prepared the 2020 Utilities PEA in accordance with Section 102 of the NEPA of 1969, *as amended*; CEQ regulations for implementation of NEPA (40 CFR §§ 1500 to 1508), FEMA Directive 108-1, and FEMA Instruction 108-1-1. |
| 12 | EarthJustice, dated December 21, 2020 | Under this statutory framework, actions that "may affect" a listed species or critical habitat may not proceed unless and until the federal agency ensures, through completion of the consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat. | All projects submitted to FEMA will be evaluated for adherence to existing programmatic consultations and associated conservation measures or in project-specific consultation with the United States Fish and Wildlife Service (USFWS). Projects which may adversely affect listed species or critical habitat will require a biological opinion in coordination and consultation with the USFWS and any associated public process. Projects that may result in jeopardy or adverse modification through that process may be ineligible for FEMA funding. |

AR_0003144

**JA_326**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 13 | EarthJustice, dated December 21, 2020 | The multiple infrastructure projects to be funded by FEMA present a high risk of significant impacts to endangered species and the environment. | See Response to Comment 12 |
| 14 | EarthJustice, dated December 21, 2020 | FEMA cannot exclude public input by subsequently determining that when, "biological impacts are greater than what this PEA includes, FEMA will review those projects on a case-by-case basis to determine appropriate level of NEPA analysis." (p.40). | See Response to Comment 12 |
| 15 | EarthJustice, dated December 21, 2020 | The PEA provides no basis for the allegation that utility projects in, on, or over land, streams, and reservoirs, embankments and in-water work "would likely result in adverse short-term negligible to minor impacts to the habitat during construction activities", (p.43) and fails to address significant adverse impacts to habitat, wildlife and fish. | See Response to Comment 12 |
| 16 | EarthJustice, dated December 21, 2020 | FEMA's proposed review of projects for the potential occurrence of threatened and endangered species ("T&E") species and designated critical habitat ("DCH") in the area should be included in an EIS. | See Response to Comment 12 |
| 17 | EarthJustice, dated December 21, 2020 | Attempts to minimize impacts to T&E Species and DCH through the National Pollutant Discharge Elimination System ("NPDES") permitting program and implementation of a SWPPP might not mitigate significant adverse impacts that could have been determined in an EIS. | See Response to Comment 12 |

AR_0003145

**JA_327**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 18 | EarthJustice, dated December 21, 2020 | The PEA presumably proposes to address the impacts of the proposed permanent work on the damaged structures and other infrastructure work. That is not explicitly stated in the PEA. | Section 4 of this PEA contains anticipated actions for consideration when using the PEA; projects not consistent with these actions are not part of this evaluation and will be reviewed under NEPA and FEMA's authorities as subrecipients submit them to FEMA. |
| 19 | EarthJustice, dated December 21, 2020 | The mere reference to different alternatives does not satisfy NEPA requirements. The agency must discuss, explain and provide public information of each alternative. | See Response to Comment 18 |
| 20 | EarthJustice, dated December 21, 2020 | Relocation of utilities at greater distances from an existing ROW, could encroach on fence line communities and the environmental impacts could also be significant. | See Response to Comment 18 |

AR_0003146

**JA_328**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 21 | EarthJustice, dated December 21, 2020 | One of the main shortcomings of the PEA is the total failure to provide specific lists, descriptions, mapping or any other indication of the electric infrastructure grid work that is proposed in each area. | Projects submitted to FEMA under the Stafford Act are developed by the subrecipients for grant reimbursement. Until a subrecipient develops a project proposal, FEMA typically does not have detailed lists, scopes of work, or other details to review. FEMA prepared this PEA as a planning tool to streamline the process of actions that FEMA routinely funds in disaster recovery operations under its authorities while separating out actions that would require more rigorous evaluation, in the absence of specific project proposals. The PEA further reduces the potential for subrecipients to segment projects in order to avoid NEPA review under FEMA's authorities. FEMA requires approved projects to comply with local, state, and federal laws and Executive Orders; the recipient and subrecipients are still required to comply public involvement requirements that the Puerto Rico regulatory entities may have. Recent changes to the President's CEQ regulations implementing the NEPA (40 CFR §§ 1500–1508) became effective on September 14, 2020 (85 Fed. R. 43304-76 (July 16, 2020)). As stated in 40 CFR § 1506.13, the new regulations apply to any NEPA process begun after September 14, 2020. This PEA substantively commenced prior to that date; therefore, this PEA conforms to the CEQ NEPA implementing regulations that were in place prior to September 14, 2020, and procedures adopted pursuant to DHS Directive 023-01, Rev. 01, and FEMA Directive 108-1. |

AR_0003147

**JA_329**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 22 | EarthJustice, dated December 21, 2020 | The PEA incorporates a faulty procedural approach, a haphazard scheme for the environmental analysis for the vast array of infrastructure work proposed; … (P. 11). This supplemental analysis and tiered EA scheme is problematic and doesn't comply with NEPA for a number of reasons: 1-It promotes segmentation of the environmental analysis; 2-Environmental review and consultation with relevant agencies is left entirely within FEMA's discretion; 3-Public access to information is piecemeal and unduly limited; and 4-Public input and informed participation is undercut by the staggered administrative process. Allowing such broad agency procedural discretion would effectively negate an integral environmental analysis and cancel out public input. | See Response to Comment 21 |
| 23 | EarthJustice, dated December 21, 2020 | The PEA is highly biased and skewed towards replicating the existing centralized T&D system and should not be allowed to block the preparation of an EIS. It not only excludes viable alternatives described in these comments but fails to consider the environmental effects of the preferred and/ or considered alternatives…. | See Response to Comment 21 |
| 24 | EarthJustice, dated December 21, 2020 | The PEA fails to specify the magnitude and extent of projects that "require replacement or relocation of contiguous portions of the utility to mitigate risk and restore infrastructure." | See Response to Comment 21 |

AR_0003148

**JA_330**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 25 | EarthJustice, dated December 21, 2020 | The environmental impacts of the project alternatives in the PEA are significant, not conducive to mitigation to less than major and merit the preparation of an Environmental Impact Statement ("EIS"). A Finding of No Significant Impact (FONSI) would not adequately address the multiple significant environmental impacts of the extensive infrastructure work proposed. | To date, FEMA has not received project proposals in Puerto Rico that would rise to the level of significance or that cannot be mitigated to lower levels through applicable local, state, or federal permitting, applicable consultation with federal regulatory agencies, or application of associated project conditions. Recent changes to the President's CEQ regulations implementing the NEPA (40 CFR §§ 1500–1508) became effective on September 14, 2020. 85 Fed. R. (43304-76 (July 16, 2020)). As stated in 40 CFR § 1506.13, the new regulations apply to any NEPA process begun after September 14, 2020. This PEA substantively commenced prior to that date; therefore, this PEA conforms to the CEQ NEPA implementing regulations that were in place prior to September 14, 2020, and procedures adopted pursuant to DHS Directive 023-01, Rev. 01, and FEMA Directive 108-1. Additionally, all projects submitted to FEMA are evaluated under Section 106 of the National Historic Preservation Act, 36 CFR Part 800, and applicable programmatic agreements negotiated between FEMA, the Puerto Rico State Historic Preservation Office, and the Puerto Rico Central Office for Recovery, Reconstruction, and Resiliency. Project proposals that do not meet programmatic agreements require individual consultation between FEMA and the Puerto Rico State Historic Preservation Office. |
| 26 | EarthJustice, dated December 21, 2020 | The PEA is a highly biased document which cannot serve the purpose of excluding the preparation of an EIS. It not only excludes other viable alternatives as described above, but also fails to consider the environmental effects of the preferred and/ or considered alternatives. | See Response to Comment 25 |

AR_0003149

**JA_331**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 27 | EarthJustice, dated December 21, 2020 | Each project's SOW should be included in an EIS to determine potential significant adverse impacts to historic or prehistoric or paleontological archeological resources. | See Response to Comment 25 |
| 28 | EarthJustice, dated December 21, 2020 | The Programmatic Environmental Assessment fails to adequately consider alternatives to centralized fossil fuel power plants, which could lessen or eliminate the need for expensive transmission system projects. | Section 4 lists the actions considered and evaluated in this PEA; actions that are not addressed by this PEA will be evaluated as subrecipients submit project proposals to FEMA. All projects proposed for FEMA funding are required to comply with local and state requirements as well. FEMA's authorities do not prevent subrecipients from proposing energy efficiency or renewable energy projects. Utility-scale, permanent power generation actions were excluded from analysis for two reasons, the first of which is that FEMA anticipates such actions would well exceed the acreage threshold considered for analysis under this PEA. Secondly, FEMA anticipates such proposals would necessarily include other federal agencies with regulatory jurisdiction for establishing new utilities. Likewise, such actions would warrant a closer look at a project-specific scale which this PEA was not intended to address. The Utilities PEA was prepared in accordance with the Stafford Act, DHS, and FEMA implementing procedures and directives for NEPA. The recipient and subrecipients are responsible for selecting and designing projects for submittal to FEMA for grant funding. FEMA funds eligible projects via grants in accordance with the Stafford Act. |
| 29 | EarthJustice, dated December 21, 2020 | The principal flaw of the PEA is that it fails to consider viable alternatives to the rebuilding, "hardening" and undergrounding of the existing T&D system. | See Response to Comment 28 |

AR_0003150

**JA_332**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 30 | EarthJustice, dated December 21, 2020 | The viability of alternatives other than those listed in the PEA has been determined in the IRP and local law and must therefore be considered by FEMA in the corresponding environmental document. This PEA fails to address this issue. | See Response to Comment 28 |
| 31 | EarthJustice, dated December 21, 2020 | The PEA is contradictory as to additional capacity in the electric system that would result from the proposed work, on the one hand referencing "utility retrofits to accommodate greater capacity" (p.25) and subsequently alleging that " Due to limiting capacity to pre-Hurricane Maria levels, there would be no additional long-term energy demands on the Commonwealth's utility networks." (p.63). | Presented in Section 4, this PEA is intended to support supplemental power, in part, rather than new permanent power generation. Page 24 discusses impacts in the context of air quality, whereas, page 65 discusses anticipated impacts in the context of public services and utilities. As indicated in Section 5.2.2, by meeting current codes and standards, this PEA will be in alignment with the Commonwealth's 2019 Energy Public Policy Act. The 2019 Act updates and unifies policy initiatives stated from several Acts regarding Puerto Rico's energy policy. The 2019 Act establishes the Puerto Rican energy public policy and guiding principles for the electric grid based on efficiency, formulates energy policy, and establishes goals and objectives for becoming more energy efficient and independent. |
| 32 | EarthJustice, dated December 21, 2020 | The Programmatic Environmental Assessment fails to adequately consider impacts to air, water, species habitats, farmland, and flooding risks. | Impacts to air are evaluated in Section 5.2, impacts to water are evaluated in Section 5.3, impacts to species habitats are evaluated as part of Sections 5.7, 5.8, and 5.9, impacts to farmland are evaluated in Section 5.1, and impacts to flood risks are evaluated in Section 5.5. |
| 33 | EarthJustice, dated December 21, 2020 | The PEA acknowledges that the projects may involve "changes to topography" but fails to discuss how topographical alterations impact superficial and ground water flows, flood levels and sedimentation of water courses. | Section 4.2 illustrates the typical dimensions of excavations associated with the installation of potential actions. During project review, FEMA also evaluates impacts to floodplains and requires mitigation or project changes to avoid a rise in flood elevations. FEMA defers to the regulatory agencies for enforcement of water quality with the Commonwealth under Section 401 of the CWA and with the USACE for Section 404 of the CWA. |

AR_0003151

**JA_333**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 34 | EarthJustice, dated December 21, 2020 | The PEA does not specify which projects or even how many projects involve the permanent installation of generators and would require additional permitting from PREQB and additional studies, a tiered EA or stand-alone EA if emissions exceed NAAQS levels. | Until subrecipients identify projects and scopes of work, FEMA does not have an estimate of projects incorporating generators. FEMA defers to the respective regulatory agencies responsible for setting emission standards, issuing permits, and other regulatory actions. As noted in Section 5.2, subrecipients are responsible for preparing a general conformity applicability analysis in air quality nonattainment areas and adhering to any applicable State Implementation Plans. |
| 35 | EarthJustice, dated December 21, 2020 | FEMA failed to account for the context and intensity of the upstream and downstream emissions impacts resulting from the activities proposed in the PEA. | See Response to Comment 34 |
| 36 | EarthJustice, dated December 21, 2020 | Furthermore, the PEA fails to specify the extent and magnitude of "utility retrofits to accommodate greater capacity" (p.25) which would not only increase short-term minor emissions but may exceed NAAQS. | The upgrade of utilities shall comply with current codes and standards. Puerto Rico's 2018 Building Codes and Standards were prepared in accordance with the International Codes Council standards. The American Society of Heating and Air-Conditioning Engineers and the International Codes Council in cooperation with the DOE develop codes and standards that incorporate materials and technologies in both designs and construction that encourage energy conservation. |
| 37 | EarthJustice, dated December 21, 2020 | The PEA fails to acknowledge that noise from realignment or relocation of utilities could impact communities with long-term noise effects. | Noise impacts are addressed in Section 5.13.2 of the Utilities PEA. Noise impacts are regulated by the PRDNER/PREQB under the Noise Pollution Control Regulation of 2011. |
| 38 | EarthJustice, dated December 21, 2020 | The PEA notes the significant adverse impacts to water resources from the four thermoelectric power plants that use large amounts of saline (seawater) for cooling… | As indicated in Section 5.3.1, FEMA notes that four thermoelectric power plants use up to 2,262 Mgal/d of seawater. The potential actions discussed in Section 4.0 do not include activities that will require the use of additional seawater withdrawals. |

AR_0003152

**JA_334**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 39 | EarthJustice, dated December 21, 2020 | The PEA's allegation that, "relocating utilities within a new or expanded ROW would have similar impacts and mitigation measures as those described for Alternative 2" (p.31) and "may have a negligible to minor direct or indirect on impact water resources, including wetlands and waterways; but would have mitigation through Section 401 and Section 404 permitting" (p. 32) is wholly unsubstantiated. | Impacts to wetlands are addressed in Section 5.4 and impacts to water quality are addressed in Section 5.3 of the PEA. FEMA defers to the regulatory agencies for enforcement of water quality with the Commonwealth under Section 401 of the CWA and with the USACE for Section 404 of the CWA. Projects with greater than one acre of ground disturbance require a state discharge pollution prevention plan and associated permitting and conditions from the USEPA. |
| 40 | EarthJustice, dated December 21, 2020 | The PEA acknowledges that, "certain sites could result in some fill placed within the wetland boundaries during construction" and proposes that, "Where individual projects may impact wetlands, streams, or WOTUS, FEMA would consider further tiered review". | See Response to Comment 39 |
| 41 | EarthJustice, dated December 21, 2020 | The PEA erroneously and repeatedly alleges that the, "process of relocating utilities within a new or expanded ROW would have the same impacts and mitigation measures as those described for Alternative 2". (p.34). Similarly, the allegation that expanding a ROW including embankment and in-water work that may impact wetlands will have "minor short-term direct or indirect impacts on wetlands" (p.34). | See Response to Comment 39 |

AR_0003153

**JA_335**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 42 | EarthJustice, dated December 21, 2020 | The extent of the damages including flow impediment and other adverse impacts to stream and floodplain hydraulics and function cannot be characterized as "moderate". Relocation of utilities in El Yunque National Forest or a Wild and Scenic River and other sensitive ecologic areas require the preparation of an EIS. The sheer magnitude of potential relocation work mandates an EIS. | Any project proposal within El Yunque will be closely coordinated with the National Park Service who has jurisdiction over the land and project proposals will follow the Wild and Scenic Rivers prohibitions and management activities noted in Section 5.3.1. Relocation of utilities within the NPS would require additional NEPA analysis as noted in Section 5.3.2. |
| 43 | EarthJustice, dated December 21, 2020 | A determination of the extent and magnitude of the projects in the CZMA that allows for public information and participation is required. | Coastal Zone Management Act is addressed in Section 5.6 of the PEA. Project proposals submitted to FEMA will be reviewed under existing general consistency determinations or project-specific consultation with the Puerto Rico Planning Board. |
| 44 | EarthJustice, dated December 21, 2020 | The Allowances in the Second Amendment Programmatic Agreement… cannot be used as a subterfuge to avoid NEPA analysis of significant adverse impacts on historic or prehistoric or paleontological archeological resources. | All projects submitted to FEMA are evaluated under Section 106 of the National Historic Preservation Act, 36 CFR Part 800, and applicable programmatic agreements negotiated between FEMA, the Puerto Rico State Historic Preservation Office, and the Puerto Rico Central Office for Recovery, Reconstruction, and Resiliency. Project proposals that do not meet programmatic agreements require individual consultation between FEMA and the Puerto Rico State Historic Preservation Office. |
| 45 | EarthJustice, dated December 21, 2020 | A subsequent Section106 review process and consultation with the SHPO and "appropriate consulting parties" will not comply with NEPA standards. | See Response to Comment 44 |

AR_0003154

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 46 | EarthJustice, dated December 21, 2020 | The Programmatic Environmental Assessment fails to include adequate public participation measures, especially concerning impacts to environmental justice communities. | The Public Comment Period was originally 30 days and subsequently extended an additional 30 days. As part of the outreach effort a public notice was published in the Commonwealth-wide newspaper *Primer Hora*, ten community organizations were contacted via email, English and Spanish versions of the document were posted at four locations within the Commonwealth and made available for download on both FEMA's website and COR3's website. Environmental Justice concerns will be evaluated for individual projects submitted to FEMA. Recipients and subrecipients may assist with carrying out requirements of Executive Order 12898, particularly with public involvement, but FEMA will make the final determination of compliance. |
| 47 | EarthJustice, dated December 21, 2020 | Effective public participation requires specific information about realignment in farmland. It is wholly inadequate if FEMA has discretion to "consult with USDA NRCS to avoid, minimize, or mitigate the impacts" (p.21) but does not discuss the potential significant adverse impacts in a public-facing document. | The Public Comment Period was originally 30 days and subsequently extended an additional 30 days. Section 5.1 addresses the Farmland Protection Policy Act; projects that affect soils that qualify as prime, unique, or of statewide importance result in consultation between FEMA and the Natural Resource Conservation Service. Project proposals that exceed the thresholds set in Section 4 of the PEA will be evaluated when FEMA receives them in a Tiered Environmental Assessment or in a project-specific environmental assessment. |
| 48 | EarthJustice, dated December 21, 2020 | The assertion in the PEA that relocation of a utility "would have a minor impact on geology and soils, negligible to minor impacts on prime or important farmland, and no impacts on seismicity" (p.21) is unfounded. | See Response to Comment 47 |

AR_0003155

**JA_337**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 49 | EarthJustice, dated December 21, 2020 | Rebuilding and hardening the existing T&D system would perpetuate South to North transmission and central station fossil fuel plants in Southern Puerto Rico thus cementing air, water and land pollution that have significant impacts on EJ communities and would continue to disproportionately and adversely affect these low income and afro descendent populations. | The Utilities PEA was prepared in accordance with the Stafford Act, DHS, and FEMA implementing procedures and directives for NEPA. The recipient and subrecipients are responsible for selecting and designing projects for submittal to FEMA for grant funding. FEMA funds eligible grants in accordance with the Stafford Act. |
| 50 | EarthJustice, dated December 21, 2020 | The PEA is contradictory, on the one hand erroneously concluding that the percentage of households below the poverty level does not vary a great deal across municipalities or towns in Puerto Rico and subsequently acknowledging variations in racial makeup, income levels, and poverty rates within Puerto Rico. While noting that, "the southeast Municipalities near Arroyo and Yabucoa generally have a higher percentage of black Hispanic population than many other Municipalities", (p.55). | As indicated in Section 5.11.1 of the PEA, small variations in racial makeup, income levels, and poverty rates differ slightly between regions and Municipalities within Puerto Rico. Both state and federal governments rely on the federal poverty level, which is published by the Department of Health and Human Services. Government programs typically measure households on a sliding scale of incomes against the federal poverty level. |
| 51 | EarthJustice, dated December 21, 2020 | The PEA fails to document the high numbers of afro descendant population in Guayama, Salinas and other municipalities where the most contaminating electric power plants are located. | As noted in Section 5.11.1 of the PEA, FEMA acknowledges the prevalence of afro descendant (black Hispanic) populations throughout the Commonwealth. |
| 52 | EarthJustice, dated December 21, 2020 | The PEA indicates that the public information process would include "targeted outreach to environmental justice populations through notices to community organizations." (p.79). Yet, no known environmental justice organizations were contacted or notified of the PEA or the comment period. | The Public Comment Period was originally 30 days and subsequently extended an additional 30 days. As part of the outreach effort a public notice was published in the Commonwealth-wide newspaper *Primer Hora*, ten community organizations were contacted via email, English and Spanish versions of the document were posted at four locations within the Commonwealth that agreed to host copies, and made available for download on both FEMA's website and COR3's website. |

Page 21 of 25

AR_0003156

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 53 | EarthJustice, dated December 21, 2020 | The PEA erroneously claims that, "data does not exist to support a claim that the existing level of utility service is causing widespread losses of employment and reduced access to health services." (p.55). As noted above, the lack of electric service was linked to hundreds of deaths in the aftermath of Hurricane Maria. | FEMA does not evaluate the immediate impacts caused by an incident. Potential projects to be considered under this PEA or subsequent detailed reviews are in contrast to the emergency actions taken after the disaster; since Hurricane Maria in 2017, emergency repairs have restored power to 99% of the Commonwealth. |
| 54 | EarthJustice, dated December 21, 2020 | The PEA contains an inadequate discussion of risks to public health and safety. | Sections 5.16 and 5.17 of the PEA address public health and safety and the interaction with hazardous materials, respectively. As indicated in Section 5.16.2, the recipient and subrecipients will be responsible for implementing OSHA standards. Requirements for the discovery of hazardous materials and workplace safety are listed in Section 6.0. |
| 55 | EarthJustice, dated December 21, 2020 | The Programmatic Environmental Assessment fails to adequately consider resiliency concerns. | Under the Stafford Act, FEMA has authority to provide funding for cost-effective hazard mitigation and resiliency measures for facilities damaged by Hurricane Maria. Subrecipients develop and propose projects for FEMA's consideration. FEMA encourages mitigation and resiliency measures to reduce risk and to protect the federal investment in disaster recovery projects. |
| 56 | EarthJustice, dated December 21, 2020 | The PEA references recent earthquakes and aftershocks but fails to discuss how seismic activity could impact proposed infrastructure, including impacts to large scale utility solar projects. | Section 4 defines the parameters of projects to be considered under the PEA and is not intended to address large scale utility projects. Such projects would be addressed through either a Tiered Environmental Assessment or site-specific Environmental Assessment. As stated in Section 4.0 of the Utilities PEA, projects must meet current codes and standards. The most recent 2018 Puerto Rico Building Codes and Standards specifically addressed earthquake design criteria (Section 1604 & Section O102.3.2 – Earthquake Loads and Section 1604 General Design Requirements). |

AR_0003157

**JA_339**

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 57 | EarthJustice, dated December 21, 2020 | The environmental analysis in this case should include the joint projects generally referenced in the PEA. The PEA references the magnitude of impacts "described in this PEA" but contains no such description. | The 2020 Utilities PEA was prepared in accordance with Section 102 of the NEPA of 1969, *as amended*; and the Regulations for implementation of the NEPA (40 CFR §§ 1500 to 1508) and FEMA Directive 108-1, and FEMA Instruction 108-1-1. |
| 58 | EarthJustice, dated December 21, 2020 | No basis is provided for the allegation that the Action Alternatives in the PEA "would not result in major cumulative impacts". | Section 5.18.1 states that FEMA expects the Action Alternatives in this PEA would not result in major cumulative impacts since FEMA is funding actions that involve the repair, replacement, or rehabilitation of projects that are similar in function, size, and locality to the existing systems. Additionally, local state, and federal permitting and permit requirements such as mitigation will assist in minimizing cumulative impacts. Project proposals that exceed the thresholds within this PEA will be addressed through either a Tiered Environmental Assessment or as a project-specific Environmental Assessment. |
| 59 | EarthJustice, dated December 21, 2020 | The PEA acknowledges that multiple simultaneous utility projects within the same watershed will have a cumulative impact to vegetation, water quality, and soil could but for some unspecified reason, FEMA erroneously assumes "that cumulative impacts from the utility projects covered under this PEA would be short-term and less than major." (p.75). In sum, the PEA fails to consider the cumulative impacts of the infrastructure projects. | See Response to Comment 58 |
| 60 | EarthJustice, dated December 21, 2020 | A programmatic environmental impact statement that discusses alternatives such as onsite, rooftop solar coupled with battery energy storage systems instead of rebuilding the existing electric transmission and distribution system is required. | Subrecipients develop and propose projects to FEMA for evaluation; should a subrecipient submit a project proposal that would require an environmental impact statement, FEMA will consider whether or not to fund it, and if so, then initiate an EIS as needed. |

AR_0003158

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 61 | FEMA Office of Chief Council, dated December 29, 2020 | Requested consistency in the reference to federal codes and regulations. | FEMA's preferred nomenclature for the statement of federal regulations within the 2020 Utilities PEA is the use of the symbol § when referring to sections and subsections of federal code. |
| 62 | FEMA Office of Chief Council, dated December 29, 2020 | Requested the addition of a statement that states that federal air quality regulations apply to the Commonwealth of Puerto Rico as they would any state. | FEMA acknowledges that federal air quality regulations apply to the Commonwealth of Puerto Rico. As such, the application of the 2020 Utilities PEA will comply with all applicable federal air quality regulations. |
| 63 | FEMA Office of Chief Council, dated December 29, 2020 | Requested consistency in the application of acronyms throughout the document. | The list of acronyms provided in the 2020 Utilities PEA is inclusive of all acronyms used within the document. |
| 64 | FEMA Office of Chief Council, dated December 29, 2020 | Clearly indicate that the CZMA applies to the areas protected under the act. | For FEMA's application of the 2020 Utilities PEA, please note that the CZMA applies to all applicable areas protected under the CZMA. |
| 65 | FEMA Office of Chief Council, dated December 29, 2020 | Requested that references to areas be consistent with the geographic thresholds listed in Section 4.0 of the PEA. | As indicated in Section 4.0, the stated geographic thresholds apply to all applicable projects satisfied by the Utilities PEA. |
| 66 | FEMA Office of Chief Council, dated December 29, 2020 | Requested that FEMA fully describe the details of agency's Programmatic Agreement at first mention. | In Section 5.10.1.2, the first Programmatic Agreement between FEMA and Puerto Rico SHPO for Section 106 Review was executed on May 2016 and amended in April 2018. A Second Amendment Programmatic Agreement between FEMA and Puerto Rico SHPO was executed on November 13, 2019. The first and second Programmatic Agreements are known collectively as the Programmatic Agreement. |

AR_0003159

| Comment Number | Commenter | Comment | FEMA's Response |
|---|---|---|---|
| 67 | FEMA Office of Chief Council, dated December 29, 2020 | Requested that FEMA update Section 7.0 based on the final details of the agency coordination and public involvement. | The Public Comment Period was originally 30 days; however, FEMA subsequently extended the comment period for an additional 30 days. As such, the public comment period for the 2020 Utilities PEA was 60 days. As part of the outreach effort, a public notice was published in the Commonwealth wide newspaper *Primer Hora*. FEMA provided the public notice to ten relevant community organizations via email. English and Spanish versions of the 2020 Utilities PEA were posted at four locations throughout the Commonwealth. Finally, the Utilities PEA was made available for public download on both FEMA's website and COR3's website. |

AR_0003160

```
NEPR

Received:

Mar 2, 2021

6:55 PM
```

GOVERNMENT OF PUERTO RICO
PUBLIC SERVICE REGULATORY BOARD
PUERTO RICO ENERGY BUREAU

| IN RE: REVIEW OF THE PUERTO RICO ELECTRIC POWER AUTHORITY'S 10-YEAR INFRASTRUCTURE PLAN – DECEMBER 2020 | CASE NO.: NEPR-MI-2021-0002 SUBJECT: PREPA'S 10-YEAR INFRASTRUCTURE PLAN |
|---|---|

## OPPOSITION TO PREPA'S MOTION SEEKING PREB APPROVAL OF 10-YEAR INFRASTRUCTURE PLAN

TO THE HONORABLE PUERTO RICO ENERGY BUREAU:

COME NOW, Comité Diálogo Ambiental, Inc., El Puente de Williamsburg, Inc. -Enlace Latino de Acción Climática, Comité Yabucoeño Pro-Calidad de Vida, Inc., Alianza Comunitaria Ambientalista del Sureste, Inc., Sierra Club and its Puerto Rico chapter, Mayagüezanos por la Salud y el Ambiente, Inc., Coalición de Organizaciones Anti-Incineración, Inc., Amigos del Río Guaynabo, Inc., Campamento Contra las Cenizas en Peñuelas, Inc., and CAMBIO Puerto Rico, Inc., ("Local Environmental Organizations"), to request that PREB reject PREPA's 10-Year Infrastructure Plan.

1

AR_0003933

**JA_343**

<u>Argument</u>

In August 2020, the Puerto Rico Energy Bureau set forth a thoroughly detailed Integrated Resource Plan to transform Puerto Rico's energy grid. PREPA chose not to seek reconsideration or appeal of any provisions of the Integrated Resource Plan. Instead, PREPA had its consultants create a secret new plan to submit to FEMA, with many points at odds with the approved IRP and with Puerto Rico law. When PREPA finally made PREB privy to the 10-Year Infrastructure Plan in December 2020, the Energy Bureau immediately recognized it as a collateral attack on the portions of the approved Integrated Resource Plan that PREPA's fossil fuel-biased consultants did not like. The cosmetic changes in the "Revised 10-Year Plan" do not change the fundamental nature of the plan. PREB should therefore reject the plan and reiterate the requirements of the approved Integrated Resource Plan. PREB should also inquire into the costs of creating the 10-Year Plan; neither Puerto Rico ratepayers nor federal taxpayers should be made to pay the consultants' fees for preparing this irrelevant document.

PREPA claims that FEMA required the 10-Year Infrastructure Plan, but provides no citation for any supporting law or rule that requires such a plan.[1] If FEMA did ask for a long-term plan, then the first thing PREPA should have done was to provide the approved Integrated Resource Plan. PREPA's consultants do not seem to understand or respect the work that the utility, the regulator, stakeholders,

---

[1] PREPA Response to Resolution and Order Entered on January 25, 2021 and Request For Approval of Revised 10-Year Infrastructure Plan at 16-17, PREB Dkt. No. NEPR-2021-MI-0002 (Feb. 16, 2021) [Hereinafter "PREPA Motion"].

AR_0003934

and the public put into the three-year Integrated Resource Planning process, to create the least-cost, least-risk plan to achieve the island's energy goals. This plan includes a detailed timeline and a lengthy description of the actions that PREPA will take over the next five years, as well as forecasts and planned actions over a fifteen-year timeframe, to achieve the island's energy goals. This detailed document should satisfy any FEMA requirement for a long-term Plan.

In fact, providing the approved Integrated Resource Plan to FEMA is a prerequisite to actually obtaining FEMA funding, because federal law prohibits FEMA from funding any project that is inconsistent with the approved Integrated Resource Plan. Under Act 17-2019 and Act 57-2014, PREB decides what projects and expenditures PREPA may move forward with, in the best interests of the people of Puerto Rico, through the Integrated Resource Planning process. Those laws also require PREPA to conform its activities to the approved Integrated Resource Plan. The approved Integrated Resource Plan is a policy and procedure that applies uniformly to PREPA's activities, and therefore projects must be consistent with the approved IRP to be eligible for Federal awards. 2 CFR 200.403(c).[2]

---

[2] *See also* 2 CFR § 200.318(a), requiring PREPA to "use documented procurement procedures, consistent with State, local, and tribal laws and regulations and the standards of this section, for the acquisition of property or services required under a Federal award or subaward."

3

AR_0003935

**I.** <u>PREPA's current FEMA funding request does not include a single dollar towards renewables or storage, which all parties agree must be PREPA's main priority. PREB should require PREPA to amend its FEMA funding request to include major investments into renewables and storage.</u>

PREPA's own proposed Integrated Resource Plan, issued in August 2019, acknowledged "[t]he urgency of adding as much PV as practical" and the need to provide distributed power ... as soon as possible..."[3] PREB's approved Integrated Resource Plan also prioritized procurement of renewables and storage, and PREB has since stated that the very first item on PREPA's priority list must be enabling existing distributed storage resources either through a rapid timeline for interconnection, or through a demand response program.[4] It is absurd that PREPA did not ask for as single dollar towards these priorities in its FEMA funding request. Experts have called the existing distributed rooftop solar + storage systems on the island "the biggest untapped Virtual Power Plant resource in the world"; FEMA funding to tap this resource would be far more effective than any of the projects that PREPA seeks FEMA funding for.[5]

PREPA's refusal to seek FEMA funds for renewables and storage hinges on an incorrect interpretation of the approved Integrated Resource Plan: "Neither the 10-Year Plan, nor the Revised 10-Year Plan, provide for investment to acquire new

---

[3] Puerto Rico Electric Power Authority, Integrated Resource Plan 2018-2019 With Errata, Rev. 2.1, at Section 10.1.1, PREB Dkt. No. CEPR-AP-2018-0001 (June 7, 2019) [Hereinafter "PREPA IRP"].
[4] PREB Resolution and Order at 7 & Appendix A at 2-3, PREB Dkt. No. NEPR-MI-2020-0012 (Dec. 8, 2020).
[5] Negociado de Energía en vivo, Evidentiary Hearing / CEPR-AP-2018-0001, YouTube (Feb. 7, 2020), https://youtu.be/zkGmgsj6OTs?t=13114.

4

AR_0003936

renewable resources and battery energy storage resources because PREPA, **in accordance with the Final IRP Order**, will not make capital investments to acquire new renewable resources and battery energy resources."[6]

Nowhere does the Order, or any Puerto Rico law, prohibit PREPA from making capital investments to acquire new renewable resources and battery energy resources. In fact the approved Integrated Resource Plan **requires** PREPA to "quickly pursue VPP approaches to capture the grid value of distributed resources through RFPs, tariffs, rates, and/or direct utility programs."[7] Direct utility programs clearly includes direct acquisition of new renewables. Law 83-1941 Sections 5 (h) and (k) give PREPA the power to acquire and use any enterprise (or "empresa") which, as defined in Section 2 of that law, includes community solar systems and rooftop solar + storage systems. PREPA cannot seriously claim that any law or policy prevents utility ownership of new power generation, when in the next breath PREPA's consultants ask FEMA to spend hundreds of millions of dollars on a PREPA-owned gas plant and 330 MW of PREPA-owned gas peakers.

Nor would any federal law or regulation prohibit FEMA from providing funding for renewable projects. On February 25, 2021, seventeen members of Congress sent a letter to FEMA noting that distributed renewables and storage would indeed be eligible for FEMA funding. These Members of Congress urged FEMA to scrap the current PREPA request, embodied by the 10-Year Infrastructure Plan, and

---

[6] PREPA Motion at 22(emphasis added).
[7] PREB, Final Resolution and Order on the Puerto Rico Electric Authority's Integrated Resource Plan at paras. 52, 496, PREB Dkt. No. CEPR-AP-2018-0001 (Aug. 24, 2020) [Hereinafter "Final IRP Order"].

5

AR_0003937

embrace a grid powered by distributed renewables & storage, as envisioned by the approved Integrated Resource Plan. The correspondence between Congress and FEMA completely debunks PREPA's claims that federal law prohibits FEMA from funding renewable projects.[8] Other Puerto Rico agencies, like the Departamento de la Vivienda, have already embraced the possibility of federal funding for distributed renewables & storage.[9] FEMA itself has pointed out that "Department of Housing and Urban Development (HUD) Community Block Development Grants (CDBG) funding is currently being explored as an option for some grid transformation projects to include renewable integration, energy efficiency programs and distributive energy operational platforms at the utility and customer level…"[10] It is past time for PREPA to follow suit and add distributed renewable + storage projects to its FEMA funding request; PREB should reject any plan that fails to do so.

PREB should therefore require PREPA to abandon its narrow focus on "renewable energy projects of private (investor-owned) partners, like energy sellers with PPOAs,"[11] instead amend its FEMA funding request to include funding for renewables and storage owned by PREPA itself. PREB's consultant, Robert Fagan, proposed this at the February 24th PREB technical conference, specifically with respect to utility-owned rooftop solar + storage systems: "The stakeholders have put

---

[8] *See* Letter from Sen. Schumer and Rep. Velasquez to FEMA (Nov. 17, 2020); Letter from FEMA to Sen. Schumer (Feb. 8, 2021); & Letter from Sen. Schumer and Reps. Velazquez and Ocasio-Cortez to FEMA (Feb. 25, 2021). A true and accurate copy of each letter is attached to this filing.
[9] CDBG-DR-IFB-2021-01 PV Systems and Water Storage System Acquisition and Installation Services, https://cdbg-dr.pr.gov/app/cdbgdrpublic/Auction/SeeMore/306?redirect=true.
[10] *See* Letter from José G. Baquero, FEMA Federal Disaster Recovery Coordinator, to Earthjustice (Sept. 24, 2020). A true and accurate copy of the letter is attached to this filing.
[11] PREPA Motion at 23.

6

AR_0003938

**JA_348**

forward the notion that there can be extensive DER installations, be they stand alone or microgrid, throughout the island, for resiliency purposes. They would also have blue sky benefits clearly."[12] Mr. Fagan explained that rental agreements between the utility and homeowners, widely in use in other jurisdictions, would make these arrangements feasible.[13]

Finally, PREPA claims that the utility cannot identify any renewable or storage projects to fund right now, asserting that it "has not listed in the 10-Year Plan, specific projects that will support the integration of renewables because it's not feasible at this time."[14] This is incorrect: PREB, stakeholders, and PREPA itself have all identified numerous clean energy projects that warrant FEMA funding. Here are just a few examples:

- PREB has required PREPA to enable existing distributed storage resources either through a rapid timeline for interconnection, or through a demand response program.
- PREPA has identified 47 sites around the island that are well-suited for interconnection of renewables and storage.[15] FEMA can immediately fund rooftop solar + storage systems close to these interconnection points.
- Over the last year, PREPA's workers have significantly improved interconnection times for new rooftop solar + storage systems.[16] With FEMA funding support, PREPA's workers could improve interconnections even more. PREPA should consider supporting these workers instead of planning layoffs and privatizations.

---

[12] https://youtu.be/lYG9XBIiOaE?t=7963.
[13] https://youtu.be/oGYujWJ8S7s?t=6719.
[14] PREPA Motion at 22.
[15] PREPA Motion in Compliance with Order Submitting Preferred Interconnections Map, PREB Dkt. No. NEPR-MI-2020-0012 (Jan. 13, 2021).
[16] *See, e.g.,* PREPA Moción Para Presentar el Informe de Progreso de Interconexión at 2-3 (Feb. 16, 2021) and PREPA Moción Sometiendo Informe de Progresso de Interconexión at 2-3 (Nov. 15, 2019), PREB Docket NEPR-MI-2019-0016.

AR_0003939

- PREB has ordered PREPA to conduct an aggressive and expeditious process to establish at least 250 MW of demand response programs with its industrial and commercial clients. PREB made it clear that this was to include both customer self-generation as well as customer load reduction. PREPA has begun work on the customer self-generation aspect, and reports that 34 customers have a total of 171 MW of self-generation equipment in service or under evaluation. PREPA recommends establishing a program to establish direct client relationships and notify customers when demand reduction is necessary, and to establish guidelines on how demand response will work. PREPA notes that the customers would expect an incentive. PREPA finally notes other jurisdictions have successfully implemented time-of-use pricing, critical peak pricing, variable peak pricing, real time pricing, and critical peak rebates.[17]
- Quick-start Energy Efficiency Programs like solar water heaters and appliance replacement incentives, which all parties agree would be cost-effective.

For all the reasons detailed above, PREB should reject PREPA's refusal to ask for a single dollar of FEMA funding towards clean energy, and direct PREPA to amend its funding request to include the renewable and storage projects that all parties, including PREPA, acknowledge are the main priority right now.

PREPA's refusal to ask for federal funding for clean energy projects stands at odds with the Biden Administration's Executive Order, 'Tackling the Climate Crisis at Home and Abroad:"

> To secure an equitable economic future, the United States must ensure that environmental and economic justice are key considerations in how we govern. That means investing and building a clean energy economy that creates well paying union jobs, turning disadvantaged communities — historically marginalized and overburdened — into healthy, thriving communities, and undertaking robust actions to

---

[17] PREPA Motion to Submit Demand Response Status Report, PREB Dkt. No. CEPR-AP-2018-0001 (Dec. 30, 2020).

AR_0003940

mitigate climate change while preparing for the impacts of climate change across rural, urban, and Tribal areas."[18]

The funds present a once-in-a-lifetime opportunity to address electric system vulnerability with onsite/rooftop solar plus storage and provide a lifeline to Puerto Rico residents. Earmarking federal funds for the localized solar + storage through the public utility to carry out a transparent procedure for large scale deployment of rooftop solar + storage serves three paramount purposes:

1) providing access to energy resiliency to all ratepayers, including the lowest income sectors of the population who would otherwise not be able to access loans, rebates or leases for solar + storage;

2) providing a uniform procedure through the public utility that would hasten the implementation of rooftop or onsite solar and storage installations; and

3) breaking the disaster cycle of repeated destruction and costly reconstruction of the vulnerable, long-distance transmission system that so often interrupts life-saving electric service.

---

[18] Exec. Order No. 14,008, 86 FR 7619 (Jan. 27, 2021), https://www.federalregister.gov/documents/2021/02/01/2021-02177/tackling-the-climate-crisis-at-home-and-abroad.

9

AR_0003941

**JA_351**

II.      <u>Several studies confirm that distributed solar + storage systems are the most affordable and resilient option for the island's grid, and confirm PREB's decision to prioritize these resources in the Approved Integrated Resource Plan. FEMA's funding priorities should mirror those in the Approved IRP.</u>

More than a decade ago, the Puerto Rico Energy Affairs Administration ("AAE") commissioned studies by faculty at the University of Puerto Rico at Mayagüez ("UPRM"), which culminated in the recommendation for widespread use of existing structures as the "roof resource" site photovoltaic / solar equipment.[19] Solar systems along with energy storage systems or batteries at or near the place of consumption provide the resilient supply of electrical energy and serve as a first line of defense for residents and businesses.

The National Renewable Energy Laboratory ("NREL") published the new estimates for Puerto Rico at the census zone level of the technical potential of photovoltaic systems on rooftops of low to moderate income residences ("LMI"), as well as the potential for savings in the solar electricity bill for LMI communities at the municipal level.[20] NREL has determined, among other things, that Puerto Rico's annual residential solar potential is 24.6 TWh. This is approximately four times the annual residential electricity consumption. Almost half of that, 11.87 TWh,

---

[19] *See* Agustin Irizarry-Rivera et al, Achievable Renewable Energy Targets ("ARET") For Puerto Rico's Renewable Energy Portfolio Standard, http://uprm.edu/aret/.
[20] National Renewable Energy Laboratory (NREL), Puerto Rico Low-to-Moderate Income Rooftop PV and Solar Savings Potential (Dec. 17, 2020), https://www.nrel.gov/docs/fy21osti/78756.pdf; and NREL, Puerto Rico Low-to-Moderate Income Rooftop PV and Solar Savings Potential Data Catalog https://data.nrel.gov/submissions/144 (last updated Dec. 28, 2020).

10

AR_0003942

corresponds to low and moderate income households. NREL also highlighted several reasons why rooftop solar is recommended for Puerto Rico.

- High solar irradiance: the average annual global horizontal irradiance ("GHI") (5.89 kWh / m2 / day) in Puerto Rico is 22% higher than the average GHI in the United States.
- Puerto Rico has a higher proportion of residential structures; This contributes to greater technical potential due to domestic electricity consumption.
- Puerto Rico has significantly lower per capita electricity consumption compared to the US (4,665 kWh vs 12,900 kWh per household per year).

Therefore, even if Puerto Rico were to consume electricity at the US rate, it would still have almost 150% of the amount of rooftop potential as electricity consumption for the entire residential electricity sector. When considering its actual energy consumption, Puerto Rico has 425% more potential for roof generation for all residential structures than the corresponding electrical consumption of those residences. Just for LMI buildings, Puerto Rico has 570% more roof generation potential than electricity consumption. Even under an overly conservative assumption that 50% of LMI buildings in Puerto Rico were structurally unsuitable for rooftop solar, there would still be more than 2.5 times the amount of rooftop potential compared to current consumption. The commercial sector in Puerto Rico is also well adapted to adopt distributed solar energy with storage. The extensive shopping centers and other facilities with large parking lots and roofs can be used to place solar panels to generate energy at or near the place of consumption.

11

AR_0003943

**PREB should reject PREPA's proposal to spend billions on hardening the long-distance transmission lines.**

The majority of PREPA's FEMA funding request—74%—concerns transmission hardening projects which serve "PREPA's current centralized-power system" rather than the future distributed power system that PREPA is required to build.[21] During the February 24th technical conference, Mr. Baretty acknowledged that this transmission hardening is only necessary for as long as long-distance transmission lines carry most of the island's power from the "aged, unreliable,"[22] polluting power plants on PREPA's southern coast to the San Juan metro area.[23] As all parties have pledged to end this unresilient and unaffordable arrangement, it seems unwise to spend the majority of FEMA's grant on shoring up the soon-to-be-obsolete system.

Mr. Fagan pointed out that many of these transmission hardening projects "might likely be marginal or not cost effective relative to DER solutions,"[24] for two reasons: "If you do have a lot more DERs, it can have the effect of reducing blue sky peak loads in addition to being able to provide resiliency during extreme events."[25]

In addition, PREPA's current proposed transmission hardening proposal significantly overstates the amount of transmission hardening necessary to serve critical loads. This is because PREPA did not calculate the actual critical load at each feeder, but rather used the entire load of the feeder as a rough estimate. At the

---

[21] PREPA Motion at 35.
[22] PREPA Motion at 25.
[23] https://youtu.be/lYG9XBIiOaE?t=8771.
[24] https://youtu.be/lYG9XBIiOaE?t=7963.
[25] https://youtu.be/oGYujWJ8S7s?t=109.

AR_0003944

February 23rd conference, Mr. Fagan explained that the critical load could be as low as 20% of the feeder load, and that if PREPA could produce data with more granularity, then the utility could replace numerous transmission projects with DER:

> In the IRP, the granularity was, there's roughly 1,100-1,200 MW of [load per feeder]. But to the extent that the actual critical load is 20% of that or 60% of that, that would be critically important for any proper analysis of distributed resource alternatives. We wouldn't want to cost out 1,100 or 1,200 MW of distributed resource alternatives for essential facility load if the real number is one third of that. So that's the purpose behind it - to have a better set of data to more accurately understand what it would cost for some of the distributed solutions - that would not be hardening the systems for the entire feeder load.[26]

Mr. Baretty explained that PREPA could conduct such a study, if given additional resources: "We did not have enough manpower to gather this information and the same thing still applies today. Because of the financial constraints that PREPA has at the moment."[27] The solution is clear: if FEMA will provide funding for PREPA to obtain more granular critical load data, that could save hundreds of millions of dollars on unnecessary transmission spending.

One reason that PREPA continues to insist on these transmission projects may be the bias of its consultants in favor of fossil fuels and transmission hardening, and against distributed solar + storage systems. Mr. Fagan noted that his "worry is the bias [in favor of transmission and against distributed resources]. There's an industry bias."[28] For example, the proposed T&D Operator, LUMA Energy, objects to PREPA using FEMA funds to install rooftop solar systems and batteries sited on ratepayers'

---

[26] https://youtu.be/oGYujWJ8S7s?t=2793.
[27] https://youtu.be/oGYujWJ8S7s?t=2317.
[28] https://youtu.be/oGYujWJ8S7s?t=6828.

13

AR_0003945

properties. Contrary to the installation of solar systems on the rooftops of PREPA ratepayers' properties, LUMA is interested in having its affiliated companies Quanta and ATCO use the funds for transmission projects, that keep ratepayers captive to unreliable powerplants burning imported fuel. Quanta Services, the LUMA Energy parent/affiliate corporation has been very clear about its intention to take advantage of its relationship with LUMA to profit from the FEMA funds:

> Quanta believes there is opportunity for it to compete for work associated with Puerto Rico's electric T&D system modernization efforts that are separate from its ownership interest in LUMA. Puerto Rico's electric T&D system is at a critical juncture after the destruction caused by Hurricanes Maria and Irma. As a result, the government of Puerto Rico, through the P3 and in collaboration with PREPA, have embarked on a plan to rebuild, modernize, harden and "green" its power grid, a majority of which is expected to be funded by U.S. federal disaster relief agencies and managed by LUMA. The P3 estimates that more than $18 billion of electric T&D capital investment could be required through 2028 for this initiative.[29]

During the recent optimization workshop, one of the LUMA Energy representatives, Lee Wood, incorrectly alleged that FEMA would not allow the use of funds for behind the meter electric generation, that is, located at the residence or business of the consumer, mainly on the rooftops of structures.[30] As detailed above, FEMA's own statements demonstrate that no law or rule prevents FEMA from funding rooftop solar + storage systems.

---

[29] Quanta Services, Inc., *Quanta Services and ATCO-Led Consortium Selected by the Puerto Rico Public-Private Partnership Authority for the Operation and Maintenance of Puerto Rico's Electric Power Transmission and Distribution System* (Jun 22, 2020), https://investors.quantaservices.com/news-events/press-releases/detail/277/quanta-services-and-atco-led-consortium-selected-by-the.
[30] https://youtu.be/oGYujWJ8S7s?t=6822.

14

Biased consultants with conflicts of interest have long plagued PREPA's decision-making with respect to grid planning. A better solution would be for PREPA to listen on its own workers, who have significantly improved interconnection times for distributed solar + storage systems over the last year, and the engineers and professors at Puerto Rico's universities, who have decades of experience observing and researching the island's grid. PREPA's unions, the island's academics, and Puerto Rico community organizations have formed a coalition to support the Queremos Sol project. Unlike PREPA's 10-Year Plan and FEMA funding requests, the Queremos Sol proposal is completely aligned with the approved Integrated Resource Plan and sets forth a detailed proposal to achieve the Puerto Rico's legally mandated Renewable Portfolio Standard (RPS) of renewable energy by 2022, 40% by 2025, 60% by 2040 and 100% renewable energy by 2050.

During the February 23rd technical workshop, participants urged PREPA to hold off on transmission projects until they could be evaluated under a set of criteria – and that only the "no-regrets" projects that met ALL criteria should be funded. It would be premature to spend any taxpayer money on transmission projects until we know whether we can instead invest in distributed resource deployments to replace them – and before the transmission projects have been comprehensively evaluated and determined to be "no-regrets" projects, in accordance with Law 17-2019.

15

AR_0003947

**JA_357**

IV. <u>PREB should reject PREPA's proposal to spend nearly one billion dollars on new gas infrastructure and projects at soon-to-retire fossil fuel plants.</u>

Through the 10-Year Infrastructure Plan, PREPA's consultants attempt to resurrect the gas infrastructure proposals that PREB already considered—and rejected—from PREPA's proposed Integrated Resource Plan. PREB must dismiss PREPA's attempt to relitigate these issues and reiterate the severe restrictions on new fossil resources in the approved Integrated Resource Plan:

- Para. 653: "The Energy Bureau FINDS that PREPA has not supported inclusion of a new CC at Palo Seco by 2025 in a least cost plan."
- Paras. 654-655: limited PREPA to spending $5M on preliminary siting, permitting, and planning for Palo Seco, only if PREPA could do so without interfering with the procurement of renewables and storage. PREB retained the authority to cut off that spending once it became clear that the gas plant was unnecessary to maintain reliability, and that renewables + storage costs were in line with forecasts.
- Para. 873: "The Energy Bureau REJECTS PREPA's plans for retirement of all eighteen (18) of the existing gas turbine peaking units located at Daguao, Yabucoa, Jobos, Vega Baja, Palo Seco, Aguirre, and Costa Sur and replacement with a new set of GTs."
- Para. 873, 885: PREB allowed PREPA to consider "some limited thermal peaker replacement" for the very worst-performing units. In Para. 885, PREB explained that it would only allow, at the very most, 81 MW of new gas-fired peaker capacity.[31]

PREPA's plans for a $572M San Juan-area utility-owned gas plant do not follow the restrictions from the approved Integrated Resource Plan: PREB only allowed the utility to plan for a gas plant in the event that renewable and storage

---

[31] Final IRP Order at paras. 653-55, 873, 885.

16

AR_0003948

**JA_358**

prices would be higher than expected.[32] PREPA has not even received the first set of bids from its Renewable Request For Proposals, and yet seeks to proceed full steam ahead with gas plant planning, having already spent over $281,000 of public money in consultants' fees.[33] PREB was correct to put a halt to this spending spree, and must continue to prohibit spending on this PREPA pet project.

PREPA's proposal for new gas-fired peakers blatantly violate the approved Integrated Resource Plan's limit of, at most, 81 MW. In fact, PREPA's gas peaker proposal is almost exactly the same as the one PREB already rejected in the approved IRP:

| The Energy Bureau REJECTS PREPA's plans for retirement of all eighteen (18) of the existing gas turbine peaking units located at Daguao, Yabucoa, Jobos, Vega Baja, Palo Seco, Aguirre, and Costa Sur and replacement with a new set of GTs. PREB Final Resolution and Order para. 873 | In the Revised 10-Year Plan, PREPA proposes to spend $280M to replace eleven Frame 5 units at Daguao, Yabucoa, Jobos, Vega Baja, and San Juan with gas turbines, totaling 330 MW. PREPA also proposes to use FEMA funds to replace Aguirre and Costa Sur peakers with gas turbines, but has not included those costs in the Revised 10-Year plan. PREPA Motion pp. 27-30. |
| --- | --- |

---

[32] Final IRP Order at para. 73 ("…to protect against the uncertainty of near-future solar PV and battery energy storage price outcomes.").
[33] PREPA Motion in Compliance With Order Entered on February 1, 2021, PREB Dkt. No. NEPR-MI-2021-0003 (Feb. 16, 2021).

AR_0003949

PREPA's new consultants, Sargent & Lundy, make the same tired arguments that PREB already rejected from PREPA's old consultants, Siemens, claiming for example, that only gas-fired resources can serve critical loads.[34]

Before responding to these previously-rejected arguments, Local Environmental Organizations note that PREB should not consider PREPA's substantive arguments on this point at all. In August 2020 PREB issued its Final IRP Order, which decisively addressed the issues of what generation types could serves critical load, and what limited degree of new gas infrastructure PREB authorized. PREPA <u>chose not to seek reconsideration</u> of or appeal PREB's Final IRP Order, and the deadline for doing so has long since expired. PREPA and its consultants may not now relitigate these settled issues. Moreover, given the impropriety of PREPA's collateral attacks: further attempts to relitigate issues already decided in the Integrated Resource Plan, or further attempts to undermine the approved Integrated Resource Plan, should be subject to sanctions under Regulation 8543 Article X Section 10.01(A) and Article XII Section 12.02.

With that said, Local Environmental Organizations provide a few reasons why PREB already rejected these claims:

- After being challenged on the assumption that only thermal resources could serve critical load, Siemens acknowledged that renewable resources could be available immediately after a major event, and recanted their assumption.[35]

---

[34] PREPA Motion at 28-31.
[35] PREPA, Corrected Rebuttal Testimony of Nelson Bacalao at 7, PREB Dkt. No. CEPR-AP-2018-0001 (Jan. 20, 2020), https://energia.pr.gov/wp-content/uploads/sites/7/2020/01/Corrected-Rebuttal-Testimony-of-Nelson-Bacalao-PH.-D.-in-Support-of-PREPAs-Draft-Integrated-Resource-Plan-CEPR-AP-2018-0001.pdf.

18

AR_0003950

**JA_360**

- In December 2019, the Energy Bureau's Energy Storage Study confirmed that "thermal resources are not required to prevent loss of critical loads."[36]
- In January 2020, the day after a seismic event put two gas-fired powerplants offline, renewables stood ready to serve critical load.[37]

In sum, the gas infrastructure requests in PREPA's 10-Year Plan are direct violations of the approved Integrated Resource Plan and therefore, as detailed above, are ineligible for FEMA funding under 2 CFR 200.403(c) and 2 CFR 200.318(a). Any federal funds that PREPA obtained towards these projects would have to be returned.

In addition, PREPA proposes to spend $134M on projects at six power plants, several of which are slated for retirement this decade.[38] Just as it is unwise to purchase new gas infrastructure which will have to be shut down well before the end of its useful life to comply with Law 17-2019, it is also unwise to spend money on "aged, unreliable" fossil fuel plants which are due to retire very soon. PREPA claims the projects are necessary for reliability and resiliency, but as detailed above in Section 2, PREPA may well be able to obtain the same reliability and resiliency benefits more cost-effectively through distributed solar + storage system deployment.

The gas infrastructure portion of the 10-Year Infrastructure Plan is yet another attempt in the years-long scheme of PREPA's consultants to flood the island with unreliable, unaffordable gas plants. PREB already considered these exact

---

[36] PREB, Resolution, PREB Dkt. No. NEPR-MI-2020-0002 (Jan. 7, 2020), https://energia.pr.gov/wp-content/uploads/sites/7/2020/01/NEPR-MI-2020-0002-Estudio-Sistemas-de-Almacenamiento-de-Energi%CC%81a.pdf.
[37] Puerto Rico Electric Power Authority, Presentation for Evidentiary Hearing Panel A, Slide 20, PREB Dkt. No. CEPR-AP-2018-0001 (Feb. 3, 2020).
[38] PREPA Motion at 31-34. This includes black start units at Aguirre Power Plant and Costa Sur Power Plant.

19

AR_0003951

**JA_361**

proposals and determined that they were **not** part of a least-cost plan. Therefore, FEMA would effectively be subsidizing fossil fuels by paying for this gas infrastructure over less expensive and more resilient distributed solar + storage systems. President Biden has already declared, through Executive Order, that federal agencies are prohibited from subsidizing fossil fuels going forward.[39]

Historically, these gas plant schemes have only benefitted the methane gas industry and PREPA's consultants, to the expense of the public, the island's environment, and our planet's climate. The continuation of such a policy is not an appropriate use of FEMA funds. Instead, these funds should be used to provide direct, life-saving electric service to Puerto Rico residents.

## V. PREPA Has Failed To Allow The Public Or Even PREB To Adequately Participate In The Creation Of The 10-Year Infrastructure Plan.

Following the rejection of most of PREPA's consultants' gas rush proposals in the Integrated Resource Plan process, PREPA asked its consultants to transfer those rejected proposals into a secret new plan: the 10-Year Infrastructure Plan. PREPA submitted that plan to FEMA, without notice to the public or even to PREB. Several months after the creation of the 10-Year Plan, PREPA now deigns to "make the Energy Bureau privy of the process," but not the public. This violates federal law and Puerto Rico law, and is another reason to reject the 10-Year Infrastructure Plan.

---

[39] Exec. Order No. 14,008, 86 FR 7619 (Jan. 27, 2021), https://www.federalregister.gov/documents/2021/02/01/2021-02177/tackling-the-climate-crisis-at-home-and-abroad.

AR_0003952

The use of funds allocated pursuant to the Stafford Act requires "public access to policies governing the implementation of the public assistance program." 42 U.S.C. § 5165c. PREPA's motion acknowledges that the 10-Year Infrastructure Plan includes Stafford Act funds, therefore PREPA is required to comply with the applicable public participation requirements, including the preparation of an annual action plan for public comment and that all comments received during that period be addressed. *See* 24 C.F.R. §§ 91.320, 91.115(b)(5). In the event that a Citizen Participation Plan is required—as it should be in this case—the grantee must certify that the participation plan is followed. To comply with the participation plan, the grantee is charged with providing reasonable and timely access to local meetings, and the opportunity for individuals to review proposed activities and program performance; providing timely written answers to written complaints and grievances; and identifying how the needs of Spanish-speaking residents will be met in public hearings where they can be expected to participate. *See* 24 C.F.R. §570.431. Compliance with the above-cited provisions requires that PREPA provide opportunities for effective public participation which always serve to enhance and improve plans and proposals.

In addition, Law No. 17-2019, Puerto Rico's Energy Public Policy Act, mandates that PREPA "promote transparency and citizen participation in every process related to electric service in Puerto Rico." PREPA's Organic Act also provides that the term citizen participation refers to the "various mechanisms that allow customers of PREPA and electric power generation and/or distribution companies certified in Puerto Rico to have a forum to express their concerns, make suggestions, and be

21

AR_0003953

**JA_363**

included in the decision-making process."22 L.P.R.A. § 192(n). The mechanisms listed in the statute include, but are not limited to, the "request and receipt of comments, photographs, and other documents from the public, administrative meetings of PREPA where customer focus groups participate, regional meetings open to PREPA's customers in such region, public hearings, and the establishment of vehicles that enable participation by electronic means." *Id.* Further, Law No. 57-2014 was approved with the purpose of establishing "strategic planning and information requirements that PREPA must provide to guarantee an efficient electrical system, promote transparency in its processes, and make active citizen participation feasible, among other matters. . . ." In sum, PREPA's refusal to allow public participation in the creation of the 10-Year Plan violates federal law and Puerto Rico law, jeopardizing PREPA's eligibility for FEMA funding.

22

AR_0003954

<u>Conclusion</u>

PREB should reject the 10-Year Plan and request that a FEMA representative attend PREB's IRP implementation conferences to provide first-hand explanations on FEMA's funding requirements. PREPA has misrepresented FEMA statements in the past[40] and appears to be doing so here again, at the behest of PREPA consultants that are biased against distributed renewables + storage. Given the economic crisis in Puerto Rico, available resources, such as the funds that PREPA has sought from FEMA, should be invested in distributed solar + storage resources. This will save lives, promote local economic development, and change the trajectory of sending billions of dollars per year out of Puerto Rico's economy to pay to imported fossil fuels to maintain a harmful and unreliable system.

Respectfully submitted,

*s/ Pedro Saadé*
PEDRO J. SAADÉ LLORÉNS
Colegiado Núm. 5452
(RUA Núm. 4182)
Calle Condado 605, Oficina 611
San Juan, Puerto Rico 00907
Tel. & Fax (787) 948-4142
pedrosaade5@gmail.com

*s/Raghu Murthy*
RAGHU MURTHY
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
Tel. (212) 823-4991
rmurthy@earthjustice.org

---

[40] Petitioners' Response to PREPA RFP Cancellation Notice at 9, PREB Docket NEPR-AP-2020-0001 (June 16, 2020), https://energia.pr.gov/wp-content/uploads/sites/7/2020/06/2020-06-16-Petitioners-Response-to-RFP-Cancellation-Temporary-Generation-PREPA-PREB.pdf.

23

AR_0003955

**JA_365**

*s/ Ruth Santiago*  
RUTH SANTIAGO  
RUA Núm. 8589  
Apartado 518  
Salinas, Puerto Rico 00751  
Tel. (787) 312-2223  
rstgo@gmail.com

*s/Laura Arroyo*  
LAURA ARROYO  
RUA Núm. 16653  
Earthjustice  
4500 Biscayne Blvd Ste 201  
Miami, FL 33137  
Tel. (305) 440-5436  
larroyo@earthjustice.org

*s/Jordan Luebkemann*  
JORDAN LUEBKEMANN  
Florida Bar No. 1015603  
Earthjustice  
111 S. Martin Luther King Jr. Blvd.  
Tallahassee, FL 32301  
Tel. (850) 681-0031  
jluebkemann@earthjustice.org

24

AR_0003956

**JA_366**

## CERTIFICATE OF SERVICE

We hereby certify that, on March 2, 2021, we have filed this Motion via the Energy Bureau's online filing system, and sent to the Puerto Rico Energy Bureau Clerk and legal counsel to: secretaria@energia.pr.gov; mvazquez@diazvaz.law; and kbolanos@diazvaz.law

*s/Raghu Murthy*
RAGHU MURTHY
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
Tel. (212) 823-4991
rmurthy@earthjustice.org

25

AR_0003957

**JA_367**

November 17, 2020

The Honorable Peter Gaynor
Administrator
Federal Emergency Management Agency
500 C Street S.W.
Washington, D.C. 20472

Dear Administrator Gaynor:

We write seeking answers on how the recently announced $9.46 billion grant to the Puerto Rico Electric Power Authority (PREPA) can be used to build a more resilient and environmentally friendly electrical grid that simultaneously ensures Puerto Rico can be less energy import dependent. With the majority of the money, over $8 billion, going to transmission and distribution, this funding represents a once in a lifetime opportunity that must not be squandered.

As you know, the Federal Emergency Management Agency (FEMA) has worked closely with Puerto Rican officials and PREPA to assess the catastrophic damage from Hurricanes Irma and Maria in 2017. The recent announcement by FEMA that almost $10 billion would be allocated to the island to rebuild its electrical grid, as well as some of the telecommunications, generation, and water infrastructure, has taken far too long, but represents an important opportunity. We understand this allocation is not an authorization to begin construction and that the next steps will be determined through the submission of PREPA's 90 day work plan, but some additional clarity on what specific limitations may be imposed on the use of this money by FEMA is an important consideration. With that in mind, please provide answers to the following questions:

1. Is there anything within FEMA's governing statutes, regulations, or guidance that would prohibit Puerto Rico and PREPA from using an appropriate portion of this money to build a grid that supports renewable electricity generation and storage?
   a. If so, what are those limitations and please provide specific citations.

2. Is there anything within FEMA's governing statutes, regulations, or guidance that would prohibit Puerto Rico and PREPA from using an appropriate portion of this money to build micro-grids?
   a. If so, what are those limitations and please provide specific citations.

3. Is there anything within FEMA's governing statutes, regulations, or guidance that would prohibit Puerto Rico and PREPA from using an appropriate portion of this money to underground transmission lines?
   a. If so, what are those limitations and please provide specific citations.

4. Is there anything within FEMA's governing statutes, regulations, or guidance that would prohibit Puerto Rico and PREPA from using this funding to leverage additional public and/or private funding to further develop its electrical grid?

AR_0003958

    a. If so, what are those limitations and please provide specific citations.

5. How does Section 20601 within the Bipartisan Budget Act of 2018 (P.L. 115-123) effect this rebuilding effort?
   a. Please provide citations for the agreed industry standard for the electrical grid.

6. Is there anything within FEMA's governing statutes, regulations, or guidance that will ensure public and community participation in how the funds will be allocated?
   a. If so, what are those limitations and please provide specific citations.

Puerto Rico desperately needs clean and reliable energy. Currently, according to the Environmental Defense Fund, "most electricity on the island is generated from old oil-burning power plants fed by expensive imports, then transported by a fragile, decrepit delivery system. The poor design, with heavy reliance on fossil fuels, adds to high electricity costs and air pollution that harms people's health." The Institute of Energy Economics and Financial Analysis, (IEEFA) has highlighted that PREPA pays over $1 billion a year for fossil-fuels, non-indigenous energy sources that include oil, coal and gas. In fiscal year 2017, 48% of Puerto Rico's electricity was generated from oil, and an additional 50% from coal and gas. The Army Corps of Engineers has estimated that Hurricane Maria destroyed almost 80% of Puerto Rico's electrical grid. Thus, Puerto Rico has a critical chance to rebuild its grid, almost in its entirety, in accordance with reliable and renewable technology available and depart from fossil fuels. The decentralization of Puerto Rico's grid, as well as the adoption of clean and renewable energy, should be the focus of any recovery and reconstruction effort. Moreover, the grid's reconstruction should be conducted through a community-centric approach. Puerto Rican communities like the Toro Negro community, in Ciales, have been organizing for years and have experience in advocating and sustaining micro-grids. Puerto Rican communities should be provided with a space on where to voice their feedback on how the $10 billion investment will be carried out and FEMA should work to make this a reality. If the investment is done in a transparent and responsible fashion, Puerto Rico has the unique opportunity to change its course and provide the island residents with clean, reliable and equitable energy for decades to come.

Thank you for your time and attention to this matter, if you have questions please do not hesitate to contact our staff.

Sincerely,

Charles E. Schumer
United States Senate

Nydia M. Velázquez
Member of Congress

AR_0003959

**JA_369**

DHS/FEMA Region 2
Jacob K. Javits Federal Office Building
26 Federal Plaza
New York, New York 10278



February 8, 2021

The Honorable Charles Schumer
United States Senate
322 Hart Senate Office Building
Washington, D.C. 20510

RE:    FEMA-4339-DR-PR
        Puerto Rico Electric Power Authority (PREPA)
        Electrical Grid Restoration

Dear Senator Schumer:

Thank you for your letter to the Federal Emergency Management Agency (FEMA) Administrator Peter T. Gaynor, dated November 17, 2020, requesting information on potential restrictions to a recently announced multi-billion dollar grant to the Puerto Rico Electric and Power Authority (PREPA, Subrecipient). I appreciate your continued support of Puerto Rico as we support their on-going recovery from hurricanes Irma and Maria.

The funding recently obligated under Project Worksheet (PW) 6099 is based on the estimated cost of eligible work associated with restoring PREPA's power infrastructure to local codes/standards[1] and/or FEMA-approved industry standard(s).[2] As alluded to in your letter, *Section 20601 of the Bipartisan Budget Act of 2018* (BBA) also provides PREPA with the opportunity to use FEMA funding to restore components of critical services, including power infrastructure, that were 1) either not damaged by the disaster and/or 2) had pre-existing damage prior to the disaster, when such work is necessary to fully restore the function of the facility to an approved industry standard.[3] In addition, since the PW was approved under the Public Assistance Alternate Procedures (PAAP),[4] PREPA may propose recovery solutions beyond simply replacing the originally damaged facilities/components as they were pre-disaster.

To maximize the potential of this funding flexibility, FEMA expects PREPA will consider specific projects that are technically feasible and economically viable, and aligned with overall grid function, reliability, and stability standards to account for other functionally dependent projects. It is important to note that renewable generation and storage assets were not included in the recent obligation, as they were either not owned by the Subrecipient, not damaged from the event, or did not exist as part of the power grid infrastructure. However, as mentioned above, due to the unique flexibility

---

[1] *Public Assistance Program and Policy Guide v3.1 FP 104-009-2 April 2018 Chapter 2.VII.B* **"Codes and Standards"** states **"FEMA provides [Public** Assistance] funding to restore facilities on the basis of pre-disaster design and function in conformity with current applicable codes, specifications, and **standards" (p. 87).**
[2] *Section 20601 of the Bipartisan Budget Act of 2018* and *FEMA Recovery Policy FP-104-009-5 Version 2 (Implementing Section 20601 of the 2018 Bipartisan Budget Act through the Public Assistance Program, September 11, 2019)* allows FEMA to provide assistance to restore disaster-damaged facilities or systems that provide critical services to an industry standard without regard to pre-disaster condition; and to restore components not damaged by the disaster when necessary to fully effectuate restoration of the disaster damaged components to restore the function of the facility or system to industry standards.
[3] *Ibid.*
[4] *Public Assistance Alternative Procedures (Section 428) Guide for Permanent Work FEMA-4339-DR-PR February 10, 2020* (DR-4339 428 Guide) requires all facilities which provide critical services to use 428 procedures.

AR_0003960

**JA_370**

associated with FEMA funding under the BBA and the PAAP, PREPA may pursue projects beyond merely restoring the facilities damaged as they were prior to hurricanes Irma and Maria.

Below you will find answers to your specific questions:

1. **Is there anything with FEMA's governing statutes, regulations or guidance that would prohibit Puerto Rico or PREPA from using an appropriate portion of this money to build a grid that supports renewable electricity generation and storage?**
   a. **If so, what are those limitations and please provide specific citations.**

   There are no governing statutes, regulations, or guidance that prohibit Puerto Rico or PREPA from pursuing and proposing power grid projects that support renewable generation and storage in their recovery solutions. However, the projects must comply with the Environmental and Historic Preservation (EHP) laws, regulations, and executive orders.[5]

2. **Is there anything with FEMA's governing statutes, regulations or guidance that would prohibit Puerto Rico or PREPA from using an appropriate portion of this money to build micro-grids?**
   a. **If so, what are those limitations and please provide specific citations.**

   There are no governing statutes, regulations, or guidance that prohibit Puerto Rico or PREPA from pursuing and proposing micro-grid projects in their recovery solutions. However, the projects must comply with the EHP laws, regulations, and executive orders.[6]

3. **Is there anything with FEMA's governing statutes, regulations or guidance that would prohibit Puerto Rico or PREPA from using an appropriate portion of this money to underground transmission lines?**
   a. **If so, what are those limitations and please provide specific citations.**

   There are no governing statutes, regulations, or guidance that prohibit Puerto Rico or PREPA from pursuing and proposing underground transmission lines as their actual recovery solution. However, the projects must comply with the EHP laws, regulations, and executive orders.[7]

4. **Is there anything with FEMA's governing statutes, regulations or guidance that would prohibit Puerto Rico or PREPA from using this funding to leverage additional public and/or private funding to further develop its electrical grid?**
   a. **If so, what are those limitations and please provide specific citations.**

---

[5] Section 106 of the National Historic Preservation Act (NHPA), Section 102 of the National Environmental Policy Act (NEPA), NEPA regulations in Title 40 of the Code of Federal Regulations (CFR) Parts 1500–1508, Section 7 of the Endangered Species Act (ESA), Clean Water Act (CWA), Clean Air Act (CAA), Coastal Barrier Resources Act (CBRA), Migratory Bird Treaty Act, Resource Conservation and Recovery Act (RCRA), Coastal Zone Management Act (CZMA), Farmland Protection Policy Act, Fish and Wildlife Coordination Act, Wild and Scenic Rivers Act, Magnuson-Stevens Fishery Conservation and Management Act, Executive Order 11988 Floodplain Management, Executive Order 11990 Protection of Wetlands, and Executive Order 12898 Environmental Justice.
[6] *Ibid.*
[7] *Ibid.*

AR_0003961

There are no governing statutes, regulations, or guidance prohibiting Puerto Rico and/or PREPA from leveraging additional public and/or private funding to further develop the electric grid and its reconstruction.

FEMA expects and encourages PREPA to incorporate and integrate additional funds via the FEMA PA Program for mitigation, and any other available funding.

FEMA believes that some portions of the electric grid will have projects proposed to coincide with operationally transformative platforms, driven by Integrated Resource Plan initiatives and policies at both the Commonwealth and Utility levels. The Interagency Group, known as the Energy Technical Coordination Team (TCT) and made up of Federal, State, and Local governmental stakeholders, works to collaborate and coordinate the different funding streams as part of the project development, review and implementation process. The Energy TCT is led by the Department of Energy (DOE) and co-chaired by FEMA-4339-DR-PR Energy Sector Public Assistance Group Supervisor (PAGS).

5. **How does Section 20601 within the Bipartisan Budget Act of 2018 (P.L. 115-123) effect the rebuilding effort?**
   a. **Please provide citations for the agreed industry standard for the electrical grid.**

Due to the pre-disaster condition of infrastructure in Puerto Rico (PR) and the catastrophic damage caused by hurricanes Irma and Maria, FEMA requested enhanced authority under Section 428 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act) to give greater flexibility in providing funding toward restoring critical service infrastructure.[1] Section 20601 of the Bipartisan Budget Act of 2018 (BBA) authorizes FEMA to **"provide assistance, pursuant to Section 428 of the Stafford Act… for critical services as defined in Section 406."**[2]

Funding authorized by BBA was included in PW 6099 by  for the restoration of components that were 1) *either not damaged by the disaster* and/or 2) *had pre-existing damage prior to the disaster*, when such work is necessary to fully effectuate the replacement or restoration of disaster-damaged components and restore the function of the facility to an approved industry standard.[3] Without the BBA, FEMA would not be authorized to fund the restoration on non-disaster damaged components.

Examples of the effects of expanding FEMA funding authorities can be seen in each of the PREPA asset categories. The most notable category is distribution[4] which in addition to the $3.9 billion in restoration of disaster damage, the project estimate included $1.5 billion authorized by BBA. Another impacted asset category is communications[5] where the damage

---

[1] *FEMA Recovery Policy FP-104-009-5 Version 2, Implementing Section 20601 of the 2018 Bipartisan Budget Act through the Public Assistance Program, September 11, 2019, at 1.*
[2] *Ibid.*
[3] *Ibid.*
[4] Approved industry standards applied: United States Department of Agriculture (USDA) Rural Utility Service (RUS) Bulletins: 1724D-107, 1724E-102, 1724E-150, 1724E-151, 1724E-152, 1724E-200, 1724E-204, 1724F-803, and 1724F-804.
[5] Approved industry standards applied: USDA RUS Bulletins 1724D-101B, 1724E-300, 1730-B2, 1751, 1753, and 1755; and Telecommunications Industry Association TIA-102 Project 25 Digital Radio Technical Standards SAFECOM.

AR_0003962

to the wide array of legacy and unsupported equipment will result in an opportunity for a **technological leap forward in PREPA's communications system, with the BBA** implementing and supporting replacements and upgrades to the Island-wide two-way radio system, fiber optic and microwave communications networks, components and software platforms.

**The primary industry standards informing FEMA, COR3, and PREPA's recovery efforts for** the electrical grid are set by the USDA Rural Utilities Service (RUS), which PREPA had previously been a member of until 2011. The RUS publishes guidance and bulletins that set policy and procedure for the development and acceptance of standards, specifications, equipment contract forms, manual sections, drawings, materials and equipment acceptable for use in RUS programs to include electric, energy, and telecommunications programs. RUS industry standards are framed by the Code of Federal Regulations (CFR) Annual Edition, which are aligned to the RUS specifically in numerous publications and subsets of 2 CFR and 7 CFR. In addition, FEMA, COR3, and PREPA, in concert with the RUS and the Department of Energy, will continue to perform additional reviews of electrical grid projects to ensure the applicability and eligibility of USDA RUS industry standards that will make **Puerto Rico's** energy infrastructure more resilient and effective moving forward.

6. **Is there anything with FEMA's governing statutes, regulations or guidance that will ensure public and community participation in how the funds will be allocated?**
   a. **If so, what are those limitations and please provide specific citations.**

No, FEMA does not have such a requirement.

FEMA Environmental and Historic Preservation (EHP) staff do review requirements set forth by the National Environmental Policy Act (NEPA) that encourage public and community involvement in activities to be funded by federal agencies. However, the NEPA process facilitated by EHP staff informs decision makers about the impacts of a proposed project and does not result in recommendations or determinations regarding a specific allocation of funds.

Lastly, please let me assure you that my team remains steadfast in our commitment to support Puerto Rico in its unprecedented recovery effort. If you have any questions, please have a member of your staff contact Kevin Sullivan in the Region 2 External Affairs Division at (202) 480-1053.

Sincerely,

DAVID I
MAURSTAD

Digitally signed by
DAVID I MAURSTAD
Date: 2021.02.08
12:14:47 -05'00'

David I. Maurstad
Regional Administrator (A)
FEMA Region 2

AR_0003963

February 25, 2021

Deanne B. Criswell
Administrator Designate
Federal Emergency Management Agency
500 C Street, SW.
Washington, DC 20472

Robert J. Fentor, Jr.
Acting Administrator
Federal Emergency Management Agency
500 C Street, SW.
Washington, DC 20472

Dear Ms. Criswell & Mr. Fentor:

We write to you to express our deep concern regarding how the estimated $9.6 billion in Federal Emergency Management Agency (FEMA) funds may be used to repair Puerto Rico's electrical grid.[1] The historic amount will be made available to the Puerto Rico Electric Power Authority (PREPA) to repair the damage to its electric grid caused by Hurricane Maria and other natural disasters. However, these funds will perpetuate the existing vulnerable centralized transmission and distribution system – while further entrenching fossil fuel generation infrastructure on the island for decades to come – if they are used in the way currently intended by PREPA. We are supportive of the call the Puerto Rican people have made for an electrical grid based on distributed renewable energy as evidenced by the work of grassroots advocacy organizations. We urge your agency to reconsider how these funds will be used and encourage the creation and implementation of a plan to best serve the people of Puerto Rico in the face of a changing climate.

As you know, Puerto Rico has endured the damage and suffering of frequent natural disasters. In September 2017, Hurricanes Irma and Maria struck the island and made landfall two weeks apart, demolishing and devastating much of Puerto Rico's electricity transmission and distribution infrastructure and water services.[2] In January 2020, the island was then hit by a 6.4 magnitude earthquake, and ensuing aftershocks, which left two-thirds of the population of Puerto Rico without power. The earthquakes significantly damaged two of the island's natural gas-fired power plants. Two months after the disaster, thousands of Puerto Ricans were still living outside with

---

[1] The Wall Street Journal, "Trump Administration Grants $11.6 Billion in Aid to Puerto Rico"
https://www.wsj.com/articles/trump-administration-to-announce-11-6-billion-in-aid-for-puerto-rico-11600440469
[2] RAND Corporation, "Hurricanes Irma and Maria: Impact and Aftermath"
https://www.rand.org/hsrd/hsoac/projects/puerto-rico-recovery/hurricanes-irma-and-maria.html

AR_0003964

hundreds of families unable to pay for their damaged homes.[3] Today, Puerto Rico still faces severe challenges in its recovery.

In 2019, Puerto Rico's legislature enacted and the governor signed into law the Energy Public Policy Act which requires PREPA to have 40% of its electricity generated by renewable sources by 2025, 60% by 2040, and 100% by 2050. Puerto Ricans do not want to depend on fossil fuels and gas and coal companies any longer. However, recent data demonstrates that 75% of the energy generated in Puerto Rico comes from imported petroleum products and in 2020 petroleum-fire plants generated almost 50% of Puerto Rico's electricity, 29% was generated using natural gas imports, and only 2.5% of total electricity generation was from renewable sources of energy.[4] Puerto Rico's dependency on fossil fuels means its population pays two to three times higher for electricity than the mainland United States.[5]

Currently, much of the existing energy infrastructure in Puerto Rico is in flood-prone areas at risk from sea-level rise, storm surge, tsunamis, or other flooding risks. These vulnerabilities have led to constant outages on the island, community displacement, and harm to local economies. Furthermore, the island's electric grid is highly centralized and large fossil fuel generation plants in southern Puerto Rico must transmit power to demand centers in the north using long transmission lines that cross the island's central mountain range, making Puerto Rico's power system exceptionally vulnerable to natural disasters.

Those existing vulnerabilities will be compounded by PREPA's most recent infrastructure investment plan. In December 2020 PREPA submitted to your agency a ten-year Infrastructure Modernization Plan (IMP) setting forth how it intends to use the $9.6 billion allocation of federal disaster relief funds, including the earmarking of $853 million for the construction of new natural gas generation infrastructure, in direct violation of the twenty-year Integrated Resource Plan (IRP) approved by the Puerto Rico Energy Bureau (PREB). This continued dependence on fossil fuels, which will cause disproportionate harm to Puerto Rico's poorer communities, should not be perpetuated by PREPA nor abetted by FEMA. Instead, FEMA should require PREPA to promote the installation of distributed electricity generation capacity using renewable energy sources, including photovoltaic and battery energy storage systems and rooftop and onsite solar to be installed by a trained workforce in coordination with local contractors and direct community input.

---

[3] The New York Times, "Months After Puerto Rico Earthquakes, Thousands Are Still Living Outside" (March 01, 2020), https://www.nytimes.com/2020/03/01/us/puerto-rico-earthquakes-fema.html
[4] U.S. Energy Information Administration, "Puerto Rico Territory Energy Profile" https://www.eia.gov/state/print.php?sid=RQ#:~:text=Under%20the%20Puerto%20Rico%20Energy,coal%2Dfired%20generation%20by%202028.
[5] EIA, "Puerto Rico: Territory Profile and Energy Estimates" https://www.eia.gov/state/data.php?sid=RQ

AR_0003965

By inducing PREPA to invest in and focus on decentralizing its electricity transmission and distribution system, while relying on distributed energy generation using renewable resources, Puerto Rico will break its dependence on fossil fuels, become more resilient, and develop the capability to restore electric power efficiently and quickly after natural disasters. And, in the process of decarbonizing the electric grid, FEMA will also be supporting massive job creation programs and protecting the livelihoods and health of local populations.

In November of 2020 our colleagues Senator Schumer and Representative Velazquez wrote to your predecessor making the case for an environmentally friendly electrical grid.[6] We fully endorse that petition and were excited to hear in FEMA's response that there "are no governing statutes, regulations, or guidance that prohibit Puerto Rico or PREPA from pursuing and proposing power grid projects that support renewable generation and storage in their recovery solutions" and that there "are no governing statutes, regulations, or guidance that prohibit Puerto Rico or PREPA from pursuing and proposing microgrid projects in their recovery solutions.". **Earmarking federal funds to transition to distributed renewable energy systems would break the vicious cycle of disaster damage, reconstruction, and repeated impairment of the vulnerable, centralized transmission and distribution system while also extending energy resilience to the poorest sectors of the population that cannot afford the life-saving transition away from fossil fuels absent federal investment.**

We commend the Biden administration for working to expedite other sources of desperately needed aid to Puerto Rico and we look forward to working with you to secure a greener, energy independent Puerto Rico.

Sincerely,

| | | |
|---|---|---|
| Alexandria Ocasio-Cortez | Charles E. Schumer | Nydia M. Velàzquez |
| Member of Congress | United States Senator | Member of Congress |

---

[6] InsuranceNewsNet, "In New Letter To FEMA, Leader Schumer And Congresswoman Velazquez Seek Answers On How Its $10 Billion Grant To Puerto Rico Ensures Rebuilding A Stronger, Environmentally Friendly Electrical Grid" (November 17, 2020)
https://insurancenewsnet.com/oarticle/in-new-letter-to-fema-leader-schumer-and-congresswoman-velazquez-seek-answers-on-how-its-10-billion-grant-to-puerto-rico-ensures-rebuilding-a-stronger-environmentally-friendly-electrical-grid

AR_0003966

/s/
Raul Grijalva
Member of Congress

/s/
Earl Blumenauer
Member of Congress

/s/
Grace Meng
Member of Congress

/s/
Adriano Espaillat
Member of Congress

/s/
Mike Levin
Member of Congress

/s/
Mondaire Jones
Member of Congress

/s/
Kathy Castor
Member of Congress

/s/
Mark Takano
Member of Congress

/s/
Jerrold Nadler
Member of Congress

/s/
Mark Pocan
Member of Congress

/s/
Darren Soto
Member of Congress

/s/
Albio Sires
Member of Congress

/s/
Ritchie Torres
Member of Congress

/s/
Jamaal Bowman
Member of Congress

AR_0003967

U.S. Department of Homeland Security
Region II
FEMA-4336-DR-PR
FEMA-4339-DR-PR
#50 165 Suite 3
Parque Industrial Buchanan
Guaynabo, P.R. 00968



September 24, 2020

Laura Arroyo
Earthjustice
Florida Regional Office
4500 Biscayne Blvd. Ste 201
Miami, FL 33137

Jordan Luebkemann
Earthjustice
Florida Regional Office
4500 Biscayne Blvd. Ste 201
Miami, FL 33137

Raghu Murthy
Earthjustice Members
Florida Regional Office
4500 Biscayne Blvd. Ste 201
Miami, FL 33137

Re:   FEMA-4339-PR
      Puerto Rico Electric Power Authority
      Earthjustice Request for Federal Emergency Management Agency funding

Dear Mrs. Arroyo, Mr. Murthy and Mr. Luebkemann,

Thank you for your correspondence dated July 10, 2020 requesting funding and suggestions to support the recovery of the Commonwealth of Puerto Rico to have a more resilient, affordable and renewable energy system. Pursuant to a major disaster declaration issued by the President, the Federal Emergency Management Agency (FEMA) provides financial assistance to Puerto Rico and a variety of Commonwealth and local government entities, including the Puerto Rico Electric Power Authority (PREPA), under the Robert T. Stafford Disaster Relief and Emergency Assistance Act. The funding supports FEMA's mission to ensure the response and recovery is locally executed, state managed and federally supported.  The financial assistance is delivered through the Central Office for Recovery and Reconstruction (COR3) as a grant recipient to grant subrecipients such as PREPA. Federal assistance is discretionary and subject to many federal statutory, regulatory and policy requirements, including grant management and fiscal oversight requirements.

FEMA funding for the energy generation is strictly based on the damage to the infrastructure from Hurricane Maria and other declared disasters where damage is applicable.  The decision of generation platforms lies within the Commonwealth of Puerto Rico and PREPA to determine. Future and enhanced projects regarding generation should be directed to the Commonwealth, COR3 and

Mrs. Arroyo, Mr. Leubkemann and Mr. Murthy
PREPA
Earthjustice Funding Request
September 9, 2020
Page 2 of 3

PREPA as it is outside the parameters of FEMA on how the grant funding is used on projects. However, FEMA can liaise and coordinate federal engagement to supplement the recovery strategy and execution for alternative projects by providing the parameters for FEMA eligibility and assist COR3 and PREPA engagement and identification of these opportunities.

FEMA fully recognizes Admiral Brown's recent visit to Puerto Rico and engagement with the Energy Sector through various grid recovery updates and scheduled site visits. FEMA supports prioritizing recovery projects related to PREPA and energy recovery on the island. FEMA, in coordination with COR3, developed the FEMA Accelerated Awards Strategy (FAAST) for PREPA, whereby all of the applicant's (PREPA's) permanent work projects are grouped under one project worksheet. This strategy will expedite funding obligations for the island's power grid.

Statements by PREPA's former CEO Jose Ortiz indicating anticipated funding of $2B from FEMA is based on PREPA's own projections, planning, project execution and strategy as part of their two-year plan. In those statements Mr. Ortiz detailed PREPA-specific plans to initially develop and execute grid recovery projects. However, these statements and proposals are not based on any approved projects for funding or authorized construction funds from FEMA at this moment in time. COR3 developed the PREPA Energy Grid Modernization (EGM) Plan to be utilized by PREPA as a high-level guideline for grid recovery. The EGM Plan and its funding estimates as much as $21B are not based on any eligibility determinations and are not projects approved by FEMA as of the date of this letter. The transition away from fossil fuels is ultimately the decision and under the authority of the Commonwealth of Puerto Rico, COR3 and PREPA as the utility provider. FEMA recommends that you discuss these concerns with the Commonwealth of Puerto Rico and COR3 as they are the decision makers on how FEMA funding is spent on recovery projects. FEMA works alongside the Commonwealth and COR3 to expedite recovery funding and reimbursement of all eligible costs for projects.

FEMA has also engaged with the Interagency Energy Technical Coordination Team with the Department of Energy (DOE) leading the effort at identifying and coordinating both planning and funding aspects of interrelated but separately funded projects to include the interface of renewables. Department of Housing and Urban Development (HUD) Community Block Development Grants (CDBG) funding is currently being explored as an option for some grid transformation projects to include renewable integration, energy efficiency programs and distributive energy operational platforms at the utility and customer level that you outlined in your letter. FEMA's role in this group as mentioned above is to provide FEMA eligibility and assist COR3 and PREPA engagement and identification of those opportunities and to ensure there is no duplication of benefits.

While describing in this correspondence FEMA's Public Assistance roles towards recovery operations and funding, we have to emphasize the Hazard Mitigation Grant Program (HMGP) efforts. The key purpose of HMGP is to ensure that the opportunity to take critical mitigation measures to reduce the risk of loss of life and property from future disasters is not lost during the reconstruction process following a disaster[1]. Hazard mitigation includes long-term efforts to reduce the impact of future events. The Recipient (COR3) has the primary responsibility for

---

[1] Hazard Mitigation Assistance Guidance, Section B.1 Hazard Mitigation Grant Program

AR_0003969

prioritizing, selecting, and administering state and local hazard mitigation projects under the HMGP. The eligibility criteria, procedures, and timelines for implementation of the HMGP measures funded differ from the hazard mitigation measures funded under the PA Program. FEMA evaluates the HMGP proposed mitigation measures for cost-effectiveness, technical feasibility, and compliance with Environmental and Historic Preservation (EHP) laws, regulations, and Executive Orders.

A key component of project eligibility is that it must be consistent with the strategies included in the State or Local Hazard Mitigation Plan, and a FEMA-approved hazard mitigation plan is needed to receive certain types of non-emergency disaster assistance, including funding for mitigation projects. Through effective mitigation planning and the implementation of mitigation strategies, greater risk reduction can be achieved. State, tribal, and local governments undertake hazard mitigation planning to identify risks and vulnerabilities related to natural disasters. Through planning, they develop long-term strategies for protecting people and property from future events. Mitigation plans are key to breaking the cycle of disaster damage, reconstruction, and repeated damage.

Thank you for your interest in Puerto Rico's recovery process from Hurricane Maria. FEMA does want to reiterate that many of the opportunities discussed in the letter are directly tied to decisions made by the Commonwealth of Puerto Rico and PREPA in determining the type of power grid operational platforms. FEMA does not play a role in determining what that decision is nor authorizes the use of funding for projects outside the eligible parameters adopted in FEMA policy. Thank you for expressing your concerns and we recommend that you express these concerns directly with COR3 and PREPA by which FEMA can attend as a recovery partner representing the eligible funding stream.

Should you have any additional comments, questions or require further information please contact us at fema-actionofffice-PR-recovery@fema.dhs.gov.

Sincerely,

**José G. Baquero**
Federal Disaster Recovery Coordinator
Joint Recovery Office Director of Puerto Rico
FEMA-4339-PR-DR/FEMA-4473-PR-DR

| IN RE: | | CASE NO.: |
| | | CEPR-AP-2018-0001 |
| **Review of the Puerto Rico Electric Power** | | |
| Authority Integrated Resource Plan | | |

## EXPERT TESTIMONY OF DANIEL GUTMAN

## ON BEHALF OF LOCAL ENVIRONMENTAL ORGANIZATIONS

Comité Diálogo Ambiental, Inc., El Puente de Williamsburg, Inc. -Enlace Latino de Acción Climática, Comité Yabucoeño Pro-Calidad de Vida, Inc., Alianza Comunitaria Ambientalista del Sureste, Inc., Sierra Club and its Puerto Rico chapter, Mayagüezanos por la Salud y el Ambiente, Inc., Coalición de Organizaciones Anti-Incineración, Inc., Amigos del Río Guaynabo, Inc., Campamento Contra las Cenizas en Peñuelas, Inc., and CAMBIO Puerto Rico, Inc.

AR_0004322

## I. Introduction and Qualifications

**Q: Please state your name, position, and business address:**

**A:** My name is Daniel Gutman. I am a consultant in environmental analysis of air pollution. My business address is 407 West 44th Street, New York, New York 10036.

**Q: On whose behalf are you testifying in this proceeding?**

**A:** I am testifying on behalf of the following organizations: Comité Diálogo Ambiental, Inc., El Puente de Williamsburg, Inc.- Enlace de Acción Climática, Comité Yabucoeño Pro-Calidad de Vida, Inc., Alianza Comunitaria Ambientalista del Sureste, Inc., Sierra Club, Inc. and its Puerto Rico chapter, Mayagüezanos por la Salud y el Ambiente, Inc., Coalición de Organizaciones Anti Incineración, Inc., Amigos del Río Guaynabo, Inc., Campamento Contra las Cenizas en Peñuelas, Inc. CAMBIO PR, Inc.

**Q: Please summarize your qualifications and work experience.**

**A:** In more than a dozen matters, I have provided expert analysis of the harmful impacts of emissions from utility projects on human health. I have testified before administrative agencies as an expert, on behalf of the Environmental Protection Agency (EPA) and local environmental organizations. I hold a Bachelor of Science degree from the Massachusetts Institute of Technology and a Master of Science degree from the University of Illinois. My resume is attached as <u>Exhibit</u> <u>A</u>.

2

AR_0004323

**Q: What is the scope of your testimony?**

**A:** I have been asked to review the air quality surrounding the major power plants in Puerto Rico and the implications of continued operation of the Puerto Rico Electric Power Authority (PREPA) power plants for air quality and public health.

**II.     PREPA's Violations and Health Impacts from Emissions at Puerto Rico's Fossil Fuel Power Plants**

**Q: What are the conclusions of your review?**

**A:** My review indicates that if the current power plant output and fuel type are maintained in the future, then the area surrounding the Puerto Rico Electrical Power Authority (PREPA) power plants at Costa Sur, San Juan, and Aguirre will fail to comply with the Environmental Protection Agency's (EPA) 2010 sulfur dioxide National Ambient Air Quality Standard (NAAQS). The 2010 NAAQS sulfur dioxide standard was based on new health research that established for the first time a causal relationship between respiratory morbidity and short-term sulfur dioxide concentrations (75 FR 35525). Therefore, my review indicates that continued operation of these plants will cause harmful health impacts to Puerto Ricans living nearby.

**Q: Considering the importance of compliance with the 2010 sulfur dioxide standard, what are your views for PREPA's preferred plans in the Integrated Resource Plan (IRP)?**

**A:** Because of the expense and difficulty of either adding pollution control equipment or cleaner fuel, the best way for Puerto Rico to comply with the 2010 sulfur dioxide standard is for PREPA to move away from generation in fossil fuel power plants and toward generation from non-

3

AR_0004324

**JA_383**

polluting sources. PREPA's preferred plans, the Energy System Modernization Plan (ESM) and Scenario 4, invest too many resources into fossil fuel generation, and not enough in non-polluting sources.

**Q: Please explain the air quality standards that PREPA must meet.**

**A:** The Clean Air Act sets up a regulatory framework whose main purpose is protection and enhancement of air quality. To achieve this purpose, the Clean Air Act encompasses broad authority for EPA to evaluate health effects of air pollutants, set ambient air pollution standards, set emission standards for both new and existing equipment, and require states to submit plans to control air pollutants (or have EPA adopt its own plan).

Under §108 of the Clean Air Act, EPA issues "air quality criteria" to control certain air pollutants that are widespread in the human environment, largely because they are emitted whenever fuel is burned. These include sulfur dioxide, carbon monoxide, nitrogen oxides, particulate matter, ozone, and lead. Under §109 of the Clean Air Act, EPA has set National Ambient Air Quality Standards (NAAQS) "requisite to protect the public health" for each of these pollutants, which apply wherever the public is exposed. States submit plans under §110 to achieve NAAQS by dates set by EPA. Plans can include mechanisms such as state regulation of fuel type, required permits for major polluters (Clean Air Act, §172), economic incentives, etc. Since ambient concentrations are proportional to emissions, the purpose of the plan is to reduce emissions enough to meet ambient standards. EPA typically helps the states by setting emission standards for equipment, providing research on effectiveness of control techniques, providing guidance on developing a plan, and many other activities.

4

**Q: Why are these air quality standards especially important in Puerto Rico?**

**A:** In 2010, EPA adopted a stricter NAAQS for sulfur dioxide (75 FR 35520). This is particularly relevant in Puerto Rico, where power plants emit significant levels of this toxic chemical. The new standard is primarily designed to limit short-term high concentrations of sulfur dioxide that cause breathing problems. Short-term peaks of sulfur dioxide cause constriction of bronchial passageways and respiratory symptoms in susceptible populations, which include children, older adults, those with pre-existing respiratory disease, those who spend time exercising outdoors, persons of lower socio-economic status, and asthmatic individuals. Notably, the prevalence and severity of asthma is higher among Puerto Ricans (75 FR 35527). The health data, epidemiological, human exposure, and other data on the relationship between short-term sulfur dioxide exposure and adverse respiratory effects is convincing enough for the relationship to be characterized as causal, the "strongest finding" that EPA can make (75 FR 35520 [2010]).

**Q: How does EPA determine compliance with standards in Puerto Rico?**

**A:** EPA set a one-hour limit of 75 ppb (parts per billion) for sulfur dioxide, based on a three-year average of the 99th percentile daily maximum sulfur dioxide concentrations in an area. A short-term standard at the level adopted by EPA will reduce longer-term sulfur dioxide concentrations as well. Consequently, EPA eliminated its previous 24-hour and yearly average standards at the same time as it adopted a one-hour standard.

EPA recognized that violations of the 2010 sulfur dioxide standard could be expected near large facilities that burn oil or coal and emit more 2,000 tons of sulfur dioxide per year. EPA accordingly determined that areas near those facilities are of special concern. Prior to submitting a plan to meet the 2010 sulfur dioxide standard, air agencies must first determine whether their air is in

5

attainment or non-attainment with the standard. While air agencies could characterize their air quality using an existing air quality monitoring network, Puerto Rico's network apparently does not meet minimum standards for data collection. Consequently Puerto Rico characterized its air primarily using computer modeling, in accordance with EPA regulations (40 CFR §51.1203).

**Q: Are PREPA's power plants in compliance with air quality standards?**

**A:** No. In 2016, the Puerto Rico Environmental Quality Board (EQB) found that the areas around four PREPA power plants are likely in violation of the 2010 sulfur dioxide NAAQS—including the Aguirre, Costa Sur, San Juan, and Palo Seco plants. The EQB projections, based on actual sulfur dioxide emissions during the years 2013-15, are shown in the table below.[1]

Table 1. Summary of the Puerto Rico 1-hour $SO_2$ Designation Modeling Results, 2016.

| Emission Sources with $SO_2$ emissions at or above 2,000 tpy | Name of geographical area | Maximum impact area (radius in kilometers) | 1-Hour $SO_2$ Design Value ($\mu g/m^3$) | 1-hour $SO_2$ NAAQS ($\mu g/m^3$) |
|---|---|---|---|---|
| PREPA Aguirre | Guayama-Salinas | 5.4 | 232 | 196* |
| PREPA Costa Sur | Guayanilla | 7.0 | 1,046 | |
| PREPA San Juan | San Juan | 3.6 | 343 | |
| PREPA Palo Seco | San Juan | 2.7 | 207 | |

\* For sulfur dioxide, 196 $\mu g/m^3$ is equivalent to 75 ppb.

The EQB is expected to submit to EPA its Implementation Plan for achieving compliance with the 2010 sulfur dioxide standard later this year.[2] PREPA has three difficult options to achieve compliance, if it wishes to keep these plants running:

---

[1] Letter from EQB to EPA, December 19, 2016. A true and accurate copy of this letter, with Puerto Rico 1-Hour SO2 Designation Modeling Results including Appendix A, is attached as Exhibit B.
[2] See "Status of SIP Required Elements for Puerto Rico Designated Areas," at https://www3.epa.gov/airquality/urbanair/sipstatus/reports/pr_elembypoll.html.

AR_0004327

- Lower the sulfur content of the oil burned at PREPA's power plants

- Install emission control equipment, or

- Reduce the maximum power generated.

**Q: Can control equipment be effectively applied in Puerto Rico?**

**A:** A previous study by Puerto Rico's Intersectoral Committee on Environmental Compliance and Energy Alternatives (ICECEA), convened by the Governor of Puerto Rico, found that three of the four power plants do not have the space for control equipment and that, in any case, the cost of installing and operating the equipment would have the effect of increasing the cost of electricity, making control equipment "not a viable compliance alternative."[3] The study also determined that using a lower sulfur fuel, for example one containing 0.3% sulfur instead of the current 0.5% sulfur, "is not an option, as it would increase energy costs significantly and would not comply with emission limits for contaminants imposed by new federal regulations."[4]

---

[3] ICECEA, Report on the Necessary Measures to Comply With New EPA Regulations, and the Conversion to, and Use of Natural Gas in, the Northern Power Plants 13, June 15, 2012, http://www.gdb.pr.gov/documents/FINAL-InformeCICAAEGobernador-English-firmado.pdf

[4] *Id..*

7

AR_0004328

According to the ICECEA report:

> As part of our evaluation, both the EQB and PREPA used dispersion models in order to determine the generating units' maximum emission levels. Both agencies agreed that in order to meet NAAQS compliance, [PREPA] must burn liquid fuel with a sulfur content of 0.1 percent per weight or less. This would imply that PREPA would be burning diesel in all of its combustion units. Currently, this fuel is only utilized in the most efficient combined cycle units, since its high cost is not economically feasible for use in other units. Increasing the use of No. 2 diesel fuel in turn increases the cost of fuel purchases.[5]

Furthermore, PREPA's current fuel risks exacerbating its non-compliance with the 2010 sulfur dioxide standard. Two power plants in Puerto Rico, the Aguirre and Palo Seco plants, are operating substantially below capacity, as shown in Table 2. If operations at either plant increase in the future without adding pollution control equipment or reducing the sulfur content of the fuel, sulfur dioxide emissions, and therefore sulfur dioxide concentrations, will increase above those projected in Table 1.

Table 2. Large $SO_2$ Sources in Puerto Rico.

| Emission sources with $SO_2$ emissions at or above 2,000 tons/year | Name of geographical area | $SO_2$ Emissions (tons/yr) | | | | Average Emissions as % of Allowable |
|---|---|---|---|---|---|---|
| | | Allowable* | 2013 | 2014 | 2015 | |
| PREPA Aguirre | Guayama-Salinas | 30,038 | 9,641 | 9,261 | 9,585 | 32% |
| PREPA Costa Sur | Guayanilla | 11,506 | 6,975 | 8,337 | 9,323 | 71% |
| PREPA San Juan | San Juan | 7,787 | 5,308 | 5,136 | 6,064 | 71% |
| PREPA Palo Seco | San Juan | 17,344 | 5,701 | 3,128 | 2,979 | 23% |

\* Exhibit B, Puerto Rico 1-Hour SO2 Designation Modeling Results, Appendix A.

---

[5] *Id.*

8

AR_0004329

**Q: What would happen if current emissions levels were maintained?**

**A:** If current emission levels are maintained in the future, areas surrounding the Palo Seco plant will comply with the 2010 sulfur dioxide NAAQS, while areas surrounding the other plants will continue to be in non-compliance. Modeling results show that the Palo Seco area did comply with the sulfur dioxide concentration standard in 2014 and 2015, but that the three-year average was pushed above compliance due to higher plant emissions in 2013, as shown in Table 3. If sulfur dioxide emissions from Palo Seco are maintained at the 2014-15 level, the surrounding area will eventually comply with the standard, which is based on a three-year average.

Table 3. Puerto Rico 1-hour $SO_2$ Designation Modeling Results, 2013–15.[6]

| Emission sources with $SO_2$ emissions at or above 2,000 tons/year | Name of geographical area | $SO_2$ Concentrations ($\mu g/m^3$) | | | 1-hour $SO_2$ NAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|
| | | 2013 | 2014 | 2015 | |
| PREPA Aguirre | Guayama-Salinas | 236 | 226 | 233 | 196* |
| PREPA Costa Sur | Guayanilla | 1,003 | 1,037 | 1,098 | |
| PREPA San Juan | San Juan | 316 | 325 | 387 | |
| PREPA Palo Seco | San Juan | 263 | 172 | 185 | |

\* For sulfur dioxide, 196 $\mu g/m^3$ is equivalent to 75 ppb.

If the current power plant output and fuel type are maintained in the future, then the area surrounding the PREPA Palo Seco power plant is the only area that can comply with EPA's 2010 sulfur dioxide NAAQS. Areas surrounding the other major PREPA power plants—Costa Sur, San Juan, and Aguirre—will not be able to achieve compliance with that important health-based standard.

---

[6] Exhibit B, Puerto Rico 1-Hour SO2 Designation Modeling Results, Appendix A.

AR_0004330

Because of the expense and difficulty of either adding pollution control equipment or cleaner fuel, the best way for Puerto Rico to comply with the 2010 sulfur dioxide standard is for PREPA to move away from generation in fossil fuel power plants and toward generation from non-polluting sources, as required by the recent Climate Change Mitigation, Adaption and Resiliency Law signed by Governor Ricardo Rosselló.[7] The requirements of this law should be reflected in Puerto Rico's forthcoming Implementation Plan for achieving the sulfur dioxide NAAQS.

**Q: What has been PREPA's history in terms of compliance with sulfur dioxide standards?**

**A:** PREPA has a history of poor compliance or non-compliance with federal air and water quality regulations governing its power plants. Prior to 1999, PREPA allowed virtually uncontrolled emissions of sulfur dioxide mist from its power plants, polluting nearby air and creating health problems for nearby residents.[8] A 1999 consent decree between PREPA and EPA, modified in 2004, addressed those failures in part by restricting the sulfur content of fuel burned at PREPA's facilities. Subsequent to the consent decree PREPA has apparently engaged in a scheme to falsify tests of fuel quality required by the consent decree.[9]

Provisions of the consent decree are incorporated into Title V air permits issued by the EQB. In addition to the sulfur content of fuel, these provisions include several aimed at ensuring proper maintenance and optimum operating conditions of the Aguirre power station. Title V of the Clean Air Act was adopted in order to consolidate the issuance and enforcement of permits under the authority of one agency (42 USC Chapter 85, subchapter V). Given PREPA's previous bad

---

[7] See Governor Ricardo Rosselló Signs Historic Climate Change Bill," May 23, 2019, available at http://prfaa.pr.gov/governor-ricardo-rossello-signs-historic-climate-change-bill/.

[8] Mary Williams Walsh, "At Puerto Rico's Power Company, a Recipe for Toxic Air, and Debt," New York Times, February 16, 2016, available at https://www.nytimes.com/2016/02/16/business/dealbook/at-puerto-ricos-power-company-a-recipe-for-toxic-air-and-debt.html.

[9] *Id.*

AR_0004331

**JA_390**

behavior, it is important that one agency, in this case the EQB, has oversight and enforcement authority over all activities covered by the Title V permit, including those provisions added as a result of the 2004 consent decree.

In particular, among PREPA's large power plants, PREPA's Aguirre power complex emits the most sulfur dioxide, while the Palo Seco power plant emits the least, as shown in Table 2 above. The area around the Aguirre plant does not comply with the 2010 sulfur dioxide NAAQS, as shown in Table 3, above.[10] Palo Seco is the only plant that could meet the 2010 sulfur dioxide standard while using the current fuel—0.5% sulfur oil. Consequently no modifications should be allowed to PREPA Aguirre's Title V permit that may dilute EQB's enforcement authority, since any such modification could hamper enforcement by EQB and weaken compliance with conditions of the permit, making the existing violation of the 2010 sulfur dioxide NAAQS worse and endangering the health of nearby residents.

**Q: What other pollutants are emitted by PREPA's power plants?**

**A:** Sulfur dioxide is only one of the pollutants emitted from PREPA's power plants. Emissions of other criteria pollutants are shown in Table 4, below. Of particular concern are emissions of nitrogen oxides, which contribute to formation of ozone (80 FR 65292 [2015]). and emissions of particulate matter—$PM_{10}$ and $PM_{2.5}$—which exacerbate asthma symptoms and adversely impact respiratory function, especially of children, in the short term and increase death rates, especially of the elderly, in the long term (78 FR 3085 [2013]).

---

[10] The PREPA Aguirre Power Complex also does not comply with its Clean Water Act (CWA) permit. See https://echo.epa.gov/detailed-facility-report?fid=110000307800#pane3110000307800.

11

AR_0004332

**JA_391**

Table 4. Criteria Pollutants Emitted by PREPA Power Plants in 2014 (tons/year).[11]

| Emissions Source | Carbon Monoxide | Nitrogen Oxides | PM 10 | PM 2.5 | Sulfur Dioxide | VOC |
|---|---|---|---|---|---|---|
| PREPA Aguirre | 6287,08669 | 85199,26495 | | | | |
| PREPA Costa Sur | 3278,89787 | 66778,33630 | | | | |
| PREPA San Juan | 1,0704,0874 | 682824,90340 | | | | |
| PREPA Palo Seco | 2082,40723 | 01673,12532 | | | | |

A review of monitoring data that the EQB submits to EPA shows that EQB's monitoring program is substandard. Most EQB monitors fail to collect sufficient data to even determine whether areas of Puerto Rico meet federal air quality standards. Sometimes when EQB monitors do collect sufficient data, they show what should be violations of the federal standard. For example, in 2016, EQB ozone monitors showed violations of the federal one-hour ozone standard in Bayamón, Cataño, and Juncos municipalities. Unfortunately EPA revoked the one-hour ozone standard in 1997 believing that a new, lower 8-hour standard would protect against both short-term (1–3 hours) and medium-term (6–8 hours) exposures (62 FR 38856 [1997]). In Puerto Rico this appears not to have been the case. Consequently, emissions of nitrogen oxides from PREPA's fossil fuel power plants continue to pose a health hazard for island residents.

---

[11] EPA, Enforcement and Compliance History Online (ECHO) Air Pollutant Reports, available at https://echo.epa.gov/.

AR_0004333

**Q: What emissions are the comparable emissions for the AES Puerto Rico and EcoElectrica**

**power plants?**

**A:** Emissions for the AES and EcoElectrica power plants are shown in the Table 5.

Table 5. Criteria Pollutants Emitted by Other Power Plants in 2014 (tons/year).[12]

| Emission Source | Carbon Monoxide | Nitrogen Oxides | PM 10 | PM 2.5 | Sulfur Dioxide | VOC |
|---|---|---|---|---|---|---|
| AES Puerto Rico | 861 | 1,729 | 402 | 100 | 245 | 7 |
| EcoElectrica, L.P. | 204 | 311 | 49 | 49 | 0 | 7 |

**Q: Does this conclude your testimony?**

**A:** Yes.

---

[12] EPA, Enforcement and Compliance History Online (ECHO) Air Pollutant Reports, available at https://echo.epa.gov/ and EPA emission factors, AP-42, at https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-compilation-air-emissions-factors.

13

AR_0004334

**JA_393**

## CERTIFICATION

I, Daniel Gutman, CERTIFY that the contents of my testimony are known to me and are the truth according to the best of my abilities and reasonable knowledge. The technical and operational aspects included in the testimony are based on information that has been gathered in good faith; but I cannot guarantee the truthfulness of information gathered from third parties.

**Daniel Gutman, M.S.**

Before me, the undersigned Notary Public, personally appeared _Daniel Gutman_, who acknowledges that the above is true this day of October _23_, 2019 in

_New York, NY_ .

( )Personally known OR

(X)Identification Document provided _Driver's License_ .

JONATHAN JAMES SMITH
NOTARY PUBLIC-STATE OF NEW YORK
NO. 02SM6335228
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES 01-04-2020

Notary Public Name, Signature, Seal

_Jonathan James Smith_
_New York City, NY_

14

AR_0004335

**JA_394**

December 21, 2020

<u>**VIA Email**</u>

Thomas Von Essen
Regional Administrator
José G. Baquero Tirado
Federal Disaster Recovery Coordinator, Puerto Rico and USVI
Federal Emergency Management Agency Region II – DR-4339-PR
Puerto Rico Joint Recovery Office
50 State Road 165 Guaynabo, PR 00968
Attn: Puerto Rico Utilities PEA Public Comments
FEMA-EHP-DR4339@FEMA.DHS.GOV

> **RE: <u>Comments Objecting to the Approval of the Programmatic Environmental Assessment: Utility Repair, Replacement, and Realignment, Commonwealth of Puerto Rico, DR-4339-PR.</u>**

Dear Messrs. Von Essen and Baquero Tirado:

Comité Diálogo Ambiental, Inc. ("CDA"), El Puente de Williamsburg, Inc. – Enlace Latino de Acción Climática ("El Puente – ELAC"), Comité Yabucoeño Pro-Calidad de Vida, Inc. ("YUCAE"), Alianza Comunitaria Ambientalista del Sureste, Inc. ("ACASE"), Sierra Club Puerto Rico, Inc. ("Sierra Club PR"), Mayagüezanos por la Salud y el Ambiente, Inc. ("MSA"), Coalición de Organizaciones Anti Incineración, Inc. ("COAI"), Amigos del Río Guaynabo, Inc. ("ARG), Campamento Contra las Cenizas en Peñuelas, Inc., and Cambio, PR, Inc., collectively known as Alianza de Energia Renovable Ahora ("AERA") submit these comments to the Federal Emergency Management Agency ("FEMA") Draft Programmatic Environmental Assessment: Utility Repair, Replacement, and Realignment in the Commonwealth of Puerto Rico, DR-4339-PR ("PEA").

We submit these comments to the Draft FEMA PEA to raise concerns about the inadequacies of the PEA, the failure to address safety issues, risks, and significant adverse environmental impacts and repercussions of not preparing an Environmental Impact Assessment. The FEMA funds for which the PEA is proposed represent an opportunity to provide a lifeline to residents and businesses in Puerto Rico, especially low- and medium-income ("LMI") communities. The comments are based on many years of work on energy issues in Puerto Rico.

1

AR_0004375

**JA_395**

*The vulnerabilities and public health risks of the existing electric system*

Hurricanes Irma and Maria demonstrated that the transmission and distribution ("T&D") system that carries power from the large, centralized power plants, especially the plants in Southern Puerto Rico to the North are a key vulnerability of the Puerto Rico electric system. Moreover, the South-to-North transmission system is vulnerable to multiple types of weather events, earthquakes, vegetation growth, wildlife impacts, lack of investment in maintenance, difficult access to servitudes and easements, among others. As a matter of basic physics, the T&D's interconnected vertical structures, will likely succumb in the next hurricane(s) even if "hardened".

The centralized configuration and heavy dependence on South-to-North transmission in the path of hurricanes that usually make landfall in Eastern Puerto Rico and cut across the Island from east to west increases the risks of power outages. After previous hurricanes, like Hugo in 1989, Hortensia in 1996, George in 1998, when the network was presumably strong and the required maintenance was done, electricity outages lasted months because a failure in one part of the centralized grid triggered interruptions in other parts of the system and sometimes complete outages.

This year's seismic events further demonstrated and alerted to the vulnerability of large, centralized plants and the affiliated transmission system: The Costa Sur and EcoElectrica plants in Southwestern Puerto Rico were both damaged by the earthquakes and aftershocks. Furthermore, the U.S. Geological Survey has determined that the areas where the San Juan and Palo Seco plants are located are at high risk of liquefaction in the event of earthquakes.[1] The Great Southern Puerto Rico Fault Zone runs through the Jobos Bay area where the Aguirre Power Complex and the Applied Energy System ("AES") Corporation AES coal burning power plants are located.[2]

Much of the existing energy infrastructure is in flood prone areas or at risk of impacts from sea level rise, storm surge, tsunamis or other flooding risks to the plants and T&D infrastructure. The Palo Seco plant, depot and accompanying infrastructure are in a tsunami flood area.[3]

The operation of all fossil fuel plants in Puerto Rico emit multiple contaminants that adversely impact public health and the environment. The AES coal-fired power plant and the

---

[1] Jeffrey L.Bachhuber, James V. Hengesh, & Sean T. Sunderman, *Liquefaction Susceptibility of the Bayamon and San Juan Quadrangles, Puerto Rico*, at 30, Figure 6, (2008), https://earthquake.usgs.gov/cfusion/external_grants/reports/03HQGR0107.pdf (noting very high susceptibility zones in areas along the Bayamon coastal plain, Bahia de San Juan, and Laguna San Jose); James V. Hengesh, & Jeffrey L. Bachhuber, *Liquefaction susceptibility zonation map of San Juan, Puerto Rico*, in Mann, P. ( ed.), Active tectonics and seismic hazards of Puerto Rico, the Virgin Islands, and offshore areas: Geological Society of America Special Paper 385, at 249–262 (2005).

[2] *Id.* at 250.

[3] Cent. Off. for Recovery, Reconstruction and Resiliency, *The Grid Modernization of Puerto Rico* at 107, Figure 6-6 ("Map of Palo Seco Plant and Depot in Flood Area," listing PREPA as the source of this information).

2

AR_0004376

Aguirre Power Complex located in Southeastern Puerto Rico are the two primary sources of air pollution and toxic emissions in the archipelago[4] and disproportionately impact some of the poorest communities. These two plants also extract large amounts of freshwater from the South Coast Aquifer and have contributed to the water scarcity that led to water rationing in summer 2019 and in previous years.[5]

The Costa Sur and EcoElectrica plants in Southwestern Puerto Rico both burn imported Liquified Natural Gas ("LNG", liquified methane gas) and also transmit energy long distance using the vulnerable T&D system.

Except for the renewable energy facilities on the eastern coast of Puerto Rico, where Hurricane Maria made landfall, solar installations withstood the hurricane force winds. However, utility-scale, land-based renewable installations that depend on the vulnerable T&D system were unable to transmit power to where it was needed. Some higher-income Puerto Rico residents and businesses have installed photovoltaic systems and/or energy storage equipment on their rooftops or onsite to supply at least part of their energy needs and provide resilience. However, the upfront investments and/or high leasing costs have prevented widespread uptake of rooftop or onsite solar and storage.

**The FEMA funds should support efforts to incentivize the Puerto Rico Electric Power Authority ("PREPA") to acquire photovoltaic ("PV") and Battery Energy Storage Systems ("BESS") to be installed by its trained workforce in conjunction with local contractors and organized communities.** Widespread onsite solar installations could subsequently provide the path to rooftop solar communities that operate as microgrids with the ability to connect and disconnect from the main grid along with energy demand management and efficiency programs and the other alternatives discussed in these comments.

Given the economic crisis in Puerto Rico, available resources, such as the FEMA funds should be invested in options that save lives, promote local economic development, and change the trajectory of exporting billions of dollars per year for fossil fuels and power purchase payments to maintain a stagnant system. Moreover, the funds present a once-in-a-lifetime opportunity to

---

[4] U.S. Envtl. Prot. Agency, 2018 Toxic Release Inventory (TRI) Factsheet: State – Puerto Rico (Nov. 12, 2019), https://enviro.epa.gov/triexplorer/tri_factsheet.factsheet_forstate?pZip=&pParent=NAT&pCity=&pCounty=&pState =PR&pYear=2018&pDataSet=TRIQ1&pPrint=0.

[5] *See, e.g.*, Puerto Rico Departamento de Recursos Naturales, Orden Administrativa 2016 - 018 Para Declarar como Área Crítica los Acuíferos del Sur de los Municipios de Ponce, Juana Díaz, Santa Isabel, Salinas, Guayama, y Arroyo (June 28, 2016), http://www.drna.pr.gov/documentos/orden-administrativa-2016-018-para-declarar-como-area-critica-los-acuiferos-del-sur-de-los-municipios-de-ponce-juana-diaz-santa-isabel-salinas-guayama-y-arroyo/; Jason Rodríguez Grafal, Acuífero del Sur: Retrocede la única fuente de agua potable de 30 mil sureños, La Perla del Sur (May 29, 2019), https://www.periodicolaperla.com/acuifero-del-sur-retrocede-la-unica-fuente-de-agua-potable-de-30-mil-surenos1/; U.S. Geol. Survey, USGS Water Use Data for Puerto Rico, https://waterdata.usgs.gov/pr/nwis/wu (last visited Mar. 5, 2020); Franquicia para el uso y aprovechamiento de aguas de AES-RO-06-10-99-PFI-70380

3

AR_0004377

reduce electric system vulnerability with onsite/rooftop solar plus storage and provide a lifeline to Puerto Rico residents.

### VIABLE ALTERNATIVES FOR LIFE-SAVING ELECTRIC SERVICE NOT CONSIDERED IN THE PEA

The commenters promote alternatives to central station, fossil fuel generation including the following options:

1. Energy efficiency and conservation measures;
2. Energy storage for rooftop or onsite solar photovoltaic (PV) installations;
3. Solar installations at schools, water purification and treatment plants, parking lots and similar areas;
4. Energy demand management programs that incorporate time of use incentives to address the nighttime peak and other demand response options;
5. Rooftop or onsite PV installations and solar communities as recommended in studies by the University of Puerto Rico at Mayaguez faculty.[6]

Numerous civil society groups, including community, environmental, labor, professional organizations and academia co-founded and endorse the Queremos Sol Proposal ("We Want Sun", www.queremossolpr.com) which promotes the transformation of PREPA to achieve a life-sustaining, renewable energy electric system. Reliable electric service is required to power life-sustaining medical equipment and medications. Studies have documented that the power failure after hurricane Maria led to thousands of deaths.[7] Queremos Sol proposes widescale adoption of rooftop solar + storage and is largely consistent with the Puerto Rico's legally mandated Renewable Portfolio Standard (RPS) to achieve 20% renewable energy by 2022, 40% by 2025, 60% by 2040 and 100% renewable energy by 2050.

Studies commissioned by the Puerto Rico Energy Bureau ("PREB") project that new solar generation will cost about 6.7 cents / kWh.[8] Furthermore, rooftop solar + storage systems have low interconnection costs and system impacts. In order to achieve the legally mandated renewable energy goals, Puerto Rico must attain a minimum of 3,750 MW of renewables and 1,500 MW of storage by August 2025 according to the Integrated Resource Plan ("IRP") recently approved by PREB.[9]

---

[6] Instituto Tropical de Energía, Ambiente y Sociedad, http://www.uprm.edu/aret/docs/Ch_1_Summary.pdf, p. 1-13,1-14.

[7] Tom Dreisbach, Problems With Health Care Contributed To Hurricane Maria Death Toll In Puerto Rico (2009), https://www.npr.org/2019/02/21/696769824/problems-with-health-care-contributed-to-hurricane-maria-death-toll-in-puerto-rico, (last visited Dec. 17, 2020).

[8] Puerto Rico Energy Bureau, Appendix A -Report on the Cost Allocation Methods and Unbundling Issues for Puerto Rico, at 61, In Re: Unbundling of the Assets of the Puerto Rico Electric Power Authority, PREB Dkt. NEPR -AP-2018-0004 (Sept. 4, 2020).

[9] Puerto Rico Energy Burau, Final Resolution and Order on the Puerto Rico Electric Power Authority's Integrated Resource Plan, PREB Dkt. No. CEPR-AP-2018-0001, (Aug. 24, 2020). (Hereinafter, "Final Resolution and Order")

4

AR_0004378

Dozens of PREPA employees are trained to implement net metering and to install and maintain rooftop solar + storage systems. These employees have completed coursework on net metering and design and installation of rooftop solar + storage systems, offered through PREPA's Commercial Operations Training Center ("CAOC") and Electrical System Training Center ("CASE").[10] Employees trained through this program could install, and maintain rooftop solar + storage systems, work to interconnect the massive backlog of rooftop solar + storage systems in the interconnection queue, and implement *Comunicado Técnico* 19-02, which would allow for automatic interconnection of rooftop systems.[11]

PREPA installations could be done in conjunction with local renewable energy contractors and organized community groups. When the next storm strikes Puerto Rico, these efforts would allow rooftop solar + storage systems to power microgrids for hospitals and other critical infrastructure. The advantages of enlisting PREPA to implement a rooftop or onsite solar program is that the utility already has the service relationship with households and businesses such that transaction costs and wait times can be minimized. Through PREPA, residents in the lowest income strata can access renewable energy and storage technologies. Installations by the public utility will allow for mitigation of the most risk for the highest number of beneficiaries possible.

*A. Energy conservation, efficiency, customer engagement and demand response programs*

The Queremos Sol proposal highlights the importance of energy conservation, efficiency, customer engagement, and demand response programs. During the IRP technical hearings, expert witnesses identified several cost-effective Quick-Start Energy Efficiency programs such as solar water heaters, energy efficient refrigerator incentive programs, appliance replacement programs, tuning up air conditioners or replacing very old air conditioners, expanding the Office of Energy Public Policy's low-income weatherization program, to name a few.[12]

The IRP assumes that PREPA will comply with the 2% annual reduction in load due to energy efficiency as required by the Puerto Rico Energy Public Policy Act ("Law 17-2019"), culminating in a 30% reduction in PREPA's total load by 2040. Law 17-2019, Section 1.9(3)(B)

---

[10] Partnership Committee Report, *Puerto Rico Public-Private Partnership for the Electric Power Transmission and Distribution System,* at 259 (2020). https://aeepr.com/es-pr/QuienesSomos/Documents/Partnership%20Committee%20Report%20-%20Transmission%20and%20Distribution%20System.pdf CASE and CAOC offer hundreds of courses and eleven certifications, including numerous courses on renewables and distributed renewables. For example, CAOC courses teach about net metering. Engineer Javier Chaparro Echevarria, PREPA Mayagüez regional administrator, approved by the State Office of Public Energy Policy (OEPPE) to teach courses on installation of Renewable Electrical Systems and Wind Turbines. One of those courses is CASE 340: Design and Installation of Photovoltaic Systems. Engineer Chaparro has also taught courses with the Colegio de Ingenieros de Puerto Rico (Puerto Rico Engineering Association).

[11] As envisioned by the Final Resolution and Order, paras. 78, 83, https://energia.pr.gov/wp-content/uploads/sites/7/2020/08/AP20180001-IRP-Final-Resolution-and-Order.pdf.

[12] Negociado de Energía en vivo, Evidentiary Hearing / CEPR-AP-2018-0001, YouTube (Feb. 4, 2020), https://youtu.be/-RXb0bf5ScY?t=13532.

5

AR_0004379

requires the IRP to include an evaluation of the conservation resources, including electricity demand management and the necessary programs to improve energy conservation. The Energy Bureau's consultant highlighted that: the initial $300M investment in energy efficiency would save $1B in avoided generation costs over the planning period, and the next $700M in energy efficiency spending would save an additional $1.8B in avoided generation costs over the planning period.[13]

PREPA must coordinate with stakeholders in designing a customer engagement plan "to educate citizens and electric power service customers on energy efficiency, consumption reduction, distributed generation strategies, and other available tools to empower consumers to have more control over their energy consumption," as required by Law 17-2019 Section 1.5(4)(b). In the approved IRP,[14] PREB determined that energy efficiency programs are always the least cost resource, and that the maximum level of EE deployment should be a core provision of an approved Preferred Resource Plan. Federal funds earmarked for these programs would allow for implementation needed, energy conservation and efficiency.

B. *Viability of rooftop solar, BESS, power electronics, and other alternatives*

Law 17-2019 directs PREPA to "maximize the use of renewable energy" and, at the same time, "aggressively reduce the use of fossil fuels" and "minimize[e] greenhouse gas emissions..."[15]

PREPA has announced that the first tranche of the renewable energy installations will be legacy power purchase and operation agreements for utility scale, land-based installations, often on agricultural land and/or ecologically sensitive areas. These projects would depend on the existing, vulnerable T&D system that failed after Hurricane Maria and has failed after every other major hurricane in the past 30 years.

The breakdown of energy consumption by group indicates that commercial and residential clients constitute the lion's share of energy demand in Puerto Rico while industrial clients barely consume about 13% of energy generation. The commercial sector consists of sprawling malls and other installations with expansive parking lots and rooftops that can be used to site solar arrays to power operations. Much residential construction in Puerto Rico consists of single-family housing developments known as urbanizations. They are especially expansive and prevalent in the San Juan metropolitan area and can provide the onsite "rooftop resource" referenced in the Department of Energy ("DOE") commissioned studies by faculty at the University of Puerto Rico at Mayaguez ("UPRM"), recommending widespread use of existing structures to site PV installations, which also coincides with the major energy demand center in Puerto Rico.

---

[13] Negociado de Energía en vivo, Evidentiary Hearing / CEPR-AP-2018-0001, YouTube (Feb. 6, 2020), https://youtu.be/HO40ImpqKe8?t=3669.

[14] Final Resolution and Order, paras. 634-635, https://energia.pr.gov/wp-content/uploads/sites/7/2020/08/AP20180001-IRP-Final-Resolution-and-Order.pdf.

[15] Law 17-2019 Section 1.5(6)(b), Section 1.11(d).

6

AR_0004380

Multiple studies have proven the resiliency of onsite photovoltaic and battery energy storage systems.[16] Renewables and BESS can serve critical loads and provide resilience. PREPA's contractor, Siemens Industry, ultimately acknowledged that renewable resources could be available immediately after a major event (e.g., hurricane, power outage). Therefore, Siemens' original assumption in the IRP that base fossil generation was indispensable was wrong.[17] Siemens's rebuttal testimony acknowledged that the June 2019 draft IRP did not recognize the full value of renewables, stating that solar panels could be certified to withstand major events, and therefore should have been considered to supply critical loads.[18] In December 2019, the Energy Bureau's Energy Storage Study confirmed that "thermal resources are not required to prevent loss of critical loads."[19]

The advantages of rooftop solar are many, they include the use of existing rooftops of sprawling housing and commercial developments to avoid further impacts to open spaces, agricultural land and ecologically sensitive areas. Rooftop and onsite solar eliminates the need for large investments in transmission infrastructure. It avoids transmission losses and vulnerabilities. Grid maintenance costs are reduced and impacts to forests ecosystems and vegetation as a result of tree cutting and pruning are minimized. The rooftop solar alternative does not require establishing extensive easements or servitudes on private property while helping to lower temperatures within the structures and providing protection to the buildings. Rooftop solar installations add value to the structures and promote local wealth. Distributed generation on rooftops creates greater reinvestment in the local economy than fossil fuel projects. It enables ratepayers to become producers or 'prosumers' of energy not mere consumers and allows for control by residents and local communities which is particularly important during outages of the main grid as was experienced after Hurricane Maria. Rooftop solar enjoys broad civil society support as opposed to utility scale, land-based installations. The advantages of using the "roof top resource" for photovoltaic energy systems also include avoiding the use of the large quantities of fresh and salt water required by fossil fuel combustion plants, reduction in the discharges of overheated thermal waters to water bodies, reduction of entrapment of marine species by the suction systems of fossil fuel plants, avoiding the impacts of spilled chemicals and other pollutants

---

[16] *See* National Renewable Energy Laboratory, Distributed Solar PV for Electricity System Electricity, Policy and Regulatory Considerations, https://www.nrel.gov/docs/fy15osti/62631.pdf (last visited Dec. 17, 2020); *See* Eliza Hotchkiss, How Solar PV Can Support Disaster Resiliency, https://www.nrel.gov/state-local-tribal/blog/posts/how-solar-pv-can-support-disaster-resiliency.html (last visited Dec. 17, 2020).

[17] In addition, Siemens did not take distributed storage into consideration. PREPA Response to the Third Discovery Request to PREPA from Local Environmental Organizations, ROI 3.56, p. 36 (Oct. 25, 2019). *See* Attachment 1.

[18] *See* PREPA's Mot. to Submit Corrected Rebuttal Test., Direct Test. of Nelson Bacalao, PH.D. at 7, (Jan. 20, 2020), https://energia.pr.gov/wp-content/uploads/sites/7/2020/01/Corrected-Rebuttal-Testimony-of-Nelson-Bacalao-PH.-D.-in-Support-of-PREPAs-Draft-Integrated-Resource-Plan-CEPR-AP-2018-0001.pdf.

[19] Puerto Rico Energy Bureau, Energy Storage Study For a Renewable and Resilient Island Grid for Puerto Rico at Section 6.1 (Dec. 19, 2019), filed in Dkt. NEPR-MI-2020-0002, https://energia.pr.gov/wp-content/uploads/sites/7/2020/01/NEPR-MI-2020-0002-Estudio-Sistemas-de-Almacenamiento-de-Energi%CC%81a.pdf.

7

AR_0004381

to marine species and vegetation, protection of public health due to a decrease in toxic emissions to air, water and land, decrease in greenhouse gases that promote climate change, among others.

PREB has recognized that renewables and especially distributed renewables have numerous benefits beyond just electric output, such as ancillary services,[20] resiliency benefits, and reduction of transmission and distribution system losses.[21] PREPA's Status Report in the IRP case also acknowledges that distributed renewables have benefits beyond electric output.[22] Rooftop and/or onsite solar coupled with BESS, EE and other programs could provide the resiliency that residents and businesses in Puerto Rico need to save lives. Therefore, we urge the government of Puerto Rico and federal agencies to earmark the FEMA funds for these types of alternatives.

During the technical hearings in the PREPA IRP process, multiple experts provided numerous recommendations that would immediately implement onsite renewables, storage, and energy efficiency programs, and achieve the transformation of Puerto Rico's electric grid to better serve the people of Puerto Rico. Federal funding afforded to PREPA should be earmarked for these types of programs. On the other hand, continued reliance on large, centralized power plants and long, vulnerable South-to-North transmission lines would not promote the resilience of the electricity grid to climate related and other disasters. Hurricane Maria and the seismic events of this year showed the importance of decentralizing the power network. A distributed generation system centered on onsite/rooftop solar will be more resilient and, after an emergency, will allow for prompt restoration of energy services, fulfilling the responsibility of saving lives.

These alternatives stand in stark contrast to the use of billions of dollars in federal taxpayer funds to rebuild and "harden" the existing T&D system and add more fossil fuel generation, especially so-called "natural" methane gas infrastructure. The federal government should work with PREPA to initiate a transparent process for acquisition or procurement of solar equipment and BESS to be installed, operated, and maintained by the dozens of PREPA employees who have been trained in renewable energy technology in conjunction with local contractors and organized communities. These types of investments would create jobs and have greater multiplier effects in the Puerto Rico economy.

As noted in the proposed CDBG-MIT Action Plan; "The advantage of renewables is that while they—like the existing PREPA grid—would require significant investment upfront, they would not have the exorbitant cost of purchasing and importing fuel for those power systems, year

---

[20] For example, frequency response, operating reserve, and reactive support. See Final Resolution and Order para. 862, pp. 268-269, https://energia.pr.gov/wp-content/uploads/sites/7/2020/08/AP20180001-IRP-Final-Resolution-and-Order.pdf.

[21] *Id.*

[22] PREPA's Status Report in the IRP case, at 6, recognizing "T&D system loss benefits for DG/storage bids" and "potential for additional resiliency benefits." See PREPA's Presentation of Status Report on the Development of PREPA's Draft Procurement Plan at p. 6 (Sept. 23, 2020), filed in Dkt. NEPR-AP-2018-0001, https://energia.pr.gov/wp-content/uploads/sites/7/2020/10/20200923-PRESENTATION-OF-STATUS-REPORT.pdf

AR_0004382

after year. Investment in renewable energy development could create stability not only in terms of reliable energy, but also jobs and environmental factors." (p.158).

The original government estimates for deployment of renewables indicated figures in the order of $4-6 Billion. In the Puerto Rico Disaster Recovery Plan, the Government of Puerto Rico requested $4.2B to $6.2B to increase solar energy generation.[23] The Government should reinstate the original $6 B for rooftop/onsite solar + storage, energy efficiency and similar programs.

While the proposed CDBG-MIT plan acknowledges the extensive damage to the power grid, i.e. transmission and distribution infrastructure as a result of the 2017 hurricanes and the "longer-term timeline on a comprehensive power system overhaul", HUD proposes to make a separate allocation of $1.93B for power grid repairs under a separate Federal Register notice and "has prohibited the use of CDBG-MIT funds for electrical system improvements or risk mitigation until the notice is released." Thus, erroneously underinvesting in rooftop and onsite solar as a first line of defense for Puerto Rico residents and businesses. The proposed "localized energy resilience measures", like rooftop or onsite solar and BESS are seriously underfunded.

Earmarking federal funds for the localized solar + storage through the public utility to carry out a transparent procedure for large scale acquisition of PV and BESS would serve three paramount purposes: 1-provide access to energy resiliency to the lowest income sectors of the population who would not be able to access loans, rebates or leases for solar + storage, 2-provide a uniform procedure through the public utility that would hasten the implementation of rooftop or onsite solar and storage installations and 3- break the cycle of disaster damage, reconstruction, and repeated damage of the vulnerable, centralized T&D system that so often interrupts life-saving electric service.

Rooftop and onsite solar and the other alternatives discussed above provide lifeline stability and strengthening. The investment in rooftop/onsite solar should align with the original estimates as eligible projects in the plan to "foster investment in lifeline infrastructure improvements while creating jobs." (p. 274). However, investment in utility-scale, land-based renewable energy projects implicate a continued reliance on the existing T&D system and would not provide the resiliency benefits of rooftop/onsite renewables and storage. Rooftop solar and BESS would provide "redundant, alternative, and independent power systems", because, as noted in the proposed CDBG-MIT plan; "Billions in federal funding have been expended on repairs yet Island-wide power outages continue to contribute to an unmet need for reliable power." (p. 281). This will continue to be the case because centralized generation and T&D largely carrying power from the large fossil fuel plants in the South to Northern Puerto Rico, primarily the San Juan

---

[23] *See* Transformation and Innovation in the Wake of Devastation: An Economic and Disaster Recovery Plan for Puerto Rico, pp. 297 & 318 (Aug. 8, 2018); https://reliefweb.int/sites/reliefweb.int/files/resources/pr-transformation-innovation-plan-congressional-submission-080818_0.pdf (last visited Dec. 17, 2020).

9

AR_0004383

metropolitan area will continue to be impacted by hurricanes and storms, floods, vegetation, wildlife and other hazards.

## THE NATIONAL ENVIRONMENTAL POLICY ACT AND THE REGULATORY FRAMEWORK

The National Environmental Policy Act ("NEPA") has two principal objectives: 1) The statute imposes an obligation on proponents to consider every significant aspect of the environmental impact of the proposed action; and 2) It ensures that an agency will inform the public that it adequately considered environmental concerns.[24] NEPA requires agencies to systematically address the environmental impacts of their decisions and prevent overvaluation of economic benefits and undervaluing environmental effects because they may be harder to quantify.

NEPA is a way to address interrelated effects of the actions of different agencies. NEPA mandates the use of all practicable means to foster and promote the general welfare and to create and maintain conditions under which humans and nature can exist in productive harmony.[25] In order to comply with NEPA, federal agencies must:

    A. Use a systematic, interdisciplinary approach to insure the integrated use of natural and social sciences and environmental criteria in decision-making.;

    B. Identify and develop methods to quantify environmental values so that they can be considered sufficiently along with economic and technical considerations; and

    C. Include an impact statement in every report on proposed legislation and other major Federal actions significantly affecting the quality of the human environment. An EIS must include a discussion of the: 1) environmental impact of the proposed action; 2) adverse environmental effects that cannot be avoided if the project is implemented; 3) alternatives to proposed action; 4) the relationship between local short-term uses of the environment and its maintenance and enhancement of long-term productivity; and 5) irreversible and irretrievable commitments of resources which would be involved. The lead agency must make the Environmental Impact Statement ("EIS") and comments made by other agencies available to the public.
. . .

    E. Study and describe alternatives to the courses of action in the proposal which involve unresolved conflicts on use of resources.
    42 U.S.C.A. § 4332.

NEPA prohibits segmentation of the environmental analysis of an agency action, agencies may not divide a large project into small actions which don't rise to the level of "significant."[26] The Council on Environmental Quality ("CEQ") requires that "connected actions" must be

---

[24] "The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process." 40 C.F.R. 1500.1(a).
[25] 40 C.F.R. 1500.1(a).
[26] *City of W. Chicago, Ill. v. U.S. Nuclear Regulatory Comm'n*, 701 F.2d 632, 650 (7th Cir. 1983).

10

AR_0004384

considered together in an EIS. 40 C.F.R. § 1501.3. Actions are "connected" if: i) they automatically trigger other actions which may require an EIS; ii) cannot or will not proceed unless other actions are taken previously or simultaneously; and iii) they are interdependent parts of a larger action and depend on the larger action for their justification.[27] A comprehensive EIS is necessary when several proposed actions that will have a reasonably foreseeable environmental trends and plan actions on an area are pending concurrently before an agency. 40. C.F.R. § 1502.15.

NEPA requires mitigation of environmental impacts uncovered in an EIS, See 40 CFR §1505.3. NEPA is a grant of authority to the agency "as a supplement to its existing authority" to protect the environmental "to the fullest extent possible". 40 CFR §1500.6.

The *NRDC v. Morton*[28] case involved the proposed leasing of submerged federal lands off the coast of Louisiana for oil and gas production. An EIS showed adverse environmental effects of the proposed leases, but the agency approved the transaction. NRDC argued that the agency was required to discuss environmental effects of the alternatives, but the agency argued that no such discussion was needed, only a statement of alternatives. The court held that section 102(2)(C) requires the agency to consider alternatives and evaluate the environmental impact of those alternatives. The court further held that agencies must provide information sufficient to permit a reasoned choice of alternatives and cannot disregard alternatives that don't offer a complete solution to the problem. And agencies must discuss alternatives even if they are outside the agency's authority or if they require legislative implementation.

Courts have voided projects where the agency failed to conduct the careful, coordinated safety and environmental impact review, with robust public participation, set forth by the National Environmental Policy Act. *See*, e.g., *W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1212 (D. Idaho 2018)(finding that the Bureau of Land Management's practices had violated NEPA public participation requirements, and that the preclusion of public participation was irreparable harm, sufficient to warrant a preliminary injunction.) In that case, the court granted relief necessary to "remedy for present purposes the harm and hardships caused by BLM's curtailment or preclusion of the opportunity for meaningful public participation. . . which on the present record appears to violate public participation requirements of ... NEPA." Id.[29]

---

[27] 40 C.F.R. 1501.9(e)(1).

[28] *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972).

[29] *See* also *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 80 (D.D.C. 2010) (partially vacating permit and remanding to agency for NEPA violation); *Humane Soc'y of the U.S. v. Johanns*, 520 F. Supp. 2d 8, 37 (D.D.C. 2007), citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("[V]acating a rule or action promulgated in violation of NEPA is the standard remedy."); *Pub. Emps. for Envtl. Responsibility v. U.S. Fish and Wildlife Service*, 189 F. Supp. 3d 1, 2 (D.D.C. 2016) (reviewing cases and finding vacatur is the standard remedy). If vacatur is an appropriate judicial remedy for a permit issued in violation of NEPA, an order to cease operations at a facility that started operations without any permit must also be an appropriate judicial remedy. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 2020 U.S. Dist. LEXIS 117866, *38, __ F. Supp. 3d __, (D.D.C. 2020) (vacating agency permit and ordering that oil pipeline be shut down for failure to comply with NEPA). Indeed, agency failure to follow the requirements of NEPA opens that agency to injunctive relief from a court. See *Realty Income Tr. v. Eckerd*, 564

11

AR_0004385

In the major federal action contemplated in the granting of a historic amount of funds, FEMA should be guided by its administrative procedure known as, "A Whole Community Approach to Emergency Management: Principles, Themes, and Pathways for Action".[30] The Whole Community approach enables residents, emergency management practitioners, community and social service organizations and other stakeholders to collectively understand and assess the needs of communities and determine the best ways to organize and strengthen assets, capacities, and interests to achieve societal security and resilience.

## THE ENDANGERED SPECIES ACT

Section 7(a)(2) of the Endangered Species Act requires that all federal agencies ensure that their actions "are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" their critical habitat. 16 U.S.C. § 1536(a)(2). Federal agencies are required to consult with the U.S. Fish and Wildlife Service (FWS) to ensure that the agency actions comply with the substantive mandates of section 7(a)(2). Id. The ESA's implementing regulations broadly define the scope of agency actions subject to the ESA section 7(a)(2) mandates to include the granting of licenses and permits. 50 C.F.R. § 402.02.

Under ESA Section 9, 16 U.S.C. § 1538(a)(1)(B), it is illegal for any person – whether a private or governmental entity – to "take" any endangered species of fish or wildlife listed under the ESA. By regulation, FWS has made the take prohibition applicable to threatened species. The § 7(a)(2) consultation process assists the action agency in discharging its duty to avoid jeopardy, and also affects the agency's obligation to avoid the take of listed species by providing an incidental take statement that shields the action from liability for take incidental to an otherwise lawful activity so long as that take does not jeopardize the species.

The proposed FEMA funding for the construction of multiple infrastructure projects will adversely affect listed species. Compliance with the procedural provisions of the ESA—making the determination of the effects of the action through the consultation process—is integral to compliance with the substantive requirements of the Act. Under this statutory framework, actions that "may affect" a listed species or critical habitat may not proceed unless and until the federal agency ensures, through completion of the consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat. 16 U.S.C. § 1536(a); 50 C.F.R. §§

---

F.2d 447, 456 (D.C. Cir. 1977) ("[W]hen an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance.").

[30] *See* A Whole Community Approach to Emergency Management: Principles, Themes, and Pathways for Action, FDOC 104-008-1 (December 2011), https://www.fema.gov/media-library-data/20130726-1813-25045-0649/whole_community_dec2011__2_.pdf (last visited Dec. 17, 2020).

12

AR_0004386

402.14, 402.13; see also 16 U.S.C. § 1536(d). FEMA may not permit any activity to move forward until valid consultation processes are complete for each of the species that may be affected.

Habitat degradation is probably the main trigger for the extinction wave currently being experienced. In addition to ESA requirements, as discussed above, NEPA regulations require federal agencies to study and, when required, disclose in an EIS, significant environmental impacts that may be caused by a federal action, and then "Use all practicable means" to "avoid or minimize any possible adverse effects of their actions upon the quality of the human environment" . . . "to the fullest extent possible." (40 CFR §1500.2). The multiple infrastructure projects to be funded by FEMA present a high risk of significant impacts to endangered species and the environment. The PEA, business as usual approach is what has led to the extinction of many species.

## COMMENTS TO FEMA PROGRAMMATIC ENVIRONMENTAL ASSESSMENT

I.    *The Programmatic Environmental Assessment fails to provide adequate detail of the work proposed.*

The PEA states that, "the electric grid includes 2,478 miles of transmission lines, 31,485 miles of overhead and underground distribution lines across the service territory, and 334 substations and transmission centers. (p.63). "All the 2,478 miles of transmission lines and remaining electrical grid infrastructure required survey and repair and 25 percent of all the structures were damaged and temporarily rebuilt" (p.73). Other sources point to 75% of T&D infrastructure damaged by Hurricane Maria.[31] The historic amount of FEMA funding and the proposed infrastructure work would be a massive undertaking, that would involve principally rebuilding, "hardening" and some undergrounding of the existing grid. The PEA presumably proposes to address the impacts of the proposed permanent work on the damaged structures and other infrastructure work. That is not explicitly stated in the PEA.

One of the main shortcomings of the PEA is the total failure to provide specific lists, descriptions, mapping or any other indication of the electric infrastructure grid work that is proposed in each area. The PEA contains generic references to rebuilding, replacement and relocation of multiple transmission and distribution towers, poles, lines, backup generators, substations and similar infrastructure that lacks any information as to the extent, magnitude, number of total miles and areas where the work would be carried out or the potential concentration of work in specific areas. For example, Hurricane Maria made landfall in the Municipality of Yabucoa but there is no information in the PEA that any area in particular, would experience more work projects and related impacts. The environmental impacts of the project alternatives in the PEA are significant, not conducive to mitigation to less than major and merit the preparation of an Environmental Impact Statement ("EIS"). A Finding of No Significant Impact (FONSI) would not

---

[31] The Puerto Rico Association/College of Engineers and Surveyors determined that the onslaught of Hurricane María in 2017 damaged 2,700 transmission towers and 75% of the distribution circuits. https://www.infraestructura2030.com/comisi%C3%B3n-de-energ%C3%ADa.

13

AR_0004387

adequately address the multiple significant environmental impacts of the extensive infrastructure work proposed.

The PEA contains alarming inaccuracies concerning the Puerto Rico electric system that range from the number of generation sites to percentages of fuels used. For example, the PEA erroneously states that; "Approximately 69% of PREPA's 5,839 megawatt (MW) generating capacity is from petroleum." (p. 63).

II. *The Programmatic Environmental Assessment fails to adequately consider alternatives to centralized fossil fuel power plants, which could lessen or eliminate the need for expensive transmission system projects.*

The principal flaw of the PEA is that it fails to consider viable alternatives to the rebuilding, "hardening" and undergrounding of the existing T&D system. Passing references in the PEA to onsite solar are inadequate as a discussion of onsite solar + storage as a full-blown alternative to centralized long-distance transmission and distribution of electric power. The PEA limits solar installations to backup power at conventional fossil-fueled facilities rather than discuss solar + storage as an alternative in its own right to transform the electric system and avoid the significant adverse impacts of rebuilding or relocation of the T&D system.

As noted in the PEA, "Under the Stafford Act, FEMA has authority to provide funding for cost-effective hazard mitigation and resiliency measures for facilities damaged by Hurricane Maria. Additionally, FEMA is authorized to provide funding to eligible grant Applicants for cost-effective activities that have the purpose of reducing or eliminating risks to life and property from hazards and their effects." (p.9). More specifically, FEMA may provide funds for "utility system restoration, replacement, upgrade, expansion, redesign, or relocation that can contribute to reducing the potential for future damages." (p.9). The PEA indicates that it includes projects for; "supplemental power generation, transmission, and distribution facilities, including, but not limited to, wind turbines, solar farms, generators, substations, and power lines; natural gas transmission and distribution facilities"." (p.11), among others. Clearly, FEMA has the authority to fund onsite or rooftop solar + storage in a way that redesigns and relocates facilities to reduce risks to life from lack of electric service stemming from downed power lines as occurred after Hurricane Maria.

The PEA is contradictory as to additional capacity in the electric system that would result from the proposed work, on the one hand referencing "utility retrofits to accommodate greater capacity" (p.25) and subsequently alleging that " Due to limiting capacity to pre-Hurricane Maria levels, there would be no additional long-term energy demands on the Commonwealth's utility networks." (p.63).

New power generation would include the installation of "combined heat and power systems, rooftop solar, fossil fuel powered standby generators, battery storage, and building energy management systems" and "Associated actions will involve the construction of on-site fuel

14

AR_0004388

storage, installation of transmission and distribution lines, and construction of substations or switch stations." (p.16). The mere reference to different alternatives does not satisfy NEPA requirements. The agency must discuss, explain and provide public information of each alternative. Installation of redundant power sources, including onsite stand-by generation could involve new fuel sources such as highly flammable Liquified "Natural" Gas ("LNG") which would need to be revaporized prior to combustion for power generation.

The references in the PEA to back-up power generation equipment that might decrease air emissions fails to acknowledge that renewables would avoid air pollution and emissions altogether as well as fossil fuel dependency. The benefits of renewables are not discussed as an alternative that would not simply reduce emissions but eliminate air pollution altogether. The proposed fossil fuel generation does not contribute to achieving the renewable energy mandate in the Puerto Rico Climate Change Mitigation Adaptation and Resilience Act or the Energy Public Policy Act. PEA alternatives 2 and 3 are contrary to local law because they will impede or delay the distributed renewable energy goals of Law 17-2019 and the recently approved IRP. Consideration of alternatives must comply with both federal and local law. The viability of alternatives other than those listed in the PEA has been determined in the IRP and local law and must therefore be considered by FEMA in the corresponding environmental document. This PEA fails to address this issue.

The PEA is a highly biased document which cannot serve the purpose of excluding the preparation of an EIS. It not only excludes other viable alternatives as described above, but also fails to consider the environmental effects of the preferred and/ or considered alternatives. Some of those consequences are discussed in Parts I-VIII of these comments. The FEMA funding proposed in the PEA (page 9) is a major Federal action significantly affecting the quality of the environment. Among those effects are the significant negative environmental justice consequences of delaying or eliminating renewable distributed energy options.

The PEA incorporates a faulty procedural approach, a haphazard scheme for the environmental analysis for the vast array of infrastructure work proposed; "In accordance with the procedures documented in Section 1 for implementing this PEA, utility projects that constitute a more substantive action such as a new sewer treatment facility may require a supplement (sic) analysis and a SEA to fully comply with NEPA. For all Action Alternatives, a tiered EA or separate NEPA process may be required if an action's impacts on any resource cannot be mitigated to less than major impacts according to the scale in Section 5. Construction areas, including cleared staging areas and access roads that are greater than five acres for previously disturbed areas that require minimal clearing and up to two acres for undeveloped land requiring clearing, grubbing, or ground disturbance, would be considered on a case-by-case basis to avoid any major impacts to sensitive resources. If a proposed project exceeds the geographical constraints considered for this PEA, it can be evaluated by a FEMA approved specialist for the purpose of determining if its impacts are in alignment with what has been determined herein or if additional NEPA documentation is required." (p. 11). This supplemental analysis and tiered EA scheme is

15

AR_0004389

problematic and doesn't comply with NEPA for a number of reasons: 1-It promotes segmentation of the environmental analysis; 2-Environmental review and consultation with relevant agencies is left entirely within FEMA's discretion; 3-Public access to information is piecemeal and unduly limited; and 4-Public input and informed participation is undercut by the staggered administrative process. Allowing such broad agency procedural discretion would effectively negate an integral environmental analysis and cancel out public input.

The PEA is highly biased and skewed towards replicating the existing centralized T&D system and should not be allowed to block the preparation of an EIS. It not only excludes viable alternatives described in these comments but fails to consider the environmental effects of the preferred and/ or considered alternatives. Some of those consequences are discussed here in Parts I-VI. It must be concluded that the grant funding considered in the PEA (page 9) is a major Federal action significantly affecting the quality of the environment. Among those effects are the inevitable negative environmental justice consequences of delaying or eliminating renewable distributed energy options.

*The extent of the electric infrastructure work proposed requires the preparation of an EIS.*

The proposed work includes upgrading or rebuilding up to 20 linear miles of pipeline, transmission, or distribution lines per area. Nowhere does the PEA indicate the areas where this extensive work would take place and whether some areas would be more impacted than others. Potential impacts would not be limited to land. According to PREPA, utility poles are installed between 5 and 14 feet below land surface (PREPA 2000). Water tables can be impacted by such excavations at new sites and even at previously impacted sites. Similarly, the installation of underground power lines will undoubtedly have significant environmental impacts. Flooding is by far, the most prevalent source of disaster damage in Puerto Rico according to the proposed CDBG-MIT plan. Undergrounding of infrastructure may aggravate flooding, impact water courses and resources and expose infrastructure to water damage.

Infrastructure realignment or relocation outside existing Rights of Way ("ROWs") will be determined "according to the needs of Subapplicant and engineering recommendations may involve relocation of utilities up to 200 feet from an existing ROW" and "FEMA will evaluate to determine if greater distances are consistent with this PEA on a case-by-case basis." (p.15). Realignment of pipelines or electric powerlines could extend for up to 10 miles. The PEA fails to specify the magnitude and extent of projects that "require replacement or relocation of contiguous portions of the utility to mitigate risk and restore infrastructure." (p.17). Relocation of utilities at greater distances from an existing ROW, could encroach on fence line communities and the environmental impacts could also be significant.

16

AR_0004390

*The Programmatic Environmental Assessment fails to adequately consider impacts to air, water, species habitats, farmland, and flooding risks.*

The PEA fails to consider that the rate of decline of agricultural land in Puerto Rico has accelerated in the most recent period evaluated.[32] In the last five-year period evaluated, agricultural land in Puerto Rico has decreased from 584,987 cuerdas in 2012 to 487,774 cuerdas in 2017 representing a loss of 17%, or an annual average loss of 16,202 cuerdas.[33]

The PEA acknowledges that the projects may involve "changes to topography" but fails to discuss how topographical alterations impact superficial and ground water flows, flood levels and sedimentation of water courses.

The current operations of PREPA's large, centralized fossil fuel powerplants are causing exceedances of the National Ambient Air Quality Standards ("NAAQS"), harming the health of the communities near these plants.[34] According to the PEA, the proposed additional fossil fuel generation would not help to achieve $PM_{10}$ attainment in the municipality of Guaynabo and would have a "negligible impact on SOx for the municipalities of Bayamon, Catãno, Guaynabo, Salinas, San Juan, and Toa Baja". (p.25). The proposed additional fossil fuel generation would impose even more air-polluting emissions and impacts on these communities, whereas customer-sited rooftop solar + storage would remove these impacts. The PEA does not specify which projects or even how many projects involve the permanent installation of generators and would require additional permitting from PREQB and additional studies, a tiered EA or stand-alone EA if emissions exceed NAAQS levels.

Furthermore, the PEA fails to specify the extent and magnitude of "utility retrofits to accommodate greater capacity" (p.25) which would not only increase short-term minor emissions but may exceed NAAQS. These issues are ripe for review now, so a subsequent tiered EA or stand-alone EA for any exceedances of NAAQS would not comply with NEPA.[35] The Puerto Rico Climate Change Mitigation Adaptation and Resilience Act mandates 20% renewable generation by 2022. This requires that all new industrial equipment not merely meet current efficiency standards but rather that the equipment eliminate or decrease emissions.

The PEA fails to acknowledge that noise from realignment or relocation of utilities could impact communities with long-term noise effects.

The PEA notes the significant adverse impacts to water resources from the four thermoelectric power plants that use large amounts of saline (seawater) for cooling, "The instream

---

[32] See Attachment 2, Dr. David Sotomayor's *Informe sobre el impacto de la construcción y operación del proyecto Montalva Solar Farm en la zona de la Reserva Agrícola del Valle de Lajas,* October 2020, Montalva Solar Project Environmental Impact Assessment Draft comments, Docket 2020-314865-REA-004636.

[33] 2017 Census by State - Puerto Rico | 2017 Census of Agriculture | USDA/NASS, https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Outlying_Areas/Puerto_Rico/prv1.pdf.

[34] See Attachment 3, October 2019 Testimony of Dan Gutman, Puerto Rico Energy Bureau Docket CEPR-AP-2018-0001.

[35] 40 C.F.R. § 93.158, 40 C.F.R. § 1501.11.

17

AR_0004391

saline withdrawals totaled 2,262 Mgal/d (8,562.6 Ml/d) (Molina-Rivera 2010)" but fails to acknowledge that rebuilding the T&D system will perpetuate these impacts.

The PEA's allegation that, "relocating utilities within a new or expanded ROW would have similar impacts and mitigation measures as those described for Alternative 2" (p.31) and "may have a negligible to minor direct or indirect on impact water resources, including wetlands and waterways; but would have mitigation through Section 401 and Section 404 permitting" (p. 32) is wholly unsubstantiated. The extent of the damages including flow impediment and other adverse impacts to stream and floodplain hydraulics and function cannot be characterized as "moderate". Relocation of utilities in El Yunque National Forest or a Wild and Scenic River and other sensitive ecologic areas require the preparation of an EIS. The sheer magnitude of potential relocation work mandates an EIS.

The PEA erroneously assumes that the implementation of subsequent hydrologic analyses and mitigation measures can avoid the need to discuss significant environmental impacts. The PEA fails to first determine, as a threshold matter whether the projects would have significant impacts. FEMA must specify the number, location, magnitude and extent of projects that will impact wetlands, streams, and other Waters of the United States ("WOTUS"). As these water impacts are ripe for review now, subsequent tiered review would not comply with NEPA standards.[36] The PEA acknowledges that, "certain sites could result in some fill placed within the wetland boundaries during construction" and proposes that, "Where individual projects may impact wetlands, streams, or WOTUS, FEMA would consider further tiered review". (p.34). It is not difficult to envision a scenario where various "individual projects" in the same area could cause significant adverse impacts.

The PEA erroneously and repeatedly alleges that the, "process of relocating utilities within a new or expanded ROW would have the same impacts and mitigation measures as those described for Alternative 2". (p.34). Similarly, the allegation that expanding a ROW including embankment and in-water work that may impact wetlands will have "minor short-term direct or indirect impacts on wetlands" (p.34). lacks credibility and is not remedied by subsequent Section 401 and Section 404 permitting because there would be no previous determination of whether the impacts are significant, can't be mitigated and should be avoided altogether.

The PEA acknowledges that, "some utilities are location-dependent and potentially located within a floodplain, the scope of work of this alternative may have impacts to floodplains. Construction of utilities may result in alteration of the course or magnitude of floodwater." (p.35). Yet nowhere in the PEA is there even an attempt to identify the proposed areas where the utilities would be sited and to determine whether the work proposed would have significant adverse environmental impacts or a discussion of alternatives.

---

[36] 40 C.F.R. § 1501.11.

AR_0004392

The PEA asserts that in cases where the proposed changes to utility infrastructure will impact the floodplain/floodway, "FEMA will apply the 8-Step Process to assess potential impacts and practicable alternatives" and that, "Projects may require a hydrology and hydraulics report to evaluate changes to stream hydraulics in detail and compliance with local ordinance." (p.35). The PEA contains totally unsubstantiated allegations that utility work and changes within floodplains would have "minor impact". If the impacts are significant, an EIS is required.

The PEA fails to substantiate the conclusion that sites that result in additional impervious surfaces with indirect long-term impacts, would only have "minor impacts on floodplains and floodways". (p.36). FEMA should list, describe and map projects in the V-zone or projects that have the potential to increase flood elevations in an EIS, not "on a case-by-case basis to determine whether this PEA applies".

Rooftop solar + storage avoids impacts to floodplains that would be exacerbated by rebuilding utilities with increased footprints resulting in additional impervious area or trenching for placement of underground utilities, potentially impacting nearby floodplains on a long-term or permanent basis. The evaluation of each project using the FIRM panels should be part of the requisite EIS.

It is imperative that FEMA list and map the proposed projects that increase flood elevations to determine the potential significant adverse impacts in each area. A case-by-case or a project by project view, as proposed in the PEA is wholly inadequate.

The PEA erroneously concludes that the proposed work will have, "short-term and long-term negligible to minor adverse impacts to the Coastal Zone Management Area ("CZMA"), associated with upgrading systems that require additional acreage beyond what these systems currently occupy" (p.39), without specifying the specific area or the amount of additional acreage in the CZMA. The October 3, 2018 Federal Consistency Resolution Certificate cannot be used to avoid a NEPA mandated analysis of significant adverse impacts. FEMA acknowledges that realignment or relocation of utilities, will have adverse long-term impacts within the CZMA but rather than determine the extent of the impacts through an EIS, the agency proposes coordination with PRDNER and PRPB at some later time and "limit impacts to the extent possible". (p.39). A determination of the extent and magnitude of the projects in the CZMA that allows for public information and participation is required.

Proposed mitigation of impacts through permit requirements and Best Management Practices ("BMPs") for vegetation clearing would not be beneficial in the case of old growth forests, ecologically sensitive areas, and other ecosystems even with implementation of an approved SWPPP. FEMA must list and map the natural areas that will be impacted and prepare an EIS to analyze significant impacts.

The PEA is ambiguous as to how vegetation impacts will be addressed stating that, "the area would either revegetate on its own or be re-vegetated in accordance with the applicable

19

AR_0004393

permits and SWPPP." (p.40). While acknowledging that, "Deforestation and vegetation clearing exposes areas to invasive species. Relocation of utilities and corresponding ROWs into previously undeveloped areas may cause impacts to additional acreage of vegetation." FEMA cannot exclude public input by subsequently determining that when, "biological impacts are greater than what this PEA includes, FEMA will review those projects on a case-by-case basis to determine appropriate level of NEPA analysis." (p.40). The subsequent, case by case approach shuts out informed public participation. NEPA requires consideration of significant environmental impacts of federal agency actions prior to proceeding.

The PEA provides no  basis for the allegation that utility projects in, on, or over land, streams, and reservoirs, embankments and in-water work "would likely result in adverse short-term negligible to minor impacts to the habitat during construction activities", (p.43) and fails to address significant adverse impacts to habitat, wildlife and fish.

Rather than speculate that, "at the programmatic level; the expectation is that landscaped or managed vegetation would occur within the disturbed footprint of many project areas", (p.46). FEMA should determine, list and map the sensitive biological resources in the project areas. FEMA's proposed review of projects for the potential occurrence of threatened and endangered species ("T&E") species and designated critical habitat ("DCH") in the area should be included in an EIS.  Attempts to minimize impacts to T&E Species and DCH through the National Pollutant Discharge Elimination System ("NPDES") permitting program and implementation of a SWPPP might not mitigate significant adverse impacts that could have been determined in an EIS.

Allegations in the PEA that realignment or relocation of utilities and corresponding ROWs on undisturbed lands would "have an adverse negligible to minor short-term and long-term impact on the federally-listed endangered, threatened, and proposed or candidate species and their DCH" (p.47). are not credible in the absence of indication of the specific sites.

Each project's scope of work should be included in an EIS to determine potential significant adverse impacts to historic or prehistoric or paleontological archeological resources. The Allowances in the Second Amendment Programmatic Agreement with the Puerto Rico State Historic Preservation Office ("SHPO") executed on November 13, 2019 (FEMA-Puerto Rico SHPO Programmatic Agreement for Section 106 Review, May 2016, Amended April 2018) cannot be used as a subterfuge to avoid NEPA analysis of significant adverse impacts on historic or prehistoric or paleontological archeological resources. The PEA acknowledges that, "Destruction or alteration of any site, structure, or object of prehistoric or paleontological importance may occur during construction. (p.52). A subsequent Section106 review process and consultation with the SHPO and "appropriate consulting parties" will not comply with NEPA standards.

20

AR_0004394

JA_414

*IV.* *The Programmatic Environmental Assessment fails to include adequate public participation measures, especially concerning impacts to environmental justice communities.*

Effective public participation requires specific information about realignment in farmland. It is wholly inadequate if FEMA has discretion to "consult with USDA NRCS to avoid, minimize, or mitigate the impacts" (p.21) but does not discuss the potential significant adverse impacts in a public-facing document. The assertion in the PEA that relocation of a utility "would have a minor impact on geology and soils, negligible to minor impacts on prime or important farmland, and no impacts on seismicity" (p.21) is unfounded.

The PEA fails to describe the major projects to be carried out and how they would impact EJ communities. Rebuilding and hardening the existing T&D system would perpetuate South to North transmission and central station fossil fuel plants in Southern Puerto Rico thus cementing air, water and land pollution that have significant impacts on EJ communities and would continue to disproportionately and adversely affect these low income and afro descendent populations.

The PEA indicates that the public information process would include "targeted outreach to environmental justice populations through notices to community organizations." (p.79). Yet, no known environmental justice organizations were contacted or notified of the PEA or the comment period.

As noted in the PEA, Community of Concern ("COC") encompasses any Environmental Justice community that may be disproportionately impacted or overburdened by an action alternative. In Puerto Rico, air quality, commercial and industrial facilities, and land use are considered when analyzing compliance with the Executive Order on Environmental Justice. (E.O. 12,898). The PEA is contradictory, on the one hand erroneously concluding that the percentage of households below the poverty level does not vary a great deal across municipalities or towns in Puerto Rico and subsequently acknowledging variations in racial makeup, income levels, and poverty rates within Puerto Rico. While noting that, "the southeast Municipalities near Arroyo and Yabucoa generally have a higher percentage of black Hispanic population than many other Municipalities", (p.55). The PEA fails to document the high numbers of afro descendant population in Guayama, Salinas and other municipalities where the most contaminating electric power plants are located.[37] The PEA fails to consider the rooftop/onsite solar + storage alternative that could have positive, enduring multiplier effects in EJ communities, the local economy and employment rates as documented in a recent study.[38] The PEA erroneously claims that, "data does not exist to support a claim that the existing level of utility service is causing widespread losses of

---

[37] U.S. Census Bureau, Quickfacts for Puerto Rico; Municipality of Salinas, (last visited on Dec. 17, 2020). https://www.census.gov/quickfacts/fact/table/PR,salinasmunicipiopuertorico/PST045219.
[38] The Solar Found., Puerto Rico Solar Jobs in 2050, (2020) https://www.thesolarfoundation.org/wp-content/uploads/2020/09/PRSolarJobs.pdf.

21

AR_0004395

employment and reduced access to health services." (p.55). As noted above, the lack of electric service was linked to hundreds of deaths in the aftermath of Hurricane Maria. [39]

The PEA contains an inadequate discussion of risks to public health and safety. The characterization of social infrastructure facilities in the PEA is limited to emergency services, schools, and hospitals and omits critical government services. The PEA erroneously equates hardening of the T&D system with resilience. Rooftop and onsite solar provides greater resilience than long distance transmission of energy, particularly South to North transmission. Hardening the existing T&D system would not necessarily make it more reliable "against future disasters". As noted in the first section of these comments, the existing T&D system is inherently vulnerable to hurricanes, storms, vegetation growth and many other hazards. Onsite or rooftop renewable energy generation would provide greater resiliency. Based on the status of Puerto Rico's utility networks, onsite/rooftop solar + storage would result in long-term benefits to the health and safety of Puerto Rico's communities. *The Programmatic Environmental Assessment fails to adequately consider resiliency concerns.* The PEA references recent earthquakes and aftershocks but fails to discuss how seismic activity could impact proposed infrastructure, including impacts to large scale utility solar projects.[40]

Relocation of utilities could have potential significant adverse long-term impacts to public health and safety, particularly the relocation of new fossil generation. The implementation of current codes and standards in proposed work does not rule out the potential for significant adverse or cumulative impacts.

> V.   *The Programmatic Environmental Assessment fails to adequately consider the negative effects of Liquefied Natural Gas facilities.*

The PEA proposes converting generation facilities from diesel to "Natural" (Methane) Gas which in its liquid state is a highly flammable material that may pose a hazard to human health and the environment. Burning LNG at multiple facilities throughout Puerto Rico would increase public health risks. Methane gas combustion also emits increased Volatile Organic Compounds (VOCs) such as formaldehyde, benzene, toluene, hexane, and styrene.[41] Renewables avoid the multiple public health and safety risks of fossil fuel combustion including those discussed in the PEA such as fuel releases that increase during disasters. Renewables avoid investments in

---

[39] Dreisbach, *supra* 7.
[40] See, Attachment 4, Dr. José Molinelli Freytes's report: Deficiencias en el análisis de los impactos geológicos encontrados en la Declaración de Impacto Ambiental del proyecto "Montalva Solar Farm – Guánica – Lajas (Borrador – DIA), October 2020, Montalva Solar Project Environmental Impact Assessment Draft comments, Docket 2020-314865-REA-004636.
[41] Pediatric Environmental Health Specialty Unit (PEHSU), Mount Sinai Medical School, Comments on Draft Aguirre Offshore Gasport Environmental Impact Statement, FERC Dkt. No. CP13-193, at 1-2., in Responses to Comments on the Draft Environmental Impact Statement (document pages CO-65 & CO-66) (Sept. 9, 2014), https://www.energy.gov/sites/prod/files/2015/02/f20/EIS-0511-FEIS-Volume2-Part2-2015.pdf.

22

AR_0004396

secondary containment to prevent releases to the environment from aboveground and underground storage tanks.

The PEA or future EIS must also address the likely upstream and downstream impacts of LNG, including on fracking of natural gas and climate change. The most catastrophic environmental impact of all would be the prolonging of the fossil fuel era with huge LNG investments in North America and worldwide instead of directing those investments to renewable energy resources.

For both an EA or an EIS, the purposes of NEPA require the agency to "consider and disclose" the environmental effects of the actions it certifies. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 96 (1983). So long as the agency takes a "hard look" at the environmental consequences, NEPA "does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA's "hard look" requires "discussion of the 'significance' of [an] indirect effect, see 40 C.F.R. § 1502.16(b) (2018), as well as 'the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.'" *Sierra Club*, 867 F.3d at 1374 (internal citation omitted).

Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[42] An environmental impact is reasonably foreseeable "if it is 'sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.'" *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003) (internal citations omitted). Implicit in this requirement to analyze foreseeable effects is a duty to engage in "reasonable forecasting." *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973). However, here, FEMA failed to account for the context and intensity of the upstream and downstream emissions impacts resulting from the activities proposed in the PEA.[43]

The indirect effects inquiry is wide-ranging. Specifically, under this standard, courts have required federal agencies to consider the indirect effects of energy-related transportation projects. In Mid States, for example, because a new rail line provided a more direct route from coal mines to power plants, the court held that NEPA required the Surface Transportation Board to consider the downstream impacts of burning the coal. *Mid States*, 345 F.3d at 549 ("[I]t is reasonably foreseeable – indeed, it is almost certainly true – that the proposed project will increase the long-term demand for coal and any adverse effects that result from burning coal."); see also *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1030 (S.D. Cal. 2003) (air quality impacts of Mexican power plant that would export electricity to the United States over new transmission line were reasonably foreseeable result of constructing transmission line).

---

[42] 40 C.F.R. § 1508.8(b); see New York v. Nuclear Regulatory Comm'n, 681 F.3d 471, 476 (D.C. Cir. 2012).
[43] 40 C.F.R. § 1508.27.

23

AR_0004397

Accordingly, "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).

The D.C. Circuit recently ruled in *Sierra Club v. FERC*, 867 F.3d 1357, 1371-1372 (D.C. Cir. 2017), that NEPA required the Federal Energy Regulatory Commission to consider the indirect but reasonably foreseeable impacts of natural gas pipelines which included the downstream greenhouse gas emissions resulting from burning of gas transported by the pipeline in its NEPA review. Although the Commission had claimed that it lacked information regarding the amount of gas that would be burned downstream, the Court found that the agency could "make educated assumptions" about use of gas based on its knowledge of the general capacity of the pipeline. *Sierra Club* at 1374.

Applying *Sierra Club*, federal district courts in other jurisdictions reached similar results. For example, in *San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227 (D.N.M. 2018), the court rejected BLM's claim that "consumption is not 'an indirect effect of oil and gas production because production is not a proximate cause of GHG emissions resulting from consumption'." *Id.* at 1242. Instead, the court ruled that BLM's "statement is circular and worded as though it is a legal conclusion…[and] it is contrary to the reasoning in several persuasive cases that have determined that combustion emissions are an indirect effect of an agency's decision to extract those natural resources." *Id.*; see also *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt.*, No. CV 16-21-GF-BMM, 2018 WL 1475470, *13 (D. Mont. Mar. 26, 2018), appeal dismissed, No. 18-35836, 2019 WL 141346 (9th Cir. Jan. 2, 2019) (finding that NEPA requires consideration of environmental consequences of the downstream combustion of the coal, oil and gas resources potentially open to development under agency plan within the NEPA document).

In *San Juan*, the court continued that "it is erroneous to fail to consider, at the earliest feasible stage, 'the environmental consequences of the downstream combustion of the coal, oil and gas resources potentially open to development' under the proposed agency action." *San Juan*, 326 F. Supp. 3d at 1244. Accordingly, the court found that BLM's action was "arbitrary" due to its failure to estimate the amount of greenhouse gas emissions which will result from consumption of the oil and gas produced as a result of the development of wells in the leased areas. *Id.*; see also *Montana Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1097-99 (D. Mont. 2017), amended in part, adhered to in part sub nom. *Montana Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, No. CV 15-106-M-DWM, 2017 WL 5047901 (D. Mont. Nov. 3, 2017); *Dine Citizens Against Ruining Our Env't v. U.S. Office of Surface Mine Reclamation and Enforcement*, 82 F. Supp. 3d 1201, 1213 (D. Colo. 2015), *Dine Citzens Against Ruining our Env't v. U.S. Office of Surface Mining Reclamation & Env't*, 643 F. App'x 799 (10th Cir. 2016).

VI.   *The Programmatic Environmental Assessment fails to consider the cumulative effect of all potential impacts.*

24

AR_0004398

The projects proposed in the PEA are a prime example of how cumulative impacts can result from individual actions over a period. Taken together, various projects in a single area could add incremental cumulative impacts to past and foreseeable future actions. Although the PEA acknowledges that, "The scale of those impacts would depend on the number of projects implemented, the size of the projects, and locality and proximity of the projects" (p.73), no attempt is made to list, describe and pinpoint projects that may overburden specific areas. The cumulative impacts in this case stem from the presumed number of projects proposed such as the large number of transmission and distribution towers, poles and lines and new fossil generation. Although section 5.18.1 of the PEA references the 2,478 miles of transmission lines that required survey and repair and that 25 percent of all the structures were damaged and temporarily rebuilt, the PEA does not specify how many miles of T&D infrastructure would be hardened, undergrounded or otherwise worked on.

Similarly, the PEA states that the USACE installed over 2,300 electric emergency generators in Puerto Rico as part of the recovery efforts (GAO 2018) but does not speak to the siting, capacity or any other detail of the proposed new generation. The environmental analysis in this case should include the joint projects generally referenced in the PEA. The PEA references the magnitude of impacts "described in this PEA" but contains no such description. No basis is provided for the allegation that the Action Alternatives in the PEA "would not result in major cumulative impacts". FEMA funding will enable relocation and numerous actions that involve infrastructure. Impacts can vary widely even for projects that are similar in function, size, and locality to existing systems. For example, emissions, noise, water requirements, fuel storage and processing vary significantly by type of generation.

The cumulative impacts of temporary repairs vary substantially from more permanent arrangements such as undergrounding. Contrary to the allegations in the PEA that, "the initial installation and temporary restoration of the projects on the human environment have already occurred prior to and after Hurricane Maria." (p.74) undergrounding would cause significant adverse impacts to land and potentially water resources. Although the extended timeframe (which is not specified in the PEA) may allow for staggering the projects, cumulative impacts can stem from past, present and foreseeable future work. The PEA acknowledges that multiple simultaneous utility projects within the same watershed will have a cumulative impact to vegetation, water quality, and soil could but for some unspecified reason, FEMA erroneously assumes "that cumulative impacts from the utility projects covered under this PEA would be short-term and less than major." (p.75). In sum, the PEA fails to consider the cumulative impacts of the infrastructure projects.

## CONCLUSION

The extensive infrastructure work proposed in the PEA will undoubtedly entail significant adverse environmental impacts. The PEA does not comply with NEPA and the rulemaking process under the APA. The magnitude of the projects and the significant impacts that the FEMA funding

25

AR_0004399

would facilitate, along with the lack of specificity in the PEA regarding the projects that would be developed, impedes an adequate and objective analysis of impacts and alternatives. A programmatic environmental impact statement that discusses alternatives such as onsite, rooftop solar coupled with battery energy storage systems instead of rebuilding the existing electric transmission and distribution system is required.

We therefore respectfully request that FEMA not approve the PEA or issue a FONSI, but rather, draft a full Environmental Impact Statement to correct the inadequacies and legal errors in the environmental analysis for the extensive projects proposed and reconsider its conclusions on the basis of the corrected information.

Please feel free to contact us with any questions.

Sincerely,

*s/ Ruth Santiago*
RUTH SANTIAGO
RUA Núm. 8589
Apartado 518
Salinas, Puerto Rico 00751
Tel. (787) 312-2223
rstgo@gmail.com

*s/ Pedro Saadé*
PEDRO J. SAADÉ LLORÉNS
Colegiado Núm. 5452
(RUA Núm. 4182)
Calle Condado 605, Oficina 611
San Juan, Puerto Rico 00907
Tel. & Fax (787) 948-4142
pedrosaade5@gmail.com

26

AR_0004400

# Build Back Better:
# Reimagining and Strengthening the Power Grid of Puerto Rico

December 2017



Prepared for:

Governor Andrew Cuomo, New York
Governor Ricardo Rosselló, Puerto Rico
William Long, Administrator FEMA

Submitted by:

New York Power Authority, Puerto Rico Electric Power Authority, Puerto Rico Energy Commission, Consolidated Edison Company of New York, Inc., Edison International, Electric Power Research Institute, Long Island Power Authority, Smart Electric Power Alliance, US Department of Energy, Brookhaven National Laboratory, National Renewable Energy Laboratory, Pacific Northwest National Laboratory, Grid Modernization Lab Consortium, and PSEG Long Island, an agent for and on behalf of the Long Island Lighting Company d/b/a LIPA, and Navigant Consulting, Inc.

AR_0008376

December 11, 2017

**Honorable Governors Andrew Cuomo of New York and Ricardo Rosselló of Puerto Rico,**

Thank you for your leadership in convening the Puerto Rico Energy Resiliency Working Group. On behalf of the Working Group, I am presenting the enclosed report *"Build Back Better: Reimagining and Strengthening the Power Grid of Puerto Rico."* As you will read, this report provides an assessment of the electric power system storm damage caused by hurricanes Maria and Irma, describes a new system design basis, and proposes redesign and rebuild recommendations for strengthening the power grid of Puerto Rico.

The Working Group included the following representatives: New York Power Authority, Puerto Rico Electric Power Authority, Puerto Rico Energy Commission, Consolidated Edison Company of New York, Inc., Edison International, Electric Power Research Institute, Long Island Power Authority, Smart Electric Power Alliance , U.S. Department of Energy, Brookhaven National Laboratory, National Renewable Energy Laboratory, Grid Modernization Lab Consortium, Pacific Northwest National Lab and PSEG Long Island, an agent for and on behalf of the Long Island Lighting Company d/b/a LIPA.

Steering Committee Principals:

| | | |
|---|---|---|
| Gil Quiniones | President and Chief Executive Officer | New York Power Authority |
| John McAvoy | Chairman and Chief Executive Officer | Consolidated Edison Company of New York, Inc. |
| Pedro Pizarro | President and Chief Executive Officer | Edison International and Electric Power Research Institute |
| Tom Falcone | Chief Executive Officer | Long Island Power Authority |
| Bruce Walker | Assistant Secretary, Office of Electricity Delivery and Energy Reliability | Department of Energy |
| Julia Hamm | President and Chief Executive Officer | Smart Electric Power Alliance |
| Nisha Desai | Board Member | Puerto Rico Electric Power Authority |

Our overriding goal is to support the Puerto Rico Governor's Office, PREPA, interested stakeholder agencies, and the Federal Emergency Management Agency in defining first level funding requirements and electric power system rebuild recommendations. Our analysis and recommendations are based on the direct participation, experience, and expertise of the members of the Working Group, many of whom have been working in Puerto Rico alongside Puerto Rico Power Authority personnel to assess the damage to the island's generation, transmission and distribution assets. The *Build Back Better* recommendations are guided by our collective experience with power system recovery, rebuilding, and hardening, as we grappled with hurricanes that have hit the US mainland.

The Working Group offers a roadmap outlining short-term, mid-term and longer-term actions to implement resiliency and hardening measures that are designed to increase the capability of Puerto Rico's electric power grid to withstand future storms. The recommendations include the modernization of the Puerto Rico electric grid, leveraging proven power system technologies to better contain outages, reduce recovery times, lower operation costs, and enable more sustainable energy resources that will reduce reliance on imported fuel. Additionally, we are recommending the use of increased renewable energy resources, such as wind and solar and incorporating new distributed energy resource technologies, such as energy storage and microgrids to enable energy to become abundant, affordable, and sustainable to improve the way of life for the citizens of Puerto Rico.

Once again, thank you for the opportunity to assist our fellow citizens in Puerto Rico during this difficult period and we remain dedicated to contributing to this most worthwhile effort to rebuild the power grid in Puerto Rico.

Respectfully yours,

Gil Quiniones

President and Chief Executive Officer, New York Power Authority
Chair, Puerto Rico Energy Resiliency Working Group

AR_0008377

JA_422

# Table of Contents

Executive Summary ............................................................................................................. 5

1.  Introduction ................................................................................................................. 8
    Power and Grid Overview ........................................................................................ 8
    Magnitude of Impact ............................................................................................... 10

2.  Vision for The Future ................................................................................................. 12
    T&D System .............................................................................................................. 12
    System Operations .................................................................................................. 13
    Generation ............................................................................................................... 14
    Implementation Challenges and Considerations ................................................. 15

3.  T&D System Rebuild and Hardening ....................................................................... 16
    Transmission System .............................................................................................. 16
    Distribution System ................................................................................................ 21
    Substations .............................................................................................................. 23
    Distributed Energy Resources .............................................................................. 30
    System Operations .................................................................................................. 35

4.  Generation Rebuild and Hardening ......................................................................... 38
    Damage Assessment ............................................................................................... 38
    Recommendations ................................................................................................... 38
    Cost Estimates ......................................................................................................... 40
    Fuel Considerations ................................................................................................ 40

5.  Implementation Roadmap ......................................................................................... 41

Appendix A.     Generation – Per Site Impact Overview and Recommendations ................. A-1
Appendix B.     Power System Rebuild Cost Estimates .......................................................... B-1
Appendix C.     Glossary ............................................................................................................. C-1
Appendix D.     Manufacturing In Puerto Rico ........................................................................ D-1

AR_0008378

JA_423

# List of Figures and Tables

Figure E-1. Power and Grid Rebuild Approach .................................................................6

Table E-1. Rebuild Cost Summary ...........................................................................7

Figure 1-1. Population Density of Puerto Rico .............................................................9
Figure 1-2. Manufacturing Centers in Puerto Rico .......................................................10
Figure 1-3. Historical Storm Tracks in Puerto Rico ......................................................11
Figure 3-1. PREPA Transmission System ....................................................................16
Figure 3-2. Recommended Upgrade or Relocation of 230 kV Transmission Lines ........................20
Figure 3-3. GIS Mapping - Substations and Flood Risk Areas in Puerto Rico.........................24
Figure 3-4. Hypothetical Islanding of Critical Infrastructure .......................................32
Figure 3-5. Recommended Approach to Launch DR/Active DER Program .....................................33
Figure 4-1. Primary Generation Facilities in Puerto Rico..............................................39
Figure 5-1. Puerto Rico Power and Grid Resiliency Implementation Roadmap ............................41

Table 3-1. Transmission Damage Assessment.................................................................18
Table 3-2. Transmission System Cost Estimates ..........................................................20
Table 3-3. Distribution System Cost Estimates ..........................................................23
Table 3-4. Summary of NYPA Substation Assessment .......................................................24
Table 3-5. Substations at Risk for flooding in Puerto Rico ...........................................25
Table 3-6. Substation Cost Estimates.....................................................................29
Table 3-7. Microgrid Cost Estimates......................................................................35
Table 3-8. System Operations Cost Estimates ............................................................37
Table 4-1. Generation Facilities Recovery and Hardening Initial Cost Considerations.................40

Table A-1. San Juan Plant Cost Estimates................................................................A-1
Table A-2. Costa Sur Plant Cost Estimates ..............................................................A-2
Table A-3. Aguirre Plant Cost Estimates.................................................................A-3
Table A-4. Cambalache Plant Cost Estimates .............................................................A-4
Table A-5. Palo Seco Plant Cost Estimates...............................................................A-4
Table A-6. Mayaguez Plant Cost Estimates ...............................................................A-5
Table A-7. Vega Baja Plant Cost Estimates...............................................................A-6
Table A-8. Yubucoa Plant Cost Estimates ................................................................A-6
Table A-9. Daguao Plant Cost Estimates .................................................................A-7
Table A-10. Hydro Cost Estimates.........................................................................A-8

AR_0008379

**JA_424**

# Disclaimer

This report was prepared by the Puerto Rico Energy Resiliency Working Group members and Navigant Consulting, Inc. (collectively, Working Group). The information presented in this report represents the Working Group's professional judgment based on the information available at the time this report was prepared. All information furnished in this report is provided "AS IS". The Working Group is not responsible for the reader's use of, or reliance upon, the report, nor any decisions based on the report. Readers of the report are advised that they assume all liabilities incurred by them, or third parties, as a result of their reliance on the report, or the data, information, findings and opinions contained in the report.

THE WORKING GROUP, THE WORKING GROUP MEMBERS AND THEIR RESPECTIVE AFFILIATES, THE UNITED STATES GOVERNMENT, AND ANY AGENCY THEREOF, AND THE RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS AND TRUSTEES, CONTRACTORS AND SUBCONTRACTORS OF THE WORKING GROUP MEMBERS, AND THEIR RESPECTIVE AFFILIATES MAKE NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTIABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR NONINFRINGEMENT, AND SHALL HAVE NO LIABILITY OR RESPONSIBILITY FOR THE ACCURACY, COMPLETENESS, OR USEFULNESS OF ANY INFORMATION, APPARATUS, PRODUCT, RECOMMENDATION OR PROCESS DISCLOSED IN THIS REPORT OR OTHERWISE.

Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the Working Group, the Working Group members or their affiliates, the United States Government or any agency thereof, or any respective contractor or subcontractor thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

AR_0008380

JA_425

# Executive Summary

Hurricane Irma struck Puerto Rico's northern coastline on September 6 and 7, 2017 as a Category 5 storm, knocking out power to more than one million residents and critical infrastructure. Two weeks later, on September 20, 2017, Hurricane Maria made its way up the Caribbean as a Category 4 hurricane, bringing winds of 150+ mph and dumping 25 inches of rain, resulting in catastrophic damage of historical proportion.

Governor Rosselló calls this a "transformative moment in the history of Puerto Rico." The magnitude of devastation to the Puerto Rico electric power system presents an unprecedented opportunity to rebuild and *transform* the system to one that is hardened, smarter, more efficient, cleaner, and less dependent on fossil fuel imports. A transformed electric power system for Puerto Rico is one that is designed with the resiliency to withstand future storms and is built with modern grid technologies and control systems. This system will deliver increased renewable energy resources, such as wind and solar; incorporate new distributed energy resource technologies, such as energy storage and microgrids; reduce the dependency on fossil fuels; and enable energy to become abundant, affordable, and sustainable to improve the way of life in the Commonwealth of Puerto Rico.

The purpose of this report is to provide an assessment of the electric power system storm damage, describe a new system design basis, and propose rebuild recommendations for the Puerto Rico Power and Grid Resiliency rebuild initiative. This report is positioned to support the Puerto Rico Governor's Office, Electric Power Authority, interested stakeholder agencies, and the Federal Emergency Management Agency (FEMA) in defining first level funding requirements and electric power system rebuild recommendations.

The information in this report is provided through direct participation, experience, and expertise of the members of the Puerto Rico Energy Resiliency Working Group (Working Group) established under the New York State's Governor's office to aid Puerto Rico in the damage assessment and rebuild planning for the electric power system. The Working Group includes the following members[1]:

> New York Power Authority (NYPA), Puerto Rico Electric Power Authority (PREPA), Puerto Rico Energy Commission, Consolidated Edison Company of New York, Inc. (Con Edison), Edison International, Electric Power Research Institute (EPRI), Long Island Power Authority (LIPA), Smart Electric Power Alliance (SEPA), U.S. Department of Energy (DOE), Brookhaven National Laboratory (BNL), National Renewable Energy Laboratory (NREL), Pacific Northwest National Laboratory (PNNL), Grid Modernization Lab Consortium (GMLC), and PSEG Long Island, an agent for and on behalf of the Long Island Lighting Company d/b/a LIPA (PSEG Long Island).

The rebuild recommendations are based on experience with power system recovery, rebuilding, and hardening from hurricanes encountered on the US mainland over the last decade. The recommendations include the use of modern technology and incorporate lessons learned from the successful rebuild efforts in other regions, post natural disasters, such as Hurricane Sandy in New York. Additionally, the rebuild recommendations align with the DOE's recommendations for power system hardening and resiliency.[2]

## Assessment and Recommendations Approach

Puerto Rico power system information (pre- and post-storm) was collected, analyzed, and used to define the recommendations and cost estimates included herein. The onsite damage assessments completed to date by NYPA and Con Edison, supported by documentation from PREPA, are high-level condition assessments to support the initial rebuild planning and estimation process. The latest Consulting Engineers report (2013) and the Integrated Resource Plan (IRP) (2015) were key sources for the power system details used to shape the rebuild recommendations in this report.

---

[1] Navigant Consulting, Inc. is providing power system subject matter expertise, project management and report development as a consultant to the Working Group.

[2] *Hardening and Resiliency: U.S. Energy Industry Response to Recent Hurricane Seasons*, Infrastructure Security and Energy Restoration, Office of Electricity Delivery and Energy Reliability, US Department of Energy, 2010.

AR_0008381

JA_426

Site-by-site engineering studies are required to further catalog all damage, verify weakened infrastructure in need of hardening, and document abnormal conditions to develop site and device specific requirements and next-level cost analysis for the rebuild effort.

**FIGURE E-1. POWER AND GRID REBUILD APPROACH**



Source: SEPA

## Rebuilding for the Future

As illustrated in Figure E-1, there are short-term recovery objectives and longer-term design and rebuild objectives to be considered when building back the system. This report focuses on rebuilding the Puerto Rico electric power system to current codes and industry best practices, hardening for greater storm resiliency, and designing for the future. To harden the transmission and distribution (T&D) infrastructure, physical and structural improvements to lines, poles, towers, substations, and supporting facilities will be needed to make them less vulnerable to the damaging effects of hurricane winds and flooding.

Consistent with observed wind speeds from Maria, PREPA's system should be designed and constructed to withstand an upper Category 4 event (155 mph winds) and heavy flood waters. To harden and enhance the resiliency of PREPA's system, the following measures are proposed:

1. Reinforce existing direct-embedded poles with enhanced support such as perimeter injected concrete grout or other soil stabilization

2. Upgrade damaged poles and structures to a higher wind loading standard

3. Strengthen poles with guy wires

4. Install underground power lines in select areas prone to high wind damage

5. Modernize the T&D system via smart grid investments to make the system less susceptible to extended outages

6. Install automated distribution feeder fault sectionalizing switches to enable fault isolation and reduce outage impact

7. Deploy modern control systems to enable distributed energy resources (DER) integration and encourage their development

8. Adopt effective asset management strategies, such as the targeted inventory of critical spares

9. Institute consistent vegetation management practices

10. Apply enhanced design standards for equipment and facilities damaged in the recent storms

This report includes recommendations to modernize the Puerto Rico electric grid, leveraging proven power system technologies to better contain outages, reduce recovery times, lower operations costs, and enable more sustainable energy resources. This includes using advanced sensors and intelligent fault interrupting devices and developing a condition-based asset management program to increase availability of critical equipment and overall power system reliability.

> ### HARDENING AND RESILIENCY CONSIDERATIONS
>
> - **Generation:** Relocate smaller coastal or river-located facilities, use of load frequency control, build back renewable energy sources, and integrate DER
> - **Transmission:** New monopole towers, high strength insulators
> - **Substations:** Defense-in-depth (multilayered) flood protection
> - **Distribution:** Use of concrete and galvanized steel poles, new backup control center
> - **System Operations:** Use of microprocessor-based devices and proven automation and control system technologies

Additionally, the increased use of renewables—in support of the Puerto Rico Renewable Portfolio Standard (RPS) of

AR_0008382

20% by 2035[3]—will further reduce reliance on imported fuel, which costs Puerto Ricans more than $2 billion per year.

The updated power system design will encourage DER technology providers to showcase their products and systems for global acceptance of such systems and set a model for the industry while promoting private investments in the use of renewables for a low carbon future.

The evaluation of Puerto Rico's generating fleet considered several issues:

1. Near-term restoration of power to the island
2. Opportunities to increase the use of DER
3. Development of new targets for renewable resources
4. Shift of fossil generation to primarily dual-fuel units, with primary fuel as natural gas
5. Hardening of the generating facilities that will remain
6. Reduction of generation reserve margin to 50%

The issues noted above will require the 2015 IRP to be revisited for modification to ensure all necessary factors are considered, including the potential impact of increased DER, increased renewable targets, shift of fossil generation to natural gas, reduction of system reserve margin, etc. Depending on the results of the updated IRP, some generation plants could be slated for retirement and not require the full level of estimated expenditures for rebuild or hardening.

At the time of this report, it is unclear what percentage, if any, of the PREPA system is being rebuilt to a high Category 4 standard during restoration. As new information on the restoration design basis becomes available, it will be necessary to reassess the quantity of work that will be necessary after restoration.

## Rebuild Cost Summary

Table E-1 provides a cost summary for the recommended power system rebuild investments, which are further defined in the following sections. Additional cost detail is also provided in Appendix B of this report.

**TABLE E-1. REBUILD COST SUMMARY**

| Rebuild Recommendations | Total (Millions) |
| --- | --- |
| Overhead Distribution (includes 38 kV) | $5,268 |
| Underground Distribution | $35 |
| Transmission - Overhead | $4,299 |
| Transmission - Underground | $601 |
| Substations – 38 kV | $856 |
| Substations – 115 kV & 230 kV | $812 |
| System Operations | $482 |
| Distributed Energy Resources | $1,455 |
| Generation | $3,115 |
| Fuel Infrastructure | $683 |
| | |
| **Total Estimated Cost** | **$17,606[4]** |

---

[3] http://www.ncsl.org/research/energy/renewable-portfolio-standards.aspx#pr

[4] Each line item estimate includes a 30% scope confidence escalator. Final cost estimates require multiple engineering studies and an updated IRP.

AR_0008383

JA_428

# 1. Introduction

The purpose of this report is to provide analysis of the power system storm damage, describe the new system design basis and rebuild recommendations, and offer initial cost estimations and implementation planning for the Puerto Rico Power and Grid Resiliency rebuild initiative. This report is positioned to support the Puerto Rico Governor's Office, Electric Power Authority, interested stakeholder agencies, and FEMA in defining first level funding requirements and system rebuild recommendations for the Commonwealth of Puerto Rico.

The rebuild recommendations are based on experience with power system recovery, rebuilding, and hardening from hurricanes encountered on the US mainland over the last decade. The recommendations include the use of modern technology and incorporate lessons learned from the successful rebuild efforts in other regions post natural disasters, such as Hurricane Sandy in New York. Additionally, the rebuild recommendations align with the DOE's recommendations for power system hardening and resiliency.[5]

The recommendations address rebuilding for resiliency against future storms, including deploying DERs and industry best practices in automation and control system technologies, resulting in a more flexible system that is resilient, smarter, more efficient, and cleaner for Puerto Rico. DER recommendations leverage the role of renewables, storage, and consumer behavior, with investments in both customer-sited and grid-located technologies. Microgrids are also recommended for critical infrastructure, industrial and commercial, based on the current and forecasted energy demand density and customer mix.

Integrating a higher penetration of renewables and DER as part of a more flexible, reliable, resilient, and efficient power system will require the use of new control system technologies such as an advanced distribution management system (ADMS) and a DER management system (DERMS). In addition, PREPA should consider best practices in integrated system planning to properly manage, forecast, and optimize DER.

## Power and Grid Overview

PREPA is a vertically integrated utility that supplies power to 1.4 million total customers in Puerto Rico and the smaller islands of Vieques and Culebra. The power system includes six fossil fuel and seven hydroelectric generation sites, owned and operated by PREPA, as well as privately owned generation facilities consisting of two cogeneration plants, two windfarms, and five solar farms. The electric grid includes 2,478 miles of transmission lines, 31,485 miles of distribution lines across the service territory, and 334 substations.[6] PREPA generates approximately two-thirds of its electricity and purchases the remaining from third parties.

Electric demand has declined from its historical system peak of 3,685 MW in FY 2006 to 3,159 MW in FY 2014[7] and 3,060 MW in August 2017; further decreases are expected with post-storm migration to the mainland. The pre-storm electric power generating capacity was 5,839 MW, which included 961 MW provided by two co-generators (EcoElectrica and AES-PR) through 20-year power purchase operating agreements (PPOAs). EcoElectrica, L.P. in the Municipality of Peñuelas (507 MW of gas-fired capacity) and AES-PR in the Municipality of Guayama (454 MW of coal-fired capacity) are the two largest sources of generation on the island.

The power system supports the entire Commonwealth of Puerto Rico, a geographic area approximately 110 miles east to west and 35 miles north to south. The island includes central mountain ranges extending the length of the island from east to west with peaks as high as 4,390 feet. Coastal lowlands formed by the erosion of the central mountains extend inwards on the north coast for eight to 12 miles and three to eight miles in the south. The northern coastal lowlands are humid while those on the south side of the island are semi-arid.

Puerto Rico's geography, climate, and dispersion of its electric power customers across the Commonwealth, as

---

[5] *Hardening and Resiliency: U.S. Energy Industry Response to Recent Hurricane Seasons*, Infrastructure Security and Energy Restoration, Office of Electricity Delivery and Energy Reliability, US Department of Energy, 2010.

[6] Substation count refers to the number of high side voltage transmission and sub-transmission substation sites.

[7] IRP Volume 1, 2015.

AR_0008384

JA_429

illustrated in Figure 1-1, present many challenges in operating and maintaining the power system.

The electric power system consists of generation, transmission, distribution, communication, and control center facilities and is operated as a single integrated system. PREPA's transmission and distribution (T&D) systems, a majority of which are above ground were particularly vulnerable to the high winds, torrential rains, and erosion-related landslides associated with the recent hurricanes. Significant winds can exceed structural capacity and storm water runoff from the mountains can cause serious flooding issues that result in long duration repairs to the power grid infrastructure.

**FIGURE 1-1. POPULATION DENSITY OF PUERTO RICO**



Source: 2000 Census

The generation and flow of electricity within the system is maintained and controlled by primary and backup dispatch control centers. The primary dispatch center is located at Monacillos, approximately seven miles south of San Juan. Energy management and supervisory control and data acquisition (SCADA) systems are used to remotely control power flow on the island, including large generating units and various substations. The backup control center in Ponce is intended to be online continuously to assume control of the power system if the primary control center becomes inoperable.

The interconnected transmission network includes supply circuits rated at 230 kV, 115 kV, and 38 kV, which transmits electrical power from generation plants to the distribution substations, where it is then delivered to customers via lower voltage distribution lines. The transmission system consists of 2,478 circuit miles of lines: 375 circuit miles of 230 kV lines, 727 circuit miles of 115 kV lines, and 1,376 circuit

miles of 38 kV lines. Included in these totals are approximately 35 miles of underground 115 kV cable, 63 miles of underground 38 kV cable, and 55 miles of 38 kV submarine cable.

PREPA-owned generation is primarily located along the northern and southern coasts. The north area of the island has two electric power generating facilities, with two of the largest and most critical generating facilities—Aguirre and Costa Sur—located in the south. These two electric power generation facilities are tied to each other using high voltage overhead transmission lines that run over mountainous terrain. Due to the physical location of these electrical connections, they are subjected to hurricane-force winds and are most likely to fail, as experienced during Hurricane Maria. When these major pathways are rendered unusable, the bulk of the electric generation in the south cannot be moved to the north side of the island, where the highest level of electric demand exists.

This presents a challenge because the largest portion of the island's electric energy demand is concentrated in the northeast, in and around the city of San Juan. The high energy demand density is due to the highly concentrated population and the presence of commercial areas, a sea port, the Island's main port, and manufacturing plants. Manufacturing in Puerto Rico, one of the largest contributors to the island's economy, is primarily pharmaceuticals and medical devices, with many major plants located in the northeast part of the island, as illustrated in Figure 1-2. This area accounts for approximately 65% of the system's energy demand.

AR_0008385

## FIGURE 1-2. MANUFACTURING CENTERS IN PUERTO RICO[8]



Source: ACS Publications[9]

Note: this figure does not represent all manufacturing on the island

## Magnitude of Impact

Hurricane Irma struck Puerto Rico's northern coastline on September 6-7, 2017 as a Category 5 storm, killing at least three people and knocking out power to more than 1 million residents and critical infrastructure. That weekend, PREPA restored service for approximately 70% of the affected customers, with others expecting to wait months for power to be restored.

Two weeks later, on September 20, 2017, Hurricane Maria made its way up the Caribbean as a Category 4 hurricane, bringing winds of 150-plus mph and dumping 25 inches of rain on Puerto Rico. Hurricane Maria followed a northwesterly track as it reached Puerto Rico, with the southeast corner of the island being the first and one of the hardest hit areas.

The storm ultimately impacted most of the island with a combination of high winds and flooding. Other severely impacted areas included the northern coast, as the rotation of the hurricane caused coastal surge to meet major rain runoff from the mountains, leading to sustained flooding. Transmission lines in the center of the island were severely impacted, as high winds were funneled through the changes in terrain and tore down large transmission lattice towers. Historical storm tracks, illustrated in Figure 1-3, suggest similar impacts can be expected in the future.



Damaged Poles
Source: NYPA/Con Edison Damage Assessments

---

[8] This figure is not considered to be inclusive of all the manufacturing on the island. Reference Appendix D for additional manufacturing illustrations.

[9] http://pubs.acs.org/cen/_img/85/i01/8501bus1maplg.gif.

AR_0008386

**FIGURE 1-3. HISTORICAL STORM TRACKS IN PUERTO RICO**



Source: NOAA

Maria devastated the island, which was still in emergency response mode following Irma. The combined impacts of the two hurricanes led to a complete failure of Puerto Rico's power grid, with little hope of a quick recovery. Because of the extended and unprecedented damage, a significant portion of the generation, transmission, and distribution system must be rebuilt, including high voltage transmission lines that often survive lower category hurricanes.

The hurricanes decimated T&D lines across the island and caused widespread wind and flooding damage to substations, generation, and distribution facilities. Damage from the hurricanes resulted in the longest duration power outage in US history. This cataclysmic failure of the power grid provides a unique opportunity to rebuild and update the power system to 21st century technologies and best practices, enabling the rethinking of how power is generated and distributed to customers across Puerto Rico.



Destroyed Wind Generation
Source: NYPA/Con Edison Damage Assessments

AR_0008387

**JA_432**

# 2. Vision for The Future

The road to the future requires resiliency and hardening measures that will increase the capability of Puerto Rico's electric power system to withstand future storms. Hardening involves instituting measures to improve the durability and stability of the infrastructure via the use of modern grid technologies, equipment, protective barriers, and enhanced communications and Information Technology (IT) and Operational Technology (OT) systems. Resiliency measures do not prevent damage but rather enable the power system to continue operating, and contribute to a more expeditious return to normal operations, even in the presence of widespread damage.

The incorporation of modern grid technology and DER is key to rebuilding the system to ensure continuity of service to key industries and electric demand centers in the event of future storms. Relying on methods laid out by the DOE on hardening and resiliency, and direct experience with mainland storms, the Working Group suggests the following design principles for rebuilding the PREPA system.

- Hazard resilience will need to be incorporated into the system design and operating plans. Renewable energy sources and distributed energy resources, including energy storage and microgrids should be incorporated into the redesigned system to improve storm resilience, reduce dependence on fossil fuels, and support a more sustainable energy future by reducing carbon producing generation.

- Substations should be enhanced by upgrading relay protection equipment and SCADA systems to enable improved system control, reinforcing and hardening substation facilities through defense-in-depth flood protection, and adding security access and monitoring systems. Substations that are damaged completely from wind or flood waters in low-lying areas should be temporarily bypassed and permanently relocated to higher ground.

- As stated in the 2015 IRP, PREPA seeks new, flexible generation to handle the intermittency of renewables. The grid can be built with smaller distributed generating units that provide greater system flexibility and redundancy, and help in the operating and spinning reserve margins. The PREPA power system could also serve as a model for the future development of advanced power generation, transmission, and distribution systems and the use of renewable resources throughout the Caribbean or other similar global locations.

- A holistic implementation plan for substation and distribution automation, with computer-based control and monitoring technology is recommended to create a highly reliable, highly automated power system that can rapidly respond to real-time events and enable DER development. Technologies such as centralized Energy Management Systems (EMS), automated mapping and facilities management, and geographic information systems (GIS), in addition to the previously mentioned ADMS and DERMS will be integral to the operations technology environment.

- PREPA must adopt a robust asset management approach which includes aggressive vegetation management and optimized maintenance programs with adequate staffing. Because of the tropical growth in Puerto Rico, PREPA will likely need to adopt vegetation management programs that are more aggressive than the industry norm.

## T&D System

One of the key features of the 'build back better' strategy is to rebuild the T&D system using design standards capable of withstanding high Category 4 storms, with sufficient design margins to ensure high survivability for Category 5 events in areas where damage is most likely to occur. Using GIS and available weather data, system planners can identify those areas on the island where critical facilities are located and where weather is typically most severe.

This report considers best practices applied by mainland utilities that upgraded power system facilities following Hurricanes Sandy and Irene. For example, electric utilities in New York have identified cost-effective approaches to rebuilding substations in flood-prone areas. This targeted approach and opportunity to build upon lessons learned from other utilities will reduce the number of customers affected and time to restore service following major storms.

The Working Group proposes a holistic approach to rebuild the T&D system—one that integrates technology, distributed generation, and energy storage with generation hardening outlined in subsequent sections of this report.

AR_0008388

JA_433

This includes an electric distribution system designed to readily integrate DER and maintain service continuity to critical customers and loads. Technology plays a key role, as upgraded communications and controls will provide control center personnel with the capability to better visualize and track outages and assess the status of power resources, with options to isolate damaged lines and reroute power to customers via alternate delivery paths.

Additional pragmatic solutions include relocating lines next to existing highways and main thoroughfares to provide better access during reconstruction and reducing lifecycle cost and expeditious repairs in case of failure; improving guying hardware to strengthen distribution lines; and using low cost, wire mesh-lined flood barrier enclosures and sump pumps at transmission substations and electric power generation facilities.

These approaches to rebuilding PREPA's T&D system ensure that proposed investments not only enhance electric system resilience, but do so in a manner that applies technology and lessons learned from other utilities and government agency programs to make the best use of rebuild funding. This approach is consistent with federal policies and initiatives to improve resilience via distributed resources, including renewable generation and storage. It also recognizes the need to enhance supply to critical customers and infrastructure. Hence, the design of the T&D system emphasizes flexibility and reliance on technology to improve the ability of the system to withstand major storms and to rapidly restore service during outages.

The proposed investment to rebuild PREPA's T&D system is $13.9 billion including $4.9 billion for transmission lines, $1.7 billion for substations; $0.5 billion for systems and technology, communications, and control center enhancements; $1.5 billion for DER; and $5.3 billion for distribution lines. The cost of technology, communications, and operational systems used in conjunction with many of the proposed rebuilds is presented in the System Operations section. Many of these investments such as rebuilding distribution lines, can be implemented over the next year. More complex transmission line and substation rebuilds, where procurement of major equipment, various studies and detailed design can take one year or longer, are proposed over the next seven to 10 years.

Per recent assessments addressed in PREPA's 2015 IRP, the plan was to reinforce the transmission system by improving the 115 kV north to south network by adding and upgrading lines to stabilize the system and better withstand critical contingencies. Exploring alternate means of transmission investments, including merchant transmission to improve the reliability and sustainability of the system is a critical component of the Working Group's recommendations. Investments in areas such as distributed resources may involve third parties and private investment options that could affect the proposed level of rebuild investment required.

## System Operations

Like most utilities, PREPA maintains operation control centers that monitor, operate, and control generating plants, the transmission network, and distribution facilities. PREPA's primary system control center was spared major damage by the storm; however, given the Working Group's recommendation to introduce new technologies to support PREPA's grid, it is an opportune time to modernize the control center facilities and their associated hardware and software. The recommended upgrades will not only improve the ability of PREPA to restore customers faster following major storms, but enable PREPA to efficiently manage the operation of traditional generating plants along with distributed resources, including energy storage systems capable of shifting mid-day solar output to align with evening peaks.

The Working Group's recommendation includes updating the primary control center to withstand a Category 5 hurricane and associated flooding, abandoning the existing backup control center, and deploying a new mobile and containerized backup facility. Mobile backup control centers have been proven to be a cost-effective form of redundancy on the mainland.

Facility upgrades would also include the consolidation and co-location of storm management centers at or near the control centers. Additionally, it will be important for PREPA to deploy and extend new communication networks to monitor and control distributed resources and to automate newly proposed intelligent devices on the distribution system.

Also, in support of operations described elsewhere in the report, control center capabilities should be upgraded to enable active monitoring and control of distributed generation and microgrids. Upgrades include an enhanced

AR_0008389

outage management functionality, integrated with an ADMS and DERMS to improve operational control of field devices and visualization of system operating conditions. Cyber and physical asset security must also be incorporated into all systems, including those that communicate with distributed resources, field devices, and customer meter data.

## Generation

The generating capability of the PREPA fleet is 5,839 MW, including several power purchase agreements (PPAs) for fossil and renewable generation. The damage to PREPA generating facilities varied from extreme to minor, and several plants not only encountered damage from Hurricane Maria, but also from Hurricane Irma, which caused damage due to sea surge, making the generation system even more vulnerable to severe damage when Maria hit.

The capacity of the generating fleet is notably higher than the PREPA peak of approximately 3,060 MW in August 2017.[10] Given this excess capacity and the need to rebuild, there are several options for modifying the size and technology of the generation fleet, including a potential reduction of reserve margin for PREPA.

In 2015, PREPA completed an IRP that laid out a vision for moving toward more renewable and gas-fired generation and away from oil as a primary fuel. The IRP identifies generating units slated for conversion to gas or repowering with newer, more efficient technology such as F and H-class machines; some of the replacement generating units would have lower installed capacity, while approximately 1,100 MW would be converted to limited use or entirely shutdown.

The IRP also outlines a goal of approximately 20% renewable generation by 2035. Prior to the hurricanes, PREPA had executed over 60 contracts for large scale renewable energy, principally solar and wind. Of those, seven solar farms with a total of 147.1 MW, two wind farms with a total of 121 MW, and two landfill gas facilities with a

total of 4.8 MW had been constructed and were in operation to help reach the 20% target.[11] The Working Group recommends that the IRP be revisited to incorporate storm hardening, improved system protection and control, increased use of distributed generation and accelerated penetration of renewables, while ensuring that the capacity meets the current and future energy demand of the island. Additionally, study of establishing new planning and operating generating reserve margins, taking all of these factors into account, to something closer to 50% (approximately 4,000 MW of firm capacity)[12] is recommended.

The estimated investment required to rebuild the plants to operating condition consistent with future needs is approximately $3.1 billion, including an estimated $2.8 billion for replacing the Palo Seco plant with an F-class machine, replacing the steam units at Aguirre with an H-class machine, and the installation of storm hardening for the sites. Much of this estimate is related to issues discussed in PREPA's IRP; particularly Mercury and Air Toxics Standards (MATS), system stability, fuel diversification, and unit flexibility needed to handle intermittent renewable resources. This estimate also includes funding to quickly move forward in restoring generation operability through key actions, including conducting more detailed testing and inspection analysis of each plant to further ensure public and worker safety and assess the true extent of damage sustained at the plant. As an example, if insulation on high pressure piping has been damaged or saturated with water, the integrity of the piping may be compromised. Similarly, ensuring that water has not been introduced into switchgear and/or other electrical equipment is vital to safe operations.

While the storms created several significant challenges, they also now offer an opportunity for overall improvement and stability of the generating fleet, as well as the expedited implementation of the recommendations in the recent IRP. The timing of when the repairs and/or replacement will take place requires strong coordination that allows for the use of existing generating units for the short-term production of needed electricity, as well as the

---

[10] Peak load figure provided by PERPA. Future loads may decline due to population exodus, greater amounts of behind-the-meter generation, and closure of some businesses.

[11] Per Puerto Rico Act 82-2010, distributed generation does not count directly for the renewable generation goals.

[12] Currently, 961 MW is provided from fossil generation PPA's, another 64 MW from PREPA hydro plants and an additional 122 MW from solar and wind - the remaining 3,200 MW will need to come from the current PREPA fleet and/or distributed resources.

AR_0008390

**JA_435**

longer-term shift from oil- to gas-fired generation, installation of DER capabilities, and shutdown of existing older generation units. Further, the introduction of large and distributed renewable resources, including energy storage and microgrids, may lessen PREPA's dependence on large central generating stations, with the potential to retire existing plants and/or defer new ones.

## Implementation Challenges and Considerations

A rebuild project of this magnitude requires the consideration of several technical and non-technical factors necessary for the success of the project. In general, these include:

- **Management of Cash Flow** – Work that is proposed as a reimbursement from other funding sources, including federal funding, requires upfront expenditures. This is particularly problematic given Puerto Rico's existing financial constraints.

- **Stafford Act Compliance** – Generally, federal funding requires the use of US-sourced material, a strict procurement process, a strong quality assurance capability, strict accounting, and an on-going audit process.

- **Supply Chain** – Competitive bidding on both equipment purchases and construction contracts is needed. Where FEMA funds are used, a strict adherence to an agreed upon protocol is necessary.

- **Labor Force** – This project can provide opportunities for retention of on-island skilled labor and development of new high-quality jobs. Recommendations in this report will require development of the on-island workforce to operate the system with new technologies and methods. Many of the skill sets, such as linemen and mechanics are in short supply generally in the US, making the constant staffing of future projects problematic.

- **Permitting and Environmental Reviews** – Because the next severe weather event can happen any time and the projects recommended in this report will take many years to complete, it is essential that any permitting and required environmental reviews, especially for the recommended transmission enhancements, be expedited.

- **Future Planning** – This report recommends a higher consideration of new distributed generation

resources and a careful consideration of the traditional generation requirements. PREPA should incorporate these approaches into a revised IRP and consider permanently retiring excess generation facilities.

- **Stewardship** – It is critical that strong asset management principles and practices are implemented with the reinstallation and replacement of power system equipment. Asset Management practices should include an inventory of assets and the entry of asset records into GIS and Asset Registry systems. Elements of a best practice asset management system includes developing standardized asset strategies, policies, and procedures, optimizing capital programs, optimizing lifecycle management of assets, mitigating operating risk, implementing an optimized maintenance program, and providing for adequate skilled labor.

Additionally, because of the tropical environment, PREPA may also consider enhancing their vegetation management program to go above and beyond typical industry practices. Finally, PREPA may need to better manage its distribution pole attachments by performing wind loading studies and requiring attachment owners to fund required upgrades.

- **Organizational Change Management** – This report proposes a significant amount of grid modernization and the use of new technologies, systems, and operating methods. PREPA and related stakeholder agencies will need to consider the impacts of these changes and institutionalize new business processes, systems and organizational roles and responsibilities.

- **Stakeholder Engagement** – Many of the Working Group recommendations will require extensive stakeholder engagement. These include incorporating input from technology suppliers, alignment with public agencies and the public in the rebuild process, developing close relationships with federal funding agencies, and developing financing plans and partnerships.

- **Project Management** – Rebuild implementation should be guided by effective project planning, monitoring, control, and reporting throughout the rebuild lifecycle. Effective project management will be required to deliver on these rebuild recommendations, optimize the use of federal funding, provide transparency and accountability,

AR_0008391

JA_436

and comply with federal tracking, control and reporting requirements.

- **Emergency Planning** – PREPA, along with its infrastructure partners in Puerto Rico need to develop an enhanced integrated emergency planning and response capability based on best-in-class Incident Command System (ICS) principles.

# 3. T&D System Rebuild and Hardening

## Transmission System

PREPA's transmission network consists of 2,478 miles of lines that deliver power from generating stations to 334 transmission and subtransmission substations. Higher voltage lines operate at 230 kV and 115 kV, with lower voltage subtransmission operating at 38 kV. The backbone of the Puerto Rico transmission system consists of 230 kV overhead lines that form an approximate loop around the perimeter of the island.

The transmission network crosses from south to north in two locations; one from the Costa Sur generating plant to the Manati TC, and the second from the Aguirre generating facility to the Aguas Buenas TC. In addition, an existing 115 kV line from Costa Sur to Cambalache was upgraded to 230 kV to create a third south to north tie. The 230 kV network connects to an extensive 115 kV transmission system that supplies power to population centers throughout the island.

**FIGURE 3-1. PREPA TRANSMISSION SYSTEM**



Source: PREPA

The 230 kV system has two north to south corridors which divide the system into three principal loops: 1) the western loop; 2) the central loop; and 3) the eastern loop. The western loop connects the Costa Sur and EcoElectrica generators in the south with the Mayaguez switchyard and generation on the west coast, and then continues to the northern cities of Aguadilla, Hatillo, and Arecibo. The center loop connects generators in the south to the San Juan area via Aguas Buenas TC south of the city. A parallel 230 kV line in the island center connects the Costa Sur and EcoElectrica generators from the south with San Juan and the Cambalache combustion turbine on the north coast. The central loop is joined by east-west transmission lines connecting the Costa Sur units with the Aguirre plant in the south, and a line in the north connects Manati to Aguas Buenas via Bayamon. The eastern loop connects large generating units in the south (Aguirre units in Salinas and the AES plant in Guayama) to the eastern part of the island through Yabucoa and Rio Blanco, terminating in Sabana Llana, southeast of San Juan.[13]

The 115 kV lines serve all the major load centers on the island. PREPA has proposed several new and rehabilitation capital improvement projects for 115 kV transmission centers and other components of the system as well as new 115/38 kV transmission centers, originally scheduled between 2013 through 2018. PREPA installed a 28-mile 115 kV transmission cable line to link the system in the San Juan urban area to provide additional backup during storms. The 115 kV loop includes three highly reliable gas insulated substations (Isla Grande, Martin Peña, Palo Seco), two

---

[13] *Fortieth Annual Report On The Electric Property Of The Puerto Rico Electric Power Authority San Juan*, Puerto Rico, URS, 2013.

AR_0008392

generating stations (San Juan, Palo Seco), and three additional key load centers (Monacillos, Hato Rey, Bayamón). These newer assets allowed PREPA to bring critical load back online in the first days after the storm in the San Juan Metro area, which otherwise would have taken weeks to power.

The 38 kV subtransmission system serves local load centers and are the primary feeds to the more inaccessible interior regions. This 38 kV subtransmission system feeds two-thirds of PREPA's distribution system. It includes overhead, underground, and two 38 kV submarine service to the islands of Vieques and Culebra.

Many of these lines were built more than 50 years ago, prior to the construction of the major highways crossing the island, and most are in difficult-to-reach locations, with no right-of-ways separating transmission towers and lines from trees or other structures. Due to protected plant and wildlife, the right-of-ways cannot be expanded or properly maintained in their current locations. The Working Group proposes that new transmission lines be installed along major highways throughout the island.

Major highways have established right-of-ways and should limit the environmental impact while reducing the time needed to obtain permits. The rebuild costs will also be lower along the highways because they are easily accessible by road.



Source: NYPA/Con Edison Damage Assessments

Notably, the southeast area of the island is particularly vulnerable to hurricanes, as the most destructive storms typically sweep through this part of the Caribbean on a northwest trajectory. Where possible, relocated transmission lines along highways in this area should be further hardened via shorter spans and greater separation between phases and grounded structures. In addition, these transmission lines should have hardened lightning protection because the island is susceptible to severe lightning. Also, the prospective system should be designed to ensure the system can reliably deliver power from generating plants in the south to population and industries located in the north.

### Damage Assessment

Damage information for this report was provided by select on-the-ground assessments by the NYPA and Con Edison teams as well as periodic reports from PREPA. While this information is adequate for developing initial recommendations, several planning and engineering studies are necessary to refine the proposed changes and proceed with project design.



Source: NYPA/Con Edison Damage Assessments

Many of PREPA's transmission lines damaged during the storms were constructed decades ago, located in difficult-to-access areas where nearby highways now exist. PREPA reported that only 15% of the transmission lines are built to a mid-Category 4 criteria and the remaining 85% are built to lesser standards. A key example is the north-south corridor, where damage was extensive, and steep hills and muddy slopes have made access difficult, leading to long repair times. Many transmission corridors, including the North-South line are heavily treed with narrow rights-of-ways. Widening of these corridors is limited due to environmental restrictions to accommodate protected wildlife and vegetation.

The southern portion of the island is more susceptible and more vulnerable to major hurricanes, thereby putting key northern load centers at risk. Table 3-1 presents the extent of damage incurred on 115kV and 230kV structures and conductors (e.g. broken insulators). Damage on the 38kV subtransmission system is included in the distribution system section of this report.

AR_0008393

JA_438

## TABLE 3-1. TRANSMISSION DAMAGE ASSESSMENT[14]

| kV | Line Segment | Structures (Towers/ Poles) | Damages (Conductors/ Insulators) |
|---|---|---|---|
| 230 | 17 | 106 | 220 |
| 115 | 84 | 530 | 453 |
| Totals | 101 | 636 | 673 |

Several key transmission lines experienced substantial damage during the storms, with lattice tower and pole failures and numerous broken insulators. Transmission poles located in muddy areas were often upended due to unstable footing. Transmission poles and structures that toppled or were damaged during the storms have compromised the electrical integrity of the interconnected grid, with a total loss of supply to many substations. Notably, the recent loss of the north-south transmission line which caused extended outages in San Juan underscores the need for targeted transmission reinforcement.

## Rebuild Recommendations

The Working Group recommends relocating and upgrading up to 350 miles of overhead transmission lines, with high strength insulators, structures, and conductor spacing designed to withstand stronger wind loading than the current design standard. At a minimum, structures located in areas prone to high winds should be reinforced to withstand Category 4 storms, including lines along the critical North-South corridor.[15] The Working Group also recommends that the transmission system be designed to enable integration of large renewables and smaller microgrids. This would serve to reduce PREPA's reliance on fossil fuel generation while providing greater resiliency to the island-wide grid.[16]

 

Monopole designs generally performed better than lattice tower designs.
Source: NYPA/Con Edison Damage Assessments

---

[14] Executive Report- Huracan Maria, Electric System Reestablishment Plan - Transmission Lines, 11/21/2017

[15] The north-south lines subsequently failed several weeks after the storms, plunging San Juan into darkness after the area was restored.

[16] It is possible that less critical transmission line additions proposed prior to the storms can be deferred, delayed, or reconfigured due to the proposed increase in renewable generation and the integration of microgrids.

AR_0008394

JA_439

In addition to relocating critical lines along readily accessible roadside locations, new transmission should be designed and built with monopole steel poles, high strength insulators, and vertical construction. The proposed 350 miles of new lines should be designed and built to 345 kV construction standards. A 345 kV design provides greater distance between conductors and enables future planning flexibility, and can initially be operated at 230 kV. Several lines should include double circuit construction on steel monopoles to make the most efficient use of transmission corridors.

Many of the existing lines that run over mountains, and are not presently built for Category 4, can be abandoned. Existing 115 kV poles that are otherwise designed for Category 4 located in areas susceptible to leaning or uprooting during high winds, should be considered for reinforcement via concrete grout injection around the base embedment or other means to strengthen and stabilize foundations.

New transmission paths are proposed for the 230 kV lines along the following roadways:

- Mayaguez to Cambalache along Route 2
- Cambalache to San Juan along Route 22
- San Juan to Aguirre along Route 52
- Aguirre to Costa Sur along Routes 52 and 2
- Aguirre to San Juan via Humacao, Juncos and Carolina (various highways)[17]
- Costa Sur to Mayaguez along Route 2
- Caguas to Juncos along Route 30
- Juncos to San Juan via Carolina (various highways)
- PREPA's new Cambalache to Costa Sur should be considered as a part of all engineering and feasibility studies

A new four loop transmission system, as illustrated in Figure 3-2, will give a lot of flexibility without transmission congestion to move power around the island. This will be key in providing reliable and affordable energy to both the population and industrial centers. It will also help attract more industrial production business to the island, which will support economic growth and potential investment opportunities.

---

[17] This path may optionally be a Direct Current (DC) Marine Cable. To be conservative in estimating, the marine cable is included in the provided cost estimates

AR_0008395

**JA_440**

## FIGURE 3-2. RECOMMENDED UPGRADE OR RELOCATION OF 230 KV TRANSMISSION LINES



Significant permitting challenges exist to implement this recommendation and the proper highway authorities should consider accelerated or legislated approval once initial engineering feasibility studies have been completed.

### Cost

For the proposed resiliency and hardening, an estimated cost of about $7 million per mile has been considered for new double circuit 345 kV lines and $1.25 million per mile for 138 kV lines operating at 115 kV. The following table presents these costs by hazard mitigation category.

Funding for the transmission recommendations would primarily consist of FEMA funding for hardening the system.

### TABLE 3-2. TRANSMISSION SYSTEM COST ESTIMATES

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| Wind Damage | $1,054 | Replace poles for higher wind rating and jet grout existing self-embedded poles for higher wind rating, install wider spacing for better insulation, selectively underground high-risk spans, install intermediate poles to reduce galloping and slapping |
| Insulators Compromised | $20 | Replace insulators with higher insulation level in salt contamination areas, replace insulator with higher strength insulators |
| Flooding | $586 | Straighten and grout existing poles or replace with deeper subgrade and/or engineered foundations |
| Accessibility | $2,639 | Develop looped transmission overlay on existing highways |
| Overhead Subtotal | $ 4,299 | |
| Underground | $ 601 | SE Puerto Rico underground bypass[18] |
| Transmission Total | $ 4,900 | |

[18] As noted earlier, this section may alternatively be a conventional overhead transmission line if PREPA chooses to forego some of the advantages of a DC-DC marine cable. Advantages include dynamic voltage response, a solid frequency source, and power flow control.

AR_0008396

**JA_441**

### Timeline

Over the short-term (one to six months), interim repairs are required to restore service. Considering the planning studies, permitting[19] and equipment lead times, the investment in the transmission rebuild is estimated over a period of five to 10 years. Further, due to the large number of substations impacted, careful scheduling and coordination with transmission upgrades is required to ensure the system can operate reliably while new transmission build is underway.

## Distribution System

PREPA's distribution system is made up of roughly 1,200 circuits, with over 30,000 miles of overhead and underground lines. Most circuits operate at voltages ranging from 4 kV to 13 kV, which is common among electric utilities. PREPA's distribution system is primarily overhead, with six percent of the circuit miles located underground. The underground lines mostly supply urban areas, including San Juan. The overhead system includes auto loops in some areas (about 30 total on the system) to ensure redundant substation feeds to customer demand centers. Distribution poles are primarily galvanized steel and concrete, with a limited population of wood poles. These poles are susceptible to high winds; concrete poles, in particular, were significantly damaged during Hurricane Maria. In addition, distribution lines are run near transmission poles and other structures, increasing the likelihood of wind causing contact and short circuits.

The distribution system was not originally designed to a Category 4 standard. There were few feeder ties, limited redundancy, or automation to provide backup or aid in the restoration of service. Accordingly, the primary objective for hardening the distribution system is reducing the number of customers impacted and reducing recovery times for future storms.

### Damage Assessment

Damage information for this report was provided by select on-the-ground assessments by the NYPA and Con Edison teams as well as damage reports from PREPA. While this information is adequate for developing initial recommendations, several planning and engineering studies are necessary to refine and prioritize recommendations and proceed with project design.

The distribution system encountered significant damage, with up to 75 percent of circuits needing repair. Both the overhead and underground systems were affected. Pre-storm distribution poles were not designed to withstand a Category 4 storm and underground equipment experienced water and contaminant intrusion. The limited use of dead-end breakaways on distribution poles led to a domino effect, with long sections of line failing successively.

Concrete and wood poles both experienced severe damage, while galvanized steel fared better during the storm. Numerous substations located along distribution circuits that step down primary voltages to lower primary, or secondary voltages were also severely damaged. The photos below illustrate the severity of damage encountered on overhead lines, including destroyed concrete and wood distribution poles.





Source: NYPA/Con Edison Damage Assessments

---

[19] Authorities should consider accelerated or legislated permitting approval once initial engineering feasibility studies have been completed.

AR_0008397

**JA_442**

## Rebuild Recommendations

The Working Group recommends the rebuild and reinforcement up to 75% of its 1,200 distribution circuits. Essential near-term improvements include the following:

- Relocate distribution lines so that they are not on the same side of the street as existing transmission lines to reduce common mode failures.

- Upgrade conductor size and use fully insulated wire (tree wire or bundled conductor) in areas where trees are present.

- Install breakaway service connectors on poles to limit the number of poles impacted by high winds.

- Install automated switching devices and enhance protection and controls by converting from electromechanical relays and SCADA to more modern and flexible microprocessor controlled devices on critical line segments. At least two automated sectionalizing devices should be installed on overhead mainline sections.

- Install underground lines in select areas prone to high wind damage.

- Convert lower voltage 4 kV lines to operate at 15 kV, which will improve efficiency and the ability to restore energy demand during storms.

A post-restoration survey will be needed to identify which poles may have been upgraded in the restoration process.

These improvements will greatly reduce the amount of damage caused by storms like Hurricane Maria, thereby lessening cost of repair and number of customers affected in the future. Not all lines can be designed to be immune from storm impacts, but higher design standards and advanced technologies such as self-healing circuits will improve resilience and sustainability, particularly for critical customers and facilities.

Further, the distribution system should be rebuilt to readily integrate renewable distributed resources and energy storage. These proposed upgrades will reduce maintenance and inspection costs while improving reliability metrics and performance. The adoption of advanced control technologies and enhanced operating center functionality described below will improve visibility and control of distributed resources, and support the development of self-healing networks. This includes investing in distribution automation, which includes installing automatic switches, circuit connections, sensors, and communication equipment. These investments will improve system reliability, reduce the impact of outages, and permit greater penetration of DER. Key benefits of recommended distribution automation investments include:

- Near real-time visibility for distribution system operators, with telemetry provided throughout the circuits enabling issues to be identified quickly and accurately;

- Remote fault isolation and service restoration, thereby decreasing outage duration and area of impact;

- Increased operational flexibility with appropriately-sized line sections for circuit switching, which will minimize outages during planned maintenance and unplanned outages; and

- Enhanced situational awareness for DER operations, including the management and control of smart DER interconnections.[20]

The degree to which these capabilities can be achieved is largely dependent on the number of isolating switches and circuit ties installed on a given circuit, as well as the ability to control voltage and loading of distribution circuits. Investments will provide greater benefits in more densely populated areas versus rural systems where there may be longer circuits and fewer connections to other circuits. While cost will vary based on the number of automated devices installed, it is expected to range between $100k to $400k per circuit.

## Cost

The following table presents the estimated costs for primary resiliency and hardening categories for overhead and underground distribution.

---

[20] The use of real-time state estimation system via enhanced distribution load flow simulation software, integrated into advanced distribution management systems, is essential for high levels of DER, and Microgrid management.

AR_0008398

**JA_443**

## TABLE 3-3. DISTRIBUTION SYSTEM COST ESTIMATES

| Cost Category | Cost (S Millions) | Description |
|---|---|---|
| Wind Damage | $3,432 | Replace poles for higher wind loading, install breakaway service connections, install fully insulated wire, relocate distribution away from transmission, selectively underground distribution, install intermediate poles on longer spans, install wider spacing in high debris areas |
| Insulators Compromised | $208 | Replace insulators with higher insulation level in salt contamination areas, replace insulators with higher strength designs in high wind areas |
| Flooding | $965 | Replace poles with deeper subgrade support, selectively underground in areas with water-driven debris |
| Accessibility | $429 | Relocate lines to accessible street level, selectively replace overhead with underground |
| Operability | $234 | Add automated switches with FDIR capability |
| **Overhead Subtotal** | **$5,268** | |
| Distribution Underground | $35 | Selectively install submersible equipment, elevate equipment and terminations, spot replace underground with overhead, install engineered protection of cables and conduit in washout areas |
| **Distribution Total** | **$5,303** | |

Funding for the distribution recommendations would primarily consist of FEMA funds for hardening the system and other Federal or Territory funding sources, such as Community Development Block Grants (CDBG) for the deployment of various recommended technologies and system enhancements.

### Timeline

The Working Group recommends 50 percent funding in the first 18 months and the remaining 50 percent over the next two to three years to execute on the distribution rebuild.

### Substations

PREPA's power system includes 334 substations owned by PREPA which are generally operated at 230 kV, 115 kV, and 38 kV. The major stations on the transmission system are operated at 230kV and 115 kV and include switching stations, to direct power flow to the various parts of the island, and large substations to step down voltages to the 38 kV subtransmission and distribution system voltages.

These stations are located throughout the island with some being exposed to flooding along the coast and others being more vulnerable to rain runoff and debris from high winds.

It is important that these stations be made more resilient to ensure that power flow from generation to the customer remains uninterrupted.

The 38 kV substations account for two-thirds of PREPA's distribution capacity on the island. Distribution substations, though smaller in size, experienced flooding and high winds based on location. Many distribution substations are single transformer stations with three or four medium voltage circuit breakers. They are often located in urban environments or other space-constrained sites due to proximity to the customer and load centers. Real estate is therefore a challenge in these locations and limits the options for physical hardening. PREPA also owns 22 portable distribution substations that enable them to perform substation maintenance. The portable distribution substations range in size from 10 MVA to 44 MVA at 38 kV and 115 kV, and includes two capacitor banks at 38 kV 18 MVAR.

### Damage Assessment

Most PREPA substations experienced some degree of damage, with several critically damaged or inaccessible due to mudslides and inundation. Particularly noteworthy is the extensive damage to switchgear, protection, and control systems caused by flooding; which is often visible only by onsite inspection. Additionally, several substation control houses suffered water intrusion from storm water or wind-driven rain. The Working Group field inspectors cautioned that many substations affected by flooding are inoperable

AR_0008399

**JA_444**

due to presence of contaminants and physical damage. We have designated some flooded stations as inaccessible and dangerous for restoration due to damage, as there is a safety risk if these substations were reenergized absent repair or rebuild.

Most of PREPA's assets were installed more than 30 years ago. Accordingly, decisions to rebuild assets such as control systems, protection systems, oil circuit breakers, and communication systems should consider the remaining life of these assets, and replacement, rather than repair should be considered.

- Major Damage – Major work needs to be performed. This can include structures or poles broken, flooded substations, trees down on building, equipment damaged and need replacement to operate, dangerous conditions for energizing the substation.

As this survey was done early in the restoration effort some of the stations which might have been inoperable are restored to operable state, but there are improvements needed to these substations for hardening and resiliency. In addition, the Working Group performed an analysis of the existing substation sites using latitude and longitude locations provided by PREPA plotted on GIS mapping of the potential flood zones as identified by the current FEMA mapping (Figure 3-3). Table 3-5 depicts the infrastructure per voltage class and the risk of flooding relative to the flood zone.

**Table 3-4. Summary of NYPA Substation Assessment**

| Region | Number of Stations | Good Condition | Some Exposure | Minor Damage | Major Damage | Old Station |
|---|---|---|---|---|---|---|
| Arecibo | 41 | | 11 | 26 | 3 | |
| Bayamon | 60 | 6 | 7 | 28 | 18 | |
| Caguas | 51 | 6 | 4 | 27 | 11 | |
| Carolina | 31 | | 1 | 3 | 23 | |
| Mayaguez | 54 | | 21 | 21 | 10 | |
| Ponce | 32 | | | 7 | 24 | |
| San Juan | 60 | | 12 | 8 | 40 | |
| VIEQUES | 5 | | | 1 | 2 | 1 |
| Grand Total | 334 | 12 | 56 | 121 | 131 | 1 |

Table 3-4 includes an assessment of the condition of the substations. These conditions are categorized based on the observations during substation survey conducted by the working group. These are

- Good condition – Station is or may be energized and is good condition

- Some Exposure – Station needs some work such as fencing and vegetation management

- Minor Damage – Significant work needs to be performed. This can include high side de-energized or load isolated, not grounded, blown fuses, equipment replacement needed due to broken insulators, downed microwave tower, blown feeder pothead, containment of transformers.

**Figure 3-3. GIS MAPPING - SUBSTATIONS AND FLOOD RISK AREAS IN PUERTO RICO**



Source: Navigant Consulting, Inc.

AR_0008400

**JA_445**

### TABLE 3-5. SUBSTATIONS AT RISK FOR FLOODING IN PUERTO RICO

| Substation Voltage (kV) | High Risk | Medium Risk | Grand Total |
|---|---|---|---|
| 38 | 25 | 43 | 68 |
| 115 | 4 | 8 | 12 |
| 230 | 2 | 1 | 3 |
| Grand Total | 31 | 52 | 83 |

Finally, the onsite surveys completed to date were for a high-level condition assessment and are not detailed enough to result in specific site-by-site detailed recommendations. The Working Group recommends a detailed site-by-site engineering survey to catalog all damage, deteriorated conditions, and abnormal conditions before developing site-specific requirements.

## Rebuild Recommendations

### Initial Recovery

Because of the serious damage incurred at substations and long repair times, PREPA will necessarily bypass some substation locations on the transmission system via temporary jumpers or by manually closing and locking substation bus sections. As a result, distribution feeders will be switched to be fed from substations much further away from customers than normal. This will result in decreased reliability and potential overloads during peak energy demand periods. Also, some substations will be energized out of necessity or with unseen damage that will be in a deteriorated state. This will result in some spurious substation operations at best; and perhaps some catastrophic failures.

As substations are reenergized, Puerto Rico should be prepared for a period of reduced reliability. Additionally, some transformers may have been subject to wind-driven rain and flooding, necessitating performing a Dissolved Gas Analysis (DGA) test, testing for insulation strength and moisture, and requiring an extended transformer dry-out procedure.

### Substations

The Working Group recommends the reinforcement and storm hardening of approximately 90%+ of the 230 kV, 115 kV and 38 kV substation sites. In general, the rebuild

recommendations will include bringing these sites up to a high Hurricane Category 4 design standard for both wind and flooding and the replacement of damaged equipment. Wind studies for 38 kV substations may reveal special wind circumstances as many of the substations have customer-owned buildings on one or more sides. Enhancements for all substations should include the phased replacement of undamaged equipment that, while marginally functional, may present higher operating risks and may hinder expansion of DER.

### Hardening for Flood Damage

Hardening of substations consists primarily of defending against flooding, protecting against wind-driven rain intrusion into equipment, and protecting against wind damage.

### Flooding Mitigation – Defense in Depth

The analysis that was performed estimates that there are approximately 15 115 kV and 230 kV sites in potential flood zones. It is recommended that future flooding risk at these sites be mitigated through a defense-in-depth approach that was used by several utilities in the New York and New Jersey area after Hurricane Sandy. The analysis also estimates that there are approximately 68 38 kV substations at risk for flooding. However, in the case of 38 kV substations, there may not be enough space for this preferred alternative. Therefore, it is expected that a higher percentage of the 38 kV substations will require elevation of critical equipment.



Flood Barrier
Source: HESCO Corp.

The first level of defense should include a perimeter flooding barrier around the site. While earthen berms and concrete walls may be appropriate in some situations, a

AR_0008401

**JA_446**

cost-effective method to construct these barriers is to use heavy-duty sand bags enclosed in metal mesh.

Design of flood barriers should be based on the observed worst-case flooding, with federal and local flood modeling, plus a foot or more for extremes caused by forecasted ocean rise, in addition to a foot or more for design safety margin.

Several designs exist for accommodating roadway openings in the perimeter. While permanent water-tight



Flood Barrier
Source: Con Edison

doors and earthen rises have been used in some cases in the industry, a less expensive approach would be to use light-weight aluminum tubes that can be dropped into pre-installed tracks and stacked to temporarily close off roadway openings.

The second level of defense would include high capacity pumps permanently installed inside the Level 1 perimeter with enough capacity to accommodate both leakage of the Level 1 perimeter and the expected rainfall inside of the perimeter. Those would require redundant power sources, including onsite elevated stand-by generation.

Third, individual critical equipment such as stand-by generators and control buildings would have an individual protection wall and pumps as a backup defense. Finally, individual components such as transformer control cabinets and air vents can be raised where appropriate. The Working Group anticipates that there are some locations where this defense-in-depth approach may not be practical because of space or other considerations. In these individual instances, it may be necessary to elevate control equipment, circuit breakers, and cabling to mitigate flood risk.

### Method for Rebuild

Rebuilding substation sites should begin with securing each site. This would include repairs to fences, gates, doors, and other openings. Other physical security equipment such as

CCTV and card readers at critical sites should also be installed. Repair of washout areas and stabilization against erosion and washout, especially around fences and foundations, is also a critical first step.

Several classes of equipment should be considered inoperable or destroyed if they have been subjected to flooding. These equipment types include protective relays, communication electronics, battery banks and battery chargers, dry-type transformers, air-blast circuit breakers, potential and instrument transformers, meters, motors and pumps, breaker racking mechanisms, and SCADA, among others. These types of components should be replaced.

Other equipment components, such as control panels and associated wiring and terminals may be salvageable if they are immediately cleaned and dried after the water recedes.

- Any equipment salvaged in such a way should be fully re-commissioned with circuit continuity checks and insulation quality tests.

- If this equipment is successfully salvaged, PREPA should be prepared for unexpected failures and mis-operations due to hidden deterioration and poor electrical connections.

- If this equipment cannot be cleaned and dried to satisfaction then it should be replaced.

- It should be noted that re-wiring switchgear and control houses can be nearly as expensive as replacement. In these cases, replacement is recommended as the more cost-effective solution.

- Install perimeter flood walls (material to be based on site conditions).

  o Wire mesh-lined flood barriers are most cost-effective but require real estate.

  o Where space is constrained, use reinforced concrete walls.

- Purchase deployable flood barriers for personnel gates and driveways.

- Install new dewatering pump stations with elevated backup generators.

- Enclose critical equipment inside the station with interior concrete flood walls.

- Install new prefabricated, modular relay and control houses on elevated platforms.

AR_0008402

**JA_447**

- o Use new microprocessor relays and fiber optic based equipment to improve system protection as well as to enable interconnection of DER.
- o Use fiber communications where possible to provide better protection against water intrusion. Include analog to digital convertors connected to fiber optic patch panels on existing equipment such as transformers to communicate with new relay/control houses.

PREPA should expect that much of the flooded equipment cannot be salvaged and will require replacement, which has been accounted for in the rebuild cost estimates.

*Hardening for Wind and Rain Damage*

Most substations surveyed suffered some amount of wind and rain damage, several extensively. A detailed site survey should be conducted to identify each damaged component.

Rebuilding and hardening for these substations includes new control buildings, upgraded structures and insulators to meet Category 4 design. Equipment with limited capabilities should be replaced if damaged.

In areas subject to salt water contamination, PREPA should consider increasing the dielectric strength of substation equipment. Many utilities have accomplished this by simply designing substations for one voltage class higher than the energized voltage. For example, using 230 kV breakers on the 115 kV system.

In areas with potential for a high amount of wind-driven debris, polymer insulators may be used to replace porcelain or glass insulators. The extent of damage in control houses that were breached is difficult to quantify, even with detailed after-the-fact inspections. Control houses that were breached or do not measure up to a Category 4 wind rating should be replaced with a standardized design. Most utilities have found that modular control houses or for the 38kV modular substations, are an economical alternative to site-built structures.

Also, for 38kV substations, the extent of damage in control cabinets, cubicles, and unit switchgear that were breached is difficult to quantify, even with detailed after-the-fact inspections.

PREPA also has a stated plan to convert the primary distribution system to 13.2 kV. Therefore, damaged



Modular Control Building
Source: Con Edison

equipment should generally be replaced with 15 kV class modular switchgear instead. Control cabinets, cubicles, and unit switchgear that were breached or do not measure up to a Category 4 wind rating should be replaced.

For the 38 kV substations, PREPA should consider a standardized containerized substation design. Generally, this would consist of two containers one with switchgear and the other with relay and control equipment for the urban areas. This way the equipment remains in a water-tight container placed on concrete piers and tied to it with side entrance bushings and wire raceways that are water tight. These standardized designs will be generic and easier to install when rebuilding a substation with minimal outage time. In addition, this design will also provide physical and security benefits and they would be interchangeable, providing lower costs and decreasing the need for multiple spares.

*Substation Automation to Modernize Protection, Control, and Security*

Substation automation (SA) will provide remote control and data acquisition from substation equipment (such as transformers, breakers, and capacitors, and devices measuring current, voltage, and power flow). SA utilizes an open-standards design to increase interoperability between systems and devices, allow for component upgrades from multiple vendors, and facilitate modern cybersecurity protections. SA is also critical as a base-line technology to enable DER development. A Common Substation Platform (CSP) design provides a critical communications hub that enables a cyber-secure interface between the Field Area

AR_0008403

**JA_448**

Network and Wide Area Network or SA. It also provides the underlying technology platform that enables remote management of substation functions.

*Efficiencies and Synergies*

Along with the extensive work required for restoration, recovery, rebuild, and hardening, there are several areas of coordination that could reduce PREPA's overall cost profile. These include coordination of the replacement of end of life circuit breakers and transformers that are leaking fluid, state-of-the-art relay protection systems and SA including supervisory control systems (SCADA) and spill prevention containment (SPCC) for power transformers. In addition, the Working Group recommends design changes such as discontinuation of the use of high side fuses (replace with reclosers or breakers), building reinforcements, communication systems, and installation of distribution automation where lines are being rebuilt. Finally, substation enhancements should include updating both physical and cybersecurity.

AR_0008404

**JA_449**

Cost

### TABLE 3-6. SUBSTATION COST ESTIMATES

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| **Substations – 38 kV** | | |
| Wind Damage | $647 | Install hurricane-rated fencing, replace or reinforce damaged control buildings, replace bus structures, replace insulators with higher insulation level and Cat 4 strength |
| Water Damage | $72 | Replace control buildings with a newer modular design, relocate or elevate substations, install water-tight enclosures for control equipment and junction boxes, elevate select equipment and raise air vents, install water barriers and engineered solutions |
| Command and Control | $13 | Replace damaged SCADA and replace high risk SCADA units, install synchronization and black start relay systems |
| Unreliable Operation | $124 | Replace high risk circuit breakers, Repair ground systems, Install SPCC containment where needed, install redundant battery systems and backup generators for charging, replace damaged and water-logged transformers, install high side switches or circuit breakers |
| **Substations – 115 kV and 230 kV** | | |
| Wind Damage | $203 | Install hurricane-rated fencing, replace or reinforce damaged control buildings, replace bus structures, replace insulators with higher insulation level and Cat 4 strength |
| Water Damage | $226 | Replace control buildings with a newer modular design, relocate or elevate substations, install water-tight enclosures for control equipment and junction boxes, elevate select equipment and raise air vents, install water barriers and engineered solutions |
| Command and Control | $79 | Replace damaged SCADA and replace high risk SCADA units |
| Unreliable Operation | $304 | Replace high risk circuit breakers, repair ground systems, install SPCC containment where needed, install redundant battery systems and backup generators for charging, replace damaged and water-logged transformers, install high side switcher or circuit breakers |
| **Total Substations** | **$1,668** | |

Funding for the substation recommendations would primarily consist of insurance recovery for damaged equipment, FEMA funds for hardening the system, and other Federal or Territory funding sources for automation and security enhancements.

AR_0008405

**JA_450**

## Timeline

Over the short-term (one to six months), interim repairs are required to restore service. Investment in the recommended transmission rebuild projects will be spread over a period of up to 10 years, as major equipment has long lead times. Further, due to the large number of substations affected, careful scheduling and coordination with transmission upgrades is required to ensure the system can operate reliably while upgrades are underway.

## Distributed Energy Resources

Puerto Rico has approximately 157 MW of installed distributed solar PV projects spread across 11,000 projects interconnected to the subtransmission (38 kV) and distribution (13.2 kV and below) systems.

### Damage Assessment

Given the vast number of systems, little information is available on status and current condition. However, the Working Group has observed extensive damage on larger solar and wind farms.

### Rebuild Recommendations

Two use cases are proposed for DER to build resilience for future emergencies and to reduce fossil fuel imports.

### DER for Resiliency

As natural disasters such as Hurricanes Irma and Maria occur in the future, it is imperative that critical infrastructure and remote, isolated communities can restore power to key services in a timely manner. Moreover, these critical loads may need to operate in isolation for days at a time. A large-scale investment in microgrids can pave the way for a more resilient Puerto Rico.

A microgrid is a specific section of the electric grid – representing as large an area as an entire community, down to as small an area as a single building – that has the capability of "islanding" itself from the rest of the electric grid and operate in isolation for hours or even days at a time, while most of the year they retain connection to the centralized grid. This is accomplished via the strategic deployment of DER such as solar, battery storage, backup generators, and control equipment.

The WG recommends pursuit of two specific deployment alternatives to harden portions of the PREPA electrical system, particularly those serving critical infrastructure and loads:

- **Critical infrastructure** such as hospitals, police and fire stations, emergency shelters, critical communications infrastructure (*i.e.*, cellphone towers), water treatment plants, airports, sea ports, telecommunication centers, commercial centers, and industrial centers could operate in isolation and provide much-needed services to Puerto Ricans immediately after a natural disaster. Industrial, airport, sea port, commercial, and telecom sites may be considered, first as an expense to those entities and second, as an alternative to the recommendations provided should implementation become untimely. The installation of onsite backup generation, combined heat and power systems (CHP), rooftop solar, battery storage, and building energy management systems at strategically located sites can create a series of self-powered, autonomous centers to help the local communities recover in the immediate aftermath of a storm.

- **Remote communities** that are more difficult to return to service after an outage, or that are served by a single utility line, could remain disconnected from the grid while still providing much-needed electricity to both critical infrastructure as well as local grocery stores, gas stations, and community centers. The installation of solar, battery storage, feeder automation control systems, load control equipment, and similar technologies could allow for these communities to more quickly recover from natural disasters.

The Working Group recommends that specific emergency services and other critical loads receive investments in onsite generation and islanding equipment, allowing for operations during and after major storms. For certain critical infrastructure, it may not be feasible to pursue microgrid technology deployments at each site. To maximize the impact of these investments while ensuring the broadest possible reach across Puerto Rico, the following assumptions have been made:

- **Hospitals** – Per the American Hospital Directory, there are 58 non-federal, short-term, or acute care

AR_0008406

**JA_451**

hospitals in Puerto Rico.[21] Based upon a review of population density and prioritizing by the number of staffed beds at each hospital, it is recommended that 26 hospitals be provided with the technologies required to operate in a non-grid interconnected (islanded) state for emergency purposes. This includes onsite generation in the form of solar PV, diesel reciprocating internal combustion engines (RICE), CHP, and battery energy storage systems (BESS). Systems would be sized to dispatch the BESS for 6 hours, with the RICE and CHP providing nighttime, shoulder, and shaped production after utilization of the solar generation.

- **Police & Fire Stations** – Based on preliminary research there are 84 fire stations[22] and 13 municipal jurisdictional regions across Puerto Rico for police enforcement.[23] Based upon a review of population density with existing infrastructure and to ensure the availability of police and fire services in the most populated regions of Puerto Rico, it is recommended that 20 of each facility type receive the technologies required to operate in an islanded state. This includes the provision of onsite solar PV, RICE, and BESS at each location, with the BESS sized to dispatch for 4-hours.

- **Emergency Shelters** – The FEMA Shelter Inventory Map identifies 452 shelters across the 78 communities in Puerto Rico.[24] For the preliminary investment in hardening the electric grid to provide emergency services, it is recommended that at least one emergency shelter in each community receive the technology required to operate disconnected from the grid immediately following a natural disaster. For purposes of this analysis, that includes 75 discrete microgrids (with three additional shelters incorporated into broader remote community deployments). These shelters would receive solar PV, BESS, and RICE, with the batteries capable of dispatching for 4-hours.

- **Wastewater & Drinking Water Treatment Facilities** – There are approximately 50 wastewater and 100 drinking water treatment facilities located in Puerto

Rico.[25] The initial assumption is that 10% of these facilities would receive solar PV, BESS, and RICE in order to assure that a minimum level of water treatment services are available to communities across Puerto Rico.

- **Remote Communities** – Several remotely located communities exist in Puerto Rico that may be more difficult for PREPA to return to service in a timely manner following a natural disaster. For these types of locations, the investment in a broad feeder-based microgrid can provide for a continuation of services and the provision of electricity to the community for long periods of time. It is assumed that three such communities would be identified, and would include at least one hospital, police station, fire station, emergency shelter, and additional residential and commercial loads. Solar PV, BESS, and RICE would be installed for islanding purposes, with the BESS designed to dispatch for four hours and the RICE units assisting with nighttime minimum loads and the shaping of solar output during the day. These microgrid deployments should be prioritized with other investments related to undergrounding distribution system equipment to enhance resiliency.

All microgrid systems shall be sized to allow for typical daily operations leveraging the dispatch of solar and battery storage during daytime and shoulder periods, and diesel backup generation (and CHP, if applicable) during nighttime hours when solar generation is unavailable. For onsite conventional generation, diesel fuel tanks should be sized to allow for a minimum of 7 to 10 days of planned islanded operations, after which additional diesel fuel would need to be procured and delivered. Remote Communities deployments may leverage larger fuel reserves depending on the anticipated post-hardening infrastructure restoration timeline.

The WG recommends time and consideration be given to investing in local training initiatives, led by PREPA staff, that provide the opportunity for local labor to perform operation and maintenance of the microgrids and associated DER.

---

[21] https://www.ahd.com/states/hospital_PR.html.

[22] Per data from FireCares and the Puerto Rico State Fire Department (https://firecares.org/departments/92796/puerto-rico-state-fire-department).

[23] http://www.oslpr.org/download/en/1999/0264.pdf.

[24] https://www.floodmaps.fema.gov/ffx/files/739166_PR_CertifiedShelters_Municipios_Barrios_book_20171111_ANSI_C_Portrait_optimized.pdf.

[25] Based upon data provided by the Puerto Rico Aqueduct and Sewer Authority.

AR_0008407

**JA_452**

For some remote areas of the island, it may be feasible to more fully isolate these communities and design them to operate as separate and discrete grids. The WG recommends the consideration of feasibility studies and stakeholder discussions with local leaders and interested third parties to determine if investments in permanent disconnection from the main PREPA grid are in the public interest, provide more cost-effective resiliency from natural disasters, and provide adequate service quality and reliability.

These efforts could also include procurement processes to identify third party investors and technology providers to provide the capital and equipment necessary to convert these communities into true islanded portions of the grid, if those local communities so desired.

A map of potential critical infrastructure microgrid deployments is included below in Figure 3-4. The exact locations will require further study.

### FIGURE 3-4. HYPOTHETICAL ISLANDING OF CRITICAL INFRASTRUCTURE



Population Map source at:
https://amory51.files.wordpress.com/2010/10/puerto-rico-map-2000-population-density.jpg

**Legend**

| | |
| --- | --- |
| H Hospital | W Drinking Water Treatment Facility |
| Emergency Shelter | Fire Station |
| W Wastewater Treatment Facility | Police Station |

Sources: Multiple, SEPA

### DER for Cost Savings

DER is also proposed to minimize dependency and cost of fossil fuel imports by either reducing energy needs or reducing peak loads, as follows

1.  **Passive DER** –Approximately 470,000[26] homes need to be rebuilt or undergo major repair. This presents an opportunity to incorporate energy efficiency and solar PV. These technologies do not require external communications and control infrastructure; therefore, they can be incorporated in the near-term. With the right specifications – such as advanced inverters and guidance from PREPA on ideal locations – passive DER could be installed rapidly with minimal integration costs.[27]

Puerto Rico's current building codes[28] require solar water heating to be installed in all new homes. This limits the potential for solar PV to be installed because less roof space is available. However, if 20%[29] of the rebuilt homes included an average system size of 1 kW PV system, 128 MW of PV would produce 136 GWh[30] per year, offsetting the equivalent amount of fossil fueled generation.

In addition, Puerto Rico's building codes[31] require all new construction to comply with IECC 2009 building standards for energy efficiency. We assume this will be met in most[32] of the rebuilt homes. If 15% of the new homes built or rehabbed were to comply with

---

[26] Source: 11/13 Build Back Better Submission

[27] The exact amount of solar that could be installed without large integration costs requires a separate analysis. This report uses conservative assumptions about system size and penetration in absence of such a study.

[28] Source: https://energy.gov/savings/puerto-rico-building-energy-code-mandatory-solar-water-heating

[29] Source: Navigant assumptions based upon https://www.nrel.gov/docs/fy08osti/42306.pdf

[30] Source: Conservative Navigant analysis using NREL's System Advisory Model for a residential PV system in Puerto Rico that yielded 1443 kWhAC/kWDC production.

[31] Source: https://www.iccsafe.org/about-icc/government-relations/map/puerto-rico/

[32] Puerto Rico's current goal is 90% compliance with code

AR_0008408

**JA_453**

IEC 2012, Puerto Rico would save an additional 60 GWh[33] in energy.

2. **Active DER** – Grid interactive DER requires installation of the communications and control infrastructure investment discussed above before it can be realized. Implementation is estimated at three to four years out, but planning should start. Figure 3-5 illustrates the WG's recommended approach to create and launch a DER program. Technologies relevant to Puerto Rico to assess during an initial feasibility study include:

   o  Smart thermostats

   o  Direct load control of thermostats or compressors

   o  Grid interactive water heaters

   o  Energy storage – this could be new builds or leveraging the storage deployed for microgrids as discussed above

   o  PV

   o  Electric vehicle charging modulation

Cost

DER for Resiliency estimates are shown in

**FIGURE 3-5. RECOMMENDED APPROACH TO LAUNCH DR/ACTIVE DER PROGRAM**



---

[33] Assumes 17% savings over IECC 2009 per PNNL - 88603 *Energy Use Savings for a Typical New Residential Dwelling Unit Based on the 2009 and 2012 IECC as Compared to the 2006 IECC*

AR_0008409

**JA_454**

Table 3-7. This does not account for the communications and controls infrastructure required to actively manage DER, as that is accounted for above in previous sections. Associated investment in distribution automation and controls that are expected to operate on common communications platforms are included in the lines and substation sections of the report.

AR_0008410

**JA_455**

## TABLE 3-7. MICROGRID COST ESTIMATES

| Facility Type | | Number of Sites in Puerto Rico | Technology Required | Estimated Cost per Site | Targeted Microgrid Deployments | Total CAPEX ($ Millions) |
|---|---|---|---|---|---|---|
| Critical Infrastructure | Hospitals | 58 | PV, BESS, CHP, RICE | $19 million | 26 | $496 |
| | Police Stations | Approx. 100 | PV, BESS, RICE | $240,000 | 20 | $5 |
| | Fire Stations | 84 | PV, BESS, RICE | $240,000 | 20 | $5 |
| | Emergency Shelters | 452 | PV, BESS, RICE | $4.6 million | 75 | $345 |
| | Wastewater Treatment Facilities | 50 | PV, BESS, RICE | $3.6 million | 5 | $18 |
| | Drinking Water Treatment Facilities | Approx. 100 | PV, BESS, RICE | $2.4 million | 10 | $24 |
| Remote Communities | | Multiple | PV, BESS, RICE | $38.1 million | 3 | $114 |
| TOTAL | | | | | 159 | $1,007 |

Our estimates for DER for cost savings are:

- Solar PV on new residential construction - $315M[34]

- Bring 15% of new construction or major rebuilds to IECC 2012 building code - $133M[35]

Funding for the DER recommendations would primarily consist of CDBG, private equity or merchant development, and non-FEMA Federal or Territory funding for DER development.

### Timeline

Investments in microgrids would occur strategically over a five to ten-year period, with the most critical loads prioritized first. This effort could be coordinated with both PREPA, FEMA, and USACE input and assistance to ensure that the highest value / highest impact facilities were targeted first and that lower priority sites received interim relief and mitigation assistance.

Implementing the passive DER portion of the Working Group's recommendation should start in early 2018 to achieve the desired timeline. Challenges to implementing this plan include:

- **Workforce availability** - installing solar PV and building energy efficient homes requires specific skills and expertise such as electricians, roofers, and plumbers. Work can begin on mapping labor needs and conducting trainings if needed.

- **Logistics and equipment supply** - this will be a large undertaking. Outside partners with implementation experience on this scale might be required. Solicitations can be developed in early 2018 so bidders can secure a supply of equipment such as solar panels and inverters.

The Active DER portion of the plan cannot be fully implemented until requisite communications and control systems are installed - likely three to five years out. However, planning should start several years earlier.

In addition, the WG recommends the next IRP specifically include a review of DER for both resiliency and cost savings, with considerations given to how strategic investments and locational deployment of DER can offset future conventional generation needs.

### System Operations

PREPA maintains both primary and backup system control centers to manage the operations of the interconnected grid. Personnel in these control centers play a critical role during major storms as they are responsible for isolating faulted lines and substations, and dispatching generation in a manner that minimizes the number of customers affected and restoring power as quickly as possible following a storm, assuring customer and work crews and system safety. Control center staff rely on sophisticated

---

[34] Assumes a cost of $2.5/Watt plus 30%

[35] Working Group estimates $1,500 per home plus 30% based upon an average from http://bcapcodes.org/tools/ica-2012/ Actual costs will vary significantly on a house by house basis.

AR_0008411

**JA_456**

supervisory control system (EMS and SCADA) and secure communications to efficiently and reliably deliver power from generators to load centers. PREPA's primary control center is in a secure building, elevated above flood levels. The backup control center is rarely used and is not built consistent with current industry practices.

## Damage Assessment

The storm surge extensively damaged generation and T&D equipment, which has compromised PREPA's ability to monitor, operate and control electric operations across the island. The Working Group's recommendations will improve PREPA's ability to execute their function as system operator and provide new capabilities associated with distributed resources, each of which are essential to the safe, reliable and secure operation.

### Operating Considerations

In addition to the rebuild recommendations below, the following operating measures are recommended to limit damage in the future and improve the resiliency of the system:

- Black start capability at generating stations and automated synchronization at selected substations
- Plan to automatically split and operate the power system on the main island of Puerto Rico as independent electrical islands should the transmission grid be severed or become unstable again in the future.

## Rebuild Recommendations

The Working Group recommends the installation of new primary and backup control center equipment, hardware and software, including associated IT and OT system upgrades required for distribution automation, monitoring and control of distributed resources and energy storage. The use of automated systems and advanced outage and distribution management systems for both the primary and backup control centers will improve system resilience, efficiency, and security. To achieve the desired functionality described above, PREPA also will need to build out communication systems as described below.

### Communication Systems to Support Automation

The expansion of communications systems, via hardened stand-alone fiber loops, and partly via integrated optical ground wire (OPGW) on the transmission network, can be accomplished cost-effectively during the T&D rebuild

process. The communication system upgrades can also have other utility and/or commercial applications that should be considered during the design process.

Communication systems are divided into two major components; a Field Area Network (FAN) supporting the distribution system and a Wide Area Network (WAN) providing backhaul data from substations to the control centers. A modern FAN would include a secure, Internet Protocol (IP)-based, data transmission system that enables information to be sent between the distribution sensors on circuits to transmitters in substations and then to the control centers. The FAN typically consists of a wireless radio system capable of supporting the capacity, speed, connectivity, and security needs of distribution field devices and DER planned for at least the next 15 to 20 years.

The WAN today is made up of a fiber-based, highspeed data system that supports the convergence of voice, video, and data from the field to the control centers. Similar to DA, these systems may more commonly be deployed in urbanized areas to support the distribution system, though they may prove useful in rural areas to provide more secure and reliable data from remote sensors and SCADA systems installed at substations; as well as visualization and control of distribution resources and microgrids.

### Advanced Distribution Management System (ADMS)

A modern distribution automation system capable of performing advanced functions outlined in this report will require ADMS operating on a common platform with SCADA and DER monitoring, control and optimization software (DERMS). The ADMS provides advanced distribution operations, switching procedure management, planned and unplanned outage management, and other applications such as Fault Location Isolation and Service Restoration (FLISR), Volt-VAR Optimization (VVO), Conservation Voltage Reduction (CVR), peak demand management, optimization through a single real-time system model, SCADA controls, and other network analysis, operation and planning functionality.

AR_0008412

**JA_457**

## Cost

Funding for the system operations recommendations would primarily consist of FEMA funds for studies related to hardening the system and other Federal or Territory funding sources, such as CDBG, for technology enhancements, and insurance recovery for damaged buildings and equipment.

**TABLE 3-8. SYSTEM OPERATIONS COST ESTIMATES**

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| System Control | $167 | Install ADMS System, upgrade communications, add a portable backup Control Center, and install hurricane coverings for the windows |
| System Studies | $55 | Post-restoration engineering studies, planning studies, pre-engineering surveys |
| Customer Communications | $165 | Upgrade customer system and messaging |
| Spare Equipment | $29 | Purchase and store adequate system spares based on new equipment and expected failures |
| Security | $66 | Upgrade security at control centers and critical substations |
| Total | $482 | |

## Timeline

The Working Group estimates five to seven years to complete the control system implementations, with the communications infrastructure more closely aligned to the T&D build schedule and continuing two to three additional years.

AR_0008413

**JA_458**

# 4. Generation Rebuild and Hardening

The generating capability of the PREPA fleet is almost 5,839 MW, including several PPAs for fossil and renewable generation. The damage to PREPA generating facilities varied from minor to extreme. The pre-storm capacity of the generating fleet is notably higher than the PREPA peak of approximately 3,060 MW in August 2017. Given this excess capacity and the need to rebuild, there are several options for modifying the size and technology of the generation fleet. The Working Group considered the following in evaluating Puerto Rico's generating fleet:

- Near-term restoration of power to the island
- Opportunities to increase the use of DER
- Development of new targets for renewable resources
- Shift of fossil generation to primarily duel fuel units with primary fuel as natural gas
- Hardening of the generating facilities that will remain
- Study establishing new planning and operating generating reserve margins to something nearer to 50% (approximately 4,000 MW of firm capacity).
- The issues noted above will require the 2015 IRP to be revisited for modification to ensure all necessary factors are considered including:

The potential impact of increased DER and renewable targets includes:

- Shift of fossil generation to natural gas
- Reduction of system reserve margin
- Recent operational history of plants (availability, outages, heat rates, etc.)
- Potential hidden damages to piping, electrical and control systems and other system necessary for operations
- A combination of plant age, operational capability, criticality to overall system operations and cost to repair

- Assessment of the viability of the IPP facilities for continued operations.

The issues noted above will require the 2015 IRP to be revisited for modification to ensure all necessary factors are considered including the potential impact of increased DER, increased renewable targets, shift of fossil generation to natural gas, reduction of system reserve margin, etc. Depending on the results of the newly proposed IRP, some of the plants may be slated for retirement and may not require the full level of estimated expenditures.

## Damage Assessment

An assessment of generation plants was performed by the NYPA team.[36] Individual generation plant damage assessment reports were prepared, and are included in Appendix A. Some of the representative damage found include:

- Critical components of the stations, such as turbines and boilers, are not enclosed in a building and the proximity to the coast results in salt mist being carried by the wind that can corrode the exposed equipment in addition to damage caused by heavy winds and rain
- Damage to louver sets of air intakes by high winds allowing for water to reach air filters
- Extended damage of cooling towers
- Bus and switching gear failure
- Flooding of fuel oil farm including fire protection house
- Water intrusion into administration building (from roof and through doors)

## Recommendations

Puerto Rico's generating facilities are concentrated along the north and south coasts of the island. They are vulnerable to flooding, both from coastal storm surge and rain runoff coming down from the mountains. In addition, the critical components of the stations, such as turbines and boilers, are often not enclosed in a building and the proximity to the coast results in salt mist being carried by the wind that can corrode the exposed equipment in

---

[36] It is important to note that the Working Group did not review or provide specific recommendations for the units on Vieques and Culebra.

AR_0008414

JA_459

**FIGURE 4-1. PRIMARY GENERATION FACILITIES IN PUERTO RICO**



conservative 50% (approximately 4,350 MW of firm capacity).[37]

While implementation of the recommendations in the 2015 IRP is proposed over multiple years, the conversion of some of the severely damaged plants to gas generation will be required in a much shorter timeframe.

addition to damage caused by heavy winds and rain. Expecting these facilities will remain in their current location, storm hardening is critical to ensure they withstand future storms.

The primary generation facilities are shown in Figure 4-1. Nine of these sites have been identified in potential flood zones and are further described in the sections to follow. It is recommended that flooding risk at these sites be mitigated through a defense-in-depth approach as described in the Substations section of this report.

A three-level defense-in-depth approach is recommended for generation facility storm hardening and resiliency. As described in the Substations section, this includes building a perimeter flood barrier, installation of required pumps and backup generators, and improvement of the structures roof and walls to withstand the anticipated high winds

As outlined in the Generation section, the Working Group recommends that the IRP be revisited to incorporate storm hardening, increased use of distributed generation and accelerated penetration of renewables, while ensuring that the capacity meets the current and future energy demand of the island.

Additionally, the Working Group recommends a study be conducted to establish new planning and operating generating reserve margins that are closer to a



Source: PREPA

Source: NYPA/Con Edison Damage Assessments

---

[37] Currently, 961 MW is provided from fossil generation PPA's, another 64 MW from PREPA hydro plants and an additional 122 MW from solar and wind - the remaining 3,200 MW will need to come from the current PREPA fleet and/or distributed resources.

AR_0008415

**JA_460**

## Cost Estimates

Estimated costs per generation site include additional engineering studies, inspection and testing, base facility repairs, spares replacement, storm hardening, and the installation of new generation equipment where required/already planned. Further cost details are provided in Appendix A, along with a high-level impact assessment and specific recommendations for each plant.

### TABLE 4-1. GENERATION FACILITIES RECOVERY AND HARDENING INITIAL COST CONSIDERATIONS

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| San Juan Plant | $38 | Test and inspection; base repairs; spares replacement; storm hardening |
| Costa Sur Plant | $32 | Test and inspection; base repairs; spares replacement; storm hardening |
| Aguirre Plant | $1,545 | Test and inspection; base repairs; spares replacement; storm hardening; install H-class machine at Aguirre to address MATS compliance, system stability, and fuel diversification issues |
| Cambalache Plant | $33 | Test and inspection; base repairs; spares replacement; storm hardening |
| Palo Seco Plant | $1,320 | Installation of dual fired F-class machine to address MATS compliance, system stability, and fuel diversification issues; storm hardening |
| Mayaguez Plant | $13 | Test and inspection; base repairs; spares replacement; storm hardening |
| Vega Baja Plant | $10.5 | Test and inspection; spares replacement; storm hardening |
| Yabucoa Plant | $13 | Test and inspection; base repairs; spares replacement; storm hardening |
| Daguao Plant | $13 | Test and inspection; base repairs; spares replacement; storm hardening |
| Hydro Plants | $32 | Test and inspection; base repairs; spares replacement; storm hardening |
| Renewables Plant | $65 | Test and inspection; base repairs; spares replacement; storm hardening |
| Total Estimated Costs | $3,115 | |

The Working Group recognizes there is a planned shift in the generation mix to more renewables, DER and natural gas fired generation. To this end, options studied by the Working Group and shared with PREPA were later discarded as previously explored and dismissed options for the island. Per input from PREPA, the decision has already been made as a matter of public policy, to pursue the Aguirre Offshore Gas Port floating storage and regasification unit (FSRU) option. Initial high-level estimates range from $300 - $525 million and exclude any funding for damage from the hurricane which is unknown at this time.

Developing the planned Aguirre Offshore Gas Port along with marine infrastructure and pipeline to shore for gas delivery to shore would enable the conversion of the Aguirre generation plant to natural gas.

In addition, PREPA is assessing the feasibility and possible locations for supplying natural gas to the northern power plants, specifically San Juan and Palo Seco.

## Fuel Considerations

Presently there is a lack of detailed information regarding the current capabilities of fuel delivery, the extent of damage from the hurricanes and needed modifications for reliable future deliveries. The IRP will need to consider the current and future fuel delivery schemes required to support the modified generation fleet. The pre-storm fuel structure is described in Appendix A.

AR_0008416

JA_461

# 5. Implementation Roadmap

The following diagram presents a high level, 7-10-year cashflow analysis and associated implementation roadmap envisioned for the power system rebuild recommendations provided in this report.

**FIGURE 5-1. PUERTO RICO POWER AND GRID RESILIENCY IMPLEMENTATION ROADMAP**



The following activities are underway or expected to begin in early Q1 2018:

- Initial Rebuild activities are underway and include the repair of salvageable substation equipment, strengthening and grouting of poles, repairing fences, restoring physical security, and restoring salvageable communications.

- Annual FEMA audits, also known as A-133 or single audits, are required by federal regulations for any entity that expends $750,000 or more of federal assistance. The audits must be filed by September 30 of the year after FEMA money is spent and must

be filed every year thereafter while federal assistance funding is spent. Accordingly, the first FEMA audit will likely need to be completed by September 2018.

- Planning Studies include the transmission planning studies, detailed engineering assessments, IRP resource studies, and DER site studies.

AR_0008417

**JA_462**

# Appendix A.  Generation – Per Site Impact Overview and Recommendations

## San Juan Plant

San Juan Steam Plant (SJSP) is a combination of four steam boiler units and a combined cycle unit all of which have oil as the primary fuel. According to the 2015 IRP, San Juan units 7,8,9, and 10 are subject to MATS, and therefore will face limited use or retirement once the transmission grid has been sufficiently repaired and replacement generation is installed at Palo Seco. San Juan 5 and 6 are combined cycle and newer than the steam units. These units should be able to better handle renewable intermittency and could be converted to burn natural gas.

### Damage Assessment

The combined cycle unit is generally available but is still in need of having a thorough test and inspection completed to ensure equipment and personnel safety.

One of the steam boiler units is unavailable while the others are partially or fully available. Units 9 & 10 cooling tower is damaged with temporary fixes in place to allow interim usage. There is no wastewater treatment available and the fuel oil fire protection has been damaged and is functionally questionable. The plant bridge crane has been damaged and in need of repairs. Battery chargers are not in service, and with a loss of AC power, can result in severe damage to equipment.

One significant issue with the loss of battery is the failure of the lube oil system to operate and cause damage to the steam turbine bearings. Unit 10 steam turbine was out of service prior to the hurricanes with the cover removed and the rotor and stationary blades stored outside under a tarp. The extent of damage to this equipment is unknown, but may require significant replacement of spares.

### Rebuild Recommendations

The 2015 IRP does not envision any significant change to SJSP and thus would indicate that this plant would be subject to a significant rebuild effort.

The SJSP is a significant portion of the capacity for the island and may be a priority facility to make fully functional as soon as possible. In the longer term, a review of the need and viability of units 7-10 should be considered.

**TABLE A-1. SAN JUAN PLANT COST ESTIMATES**

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| Test and Inspection | $0.25 | Work to further define damage at generation facilities |
| Base Repairs | $10 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | $7.75 | Replacement of spares that have been damaged by the storm |
| Storm Hardening | $20 | Storm hardening at existing generation facilities |
| Total | $38 | |

AR_0008418

**JA_463**

Repairs to full functionality can be done in a phased approach extending an estimated 18 months. A complete evaluation of the damage and operability assessment is expected to take approximately one month from which a more defined action plan can be prepared.

## Costa Sur Plant

A four-unit oil/gas 820 MW station with two Frame 5 turbines and two steam units. The two steam units, Costa Sur 3 and 4, are subject to retirement, and are not used unless there are extreme system conditions. No additional information is available on the two steam units.

### Damage Assessment

This station experienced a failure of one combustion turbine (CT) generator stator during the hurricane. The second CT was previously unavailable prior to the hurricane. The blackstart capability at the station in unavailable. The station crane was blown off its rails during the storm. Repairs to the blackstart capability may well be an initial priority. The Costa Sur 6 unit is in service.

### Rebuild Recommendations

While the 2015 IRP has the Costa Sur plant being repowered with an H-class combined cycle, that is not expected until the 2030/2031 timeframe.

With a capacity of 820 MW and what now seems to be limited damage, this station could also be placed on the priority list for operability.

**TABLE A-2. COSTA SUR PLANT COST ESTIMATES**

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| Test and Inspection | $0.25 | Work to further define damage at generation facilities |
| Base Repairs | $10 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | $1.75 | Replacement of spares that have been damaged by the storm |
| Storm Hardening | $20 | Storm hardening at existing generation facilities |
| Total | $32 | |

Repair of the facility to operability will require a phased approach. The first step, approximately one month consists of comprehensive inspection and testing to ensure safety of equipment and personnel. Repair of the blackstart capability in conjunction with repairs to the two Frame 5 machines will be heavily dependent on the specific damage and availability of spare parts.

Also in conjunction with this effort, a review of the steam units should be completed which may offer greater capacity in a shorter timeframe. Expected overall time for full operability is six to 18 months.

AR_0008419

**JA_464**

## Aguirre Plant

The 1200 MW Aguirre oil-fired plant consists of 900 MW of steam capacity and 300 MW of combined cycle capacity. The station also includes two Frame 5 machines for blackstart capability. According to the 2015 IRP, PREPA is also pursuing the Aguirre Offshore Gas Port (AOGP) for fuel diversification, cost reduction, and future generation at Aguirre.

### Damage Assessment

The plant experienced destruction of the cooling towers and an apparent bus failure on one of the combined cycle units. One of the combined cycle units was taken out of service prior to the hurricane. The steam units appear to have experienced minimal damage. A key issue is the lack of any available transmission lines leading to the switchyard. Depending on the results of the comprehensive inspection and testing, a significant portion of the units may be made functional quickly, but the lack of operating cooling towers will limit their full functionality. As of November 29, Aguirre 1 is in service.



Source: NYPA/Con Edison Damage Assessments

### Rebuild Recommendations

The damage to the cooling towers at the station is significant and a major driver of the costs to repair. Repair of the cooling towers will be on the critical path to bring the station into full operability. The cost estimate assumes repairs to the cooling towers versus full replacement. If the cooling towers require replacement, the cost estimate will increase significantly. Restoring blackstart capability and repairs to the cooling towers should take precedence in the schedule.

The 2015 IRP calls for the conversion to gas by 2017; however, this has not occurred. The plan also calls for the replacement of the steam units with H-class combined cycle units in the next 10 years. Given the current state of the PREPA generation fleet, an accelerated move to the H-class machines should be considered.

### TABLE A-3. AGUIRRE PLANT COST ESTIMATES

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| Test and Inspection | $ .25 | Work to further define damage at generation facilities |
| Base Repairs | $ 41 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | $ 3.75 | Replacement of spares that have likely been damaged by the storm |
| New Unit Build | $ 1,500 | Install H-class machine at Aguirre |
| Storm Hardening | $ 20 | Storm hardening at existing generation facilities |
| Total | $ 1,545 | |

The time required to bring this station back to full operability is an estimated 12-24 months depending on the requirements for the cooling tower and spares required to repair the combined cycle units. Additionally, this would assume that the required transmission lines will be available in a timely manner.

## Cambalache Plant

Cambalache is a 247 MW oil-fired CT station.

AR_0008420

**JA_465**

### Damage Assessment

A detailed assessment of this station has not been performed. Additional analysis to better understand the extent of the damage is required. The assessment performed indicates several buildings sustained damage to walls and roofs. While the Cambalache plant is in service, the Working Group recommends detailed inspection and testing.

### Rebuild Recommendations

Since the 2015 IRP does not anticipate any significant change in the station status, repairs to this station should proceed.



Source: NYPA/Con Edison Damage Assessments

**TABLE A-4. CAMBALACHE PLANT COST ESTIMATES**

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| Test and Inspection | $0.25 | Work to further define damage at generation facilities |
| Base Repairs | $10.0 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | $2.75 | Replacement of spares that have likely been damaged by the storm |
| Storm Hardening | $20.0 | Storm hardening at existing generation facilities |
| Total | $33.0 | |

It is estimated that this plant would be available for operation within 9-12 months.

## Palo Seco Plant

Palo Seco is a combination plant with gas-fired steam and CT units onsite. It has a 602 MW rating. According to the 2015 IRP, Palo Seco Units 1, 2, 3 and 4 are subject to MATS.

### Damage Assessment

The damage is extensive. Since this plant was slated for conversion to F-class machines or shutdown per the 2015 IRP, additional expenditure is not recommended.

### Rebuild Recommendations

With the extent of damage and significant safety concerns, the Working Group recommendation is to shut down or replace this facility.



Source: NYPA/Con Edison Damage Assessments

**TABLE A-5. PALO SECO PLANT COST ESTIMATES**

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| New Unit Build | $1,300 | Installation of dual fired F-class machine at Palo Seco |
| Storm Hardening | $20.0 | Storm hardening at existing generation facilities |
| Total | $1,320 | |

AR_0008421

**JA_466**

This type of facility would require a 3-4-year timeframe for design and construction of the new facility.

## Mayaguez Plant

The Mayaguez plant is a four unit FT8 oil-fired CT plant rated at 220 MW. It is one of the newer plants having commenced operation in 2008.

### Damage Assessment

Given the recent construction of the facility plant, it appears the plant saw minimal damage. As of November 26th, Mayaguez is in service.

### Rebuild Recommendations

This plant may be capable of generating power as long as fuel is available and the T&D systems is intact/ restored. Additional storm hardening may result in reliable operation in the future. Cost estimates include the necessary repairs and some storm hardening.

**TABLE A-6. MAYAGUEZ PLANT COST ESTIMATES**

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| Test and Inspection | $0.25 | Work to further define damage at generation facilities |
| Base Repairs | $2.0 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | $0.75 | Replacement of spares that have been damaged by the storm |
| Storm Hardening | $10.0 | Storm hardening at existing generation facilities |
| Total | $13.0 | |

Portions of this plant are capable of running immediately, as long as fuel is available and there is a means to move the power into the system.

## Vega Baja Plant

The Vega Baja plant is a 2-unit oil-fired CT plant rated at 40 MW.

### Damage Assessment

No major damage from the hurricane was seen during the evaluation. Neither unit was available at the time of the inspection, but repairs were underway on unit 2. It is expected that those repairs have been completed. The unavailability of the units was due to hurricane damage.

### Rebuild Recommendations

If fuel supply is available, this site may be available to generate power however, the status of the transmission/distribution infrastructure may limit its capabilities. Additional storm hardening may be beneficial to ensure greater resiliency in the future.

AR_0008422

**JA_467**

The current estimate to address minor damage and/or replacement of damaged spares and storm hardening is $10.5 million. Further evaluation is required to determine the full scope of work needed at this facility.

**TABLE A-7. VEGA BAJA PLANT COST ESTIMATES**

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| Test and Inspection | $0.05 | Work to further define damage at generation facilities |
| Replacement of Damaged Spares | $0.45 | Replacement of spares that have been damaged by the storm |
| Storm Hardening | $10.0 | Storm hardening at existing generation facilities |
| Total | $10.5 | |

This plant may be capable of generating power as long as fuel is available and the T&D systems are intact or restored.

## Yabucoa Plant

The Yabucoa plant is a 2-unit oil-fired CT plant rated at 40 MW.

### Damage Assessment

The building's roofing, doors, fire suppression system, fuel storage tanks suffered damage. As of November 29, one of Yabucoa's units is in service.

### Rebuild Recommendations

If fuel supply is available, this site may be available to generate power however, the status of the transmission/distribution infrastructure may limit its capabilities. Additional storm hardening may be beneficial to ensure greater resiliency in the future.

$13 million is the estimate for damage and/or replacement of damaged spares and some storm hardening. Further review should be conducted to consider the need for this facility.

**TABLE A-8. YUBUCOA PLANT COST ESTIMATES**

| Cost Category | Costs ($ Thousands) | Description |
|---|---|---|
| Test and Inspection | $0.05 | Work to further define damage at generation facilities |
| Base Repairs | $2.7 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | $0.25 | Replacement of spares that have been damaged by the storm |
| Storm Hardening | $10.0 | Storm hardening at existing generation facilities |
| Total | $13.0 | |

This plant may be capable of generating power in three – six months as long as fuel is available and the T&D systems are intact or restored.

## Daguao Plant

The Daguao plant is a 2-unit oil-fired CT plant rated at 40 MW.

AR_0008423

**JA_468**

## Damage Assessment

Hurricane damage to this plant was minimal, but there was some damage to the fuel storage tank. According to PREPA, the Daguao units are currently in service.

## Rebuild Recommendations

If fuel supply is available, this site may be available to generate power however, the status of the transmission/distribution infrastructure may limit its capabilities. Additional storm hardening may be beneficial to ensure greater resiliency in the future. Further review should be conducted for the needs of this facility in the longer term.

TABLE A-9. DAGUAO PLANT COST ESTIMATES

| Cost Category | Costs ($ Millions) | Description |
| --- | --- | --- |
| Test and Inspection | $0.05 | Work to further define damage at generation facilities |
| Base Repairs | $2.7 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | $0.25 | Replacement of spares that have been damaged by the storm |
| Storm Hardening | $10.0 | Storm hardening at existing generation facilities |
| Total | $13.0 | |

This plant may be capable of generating power as long as fuel is available and the T&D systems is intact/ restored.

## Hydro Plants

PREPA has seven hydro facilities with an available capacity of approximately 60 MW depending on operating conditions. The largest hydro plant is Dos Bocas, a 22.5 MW facility. Other hydro facilities include Rio Blanco (5 MW), Yauco 2 (9 MW), Toro Negro I and II (10 MW), Garzas I and II (12 MW), Caonillas (4 MW), and Patillas (1.4 MW).

## Damage Assessment

There was extensive damage to the Dos Bocas plant including intrusion of significant amounts of mud and water as well as damage to the Westinghouse unit due to a ground fault on the stator. Based on this assessment, the Working Group recommends a comprehensive evaluation of the facility including detailed inspection of all switchgear, rotating equipment and control systems. As of November 29, 2017, Yauco 2 and Toro Negro are in service.

AR_0008424

**JA_469**



Source: NYPA/Con Edison Damage Assessments

## Rebuild Recommendations

Since these plants are only a small portion of the capacity of the PREPA fleet, their return to service may not be a high priority. With the repairs to these facilities, there is an opportunity to install barriers and enhance the plants' capability to withstand a Category 4 hurricane, which will help in maintaining power during future storms.

**TABLE A-10. HYDRO COST ESTIMATES**

| Cost Category | Costs ($ Millions) | Description |
|---|---|---|
| Test and Inspection | $0.05 | Work to further define damage at generation facilities |
| Base Repairs | $30.0 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | $1.5 | Replacement of spares that have been damaged by the storm |
| Total | $ 32.0 | |

Assuming these are not a high priority to return to service, it is anticipated it will take six to nine months to complete the repairs.

## Renewables

The renewables include two privately owned wind farms and five privately owned solar facilities.

### Damage Assessment

The Punta Lima wind farm suffered significant damage, with loss of approximately half the blades and damage to vertical posts. The other wind farm (Santa Isabel) was seemingly intact. Of the five solar facilities, at least one solar farm had extensive damage to a large portion of the panels which will need replacement.

AR_0008425

**JA_470**

## Rebuild Recommendations

For the privately-owned renewables, it is typical for the current owner/operators to be responsible for rebuilding the damaged facilities. The 2015 IRP anticipates up to 20% of the island's energy coming from renewables. Achieving this target will require investment in new[38] renewable sources of power and the rebuild of the existing facilities that suffered damage.

The estimated cost of repair of these merchant facilities is $25 million for the wind farm and $40 million for solar farm repairs. Repair/replacement of the existing solar and wind facilities is estimated to take approximately nine to 12 months.



Source: NYPA/Con Edison Damage Assessments



*Punta Lima Wind (Damaged)*

Source: NYPA/Con Edison Damage Assessments

## Fuel Infrastructure Pre-Storm Description

### Residual Fuel Oil

Puerto Rico has four steam-electric power plants which burn residual fuel oil. These are Palo Seco and San Juan, both located in the San Juan area on the north coast, and Costa Sur and Aguirre, located on the south coast.

The Costa Sur plant is dual fueled, capable of burning either residual fuel oil or natural gas. Its primary fuel is natural gas. The San Juan and Aguirre facilities have additional combined-cycles plants that burn distillate fuel oil.

Residual fuel oil is delivered to Puerto Rico by vessel. It is stored centrally at the former Commonwealth Oil Refinery complex on the south-west of the island. From there it is piped to the nearby Costa Sur plant and delivered by barge to the other three plants.

Each of the four steam-electric plants has onsite storage for residual fuel oil. Palo Seco has capacity to store 450,000 barrels, San Juan 138,000, Costa Sur 800,000 and Aguirre 780,000. Based on 2013 generation figures, this storage capacity corresponds to 36 days for Palo Seco, 14 days for San Juan, 53 days for Costa Sur and 40 days for Aguirre. The plants typically hold at least 15 days' worth on fuel oil on site.

### Distillate Fuel Oil

Distillate fuel oil is used at the combined-cycle plants at Aguirre and San Juan and the combustion-turbine plants at Cambalache, Mayaguez and nine further small facilities around the island.

The distillate fuels are delivered storage facilities at Yabucoa and Bayamon and from there are barged to four larger stations (Aguirre, San Juan, Cambalache and Mayagüez). The nine further small facilities around the island operate infrequently and receive fuel deliveries by truck when required.

---

[38] In addition to wind and solar, the Working Group recommends looking at other renewable energy resources such as biogas, biomass, and geothermal energy.

AR_0008426

**JA_471**

The Yabucoa facility has capacity for four million barrels of crude oil, fuel oil, and refined products. The Bayamon facility has capacity for 3.5 million barrels. There is no information available on what the current storage arrangements for distillate fuel oil are.

The 2013 report indicates that there are two distillate fuel transfer lines between the Palo Seco and San Juan plants went into service. There is no information regarding onsite storage for distillate fuel oil at any of the plants.

### Natural Gas

Natural gas is used at the privately-owned EcoElectrica cogeneration facility and at the Costa Sur steam plant which are both located at Guayanilla Bay on the southwestern coast where the Peñuelas terminal and regasification facility is located. Natural gas is imported as LNG, mainly from Trinidad and Tobago.

The EcoElectrica plant is adjacent to the regasification facility and the Costa Sur plant receives gas via a short pipeline. Storage for one million barrels of LNG is available at the regasification facility.

The facility currently receives an average of two LNG deliveries per month and delivers 186 MMcf per day, which is split 50:50 between the EcoElectrica plant and the Costa Sur plant. The facility has two spare regasifiers and earlier this year obtained FERC approval to put one of them into continuous service and to increase LNG deliveries to 40 per year from the current 24. The FERC approval will allow the gas received by the Costa Sur plant to double to 186 MMcf per day from the current 93 MMcf per day.

Some steps were taken prior to 2013 to convert other of the steam plants to natural gas, but these were put on hold due to uncertain gas supply following the cancellation of a cross-island pipeline project. There are current plans to build the Aguirre Offshore GasPort, a floating storage and regasification unit, offshore near the Aguirre plant that would be ready by 2019 and to convert the Aguirre plant to natural gas.

### Coal

The privately-owned AES-PR facility burns Colombian bituminous coal. The coal is delivered to Puerto Rico at Las Mareas Port, just south of the plant site and is transported to the plant via covered conveyors.

AES maintains a 30-day inactive coal storage supply to cover delivery interruptions and a 20-day active storage supply.

AR_0008427

**JA_472**

# Appendix B. Power System Rebuild Cost Estimates

| Hazard Mitigations | Total ($ Millions) | Line Item Rollups ($ Millions) | Rebuild Recommendations[*] |
|---|---|---|---|
| Overhead Distribution (includes 38 kV) | $5,268 | | |
| Wind Damage | | $3,432 | Replace poles for higher wind loading; install breakaway service connections; install fully insulated wire; relocate distribution away from transmission; selectively underground distribution; install intermediate poles on longer spans; install wider spacing in high debris areas |
| Insulators Compromised | | $208 | Replace insulators with higher insulation level in salt contamination areas; replace insulators with higher strength designs in high wind areas |
| Flooding | | $965 | Replace poles with deeper subgrade support; selectively underground in areas with water-driven debris |
| Accessibility | | $429 | Relocate lines to accessible street level; selectively replace overhead with underground |
| Operability | | $234 | Add automated switches with fault detection, isolation and restoration capability |
| Underground Distribution | $35 | | |
| Storm Surge/Flooding/Flowing water | | $35 | Selectively install submersible equipment; elevate equipment and terminations; spot replace underground with overhead; install engineered protection of cables and conduit in washout areas |
| Transmission – Overhead | $4,299 | | |
| Wind Damage | | $1,054 | Replace poles for higher wind rating and jet grout existing self-embedded poles for higher wind rating; install wider spacing for better insulation; selectively undergrounding risk spans; install intermediate poles to reduce galloping and slapping |
| Insulators Compromised | | $20 | Replace insulators with higher insulation level in salt contamination areas; replace insulator with higher strength insulators |
| Flooding | | $586 | Straighten and Grout existing or replace poles with deeper sub-subgrade and/or engineered foundations |
| Accessibility | | $2,639 | Develop looped transmission overlay on existing highways |
| Transmission – Underground | $601 | | |
| | | $601 | SE Puerto Rico underground bypass |

---

[39] Reference more detailed rebuild recommendations throughout this report.

AR_0008428

**JA_473**

| Hazard Mitigations | Total ($ Millions) | Line Item Rollups ($ Millions) | Rebuild Recommendations |
|---|---|---|---|
| **Substations – 38 kV** | $856 | | |
| Wind Damage | | $647 | Install hurricane-rated fencing; replace or reinforced damaged control buildings; replace bus structures; replace insulators with higher insulation level and Cat 4 strength |
| Water Damage | | $72 | Replace control buildings with a newer modular design; relocated or elevate substations; install water-tight enclosures for control equipment and junction boxes; elevate select equipment and raise air vents; install water barriers and engineered solutions |
| Command and Control | | $13 | Replace damaged SCADA and replace high risk SCADA units; install synchronization and blackstart relays systems |
| Unreliable Operation | | $124 | Replace high risk circuit breakers; repair ground systems; install SPCC containment where needed; install redundant battery systems and backup generators for charging; replace damaged/water impaired transformers; install high side switcher or circuit breakers |
| **Substations – 115 kV and 230 kV** | $812 | | |
| Wind Damage | | $203 | Install hurricane-rated fencing; replace or reinforced damaged control buildings; replace bus structures; replace insulators with higher insulation level and Cat 4 strength |
| Water Damage | | $226 | Replace control buildings with a newer modular design, relocate or elevate substations; install water-tight enclosures for control equipment and junction boxes; elevate select equipment and raise air vents; install water barriers and engineered solutions |
| Command and Control | | $79 | Replace damaged SCADA and replace high risk SCADA units |
| Unreliable Operation | | $304 | Replace high risk circuit breakers; repair ground systems; install SPCC containment where needed; install redundant battery systems and backup generators for charging; replace damaged and water impaired transformers; install high side switcher or circuit breakers |
| **System Operations** | $482 | | |
| System Control | | $167 | Install ADMS system; new/upgrade wide area and field area communications; add a mobile, containerized backup Control Center; install hurricane covering for the primary Control Center windows |
| System Studies | | $55 | Post-restoration engineering studies, planning studies, pre-engineering surveys |
| Customer Communications | | $165 | Update customer system and install customer service portals |
| Spare Equipment | | $29 | Purchase and store adequate system spares based on new equipment and expected failures |
| Security | | $66 | Install physical and cybersecurity controls at control centers and critical substations |

AR_0008429

**JA_474**

| Hazard Mitigations | Total ($ Millions) | Line Item Rollups ($ Millions) | Rebuild Recommendations |
|---|---|---|---|
| Distributed Energy Resources | $1,455 | | |
| Microgrids | | $1,007 | Microgrid deployment for critical infrastructure and remote communities (DER for Resiliency) |
| Solar PV | | $315 | Solar PV on new residential construction (DER for cost savings) |
| IECC 2012 Building Code Upgrade | | $133 | Bring 25% of new construction or major rebuilds to IECC 2012 building code (DER for cost savings) |
| Generation | $3,115 | | |
| Test and Inspection | | $2 | Work to further define damage at generation facilities |
| Base Repairs | | $108 | Repairs to generation facilities to energize the island |
| Replacement of Damaged Spares | | $19 | Replacement of spares that have likely been damaged by the storm |
| New Unit Build | | $2,864 | Installation of dual fired F-class machine at Palo Seco and an H-class machine at Aguirre |
| Storm Hardening | | $122 | Storm hardening at existing generation facilities |
| Fuel Infrastructure | $683 | | |
| | | $683 | For the build-out of land and/or sea-based LNG pipelines |
| Total Estimated Costs | $17,606[40] | | |

[40] Each line item estimate includes a 30% scope confidence escalator. Final cost estimates require multiple engineering studies and an updated IRP.

AR_0008430

**JA_475**

# Appendix C.    Glossary

| Term | Definition |
|---|---|
| Cable | A conductor with insulation, or a stranded conductor with or without insulation and other coverings (single-conductor cable), or a combination of conductors insulated from one another (multiple-conductor cable). |
| Capacitor Bank | An array of capacitors connected into a circuit. Capacitors are used to control voltages supplied to the customer by eliminating the voltage drop in the system caused by inductive reactive loads. |
| Capacity | The maximum output of electricity that a generator can produce under ideal conditions. |
| Capacity Factor | The amount of energy that the system produces at a particular site as a percentage of the total amount that it would produce if it operated at rated capacity during the entire year. |
| Circuit | A conductor or system of conductors through which an electric current is intended to flow. |
| Combined Cycle (CC) | A form of power generation that captures exhaust heat often from a CT (or multiple CTs) to create additional electric power beyond that created by the simple CT and enhance the overall efficiency of the unit by producing more output for the same level of input. |
| Combustion Turbine (CT) | A form of power generation that forces air into a chamber heated through the combustion of a type of fuel (often diesel or natural gas) which causes the heated air to expand and power the circulation of a turbine that spins an electric generator to produce electricity. |
| Conductor | A wire or combination of wires not insulated from one another, suitable for carrying electric current. |
| Disconnect Switches | Disconnect switches or circuit breakers are used to isolate equipment or to redirect current in a substation. |
| Distributed Energy Resources (DER) | Physical and virtual assets that are deployed across the distribution grid, typically close to load, and usually behind the meter, which can be used individually or in aggregate to provide value to the grid, individual customers, or both. |
| Distribution Bus | A steel structure array of switches used to route power out of a substation. |
| Distribution System | A system that originates at a distribution substation and includes the lines, poles, transformers, and other equipment needed to deliver electric power to the customer at the required voltages. |
| Electric Circuit | Path followed by electrons from a power source (generator or battery) through an external line (including devices that use the electricity) and returning through another line to the source. |
| Energy Efficiency | Any number of technologies employed to reduce energy consumption. Examples include more efficient lighting, refrigeration, heating, etc. |
| Feeder | A circuit, such as conductors in conduit or a busway run, which carries a large block of power from the service equipment to a sub-feeder panel or a branch circuit panel or to some point at which the block power is broken into smaller circuits. |
| Fossil Fuel | A fuel source that is derived from the decomposition of plant and animal matter under the ground. Typically, coal, oil, and natural gas fall under the definition of fossil fuels. |
| Generation | Refers to the amount of electricity that is produced over a specific period of time. |
| Integrated Resource Plan (IRP) | The process of projecting future energy demand, and analyzing current and future energy, transmission, and distribution resources to plan to meet such future demand at minimized cost to the system owner/operator and its stakeholder. |

AR_0008431

**JA_476**

| Term | Definition |
|---|---|
| Load Forecast | A forecast of expected future energy demand based on an analysis of underlying economic indicators and past correlation between energy consumption and such economic conditions. |
| Microgrids | A group of interconnected loads and distributed energy resources within clearly defined electrical boundaries that acts as a single controllable entity with respect to the grid. A microgrid can connect and disconnect from the grid to enable it to operate in both grid-connected or island mode. |
| Oil Circuit Breakers | Oil circuit breakers are used to switch circuits and equipment in and out of a system in a substation. |
| Photovoltaics (PV) | Method of converting solar energy into direct current electricity using semiconducting materials that exhibit the photovoltaic effect. |
| Pothead | A type of insulator with a bell or pot-like shape used to connect underground electrical cables to overhead lines. |
| Power Generation Plant | A facility designed to produce electric energy from another form of energy such as fossil fuel, hydroelectric, nuclear, solar energy, or wind energy. |
| Power Purchase Agreement (PPA) | A contract to purchase energy between one party who generates the energy and the second party who purchases it. |
| Purchased Power | Power purchased from a third party used to meet retail or wholesale electric demand. |
| Renewable Portfolio Standard (RPS) | An energy policy which specifies the proportion of the energy mix that must come from renewable resources for an electricity provider. Typically, an RPS will require a certain age of renewables be used (on a capacity or energy basis) by a certain year in the future. |
| Reserve Margin | A measure of available capacity over and above the capacity needed to meet normal peak demand levels. |
| Substation | A high voltage electric system facility used to switch generators, equipment, and circuits or lines in and out of a system, as well as to change voltages from one level to another or current. |
| Sub-transmission Lines | Lines that carry voltages reduced from major transmission lines. |
| Transformer | Converts the generator's low-voltage electricity to higher voltage levels for transmission to the load center. |
| Transmission Lines | Transmission lines carry voltages from 69 kV up to 765 kV. |
| Transmission System | Series of towers and wires that transmit high voltage electricity from the generation source or substation to another substation in the electric distribution system. |
| Virtual Power Plant | A cloud-based distributed power plant that aggregates the capacities of heterogeneous Distributed Energy Resources (DERs) for the purposes of enhancing power generation, as well as trading or selling power on the open market. |
| Voltage | The effective potential difference between any two conductors or between a conductor and ground. |

AR_0008432

**JA_477**

## Appendix D.   Manufacturing In Puerto Rico



AR_0008433

**JA_478**



THE WORLD'S LEADING MEDICAL DEVICE COMPANIES
HAVE PRESENCE IN PUERTO RICO.

AR_0008434

**JA_479**

# PUERTO RICO'S AEROSPACE ECOSYSTEM





Aerospace Companies & Supply Chain    Academia    Support services /Infrastructure

Build Back Better: Reimagining and Strengthening the Power Grid of Puerto Rico • December 2017 • D-3

AR_0008435

**JA_480**



INFORMATION TECHNOLOGY
IN PUERTO RICO

AR_0008436

Build Back Better: Reimagining and Strengthening the Power Grid of Puerto Rico • December 2017 • D-4

**JA_481**

# ELECTRONIC & ELECTRIC MANUFACTURING
## IN PUERTO RICO



AR_0008437

**JA_482**



# APPAREL
## IN PUERTO RICO

King's Sports Wear & Pro Shop, Inc
Olimac Mfg. Corp.
Pibire Manufacturing, Inc.
Rafael Sanchez H/n/c Rafy Promotions
Roll-up & Roman Shade, Inc.

Joy S.A., Inc.
Tropical Flag Mfg.
Corp

V'soske, Inc.
Adorable Pillows
F & R Corporation

Noliar, Inc
Sweet
Fashions,
Inc.

Black Horse Inc. Of Puerto Rico
Rsf Corp D/b/a Caribe Bag Mfg.

V.A. Bien International

Agi LLC
Snc Technical Services, LLC
Seamless Puerto Rico, Inc.

Cooperativa
Industrial Creacion
De La Montaña

Blue Water
Defense

Blanco & Riera, Inc.
Fashion Group, Inc.
Javiera Shades Design, Inc.
Lermaj Mfg, Inc.
Pirette Uniforms, Inc.
Triple B Enterprises, Inc.
Tropicolor Mfg. Co., Inc. #1

La Tina Uniforms and
Dry Cleaning, Inc.

Kandor
Manufacturing,
Inc.

L.S.
Quilting
Inc.

Western Fashions, Inc.
Lifestyle Footwear

Decor Blinds, Inc.
Rof Drapperies, Inc.

A.S.W. Corp.

Gaviota
Manufactura, Inc.

Quartermaster, Gf, Inc.

Hossana
Corporation

Koman - Propper LLC

Frederick Lee, Inc.
Front Line Defense
International, Inc.
Gaspard & Sons Mayaguez, Inc.
Propper International, Inc.
Puerto Rico Apparel
Manufacturing (Prama) Corp.
Winston-Salem Industries
For The Blind
Raine Inc.

Seamless
Puerto Rico, Inc.

Dj Manufacturing Corp.

Sportzona, Inc.

Caguas Uniforms, Inc.
Hispallis Corp.
Juro-mfg Corp.

Eagle Industries
Del Caribe, Inc.

Johanna
Lingerie
Corp.

Dj Manufacturing Corp.
Maristella, Inc.

Carolina International, Inc.
Mm Manufacturing, LLC
Montenegro's Creative, Inc.
Wear-tech, Inc.

Short Bark
Industries, Inc.

Pentag
Manufacturing
Corp.

House Of
Hairie, Inc.

Textile Fibers
Of P.R., Inc.

Gaspard And Sons, Inc.
J.A.C. Mfg., Inc.

Cooperativa Industrial Comerio
Snc Telecommunication D/b/a Snc Manufacturing
Snc Technical Services, LLC

Atelier Lissa Porrata, Corp.
Embroidery Shop, Inc.
Tony White, Inc.

Snc Technical
Services, LLC
Snc
Telecommunication
Corp.

Pro-Wear

AR_0008438

**JA_483**



# Puerto Rico Energy System Modernization (ESM) Plan
## FEMA Presentation
## February 5, 2019

*Privileged and Confidential. Do not distribute without permission from COR3.*

AR_0011455

**JA_484**



## Today's Objectives

- Introduce FEMA leadership to Puerto Rico's Energy System Master (ESM) Plan
  - Confirm alignment to the Governor's Recovery Plan and the Energy Sector Courses of Actions (COA's)
- Ensure stakeholder alignment in core areas of transformation and investment
  - Review identified strategies for foundational, standardization and transformation
  - Review cost-estimates and funding analysis
  - Release ESM Plan externally on 2/6 (currently under review by COR3)
- Discuss next steps

2

AR_0011456

**JA_485**



## Agenda

**Executive Summary**

Funding Analysis

ESM Plan Report Overview

ESM Plan Categories

Next Steps

Appendix



AR_0011457

**JA_486**



## Executive Summary

- The ESM Plan includes
  - Programs and initiatives for the fulfillment **of key** objectives in the Governor's plan
  - Initial analysis of funding sources
    - ~$20.0 billion in total expenditures, averaging $2.0 billion per year, with maximum annual expenditures of $3.19 billion in year three
    - 62 percent of expenditures are for transmission, distribution and substation repair, hardening and reinforcement
    - Majority of FEMA funding (Public Assistance) is allocated towards T&D
  - A proposed strategy for technology deployment



*The allocations between the different program areas are preliminary and will require additional discussion and support (i. e., with FEMA)*

AR_0011458

**JA_487**



# Key Principles of the ESM Plan

**Call for Transformation**

**Unique geography of Puerto Rico requires a decentralized, cleaner and transformed energy system to achieve reliability and resiliency**

Repair and harden to current codes and standards in T&D for critical infrastructure and high risk areas

Decentralize generation and move to cleaner, more sustainable energy sources

Deploy islandable grids to increase grid flexibility and resiliency across the island

Transform IT/OT systems to enable operation of distributed energy resources

Adopt and implement Emergency Preparedness Plan



5

AR_0011459

**JA_488**



# Energy System Recovery (Major Phases)

## Foundational

- Codes & Standards
- Harden Transmission, Substations and Distribution
- Repair and harden Critical Infrastructure/Assets
- Control Center Hardening/Redundancy
- Upgrade EMS/SCADA (Situational Awareness)
- Communications deployment (Technology)
- AMI (Smart Meters)
- Cybersecurity Framework
- Emergency Preparedness

## Standardization

- Evolution to a "Flexible" Grid
- Decentralized Generation with Supporting Fuel Infrastructure
- Renewable and Battery Storage Integration
- Targeted Voltage Conversion
- Fault-Isolation and Distribution Automation
- Selective Undergrounding
- ADMS, DERMS and DRMS
- Depots and Staging Sites

## Transformation

- Digitization to IEC 61850 (Grid Awareness & Analytics)
- Islandable Grids
- Customer Systems and Technology
- Two-Way Power Flow Operations
- Technology-Enabled Work and Asset Management
- Grid Analytics/Intelligence
- Emergency Operations Center
- Security Operations Center

6

AR_0011460

**JA_489**



# ESM Plan Strategic Imperatives











**Customer-Centric**
- Enables its citizens to choose how to best address their energy needs ("customer choice" paradigm)
- Ability to become prosumers
- Increased customer engagement with the utility

**Affordable**
- Improved cost of electric service to all residents and businesses
- Improved operational efficiency and financial stability in running the utility business

**Reliable**
- Best-in-class reliability of electric service – essential for residents' well-being and economic/business development
- Best-in-class power quality that meets the growing demands of electricity users

**Resilient**
- Resilient energy system able to adequately withstand future extreme weather and man-made events
- Continuously improving emergency preparedness capability

**Sustainable**
- Safe, trained and engaged workforce
- Transparent regulatory framework
- Leadership in environmental stewardship
- Energy ecosystem that drives new businesses and employment opportunities and can support residents' well-being

7

AR_0011461

**JA_490**



# Energy Sector Courses of Actions (COAs)

Twenty-Seven (27) Energy Sector (ENR) Courses of Actions (COA's) were mapped to each of the Working Group Categories

Throughout the document, "COA Highlights" were inserted to emphasize the relationship to the COA's and the Governor's Plan

**COA Highlight**

**ENR COA-006 :** Improve Grid Assets' Resilience to Flooding

Prioritize hardening the grid to flooding. This course of action may include: Altering siting requirements in floodplains; Altering asset types to reduce vulnerability; Reducing exposure by moving, raising, or waterproofing assets; Strengthening assets against hydrostatic and hydrodynamic pressure commissioning assets where flood risks are too costly to mitigate; and Expediting repairs to reduce mold; and rot damage.

AR_0011462

**JA_491**



## Agenda

- Executive Summary
- **Funding Analysis**
- ESM Plan Report Overview
- ESM Plan Categories
- Next Steps
- Appendix



AR_0011463

**JA_492**



# Why FEMA should fund most of the ESM Plan?

- Transforming energy services in Puerto Rico will provide much quicker recovery, reduce the rebuild cost, and just may save lives in future disasters

- Puerto Rico, being mountainous creates challenges for maintaining a robust transmission and distribution system
  - Transformation results in a more flexible and decentralized grid

- Thermal generators are substantially older than industry average, with low availability, with lower efficiency, and with high fuel and operating costs

- The system lacks adequate control, monitoring, communications, information systems, and back-up generation technology
  - Technology needs be aligned with grid transformation

10

AR_0011464

**JA_493**



# Funding Analysis by FEMA Funding Category



In order to substantiate eligibility under Section 20601 of the Bipartisan Budget Act (BBA) of 2018 (P.L 115-123), all potential funding for new or undamaged generation assets will need to be presented as necessary per an industry standard or best practice, necessary for the functionality of the energy system, and eligible per the criteria outlined in FEMA Recovery Policy FP-104-009-5. The extent by which funding will be deemed eligible for new and/or undamaged components of a system remains an uncertainty as of this date.

| Category | Units | FEMA (PA) | | FEMA (Mitigation) | | FEMA (BBA) | | Other | | Cost Share | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transmission & Substations | (Millions) | $ | 4,221 | $ | 247 | $ | 1,344 | $ | 40 | $ | 646 | $ | 6,498 |
| Distribution | (Millions) | $ | 3,126 | $ | 1,093 | $ | 764 | $ | - | $ | 720 | $ | 5,703 |
| Generation & Fuel | (Millions) | $ | 2 | $ | - | $ | 2,160 | $ | 1,150 | $ | 240 | $ | 3,552 |
| Technology Transformation | (Millions) | $ | - | $ | 9 | $ | 1,494 | $ | 165 | $ | 167 | $ | 1,835 |
| DERs & Microgrids | (Millions) | $ | - | $ | - | $ | 1,403 | $ | 196 | $ | 156 | $ | 1,755 |
| Security | (Millions) | $ | - | $ | - | $ | - | $ | 290 | $ | - | $ | 290 |
| System Operations | (Millions) | $ | - | $ | - | $ | 194 | $ | - | $ | 22 | $ | 215 |
| Emergency Preparedness | (Millions) | $ | - | $ | 68 | $ | - | $ | 22 | $ | 23 | $ | 112 |
| Operational Efficiency | (Millions) | $ | - | $ | - | $ | 5 | $ | 16 | $ | 1 | $ | 21 |
| Regulatory & Policy | (Millions) | $ | - | $ | - | $ | - | $ | 12 | $ | - | $ | 12 |
| **Total** | **(Millions)** | **$** | **7,349** | **$** | **1,417** | **$** | **7,358** | **$** | **1,863** | **$** | **1,973** | **$** | **19,993** |

11

AR_0011465

**JA_494**



## Agenda

- Executive Summary
- Funding Analysis
- **ESM Plan Report Overview**
- ESM Plan Categories
- Next Steps
- Appendix



AR_0011466



## How we got here

- Convened ESM Summit in October, 2018
    - Brought key stakeholders together to discuss framework and approach for ESM Plan development
- Built initial ESM Plan on insights from "Build Back Better – Reimagining and Strengthening the Power System in Puerto Rico", "DOE Energy Resiliency Solutions for Puerto Rico", and the Governor's Report (Energy COAs)
- ESM Plan further developed through Working Groups supported by Navigant, PREPA, DOE Labs, NYPA and others
- 'ESM scenario' identified in December and introduced into PREPA IRP process
- Mapped ESM Plan initiatives to Energy Sector Courses of Action (COAs)
- Developed investment plan and funding analysis
- Preliminary draft of ESM Plan submitted to COR3 (2/1/2019) for final review

13

AR_0011467

**JA_496**



## ESM Plan Categories

1. Transmission & Substations
2. Distribution
3. Generation & Fuel
4. DERs & Microgrids
5. Technology Transformation
6. Security
7. System Operations
8. Emergency Response
9. Regulatory & Policy
10. Operational Efficiency

AR_0011468



# Transmission & Substations

## Current State

- Most of the bulk electric system grid restored and operational
- Several lines and substations repaired following Maria were built to current design standards
- Some highly damaged transmission lines remain out of service, with attendant reliability exposure to critical loads
- Substations that were flooded during Maria and back in service are susceptible to flood-related damage
- Transmission lines and substation rated 38kV is not consistent with industry standard. Over 1000 miles of line and 600 utility and private substations are in service today
- Bulk power grid may not be capable of meeting contingency criteria or remain stable for a loss of critical lines or generation

## Major Investments (Total: $6.5 billion)

- $1.7 billion to harden 350 miles of the 230kV transmission grid, mostly hardening along existing ROW
- $1.3 billion on reinforcing or relocating existing high and medium voltage substations, and digitization
- $0.5 billion to harden about 20% of existing 115kV lines
- $0.5 billion to rebuild about 10% of 38kV lines to 115kV design standard
- $0.5 billion for new or upgraded transmission needed to integrate renewable generation
- $0.5 billion for lines and substations for islandable grids

## Future State (Drivers to Transform)

- Damaged transmission lines and substations targeted for near-term hardening
- 19 substations susceptible to flooding will be raised or relocated
- Most high voltage transmission lines will be reinforced along existing corridors
- Transmission lines and substations targeted for reinforcement or replacement include designs capable of sustaining high Hurricane Category 4 design standards and flooding
- Near-term upgrades are targeted to hardest hit areas such as Humacoa - includes transmission, substation and distribution upgrades
- New or upgraded transmission lines will be needed for islandable grid design and to maintain system stability

## Funding Source Analysis



$643.5
$40.0
$1,344.4
$246.8
$4,200.4

- FEMA (PA)
- FEMA (Mitigation)
- FEMA (BBA)
- Other
- Cost Share

AR_0011469

**JA_498**



## Transmission & Substations

- The T&S plan does not propose a completed replacement/upgrade of the entire transmission system
  - Hardening and upgrades targeted to facilities that sustained damage, are obsolete or unreliable
- Minimal relocation of lines is proposed
  - Permitting, residential and commercial growth and environmental concerns limit relocation alternatives
- 38kV lines and substations will continue to operate at this voltage, with targeted conversion to a higher voltage where justified
- Some new or upgraded lines and substations will be needed for preferred IRP strategy
  - The amount and location of new renewable generation is key factor affecting where facilities will be needed
- Detailed damage assessments will be used to further prioritize mid- and long-term hardening and resiliency

16

AR_0011470



## Distribution

### Current State

- Distribution grid was not designed to withstand a Category 4 (CAT4) hurricanes
- Hurricane Maria resulted in up to 75 percent of circuits needing repair
- Distribution system now restored and operational, but still cannot withstand CAT4
- Underground equipment experienced water and contaminant intrusion
- Distribution poles suffered severe damage from high winds
- Distribution lines ran near transmission poles and other structures, increasing the likelihood of winds contributing to short circuits.
- Long sections of line failed under a domino effect due to the limited use of dead-end breakaways on poles.
- There were few feeder ties, limited redundancy, or automation to provide backup or aid in the restoration of service.

### Major Investments (Total: $5.7 billion)

- $3.6 billion for pole strengthening to eliminate wind damage
- $1.0 billion for flood-proof equipment and underground deployment
- $1.0 billion for automation and relocation of inaccessible lines

### Future State (Drivers to Transform)

- Build poles to code and install guying wire and breakaway service connectors on poles in high wind areas
- Selectively underground distribution feeds into critical facilities and urban centers
- Upgrade conductor size and use fully insulated wire
- Install automated switching devices and microprocessor relays
- Selectively convert lower voltage 4, 7 and 8 kV lines to operate at 13kV
- Enable fault location, isolation and service restoration (FLISR) technology for faster service restoration
- Enhance situational awareness for DER operations

### Funding Source Analysis



AR_0011471



## Distribution

- Highest priority near term projects are:
  - Vieques and Culebra islands distribution system upgrade
  - Humacao district distribution system upgrade
- Cost estimate for the Humacao district upgrade is not yet available (Humacao district was worst hit by the hurricanes.)
- Puerto Rico distribution system damage assessment available is from first 48 hours after storm, and at regional level only
  - This is sufficient to arrive at preliminary cost estimates
  - Additional damage assessment will be needed for detailed engineering studies
- Expenditures were allocated among districts based on both number of damaged structures and customer density
- Expenditures earmarked for undergrounding lines that feed critical and priority facilities (hospitals, sanitation, urban centers, etc.)

18

AR_0011472

**JA_501**



# System Operations

## Current State

- Critical facilities not rated to withstand Category 5 hurricane force winds
  - Primary and backup System Control Centers and Distribution Control Centers
  - Emergency Operations Centers
  - Security Operations Center
- Insufficient geographic diversity between primary and backup Emergency Operations Centers (EOCs)
  - Significant risk of major storm event disabling both EOCs
- Current control centers and systems cannot support islandable grids

## Major Investments (Total: $215 million)

- $100 million to build hardened (CAT 5) primary and backup System Control Centers and Distribution Control Centers
- $55 million for post-restoration system engineering and planning studies including CIP 14 benchmark
- $40 million for expansion and hardening of selected generation control rooms to support control systems for islandable grids
- $20 million for primary and backup EOC, SOC, and Smart Grid Diagnostic Center

## Future State (Drivers to Transform)

- Hardened, resilient, geographically diverse primary and backup facilities capable of withstanding Category 5 hurricane force winds
  - System Control Centers and Distribution Control Centers
  - Emergency Operations Centers
  - Security Operations Centers
  - (New) Smart Grid Diagnostic Centers
  - Eliminated single points of failure
- Control capability for islandable grids

## Funding Source Analysis



AR_0011473



## System Operations

- Hardened, resilient primary and backup facilities capable of withstanding Category 5 hurricane force winds
  - New buildings proposed at current System Control Center sites in Monacillos (primary) and Ponce (backup)
  - Critical facilities will be consolidated
    - System Control Center, Distribution Control Center, Emergency Operations Center, Security Operations Center, and new Smart Grid Diagnostic Center will reside in same hardened building.

- New Smart Grid Diagnostic Center will provide System Operations with additional tools, technology, and situational awareness to reduce restoration time after major storm events

- Control capability for islandable grids
  - Selected generation control rooms will be expanded and hardened to host and support control systems for islandable grids
  - One key driver is the requirement to provide control capability for each islandable grid following loss of communication with the System Control Centers

20

AR_0011474

**JA_503**



# Operational Efficiency

## Current State

- Operational efficiency refers to organizational capabilities and asset management practices required to leverage the new technologies to their full potential
- Operational efficiency represents another transformation in Puerto Rico, one that will unfold among the workforce operating and maintaining Puerto Rico's grid of the future
- New assets / technologies will require new workforce capabilities
- PREPA's workforce is not trained in updated hurricane codes and standards
- Current asset maintenance practices are not best in class and do not minimize reliability risk

## Major Investments (Total: $21 million)

- $ 5.4 million for asset management program
- $ 7 million for a T&D training facility
- $ 9 million for educational outreach and research partnerships

## Future State (Drivers to Transform)

- Asset Management Program
  - Appropriate inspection and maintenance practices for all T&D assets
  - Asset health and lifecycle assessment to minimize reliability risk
  - Robust inventory management for spare parts
  - Includes asset maintenance and health tracking tools
- T&D Training Facility to improve organizational capabilities
  - Lineman, meter, and substation training covering new equipment
  - IT and operational technology training
- Educational outreach and innovation
  - Outreach to local higher education institutes to attract next generation of talent
  - Partnership with local researchers to foster grid innovation

## Funding Source Analysis



AR_0011475



## Operational Efficiency

- Investments in workforce training and asset management are fundamental and key to the success of the 10-year transformational plan

- A vast array of new equipment and new codes and standards are being introduced

- PREPA's workforce must be trained to safely and reliably operate and maintain the new assets

- A host of new IT/OT software solutions are being introduced, with significant change management implications for PREPA's workforce

22

AR_0011476

**JA_505**



# Generation & Fuel Infrastructure

## Current State

- 4,875 MW of existing PREPA-owned generation capacity, plus 961 MW of IPP capacity at the AES coal plant and EcoElectrica
- 68 percent of capacity uses fuel oil, with LNG used only at EcoElectrica and Costa Sur
- Existing generation resources have high operating costs, utilizing steam turbine technology and burning fuel oil. Relative to new combined-cycle and peaking technology, the existing PREPA generation fleet is inefficient, with relatively low availability and operating flexibility
- In its Integrated Resource Plan (IRP) and Generation Plan, PREPA targets reliability upgrades and LNG conversion at select generating units in the near-term, with mid-term retirement and replacement with new thermal and renewable resources.
- LNG conversion targeted for San Juan Units 5 & 6, Mayaguez, and potentially at new peaking units.

## Future State (Drivers to Transform)

- PREPA IRP and ESM Generation Plan both envision transition to more decentralized generation fleet, characterized by substantial use of solar generation resources, and more efficient and flexible generation resources
- Reliance on a more distributed generation fleet is designed to improve reliability and resiliency, and to support islandable grid and micro-grid formation and operations.
- Economic and additional thermal efficiency benefits are planned based on increased LNG imports, either through fixed or ship-based terminals. Increased use of LNG at both existing and new thermal generation sources has potential to reduce electricity costs on the island, although uncertainty exists about ultimate cost, and whether development of a land-based LNG import terminal will be possible.
- ESM envisions adoption of new combined-cycle and flexible peaking capacity to support development of ~900 MW of solar resources, and ~560 MW of battery storage.

## Major Investments (Total: $3.6 billion)

- $ 2.0 billion for solar plus storage
- $ 435 million for Peakers and Mayaguez Conversion
- $ 420 million for Yacuboa (Caguas) CCGT
- $ 420 million for Bayamon CCGT
- $ 255 million for San Juan CCGT

## Funding Source Analysis



AR_0011477



## Generation & Fuel Infrastructure

- ESM Generation Plan is aligned with PREPA IRP and Generation Plan
- Near-Term Initiatives Focus on Improved Reliability and Increased LNG Usage
  - Hardening and Reliability Improvement at existing assets
  - Conversion of San Juan 5&6 and Mayaguez to LNG
  - Replacement of 18 peakers with peaking or reciprocating engine units
  - Expansion of solar generation
- Medium-Term Initiatives Focus on Solar Penetration and Efficient Combined-Cycle Expansion
  - $2.0 Billion Investment in renewable (0.9 GW solar capacity) and battery resources
  - LNG-fueled combined-cycle units at Yabucoa, Bayamon (Palo Seco) and LPG peaking unit at San Juan
- Long-Term Initiatives Focus on Continued Expansion of Renewable and Distributed Generation Resources

24

AR_0011478



# Regulatory & Policy

## Current State

- Construction Codes and Standards in need of update
- Generation plan heavily influenced by IRP
- Substantial Change being considered/implemented, with legislative initiatives designed to increase use of renewable resources

## Major Investments (Total: $12 million)

- 12 million for Processing of modifications and eventual approval of new Codes & Standards and assumed costs for regulatory/policy support to reintegrate applicable ESM initiatives back into the IRP pursuant to PREB process

## Future State (Drivers to Transform)

- The regulatory and policy aspect of the ESM Plan is intended to identify key areas where policy reforms or development are likely needed to ensure that the ESM can be implemented as effectively and efficiently as possible.
- A key goal is to identify areas where potential challenges are likely to be encountered in transforming the Puerto Rico electric system, and to examine policy and regulatory changes that will help to overcome or offset those challenges.
- Key areas of focus include:
    - Updated codes and standards
    - Integration with legislative initiatives
    - Interconnection and renewable siting policies and procedures
    - Residential and commercial solar programs
    - PURPA Compliance
    - Review of Regulatory Model
    - Jones Act Waiver Requests

## Funding Source Analysis



$12.0

- FEMA (PA)
- FEMA (Mitigation)
- FEMA (BBA)
- Other
- Cost Share

AR_0011479

**JA_508**



## Regulatory & Policy

- Updated Codes and Standards
  - Distribution, Transmission, Project & Control, Substation Layout and Civil/Structural Codes and Standards have been updated, and are in process of finalization

- Interconnection and Renewable Siting
  - Efficient adoption of solar resources will require re-visitation of transmission interconnection policies and procedures
    - o Rational development and processing of interconnection queue
    - o Coordination with procurement/contracting process
    - o Incentives/policies to encourage preferred site selection, and collector system based interconnection

- Residential and Commercial Solar
  - Development of rooftop residential and commercial solar projects would be beneficial, but regulatory and pricing policies need to limit cross-subsidization and encourage efficient interconnection and integration with PREPA distribution system

- Align with legislative initiatives

26

AR_0011480



# DERs & Microgrids

## Current State

- Very little microgrid penetration and no coordinated effort to develop more
- One grid in which issues in one region can impact the whole island
- Very few energy efficiency programs
- No demand response programs
- Unmanaged installations of behind the meter solar PV that could have high grid integration costs

## Major Investments (Total: $1.8 billion)

- $ 1.2 billion for microgrids for critical infrastructure and design and EPC costs for islandable grids
- $ 0.5 billion for conduct feeder hosting capacity studies and develop and launch incentive program to incent guided installations of DER, implement initial set of EE programs and DR programs

## Future State (Drivers to Transform)

- A prioritized list of sites to develop and a coordinated effort to develop them.
- A grid made up of islandable grids that can operate independently if one region is having issues.
- A full suite of energy efficiency programs that save 2%+ per year
- A full suite of demand response programs
- A managed, coordinated DER program – that includes solar PV, CHP, energy storage, backup generators, and electric vehicles – adds value to the grid and brings down costs

## Funding Source Analysis



AR_0011481

**JA_510**



## DERs & Microgrids

- High priority next steps:
  - Conduct feeder hosting capacity studies
  - Assign responsibility to a team to develop EE programs scope, governance, and implementation plan
  - Assign responsibility to a team to develop DR programs scope, governance, and implementation plan
  - Form a team to decide on a priority list of microgrid sites to develop
  - Start islandable grid design

28

AR_0011482

**JA_511**



# Technology Transformation

## Current State

- A multitude of PREPA technology systems are out of support or reaching end of life
- Communication systems are fragmented and do not support future state
- System Metering, Protection & Control, Distribution, and Substation technologies lack modern applications
- Customer Metering: 1.5M meters are read via AMR (200K of which were damaged by hurricanes and not functional)
- 500K estimated street lights throughout Puerto Rico (of which 23% were estimated to be damaged from Hurricane)
- Outdated GIS or Asset Management System for asset tracking
- Rely on customers to report outages
- Technology systems and applications are not supported by an integrated cybersecurity program

## Major Investments (Total: $1.8 billion)

- $ 820 million for grid automation
- $ 700 million for metering systems
- $ 200 million for smart street lights
- $ 115 million for customer systems

## Future State (Drivers to Transform)

- Alignment between technology and cybersecurity architecture via governance, policy, procedure, architecture, and guidelines to meet stakeholder requirements
- Establish Emerging Technology and R&D Center to pilot and perform testing on new technology
- Implement Automated Metering Infrastructure and integration of Customer and Care Center Systems
- Incorporated Grid Control and Automation Systems which include:
    - Advanced Distribution Management System
    - Energy Management System (with islandable grid control capabilities)
    - Asset Management, Workforce Management, and Geographical Information Systems, Historian and Data Analytic

## Funding Source Analysis



AR_0011483



## Technology Transformation

- A major driver for technology transformation is the ability to operate the grid with bi-directional power flow and to be able to achieve greater reliability and resiliency

- Transforming Technology within the electric grid enables industry standards and aligns with mitigating future restoration efforts
  - Implement an Automated Metering Infrastructure, which is the industry standard in meter reading today with well over 50% of the households in the United States having smart meters.
  - Implement grid control and automation systems that:
    o Establish the foundation for energy transformation (Comms, Data Center, Emerging Tech Center)
    o Enable fault location, isolation, and restoration, and automated feeder switching (ADMS)
    o Enable more efficient restoration efforts (GIS, OMS, MWMS, SCADA)
    o Enable preventative monitoring and maintenance (GIS, AMS, Historian)
    o Enable management of customer load and generation (DRMS, DERMS)
  - Upgrade customer systems to improve billing, CIS and Call Center

30

AR_0011484

**JA_513**



## Security

### Current State

- Physical security state is likely immature lacking a comprehensive physical security plan.
  - PREPA and DHS have conducted an analysis to determine the most critical sites prioritize protection.
  - Physical condition of sites varies considerably due to hurricane damage and underinvestment
  - PREPA has a dedicated Physical Security team and monitoring center
  - Substantial improvements are needed across all aspects of physical security
- Notable gaps exist in PREPA cybersecurity posture

### Major Investments (Total: $290 million)

- $153 million for Physical Security Controls and Measures
- $129 million for Cybersecurity and Physical Security Organization and Staffing,
- $94 million for assessment, planning and testing, governance and implementation

### Future State (Drivers to Transform)

- Ubiquitous digitally-connected devices (sensors, controllers, etc.) will aid PREPA's grid to become more reliable and more resilient but will also increase the "attack surface" for hackers or other malicious actors i.e. more opportunities to gain unauthorized access and affect the reliable delivery of power
- Physical security concerns arise from a variety of sources including theft, violent attacks, and even corruption. Investments in physical security protect investments in Puerto Rico's electric grid as well as the physical safety of PREPA staff
- Conduct a thorough assessment and implement a variety of policies and technologies to establish a secure posture that prevents, delays, and detects potential nefarious actors.

### Funding Source Analysis



$290

AR_0011485

**JA_514**



## Security

- Security is an essential component of reliability
- Physical security protects investments to PREPA's electric grid and safeguards personnel
  - Controlled physical access restricts theft, vandalism, and opportunities for attack
  - Central monitoring allows PREPA to consistently deter, detect, delay, respond, and assess physical security events and investigations
- Cybersecurity investments will safeguard the reliability and performance of a digitally-connected grid
  - Control and operational networks will meet industry standards to prevent misuse or destruction of key infrastructure for power delivery
  - Allow PREPA to securely enable a reliable and resilient grid that is more cost-effective and efficient
  - Allow PREPA to monitor for cybersecurity issues and respond appropriately
  - Prevent or limit cybercrime in connection with data theft, ransomware, etc.

32

AR_0011486

**JA_515**



# Emergency Preparedness

## Current State

- Lack of emergency preparedness to respond to and recover from a Cat 4 hurricane
- Lack of comprehensive
  - Emergency Response Plan (& Communication Plan) and
  - Signed mutual assistance agreements
- No confirmed Supply and Logistics Plan
- Inadequate critical spares and long-lead time spare inventory
  - $93M in spare inventory in 2003, now
  - $39M in spare inventory when Maria hit
- Ineffective and inefficient depot and supply system (2 primary depots, 23 warehouses)
- No formal pre-agreed regional staging agreements
- No effective emergency management training, table top and exercising program

## Major Investments (Total: $112 million)

- $5M for 2019-2020 Emergency Readiness Planning:
  - Emergency Response Plan
  - Supply and Logistics Plan
  - Mutual Assistance Plans and MOUs
- $20 million for Hurricane 2019 Readiness Spares/Equipment/Trucks
- $2 million for 2021-2022 Emergency Preparedness Planning Maturation and Training/Exercising
- $50 million for depots/staging/inventory management 2020-2025
- $20 million for modernized grid critical and long-lead time spares 2020-2025
- $15 million for equipment/trucks 2020-2025

## Future State (Drivers to Transform)

- Up-to-date Emergency Response, Supply and Logistics and Mutual Assistance Plans
- Formal, signed MOUs and agreements for Mutual Assistance w/ partnering entities
- Formal mutual aid vehicle/ FEMA reimbursement structure
- Sufficient spares, equipment, and trucks to support recovery of the existing grid within a five week period for 2019 and 2020 Hurricane Seasons and for the modernized grid
- Modernized grid built using off-the-shelf equipment to reduce procurement lag times, improve on-island supplies, and be better prepared to receive supplies from U.S.
- Centralized depots with distribution and transmission equipment that is managed under a single inventory and asset management system
- Mature organization that trains to updated plans

## Funding Source Analysis



AR_0011487

**JA_516**



## Emergency Preparedness

- Near-term objectives include developing comprehensive, up-to-date emergency response and mutual assistance plans, implementing emergency response training, and optimizing spare inventory for the existing grid.

- Longer term objectives include developing a comprehensive Supply & Logistics Plan, hardening or relocating depots, developing a sufficient spare and equipment inventory (and tracking) for the modernized grid, and continuing to update emergency response plans and training.

- Overall, these initiatives focus on strengthening grid resiliency and preparedness by building a well-understood emergency framework.

- Additional analysis and study is needed to:
  - Better identify current and future spare inventory needs
  - Confirm location and capacity of depots

34

AR_0011488

**JA_517**



## Agenda

Executive Summary

Funding Analysis

ESM Plan Report Overview

ESM Plan Categories

**Next Steps**

Appendix



AR_0011489

**JA_518**



## Next Steps

- Incorporate final input from Working Groups and Executive stakeholders
  - Confirm release approach and send on 2/6
- External stakeholder "roadshow"
  - FEMA/OMB, FOMB, PREB, PRIDCO, Business consortiums, etc.
  - Confirm FEMA's position on funding eligibility
- ESM Plan Summit II
  - Great opportunity for a COR3/PREPA Energy Transformation update (Key first step in new energy age in Puerto Rico!) ; considering March timeframe
  - Agenda considerations
    o ESM Plan review
    o Concessionaire update
    o Introduce the Energy Innovation Center concept
    o Next steps plan
    o Panel for Q&A
- System islandable grid architecture & district-level planning for project definition and implementation

AR_0011490

**JA_519**



## Agenda

Executive Summary

Funding Analysis

ESM Plan Report Overview

ESM Plan Categories

Next Steps

**Appendix**



AR_0011491

**JA_520**



# Annual CAPEX Spending Curve

| Category | Units | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transmission & Substations | (Millions) | $ 168 | $ 318 | $ 590 | $ 530 | $ 572 | $ 752 | $ 727 | $ 947 | $ 947 | $ 947 | $ 6,498 |
| Distribution | (Millions) | $ 302 | $ 583 | $ 633 | $ 633 | $ 633 | $ 584 | $ 584 | $ 584 | $ 584 | $ 584 | $ 5,703 |
| Generation & Fuel | (Millions) | $ 228 | $ 482 | $ 744 | $ 953 | $ 768 | $ 300 | $ 40 | $ - | $ - | $ 36 | $ 3,552 |
| Technology Transformation | (Millions) | $ 56 | $ 244 | $ 496 | $ 612 | $ 365 | $ 62 | $ - | $ - | $ - | $ - | $ 1,835 |
| DERs & Microgrids | (Millions) | $ 136 | $ 360 | $ 572 | $ 313 | $ 58 | $ 62 | $ 63 | $ 64 | $ 63 | $ 64 | $ 1,755 |
| Security | (Millions) | $ 40 | $ 32 | $ 38 | $ 31 | $ 29 | $ 30 | $ 24 | $ 22 | $ 22 | $ 22 | $ 290 |
| System Operations | (Millions) | $ 23 | $ 65 | $ 92 | $ 35 | $ - | $ - | $ - | $ - | $ - | $ - | $ 215 |
| Emergency Preparedness | (Millions) | $ 25 | $ 42 | $ 10 | $ 10 | $ 10 | $ 10 | $ 5 | $ - | $ - | $ - | $ 112 |
| Operational Efficiency | (Millions) | $ 1 | $ 4 | $ 8 | $ 3 | $ 1 | $ 1 | $ 1 | $ 1 | $ 1 | $ 1 | $ 21 |
| Regulatory & Policy | (Millions) | $ 3 | $ 4 | $ 3 | $ 2 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12 |
| **Total** | **(Millions)** | $ 981 | $ 2,133 | $ 3,186 | $ 3,122 | $ 2,436 | $ 1,801 | $ 1,445 | $ 1,619 | $ 1,617 | $ 1,654 | $ 19,993 |

38

AR_0011492

**JA_521**



# Energy System Recovery (Roadmap)

| Category | Critical Projects | Hardening |
|---|---|---|
| **Power Delivery** Transmission & Substations Distribution Operational Efficiency | Dsitrubution substation upgrades, relocation, repair and/or rebuild; Substation hardening (against flood and wind) and line reinforcement; Vegetation Management; Pilot (context - digitization and islandable grids) | Continuation of restoration and hardening for selected substations; Transformation through substation Digitization, Islandable Grid Integration, and New Transmission Lines |
| **Generation** Conventional Generation DERs and Microgrids | Repair damage facilities; District Level CCGT (small and large); Fuel Infrastructure; Renewable Integration; LNG Conversion | Transformation through guided programs (DER, EE and DR) |
| **Technology Systems** Technology Transformation System Operations | Foundational Technology (including AMI and Comms); Transformation through integration of Grid Control and Automation, System Studies, and Primary Backup and Island Controller | Leveraging technology to improve resiliency |
| **Other Categories** Emergency Preparedness Energy Policy & Regulation Security | Regulatory policy support (including integration of IRP); Develop ESO Detailed Plan (refreshed regularly); Workforce Training; Emergency Preparedness (Near); Emergency Preparedness Finalization | |

2019  2020  2021  2022  2023  2024  2025  2026  2027  2028

AR_0011493

**JA_522**

**GOVERNMENT OF PUERTO RICO**
**PUERTO RICO PLANNING BOARD**

October 3, 2018

**RESOLUTION JP-2018-324**

Federal Consistency Certification with the Puerto Rico Coastal Zone Management Program
FEMA Puerto Rico DR-4336-PR and DR-4339-PR Permanent Work:
Federal Assistance for Permanent Work through the Public Assistance (PA) Program and
Hazard Mitigation Grant Program (HMGP)

The damage caused by high winds, storm surge and flooding attributed to Hurricanes Irma and Maria had devastating effects on Puerto Rico's coastal areas that need to be addressed in an expeditious manner. While many of the most dire emergency needs have been met, the post-Irma and Maria recovery needs of the Commonwealth are on-going and will continue into the near future.

In its role conducting reviews pursuant to the authority of the Commonwealth under the Coastal Zone Management Act, the Puerto Rico Planning Board recognizes that these circumstances require expedited reviews. In order to achieve this, the Federal Emergency Management Agency (FEMA) in coordination with the Puerto Rico Planning Board agreed the following:

1. The financial assistance awards made by FEMA for responding to the Hurricanes Irma and Maria (Puerto Rico DR-4336-PR and DR-4339-PR) are consistent with the enforceable policies of the Puerto Rico Coastal Zone Management Program (PRZCMP), when the use of such funds is to finance:

    a. Activities described under categories C through G according to the FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018). A summary table with these activities is provided in Appendix A.

    b. Hazard mitigation projects and activities to be covered through the "Hazard Mitigation Grant Program" (HMGP) according to the "Hazard Mitigation Assistance Guidance of February 27, 2015". Hazard mitigation activities to be covered by this program are detailed in appendix A.

    c. "Planning-Related Activities", "Technical Assistance" and "Management Cost" covered under the Hazard Mitigation Grant Program.

2. Financing the above mentioned projects and activities will not require further review pursuant to Subpart F of the Federal Consistency Regulations at 15 CFR Part 930, yet:

    a. The granting of financial assistance under the programs at reference does not exclude or supersede the financed projects to comply with applicable federal and state permits or requirements.

    b. Recipients and Subrecipients that receive FEMA assistance through these programs are not exempt to comply with Federal Consistency requirements (according to Subpart C of the 15 CFR Part 930) for certain projects and activities that may affect the Puerto Rico coastal resources.

    c. This Certification does not exempt or supersede any of the activities mentioned in paragraph number one (1) from compliance with Federal Consistency requirements for "Federal Licenses or Permits" (according to Subpart D of the 15 CFR Part 930) that may be required for certain projects and activities under this agreement.



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

AR_0011701

**JA_523**

d. Where "In-kind" repair or replacement is specified for a project, "In-kind" shall mean that it is either the same or a similar material, and the result shall match all physical and visual aspects. The in-kind repairs and replacements should be limited to pre-existing architectural features and physical components of buildings and structures that were in existence prior to the event but are not extant after the event.

After the evaluation of the type of activities to be granted, according to the above mentioned FEMA guides, the Puerto Rico Planning Board, in its meeting of October 3, 2018, determined the following:

"The Financial Assistance at reference is consistent with the Puerto Rico Coastal Zone Management Program; as long as each financed project complies with conditions under paragraph number two (2) of this resolution."

This Certification only applies to disasters DR-4336-PR and DR-4339-PR and will be in effect for a term of five years from the notification date of this resolution. The Certification at reference will be renewed or amended if necessary to extend its validity or address other matters. The Puerto Rico Planning Board agree to have an open line of communication with FEMA to resolve questions that may arise in executing the Federal Assistance grants under the programs at reference.

María del C. Gordillo Pérez
President

*Excused*
Eileen Poueymirou Yunqué
Associate Member

Rebecca Rivera Torres
Associate Member

Suheidy Barreto Soto
Designated Associate Member

**Certify:** That this Resolution is copy of the agreement adopted by Puerto Rico Planning Board (PRPB) in its meeting of **October 3, 2018**. I expedite and notify this copy to the parties under my sign and official stamp of the Puerto Rico Planning Board stamp, for general use and knowledge.

In San Juan, Puerto Rico, today   05 OCT 2018

Loida E. Soto Nogueras
Secretary



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

AR_0011702

**JA_524**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| **CATEGORY** | **TYPE OF PROJECT** | **ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO:** | |
| **C- ROADS AND BRIDGES** | 1- Roads may be paved, gravel or dirt. Road components include but may not be limited to:<br>• Surfaces<br>• Bases<br>• Shoulders<br>• Ditches<br>• Drainage Structures, such as culverts<br>• Low Water Crossings<br>• Associated facilities, such as lighting, sidewalks, guardrails and signs.<br>2- Bridge components include, but may not be limited to:<br>• Decking<br>• Guardrails<br>• Girders<br>• Pavement<br>• Abutments<br>• Piers<br>• Slope Protection<br>• Approaches<br>• Associated facilities, such as lighting, sidewalks and signs.<br>3- Maintenance: the incident may cause minor damage to roads that result in damage similar to that which may occur over time from other causes. Normal maintenance is not eligible. | **Restoration:** Permanent repair or replacement | Localized Flood Risk Reduction Projects<br><br>Non-localized Flood Risk Reduction Projects<br><br>Infrastructure Retrofit<br><br>Soil Stabilization<br><br>Post-Disaster Code Enforcement<br><br>Advance Assistance<br><br>5% Percent Initiative Projects:<br><br>Miscelaneous/Other |



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

**JA_525**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| **CATEGORY** | **TYPE OF PROJECT** | **ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO:** | |
| **D- WATER CONTROL FACILITIES** | Water Control facilities are does built for Channel alignment, recreation, navigation, land reclamation, irrigation, maintenance of fish and wildlife habitat, interior drainage, erosion prevention, flood control and storm water management. They include:<br>• Dams and reservoirs<br>• Levees and floodwalls<br>• Lined and unlined engineered drainage channels<br>• Canals<br>• Aqueducts<br>• Sediment and debris basins<br>• Storm water retention and detention basins<br>• Coastal shoreline protective devices<br>• Irrigation facilities<br>• Pumping facilities<br>• Navigational waterways and shipping channels | **1- Debris and silt removal required to restore capacity (engineered and maintained facilities only)**<br><br>• Eligible only if the Applicant provides documentation to establish the pre-disaster capacity of the facility and that the facility was actively used and maintained with a regular clearance schedule.<br><br>**2- Restoration: Permanent Repair or Replacement**<br>• PNP irrigation facilities are only eligible if they provide water for essential services of a governmental nature to the general public for fire suppression, generating and supplying electricity, and drinking water supply. | Localized Flood Risk Reduction Projects |
| | | | Non-localized Flood Risk Reduction Projects |
| | | | Soil Stabilization |
| | | | Post-Disaster Code Enforcement |
| | | | 5% Percent Initiative Projects |
| | | | Miscelaneous/Other |

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)

GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

**JA_526**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| **CATEGORY** | **TYPE OF PROJECT** | **ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO:** | |
| **E- BUILDINGS AND EQUIPMENT** | Buildings including:<br>• All structural and non-structural components, including mechanical, electrical, and plumbing systems.<br>• Contents and equipment within the building<br>• Furnishings<br><br>Equipment includes:<br>• Vehicles<br>• Construction equipment | 1- **Restoration – Permanent repair or replacement**<br>• Repair or replacement of buildings<br>• Repair or replacement of building components, vehicles or equipment with items similar in age, condition, and capacity.<br>• Replacement of destroyed contents with items similar in age, condition, and capacity.<br>• Recovering and stabilizing records.<br>• Stabilization of irreplaceable collections and individual objects is eligible.<br>• Re-shelving, cataloging, and other work incidental to the replacement of library books and publications.<br><br>2- **Demolition when replacing a facility including removal and disposal of associated debris.**<br><br>3- **Extracting water and removing mud, silt, or debris from interior in conjunction with repairs.**<br><br>4- **Mold remediation when conducted in conjunction with restoration of the facility**<br>• Post remediation sampling to confirm remediation is complete.<br><br>5- **Post-earthquake inspection and evaluation of welded steel moment frames in buildings to determine the level of disaster-related damage requiring repair.** | Property Acquisition and Structure Demolition<br><br>Property Acquisition and Structure Relocation<br><br>Structure Elevation<br><br>Wind Retrofit Projects<br><br>Soil Stabilization<br><br>Mitigation Reconstruction<br><br>Wildfire Mitigation<br><br>Advance Assistance<br><br>5% Percent Initiative Projects<br><br>Miscelaneous/Other |

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)

GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

**JA_527**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| **CATEGORY** | **TYPE OF PROJECT** | **ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO:** | |
| **F- UTILITIES** | • Water storage facilities, treatment plants, and delivery systems<br><br>• Power generation, transmission, and distribution facilities, including, but not limited to, wind turbines, generators, substations, and power lines<br><br>• Natural gas transmission and distribution facilities<br><br>• Sewage collection systems and treatment plants<br><br>• Communication systems | **Eligible restoration activities:**<br><br>• Permanent repair or replacement of any component of system, including buildings, structures, or systems, even if not contiguous.<br><br>• Electrical conductor replacement subject to specific criteria.<br><br>• Inspection or assessment of damaged components of a system.<br><br>• Inspection or assessment of an inaccessible structure or component of a system may be eligible, but only when there is evidence of damage, such as when sunken ground appears above a water pipeline. | Generators<br><br>Infrastructure Retrofit<br><br>Soil Stabilization<br><br>Post-Disaster Code Enforcement<br><br>Advance Assistance<br><br>5% Percent Initiative Projects<br><br>Miscelaneous/Other |

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)

Page | 4

GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

**JA_528**

| PUBLIC ASSISTANCE (PA) | | | HAZARD MITIGATION GRANT PROGRAM (HMGP) ELEGIBLE ACTIVITIES |
|---|---|---|---|
| **CATEGORY** | **TYPE OF PROJECT** | **ELIGIBLE WORK INCLUDING BUT NOT LIMITED TO:** | |
| **G- PARKS, RECREATIONAL, OTHER** | Eligible publicly owned facilities in this category include:<br>• Mass transit facilities such as railways<br>• Beaches<br>• Parks<br>• Playground equipment<br>• Swimming pools<br>• Bath houses<br>• Tennis courts<br>• Boat docks<br>• Piers<br>• Picnic tables<br>• Golf courses<br>• Ball fields<br>• Fish hatcheries<br>• Ports and harbors<br><br>Other facilities that do not fit in Categories C–F | Restoration – Permanent repair or replacement.<br><br>Restoration of engineered beaches is subject to specific eligibility criteria. | Infrastructure Retrofit<br><br>Soil Stabilization<br><br>Post-Disaster Code Enforcement<br><br>Advance Assistance<br><br>5% Percent Initiative Projects<br><br>Miscelaneous/Other |

AR_0011707



GOBIERNO DE PUERTO RICO
OFICINA DEL GOBERNADOR
JUNTA DE PLANIFICACIÓN

Reference: FEMA Public Assistance Program and Policy Guide (FP 104-009-2/April 2018) /Hazard Mitigation Assistance Guidance (February 27, 2015)

**JA_529**